UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

***************************

UNITED STATES OF AMERICA,
    Plaintiff

vs.                                            Case No. 1:16-cr-10343-ADB-7

JOHN KAPOOR,
    Defendant

***************************

TRANSCRIPT OF INITIAL APPEARANCE/ARRAIGNMENT
BEFORE THE HONORABLE JENNIFER C. BOAL
AT BOSTON, MASSACHUSETTS
ON NOVEMBER 16, 2017

APPEARANCES:

For the Plaintiff:
K. Nathaniel Yeager, Assistant United States Attorney
Susan M. Poswistilo, Assistant United States Attorney
David G. Lazarus, Assistant United States Attorney
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, Massachusetts 02210
617-748-3267

For the Defendant:
Brian T. Kelly, Esquire
Robert A. Fisher, Esquire
Nixon Peabody, LLP
100 Summer Street
Boston, Massachusetts 02210
617-345-1000


Transcriber:  Karen M. Aveyard,
              Approved Federal Court Transcriber

---

**TRANSCRIPTION PLUS**
**1334 ELM STREET**
**LEOMINSTER, MASSACHUSETTS 01453**
**(978) 466-9383**
**k.aveyard@comcast.net**

1          P R O C E E D I N G S

2

3          THE CLERK:  Today is November 16, 2017.  We're on the
4    record in the matter of United States v. John Kapoor.  Case
5    number is 16-cr-10343.
6          Will counsel please identify themselves for the
7    record.
8          MR. YEAGER:  Good morning, your Honor.  Nathaniel
9    Yeager for the United States.
10         MS. POSWISTILO:  Susan Poswistilo for the United
11   States.
12         MR. LAZARUS:  And David Lazarus for the United States.
13   Good morning, your Honor.
14         THE COURT:  Good morning.
15         MR. KELLY:  Good morning.  Brian Kelly and Robert
16   Fisher for John Kapoor.
17         THE COURT:  Good morning.
18         MR. FISHER:  Good morning.
19         THE COURT:  Mr. Kapoor, if you could please stand.  I
20   understand that you already would have received a reading of
21   your rights in Arizona, but they're important rights, so I'm
22   going to go over them again.
23         The purpose of this proceeding is to advise you of the
24   charges that have been filed against you, to advise you of your
25   rights, including your right to remain silent and your right to

1   counsel, to consider the appointment of counsel for you, to
2   consider detention, and to set a date for your next court
3   appearance.  Your initial appearance is not a trial and you
4   will not be asked to comment on the charges that are pending
5   against you.
6        I want to confirm that you understand that you have
7   the right to remain silent.  You do not have to make a
8   statement and anything that you do say may be held against you.
9   If you choose to make a statement or answer any questions, you
10  may stop answering at any time if you change your mind.
11       Do you understand?
12       THE DEFENDANT:  Yes, your Honor.
13       THE COURT:  You also have the right to be represented
14  by an attorney at any critical stage of the proceedings against
15  you.  You may consult with an attorney before you are asked any
16  questions and you may have an attorney present while you are
17  questioned.  If you cannot afford an attorney, counsel will be
18  appointed for you without charge.
19       Do you understand?
20       THE DEFENDANT:  Yes, your Honor.
21       THE COURT:  And do you wish the Court to appoint
22  counsel for you or do you wish to retain your own counsel?
23       THE DEFENDANT:  My own counsel, please.
24       THE COURT:  You have been charged in an indictment
25  with racketeering conspiracy, in violation of 18, United States

1  Code, Section 1962; mail fraud conspiracy, in violation of
2  18, United States Code, Section 1349; wire fraud conspiracy, in
3  violation of 18, United States Code, Section 1349; conspiracy
4  to violate antikickback law, in violation of 18, United States
5  Code, Section 371; and there are also forfeiture allegations.
6  　　　　　Do you have a copy of the indictment?
7  　　　　　THE DEFENDANT:  Yes, your Honor.
8  　　　　　THE COURT:  You may be seated.
9  　　　　　If the Government could please state the maximum
10 potential penalties.
11 　　　　　MR. YEAGER:  Thank you, your Honor.
12 　　　　　With regard to Count 1, racketeering conspiracy,
13 Mr. Kapoor faces a maximum of 20 years in prison, a fine the
14 greater of $250,000 or twice the amount of (inaudible) gain or
15 loss, three years supervised release and a special assessment
16 of $100.  In addition, notice of forfeiture is provided in the
17 indictment.
18 　　　　　Count 2, conspiracy to commit mail fraud, Mr. Kapoor
19 faces a 20-year possibility of imprisonment, a fine the greater
20 of $250,000 or twice the amount of (inaudible) gain or loss, a
21 supervised release of three years and a special assessment of
22 $100.  Again, notice of forfeiture is provided in the
23 indictment.
24 　　　　　Count 3, conspiracy to commit wire fraud, the maximum
25 penalty is 20 years, a fine the greater of $250,000 or twice

