UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

***************************

UNITED STATES OF AMERICA,
        Plaintiff

vs.                                 Case No. 1:16-cr-10343-ADB

MICHAEL L. BABICH ET AL,
        Defendants

***************************


TRANSCRIPT OF INTERIM STATUS CONFERENCE/MOTION HEARING
BEFORE THE HONORABLE JENNIFER C. BOAL
AT BOSTON, MASSACHUSETTS
ON JULY 17, 2018


APPEARANCES:

For the Plaintiff:
K. Nathaniel Yeager, Assistant United States Attorney
Susan M. Poswistilo, Assistant United States Attorney
David G. Lazarus, Assistant United States Attorney
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, Massachusetts 02210
617-748-3311
617-748-3103
617-748-3100




Transcriber:  Karen M. Aveyard,
              Approved Federal Court Transcriber

    -----------------------------------------------------

**TRANSCRIPTION PLUS**
**1334 ELM STREET**
**LEOMINSTER, MASSACHUSETTS 01453**
**(978) 466-9383**
**k.aveyard@comcast.net**

APPEARANCES (continued):

For Defendant Michael L. Babich:
William H. Kettlewell, Esquire
Hogan Lovells, LLP
100 High Street, 20th Floor
Boston, Massachusetts 02210
617-371-1005

For Defendant Alec Burlakoff:
George W. Vien, Esquire
Donnelly Conroy & Gelhaar, LLP
260 Franklin Street
Boston, Massachusetts 02110
617-720-2880

For Defendant Michael J. Gurry:
Tracy A. Miner, Esquire
Demeo, LLP
200 State Street
Boston, Massachusetts 02109
617-263-2600

For Defendant Richard M. Simon:
Patrick J. O'Toole, Jr., Esquire
Weil Gotshal & Manges
100 Federal Street
Boston, Massachusetts 02110
617-772-8365

For Defendant Sunrise Lee:
Peter C. Horstmann, Esquire *(Telephonically)*
450 Lexington Street, Suite 101
Newton, Massachusetts 02466
617-723-1980

APPEARANCES (continued):

For Defendant John Kapoor:
Beth Wilkinson, Esquire
Kosta S. Stojilkovic, Esquire
Wilkinson Walsh & Eskovitz
2001 M Street NW
Washington, DC 20036
202-847-4000

Aaron M. Katz, Esquire
Brien T. O'Connor, Esquire *(Telephonically)*
Ropes & Gray, LLP
800 Boylston Street
Boston, Massachusetts 02199
617-951-7117

1                        P R O C E E D I N G S

2

3          THE CLERK:  Today is July 17, 2018.  On the record in

4    the matter of the United States v. Michael Babich et al,

5    Case number is 16-cr-10343.

6          Will counsel please identify themselves for the

7    record.

8          MR. YEAGER:  Good afternoon, your Honor.  Nathaniel

9    Yeager for the United States.

10          MS. POSWISTILO:  Susan Poswistilo for the United

11    States.

12          MR. LAZARUS:  David Lazarus for the United States.

13    Good afternoon, your Honor.

14          THE COURT:  Good afternoon.

15          MR. KETTLEWELL:  Good afternoon, your Honor.  William

16    Kettlewell for Michael Babich.

17          MS. MINER:  Good afternoon, your Honor.  Tracy Miner

18    for Mike Gurry.

19          MR. VIEN:  Good afternoon, your Honor.  George Vien

20    for Mr. Burlakoff, and I think Mr. York approved it, that I'm

21    also standing in for Mr. Kendall, who represents Mr. Rowan, who

22    is tied up right now in a hearing before Judge Stearns.

23          THE COURT:  Alright.  Thank you.

24          MR. VIEN:  Thank you.

25          MR. O'TOOLE:  Good morning, your -- good afternoon,

1    your Honor.  Patrick O'Toole for Rich Simon.

2            MS. WILKINSON:  Good afternoon, your Honor.  Beth

3    Wilkinson for Dr. Kapoor.

4            MR. KATZ:  Good afternoon, your Honor.  Aaron Katz for

5    Dr. Kapoor.

6            MR. STOJILKOVIC:  And good afternoon.  Kosta

7    Stojilkovic, also for Dr. Kapoor.

8            THE COURT:  And I believe we have some folks on the

9    telephone.

10           MR. O'CONNOR:  Thank you, Judge Boal.  It's Brian

11   O'Connor on by phone for Dr. Kapoor.

12           MR. HORSTMANN:  Thank you, your Honor.  Pete Horstmann

13   for Sunrise Lee.

14           THE COURT:  Alright.  Good afternoon, everyone.  So

15   that folks can hear on the phone, where possible I'm going to

16   ask counsel who are arguing to stay seated and pull the

17   microphones towards them, and that's the way we found is the

18   best for folks on the phone to hear what is going on.

19           So there are, I think, two outstanding motions pending

20   before me.  Why don't we start with the Bill of Particulars,

21   and I wanted to start with a question for the defendants.  My

22   question is, I acknowledge the principle that in general a Bill

23   of Particulars can't cure a deficiently pled Indictment, but my

24   question for the defendants, especially given Judge Burroughs's

25   argument this morning, is what, if any, is the overlap between

1    the Motion to Dismiss before Judge Burroughs and the

2    defendants' Motion for a Bill of Particulars?

3         MR. KATZ:  Your Honor, this is Aaron Katz for

4    Dr. Kapoor and the other defendants.

5         I think the overlap is very minimal, which is to say

6    if the RICO count were dismissed, that would take care of

7    Request No. 1 and maybe portions of Request No. 2.  The rest of

8    our requests are not geared towards necessarily the elements of

9    the offenses.  They're not meant to flesh out elements that

10   have not been adequately pled in the Indictment.  Instead, it

11   is to avoid unfair surprise.

12        The Government likes to say that a long Indictment is

13   a roadmap to its case, and the problem with this Indictment is

14   that it does provide certain points of a roadmap, and I point

15   the Court to paragraphs such as 142 and 143, 142 being an

16   allegation about Practitioner No. 2.  There's a line in there

17   that says many of the speaker program events, the latter

18   attended by Practitioner No. 2, were sham events.

19   Paragraph 143 says that INSYS submitted 984 prescriptions for

20   SUBSYS to insurance companies, and here's one example of a

21   false one.  That indicates to us that to prove up the

22   conspiracy circumstantially, they're going to put in evidence

23   that not just that there was an agreement, but that these

24   things actually occurred.  Sham events occurred, false

25   statements were made to insurance companies, and we are here

1    saying it's not enough to say many.  It's not enough to say

2    they did a hundred programs and many of them, or 30 percent of

3    them, were shams, and we're not going to tell you which ones.

