1                   UNITED STATES DISTRICT COURT

2                     DISTRICT OF MASSACHUSETTS

3     _____

4     UNITED STATES OF AMERICA,

5                    Plaintiff,          Criminal Action
                                         No. 16-CR-10343-ADB
6     v.

7     MICHAEL L. BABICH, ALEC BURLAKOFF,     July 17, 2018
      MICHAEL J. GURRY, RICHARD M.           Pages 1 to 70
8     SIMON, SUNRISE LEE, JOSEPH A.
      ROWAN, and JOHN KAPOOR,

9
                     Defendants.
10    _____

11

12

13                 TRANSCRIPT OF MOTION HEARING
            BEFORE THE HONORABLE ALLISON D. BURROUGHS
14                UNITED STATES DISTRICT COURT
                JOHN J. MOAKLEY U.S. COURTHOUSE
15                  ONE COURTHOUSE WAY
                    BOSTON, MA  02210

16

17

18

19

20

21

22                 JOAN M. DALY, RMR, CRR
                   Official Court Reporter
23            John J. Moakley U.S. Courthouse
              One Courthouse Way, Room 5507
24                  Boston, MA  02210
                 joanmdaly62@gmail.com

25

```
 1    APPEARANCES:

 2

       FOR THE GOVERNMENT:
 3
               K. NATHANIEL YEAGER
 4             MARK T. QUINLIVAN
               SUSAN M. POSWISTILO
 5             DAVID J. D'ADDIO
               DAVID G. LAZARUS
 6             Assistant U.S. Attorneys
               United States Attorney's Office
 7             John Joseph Moakley Federal Courthouse
               1 Courthouse Way
 8             Suite 9200
               Boston, Massachusetts 02210
 9             617.748.3100
               Nathaniel.Yeager@usdoj.gov
10             mark.quinlivan@usdoj.gov
               susan.poswistilo@usdoj.gov
11             david.daddio@usdoj.gov
               david.lazarus2@usdoj.gov
12

13    FOR THE DEFENDANT MICHAEL L. BABICH:

14             JOSEPH SEDWICK SOLLERS, III
               MARK A. JENSEN
15             King & Spalding, LLP
               1700 Pennsylvania Avenue NW
16             Suite 200
               Washington, DC 20006
17             202.626.5612
               wsollers@kslaw.com
18             mjensen@kslaw.com

19             WILLIAM H. KETTLEWELL
               Hogan Lovells US LLP
20             100 High Street
               20th Floor
21             Boston, Massachusetts 02110
               617.371.1005
22             bill.kettlewell@hoganlovells.com

23

24

25
```

1    Appearances (continued):

2

3    FOR THE DEFENDANT ALEC BURLAKOFF:

4            GEORGE W. VIEN
             PETER E. GELHAAR
             Donnelly, Conroy & Gelhaar, LLP
5            260 Franklin Street
             Suite 1600
6            Boston, Massachusetts 02110
             617.720.2880
7            gwv@dcglaw.com
             peg@dcglaw.com

8

9    FOR THE DEFENDANT MICHAEL J. GURRY:

10           TRACY A. MINER
             Demeo LLP
11           200 State Street
             Boston, Massachusetts 02109
12           617.263.2600
             tminer@demeollp.com

13

14   FOR THE DEFENDANT RICHARD M. SIMON:

15           PATRICK J. O'TOOLE, JR.
             Weil, Gotshal & Manges LLP
16           100 Federal Street
             Boston, Massachusetts 02110
17           617.772.8365
             patrick.otoole@weil.com

18

19   FOR THE DEFENDANT SUNRISE LEE:

20           PETER C. HORSTMANN
             Law Offices of Peter Charles Horstmann
21           450 Lexington Street
             Suite 101
22           Newton, Massachusetts 02466
             617.723.1980
23           pete@horstmannlaw.com

24

25

APPEARANCES (continued):


FOR THE DEFENDANT JOSEPH A. ROWAN:

         MICHAEL KENDALL
         White & Case, LLP
         75 State Street
         Boston, Massachusetts 02109
         617.939.9310
         michael.kendall@whitecase.com


FOR THE DEFENDANT JOHN KAPOOR:

         BETH WILKINSON
         KOSTA S. STOJILKOVIC
         Wilkinson Walsh Eskovitz
         2001 M Street NW
         Washington, D.C. 20036
         202.847.4000
         bwilkinson@wilkinsonwalsh.com
         kstojilkovic@wilkinsonwalsh.com

         AARON M. KATZ
         BRIEN T. O'CONNOR (present via telephone)
         Ropes & Gray
         Prudential Tower
         800 Boylston Street
         Boston, Massachusetts 02199
         617.951.7385
         aaron.katz@ropesgray.com
         boconnor@ropesgray.com

1      **P R O C E E D I N G S**

2          THE CLERK:  Matter before this Court is *United*

3 *States v. Babich*.  United States Judge Burroughs presiding.

4 Docket number 16-10343.  Counsel, please state your name

5 state your names for the record.

6          MR. YEAGER:  Good morning, Your Honor.  Nathaniel

7 Yeager for the United States.

8          MR. QUINLIVAN:  Good morning, Your Honor.  Mark

9 Quinlivan for the United States.

10          MR. D'ADDIO:  Good morning, Your Honor.  David

11 D'Addio for the United States.

12          MS. POSWISTILO:  Good morning.  Susan Poswistilo

13 for the United States.

14          MR. LAZARUS:  Good morning, Your Honor.  David

15 Lazarus on behalf of the United States.

16          MR. VIEN:  Good morning, Your Honor.  George Vien

17 and Peter Gelhaar for Mr. Burlakoff.

18          MR. KENDALL:  Good morning.  Mike Kendall for Joe

19 Rowan, Your Honor.

20          MR. SOLLERS:  Good morning, Your Honor.  Wick

21 Sollers, Mark Jensen and Bill Kettlewell for Mike Babich.

22          MS. MINER:  Good morning.  Tracey Miner for Mike

23 Gurry.

24          MR. O'TOOLE:  Good morning.  Patrick O'Toole for

25 Richard Simons.

```
 1              MR. HORSTMANN:  Good morning, Your Honor.  Pete
 2    Horstmann for Sunrise Lee.
 3              MS. WILKINSON:  Good morning, Your Honor.  Beth
 4    Wilkinson for Dr. John Kapoor.
 5              MR. STOJILKOVIC:  Good morning, Your Honor.  Kosta
 6    Stojilkovic also for Dr. John Kapoor.
 7              MR. KATZ:  Good morning, Your Honor.  Aaron Katz
 8    for Dr. John Kapoor.
 9              THE CLERK:  Mr. O'Connor?
10              MR. O'CONNOR:  Yes.  Good morning, Your Honor.
11    Brien O'Connor for Dr. John Kapoor by phone.
12              THE COURT:  All right.  I am happy to do this
13    however you want.  I do have some sort of particular things
14    I'm interested in, but if you all have prepared formal
15    presentations and that's how you want to do it, it's fine.
16    Or I can start shooting and we can see where it goes.
17              MS. WILKINSON:  Your Honor, I think we'd prefer to
18    hear your questions and not waste your time.  We do have
19    presentations, and if we think we didn't address something
20    maybe at the end we can do it.  But I think it's more useful
21    if we addressed your questions.
22              THE COURT:  Not strictly to the merits of the
23    motion, but for the life of me I can't understand this
24    indictment.  I can't understand why you'd want to go to a
25    jury with this sort of indictment.  I can't think of how
```

1     we're going to instruct them in any kind of way that makes

2     sense.  It's basically four conspiracy counts.

3          I think there's some individual problems along the

4     way and maybe we can solve them with a bill of particulars

5     and maybe we can't.  But I don't get this at all.  And I

6     think just looking down the road -- Mr. Yeager, you're

7     looking at me like I have three heads.  I just don't

8     understand how you charge a jury under this scenario, how

9     it's going to make any sense to anybody.

10          Not to mention the fact that I read the indictment

11    a billion times, and I really can't understand what you're

12    charging.  So I'm happy to parse through this on the motions.

13    As Mr. Quinlivan points out in his papers, which are

14    excellent as usual, it's a relatively low threshold at this

15    stage of the game.  But I don't want to try a case for 14

16    weeks, whatever this is going to take, that doesn't have any

17    capacity to either get to the jury or hold up after a

18    verdict.

19          So I don't know if you want to address that

20    generally.  Why do we have a RICO here and then three other

21    separate conspiracy counts?  What are you trying to get at?

22    It just seems a crazy way to charge a case.

23          MR. YEAGER:  Well, Your Honor, I appreciate the

24    Court's frankness.  We charged RICO after deliberating.  We

25    didn't just sort of rattle it off.  We talked through the

1  possibilities.  We talked about how other cases like this

2  have been brought, and we decided it was the best way to go

3  forward on the case.

4          Racketeering gives the government the ability to

5  deal with the fact that it was a national organization that

6  did this that was limited to a certain number of doctors.

7  And as you'll hear today with regard to hub-and-spoke, it has

8  certain advantages with regard to understanding the breadth

9  of the way the enterprise instruction works.

10          As far as the other charges, it's not uncommon to

11  charge several of the other counts that go along with the

12  racketeering conspiracy as well.  And so that's why we

13  charged them that way.

14          I'm happy to defend specific concerns that this

15  has.  I don't want you to think that I just sat in my office

16  and rattled off an indictment.  This was a matter that was

17  discussed at length with the criminal division chief, who as

18  Your Honor knows who used to work with OCGS.  And then with

19  OCGS which is not a light lift whatsoever.

20          The Department of Justice reviewed the information

21  and thought about the case and felt like it really is best

22  presented as a racketeering conspiracy.

23          THE COURT:  Why don't you just go with the

24  racketeering conspiracy and get rid of the other three

25  counts?

1       MR. YEAGER:  That's a possibility.  We can do that.

2  I think we want to sort of see how things flesh out.  There's

3  four counts there.  They are in many ways co-extensive, and

4  we could take a look at a way to trim back the case in many

5  different ways, both in terms of the allegations as well as

6  witnesses.  So we're open to doing that.

7       THE COURT:  I feel like the people that approve

8  these indictments never actually try a case.  Can you imagine

9  the jury charge in this case the way this thing is charged?

10  I know that's not today's problem.  But just thinking ahead,

11  I just don't even -- I'm trying to think about how I would do

12  it.  It's hard to even think about how you'd do.

13       What's the verdict form going to look like?  I'm

14  not even sure what the difference is between Counts 2 and 3

15  other than mail and wire.  I don't know how to even explain

16  that to the jury.

