# Exhibit 1

```
 1                    UNITED STATES DISTRICT COURT

 2                     DISTRICT OF MASSACHUSETTS

 3   _____

 4   UNITED STATES OF AMERICA,

 5                    Plaintiff,        Criminal Action
                                        No. 16-CR-10343-ADB
 6   v.
                                        January 18, 2018
 7
     MICHAEL L. BABICH, ALEC BURLAKOFF,     Pages 1 to 23
 8   MICHAEL J. GURRY, RICHARD M.
     SIMON, SUNRISE LEE, JOSEPH A.
 9   ROWAN, and JOHN KAPOOR,

10                    Defendants.

11   _____

12

13

14                   TRANSCRIPT OF HEARING
           BEFORE THE HONORABLE ALLISON D. BURROUGHS
15              UNITED STATES DISTRICT COURT
              JOHN J. MOAKLEY U.S. COURTHOUSE
16                   1 COURTHOUSE WAY
                    BOSTON, MA  02210

17

18

19

20

21

22                 JOAN M. DALY, RMR, CRR
23                 Official Court Reporter
               John J. Moakley U.S. Courthouse
24             1 Courthouse Way, Room 5507
                   Boston, MA  02210
25                joanmdaly62@gmail.com
```

1    APPEARANCES:

2

3    FOR THE GOVERNMENT:

4            K. NATHANIEL YEAGER
             DAVID LAZARUS
             Assistant U.S. Attorney
5            United States Attorney's Office
             John Joseph Moakley Federal Courthouse
6            1 Courthouse Way, Suite 9200
             Boston, Massachusetts 02210
7            617.748.3311
             Nathaniel.Yeager@usdoj.gov
8            David.Lazarus@usdoj.gov

9

     FOR THE DEFENDANT DR. JOHN KAPOOR:

10

             BETH WILKINSON
11           ALEXANDRA WALSH
             Wilkinson, Walsh & Eskovitz
12           2001 M Street, NW
             Suite 1000
13           Washington, D.C. 20036
             202.847.4000
14           bwilkinson@wilkinsonwalsh.com
             awalsh@wilkinsonwalsh.com
15

16           FOR THE DEFENDANT MICHAEL L. BABICH:

17           JOSEPH SEDWICK SOLLERS, III
             King & Spalding, LLP
18           1700 Pennsylvania Avenue NW
             Suite 200
19           Washington, DC 20006
             202.626.5612
20           wsollers@kslaw.com

21

22

23

24

25

```
1    APPEARANCES (continued):

2

3    FOR THE DEFENDANT ALEC BURLAKOFF:

4            GEORGE W. VIEN
             JOSHUA N. RUBY
             Donnelly, Conroy & Gelhaar, LLP
5            260 Franklin Street
             Suite 1600
6            Boston, Massachusetts 02110
             617.720.2880
7            gwv@dcglaw.com
             jnr@dcglaw.com
8

9    FOR THE DEFENDANT MICHAEL J. GURRY:

10           TRACY A. MINER
             Demeo LLP
11           200 State Street
             Boston, Massachusetts 02109
12           617.263.2600
             tminer@demeollp.com
13

14   FOR THE DEFENDANT RICHARD M. SIMON:

15           STEVEN A. TYRRELL
             Weil, Gotshal & Manges LLP
16           1300 Eye Street, N.W.
             Suite 900
17           Washington, DC 20005
             202.682.7213
18           steven.tyrrell@weil.com

19

20   FOR THE DEFENDANT SUNRISE LEE:

21           PETER E. BALL
             Fitch Law Partners LLP
             One Beacon Street
22           16th Floor
             Boston, Massachusetts 02108
23           617.542.5542
             peb@fitchlp.com

24

25
```

1    APPEARANCES (continued):

2

     FOR THE DEFENDANT JOSEPH A. ROWAN:

3

             MICHAEL KENDALL
4            White & Case, LLP
             75 State Street
5            Boston, Massachusetts 02109
             617.939.9310
6            michael.kendall@whitecase.com

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        P R O C E E D I N G S

2              (The following proceedings were held in open

3   court before the Honorable Allison D. Burroughs, United

4   States District Judge, United States District Court, District

5   of Massachusetts, at the John J. Moakley United States

6   Courthouse, 1 Courthouse Way, Boston, Massachusetts, on

7   January 18, 2018.)

8              THE CLERK:  Please be seated.  This is criminal

9   matter 16-CR-10343, United States versus Michael Babich, et

10   al.