1   the amount of (inaudible) gain or loss, a supervised release
2   period is three years, the special assessment would be $100,
3   and again, notice of forfeiture is provided in the indictment.
4           With regard to Count 4, conspiracy to violate the
5   antikickback statute, the maximum penalty is five years, the
6   maximum fine is $25,000, the supervised release period is three
7   years, the special assessment is $100, and notice of forfeiture
8   was provided in the indictment.
9           THE COURT:  I know there's a motion to modify
10  Mr. Kapoor's conditions of release, but why don't we go through
11  the arraignment part of the proceeding first.
12          So, Mr. Kapoor, if you could please stand again.
13          Have you had the opportunity to review the indictment
14  with your attorneys?
15          THE DEFENDANT:  Yes, your Honor.
16          THE COURT:  And do you understand generally the
17  charges that are pending against you?
18          THE DEFENDANT:  Yes, your Honor.
19          THE COURT:  Are you prepared to enter a plea of not
20  guilty today?
21          THE DEFENDANT:  Yes, your Honor, not guilty.
22          THE COURT:  Do you waive the reading of the indictment
23  out loud?
24          THE DEFENDANT:  Yes, your Honor.
25          THE COURT:  Mr. York, if you could please take

1  Mr. Kapoor's plea.
2         THE CLERK:  Mr. Kapoor, as to Count 1 of the first
3  superseding indictment charging you with racketeering
4  conspiracy, in violation of Title 18, United States Code,
5  Section 1962(d), how do you plead, guilty or not guilty?
6         THE DEFENDANT:  Not guilty.
7         THE CLERK:  As to Counts 2 and 3 of the first
8  superseding indictment charging you with -- sorry.  As to
9  Count 2 of the first superseding indictment charging you with
10 mail fraud conspiracy, in violation of Title 18, United States
11 Code, Section 1349, how do you plead, guilty or not guilty?
12        THE DEFENDANT:  Not guilty.
13        THE CLERK:  And as to Count 3 of the first superseding
14 indictment charging you with wire fraud conspiracy, in
15 violation of Title 18, United States Code, Section 1349, how do
16 you plead, guilty or not guilty?
17        THE DEFENDANT:  Not guilty.
18        THE CLERK:  And as to Count 4 of the first superseding
19 indictment charging you with conspiracy to violate the
20 antikickback law, in violation of Title 18, United States Code,
21 Section 371, how do you plead, guilty or not guilty?
22        THE DEFENDANT:  Not guilty.
23        THE CLERK:  You may be seated.
24        THE COURT:  Mr. Kelly, do you wish to receive
25 automatic discovery?

1     MR. KELLY:  Yes, your Honor, we do.

2     THE COURT:  And how long will it take the Government

3  to provide Mr. Kapoor's attorneys with automatic discovery?

4     MR. YEAGER:  We've already begun, your Honor.  We've

5  provided discovery with regard to the previous defendants and

6  we intend to provide the 28-day discovery by Tuesday of next

7  week.

8     THE COURT:  And we have -- already, Mr. Kelly, we have

9  scheduled a number of status conferences.  The first one is

10 December -- the next one, really, is December 19th at 3:30,

11 followed by one on January 18th at 11:30 and March 8th at

12 11:30.  At least for the other defendants, we have excluded the

13 time through March 8th.

14     Do you agree to exclude the time through March 8th?

15     MR. KELLY:  Yes, we do, your Honor.

16     THE COURT:  Now, moving on to the motion to modify the

17 conditions of release, my first question is does the Government

18 oppose the motion to modify?

19     MR. YEAGER:  Yes, your Honor, the United States

20 objects to modifying the conditions of release.