4    It's not enough to give us one example of a false insurance

5    claim and say we could put in 983 more potentially at trial,

6    you can go figure it out.

7         We want to be given some advance notice.  We're not

8    asking for a witness or an exhibit list about how they're going

9    to prove those up.  But like United States versus Nachamie out

10   of the SDNY, U.S. v. Bortnovsky in the Second Circuit, we are

11   asking for some advance identification about which insurance

12   claims you're going to say were false and which programs you're

13   going to say were shams, because I think the Government would

14   concede that generally speaking, it's not illegal to pay a

15   doctor, even a prescriber, to do an educational legitimate

16   speaker program, and it's certainly not illegal for a company

17   to submit an insurance claim on behalf of a patient.  These

18   things are completely protected by the anti-kickbacks that you

19   safe harbor.  So we need to be given some advance notice.

20        The key, your Honor, about why we need that is

21   actually found in recent discovery letters that the Government

22   has given us.  May 31, 2018, we get a discovery letter from

23   Mr. Yeager.  It's actually a Brady letter issued by the SDNY to

24   a defendant in one of the cases in the SDNY.  They actually had

25   their agents, apparently post-Indictment, go out and interview

1    alleged attendees of speaker program events, events that may be

2    within that category of shams, and many of the attendees that

3    they're interviewing are saying they weren't shams, they were

4    educational.  There was a 20- or 30-minute presentation given.

5    Yeah, maybe I attended two or three in a single week, but

6    that's because I learn something new each program.  That's the

7    type of defense that we could not put on if we were left to

8    wait until trial to see what program a witness says was a sham.

9    So that's really all we're asking for.

10        I understand that in many cases in this district, Bill

11   of Particulars are not given.  I think that Indictments in

12   those cases, Reikel (PHONETIC), for example, Cadden, Stryker

13   Biotech, a case that I spent four years on, certainly all those

14   Indictments were significantly more detailed than this one when

15   it comes down to where the rubber hits the road.  In many of

16   those cases, Stryker Biotech springs to mind in particular.

17   The Government said look, we are not going to go outside the

18   Indictment at trial.  The examples in the Indictment, that's

19   going to be exhaustive of what we say false statements were

20   when it comes down to trial.  I don't think any of us have the

21   confidence that that is going to be true here.

22        THE COURT:  My understanding is, in front of Judge

23   Burroughs there was some discussion with respect to Counts 2

24   and 3 about whether or not there was sufficient information

25   about the individuals or types of individuals or entities that

1    were involved in either the honest services portion of the

2    scheme or the obtaining money and property by means of material

3    false means.  Is that some clarity, some types of clarity, that

4    you are seeking with the Bill of Particulars motion or not?

5              MR. KATZ:  That does fall into one of the categories.

6    So if you look at our --

7              THE COURT:  And I'm sorry to interrupt you, but I

8    thought perhaps it might fall into, and you can tell me if I've

9    misunderstood the papers, but if I'm looking at your Memorandum

10   in Support of the Motion for a Bill of Particulars, perhaps

11   Item No. 3.

12             MR. KATZ:  That's exactly right, your Honor.

13             THE COURT:  Okay.

14             MR. KATZ:  As I said that to Judge Boal this morning,

15   we get that the Government is claiming that all seven

16   defendants agreed both to bribe doctors and agreed to defraud

17   insurance companies, even though certain defendants, like, for

18   example, Defendant Michael Gurry, had absolutely nothing to do

19   with physician relationships, nothing to do with speaker

20   programs.  We get that they're charging it.  What is very

21   confusing is understanding, for example, which sales reps that

22   you included on your list of unindicted co-conspirators, I

23   think there's about 70 of them, which of those sales reps

24   weren't just involved allegedly in bribing physicians, but

25   which were involved in helping the Internal Reimbursement

1    Center based in Phoenix lie to insurance companies.  We just

2    don't have that level of detail.  One of the confusing aspects

3    of the Indictment, which Judge Burroughs highlighted this

4    morning, was that there really arguably two separate

5    conspiracies packed into Count 2 and two separate conspiracies

6    packed into Count 3, so it doesn't really help us for the

7    Government to say well, every unindicted co-conspirator is

8    involved in each of those schemes.  We need more detail, which

9    reps were involved in just the physician one, but not the

10   insurance one, which ones were involved in both, and are you

11   saying that, you know, folks in the Internal Reimbursement

12   Center were involved in the kickback scheme.  That would go a

13   long way towards clarifying that ambiguity.  Of course it's not

14   all we're asking for.

15          The other item I do want to flag because Mr. Yeager,

16   this morning, highlighted that they are going to put in

17   evidence -- at least this is how I heard it, he can correct me

18   if I'm wrong -- that Haitians were receiving SUBSYS without a

19   legitimate medical need.  We have been given no information

20   sufficient to prepare a defense to that allegation.

21          Discovery letters that we have gotten, again, from

22   Mr. Yeager that he received from other districts, indicate that

23   when the Government and other districts hand patient files to

24   an expert, the experts are saying no, these patients look like

25   they had a legitimate medical need for this product.  And so if

1    Mr. Yeager is going to have witnesses coming up at trial saying

2    yeah, half the patients didn't need it or, you know, there were

3    a handful of patients that I prescribed it to that didn't need

4    it, we would like some advance identification about who those

5    patients are so that we can retain our own expert to review the

6    medical records.

7            In some cases, we may not even have medical records.

8    Of course we could, if we were left to nothing else, impune the

9    credibility of the witness.  Some of these witnesses are

10   cooperators.  We don't think they're credible.  But we would

11   like to have all available defenses to us.  We would like to

12   have the ability to actually prepare to meet that allegation

13   rather than just say well, you're not credible.

14           THE COURT:  Anything else?

15           MR. KATZ:  You know, your Honor, I think our briefs

16   largely speak for themselves.

17           I would point your Honor both to the appendix that we

18   list in Exhibit 1, but also the discovery letter we gave to the

19   Government at the outset.  I think that really does walk

20   through the paragraphs that we want clarification on or what

21   clarification we would like.  Mr. Yeager, this morning, called

22   it interrogatories.  It's not.  Again, we're not asking for

23   interrogatory responses; we're not asking for an exhibit list

24   or a witness list.  We're asking for information that will

25   allow us to avoid being surprised at trial.