17       MR. YEAGER:  I'm happy to explain my position on

18  that now.  I don't know how you want to proceed as far as the

19  motions are concerned.

20       THE COURT:  We can start with the RICO.

21  Mr. Quinlivan, however you want to interchange this is fine

22  with me.  I know you're probably the author of the indictment

23  and he's done the motion papers.  So feel free to tag team

24  it.  I don't want to stand on any ceremony here.  I really

25  want to understand the information and what it is that you're

1    saying.  So however it is easiest to present it, feel free to

2    present it.

3            The First Circuit, just to start with this

4    hub-and-spoke idea.  The First Circuit hasn't ruled on it.

5    It appears clear to me that you need a rim on these

6    conspiracies.  Mr. Quinlivan, your papers really frame it as

7    a single or a multiple conspiracy, and your position is

8    that's a jury issue, not an issue for here.  And I agree with

9    that.  But I still think you have to set out, am I wrong?

10           It seems to me that you have to set out what the

11   rim is in the indictment, and I don't see that.  I know

12   there's many many paragraphs and your position is see all

13   those many many paragraphs.  I may not be as smart as you

14   are, but I couldn't figure it out.

15           MR. QUINLIVAN:  I'd be happy to respond to that,

16   Your Honor.  Start with the threshold question.  It's our

17   position that there is no such animal as a hub-and-spoke

18   enterprise.  And that's where we rely on the Fifth Circuit's

19   position in *Elliot* that explained when Congress enacted the

20   RICO statute, it supplanted the traditional wheel and chain

21   limitations on RICO conspiracy with the statutory enterprise.

22   And it did so so that the statute could reach several

23   different types of crimes that previously were limited by the

24   "wheel and chain" limitations.

25           Now, importantly, Your Honor is correct, the First

1    Circuit has not specifically addressed this question.  But

2    what it has done in two different decisions, which we cited

3    in our memorandum, *Turkette* and *Tashjian*, it cited with

4    approval of the Fifth Circuit's position in *Elliott* for the

5    proposition that RICO conspiracy casts a wider net than

6    traditional conspiracy --

7              THE COURT:  I completely agree with you that it

8    casts a wider net.  I completely agree with you.  That's not

9    where I'm having the issue.  I've read *Elliott*.  I just don't

10   think that -- I don't think that *Elliott* is a majority

11   opinion.  Do you disagree with me with that?  It seems like

12   there's many other cases that -- and granted they're in the

13   civil RICO context.  It's hard to think that's a lower

14   standard than the criminal arena.

15             MR. QUINLIVAN:  Two answers, Your Honor.  First of

16   all, it is a different standard.  And the reason is because

17   there are fundamental differences between how the standards

18   for considering a pretrial motion to dismiss a criminal

19   indictment vis a vis whether it be a summary judgment motion

20   or a 12(b)(6) motion in the civil context.

21             THE COURT:  Most of the civil cases are decided on

22   motions to dismiss, not on summary judgment.

23             MR. QUINLIVAN:  That's true.  That really doesn't

24   change the analysis respectfully because what -- we pointed

25   to I think Judge Mazzone and Magistrate Judge Collings, the

1    *Mavroules* case really set this out.  There's a check in the

2    criminal context that is not existing in the civil context.

3    And that's the presence of a grand jury and the role of the

4    prosecutor in the office.

5         And therefore there's no comparable Rule 12(b)(6)

6    standard when considering a pretrial motion to dismiss a

7    criminal indictment.  In fact, the First Circuit has

8    repeatedly said and most recently just this year in the

9    *Stepanets* decision.  To just quote directly, it says, "When a

10   defendant seeks dismissal of an indictment, the question is

11   not whether the government has presented enough evidence to

12   support the charge but solely whether the allegations in the

13   indictment are sufficient to apprise the defendant of the

14   charged offense."

15        The government doesn't have to set out all of its

16   evidence in a indictment.

17        THE COURT:  I completely agree.

18        MR. QUINLIVAN:  And so that's the difference.

19   Because in the civil context there is no filter before a

20   complaint is filed.  And therefore --

21        THE COURT:  I don't share your confidence in the

22   effective shield function of the grand jury and sort of the

23   notion that I should trust the grand jury and the U.S.

24   Attorney's Office.  Although I mean, I get it, that doesn't

25   get me over the hump.  That's sort of like the "Trust me;

1   trust the grand jury" argument.  I agree that the grand jury
2   serves an important function.  And of course I know that all
3   of you are trying to do your job as conscientiously as you
4   can, but I don't want to spend 14 weeks on a trial that can't
5   support a verdict sort of on that.  So you're going to need
6   to flesh out the rim for me.
7            MR. QUINLIVAN:  Again, and I won't belabor the
8   point, but I will say I think it's noteworthy that all of the
9   cases, and I believe this is without exception, that the
10  defendants rely in this context are civil RICO cases.  They
11  don't deal with the fact or respond to our showing that the
12  First Circuit has cited *Elliott* with approval for the
13  proposition that RICO conspiracy casts a wider net.
14            And it's not just it cites *Elliott* in general.  It
15  cites the very pages 902 to 903 on which the Fifth Circuit
16  said that the statutory enterprise supplants --
17            THE COURT:  I'm not disagreeing with that point at
18  all.  I don't think you have to show a conspiracy in exactly
19  the same way that you did before RICO.  And I'll read *Elliott*
20  again.  I'm not going to rule on this today, so I'll look at
21  *Elliott* again.  I still think there has to be some
22  interrelationship between the parties.
23            You can't have just a pure hub-and-spoke kind of
24  arrangement.  You have to have something that ties it
25  together.  It doesn't necessarily need to be an agreement

1    between the parties which is how I think the RICO law changed

2    the environment, I guess, or changed the universe.  There

3    still has to be some kind of relationship or common purpose

4    or something between the spokes.

5             MR. QUINLIVAN:  Right.  And I think that that is

6    answered by the three structural features that the Supreme

7    Court in *Boyle* set out.  And defendants acknowledge as well

8    that there's -- even in the civil RICO context there's some

9    question about whether *Boyle* itself supplanted or took away

10   the idea of a rimless conspiracy.

11            In our view *Boyle* is entirely consistent with the

12   proposition that the statutory enterprise supplanted the

13   wheel and chain.

14            THE COURT:  All the cases that come after *Boyle*

15   don't read it that way.  Possibly *Elliott*.  You can throw in

16   a couple here, but the majority of cases after *Boyle* still

17   want a rim.

18            MR. QUINLIVAN:  Yes.  And again in the civil RICO

19   context, it's not clear that those courts even considered

20   *Elliott*.  I mean, there are times, and I haven't certainly

21   gone back and canvassed all the pleadings in those cases, but

22   it very well may be the case that the defendants in those

23   cases accepted the premise of the argument that there's such

24   a thing as a wheel and hub enterprise.

25            I've got to just take a step back, Your Honor.  The

1    whole idea of hub-and-spoke derived as a limitation on a

2    conspiracy.  Now, of course, RICO has a conspiracy charge.

3    So we're now saying that not only can hub-and-spoke be a

4    limitation on conspiracy, but we're transposing that onto the

5    enterprise element.

6              And that doesn't make sense for two reasons.

7    Because again if the whole idea of the enterprise was to, as

8    the First Circuit said, cast a wider net than RICO

9    conspiracy, it makes no sense that Congress would take away

10   with the one hand what it provided in establishing the

11   statutory enterprise.  It would mean that the hub-and-spoke

12   limitation doesn't apply to RICO conspiracy, but we just

13   apply that very same limitation to the concept of an

14   enterprise.

15             THE COURT:  We disagree on that.  I think it does

16   apply to the conspiracy for the enterprise.

17             MR. QUINLIVAN:  Respectfully, I can't see how you

18   would have -- you would be both considering whether there's a

19   hub-and-spoke enterprise and then separately considering

20   whether there's a hub-and-spoke conspiracy.

21             THE COURT:  Back to your charging decisions, which

22   you can just satisfy my curiosity, why don't you just have

23   the RICO enterprise with the seven defendants?  Why do you

24   throw in all the pharmacies and the doctors?

25             MR. QUINLIVAN:  I think my colleague's probably --

1    I wasn't involved in the charging.  So that's probably

2    something we had better address to my colleague.

3              THE COURT:  Doesn't getting rid of them sort of

4    solve this problem?  Don't you still have an adequate

5    enterprise with the seven, and then you can basically call

6    the business the enterprise?

7              MR. QUINLIVAN:  Conceivably, Your Honor, it could

8    fulfill that purpose.  I will say that as my colleague said,

9    those are all decisions that were carefully thought out and

10   typically always are carefully thought out when an indictment

11   is charged.  Again I wasn't involved in this process, but

12   what I can speak to is the fact that the Department of

13   Justice institutionally in certain areas requires basically

14   heightened pleading before an indictment can be returned.

15             In the civil context, for example, the Federal Tort

16   Claims Act, only main justice can approve when the government

17   asserts discretionary function.  RICO is one of those areas.

18   A U.S. Attorney's Office can't just charge a RICO indictment.

19   It's not only got to be approved, it's got to be approved by

20   the organized crime and gang section.  And the reason for

21   that is to ensure that when the department takes that step it

22   is doing consistent with departmental policy and that there

23   isn't a concern or at least from the department's perspective

24   there isn't a concern.

25             THE COURT:  They may have a different view than I

1    do on this rim thing.  I think that you have to have

2    something connecting the parties to the RICO, right?  So the

3    spokes needs a rim.  So help me out here.

4           Let's just say I buy your argument that the

5    indictment is sufficient if you pare it back to the elements

6    of the offense.  But I'm telling you that I think there needs

7    to be a rim.  If you can't tell me what that rim is, you want

8    me to try this case for 14 weeks and then say it needs to be

9    dismissed because there's no rim?

10          Is there a rim or isn't there a rim?  We're going

11   to disagree on this.  You say I don't need a rim.  I'm

12   telling you I think you need a rim.  So now where does that

13   leave us?  What do you want to do?  Do you want a bill of

14   particulars to come up with the rim?  Do you want -- I don't

15   want to try a case for 14 weeks that I'm telling you is not

16   going to get by without a rim.

17          MR. QUINLIVAN:  I understand, Your Honor.  Two

18   points on that.  One is that we do think that that question

19   -- again, the whole idea of a rim and a hub-and-spoke is

20   essentially the question of whether a single or multiple

21   conspiracies have been pled.