11              Will counsel identify yourselves for the record.

12              MR. YEAGER:  Good afternoon, Your Honor.  Nathaniel

13   Yeager for the United States.

14              MR. LAZARUS:  Good afternoon, Your Honor.  David

15   Lazarus for the United States.

16              MS. WILKINSON:  Good afternoon, Your Honor.  Beth

17   Wilkinson for Dr. John Kapoor.

18              MS. WALSH:  Good afternoon, Your Honor.  Alex Walsh

19   for Dr. John Kapoor.

20              MR. KENDALL:  Good afternoon, Your Honor.  Mike

21   Kendall for Joe Rowan.

22              MR. BALL:  Good afternoon, Your Honor.  Peter Ball

23   for Sunrise Lee.

24              MR. TYRELL:  Good afternoon, Your Honor.  Steven

25   Tyrrell for Rich Simon.

1          MR. SOLLERS:  Good afternoon, Your Honor.  Wick
2     Sollers for Mike Babich.
3          MS. MINER:  Good afternoon, Your Honor.  Tracy
4     Miner for Mike Gurry.
5          MR. VIEN:  Good afternoon, Your Honor.  George Vien
6     for Alec Burlakoff.
7          MR. RUBY:  Good afternoon, Your Honor.  Josh Ruby
8     also for Alec Burlakoff.
9          THE COURT:  Welcome, everyone.  Mr. O'Connor, you
10     didn't want to join us up here?
11          MR. O'CONNOR:  Your Honor.  Nice to see you.  Like
12     how many lawyers does it take to screw in a light bulb and
13     you thought you could sit back there?
14          Okay.  We're here on Ms. Wilkinson's motion for a
15     continuance, correct?
16          MS. WILKINSON:  Yes, Your Honor.
17          THE COURT:  Just to cut to the chase here, the
18     motion, qua the motion is denied.  But that's not all I want
19     to say about it.  It is my general philosophical view, which
20     I think most people already know, that there's not a case
21     that can't be trial ready within a year.  And we're still
22     already well beyond a year.  So I'm not going to continue it
23     on the basis that there's an inequity of how long various
24     people have had discovery.
25          I'm also not going to continue it based on your

1   trial schedule because when you got into the case you knew
2   the trial schedule.  The date had already been set.  And I
3   have every confidence that Mr. O'Connor can handle it if need
4   be.
5           That all being said, the last time we were here I
6   myself fell victim to Mr. Kendall's high pressure sales
7   tactics with these eight trials that he had between now and
8   then.  How many of those have you tried, Mr. Kendall?
9           MR. KENDALL:  Your Honor, I start next month in
10  front of Judge Stearns and in June in front of Judge Berman
11  in --
12          THE COURT:  I'm keeping a tally sheet of how many
13  of those will go.
14          MR. KENDALL:  I promised five.  I think four will
15  go.
16          THE COURT:  You promised eight.  I have plenty of
17  witnesses, but you can sit down.  So anyway, I did succumb to
18  his trial schedule as I think most of the people here knew.
19  And I pushed myself to exactly where I did not want to be
20  which is running into the Christmas holidays.  Not that we
21  couldn't do it then.  I'm willing to do it then, but I don't
22  love it when a trial runs that close to the holidays.
23          So my counteroffer on your motion is that I will
24  leave it where it is, but I would also be willing to move it
25  to January 7, 2019, with the idea that gets us on the other

1    side of the holidays.  And then depending on what people are

2    contemplating in terms of jury selection and where we are, I

3    might actually do the jury selection in December or maybe

4    even that first week in January, but we would look to be

5    starting evidence after jury selection on January 7.