21     THE COURT:  And what -- I understand -- perhaps you

22 could tell me a little bit about -- it's not clear to me, and

23 why I'm asking these questions is whether this motion is

24 properly before me or Judge Burroughs, it wasn't clear to me

25 what type of hearing occurred in Arizona.  I do note that

1  Mr. Kapoor signed a form that appears to preserve his rights to
2  a detention hearing here in Massachusetts.
3          MR. YEAGER:  He did, although I would note that the
4  docket notes that we have access to, which I think I provided
5  to Mr. York earlier today, indicated there was a detention
6  hearing in Arizona.
7          I think to get to the bottom line on it, your Honor,
8  Mr. Kapoor has a balance of factors that the United States took
9  into consideration.  He has access to a very large sum of
10 money.  I think that the probation report -- the Government has
11 a better understanding, I think, of his access to money.  We
12 believe he has access to at least $2 billion.  He owns a huge
13 amount of a company called Akorn Pharmaceuticals, which was
14 purchased by Fresenius, a Massachusetts corporation, in April
15 of this year.  He owns a substantial number of shares of the
16 stock related to that purchase, which right now is restricted,
17 but we, from public filings, understand will become available
18 any day now.  That by itself is worth $1 billion.  He has
19 indicated to Probation in excess of $100 million and we believe
20 it's far, far more than that.
21         So that creates a concern on the one hand because, you
22 know, he has access to leave the country.  We can't control
23 anything other than -- we can monitor commercial airlines, as
24 your Honor knows, but we can't monitor private aircraft.  In
25 addition, he lives in Arizona.  If he were to leave the United

1   States for Mexico or Canada, it would be very easy, based on
2   the means that he has, for him to obtain a flight to any number
3   of countries that do not have extradition treaties with the
4   United States.
5        So in considering that information, we spoke to
6   counsel for the defendant right after his arrest on the morning
7   of October 26th.  We indicated our intention to go forward on a
8   detention hearing and we asked whether or not there was a way
9   we could agree on all conditions.  And the parties agreed.  We
10  agreed on many of the conditions that ultimately Judge Burns
11  imposed, including a $1 million cash bond, restrictions on
12  travel that are included in the conditions that are imposed by
13  Judge Burns, as well as electronic monitoring.
14       The defendant posted the bail and he was shortly
15  thereafter placed on a bracelet.  He's been on a bracelet ever
16  since.  So nothing has changed since that moment.
17       I would point out that all of the arguments that the
18  defendant makes in their Motion to Modify Conditions were
19  available to the defendant in Arizona and those arguments were
20  not made.  In fact, they agreed to the conditions as they
21  exist.
22       THE COURT:  Which is one of the reasons why I'm asking
23  if there's an appeal or a change in conditions, and that would
24  suggest to me whether or not it should be in front of me or
25  Judge Burroughs.

1           Do you have a position on that?

2           MR. YEAGER:  So I think, based on my reading of the
3 caselaw, and I recognize that the caselaw is growing in this
4 area, I believe he's entitled to one detention hearing and that
5 detention hearing occurred in Arizona.

6           THE COURT:  But you haven't answered my question.

7           MR. YEAGER:  So that would mean that he has to go to
8 Judge Burroughs.

9           THE COURT:  Okay.  And I know you've told me that he
10 has a lot of money, but other than the money, what is your
11 evidence of a risk of flight?

12          MR. YEAGER:  Well, I would say that the two factors I
13 think the Court should take into consideration are the fact of
14 the quantity of money that he has.  In addition, the strength
15 of the evidence against Mr. Kapoor.

16          THE COURT:  So I guess what you're telling me you have
17 no evidence that other than he has money, he has taken no
18 actions that indicate to you that he intends to flee?

19          MR. YEAGER:  We're not aware of any actions he's taken
20 if he intended to flee.  We would have moved to detain -- we
21 would have not agreed to these conditions if we were aware of
22 specific actions other than what we've talked about, other
23 information that we've talked about.

24          So I don't -- he's a permanent resident of the United
25 States.  He's lived in Phoenix for a long time.  He has family

1    there.  Those things are all true.  I could have asked for
2    money to secure his presence, your Honor, but the truth is that
3    the amount of money that he has, we could never truly secure
4    his presence.  If he leaves, he has resources that he could
5    stay in another country forever.  We'd have a very difficult
6    time getting him back.
7            So based on that, that's why we're asking for this
8    middle ground of a bracelet.
9            THE COURT:  Alright.  Thank you.
10           MR. KELLY:  Yes.  Good morning, your Honor.
11           So just procedurally so the Court knows, I do believe
12   it's properly in front of this Court.  There was no detention
13   hearing in Phoenix.  I did, in fact, appear in Phoenix and
14   there was no detention hearing.  His conditions were set.  At
15   the time, the Government advised it was going to seek a
16   detention hearing if we did not acquiesce to an electronic
17   monitoring bracelet.
18           Now, the defendant is a 74-year-old man, he had been
19   arrested at 7 a.m. by a dozen armed agents, and the prospect of
20   sitting in jail waiting for the mandatory three-day detention
21   hearing, and this was a Thursday until Monday, was not very
22   inviting.  So there was never any promise that we wouldn't seek
23   modifications of the conditions of release and that's what
24   we're doing here today.
25           The defendant has, in fact, already posted a