1          THE COURT:  Alright.  So I did have a question for the

2     Government, particularly on the venue request, and as I read

3     the Government's brief opposing the Bill of Particulars, it

4     talked about reasons why there was adequate venue information,

5     except as to the mail fraud conspiracy.  Did I miss that?

6          MR. YEAGER:  So the mail fraud conspiracy, your Honor,

7     relates to the honest services fraud, and specifically the

8     bribes that take place at sham dinners.  So the sham dinners

9     occur in Massachusetts, those are bribes that go to honest

10    services, and that is how you have venue over the mail fraud

11    conspiracy.

12         THE COURT:  So I thought actually what you were

13    relying on, and I didn't see it really developed in the brief,

14    was, rather, this allegation that the defendants had contracted

15    with a mail pharmacy in New York that stated that they could

16    ship to 32 states, including Massachusetts.  That's not what

17    you're relying on?

18         MR. YEAGER:  So I can rely on that.  I don't mean to

19    limit myself with regard to the answer, but we provided

20    discovery to the defendants --

21         THE COURT:  Well, I mean, in terms of not limiting

22    yourself, I'm asking what your response is.

23         MR. YEAGER:  No, I know.  I don't want to -- so I

24    didn't mean to -- what I'm saying -- what I meant to say, your

25    Honor, I didn't mean to limit myself.

1          So I understand you're asking, and the answer is that

2     the venue that exists, both in terms of that paragraph, but

3     more generally with regard to mail fraud in terms of the sham

4     speaker programs that are alleged, and there are allegations of

5     sham speaker programs that occur in Massachusetts -- I think we

6     detailed this in my memorandum, your Honor, if I can follow up

7     if I'm wrong about that -- you know, there were multiple sham

8     dinners that were provided to -- evidence to provide to the

9     defendants in terms of Grand Jury testimony of several

10    different witnesses, and there were explicitly -- the dates and

11    times of those dinners and the attendees of those dinners were

12    provided to the defendants in the course of discovery in this

13    case.

14          MR. KATZ:  Your Honor, if I may --

15          THE COURT:  Yeah.

16          MR. KATZ:  -- that's one category where if the

17    Government is representing that the -- and I don't think it's

18    several, I think it might be two or three -- speaker

19    presentations that we have identified in the discovery, and

20    it's massive discovery as your Honor knows, but we have

21    identified two or three that occurred in or around Boston, if

22    he's saying that's how we're going to prove venue on, he calls

23    it the mail fraud count, I guess I'd call it the honest

24    services fraud count, yeah, I think, frankly, we can defend

25    against that because it's a universe of two or three as

1    contrasted to a physician who, over a three-year period, gives,

2    you know, a hundred speaker programs, and they're saying well,

3    30 percent are false, you figure it out.

4          But I agree that if the Government is representing

5    that's how we're going to prove venue, that concession has

6    helped it arguably moot some of our requests on the venue

7    issue.

8          THE COURT:  Alright.  Anything else, Mr. Yeager, on

9    the Bill of Particulars motion?

10         MR. YEAGER:  Just very quickly --

11         THE COURT:  Yes.

12         MR. YEAGER:  -- because I don't think we have an

13    agreement as far as what happened with Judge Burroughs today.

14         First of all, I think most importantly, I agreed that

15    I would provide some aspect of a Bill of Particulars.  It

16    wasn't clear what that would be.  We want to sort of think

17    about it and talk to the Court to address her Honor's concerns

18    with regard to the case, and I said that on the record.

19         THE COURT:  Obviously, I wasn't there.

20         MR. YEAGER:  No, I know.  I just --

21         THE COURT:  That's not what I understood happened.

22         MR. YEAGER:  Counsel was though and I thought -- I was

23    just trying to make clear that in terms of the Court's

24    decisionmaking process, I've already conceded that we're

25    willing to do that.

1        I think there is a couple of things that her Honor

2   took issue with with regard to the mail fraud and --

3        THE COURT:  And I'm sorry, Mr. Yeager, let me just

4   stop you there.

5        For my purposes, when are you going to provide that

6   material to the defendants?

7        MR. YEAGER:  Can I respond later, your Honor, I just

8   want to double check?

9        THE COURT:  Well, I'm just trying to determine, and it

10  sounds like what you're asking me to do is to hold off on

11  ruling on the Motion for a Bill of Particulars because you're

12  going to provide information to the defendants that might moot

13  out parts of their motion.

14       MR. YEAGER:  So let be clear, I think we're talking

15  about two different things with regard to the defendants.

16       THE COURT:  Okay.

17       MR. YEAGER:  I think the defendants want things above

18  and beyond what we're willing to provide -- what we think we

19  should be required to provide in terms of the Bill of

20  Particulars, and those are addressed in their memorandum.  We

21  agreed today to provide -- her Honor wanted the standard

22  object, manner and means type of information, and we agreed to

23  do that in court today.

24       So we object to the defendants' motion here with

25  regard to a Bill of Particulars, specifically with regard to

1   what you just discussed to Count 3.  I don't have a problem

2   explaining some of the basics as far as the allegations are

3   concerned.  What I don't want to do is what's alleged in

4   Count 3, go line by line, paragraph by paragraph, every time

5   the word "co-conspirator" is said, and lay out who the

6   co-conspirator is and how it worked.  I don't think that's

7   reasonable and I don't think it's justified by the caselaw.

8           I do think, you know, our Bill of Particulars can say

9   to them, you know, how we intend to -- basic manner and means,

10  as your Honor asked for, and they can glean from that, if they

11  can't from the Indictment already, how we intend to prove our

12  charges.

13          THE COURT:  So are you asking me to hold off on making

14  a decision or are you not?

15          MR. YEAGER:  Yes, I think just in terms of wasting the

16  Court's time --

17          THE COURT:  Okay.  So then if you're going to ask me

18  to hold off, I want a date by which you're going to provide it

19  to the defendants.

20          MR. YEAGER:  May I have two weeks, please?

21          THE COURT:  Alright.  And then a week after that, can

22  you tell me whether or not it satisfies your request or?

23          MR. KATZ:  I think we would be fine with that, your

24  Honor.  What I'm hearing from Mr. Yeager, and it's, you know, a

25  bit unclear what he intends to provide, I think at the hearing

1   this morning we talked about, for example, the mailings and the

2   wires, which is not what we need and what we're looking for to

3   be able to actually prepare a defense.  But it sounds like he's

4   promising to provide things that will not be sufficient, so we

5   likely will be back in front of your Honor.