22          THE COURT:  I don't think so.  I don't think that's

23   necessarily true.  It's like an incomplete -- it can be like

24   an incomplete one conspiracy.  You could cast it as one or

25   multiple, but that's not what I'm focused on.  I think you're

1  missing an element of the RICO.

2          MR. QUINLIVAN:  We did respond.  We do think that

3  the factual allegations in the complaint, even assuming that

4  there's such a thing as a hub-and-spoke enterprise, and even

5  assuming that that's a question that can be decided on a

6  pretrial motion to dismiss, for the reasons we set out in the

7  memo, we think there are sufficient -- certainly there are

8  sufficient allegations to meet the Rule 7(c)(1) standard.

9          THE COURT:  What are they?  What makes out the rim?

10         MR. QUINLIVAN:  I think it probably would be better

11 for Mr. Yeager to sort of set that out.

12         THE COURT:  I'm happy to hear him on it today, but

13 maybe it needs to be done through a bill of particulars or

14 superseding indictment.  I think they need some notice of

15 what the rim is.  I don't know how they're supposed to defend

16 without knowing what the interrelationship is between all

17 those spokes.

18         I do want to hear you on it, Mr. Yeager, but I'm

19 not sure just spouting a paragraph today sort of fleshes it

20 out adequately enough for them.  You can address that, too,

21 if you want.

22         MR. YEAGER:  I think I'm happy to handle it however

23 the Court wants.

24         THE COURT:  What's the rim?

25         MR. YEAGER:  From my perspective the rim is

1    multiple things, and we cite some cases in there.  The

2    *Ulbrecht* case is a case that's well known.  The *Niemi* case

3    are both in there.  They talk about factors to look for with

4    regard to whether or not there's a rim.

5              It doesn't require actual awareness all the time,

6    although that's alleged in the indictment.  Practitioner 1

7    and Practitioner 2 know each other.  They work with each

8    other in the same practice, and they're both part of the

9    conspiracy.

10              THE COURT:  They're the same spoke.

11              MR. YEAGER:  They're not.  They're absolutely not.

12              THE COURT:  Aren't they charged as the same spoke?

13              MR. YEAGER:  No, they're not.  They're bribed

14    separately.  They own pharmacies together, and that's further

15    evidence of actionable information.  Practitioner 1 and

16    Practitioner 2 are separate people in this indictment.  They

17    practice together but they're bribed separately.

18              THE COURT:  I'm looking at paragraph in a section

19    on page 38.  Practitioners 1 and 2 are set out like as the

20    same spoke.

21              MR. YEAGER:  Because they have the same practice,

22    Your Honor.  In terms of the definition of a spoke, there's

23    multiple people that are involved with the conspiracy.  Those

24    two know each other.  Secondly, there's -- you're not talking

25    about selling cocaine here.  You're not talking about selling

1    wheat.  It's not a generic product.  It's a branded drug that

2    relies upon the sales of a very limited number of people

3    around the country that drive the stock and that drive the

4    sale of the product.

5         There's evidence throughout the indictment that

6    talks about the importance of not just speakers but the

7    importance of specific powerfully -- large prescribers and

8    the relationship to the company and the success of the

9    company.

10        These guys are on board trying to make Subsys a

11   successful brand, and they're being bribed to do.  So they're

12   connected that way.  It's not like there's a cocaine dealer

13   on one block and another cocaine dealer on another block, and

14   they don't know there's another guy out there that's

15   distributing to both of them.

16        Here you have one company selling a drug, and in

17   order to get into the market, they're specifically bribing

18   doctors to do it.  So in terms of the *Ulbrecht* case and the

19   *Niemi* case, I think clearly there's a rim.

20        MS. WILKINSON:  Your Honor, would it be appropriate

21   if I address just a few of those issues to focus just a

22   little bit more?

23        THE COURT:  Sure.

24        MS. WILKINSON:  Thank you.  We obviously agree with

25   you that there's a requirement that there be a rim.  I don't

1    think this is really a big question other than the government

2    wants to ignore every civil case that's been issued before

3    *Boyd* and after *Boyd* including people like your sister judges,

4    Judge Forrest in the Southern District and Judge Amon in the

5    Eastern District who went through a very long history of this

6    exact issue about having a rim for this hub-and-spoke, for

7    the enterprise itself.

8              And when they charge every single person, they

9    chose.  They didn't choose to charge just the seven as you

10   suggest.  They chose to put all these people who do not have

11   relationships, who do not have connections and put them into

12   one enterprise.

13             So they have to show as those courts laid out, as

14   your fellow judges here have laid out since 2009, that there

15   is a common purpose.  There are relationships.  And perhaps

16   the government wants to say the rim is something separate.

17   Even if you want to say that, they still are not alleging the

18   common purpose which would be the same concept.  What aligns

19   all of these people that they know they are furthering the

20   enterprise and what the goal of that enterprise is?

21             And they don't have anything in this indictment

22   that alleges all of those people understand what the goal,

23   what the common purpose is of this enterprise and the

24   relationships among those people.  And the government says

25   that in these cases, because we cite civil cases they can't

1    be persuasive because there's a different standard of proof.

2    In those cases they are addressing, except for one that we

3    say is a summary judgment, the legal standard of what is

4    necessary to plead an enterprise as a legal matter, which is

5    the same reason that we're here today.

6            And just as an example, in the *City v. Chavez* case,

7    Judge Forrest specifically talks about the standard and says

8    that it's the standard for a civil or a criminal prosecutor.

9    I don't think all of these judges just missed this concept

10   that the government is trying to convince you of that they're

11   the first ones to contend and the judges all didn't

12   understand that the hub-and-spoke issue, the connection of

13   all the people in the enterprise, is something that is not

14   relevant in a criminal case.

15           But if you want to just set that aside, you said

16   you disagree with him, still focus on making them tell us

17   what the common purpose is and the relationship is among

18   these folks.  Because while RICO is meant to cast a wider

19   net, it is still a limitation.

20           THE COURT:  How do you suggest I do this?  I know

21   your first --

22           MS. WILKINSON:  You know my first answer.  There's

23   a really easy answer for you.

24           THE COURT:  I know.  You want the indictment

25   dismissed.  Then they supersede and we're back here again.

1    And we have a trial date.  Let's just play this out a little

2    bit more.  Does a bill of particulars do it for you?  I know

3    Judge Boal is going to hear the bill of particulars this

4    afternoon.

5           I was thinking on this last night and this morning

6    about kind of how they fix this because I think -- a bill of

7    particulars could arguably do it, but you haven't asked for a

8    particularly broad or detailed bill of particulars.

9           MS. WILKINSON:  Your Honor, a bill of particulars

10   won't fix this and dismissing the indictment.  They won't be

11   able to go back to the grand jury and supersede.  We've seen

12   the discovery.  There are not facts that allow them to plead

13   or they would have done it.

14          THE COURT:  What if they drop out the doctors and

15   the pharmacies and just charge the seven?

16          MS. WILKINSON:  In theory they could do that, Your

17   Honor, but that's not what they want to do because they want

18   to put in these disparate folks, the pharmacies which we can

19   get into why having a contract with them for direct

20   distribution is even unlawful activity.  Going back to your

21   point of what will the instructions look like in this case.

22          They will be a disaster because the government is

23   not telling you what they think the legal standard is.

24   They're trying to convince you that this is a factual issue

25   for the jury when this is clearly a legal issue.  And we're

1   going to ask you to give a myriad of instructions on what is

2   lawful behavior so the jury doesn't convict our clients

3   unfairly and prejudicially for all the lawful conduct that

4   they're trying to characterize as bad conduct or, you know,

5   or illegal conduct.

6           All the things that they lay out in the indictment

7   that they say are the way we're supposedly illicitly

8   distributing the drugs.  What do they say?  They say that we

9   are targeting physicians.  Absolutely they're targeting

10  physicians.  Let's assume all those facts are true.  Of

11  course if you are prescribing a pain medication, you go

12  target doctors who are already prescribing pain medications.

13          They would be outraged if these defendants had gone

14  and targeted gynecologists and internists.  You go to the

15  people who already have the knowledge, expertise and patients

16  who have already had these medications prescribed to them

17  because there's many competitor drugs out.  So you go target

18  those physicians.  You try and convince them that your drug

19  is the right drug and should replace some of the competitor

20  drugs.

21          Absolutely appropriate and lawful behavior and they

22  make that sound like that's somehow criminal behavior.  You

23  tell them the proper dose.  They make a huge deal out of

24  titration and they say that that somehow shows criminal

25  intent.  The label which contains the clinical study says

1    very specifically that 96 percent of the people who use

2    Subsys do not -- it does not have any efficacy -- there's no

3    efficacious proof for addressing the pain.

4           So of course they want people to titrate.  And they

5    want that -- they're trying to make that akin to drug dealing

6    and getting people hooked and keep buying more and more drugs

7    when that is a doctor's decision and totally appropriate and

8    consistent with the science to titrate those patients up to a

9    dose that actually works and addresses their pain.

10          The third kind of type of lawful conduct they try

11   to characterize as unlawful is going out to these pharmacies

12   and saying we're going to have a direct shipment

13   relationship.  The competitors in the marketplace were doing

14   that, but there's nothing unlawful about doing that.  There's

15   still an intermediary.  There's still reporting of the

16   transfer of all those drugs, and there's nothing unlawful.

17          And they want the jury to believe that all of that

18   somehow because this is an opioid and because we're in the

19   middle of an opioid crisis, they want the jury to be confused

20   and think all of that lawful conduct which some people find

21   unattractive, which is marketing and selling prescription

22   medications, they want the jury to think that shows that

23   these folks are criminals.  You know why they're doing it,

24   Judge.

25          THE COURT:  My eight-year-old did tell me he wanted

1    the little purple pill this weekend.

2                MS. WILKINSON:  You know why they're doing it, Your

3    Honor.  They're getting pressure to show that they are being

4    tough on the opioid crisis.  We don't need to guess why they

5    did it.  They put out a press release where they're not

6    limited by the grand jury and they're not limited by you to

7    adhere to the legal elements.  And they said our clients are

8    akin to drug dealers and they fueled the opioid crisis.

9                There is absolutely no evidence that this drug

10   fueled the opioid crisis.  It's .03 percent of the opioid

11   market.  There's not evidence from them that all these people

12   were addicted and died because of an overdose of Subsys.  And

13   they used that press release and they had that pressure, I'm

14   sure, from wherever to make this case look like something

15   more than your kind of garden variety --

16               THE COURT:  Let me interrupt you.  I know I told

17   you at the outset that this indictment sort of perplexes me.