6             MS. WILKINSON:  Your Honor, when the Court offers a

7    counteroffer, I don't really think it's a counteroffer.  I

8    don't think I can negotiate with you, but I will ask you to

9    reconsider because Dr. Kapoor knew about my trial schedule as

10   well and wanted me to be his lead lawyer.  But really the

11   most important thing is the amount of time it will take to

12   get ready for this case.

13            I think we cited some of the data for you.  But

14   there's 17 million pages of data.  As you know this is not a

15   case based in Boston.  There is evidence all around the

16   country.  Different cooperators and co-conspirators and

17   indicted co-conspirators that the government's RICO

18   indictment references.  And there's hundreds of individuals

19   that we will have to talk to, documents that we'll have to

20   look at to get ready.

21            And my real concern was calling it an October trial

22   date isn't really accurate because we have to submit to you

23   motions in limine and jury instructions by late August.  In

24   my mind when we get ready for trial we have to be ready then

25   because we can't make meaningful motions to the Court and to

1    protect our clients' rights unless we know the case well at

2    that point.

3              And I just think it's January, I did just finish a

4    five-week trial, Ms. Walsh and I did, in Philadelphia.  We

5    started working on the case as soon as that was over and we

6    got hired.  But I don't see how we can be ready in time for

7    October.

8              January, I think we still need more time, and I

9    would ask the Court to consider even moving it to the end of

10   the month or to the beginning of February because it's going

11   to be difficult for us to talk to some witnesses and do some

12   things we have to do over the holidays.  We don't mind

13   working over the holidays.  We know that's our obligation.

14   But there's lots of other people that we're going to need to

15   work with over that time.

16             So as much as I believe April is necessary and we

17   need that time, we will need at least until the beginning of

18   February.  We believe in this case and there's a disagreement

19   with the government and the defendants that we are going to

20   need experts in the case and even that timing, we don't

21   disagree with them on that, but the timing of disclosing on

22   those experts, and those are the folks that we would include

23   that we would have to work with over the holidays.

24             So I would just ask Your Honor to consider moving

25   it to February since you're not willing to consider April and

1  I understand that.

2          THE COURT:  What is the current estimate on length

3  of trial?

4          MR. YEAGER:  I think that might have been

5  duplicated from a previous one.  I change it to eight weeks,

6  Your Honor, and I say that trying to be cautious.  I'm

7  hopeful to try to shorten that.

8          THE COURT:  That's eight weeks for the government's

9  presentation or eight weeks all in?

10          MR. YEAGER:  I believe it's eight weeks all in, but

11  I'm not positive about that.

12          THE COURT:  Eight weeks all in?

13          MS. WILKINSON:  Well, it depends, Your Honor.  I'm

14  not sure how long the government thinks their case is going

15  to go.  And because we have this many defendants, and we

16  believe we have significant evidence that we will be able to

17  offer including fact witnesses and experts, I normally like

18  to try cases very leanly, and I think that's better no matter

19  which side you're on.  But if counsel for the government is

20  going to say they need six to seven weeks, I don't think we

21  could honestly say with the current complement of defendants

22  that we could be done in a week or ten days.  I don't see how

23  that's possible.

24          THE COURT:  Mr. Yeager, what are you estimating for

25  the government's case?

1          MR. YEAGER:  I forgot, Your Honor.  Does Your Honor

2   do full days?

3          THE COURT:  It is my preference to do full days.

4          MR. YEAGER:  I think six weeks is what the

5   government needs.

6          THE COURT:  Six weeks for the government's case?

7          MR. YEAGER:  Yes, Your Honor.

8          THE COURT:  So you were going to take six weeks for

9   yourself and leave them two?

10          MR. YEAGER:  I'd like it that way, yes, Your Honor.

11          THE COURT:  So how about if we think about this as

12   something like 12 weeks which means six and six which seems

13   to be more equitable, Mr. Yeager, which is the same time

14   you're going to take.

15          Is there anyone that doesn't think we can get it

16   done in that timeframe?