1   significant bond of $1 million.  Perhaps contrary to the
2   suggestion in the report, he's already surrendered his
3   passport.  I think this report was taken the day of his arrest
4   and the reference to his passport being at home is from that
5   day, not now.  So the Government has his passport.  He can't go
6   anywhere.
7           He's restricted to travel within Maricopa County where
8   he lives in the Phoenix area, where he's been for over 20
9   years.  He is, in fact, a citizen of this country.  He's been
10  here for more than 50 years.  He doesn't have a citizenship in
11  any other country; he's not interested in going to any other
12  country.  We believe that the Bail Reform Act simply does not
13  require that he wear this bracelet.  It requires the least
14  restrictive means possible.
15          The burden is on the Government.  The caselaw is clear
16  that they have to establish that this condition is necessary,
17  and it really isn't.
18          Now, it's not the defendant's burden, but, in fact, in
19  this case he's already proven he's not a flight risk.  And why
20  do I say that?  Although it's not his burden, he's proved he's
21  not a flight risk in many ways.  He's known about this
22  investigation since back in 2013 when the first subpoena was
23  served.  He's known he's been a target of the Government's
24  investigation.  Indeed, last December his co-defendants were
25  arrested.  If someone who is wealthy wants to flea, that's the

1   time to leave town.  He didn't leave town.  He stays here.
2   He's going to fight the defendant's good name.  He believes
3   he's not guilty, there's no proof that he's guilty, and he's
4   presumed guilty.
5         So that is the test, and, frankly, you know, there's
6   another test even more recently.  In early September, through
7   no fault of the Government, I understand it was an inadvertent
8   bureaucratic mixup, but, in fact, a letter was inadvertently
9   leaked out to the press that he was named as a co-conspirator
10  by the Government in its automatic discovery letters.  I'm not
11  complaining; I'm not blaming the Government.  These things
12  happen.  But the reason I raise it is because it is extremely
13  strongproofed that he knew he was under the Government sights.
14  He knew he was a target.
15        His co-defendants have already been arrested.  He gets
16  that notice.  He could have fled then with all his wealth.  And
17  we don't dispute he's made a lot of money in his life and that
18  shouldn't be held against him.  There's nothing in the Bail
19  Reform Act that says people with money are treated differently
20  than people without money, because the Government can just flip
21  this argument around and say well, this person has no money,
22  what do they have to lose, they'll run.  Now they're saying
23  well, he's got so much money, he'll run.
24        In fact, his money is one of the many reasons, besides
25  the fact he has no intention of running away, he's not going to

1   leave all this money on the table.  If he runs away, the
2   Government gets all his assets.  Why should he leave.  He has
3   no interest in leaving, he's proven that already in this case,
4   and if you look at the weight of the evidence here, you know,
5   the indictment is really pretty thin on him.  They talk about
6   e-mails, they talk about statements, all with respect to the
7   co-defendants.  With him, it's oh, he's blind copied on an
8   e-mail.  That's not exactly, in my opinion, something that's
9   going to be proved beyond a reasonable doubt at trial, and the
10  defendant believes that too.  The defendant wants to fight this
11  case and he's going to go to trial.
12          Now, certainly the charges are serious.  Any felony
13  charge in Federal Court is serious.  But the six co-defendants,
14  they're facing the same charges.  In fact, none of them have
15  bracelets because it's not necessary for them either.  In fact,
16  one of them, the lead defendant, he's only the seventh
17  defendant, but the number one defendant, Babich, he's a wealthy
18  guy too.  He lives in Arizona.  He's got no bracelet.
19          So we think the defendant deserves the same
20  consideration.  We think it's totally unnecessary.  It's not
21  required by the Bail Reform Act.  We don't dispute he has
22  assets, but that's, in our view, a reason he's going to stay
23  here.  He intends to fight this case and he wants to be
24  vindicated, and we think he will be vindicated.
25          So we would ask the Court to take those factors into