6        And I understand Mr. Yeager's position, I do.  The

7   Government always hates to be -- they say a Bill of Particulars

8   will hem us in.  We'll be, you know, in a straightjacket.

9   Clearly, not what we're trying to do here.  We're trying to get

10  the information that, again, I'll go back to Nachamie again,

11  there were 2,000 Medicare claims that were submitted and the

12  court said you need to issue a Bill of Particulars to identify

13  which among those 2,000 were false and why they were false.

14  That's basically what we're asking on the speaker programs,

15  which were legitimate, which were false.  On the INSYS

16  reimbursement claims, which were false, which were not false.

17  Also the patients.  You know, if they have patients that

18  they've identified as having gotten SUBSYS without medical

19  necessity, identify those for us.

20       And, you know, I cannot emphasize this enough, it will

21  prejudice us if a witness gets up there, and without

22  identifying any event or any patient in particular, says 30

23  percent were shams, or 25 percent didn't need it, or 50 percent

24  were addicts that got it.  That's like a summary witness going

25  up and summarizing information that we have not been provided.

1    It would be deeply prejudicial and unfair.

2         If they can't specify the evidence, then they should

3    just say so.  They should just say they don't actually have the

4    evidence and they're not going to put it on at trial.

5         MR. YEAGER:  So that's where we disagree, your Honor.

6    If the Court is going to rule after I file my Bill of

7    Particulars and the defendants object to that, I'd like to sort

8    of make a couple of points about what they're saying.

9         The first is that it's true that there are cases.

10   It's obviously within the Court's discretion to allow the Bill

11   of Particulars.  We understand that.  But there are cases out

12   there that talk about it and they have specific reasons, your

13   Honor, they're talking about with fraud.

14        So, for instance, we turned over all of the recordings

15   of the calls.  What they're asking for is a trial list of which

16   recordings we intend to introduce at trial.  They actually say,

17   and they've said it in their arguments today and they say

18   repeatedly in the Reply Memorandum and in their original

19   motion, they talk about proof at trial, proof at trial,

20   constantly.  What they want is discovery and that's not the

21   purpose.  I agree her Honor made it clear this morning, and I

22   don't know what the Court's position is, that I need to clarify

23   some things, and we will do that.  But what they're talking

24   about is hamstringing the Government's case now six months

25   before trial and that's the distinction I'm making.  That's

1    true with regard to requests for victim names, with regard to

2    requests for a line-by-line description of the co-conspirators

3    in the Indictment, and for all of the kickbacks that are out

4    there.

5         These are conspiracies that are alleged, as the Court

6    knows, and we don't have to prove even the fruition of them.

7    We have to prove that there was an intent to do these things

8    and that there was an agreement, and their request goes beyond

9    the bounds of that.  That's the Government's position, as we

10   say in our brief.

11        MR. KATZ:  Nachamie, conspiracy case; Bortnovsky,

12   conspiracy case.  So this idea that it's a conspiracy case, and

13   so they don't need to prove certain overt acts, there's no

14   answer when they say, but circumstantially to prove the

15   agreement, we're going to put in all these overt acts.  Which,

16   by the way, I will speak for Dr. Kapoor, he wasn't involved in

17   the IRC.  He was not an employee of the IRC.  He doesn't know

18   which phone calls are being made on a daily basis.  These phone

19   calls that Mr. Yeager is referring to, these 3 or 4,000 phone

20   calls, I'd be hard pressed to say that my client has ever heard

21   them ever.  There's, I think, nine of them highlighted in the

22   Indictment, eight of which are easily found in the discovery.

23   I will give Mr. Yeager credit for that.  The ninth has been

24   impossible for us to find at this point.

25        But you need to listen to the phone call, you need to

1  then find who the patient is, see if you happen to have the

2  patient's medical records in the discovery, go back to the

3  patient's medical records to see if it lines up with the

4  information on the phone call.  If it does line up with the

5  information on the phone call, you then need to go back and see

6  whether there was some conspiracy between the sales rep and the

7  doctor to falsify the information that the Internal

8  Reimbursement Center received.  That takes hours and hours and

9  hours.

10          We've already identified one mistake that they've made

11  in the Indictment on their examples.  If they come in to court

12  with 20 or 30 or 40 more examples from this universe of 4,000

13  and we don't have more than a day or two's notice, we will not

14  be able to defend against that allegation.  We will be limited

15  to saying there was no agreement, you're lying, you're a

16  cooperator.

17          MR. YEAGER:  If I might, your Honor, you know, I don't

18  think the portrayal that the Court has received demonstrates

19  what information they've been given.  Their reply specifically

20  states, I believe, that they didn't get hot documents, for

21  instance, and but for the label of hot documents, my office and

22  my unit, we specifically require people in cases like this to

23  either provide hot documents or all of the Grand Jury exhibits

24  and testimony.

25          We turned over more than 700 Grand Jury exhibits in

1    this case and all of the Grand Jury testimony to the defendants

2    at the 28-day point of discovery.  We also turned over multiple

3    302s, more than 230 302s just from the Boston investigative

4    team, as well as investigative reports from multiple others, as

5    well as patient records, insurance records and insurance calls.

6    And the hot docs make it very clear as to what our theory is

7    with regard to the fraud conspiracy on the phones.  I point out

8    counsel's assertion right now that Mr. Kapoor had nothing to do

9    with the IRC.  If you read the Grand Jury testimony and you

10   read the reports, you'll see very clear that of all the

11   defendants in this room, the person who took the most primary

12   role in making the IRC happen and worked on a regular basis on

13   this, up to the point that one particular witness testified

14   that the Chairman of the Board, Mr. Kapoor, was editing the

15   opt-in forms about how he wanted them to look when they went to

16   the people, was John Kapoor.

17          So I think, you know, it's not -- I would ask the

18   Court to look at both the Indictment, which I -- as well as the

19   volume and quantity -- not just quantity, but quality of the

20   discovery that we've provided.  I've gone out of my way here to

21   provide them as much as I can as early as I can.  You know,

22   what this is is an effort -- I really believe it's much more

23   like interrogatories and preparing for a civil trial than it is

24   a basic sort of what's the manner and means, what's the object

25   of the conspiracy request, and that's why we're opposed.

1          THE COURT:  So moving on to the exculpatory materials

2    request, Mr. Yeager, are you speaking to that one as well?

3          MR. YEAGER:  I am, and I think it's more information

4    the Court should have.  I shared it with counsel on Friday.