18   What are you alleging is the wrongful conduct?  And if you

19   could relate it what you listed as the RICO predicates, the

20   statutes, that would be helpful because you lose me there,

21   too.

22               MR. YEAGER:  I'm sorry, Your Honor.

23               THE COURT:  I guess I don't really understand what

24   you're saying is the crux of what you think they're doing

25   wrong.  I know we have like mail fraud, wire fraud.  What are

1    you doing?  What are you getting at?

2            MR. YEAGER:  There's a scheme that's completely

3    independent of one another.  To first of all, bribe doctors

4    to prescribe the drug.  And after they bribe doctors, they

5    can't get money for it.

6            THE COURT:  You're talking about the Speakers

7    Program?

8            MR. YEAGER:  Yes.  Well, the Speakers Program is

9    the biggest part of it.  By the way, and I don't want to get

10   into a back and forth about the details of it, but Your Honor

11   has extensive experience with the pharmaceutical industry.

12   This is not the normal pharmaceutical world.  Mr. Kapoor went

13   to Alabama and participated in a meeting in which doctors

14   were explicitly bribed.

15           It's just not like other pharmaceutical companies.

16   They bribe doctors repeatedly, glaringly, in black and white,

17   which the indictment is the filled with examples of, all over

18   the country to prescribe the drug to people.  They targeted

19   certain types of physicians.  They didn't just go after

20   people, oncologists or whatever.  They went after people who

21   they knew ran pain clinics.

22           And there's evidence in the indictment, Your Honor,

23   where the CEO of the company is told by sales reps, we're

24   supposed to go to Dr. X, and Dr. X we think he's under

25   investigation by the DEA.  He's lost his ability to prescribe

1     narcotics, to sell narcotics out of his pharmacy, and a week
2     later they make him a speaker.  And there's multiple examples
3     of that.
4            THE COURT:  On the bribery, on the kickbacks, I
5     think, and I may have this wrong, but I think all they're
6     really saying on Count 4 is that you haven't really laid out
7     an overt act.  Right?  So let's assume that the kickbacks,
8     that that's a crime.  Okay?  How do you wrangle like honest
9     services into that?
10           MR. YEAGER:  So honest services is reflected to the
11    fiduciary duty of the doctors.
12           THE COURT:  Explain to me how the doctors have a
13    fiduciary duty and to who.
14           MR. YEAGER:  To their patients.
15           THE COURT:  A fiduciary duty?
16           MR. YEAGER:  They do.  They have a fiduciary duty
17    to their patients.
18           THE COURT:  What does that come from?
19           MR. YEAGER:  It comes from multiple places, but it
20    comes from specific state law.  It also comes from findings
21    by -- the best case to give an example is the *United States*
22    *versus Nayak*, N-A-Y-A-K.  It's a Seventh Circuit case that
23    details the theory.  It was used effectively in that circuit.
24           There's also a case out of the New Jersey, and I
25    can provide the Court with the cites.  I think it's called

1    *Greenhouse* that involved the same theory, Your Honor.

2              THE COURT:  Okay.  Honest services, that's another

3    charge that is so difficult and now limited.  Why aren't we

4    just going with the kickbacks?  Again I don't want to overly

5    get into your business on the charging decisions, but I am

6    thinking ahead on this and how we're going to charge the

7    jury.  And I don't want to send a case forward that can't be

8    sustained.

9              So assuming that the kickbacks are a viable theory,

10   why the honest services?  What are you getting on the honest

11   services that you're not getting some place else and that's a

12   much better fit for the conduct.

13             MR. YEAGER:  The severity of the crime, the

14   penalties that are available and the breadth of the conduct.

15   This is absolutely beyond -- this is not a situation, Your

16   Honor, where we can talk about disagreements about whether a

17   $150 dinner is too much or a $200 dinner is too much.

18             THE COURT:  Do you have evidence that doctors are

19   inappropriately prescribing this drug for patients?

20             MR. YEAGER:  Yes.  And they know that.  We've

21   provided transcripts of a doctor who testified in the grand

22   jury in this particular case, Your Honor, who specifically

23   said, I prescribed Subsys to people who didn't need it

24   because they bribed me."  I don't have to worry about the

25   vagaries of the AKS statute in this district, which is a

1    mess.  It's straight up bribery.  That's what it is.  And

2    it's borne out in black and white unlike any pharmaceutical

3    case I'm confident Your Honor has ever dealt with.

4          THE COURT:  Why aren't you just charging it as

5    straight up bribery?

6          MR. YEAGER:  Because the bribery that takes place

7    here takes place in multiple different jurisdictions.  It's a

8    national effort.  The way to deal with it is through mail

9    fraud and wire fraud.  I understand the Court is not happy

10   with the charging decisions that we made, but the evidence is

11   there to back this up.  It really is.

12         THE COURT:  Mr. Yeager, that's not how this works.

13   You don't just get to stand there and tell me there's enough

14   evidence.

15         MR. YEAGER:  With all due respect to the Court.  I

16   generally appreciate the frankness, but it's unusual to have

17   a Court come out and say I prefer you do one charge instead

18   of another.

19         THE COURT:  I've just never seen an indictment

20   that's a RICO count and then three other conspiracy counts.

21   I don't understand what you're trying to get at.  And I know

22   what the problem is with the RICO, there's not -- you're

23   missing the rim.  I don't know if that can be fixed or not.

24   So I'm trying to --

25         I haven't made any decisions on this.  But my

1    initial impression is, and we'll keep discussing it today, is

2    that there are kernels of criminal activity buried in this.

3    But you've got to so obfuscated in the RICO and these

4    conspiracies without charging any kind of substantive

5    offense.  I think it's hard to understand what the indictment

6    is charging.

7          I look at Counts 2 and 3 and I really can't tell

8    the difference.  What's the difference?  I know it's mail

9    fraud and wire fraud, but I can't look at Counts 2 and 3 and

10   see what the conduct is that you're getting at.

11         MR. YEAGER:  Mail fraud Count 1 is specifically the

12   bribes.

13         THE COURT:  Count 2?

14         MR. YEAGER:  Count 2.  I'm sorry, yes.

15         THE COURT:  How do I read that and know that?

16         MR. YEAGER:  I think the fastest way to do it, Your

17   Honor, is to look at the indictment.  If you look at -- a lot

18   of this in terms of a bill of particulars, Your Honor, is

19   really form over substance.  If you look at the indictment

20   and you look at paragraphs 47 to 119, it's entitled The

21   Scheme.  But really what it is is the means and manners by

22   which they accomplished these separate different criminal

23   actions.

24         The first part, it comes in five parts.  Part A is

25   bribes related to the Speaker Program.  That's paragraphs 48

1    to 69, and it details how they did the bribes with the

2    Speaker Program.  It talks about how they used speaker

3    honoraria.  How they were exacting a quid pro quo.  How they

4    used dinner and entertainment.  Those are all in those

5    different paragraphs.

6          THE COURT:  Let's go back to Count 2.  You

7    incorporated 1 through 241.

8          MR. YEAGER:  Yes.

9          THE COURT:  And then you have like the most -- all

10    you do is parrot back the statute, right?  There's no

11    substantive counts.  You're not giving me any specific

12    mailings to look at.

13          MR. YEAGER:  That's the reason for the examples

14    that are provided, Your Honor.  The examples detail, if you

15    follow through with the examples at the end, those are

16    essentially the overt acts in the case.  If you go through it

17    you'll see all the different allegations as it follows

18    through each one of those practitioners.

19          So, for instance, the means and manners of the

20    scheme with regard to bribes related to speaker kickback

21    program are 48 to 69.  If you look at each one of the

22    practitioners, you'll see each one of the means and manners

23    discussed in that particular section as it follows through

24    each one of those doctors.  Same thing with bribes related to

25    administrative support.  Same thing with regard to drugs.

1          THE COURT:  You mean Count 2 to encompass each of

2    those five different things?

3          MR. YEAGER:  No.  I mean Count 2 to encompass

4    bribes paid to them for Speaker Programs.  Whether they be --

5    mostly they were monies and also sham Speaker Programs.

6          THE COURT:  How do I get that out of this?

7          MR. YEAGER:  If you look at bribes related to

8    Speaker Programs, paragraph 48 to 69.

9          THE COURT:  I'm looking at Count 2.  How do I get

10   to Count 2 and figure out what you're talking about?

11         MR. YEAGER:  Count 2 encompasses the entire

12   indictment.

13         THE COURT:  Yep.

14         MR. YEAGER:  It references back all of the

15   indictments.  There's a table of contents in the indictment,

16   and it refers you to the bribes related to the Speaker

17   Program which is paragraphs 48 to 69.  And then you can see

18   the manner and means by which the company set up the scheme,

19   and then you see it play out within --

20         THE COURT:  Wait.  I'm at the table of contents.

21   How does it say --

22         MR. YEAGER:  Do you see the scheme there?

23         THE COURT:  Yes.

24         MR. YEAGER:  If you go to that page.

25         THE COURT:  Yes.

1      MR. YEAGER:  That section of the indictment is

2  paragraphs 47 to 119, Your Honor.  It details the manner and

3  means of all of the allegations in the indictment.

4      THE COURT:  But how do I get what you're charging

5  in Count 2?

6      MR. YEAGER:  So Count 2 is related to bribes

7  related to Speaker Programs, 48 to 69.  Look at paragraphs 48

8  to 69, Your Honor.

9      THE COURT:  How do I link that to Count 2?

10      MR. YEAGER:  Count 2 references all of the

11  paragraphs in the indictment, Your Honor.

12      THE COURT:  I know.  Count 2 and Count 3 are

13  basically exactly the same, right?

14      MR. YEAGER:  No.

15      THE COURT:  What do you mean no?

16      MR. YEAGER:  Count 3 is wire fraud.  Count 2 is

17  mail --

18      THE COURT:  Other than that, other than changing

19  the word from mail to wire and wire to mail, they're exactly

20  the same, right?

21      MR. YEAGER:  No.

22      THE COURT:  Tell me how I look at these counts and

23  figure out how they're different.

24      MR. YEAGER:  Because when you read what the mail

25  fraud was in the context of the narrative in the indictment,

1    you see the allegations relating to the mailings.

2            THE COURT:  Where does it say mail fraud in the

3    indictment?

4            MR. YEAGER:  It doesn't say mail fraud in the

5    indictment, in the narrative of the indictment, Your Honor.