17          Has anyone given any thought to jury selection?

18          MS. WILKINSON:  We have given some, Your Honor, and

19   due to the broad nature of the government's allegations, I

20   believe trying to put the opioid crisis on trial here, of

21   course we object to that.  I think we would need a longer

22   voir dire than maybe Your Honor normally does.

23          THE COURT:  Are you thinking about a questionnaire,

24   a questionnaire on hardship, a questionnaire beyond hardship.

25          MS. WILKINSON:  We would like a questionnaire

1     beyond hardship.  Not extensive but on issues about bias and

2     personal experience with opioids.  I think that will be very

3     important for jury selection and will probably streamline the

4     voir dire when the jurors are in front of Your Honor.

5         MR. YEAGER:  I agree with that, Your Honor.  I

6     believe it will be very helpful on a long case.

7         MS. WILKINSON:  Your Honor, I know you may not want

8     to hear this, but once we do that, it depends on whether you

9     can back it out long enough before the trial, I don't know

10    how the selection process works here, but we will need a few

11    days to review that.  We may agree that some can be struck.

12    I bet we will be able to agree.

13         So I don't know if you can call the jurors in a

14    week before you want to start the trial or if we do that and

15    take a few days.  But I think we could work together with the

16    government at least to eliminate some of having to call those

17    jurors in for voir dire in front of the Court.

18         MR. YEAGER:  We're open to that, Your Honor.

19         THE COURT:  It's not easy to get a jury that will

20    be willing to give up February break and April break.  I'm

21    trying to get us into February and be done by April.

22         MS. WILKINSON:  That was, Your Honor, why we were

23    asking for that because there's February and April breaks.

24         THE COURT:  Then you have summer which is even

25    worse.

1          MS. WILKINSON:  Yes.

2          THE COURT:  We'll back ourselves into jury

3     selection, but what about a process where we anticipate

4     beginning opening arguments on the 28th?  That gets you to

5     the end of January.  It let's us -- we don't start on a short

6     week.  It gets us done -- that puts your 12 weeks at April 19

7     which is the Friday before April break.

8              And I'm going to push very hard to finish by then.

9     So that really cuts you back to something more like 11 weeks.

10    So we're figuring a week on charge, deliberation, etc.  I

11    know you want more, but I'm not giving you more.

12             MS. WILKINSON:  I understand, Your Honor.  Based on

13    your ruling, I think that's reasonable.  We appreciate --

14             THE COURT:  We can talk about it as we get closer

15    about whether that's like a questionnaire the week of the

16    14th and then we reconvene the week of the 22nd or something

17    like that.

18             MS. WILKINSON:  I think that works.  I really have

19    seen in the past that it does streamline the process because

20    there will be people in their questionnaire that are so

21    obviously unqualified for the jury and you just don't waste

22    the time, and the jurors are happier obviously that they

23    don't have to come in.

24             THE COURT:  So we will anticipate beginning on

25    January 28.  You will be committed to finishing by April 19.

1    The plan will be to work through February break but for the

2    holiday.  Speak now or forever hold your peace on the

3    schedule.  Mr. Kendall?

4         MR. KENDALL:  It is perfect for my eight trials.

5    Thank you, Your Honor.

6         THE COURT:  Great.

7         MS. WILKINSON:  Your Honor, can I ask a basic

8    question?  I'm sure other people in the room already know the

9    answer.  When you say full days, do you do the 9 to 1?

10        THE COURT:  No.  It's funny because I'm trying a

11   case right now, something so exciting, when you come in you

12   saw it.  This is the first jury in all the cases I've tried,

13   which has not been that many because it's only been three

14   years.  This is the first jury that's asked for a 9 to 1

15   schedule.

16        I generally give them the option.  I'm not going to

17   give them the option here.  I offer 9 to 1 or 10 to 4.  The

18   way the 10 to 4 schedule works is we start at 10.  I'm always

19   out on the bench by 9:30 to take care of as much as we can

20   take care of in that half hour.  We set from 10 to 12.  I

21   feed them in the jury room which gives us about 45 minutes

22   for lunch.