1     consideration and order that the bracelet be removed.
2               THE COURT:  Thank you.
3               MR. YEAGER:  May I respond briefly, your Honor?
4               THE COURT:  Yes.
5               MR. YEAGER:  So there's a couple points I would like
6     to make with regard to Mr. Kelly's argument.  The first is, you
7     know, it's true that Mr. Kapoor was aware of the ongoing
8     investigation of him.  We had regular conversations with his
9     attorney, and there's many other factors that make it clear he
10    knew about the potential indictment and didn't run.  He cites
11    in his motion to modify conditions several cases, one of which
12    is from this district, Simone, and there's two others.  Two of
13    the three cases that he cites, the defendants ultimately were
14    released on bail with conditions of release, including the
15    Simone case that he relies on.
16              So the Simone case, fine, yes, you can consider his
17    willingness to stay despite the fact that he knows he's a
18    target, but then that same judge considered that and released
19    the defendant on a bracelet, as well as 24-hour home arrest.
20              You know, in addition, we reached agreement with
21    defense counsel in Arizona, your Honor.  We did so believing
22    that he agreed that these were reasonable conditions for
23    release.  Now we're standing before your Honor having to argue,
24    based on what Mr. Kelly is saying, that the statute doesn't
25    apply.  We already agreed that the statute applied in Arizona.

1           I think the argument about money that he's making is
2  pretty offensive.  It is, therefore, because of it --
3           THE COURT:  I'm sorry, what statute applied?
4           MR. YEAGER:  The bail factors.  The bail factors
5  should be -- we have the burden to establish all the bail
6  factors despite the fact that he agreed that we did so in
7  Arizona.  So he agreed that the conditions were appropriate
8  under the bail statute in order to assure his client appeared
9  at trial.
10          But as far as the money he's making about -- the
11 argument that he's making about money, your Honor, he's saying
12 that because his client is very wealthy, that he stands to lose
13 a lot of money if he flees, and that argument, your Honor, at
14 its core, is if I'm wealthy, I don't have a risk of flight, and
15 it's an offensive argument.  What we're saying is you need
16 consider -- we're asking the Court to consider the fact that he
17 does have a lot of money, that there are reasonable conditions
18 that don't require him to be held in custody, but that can
19 ensure his presence here, and that is a bracelet.
20          THE COURT:  Why is it a bracelet as opposed to
21 electronic monitoring with a curfew so at least you get some
22 idea?
23          Why does he have to be on a GPS?
24          MR. YEAGER:  So the way the conditions are written in
25 Arizona, your Honor, was that it's determined by the Pretrial

1   Services Officer.  I checked with the Pretrial Services Officer
2   last night.  They put him on GPS monitoring.  So we're open to
3   a bracelet without GPS if that's something the Court thinks is
4   appropriate, and I think that that's splitting hairs.  But that
5   decision was ultimately made by the Pretrial Services Officer
6   in Arizona.
7           THE COURT:  Mr. Kelly, what about --
8           MR. KELLY:  Yeah.  I don't know what's offensive about
9   refuting his argument.  It's his argument that because the guy
10  has money, he should have a bracelet on, and I'm saying that's
11  not an appropriate argument.  A person's wealth or lack of
12  wealth is not the guiding factor here.
13          And of course the Bail Reform Act applies to this
14  situation.  We've never said otherwise.
15          Now, again, as I indicated, if the defendant, upon
16  arrest at 7 a.m., is looking at three or four days in jail in
17  Phoenix, of course he's going to agree to a bracelet versus
18  detention.  There was never any agreement that forevermore this
19  could not be revisited, and that's what we're asking the Court
20  to do.  He's presented no evidence of risk of flight other than
21  the abstract notion that he's rich, hence he might run.  But
22  the guy hasn't left the country since April of 2016 for
23  vacation in Mexico.  All of his friends and family, his
24  charitable works, his businesses, are in the Phoenix area.
25  That's where he lives.  He's not going to desert the U.S.A.

1   because of this case.  He doesn't believe it's a strong case.
2   He wants to fight this case.  And under the Bail Reform Act,
3   what's the least restrictive measures that can be taken to
4   assure his appearance?  He'll be back whenever the Court wants
5   him.
6          So we strongly urge the Court to modify this
7   condition.
8          THE COURT:  And what about Mr. Yeager's suggestion
9   about a different type of electronic monitoring?
10         MR. KELLY:  Well, it's the cumbersome device on his
11  foot.
12         THE COURT:  I see.
13         MR. KELLY:  That's the problem.  That's what we're
14  interested in having you look at.
15         THE COURT:  Alright.  Thank you very much.  I will
16  take it under advisement.
17
18         (The hearing was concluded.)

# C E R T I F I C A T I O N

I, Karen M. Aveyard, Approved Federal Court Transcriber, do hereby certify that the foregoing transcript, consisting of 18 pages, is a correct transcript prepared to the best of my skill, knowledge and ability from the official digital sound recording of the proceedings in the above-entitled matter.

/s/ Karen M. Aveyard

Karen M. Aveyard

November 22, 2017

Date

Case 1:16-cr-10343-ADB   Document 246   Filed 11/24/17   Page 19 of 19

19