5          So of the six U.S. Attorney's Offices that have been

6    identified by the defendants, I think they call them our sister

7    USAOs, we have provided -- in conversation with the AUSAs that

8    prosecuted those cases and investigated those cases, they have

9    turned over -- they took the same approach to discovery that we

10   took in this district, which was to turn over all the 302s that

11   they have, as well as the hard documents, in terms of records

12   that they have, tangible evidence, and we have subsequently

13   turned it over to the defendants.

14         There is one district that is entirely ethical in

15   their approach, and I don't mean to be critical of them, but

16   their approach in SDNY is much more conservative than it is in

17   other districts.  In SDNY, they do these Brady letters that

18   you've heard referred to today where they review every 302 that

19   they have, and they go and they highlight what they think is

20   Brady.  Then they turn that over to the defendants and they

21   wait until two to three weeks before trial before they turn

22   over Jencks.

23         So I've explained to the prosecutors in the Southern

24   District of New York that's not the process I followed in this

25   case, nor is it generally how we handle things in complex

1    cases.  But we reached agreement, and that is that they would

2    provide the United States District of Massachusetts two

3    tranches of their discovery.  One will be the materials that

4    they have no objection if I turn it over immediately, and the

5    other will be a series of 302s that they identify as ones that

6    they don't want turned over until later on in the process.  I

7    will review those materials and provide my own Brady evaluation

8    with regard to this district on those materials.

9           You know, the point I'm trying to make, and I know

10   counsel takes great effort to talk about all the disclosures

11   that I make, what your Honor is being asked to do here is make

12   a factual finding with regard to the prosecution team, and I

13   didn't want to be in a position where, you know, I ask you not

14   to do it and then another fact comes out or another fact comes

15   out.  So that's the reason I detail at the level I do in our

16   opposition.

17          The concern I have, and I think it's demonstrated by

18   our efforts to obtain the evidence, is not turning over the

19   evidence.  We've tried to do that as diligently as we can.  The

20   concern that I have is that they want a Brady finding up front.

21   They want the Court to find that it's part of our prosecution

22   team up front, and then we pay the consequences of that despite

23   our efforts to turn over everything that we can.  And I don't

24   think the Court has to go that far if, in total, we're turning

25   over all of the available discovery for Brady.  We're there

1   where we need to be and I think the Court should go no further

2   with regard to it.

3         THE COURT:  But I guess maybe I'm not understanding

4   it.  As I understand it, you're going to turn over information

5   that those other districts have turned over in conjunction with

6   their cases, including their Brady review for those defendants.

7         MR. YEAGER:  So --

8         THE COURT:  So you're saying that there is -- because

9   they're not part of the prosecution team, there's no obligation

10  to review for Brady for the defendants here?

11        MR. YEAGER:  So no.  Well, not -- I mean, no.

12        That I have an obligation to review for Brady?  No.  I

13  have no obligation to review for Brady if it's in my

14  possession, and all of those materials are now in my

15  possession.  My point is, the advantage of turning everything

16  over, your Honor, is that there's no issue as to whether or not

17  they've been given access to Brady.  Regardless of whether I do

18  a review or not is irrelevant.  I don't write a letter and say,

19  you know, here are the following Brady materials.  I give them

20  what we have and then they can review it on their own.

21        THE COURT:  But I guess what I'm wondering is you only

22  have what the other districts have turned over in their cases.

23  They may have other material they have not turned over.

24        MR. YEAGER:  But that's what I'm trying to convey.

25        THE COURT:  Okay.

1          MR. YEAGER:  In a follow-up conversation with those

2     districts, they follow the same process that we have followed.

3     In other words --

4          THE COURT:  But for the defendants here or just for

5     the defendant --

6          MR. YEAGER:  Well, for everything.  There is nothing

7     left in their possession that I can review with regard to Brady

8     materials that has not been turned over to their defendants and

9     now to ours.

10          MR. KATZ:  So I will say at the outset I've tried

11     cases in this district and other districts.  I am entirely

12     appreciative of the discovery procedures that this district

13     uses.  I think Mr. Yeager ought to be commended for turning

14     over as much as he has.  It's one of the reasons why we need a

15     Bill of Particulars.  One of the Grand Jury exhibits he

16     mentioned is, in fact, I think 3 or 4,000 phone calls that

17     probably average 10 minutes a piece.  That's one hot document.

18     But I think he is going out of his way to do the right thing

19     and get us the information from the other districts.

20          I think you hit the nail right on the head though,

21     that the other districts are reviewing for Brady in their case

22     or their cases, not for this case.  There is going to be, even

23     though it's the same alleged conspiracy being investigated by

24     all these districts, there is going to be some daylight.  I

25     don't know if the SDNY, when they have their agents go and

1    speak to attendees of speaker programs, are receiving

2    information that, for example, Dr. Kapoor never met that

3    physician, or Dr. Kapoor met that physician once and said, you

4    know, are you finding my speaker programs educational.  That's

5    information that I doubt the SDNY is giving to the defendants

6    in that case.

7         I think, and I know it's a bit of an ask for the

8    judge, but I think Mr. Yeager, if he were to have an order from

9    this Court that the sister USAOs that are investigating the

10   same conspiracies and have coordinated in some way at some

11   points in time with this office their part of the prosecution

12   team, he could go use that order to say to those districts

13   look, you have to review your files for Brady for this case.

14   I'm not asking him to concede that those districts are part of

15   the prosecution team.  I understand he's worried about

16   creating, you know, an appealable issue on Brady if there are

17   convictions in this case, but I think it would go a long way

18   towards ameliorating the concerns that we have that these other

19   districts are dredging up information, some of which goes to

20   Boston and some of which does not, namely the really

21   exculpatory information.

22        The other issue that I think will still be on the

23   table as well, your Honor, is the agencies.  Obviously, the

24   sister USAOs stand in a different position than some of these

25   federal agencies that have been working with the Boston office

1    and that the Boston office acting attorney, U.S. Attorney

2    Weinreb, congratulated in the press release back in October of

3    2017.  They're not under the Department of Justice umbrella,

4    but they were part of the investigation, and they could have

5    very crucial information.  We can get some of that information

6    potentially by a Rule 17(c) subpoena, but it would be a lot

7    cleaner and faster if they were deemed, at least to some

8    extent, part of the prosecution team.