6    It doesn't have to.

7            THE COURT:  I can't figure out what you're alleging

8    is mail fraud.  The mail and the wire fraud, the language is

9    exactly the same.  I can't tell what you're calling mail

10   fraud or what you're calling wire fraud.  I can't look these

11   counts and have any idea what you're alleging they did wrong.

12           MS. WILKINSON:  And, Your Honor, they also mention

13   honest services and obtaining money and property by means of

14   materially false and fraudulent pretenses.

15           THE COURT:  I know you think those are two separate

16   things.  I'm trying to figure out how -- Normally a mail

17   fraud conspiracy is accompanied by a substantive mail fraud

18   charge which lists out some mailings that you think are a

19   problem or lists out some wire transfers, and that kind of

20   anchors the conspiracy charge so you know what you're talking

21   about.  I have no idea what you're talking about here.

22           MR. YEAGER:  If you read the examples that are

23   provided at the end of the indictment, Your Honor, it goes

24   through the amount of checks that were spent as far as the

25   bribing was concerned; that they were mailed to the

1    practitioners; and relates the schemes that are described in

2    the manner and means.

3            THE COURT:  Are you suggesting that I should do a

4    bill of particulars where I make you identify for them what

5    the mailings are that you think are problematic?

6            MR. YEAGER:  I specifically identify all of the

7    mailings are the checks, Your Honor, in the indictment.

8            THE COURT:  But not in connection with Count 2.

9            MR. YEAGER:  No.  I cross-reference the entire

10   indictment.

11           THE COURT:  I'm just trying to think about the

12   presentation of that.  I have no idea how you do that or how

13   I charge on it.  It's so vague.  Why aren't you limiting it

14   to the paragraphs that have the mailings in them?  I just

15   think for them to try and use this document to get ready for

16   trial just seems very challenging to me.

17           Count 2 just -- and the same with Count 3.  It

18   doesn't give them any idea what the mailings or the wires

19   are.

20           MR. YEAGER:  Respectfully, Your Honor, I think it

21   gives -- if you read through the examples that are at the end

22   of the indictment, it makes it very clear how each one of

23   those doctors was bribed and the manner in which the mail was

24   used with regard to them.  And it does the same with regard

25   to wire communications and the insurance industry.  They're

1    on the phone talking to insurers lying.  It does lay it out.

2    It really does.

3            I understand the Court is unhappy with the fact

4    that I don't specifically name paragraphs, specific

5    paragraphs and cross-reference back.  But that doesn't --

6    that's not required by the law.

7            THE COURT:  They have to be able to know what

8    they're defending.  What you've basically said here is they

9    do many bad things.  They do 241 paragraphs of bad things,

10   and some of them use the mail and some of them use the wires.

11   Let's get back to the rim.  What do you want to do about the

12   rim?  You need a rim.

13           MR. YEAGER:  I think we want to talk about how we

14   want to handle it, and we'll get back to you on that.

15           THE COURT:  Ms. Wilkinson and anyone else for the

16   defense, do you want to say anything else about the rim idea?

17           MS. WILKINSON:  Yes, Your Honor, because I think

18   it's consistent with the common purpose and the relationship.

19   What I hear the government saying is there's a doctor over

20   here and he was bribed.  And then there's a doctor over here

21   and he was bribed; and then there's a doctor over here and he

22   was bribed; and there's a pharmacy over here and they

23   participated.

24           Assuming all that's true, it doesn't show that

25   these people are interconnected, which the government doesn't

1   dispute that's required.  They don't dispute they need to say

2   and show allege, a common purpose, and that they need to

3   allege the relationship among everyone.  Again, they chose to

4   make this group broad and nationwide as they said it.  If

5   you're going to do that, then you also have to plead it

6   properly so everyone understands and we're on notice what is

7   that relationship among all those disparate people.

8           And that's why all those other cases show when

9   either a private litigant sues under RICO and has disparate

10  people involved, many many times the reason it's dismissed is

11  because there's not a show of a common purpose for the

12  enterprise, and there's not a relationship among everyone.

13  And what you are suggesting is, well, you could shrink it.

14  That's true.

15          They chose not do that because they wanted a

16  nationwide conspiracy, and they can't fix it by giving a bill

17  of particulars.  I really urge you that's not a fix because

18  they are not alleging things that --

19          THE COURT:  It's not a fix for the rim.  But let's

20  see what they come up with on the rim.  It can fix other

21  things.

22          MS. WILKINSON:  Well, it's not a fix for the

23  pattern -- agreement on the pattern of racketeering activity.

24  And this goes to what you raised with them with Count 2 and 3

25  and then the predicate acts.  So everyone agrees that they

1   have to show that all of the defendants agreed that two

2   racketeering acts had to be agreed upon and would further the

3   enterprise.  They haven't done that.

4   And then when they give the predicate acts which

5   they then -- they repeat in Count 2, which I didn't

6   understand what the government said.  You asked a very

7   specific question and the government said, well, this is

8   about bribing.  But then when you read what Count 2 says, and

9   this is showing you that we don't know what they're talking

10  about, they don't just talk about bribes.  They talk about

11  the honest services and the obtaining money and property

12  which is the fraud upon the insurance company.

13  That is not the same even under their allegations

14  as bribing the doctors.  That is people within the company

15  they say calling the insurance company and not providing

16  truthful or providing misleading information.  So you can't

17  look at just the paragraphs he's claimed to look at to figure

18  out what the proof is or the allegation is specifically for

19  the mail fraud and as you say the difference between the mail

20  and wire fraud.

21  But go back to the predicate acts.  They're asking

22  you and us to figure out the four states they allege, one

23  which is almost clearly the bribery statute is

24  unconstitutional as to physicians down in Florida.  They

25  don't even address that in their pleadings.  They don't even

1    mention it.  Texas, New Hampshire, and Connecticut.  Almost

2    never used by the state.  No evidence of where there the

3    doctor has -- because they're never used, I don't know what

4    they're talking about where that duty comes from.  How am I

5    supposed to go look at and say here's the duty, that's the

6    source of the duty for the honest services that this doctor

7    supposedly violated.

8              And again assume what they say is true.  Assume

9    that the doctors were bribed to prescribe.  That is an

10   anti-kickback violation.  Clearly that would be an allegation

11   of an anti-kickback violation.  But how are they, if you

12   don't understand the duty, harming the patient?  Let's assume

13   this patient was using a competitor called Actiq, which is a

14   lollipop that has an opioid in it that is a pain reliever as

15   well.  If you go that doctor and you say, okay, I want to pay

16   you because I don't want you to prescribe Actiq; you've

17   already made a medical decision that that's appropriate for

18   that patient; I want you to prescribe Subsys.

19             They allege that that's an anti-kickback violation.

20   Assume that's true.  How is that a violation of honest

21   services?  The patient is still getting a drug that they

22   need.  The FDA has already said that these drugs have the

23   same indication.

24             THE COURT:  What they're saying is that because of

25   the bribes they were prescribing it to people that didn't

1    need pain medicine at all.

2         MS. WILKINSON:  That's not what they say in almost

3    all of these, and we don't have that evidence.  Mr. Yeager

4    pointed to one transcript that he said where one doctor said,

5    I was bribed and I didn't prescribe it where it was medically

6    necessary.  That's not the allegation -- again this is the

7    problem with the common purpose, the rim and the

8    relationships.  That's not what all the other doctors say,

9    and that's not what the allegations here say.

10        In fact, they go out of their way not to say it.

11   If you look at the other indictments that have been released

12   related to this conduct, there are no racketeering

13   enterprises pled in all those recent indictments that were

14   released, none down in the Southern District of New York

15   where they're charging the doctors.  The only place they even

16   mention a RICO enterprise is down in Alabama with

17   Practitioners 1 and 2 who, as you were kind of alluding to

18   know each other, own the pharmacy, and that was the

19   enterprise.  That was it.

20        Nowhere else are they saying that these folks were

21   violating, doing an enterprise.  What do they say?  They

22   charged those doctors in the Southern District and elsewhere

23   with failing or prescribing when there's no medical

24   necessity.  And they lay it out.  There is only, I think, one

25   mention in the entire indictment where they say they don't

1    know -- there's a concern about medical necessity.  That's

2    it.  They don't want to say that because they know that most

3    of these physicians in the records show that there was a

4    medical necessity.

5          By virtue of what they're saying, that you're

6    targeting doctors who are already prescribing the competitor

7    medications, those doctors have already made that decision

8    that that patient has a medical necessity for that

9    prescription or at least the person talking to them --

10          THE COURT:  Mr. Yeager, hum a few bars of the

11   medical necessity piece for me.

12          MR. YEAGER:  So in terms of that, there's a couple

13   of things that are being ignored here.  First of all, three

14   of the ten doctors in the indictment have been specifically

15   convicted of illegal distribution of Subsys.  Counsel doesn't

16   tell you that.  One of them testified in our grand jury as I

17   described.  Two of them are cooperating in the case.

18          With regard to the indictment, in addition to what

19   I've just said, there's a text that deals with Practitioner

20   Number 5, Your Honor, that deals with conversations with Rich

21   Simon who is one of the alleged defendants in this case.

22   Paragraph 189, "On or about March 11, 2013, Simon sent the

23   email to sales representatives for Practitioner Number 5

24   complaining that three out of four scripts he wrote were for

25   refills and were still low.  Simon instructed the sales

1    representative to admonish office staff for Practitioner

2    Number 5, 'drill into his head that every refill has to be

3    180 to 200, etc., and that he agreed to do this.'"

4            So the allegations are that they actually bribe

5    these doctors.  There's a quid pro quo.  It's very clear.

6    They track ROI.  Not ROI of attendees, Your Honor, but ROI of

7    the speaker for the number of prescriptions that he's

8    writing.  And they compare it with the ratio, and that's in

9    the indictment.  They say we paid Doctor Number One X, and

10   he's only written prescriptions with net revenue of Y.  And

11   if he won't write more, we're going to delete his programs,

12   and he's not going to get to be a speaker of ours.

13           So they're requiring these doctors to make

14   agreements to prescribe the medication to patients before

15   they ever see the patient.  And it's in black and white in

16   here.  So it's not like a typical pharmaceutical case in any

17   way shape or form.  It just isn't.

18           THE COURT:  The basis of your controlled substance

19   violations, that's the idea that they're giving the drug to

20   people that don't have a medical need?

21           MR. YEAGER:  Yes.  As far as a controlled drug.

22   They're bribing doctors to prescribe the drug without a

23   medical necessity outside the scope of ordinary practice.