23        At some point if they tell me they only need half

24   an hour, we'll ratchet it back to half an hour.  They come

25   back from lunch at say quarter to one.  We sit from quarter

1    to one to 2:15, which is an hour and a half.  They get a

2    15-minute break, and then we sit another hour and a half.  So

3    it's a two-hour chunk in the morning which I think is when

4    people's attention is best and then two one-and-a-half-hour

5    chunks.

6              On the lunch thing, we serve them lunch back there.

7    In order to do that logistically, we have to enter basically

8    a partial sequestration order.  There's many ways to justify

9    that.  But in this kind of case it's just because there's so

10   many of you that it limits the interaction in the cafeteria

11   between the jurors and the parties.

12             But we explain to them that -- they understand that

13   it's a partial sequestration order because of the difficulty

14   in bumping into you.  We basically keep them up here in

15   there.  I think we do it in a way that there's no prejudice,

16   but that's how we do it and keep to that schedule.

17             MS. WILKINSON:  Thank you.

18             THE COURT:  Anything else?  All right.  When are

19   you next in to see Judge Boal?

20             MS. WILKINSON:  March 8.  But she asked us if you

21   change the schedule to work together with the government to

22   put in a new scheduling order and we have to do that within

23   seven days.  We'll do that and she'll issue a new schedule

24   for all the pretrial matters.

25             THE COURT:  I'm not going to move this date again

1     short of being at war with North Korea.  We will issue a

2     pretrial order as well setting motion dates.  If you can by

3     agreement want to make adjustments to that, feel free.  I

4     just want to make sure that you have enough time to file your

5     motion and you have enough time to respond to them and we

6     have enough time to think about them as well.

7         If you could also think about how you want to do

8     this jury selection, whether you want the questionnaires the

9     week of the 14th, how you want to do that?  I'm not a huge

10     fan of questionnaires.  I don't want a questionnaire that

11     what's the last book they read and all that.  I'm not going

12     to do that.  If you can get a short one that does some

13     weeding out, I'd be more amenable to that.

14         Mr. Yeager, how many documents did she say you are

15     producing?

16         MR. YEAGER:  I think the 13 million was the number

17     we just heard.

18         MS. WILKINSON:  17 million pages and still coming,

19     I believe, Your Honor.

20         THE COURT:  17 million.  Give them some direction

21     on that.

22         MR. YEAGER:  I've given them an index.  Several

23     counsel have called me to talk about where to find things.

24     I'm happy to continue to do that, Your Honor.

25         MS. WILKINSON:  Your Honor, we have one issue.  I

1    believe it's about 90,000 pages that the government will not

2    provide to us.  We have to come and visit and sign it and

3    obviously that makes it more difficult.  I'm not quite sure

4    why that is, but that is also something that just complicates

5    the discovery.

6           Like you said we're lucky we have Mr. O'Connor and

7    folks who can go look at that with us.  But I know there's

8    other counsel from out of town as well.  It just complicates

9    the discovery process for us.

10          MR. YEAGER:  I've erred on the side of turning over

11   everything, Your Honor, as best I can.  There's patient

12   records here that are pretty sensitive.  So there are things

13   that can't be turned over.  I'm happy to talk to counsel

14   about that.  If we can't agree, we'll come back and talk.

15          THE COURT:  Why do they have to look at those here?

16   I know the HIPAA regulations, but I don't know of anything

17   that would require them to look at them here versus someplace

18   else if they agreed to be subject to a protective order.

19          MR. YEAGER:  There's a protective order already in

20   the case, Your Honor.  Generally with regard to these medical

21   records, we don't like to hand out medical records just

22   generally.  As a practice we don't do that.  We can make them

23   available.  I don't know that they're highly relevant

24   documents.  If counsel disagrees, again we can talk about it.

25   That's why we chose to do it this way.

1          We're dealing with people who were suffering from

2     cancer, from other maladies as well as from addiction.  So we

3     err on the side of not turning over these documents.