9         Mr. Yeager, this morning, pointed out that some of

10   these practitioners identified in the Indictment may have been

11   under DEA investigation or had suspicious order reports filed

12   against them at the time that INSYS was providing them or

13   targeting them as customers.  Well, for example, if the DEA had

14   a Suspicious Order Report front of INSYS's wholesalers, that

15   would prove that INSYS and its wholesalers were not subverting

16   the DEA suspicious order reporting requirements as the

17   Indictment says.  If the DEA didn't do anything in response to

18   a Suspicious Order Report or contacted the wholesaler and said

19   we actually don't find this suspicious, that would be

20   exculpatory.  That's the type of information that we think

21   these agencies may have.

22        Again, we could try to get it through a Rule 17

23   subpoena, but you know what's going to happen then.  We're

24   going to get the 2(e) motion, we're going to get the Motion to

25   Quash, and there's going to be delay.  We think it would just

1    be easier if Mr. Yeager had the power potentially with an order

2    of this Court to wield, to go to those agencies and say these

3    categories of information, if you have them, you need to turn

4    it over to me.

5         THE COURT:  And there was one very specific request

6    that the defendants made for documents referenced in the recent

7    Indictment brought by the Southern District of New York.  Do

8    you have those documents?  It sounds like that would be a

9    category that, according to Mr. Yeager's description, would

10   have been turned over to you.

11        MR. KATZ:  Yeah.  So, you know, that was one where,

12   and I'm happy to get back to your Honor after the hearing

13   because I know there's some associates that would have a better

14   answer than I do, I know that we had looked for a couple of

15   documents in particular in the searchable database and we did

16   not find them.  It may have simply been that the SDNY had not

17   yet turned over that discovery to Mr. Yeager.

18        We keep getting discovery from Mr. Yeager.  I think we

19   got six gigabytes of information just in the past few days.  To

20   be fair, that's not Mr. Yaeger's fault.  He is getting this

21   discovery from the other districts.  So that may be one where

22   we didn't have the documents at the time and we do now, but I'm

23   happy to circle back with your Honor.

24        THE COURT:  Alright.

25        MR. YEAGER:  So I want --

1          THE COURT:  Yes, Mr. Yeager.

2          MR. YEAGER:  If I could just say, just so the record

3     is clear, because I want to make sure that the Government's

4     position is -- I have had specific conversations with the lead

5     prosecutors in all six districts and I have asked them, I've

6     told them I understand you've turned over what is appropriate

7     for your case, but our Brady obligations are different.  Do you

8     have any materials whatsoever that I need to review with regard

9     to my own Brady obligations other than what you've turned over

10    to the defendants in your cases, which I've now turned over to

11    these defendants.  Across the board, with the exception of the

12    SDNY category that I carved out earlier, the answer is no, we

13    don't have any.

14          So that's what I've done with regard to six districts.

15    I can't do more than that.  I really don't think I can.

16          One thing that I ask the Court to consider, at the end

17    of their Reply Memorandum on Page 8, the defendants say, at

18    bottom, "All defendants are asking for here is that the

19    Government make the same effort to obtain and review potential

20    Brady and Giglio material from other offices as it exerted in

21    building its case against the defendants."  That language

22    seemed different to me.

23          So I searched it and there's actually a Boston case

24    that Judge Keeton did in 1988 called LaRouche and it dealt with

25    the allegations against the Lyndon LaRouche campaign that were

1   out amongst many different districts.  The cite is 695 F.Supp.

2   1265.  In that case, Judge Keeton ordered -- made two specific

3   orders at the very end of the case in which he required the

4   Government to do exactly what we've already done, which is to

5   go back to the place -- and it's similar to the language that

6   they quote, to do as much with regard to our efforts with those

7   other districts as we have done with regard to inculpatory

8   information, and we've done that.  We've gone back to those

9   districts and we've gotten the information.  And then secondly,

10  to go further and say is there any other way we can get this

11  information, and the answer is no.

12         THE COURT:  Just so I understand, you said that you

13  have asked the other districts for Brady information about the

14  defendants here.

15         Did you also ask for Giglio information.

16         MR. YEAGER:  I asked for any and all Brady -- any

17  other documents that I -- any other materials that I need to

18  review for my obligations here in Massachusetts, your Honor.

19         MR. KATZ:  So, your Honor, this is where

20  information -- it's a critical distinction, I always make it in

21  my briefs, materials versus information.  I'm not saying

22  Mr. Yeager is attempting to blur that line, but I do worry that

23  these other districts, when he's requesting materials, they're

24  not saying themselves, you know, one of our agents in a

25  driveway interview last week heard the following information

1   that he did not memorialize in a 302 or maybe even notes, but

2   he has the information.

3        You know, here -- so since our reply brief, I mean, it

4   was just Friday where Mr. Yeager, we got in a phone call.  It

5   was very cordial.  I mean, it very nearly mooted our motion.

6   It obviously doesn't, but he went a long way towards conceding

7   some of our position.  He is now, I think, going out of his way

8   to go to the other districts to request the information.  The

9   owness is now going to be on those other districts to make sure

10  that they understand that they're part of the prosecution team,

11  that it's not just documents, it's information that would meet

12  Brady or Giglio.

13       You know, if Mr. Yeager had -- I honestly believe if

14  he had a court order, it would make it a lot easier for him to

15  go to these other districts and get the information.

16       MR. YEAGER:  But to be clear, they're not part of our

17  prosecution team.  You know, I think that's a fundamental

18  disagreement between us.  It's all I really care about.

19  They're not.  I mean, I'm trying to get them and have gotten

20  them everything that exists, to my knowledge.

21       Now, there could be other stuff that comes up, they're

22  right, but in the course of that I have an obligation to reach

23  out to them, to continue to reach out to them to get that

24  information, and I will.  But --

25       THE COURT:  So, Mr. Yeager, in part of what you had

1    put forward to show that these other districts are not part of

2    the prosecution team, you had said that no member of either

3    team took direction regarding any matter.  But in the same

4    breath, you had said that the Massachusetts prosecutor had

5    asked the SDNY to decline prosecution.

6         Why isn't that some level of control?

7         MR. YEAGER:  Well, because, without getting into

8    details, it's simply my request.  They had --

9         THE COURT:  And they did it.

10        MR. YEAGER:  No, but they had to make their own

11   independent evaluation, and they did, about whether or not they

12   would go (inaudible), and that was a long, drawn out process,

13   I'm told, within the SDNY.  I couldn't tell them I've done

14   this.

15        And as a matter of law, by the way, I made promises,

16   inducements or rewards to that witness, which I've disclosed

17   previously and I've talked about in the memorandum, but I was

18   talking about the prosecution in this district.  The decision

19   to go forward in the other district was entirely theirs.