24   And in addition to that, if you need any confirmation that

25   I'm right when I say that, when you look in the section in

1    the indictment that talks about suspicious orders, John

2    Kapoor is on an email with several of the defendants in which

3    they talk about the reason that they're directly shipping, in

4    part, is because they're trying to subvert the scrutiny of

5    the Drug Enforcement Administration with regard to their top

6    prescribers, Practitioners 1, 2, and 3.  So they know that

7    the DEA is looking at these guys.

8           In addition to what I said before about how they

9    would go ahead and sign people up, they target pain clinics,

10    they sign people up who they know are pill mills, and then

11    they have specific allegations in those pill mills and they

12    make them speakers.  Then in the back when they're getting

13    scrutiny from the DEA, they then go out of their way to help

14    them avoid that scrutiny with suspicious order reporting.

15           And last with regard to the doctor in Arkansas,

16    Practitioner Number 4.  He says to them flat out, if you guys

17    can get me to be able to prescribe -- to sell schedule 2's

18    out of my pharmacy, you'll have as many scripts as you need.

19    So this company, unlike any pharmaceutical company I've ever

20    seen, is specifically negotiating with these doctors around

21    the country to prescribe drugs to patients before they ever

22    need them.  And it's not just a drug, Judge.  It's a Schedule

23    2 narcotic.

24           One of the reasons that we chose a fiduciary

25    relationship theory and one of the reasons that we chose RICO

1   is this case is markedly different.  The Court has expressed

2   concern about the indictment.  I take responsibility for

3   that.  But the reason I go into as much detail as I do

4   talking about quoting emails, quoting phone calls, is to

5   demonstrate to this Court this case is markedly different

6   than anything Your Honor has ever seen.  And I know who I'm

7   talking to when I say that.

8         Your Honor has extensive experience with

9   pharmaceuticals.  You just haven't seen behavior like this.

10  It is entirely different than what's come before, and it's in

11  black and white.  It's not me making it up.  They say stuff

12  over and over and over.  They didn't even have corporate

13  counsel until 2014 which means there's all kinds of email

14  traffic and texts which are quoted here.

15        So I understand the Court has an obligation to make

16  sure that the case makes sense before it's presented.  But

17  this case charges a unique fact pattern, and it's worthy of

18  RICO and it's worthy of honest services.  I think we meet the

19  burden.

20        THE COURT:  I don't mean to take you on about

21  whether or not there's bad conduct here.  What I'm concerned

22  about is the way that it's charged.  My jurisdiction, so to

23  speak here, is sort of limited, right?  I can't make you

24  indict it the way that I would have indicted it.  But I need

25  to -- what I can do is make sure that the offenses that

1   you've chosen to charge are properly charged.  And I would

2   like to see it -- I would like to understand it in a way that

3   I can figure out how we're going to present it to a jury and

4   how we're going to charge a jury.

5           I get that's not today's battles.  I'm just trying

6   to think ahead.  Back to what I said at the beginning - I

7   don't want to try a case for 14 weeks and then say, hey,

8   there's still no rim.

9           MR. YEAGER:  Can I make one more point, Your Honor,

10  just in terms of Your Honor thinking about this.  With regard

11  to the mail fraud, if I could direct the Court's attention to

12  a couple different paragraphs.  There's examples of this

13  throughout all ten of the practitioners.  Look at paragraph

14  208 in the indictment.  It's how we tend to end each one of

15  these practitioners.

16          THE COURT:  Hold on.

17          MR. YEAGER:  It alleges the defendants have no

18  doubt as to where we're going with mail fraud.  Between in or

19  about December of 2012 and April of 2015, the defendants and

20  co-conspirators known and unknown to the grand jury sent and

21  caused to be sent to Practitioner Number 7 checks totalling

22  $78,758.25 for Speaker Program bribes and kickbacks.

23          We do that in paragraph 232, paragraph 241.  It's

24  throughout the indictment.  They know what we're talking

25  about when we're talking about the Speaker Program.  And not

1   only have we done that, Judge, but in terms of discovery

2   here, we turned over all the grand jury minutes at

3   arraignment.  We turned over all of the grand jury exhibits

4   at arraignment.  And they explicitly lay out all the checks

5   totaling, all the details for what they received, when they

6   received it, who wrote the checks.  All of that was given to

7   them from the very beginning when they walked into this case.

8   So it's there.

9            And again, I respect the Court is trying to get

10  through this, and I know it's a novel approach, but I would

11  ask the Court to consider the complexity of the scheme itself

12  and how the government was forced to deal with it.  And then

13  how we dealt with discovery on top of the bill of particulars

14  because we haven't hidden the ball here at all.  It's there

15  for them to see.

16           MS. WILKINSON:  Your Honor, this is the difficulty

17  in arguing about the facts.  Obviously Mr. Yeager is giving

18  his version of the facts, and we disagree with those facts.

19  One I just wanted to clarify because I think it's so

20  misleading to the Court and to the public.  He's talking

21  about evading DEA requirements.

22           The only allegations that they provide are that

23  there were wholesalers and shippers who had their own

24  internal guidelines because they then in turn had to make

25  suspicious order reports.  There's no allegation that those

1    weren't made.  In fact -- and they are made based on all

2    fentanyl products, not Subsys alone.  And he tells you about

3    an email that was sent to Dr. Kapoor, and then he doesn't

4    tell you the rest where it specifically says that, "We're

5    learning more and we want to make sure we're looking into the

6    actions we can take as an organization to ensure we are

7    properly complying with the DEA rules and guidelines."

8           So there's a reason at this stage we're not talking

9    about the facts.  We're talking about whether they have pled

10   appropriately the crimes they claim they want to charge our

11   clients with.  And they have not done that.  It shouldn't be

12   that you have to ask them and we have to ask them seven

13   different times to point out to us what the evidence is,

14   where the duty comes from, and what is the common purpose and

15   the agreement on these predicate acts.  But that's what

16   they're doing.

17          They're not going to fix it by doing a bill of

18   particulars.  They're not going to fix it even by -- it will

19   be better for us, but by dismissing the indictment because

20   they don't have the evidence to show this nationwide

21   conspiracy.

22          THE COURT:  On Counts 2 and 3, and I need to think

23   about what they've said and go back and look at it again, but

24   couldn't we fix Counts 2 and 3 with a bill of particulars?

25   These are the mailings; these are the wires.

1          MS. WILKINSON:  I don't think so because you have

2     the honest services problem.  Again maybe if you dropped some

3     of those, but that's the problem.  And you have two different

4     conspiracies in one count.  I think it's clear when you read

5     the indictment they say some people have agreed to defraud

6     the insurance companies, and then they say that other people

7     have agreed to bribe the doctors.

8          Mr. Gurry would be an example, a defendant.  They

9     put him in the category of bribing the insurers, but they

10    don't put him in the category of bribing the doctors -- or

11    lying to the insurers, of bribing the doctors.  Yet they put

12    those two conspiracies into Count 2 as one conspiracy and

13    into Count 3 as one conspiracy.  When you read through the

14    entire indictment there's no evidence linking that particular

15    defendant to both of those conspiracies.

16         So I don't know how they fix it.  And you're

17    allowed under the rules when they do that to dismiss the

18    count.  They don't disagree with that.  They just say, oh,

19    no, that's a factual question.  These are not factual

20    questions.

21         THE COURT:  Couldn't that be fixed with a jury

22    verdict form that says there's this object, there's this

23    object, and you make them do a separate verdict form for each

24    defendant on each of the two objects.

25         MS. WILKINSON:  In theory it could be fixed after

1  we've suffered unbelievable prejudice in not being able to

2  prepare for trial.  As you say, it's not let's see how the

3  government does and defendants will figure out what they

4  meant when they submit their submission on their

5  instructions.

6           THE COURT:  You could --

7           MS. WILKINSON:  Verdict form.

8           THE COURT:  I'm thinking aloud.  How about a bill

9  of particulars that says which people they think did honest

10 services fraud, who bribed the insurers, who bribed the

11 doctors.

12          MS. WILKINSON:  I think that would be a start.

13          THE COURT:  You don't ask for a lot of that.  You

14 asked for stuff, but you don't ask for all that stuff.

15          MS. WILKINSON:  No.  We do ask for that.  Mr. Katz,

16 could you address that briefly?

17          MR. KATZ:  We do ask for that.  We don't highlight

18 it in our reply brief, Your Honor, but in our opening

19 brief we specifically ask --

20          THE COURT:  I'm looking at the motion for the bill

21 of particulars.

22          MR. KATZ:  Yes.  In our opening brief and in our

23 motion we do ask for -- maybe it's not the defendants, but at

24 a minimum which co-conspirators are in which scheme.  And

25 because we believe that the honest services fraud scheme and

1  the money and property fraud schemes or alleged fraud schemes

2  are separate fraud schemes, we are asking for the government

3  to say was the prior authorization specialist in the bribery

4  scheme or just the insurance fraud scheme?

5          THE COURT:  Which paragraph are you looking at?

6  I'm looking at the motion for the bill -- I know this is not

7  in front of me, but just to make sure.  You asked for

8  basically six things, rights?

9          MR. KATZ:  Six things.  I would say it is in number

10  three, "the names of the co-conspirators who engaged or

11  participated in the alleged conduct as well as identification

12  of which alleged conspiracy each alleged co-conspirator had

13  joined."  We understand that the government is charging here

14  that Michael Gurry was in the physician bribery scheme even

15  though he worked in the internal reimbursement center, had

16  nothing to do with Speaker Programs.  We understand they're

17  charging that.

18          But we don't understand with respect to the

19  co-conspirators, many of whom are named, many of whom are not

20  in the discovery letters.  We don't understand which

21  co-conspirators are in which scheme.  And, of course, they're

22  saying that the money and property scheme, the defrauding

23  insurers and the honest services scheme, which is the bribing

24  of physicians, they're calling that one big scheme, one

25  object.

1          I agree with Ms. Wilkinson that you can't cure that

2     with necessarily a verdict form.  The prejudice is when the

3     evidence comes in and the *Petruzziello* findings are made, and

4     the jury is potentially charged prior to the evidence coming

5     in.

6          THE COURT:  You think that the four conspiracies

7     they have charged aren't enough; that we should add another

8     three?

9          MR. KATZ:  I agree with Your Honor.  I would have

10    charged this as simply an Anti-Kickback Statute 371

11    conspiracy.  That seems pretty simple.  They're trying to

12    convert essentially any AKS conspiracy, maybe as long as it

13    involves a controlled substance into an honest services fraud

14    scheme as well.  They don't need to show anything more than a

15    bribe and a controlled substance, and all of a sudden you

16    have an honest services fraud scheme.