4          THE COURT:  If you want to redact names or however

5     you want, to give them a number or letter or however you want

6     to do.  I don't think it's fair under the circumstances when

7     you're dumping 17 million pages on them and you want them to

8     look at 90,000 in your office because you don't trust them

9     with medical records.  So we're going to figure out another

10    way.

11         MR. YEAGER:  I'm not dumping the records.  I'm

12    providing everything that we've obtained in discovery so that

13    counsel has a full breadth of what we know, Your Honor.  It's

14    not an effort to dump anything.  I'm simply trying to protect

15    the rights of the patients.  If the Court wants us to work

16    through that, we will.

17         THE COURT:  The rights of a patient, I don't

18    understand how the rights of a patient are implicated whether

19    they look at them here or in their offices.  What impacts the

20    rights of the patients is that the information is

21    disseminated more publicly, right?

22         MR. YEAGER:  I agree with that.

23         THE COURT:  There's a protective order, and I think

24    they understand, they're all experienced lawyers, that if

25    that information gets out and the protective order gets

1   violated, they'll be sanctioned.

2          MR. YEAGER:  I don't disagree with either

3   assertion.  It is certainly the protective order exists and

4   counsel are responsible and will do the best they can.  But

5   with regard to medical records, there are things that happen.

6   And it's just an effort to protect people's privacy.  That's

7   all.

8          THE COURT:  I appreciate the concern for their

9   privacy, but really my concern here is protecting the rights

10  of these defendants.  So that's what we're going to do.

11  They're going to have a full opportunity to look at those

12  documents somewhere other than here.

13         MR. YEAGER:  Okay.

14         MS. WILKINSON:  Thank you, Your Honor.  One other

15  clarification.  I believe there are also texts that are in

16  those documents.  As you know, we don't need to say it again,

17  we are bound by the protective order.  We do this in all

18  kinds of cases, even in civil cases and pharmaceutical cases

19  where we get plenty of medical records.  We understand the

20  sensitivity.  I've never had someone not turn them over.  I

21  have been clear of my obligations.

22         THE COURT:  You've won the battle.

23         MR. YEAGER:  I'd like to brief the issue.  I don't

24  want to turn over texts, and I have reasons for to go that.

25         THE COURT:  You don't want to turn over texts?

1        MR. YEAGER:  There's phones seized of defendants as

2   well as other witnesses.  As Your Honor knows, people's

3   entire lives are on those phones.  There are things that are

4   totally irrelevant.  I'm happy to talk to them about it, but

5   I've chosen to do it in a way that is in an effort to protect

6   those matters.

7        I think it would be better if we dealt with it with

8   regard to discovery motions, Your Honor, and we can brief the

9   matter because there are reasons to not send them out to

10  everyone.

11       THE COURT:  You want to brief the patient records

12  or just want to brief the phones?

13       MR. YEAGER:  I take it Your Honor has ruled on the

14  patient records.

15       THE COURT:  Yes.

16       MR. YEAGER:  I'd like to brief the texts.

17       THE COURT:  You can redact them and assign them a

18  number.  If you want to take the time to do all that, but

19  they have a protective order.  These are experienced lawyers.

20  They know what they're doing, and they know what the

21  consequences are going to be to them and to their clients if

22  they run afoul of their protective order.  Those records are

23  produced all the time in civil litigation.

24       But in terms of the phones, I'm just not -- you can

25  brief that if you want.  I'm not really sure what we're

1    talking about.  Are you saying you want the entire phone to

2    do a forensic exam?

3            MS. WILKINSON:  All we want, Your Honor, is what

4    they're allowing us to look at when we come -- right now I

5    don't really know what I don't know what's on the phones.

6    But as I understood that there are text messages in the same

7    place where we're supposed to go look at the medical records.

8    And what I don't understand is why we can't have copies of

9    the text messages under the same understanding of the

10   protective order that we're not allowed to disclose that

11   evidence.

12           THE COURT:  You just won that war, too.  So you can

13   sit down.