20        So that is not an act of acting in my direction.  They

21   absolutely did it.  It was a back and forth and it took a lot

22   of persuading, and ultimately they did their own analysis about

23   whether they needed to go there or not.  I wasn't part of that

24   analysis.  So it's not accurate to say that.

25        The other thing too is, you know, in terms of sharing

1    reports and sharing evidence here, you know, I go out of my way

2    because I want to make sure the Court knows what's out there.

3    But what I leave out of that memorandum is the reality of the

4    investigation, which is there are more than 230, I think close

5    to 240, reports of the Boston team.  In terms of shared

6    interviews, we're talking about single digits with all the

7    districts that we're talking about.

8              THE COURT:  How many were there?

9              MR. YEAGER:  There were, I think -- well, I can get

10   the information for the Court, but I think the most I saw was

11   like a dozen, and maybe that's too much, and the least I saw

12   was zero.

13             So by district, you know --

14             THE COURT:  You mean by district.  But how many -- I'm

15   sorry, the most in any one district was a dozen?

16             MR. YEAGER:  I might be overstating.  It might be

17   eight.  I'm not positive.  I can get the numbers for the Court.

18   But my point on it is, they're in the single digits, and if you

19   look at the total number of reports, overwhelmingly they're not

20   shared.

21             So if you look at that Gupta case that counsel cites,

22   you know, that Judge Rakoff wrote, he talks about an SEC

23   investigation where I think it was like 46 reports -- 46

24   witness interviews, 44 of the SEC attended.  That's not what

25   happened here.  I'm happy to follow up with the specifics of

1    it.  I've got an Excel spreadsheet and I'll provide it to the

2    Court.  But they're extremely disparate.

3           And when you drill down further, the people that we're

4    doing joint interviews with are sort of three types of

5    witnesses:  They're cooperators who are charged in that

6    particular district, and when we met with them, the prosecutors

7    that charged them were there; their patients, who, you know,

8    while both sides are running parallel investigations,

9    reasonably, we don't want to intrude on them more than we have

10   to; and then there's the SDNY situation where the former, I

11   think it was the chief -- it was either CEO or COO who lasted

12   six months at INSYS, who obviously had access to

13   attorney-client information, and we were concerned that in

14   meeting with them, we needed to make sure that our -- that we

15   were following the proper rules.

16          So we met together with counsel and the witness and

17   interviewed the witness.  That's bulk of what we did.  We

18   didn't go out jointly in Alabama looking for witnesses that

19   they wanted to go with us.  It didn't work that way and it

20   didn't happen in any of the districts that way.

21          THE COURT:  And going back to an earlier point that

22   defense counsel raised, your brief seemed to focus on the

23   relationship with the USAOs and I didn't really see much in

24   there about the agencies.

25          MR. YEAGER:  Yeah.

1          THE COURT:  So why shouldn't I give them what they've

2     requested --

3          MR. YEAGER:  So I think --

4          THE COURT:  -- with respect to the agencies?

5          MR. YEAGER:  Well, because, I mean, in the cases, and

6     I cite them in my memorandum, but the cases -- first of all, I

7     think we need more materiality on those issues.  I agree with

8     them.  As far as materiality is concerned, I agree that

9     promises, inducements or rewards made by other offices to our

10    witnesses to cooperate or to testify in our case, I think

11    that's their second point, I agree to that material.  I agree

12    that a statement that it's a sham event, or wasn't a sham

13    event, I should say, would be exculpatory, and that's material.

14         But with regard to the other requests that they

15    make -- and the patient records, we've turned over everything

16    in the possession of all the U.S. Attorney's Offices, as well

17    as the DEA, I believe, in terms of this case.

18         But, you know, with regard to the other agencies, your

19    Honor, I don't --

20         THE COURT:  So is what you're saying with respect to

21    those items that -- and I understand the defendants have said

22    that's not an exclusive list.

23         MR. YEAGER:  Right.

24         THE COURT:  But with respect to those items that you

25    say are material, are you saying you are going to ask the

1    agencies for that material?

2         MR. YEAGER:  So I've already asked.  I mean, in terms

3    of the DEA evidence, I've asked them about -- I suspect that

4    what they want are Suspicious Order Reports.  I've asked about

5    how they detail those.  And it's not organized, it's district

6    by district.  There's no national understanding of how that

7    works.

8         THE COURT:  So you're not opposing that request?

9         MR. YEAGER:  So I can ask them for it.  I don't know

10   that it exists, but I can ask.  Yes, I'm not opposing that

11   request.

12        THE COURT:  Alright.  And anything else that you're

13   not opposing?

14        MR. YEAGER:  Well, I don't have the six in front of

15   me, your Honor, but as I think I said, the patient records, the

16   sham events.  The rest should be moot, I think.

17        If I could just have a moment, your Honor.

18        THE COURT:  Yes, of course.

19        (Pause.)

20        THE COURT:  So I think it's actually on Page 6 of your

21   brief.  You listed them out.

22        MR. YEAGER:  Yeah.  Right.

23        So to one, "Any denial made to any federal agent or

24   federal prosecutor involved in the federal investigation of

25   INSYS," you know, with regard to the six -- so the caselaw that

1     we cite talks about it's not any federal agent.  It's federal

2     agents on the prosecution team and I would limit it to that.

3     But any federal agent on the prosecution team --

4          THE COURT:  No.  So the question here is that your

5     brief did not oppose their request with respect to agencies.

6     So I thought we were talking about the request to the agencies

7     with respect to these six items, some of which you say are

8     material.

9          MR. YEAGER:  So I thought we had opposed it with

10    regard to agencies, but I don't believe the Government should

11    be required to be responsible for the entire DEA agency, or all

12    the other agencies with regard to this investigation, what

13    might be out there on other cases.  No, your Honor, I don't.

14         THE COURT:  So what were you offering?

15         MR. YEAGER:  With regard to the case agents on this

16    case and their knowledge with regard to this particular case, I

17    agree that if anyone on the prosecution team was aware of

18    anything with regard to number one, we would have an obligation

19    to turn that over.  Secondly, I think that problem should be

20    resolved by the agreement that we have with the other six

21    USAOs.  But I don't agree that they're part of my prosecution

22    team.

23         THE COURT:  So then how did we get to the discussion

24    where you said you were willing to ask DEA if they had some of

25    the reports that defense counsel had alluded to that might be

1     beyond what was generated by the agents assigned to your team?