17         I think we would prefer a single count indictment.

18    But what we certainly don't prefer is Count 2 charging two

19    conspiracies in a single count and Count 3 essentially

20    charging the same two conspiracies in another count.  It's

21    both duplicitous and multiplicitous.  It's something I have

22    not seen before.

23         MR. YEAGER:  If I might, Your Honor.  What we've

24    just heard is defense counsel telling the Court the charges

25    they prefer to have for their clients.  That's not how it

1    works.  I understand the Court is trying to get through this.

2    The racketeering conspiracy, I would ask the Court to the

3    consider two things.  First of all, in terms of our ability

4    to prove this case and how we chose to charge, racketeering

5    conspiracy we believe given the breadth of the conspiracy is

6    easier for us to prove than the mail fraud conspiracy or the

7    wire fraud conspiracy.

8            And secondly, there's a reason that the only cases

9    they can cite in defense of this rim, the rim issue going to

10   the enterprise are only civil.  And that's because what

11   they're asking this Court to do has never been done.  And

12   that is to say, that the enterprise requires a rim.  It's not

13   been done criminally.

14           THE COURT:  Is the argument that the standard is

15   lower on the civil side than it is on the criminal?

16           MR. YEAGER:  No.  The argument, and I'll let my

17   brother argue this.  He's more attune to.  The argument is

18   that when you're a civil attorney and you're sitting down to

19   write, and there's reasons that you want to charge RICO, Your

20   Honor knows, that you fill out a complaint, you sign it and

21   you send it in.  And that's all the scrutiny that you have.

22           And there's extensive examples of that, how those

23   cases need to be gotten rid of.  I'm not saying that those

24   judges didn't have a right to get rid of those charges.  I'm

25   just saying when we say to them they're only citing civil,

1    and they're not considering the process that occurred here.

2    What do they do?  They double down with eight more civil

3    cases.

4            THE COURT:  I looked.  There aren't any criminal

5    cases.  There aren't any criminal cases that come down either

6    way on this.  I'll look at *Elliott* again.  The only guidance

7    that we have are the civil cases.  And then all the case law

8    that says the civil case law is equally applicable to the

9    criminal arena and vice versa.

10           MR. YEAGER:  You have *Elliott* and then you have

11   *Turkette* in the First Circuit -- I'll let Mr. Quinlivan take

12   this.

13           MR. QUINLIVAN:  Your Honor, just briefly.  I think

14   you do have additional guidance because in both *Turkette* and

15   *Tashjian* the First Circuit cited *Elliott* with approval for

16   the proposition that RICO conspiracy casts a wider net than

17   traditional conspiratorial -- traditional conspiracy.  And

18   they expressly cite 571 F.2d at 902-903.  The other one is

19   471 F.2d at 902.  Those are the pages where we block quoted

20   the *Elliott* for the proposition that the enterprise has

21   supplanted the wheel and chain limitation on

22   conspiratorial -- for traditional conspiracy.

23           There's no other way that the First Circuit could

24   be adopting that and saying that RICO conspiracy casts a

25   wider net but to be adopting what the *Elliott* Court said.

1          THE COURT:  I don't have those cases in front of

2     me.  What's the page of your brief, Mr. Quinlivan?

3          MR. QUINLIVAN:  It's on page 14 to 15 of our brief.

4     The first case is *Tashjian* at 660 F.2d 829.  The pincite is

5     834 where the First Circuit said, "The breadth of the alleged

6     conspiracy does not in itself evidence impermissible

7     prosecutorial objective but rather simply reflects the fact

8     that RICO enables the government to cast a wider net than was

9     possible under traditional conspiratorial principles."

10    Citing *Elliott* 571 F.2d at 902, 903.

11         THE COURT:  I did not go back and read those cases

12    and I will.  The reason that I didn't is I don't disagree

13    with what you've cited there which is the idea that RICO

14    casts a wider net than a conspiracy.  It's an inartful way of

15    saying it because I don't have time to be more artful as I

16    sit here.  You don't have to show each of those spokes

17    conspiring with each other.  I have understood that's what it

18    means when it says casts a broader net.  But I do think you

19    have to show an interrelationship between them.

20         Now, because I thought you were citing those two

21    cases for the wider net principle, which I agree with, I

22    didn't go back and read those two.  But I will.

23         MR. QUINLIVAN:  I think it's important you read

24    those cases and then go back that they're citing *Elliott* for

25    that proposition, and what does *Elliott* say on pages 902 to

1     903.

2            THE COURT:  Okay.  So I will do that.

3            MR. YEAGER:  In terms of just working through this,

4     and I'm happy to brief the Court again.  I don't know how

5     we're going to handle the motion in front of Judge Boal later

6     this afternoon because we've talked extensively about a bill

7     of particulars.

8            My concern most importantly is with the RICO

9     charge.  And in terms of a bill of particulars, and I

10    understand counsel's position on that and we've argued that.

11    The government is happy to concede at some level to provide

12    additional information in the bill of particulars with regard

13    to the mail fraud allegations or details of the wire fraud

14    issues.

15           I think, the two concerns I have are that I don't

16    think that their position on rim is accurate.  We've charged

17    other wire fraud conspiracies in this district.  And I've

18    seen defense counsel stand in front of a jury with a picture

19    of a map and claim how is the CEO supposed to know what was

20    going on here, and how is the VP of sales supposed to know

21    what was going on there?  And RICO solves that problem for us

22    much better than the other charges.  That's one reason that

23    we chose it.

24           As far as the counts are concerned, we're happy to

25    take a look at whether or not in terms of a jury issue it's

1      appropriate to include all four conspiracies in terms of what

2      goes to the jury.

3              And last, as I said, if the Court has specific

4      concerns about a bill of particulars, we'd be happy to

5      provide that.  The defendants, just so the Court -- and this

6      is in the papers, they gave us literally a list of

7      interrogatories with regard to what they want in terms of

8      bill of particulars.  It went above and beyond anything that

9      I've ever seen as far as a request for bill of particulars is

10     concerned.

11             THE COURT:  All right.  I too will be interested in

12     seeing what Judge Boal does.  She's probably much smarter and

13     more clever than I am, and maybe she has some elegant

14     solution to this that I haven't come up with.  So we can all

15     see what she does this afternoon.

16             I will take a look at what you've argued today.

17     It's all been very helpful.  I know the government probably

18     feels that they've been assaulted today.  I don't mean to

19     suggest that you were crazy to bring the case.  There's

20     clearly -- from what it appears to me now, the indictment has

21     a core of conduct that is problematic and may well be

22     criminal.  I don't know.  That's what a trial is for.  I'm

23     having difficulty with the way it's laid out.  Maybe that

24     will make you feel better on your way to lunch.

25             I am concerned about the hub on the RICO.  And then

1    I wonder if we get it together on the RICO, but doesn't at

2    the end of the day make more sense to have the RICO go to the

3    jury and not all these other ancillary conspiracies.  I'm not

4    sure what they get you beyond the RICO.

5              MR. YEAGER:  I understand the Court's point.

6              THE COURT:  Again I know that's not my job, and I'm

7    not -- but just trying to think ahead about what this is

8    going to look like at trial and how it's going to go to a

9    jury.  And if it can be -- I guess what I'm sort of trying to

10   get at is if this can be all clarified and simplified and it

11   can be done through a bill of particulars, I'm thinking about

12   it now because the bill of particular issue is ripe now.

13             And if this can all be streamlined and clarified

14   and some of their legitimate concerns can be addressed, I

15   want to do now at the bill of particular stage rather than

16   chucking an indictment that clearly has a core of conduct

17   that is worth looking at.

18             MS. WILKINSON:  Your Honor, could I follow up on

19   one thing Mr. Yeager said to ask you?

20             THE COURT:  Yes.

21             MS. WILKINSON:  You asked him at some point, I

22   think you were talking about the rim, I'm not sure he was

23   talking about the rim or common purpose, and he said there

24   were multiple things.  And then we just heard counsel talk

25   about *Turkette*.

1          The Court here in the First Circuit has cited

2   *Turkette* as well to say that it's very clear you have to have

3   a common purpose.  This is from *Ryan v. Clemente*, which is

4   901 F.2d 177, which was then Judge Pryor and the panel

5   saying, "Although much about the RICO statute is not clear,

6   it is very clear that those who are associates of a criminal

7   enterprise must share a common purpose.  Requiring that the

8   members of an enterprise have a common purpose limits the

9   boundless scope of the word enterprise."

10          What counsel just stood up and said is we used to

11  have a problem when we would just charge conspiracies because

12  people would just say they don't know each other.  And now as

13  long as we charge RICO we don't have to prove that there's

14  any relationship or common purpose or rim.

15          THE COURT:  Let me ask you this:  What if he stood

16  up and said the common purpose was to sell more of this drug?

17          MS. WILKINSON:  Well, I would say there's many

18  problems with that because then every pharmaceutical company

19  in the United States would be subject to RICO.  And I can't

20  imagine --

21          THE COURT:  You think that the common purpose has

22  to be illegal?

23          MS. WILKINSON:  No.  It's not clear it has to be

24  illegal.  I would say that's not -- The First Circuit hasn't

25  --

1          THE COURT:  -- okay purpose that was accomplished

2     in illegal ways, right?

3          MS. WILKINSON:  They could in theory.  I'm not sure

4     that that's correct, but I don't believe the First Circuit

5     has come down and said it must be an unlawful common purpose.

6     I think they may be leaning that way if you read between the

7     lines, but I'm not a student of the First Circuit or really

8     any circuit as well as some of these folks.  So I don't think

9     that's appropriate for me to comment on.

10          But I think it doesn't matter because here I

11     believe what the government is saying there were multiple

12     things that they all agreed upon.  I would like to know just

13     before we go if it's so obvious what are those multiple

14     things that are the common purpose of this enterprise.

15          MR. YEAGER:  Paragraph 18.  By bribing

16     practitioners and pharmacies, subverting the reporting

17     requirements of the DEA, providing false and misleading

18     information including false diagnoses and medical histories

19     to insurers, I'm sorry --

20          MS. WILKINSON:  And that, Your Honor, shows exactly

21     what the problem is.

22          MR. YEAGER:  The defendants and their

23     co-conspirators sought to cause illicit distributions and

24     sale of fentanyl spray, a product containing a Schedule 2

25     opioid.  If I might point out, Judge, your point about the

sale of Subsys is exactly right.  And it detailed in this
indictment.  What these defendants did is try to take over
the market for Subsys, and they did it with all of the
separate types of offenses that the RICO conspiracy alleged.