14           MR. YEAGER:  If I can be heard on that.

15           THE COURT:  You can be heard on it, but you are

16   right.  People's entire lives are on their phones.  But if

17   you have text messages that you've identified as being

18   relevant to your case and their defense --

19           MR. YEAGER:  Those have been turned over.

20           THE COURT:  Those have been turned over?

21           MR. YEAGER:  Yes, Your Honor.

22           THE COURT:  What is there besides the medical

23   records that you're requiring them to look at here?

24           MR. YEAGER:  I'm not prepared to argue every single

25   thing that we have, but generally we're talking about those

1  two broad categories of things.

2          THE COURT:  You just told me you turned over the

3  texts.  What's the second?

4          MR. YEAGER:  When the person gives us a phone, we

5  copy the phone.  It's an entire copy of the phone.  We then

6  search it for conversations that exist between other

7  employees in the company, and we provided that information to

8  my understanding.

9          THE COURT:  That takes us down to one category of

10  information, the medical records.  He's saying he's turned

11  over the texts.

12          MR. YEAGER:  I'm giving them access to the rest of

13  the phone if they want to look at it is my point.  If they

14  find something that they think is relevant, then I'm happy to

15  turn that over.

16          MR. SOLLERS:  Your Honor, may I make one point?  My

17  concern with regard to the text messages is that if there are

18  messages that are exculpatory, it seems to me the government

19  should be identifying those and providing them to us rather

20  than dumping tens of millions of documents on us and saying,

21  well, it's in there, you can find it if you need to.

22          For example, I've seen emails where defendants in

23  this case are talking about the importance of compliance,

24  reiterating the message to their subordinates that they have

25  to do things in a way that's consistent with regulations,

1    etc., etc.  If there's something like that in the text

2    messages, I don't think it's enough for the government to

3    just give us the texts that they think are evidence in

4    support of their case.  They're obliged to also identify for

5    us the exculpatory material.

6              THE COURT:  They're obliged to turn it over.  I'm

7    not sure they're obliged to identify it for you.

8              MR. YEAGER:  I'd very much like to brief the matter

9    to argue the discovery motions like below.  And then if

10   there's any disagreement amongst the parties, we can.  I

11   think that's how we should handle it.

12             THE COURT:  Why?  You want to brief the issue on

13   whether or not you have to give them exculpatory texts?

14             MR. YEAGER:  No.  I don't have any issue with

15   exculpatory texts at all.  I have provided access to

16   everything that's exculpatory, and I intend to do that.  By

17   the way, we've done that already by letting them know that

18   the texts are there.  We've gone beyond that and turned over

19   literally within a month of indictment all of the Grand Jury

20   minutes, all of the reports.

21             We've gone out of our way to be as inclusive in the

22   discovery as we can.  Just trying to protect certain rights

23   of other people.  And I know the Court has disagreement with

24   how the government has approached it.  But it's not an insult

25   with regard to witnesses.  I certainly don't want to have to

1  go through all the documents and specifically identify

2  everything exculpatory.  I don't think the law requires that.

3          THE COURT:  I agree with you.  I don't think that

4  you have to identify what's exculpatory.  With all due

5  respect, if he's identifying what he thinks is exculpatory,

6  your view of what is exculpatory is going to be different

7  than his.  I'm going to give you access to as much

8  information as I can, but I'm not going to whipsaw him in

9  that way either by holding him accountable for what's

10  identified as exculpatory and what isn't.

11          MS. WILKINSON:  Your Honor, could I make a

12  practical comment about what he's suggesting?  So there's all

13  these texts that are in this room or the place where we're

14  allowed to look.  He ran searches.  We want to run our own

15  searches.  I'm not going to rely on the government in this

16  case to say these are the relevant conversations and texts.

17  It's the same thing.

18          I don't want to look at other people's personal

19  information that has no relevance to my client.  But I

20  certainly don't want to rely on the government as you said to

21  tell me which conversations are really ones that I could use.

22  So we need those documents ourselves so that we can run

23  electronic searches.