2          MR. YEAGER:  What I was referring to was when counsel

3     mentioned the suspicious activity reports, I think what he's

4     referring to is number three.  So it's DEA communications, and

5     it's very broad and it's argumentive.  But if he's talking

6     about the existence of suspicious activity reports with

7     regard -- it would only be the pharmacies, by the way.

8     Suspicious activity reports I don't think would happen for the

9     doctors, it would just be for the pharmacies.  There's four

10    pharmacies alleged in the indictment.

11         So I have reached out and asked them whether they have

12    that information and they don't know if they have it, but I'm

13    happy to provide that from the DEA if they have it.

14         THE COURT:  Alright.  Thank you.

15         Anything else?

16         MR. KATZ:  Yeah.  So two things.  One, on the

17    prosecution, saying that he was able to meet with SDNY

18    cooperators, it's a little bit of a mythology to me.  I'm not

19    from Boston, but that goes way beyond any cooperation I've ever

20    heard between SDNY and Boston USAO.  In the past, it --

21         THE COURT:  Or any other district, perhaps.

22         MR. KATZ:  Yeah.  I mean, if they're able to meet with

23    the cooperating witness to help develop their case, we

24    certainly are not able to meet with that cooperating witness.

25    So that is the type of coordination I think makes the SDNY then

1    liable to not just help the Boston case by allowing them access

2    to the witness, but to look for Brady information as well.

3           On number three, I just want to point out briefly,

4    that is not an argumentive request.  That is actually targeted

5    to something very specific that was said in congressional

6    testimony of the president of H.D. Smith, which is a family

7    regional wholesaler, and they were told that simply because

8    of -- the DEA allegedly, according to this president's

9    congressional testimony, said to them just because a pharmacy's

10   order exceeds H.D. Smith's internal quota, that does not make

11   the pharmacy's order suspicious.  The reason we put that in

12   there, and the reason it is so exculpatory in this case, is

13   because one of the allegations in the Indictment is that we

14   were trying to subvert the DEA's suspicious order monitoring

15   requirements by shifting from one wholesaler that had a lower

16   quota to a new wholesaler that had a slightly higher quota, or

17   the 3PL, as the Indictment calls it.

18          So that is deeply exculpatory information that's not

19   related necessarily to the four pharmacies identified in this

20   Indictment, but it is deeply exculpatory, it is core Brady, and

21   it's the type of information that yes, we could probably serve

22   a Rule 17(c) subpoena on the DEA, but it is so much easier for

23   Mr. Yeager, who worked with the DEA to make this case, to go to

24   the agency and say if you have this information, please turn it

25   over.  Otherwise, we're going to be in motion practice, waiting

1    for documents.  You know, a Rule 17(c) subpoena goes in as

2    neither world when you serve it on a government agency.  It

3    really would risk the trial date.

4         THE COURT:  And as I understand it, you're asking for

5    this information not just with respect to the company at issue

6    here, or you are?

7         MR. KATZ:  So most of these requests are strictly for

8    the company or the physicians that are identified as

9    co-conspirators.

10        THE COURT:  Okay.

11        MR. KATZ:  I think there's 22 of them that were

12   identified in the 28-day material.  Number three is a DEA

13   position that we're looking for.  It does not have to be SUBSYS

14   or INSYS specific.

15        MR. YEAGER:  So to be clear about the cooperators,

16   your Honor, I didn't meet with SDNY cooperators.  I detailed

17   the cooperators that I met with in our opposition.  And it

18   isn't unusual to have a case prosecutor in another district

19   then go forward, have that person plead guilty, and that person

20   say I have information in another district and to be contacted

21   by a prosecutor (inaudible).

22        THE COURT:  What I think they were saying is it's

23   unusual for SDNY to share their cooperators.

24        MR. YEAGER:  Well, I have to continue my working

25   relationship with SDNY as far as getting the additional

1    discovery, so I'm not going to comment on that.

2          One more thing, Judge.  Just in terms of the way this

3    plays out is, you know, in terms of thinking about the

4    relationship that we have with the other U.S. Attorney's

5    Offices, you know, counsel makes an issue in their memorandum,

6    and I want to make sure I mention this, about how we made

7    presentations to them about the status of our case.  That's

8    true, we did.  We didn't do it because we were joining a team,

9    we were doing it to define the lines of the investigation.  You

10   can't have a parallel investigation, particularly with certain

11   districts, where you don't make clear this is what we're

12   looking at, this is why we're focused, and that's why we did

13   that.  It was specifically to make sure that we didn't cross

14   lanes if it was avoidable at all.

15         Those efforts were made throughout.  I mean, if you

16   see here, it was almost always a minor detail to this case, in

17   terms of the cooperation with other folks.

18         Now, the last point, and this is what I'm trying to

19   get at, the Eastern District of Michigan is about ready to

20   arrest Gavin Awerbuch.  They've completed their investigation.

21   They call the prosecution team and they tell them this is what

22   has happened and this is what we're going to do, and we get

23   involved and we send out agents from our team to deal with him.

24   They weren't even investigating the case at that point, it was

25   over.  So we didn't do anything jointly other than work with

1   Awerbuch once he had agreed to cooperate with EDMI.  And, by

2   the way, he cooperated in more than one investigation.

3         The same is pretty much true with the Southern

4   District of Alabama.  That was an extensive investigation that

5   took place over years.  They did, I think, I want to say four.

6   They might have done more than that as far as superseding

7   indictments are concerned.  Over the course of years, that grew

8   and grew and grew.  But we had very little involvement with

9   them in terms of their day-to-day work.  Almost always it had

10   to do with making sure they knew what we were working on and

11   not getting in our way versus not getting in their way, and

12   then there were times when we shared evidence that we had

13   obtained, just like you would with any other parallel

14   investigation.  But neither side was working with one another,

15   and both of those, the timing matters, right, and that's what

16   I'm trying to convey.

17         Now, some of the others, they did start after our

18   investigation.  So that's a different scenario.  That's why I

19   think the Court needs to assess it USAO by USAO.

20         THE COURT:  Okay.  Thank you.

21         MR. KATZ:  Thank you, your Honor.

22         THE COURT:  I'll take it under advisement.

23

24         (The hearing was concluded.)

25

C E R T I F I C A T I O N

     I, Karen M. Aveyard, Approved Federal Court Transcriber, do hereby certify that the foregoing transcript, consisting of 42 pages, is a correct transcript prepared to the best of my skill, knowledge and ability from the official digital sound recording of the proceedings in the above-entitled matter.

/s/ Karen M. Aveyard

Karen M. Aveyard

July 21, 2018

Date