First they bribed the doctors using mail fraud to
pay for the bribes.  That wasn't good enough.  Once they had
prescriptions it didn't work.  They had to get them through
the insurers.  So they created the insurance fraud aspect of
it.  Then they had way more prescriptions flowing, and they
got through and got approvals because they lied to the
insurers, and it created scrutiny of the DEA.

And so all of those things working together are
exactly what happened.  They took over every aspect of the
market for Subsys.  The sale, the prescription, the demand,
and the supply of the drug.

THE COURT:  So if you had said the common purpose
is to sell more of the drug, and the RICO enterprise is the
seven people working together to make it happen, I'm not sure
we'd be here now.  That seems to me to be like a legitimate
RICO framework without giving it too much thought and hearing
what the defendants have to say about.  I'm sure they can
find problems with that formulation as well.  But that's
what --

The problem is when you say all these pharmacies
and all these doctors, and they're part of your RICO

1   enterprise, I just don't -- that's where I think you have the

2   rim problem.

3          MR. YEAGER:  To be clear, and again, I don't blame

4   the Court for believing this because it's in the defendant's

5   papers.  We've identified 10 practitioners here and four

6   pharmacies and we identified an additional 12 doctors whose

7   names came up with regard to specific evidence in terms of

8   co-conspirator practitioners.  So there are in total 22

9   practitioners.

10          THE COURT:  The indictment doesn't limit it that

11   way at all, right?

12          MR. YEAGER:  No, it doesn't.  I'm saying that

13   counsel says that there's dozens and dozens of practitioners.

14   We've listed our co-conspirator practitioners in our 28-day

15   letters and made it clear we're limiting it to 22, 10 ten of

16   whom are described in this indictment.

17          THE COURT:  Let's see.  You have 10 and then on the

18   pharmacies you have four.  So if this had been -- is there a

19   rim between those 14 entities?

20          MR. YEAGER:  I believe there is, Your Honor.  As I

21   said before, the fact is we're not selling cocaine here.

22   We're selling Subsys.  They all know their job is to sell

23   Subsys.  They know that they're supposed to agree to write

24   the prescriptions before they ever talk to a patient.

25          THE COURT:  Is your proof limited to these 14

1   entities?

2            MR. YEAGER:  My proof at trial?

3            THE COURT:  Yes.

4            MR. YEAGER:  No.  We name another 12 practitioners.

5   No other pharmacies but another 12 practitioners.

6            THE COURT:  Where do you name those?

7            MR. YEAGER:  In the 28-day letter in terms of the

8   co-conspirators.

9            MS. WILKINSON:  Your Honor, his answer though shows

10  you the fundamental problem with the pleading and

11  racketeering enterprise.  He's saying there were three common

12  purposes.  Bribing the doctors and pharmacies, subverting the

13  DEA requirements and the insurance fraud.  There's no

14  evidence in here that all those people agreed to all those

15  purposes.

16           And there's no dispute in the law, whether you call

17  it a rim or not, that everybody has to agree on the common

18  purpose of the enterprise.  They can't do it.  They didn't

19  say what you said, and they didn't say one common purpose.

20  They said it's all three of these.  And there is no way no

21  matter how you read this indictment, no matter how many times

22  you read it, that you could take Practitioner Number 1 and

23  Number 7 and say that they agreed to all three of these.

24           So yes, you can say some of the doctors agreed to

25  some of this, some of the pharmacies agreed to some of this

and some agreed to the insurance fraud.  I don't dispute that
they've alleged that some people agreed to that.  But it is a
RICO count where you have to show an agreement on the common
purpose and relationship of the enterprise.

And when you name three different purposes and you
say they're common, then you have to have evidence and
allegations to show how everyone involved, now he's talking
about 22 or so doctors, all those pharmacies, all the
defendants and co-conspirators all sat down, I would call it
a business plan.  Your business plan you presented was
simple.  You're going to try and make more money selling
Subsys.  I don't agree with that, but that was a one single
common purpose.

They're saying the business plan was to do all
three of these and everybody agreed that was the common
purpose or the business plan of the enterprise.  And there
isn't evidence in this indictment to support that.

THE COURT:  Let's just talk about a drug gang which
seems like an easier way to think about RICO.

MS. WILKINSON:  Yes.

THE COURT:  If you have a drug gang and you have
sellers and you have enforcers and you have your big
supplier.  They do have this common purpose of making money
selling drugs, right?

MS. WILKINSON:  Right.

1          THE COURT:  But they have jobs within that, right?

2          MS. WILKINSON:  Right.

3          THE COURT:  So the enforcer is not selling it all.

4          MS. WILKINSON:  Right.

5          THE COURT:  The supplier is not distributing it on

6    a street level.

7          MS. WILKINSON:  Right.

8          THE COURT:  Flesh it out using that example for me.

9          MS. WILKINSON:  You started with a single common

10   purpose which is their job is to sell drugs and make money

11   selling street drugs.  That's not what they allege.  He just

12   told you on the record that their common purpose is to bribe

13   doctors, is to evade the DEA requirements, and to defraud the

14   insurance companies, and that was going to cause the illicit

15   distribution of Subsys.

16         Now, some of these people there's no illicit

17   distribution, but they would have to agree to all three of

18   these.  That would be like saying that the drug gang is going

19   to sell cocaine and they're going to go, I don't know how you

20   defraud insurance companies when you're selling cocaine, and

21   that you're going to bribe a DEA agent.  That could be a

22   common purpose if they all agreed on it.

23         They don't have to all do it as we know.  They

24   don't even have to all know about each other, but they have

25   to have some relationship.  That's why I like the business

1   plan idea because you could sit down and have a business plan

2   and lots of people execute it in different ways and have

3   different jobs as you say.  But they know what the goal is,

4   the common purpose.  And the way the government charged the

5   common purpose, because they want all these people in,

6   because they want every statement from every one of these

7   people to come in and prejudice our clients, that's the only

8   reason they did it because it doesn't make any sense.

9          So they want to cover every single statement, and

10  so they had to make the common purpose this big yet they

11  couldn't proof that everyone agreed to that common purpose.

12         MR. YEAGER:  If I could just and be done, one point

13  about paragraph 18, what I said and what I didn't say.  I'd

14  ask the Court to take a specific look.  This language appears

15  elsewhere in the indictment.  Counsel is really not giving a

16  fair read of this paragraph.

17         If you start the paragraph, go all the way to the

18  last clause of paragraph 18.  "The defendants and their

19  co-conspirators sought to cause the illicit distribution and

20  sale of Subsys fentanyl spray, a product containing a

21  Schedule 2 opioid ..."

22         And then go to the top.  "... by bribing

23  practitioners and pharmacies, subverting reporting

24  requirements of the DEA, providing false and misleading

25  information, including false diagnoses and medical histories

1 | to insurers."

2 |     This argument fundamentally misunderstands

3 | racketeering.  And the purpose of the racketeering statute is

4 | to cover multiple different potential crimes that are being

5 | committed around the country.  And that's exactly --

6 |     THE COURT:  If you'd set it out -- not to show my

7 | old-fashionedness on this, But if you'd set out an object of

8 | a conspiracy and then a manner and means, we wouldn't be in

9 | this problem.  Right?  It's like one -- and then you could

10 | have had some overt acts, and we wouldn't have been in the

11 | mail and wire fraud problem.  But anyway, all right.

12 |     I have another thing at noon.  So I have to go.

13 | But I will think about this.  We'll rule on the motions.  If

14 | we need more argument on it once I've thought about it, I'll

15 | bring you back.  If you want to submit any supplemental

16 | briefing, particularly on the rim issue -- and Mr. Quinlivan,

17 | you may feel -- I'll take a look at those cases.  If that

18 | would be your sum and substance of your supplemental

19 | briefing, don't worry about, I'm going to go read them.

20 | Anything else for today?

21 |     MR. YEAGER:  No.

22 |     MS. WILKINSON:  The only thing I'd say, Your Honor,

23 | is we've just gotten more discovery from the government,

24 | which we appreciate, but based on this and more discovery, we

25 | are facing time limitations.  So we're just concerned.  I

1    know we're not going to reschedule the trial unless there's a

2    war in North Korea and so far that looks like --

3              THE COURT:  Maybe not even if there's a war with

4    North Korea.

5              MS. WILKINSON:  That is exactly what you said.

6              THE COURT:  The war with North Korea is more likely

7    than rescheduling this.

8              MS. WILKINSON:  I don't want to come in here

9    complaining too late and you saying, you know, why are you

10   here now and you didn't tell me earlier.  I'm not saying

11   anything about the government's motives.  Mr. Yeager has been

12   very kind to talk to us and tell us when he's going to

13   provide discovery.  We've had lots of calls and conversations

14   about that.

15             We have some disputes over what's being provided.

16   We'll deal with Magistrate Boal on those.  But I am concerned

17   about the timing.  And I know Your Honor has a busy docket

18   with some other high profile cases.  So we're not the only

19   case you have to decide some important issues on.  And so I

20   just want to make sure that if the government is going to do

21   supplemental briefing or we are, that we have some time limit

22   and that we get some resolution so we can really prepare for

23   the case.

24             THE COURT:  I don't understand them to be doing any

25   supplemental briefing.

```
1              MR. QUINLIVAN:  On the rim issue?

2              THE COURT:  Yes.

3              MR. QUINLIVAN:  I don't think any is necessary.

4              MS. WILKINSON:  Or the common purpose.

5              THE COURT:  I understand the common purpose issue.

6    There's no need for supplemental briefing on that.  So I

7    guess what I'm going to say is that I'm going to go ahead and

8    make my decisions on this.  And if supplemental briefing

9    comes in while it's still pending, that's fine.  But I'm not

10   slowing down my progress.  I'm not waiving.  I'm not.

11             MS. WILKINSON:  That's helpful.

12             THE COURT:  My suggestion is if you want to

13   supplemental brief, you do it quickly because I'm not holding

14   out for it.  All right.  Thanks, everyone.  This has been

15   helpful.

16             THE CLERK:  Court's adjourned.  All rise.

17             (Court recessed at 12:04 p.m.)

18

19

20

21

22

23

24

25
```

```
 1                  - - - - - - - - - - -

 2                      CERTIFICATION

 3

 4          I certify that the foregoing is a correct

 5    transcript of the record of proceedings in the above-entitled

 6    matter to the best of my skill and ability.

 7

 8

 9

10    /s/ Joan M. Daly                July 20, 2018

11    _____        _____

12    Joan M. Daly, RMR, CRR          Date
      Official Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25
```