24          I mean it's not just a matter of is it convenient

25  to go over there.  We need the documents.  We have hired

1    people to review the documents.  You know how this goes.

2    Putting it up on a server.  I probably lost my qualifications

3    to talk about what happens after that, but we can run

4    searches.  And we should be able to run searches.

5              THE COURT:  I'm on a panel this afternoon where I'm

6    supposed to discuss just that, and I'm also --

7              MR. YEAGER:  I'd very much like to brief the matter

8    and deal with discovery motions below.  And then from there

9    if there's concerns, we can advance it with the Court.  I

10   don't think there will be.

11             THE COURT:  You can brief the matter, but they're

12   going to have access to the information.  You've chosen to

13   bring a criminal case.  And I applaud the idea that you're

14   trying to keep patient information confidential, but I don't

15   see that giving it to them runs afoul of that.  They're

16   trying to defend people in a criminal case.

17             The benefit of the doubt goes to them.  They get

18   access to the information in a way that they can use it

19   meaningfully and put together their defense as best they can.

20   Now on these texts, you can brief it, but I'm telling you

21   what's going to happen then, too.  I'm going to give them

22   access to those texts in some way that they can search them

23   and make their own determinations about what's exculpatory

24   and what isn't.

25             So I don't -- I'm with Ms. Wilkinson.  I don't know

1  how these phones work anymore.  They bypass my technical

2  knowledge.  But if there's a way to segregate and make the

3  text records searchable, that's what you should do.

4         MR. YEAGER:  I appreciate the Court's concerns.

5  I'd like the benefit of the rules.  And I'd like the

6  opportunity to be warned if we're going to argue these issues

7  beforehand to have an opportunity to brief them before we

8  walk into court and I'm sandbagged with an entire argument

9  for discovery without ever having discussed them before.

10        And, Your Honor, I completely understand what

11  you're saying about access to the information.  But I'm

12  handicapped here by the fact that this just came up right now

13  for the first time I heard about it here in front of Your

14  Honor.  This are real reasons to approach this the way we

15  have, and I'd like the opportunity to demonstrate first to

16  Judge Boal and then to Your Honor.

17        THE COURT:  That's fine.  You know what they want.

18  Do you want to brief it first, or do you want me to make them

19  ask you for it first and then you respond?

20        MR. YEAGER:  I'd like them to ask for what they

21  want and then I'll respond.

22        THE COURT:  Okay.  You all ask them for what you

23  want.  You make the motion and he has the time that he has to

24  respond.  I'm not going to set deadlines because the faster

25  you want it, the faster you'll file your motion.  And then

1    he'll be on the clock and he'll respond.

2              MS. WILKINSON:  Understood, Your Honor.

3              THE COURT:  Anything else for today?  So I am going

4    to set periodic status conferences in this case.  I think it

5    makes sense.  I know a lot of you are from out of town.  I

6    tried today to set it up the same day Judge Boal has hers.

7    I'd like to continue doing that unless anybody wants

8    something different.  If you want something in addition to

9    whatever she's scheduling, just go ahead and ask.

10             I want to just keep it on track.  I want to keep it

11   moving.  I'll make myself available.  We'll respond to your

12   motions as quickly as we can.  All right?  Anything else?

13             Mr. Kendall, are you happy today?

14             MR. KENDALL:  Delighted, Your Honor.  Delighted

15   with the schedule.

16             THE COURT:  It's so unexpected.  If there's nothing

17   else, the case is recessed and we'll get out a date for the

18   next status conference.  You're supposed to respond to Judge

19   Boal, her schedule in a week.  We'll key off her schedule.

20   Thank you.

21             (Court recessed at 1:16 p.m.)

22

23

24

25

1                      - - - - - - - - - - -

2                            CERTIFICATION

3

4          I certify that the foregoing is a correct

5    transcript of the record of proceedings in the above-entitled

6    matter to the best of my skill and ability.

7

8

9

10   /s/ Joan M. Daly                  January 23, 2018

11   _____            _____

12   Joan M. Daly, RMR, CRR            Date
     Official Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25