## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES<br><br>v.<br><br>MICHAEL L. BABICH et al.,<br><br>Defendants. | Criminal No. 16-CR-10343-ADB<br><br>**REDACTED VERSION** |

### DEFENDANTS' MOTION *IN LIMINE* NOS. 11–12 AND MEMORANDUM OF LAW IN SUPPORT OF MOTIONS *IN LIMINE* NOS. 11–12 TO PRECLUDE THE GOVERNMENT FROM MISCHARACTERIZING PERMISSIBLE PRACTICES AS CRIMINAL CONDUCT

The government should not be permitted to argue or imply that lawful practices are evidence of criminal conduct.  In the First Superseding Indictment ("FSI"), "kernels of criminal activity" were "buried" within ominous-sounding descriptions of lawful marketing and prescribing practices.  *See* 7/17/2018 Hr'g Tr. (Dkt. No. 365) 30:25–31:6.  Those lawful practices included the marketing of Subsys to doctors who were high prescribers of other transmucosal immediate-release fentanyl products ("TIRFs"), *e.g.*, FSI ¶ 77; off-label prescribing by health care providers, *e.g.*, FSI ¶¶ 77–80; advocating effective dosing, *e.g.*, FSI ¶¶ 82–91; assisting patients with obtaining prior authorization for Subsys from their insurance companies, *e.g.*, FSI ¶¶ 93–100, and the "direct shipment" of Subsys to pharmacies, *e.g.*, FSI ¶ 92.  Given the ink spilled by the government on such topics, the clear implication was that these acts were somehow unlawful, or themselves suggestive of unlawful activity.  And this left the Court asking, in the context of the FSI, "What . . . is the wrongful conduct?"  7/17/2018 Hr'g Tr. 26:16–21.

Although the Second Superseding Indictment ("SSI") eliminated many of the FSI's references to these lawful and commonplace practices, Defendants are concerned that they will

1

reappear in the government's presentation of this case to the jury.  Indeed, the government has informed Defendants that it has the right to "introduce evidence" of what it believes to be "uncharged crimes" at trial.  Ltr. from N. Yeager to Defense Counsel (Oct. 18, 2018) (Ex. 1) at 3. Defendants therefore ask the Court to preclude the government from misleading the jury by arguing or implying that such lawful practices are evidence of criminal conduct.  *See* Fed. R. Evid. 403.

## I.  MOTION *IN LIMINE* NO. 11 TO PRECLUDE THE GOVERNMENT FROM MISCHARACTERIZING PERMISSIBLE MEDICAL AND MARKETING PRACTICES AS CRIMINAL CONDUCT

In consequence of their association with Insys, Defendants undertook many legal activities to market and sell Subsys, which remains an FDA-approved drug that is legally prescribed to patients who are suffering from hard-to-treat pain.  Throughout this case, the government has sought to characterize many of these perfectly legal activities as sinister or unlawful in nature.  The government should be precluded from making such irrelevant, misleading, and prejudicial claims to the jury.  Fed. Rs. Evid. 401, 403.

*First*, the government has suggested that Insys's strategy of marketing Subsys to doctors as a superior alternative for patients already using other TIRFs was somehow improper.  *See, e.g.*, FSI ¶ 77 (noting Defendants "continuously targeted practitioners who prescribed TIRF medicines").  Not so.  Subsys was the sixth TIRF product to be approved by the FDA.[1]  The primary innovation of Subsys over previous TIRF products was the delivery mechanism.[2] Subsys's sublingual delivery mechanism allowed for easier absorption and quicker pain relief.

---

[1] FDA Center for Drug Evaluation and Research, Summary Review for Regulatory Action at 24 (Jan. 4, 2012), *available at* https://www.accessdata.fda.gov/drugsatfda_docs/nda/2012/202788Orig1s000SumR.pdf.

[2] *Id.* at 3 (describing previous delivery mechanisms).

*See, e.g.*, Donald R. Taylor, *Single-Dose Fentanyl Sublingual Spray for Breakthrough Cancer Pain*, Clin. Pharmacol. 2013; 5:131–41 (explaining that "patients indicated that [Subsys's] sublingual spray formulation is convenient and easy to use"—especially as compared to other delivery methods—and that Subsys relieved pain within five minutes, while Actiq took 15 minutes and other TIRFs took as long as 30). Doctors therefore had good reason to switch patients from other TIRFs to Subsys—and Defendants had good reason to market Subsys as a superior alternative to other TIRFs.

*Second*, the government seems intent on casting aspersions on off-label prescribing—in particular, doctors' prescribing Subsys to non-cancer patients. *See, e.g.*, FSI ¶ 79 (quoting text message concerning the efficacy of Subsys for all breakthrough pain). But, as the government well knows, doctors are authorized to prescribe medications off-label. The FDA has acknowledged that "healthcare providers generally may prescribe [a] drug for an unapproved use when they judge that it is medically appropriate for their patient."[3] The FDA also explains that one reason a doctor might prescribe a medication off-label is that a patient "may have tried all approved treatments without seeing any benefits."[4] For example, a doctor might prescribe Subsys to a patient whose chronic, breakthrough pain has persisted despite exhaustive trials of interventional and pharmaceutical treatment options.

Before the FDA approved Subsys, it knew doctors prescribed TIRFs off-label more than on-label.[5] In particular, as explained in the materials accompanying the FDA's decision to approve

---

[3] FDA, Understanding Unapproved Use of Drugs "Off Label," *available at* https://www.fda.gov/forpatients/other/offlabel/default.htm (last visited Dec. 4, 2018).

[4] *Id.*

[5] *See supra* n. 1. In fact, the FDA had long been aware that other TIRFs were being used off-label. FDA Review of Fentora and Actiq Adverse Events from the Adverse Events Reporting System (AERS) Database (May 6, 2008) at 150, *available at* https://www.powershow.com/view/24ecfNTdkN/Review_of_Fentora_and_Actiq_Adverse_Even

Subsys, "the use of Actiq in noncancer pain . . . exceeded its use in cancer pain" and it was being "used primarily in opioid-tolerant patients with chronic noncancer pain."[6]  Notwithstanding that Subsys was likely to be used in the same way, the FDA determined that "the benefits of [Subsys] outweigh the risks."[7]

   *Third*, the government has suggested that it was wrong for Defendants to "push" high doses of Subsys.  *See, e.g.*, FSI ¶ 91 ("A video . . . encouraged sales reps to push practitioners to prescribe higher doses.").  In reality, both Defendants and doctors had good reason to believe that certain patients would benefit from higher doses of Subsys.  Only 4% of the patients who participated in the double-blind period of the Subsys clinical trials found 100 mcg of Subsys to be a "successful dose"—that is, a dose that "adequately reduced [their] pain with tolerable side effects."[8]  In fact, some patients who participated in the Subsys clinical trials and who had previously been treated with Actiq or Fentora were never even given a 100 mcg dose of Subsys, because their physicians started them on higher doses to alleviate their pain.[9]  After titrating to a "successful dose," more than half of patients in the Subsys clinical trials received one of the three highest doses.[10]  Based on those results, doctors could reasonably conclude that a 100 mcg dose was unlikely to be helpful

---

ts_from_the_Adverse_Event_Reporting_System_AERS_Database_powerpoint_ppt_presentation (last visited Dec. 4, 2018) ("For Actiq and Fentora, majority of diagnoses are non-cancer related.").

[6] *Supra* n. 1 at 4.

[7] *Id.* at 25.

[8] Subsys Label (January 2012) at 22, *available at* https://www.accessdata.fda.gov/drugsatfda _docs/label/2012/202788s000lbl.pdf.

[9] *See supra* n. 1 at 12 ("Patients previously using Actiq or Fentora were allowed to begin on doses of [Subsys] greater than 100mcg based on their prior TIRF doses.").

[10] *Id.* at 14.

to a patient, and the doctor could start the patient on a dose higher than 100 mcg, in order to avoid additional time spent in pain.[11]

Changes to the Subsys label over time reflected the need for individual dosing decisions that took into account patients' medication history. Initially, the label recommended that all patients receive an initial dose of 100 mcg before being titrated to a dose that provided "adequate analgesia."[12] In June 2012, however, Insys filed a Supplemental New Drug Application (sNDA) proposing new "initial dosing recommendations to assist prescribers in converting patients from Actiq (fentanyl citrate) lozenges to Subsys (fentanyl sublingual spray)," consistent with what had been done during the Subsys clinical trials.[13] In July 2013, the FDA approved the sNDA for Subsys.[14] Thereafter, the Subsys label suggested that patients already receiving at least a 600 mcg dose of Actiq should start on a 200 mcg dose of Subsys and patients already receiving at least a 1200 mcg dose of Actiq should start on a 400 mcg dose of Subsys.[15]

*Fourth*, the government has implied that there is something inherently wrong with, or suspicious about, the existence of the Insys Reimbursement Center. *See, e.g.*, FSI ¶¶ 93–100. But the government is well aware that pharmaceutical companies may properly assist patients seeking to obtain coverage for their treatments from insurance companies. In fact, the government maintains a directory of "Pharmaceutical Assistance Program[s]" for patients, including programs sponsored by pharmaceutical companies to assist patients with these very types of insurance

---

[11] *See supra* n. 3 (noting as an example of "off-label use" prescriptions at a "different dose" than approved by the FDA).

[12] *Supra* n. 8 at 4.

[13] July 31, 2013 Supplement Approval at 1, *available at* https://www.accessdata.fda.gov/ drugsatfda_docs/appletter/2013/202788Orig1s005,s006ltr.pdf.

[14] *Id.* at 5.

[15] Subsys Label (revised July 2013), *available at* https://www.accessdata.fda.gov/drugsatfda _docs/label/2013/202788s005s006lbl.pdf.

issues.[16]  For example, the government directory notes that patients who are prescribed certain Novartis Pharmaceuticals products, including the immunosuppressive Gilenya, are eligible for "help navigating . . . insurance coverage."[17]  Novartis's website further notes that such assistance may include help "with prior authorization and appeals, if required."[18]  Other major pharmaceutical companies have launched similar efforts.[19]

The government should be prevented from making any argument or insinuation at trial that the type of lawful activity described above is wrongful conduct, as it would mislead and confuse the jury and irreparably prejudice Defendants by casting lawful conduct as criminal.  *See* Fed. R. Evid. 403.  Moreover, the government should be barred from arguing that Defendants agreed to or intended illegal conduct simply because they agreed and intended for Insys to engage in the entirely legal conduct described above.  The Court can exercise its discretion to manage opening arguments and limit those arguments as appropriate.  *See, e.g.*, *United States v. Dominguez*, 735 F. App'x 591, 596 (11th Cir. 2018) (district court did not abuse discretion in preventing counsel from airing irrelevant facts during opening statement); *Schwartz v. Sys. Software Assocs., Inc.*, 32 F.3d 284, 288 (7th Cir. 1994) (district court did not abuse discretion in directing counsel to "refrain from legal argument in his opening statement"); *Onujiogu v. United States*, 817 F.2d 3, 6 (1st Cir.

---

[16] *See* U.S. Ctrs. for Medicare & Medicaid Services, Pharmaceutical Assistance Program, *available at* https://www.medicare.gov/pharmaceutical-assistance-program/ (last visited Dec. 4, 2018).

[17] *Id.*

[18] Novartis, Patient Assistance NOW Program Information, *available at* https://www. patientassistancenow.com/program-information#ui-id-1=1 (last visited Dec. 4, 2018).

[19] *See, e.g.*, Genentech Access Solutions, Learn About Our Services, https://www.genentech-access.com/hcp/learn-about-our-services.html (last visited Nov. 27, 2018) (noting that services include "prior authorization resources" for Genentech medications); Gilead Advancing Access, Insurance             Support             for             Patients,             https://www. gileadadvancingaccess.com/hcp/insurance (noting program can help patients with "prior authorization information" for Gilead medications).

1987) (the "district court has wide discretion in steadying the Rule 403 seesaw"); Fed. R. Evid.
403.   And the Court should bar the government and its witnesses, throughout trial, from
characterizing evidence about legal and beneficial practices that are common and accepted in the
pharmaceutical industry as evidence of crimes or criminal intent.   Such characterizations are wrong
as a matter of law, not relevant to the case, and unduly prejudicial to Defendants.   Fed. Rs. Evid.
401, 403.

## II.    MOTION *IN LIMINE* NO. 12 TO PRECLUDE THE GOVERNMENT FROM MISCHARACTERIZING PERMISSIBLE DIRECT SHIPPING AGREEMENTS AS CRIMINAL CONDUCT

The government has taken the permissible practice of "direct shipping" and
mischaracterized it as criminal conduct.   The government alleges that Defendants "engaged in
conduct to prevent detection of their illegal activities by the DEA and others" by "agree[ing] that
Insys would ship Subsys directly to ████████████, thereby reducing the possibility of the
wholesaler reporting suspicious activity to the DEA regarding the volume of Subsys purchased by
that pharmacy."   SSI ¶¶ 71–72.   Likewise, the government alleges that Insys entered into a direct
shipping arrangement ████████████ "to reduce the possibility of the wholesaler reporting
suspicious activity to the DEA which would uncover the volume of Subsys prescribed by
Practitioner #3."   *Id.* ¶ 73.

As a preliminary matter, it is inaccurate to refer to Insys's distribution agreements as "direct
shipping" arrangements.   Insys never shipped Subsys directly to a pharmacy.[20]   Instead, either a

---

[20] Even arrangements involving shipments directly to pharmacies are perfectly legitimate and
permissible, as acknowledged by the DEA.   *See* Ltr. from N. Yeager to Defense Counsel (Oct. 26,
2018) (Ex. 2) at 9.   But these arrangements are rare.   *See Understanding the Pharmaceutical Supply
Chain*,   HDMA   (July   22,   2015)   at   5,   7,   *available   at*
http://www.nationalacademies.org/hmd/~/media/Files/Activity%20Files/PublicHealth/Stockpile/
2015-JUL-22/Presentations/2%20Perry%20Fri.pdf (showing that truly direct shipments accounted
for only 10% of all drug distributions in 2012).

wholesaler or a third-party logistics company ("3PL"), which was a subsidiary of the wholesaler, was involved in distributing Subsys.  INS-BOS-04260748 (Ex. 3) ██████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████.  The practice of using a 3PL to distribute medication as opposed to a wholesaler is often referred to as direct distribution—and that is the practice that is at issue in this case.

Further, the government's allegations that Defendants attempted to evade DEA regulations rest upon mischaracterizing the practice of direct distribution—a legitimate practice—to improperly suggest that something nefarious was happening.  This theory plainly misstates the reporting obligations under a direct distribution agreement, and contradicts the DEA's own admission that "'[d]irect shipping' agreements are not prohibited."  *See* Ex. 2 at 8.

### A.  Direct Shipping Is A Legitimate And Permissible Practice

Pharmaceutical manufacturers have two main options when distributing their products: (1) use a large wholesaler (such as McKesson, Cardinal Health, or ABC); or (2) "direct ship" the medication by using a 3PL, which is often a subsidiary of the larger wholesaler.  While "[w]holesaling is the dominant way to distribute branded drugs in the US," "direct shipping" through a 3PL has been characterized as "the future of the US branded drug distribution."[21]  3PLs have also been recognized as "ideal for smaller drug manufacturers," such as Insys.[22]  The DEA itself has acknowledged that "'direct shipping' agreements are not prohibited."  *See* Ex. 2 at 8.

---

[21] Kathleen Iacocca, Yao Zhao, *Resell vs. Direct Models: US Branded Drug Distribution in the Future*, PharmaExec (July 17, 2015), *available at* http://www.pharmexec.com/resell-vs-direct-models-us-branded-drug-distribution-future.

[22] *3PLs, Specialty Pharmaceuticals, and Direct Drug Distribution*, Datex Corp., *available at* https://www.datexcorp.com/3pls-specialty-pharmaceuticals-and-direct-drug-distribution/   (last visited Dec. 4, 2018).

The government should not be allowed to argue that Defendants were attempting to evade DEA regulations solely because they entered into a direct shipping arrangement, especially during opening statements.  *See Dominguez*, 735 F. App'x at 596 (limiting opening statements).

### B.  The 3PL—Not Insys—Had A Responsibility To Monitor And Report Suspicious Orders To The DEA Through A Suspicious Order Monitoring Program

The government has repeatedly suggested that Insys was attempting to evade DEA regulations and reporting obligations regarding "suspicious activity" by engaging in direct shipping.  *See, e.g.*, SSI ¶¶ 72–73.  This argument is misguided because Insys was never registered with the DEA as a manufacturer or distributor of Subsys, and, as a matter of law, never had any obligation to monitor or report suspicious Subsys orders.[23]  *See* 21 C.F.R. § 1301.74 (requiring "manufacturers, distributors and dispensers of controlled substances" to "design and operate a system to disclose to the registrant suspicious orders of controlled substances").  Allowing the government to introduce evidence or argument to the contrary would be legally incorrect and would mislead the jury.  *See* Fed. R. Evid. 403.

*First*, Insys never manufactured Subsys.  That task fell to a contract manufacturer, DPT Lakewood.  *See* USAO-MA-1314275 (Ex. 5) (letter from Insys acknowledging that DPT Lakewood has been contracted to manufacture Subsys).  DPT Lakewood was registered with the DEA, *see* USAO-MA-0223208-13 (Ex. 6) (DPT Lakewood DEA Registration), and there has been no allegation by the government that it ever failed to comply with its DEA reporting requirements.

---

[23] Insys was registered with the DEA as a researcher and analyst, *see* USAO-MA-0223123-28 (Ex. 4), but this did not carry with it a corresponding obligation to enact a suspicious order monitoring system.  *See* Know Your Customer / Suspicious Order Reporting, DEA, *available at* https://www.deadiversion.usdoj.gov/chem_prog/susp.htm (issuing suspicious order reporting guidelines for "manufacturers, distributors, wholesalers and retailers," not researchers or analysts).

*Second*, Insys "direct shipped" Subsys to ███████████ pharmacies by using ICS, which is a subsidiary of ABC. *See* Ex. 3. ICS is a healthcare logistics company that has operated for decades and, like all 3PLs, is registered as a distributor with the DEA and "ensur[es] full regulatory compliance."[24] *See* USAO-MA-0223178-83 (Ex. 7) (ICS DEA Registration); *see also* Mem. in Support of Mot. to Dismiss Second Superseding Indictment ("Second MTD") (Dkt. No. 514) n.4 (noting that the SSI does not allege that any of the DEA's requirements were violated, nor is there any evidence of such violations in the discovery provided by the government).

The government is well aware of these facts. ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████[25] ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

[24] *See* Integrated Commercialization Systems, https://www.icsconnect.com/storage-and-distribution (last visited Dec. 4, 2018).

[25] █████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████ *ee* INS-BOS-05320839-43 (Ex. 9).

████████████████████████████████████████████████████████

███████████████████████████

This clearly shows that moving from a wholesaler—ABC—to a 3PL subsidiary of the exact same wholesaler—ICS—would not have evaded DEA regulations.  But this does not make for a punchy indictment, so the government ignored the plain facts and mischaracterized the direct shipping arrangements in this case to suggest criminal conduct.  The government should not be allowed to mislead the jury at trial with evidence or argument that Insys had any obligation to monitor or report suspicious orders to the DEA.

For example, Defendants expect the government to introduce ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████  If presented with this sort of evidence, the jury would likely assume that the "direct shipping" agreements at issue in this case imposed a monitoring burden on Insys that did not, in fact, exist.  Nor should the government be permitted to exploit this confusion to suggest that Insys was attempting to evade DEA regulations—which, as explained above, is false.  Even if Insys had such DEA-SOM obligations (which it did not), it is undisputed that ICS as the intermediary shipper had DEA-SOM systems in place that would have resulted in compliant reporting of Subsys orders fulfilled by ICS and reported by that 3PL to the DEA.  And in all events, the government has never suggested, let

alone established, that the DEA failed to receive any required SOM reports under this regulatory regime.  This process includes regularly reporting Subsys shipments to DEA through various mechanisms like DEA Form 222 and through the ARCOs system.  *See* 21 C.F.R. § 1301.74 (requiring DEA Registrants to operate SOM systems; *see also* 21 C.F.R. § 1305.03 (requiring submission of DEA Form 222 to dispense a Schedule I or Schedule II substance); 21 C.F.R. § 1304.33 (requiring quarterly ARCOS reporting).

Admitting such inaccurate evidence or argument about SOM obligations would also cause delay, as Defendants will be forced to delve into the DEA regulations and explain the minutiae of the reporting obligations.  Introducing this evidence "into an already lengthy trial poses a substantial chance of derailing the trial and creating a trial within a trial on [a] tangential concern[]."  *Pedroza v. Lomas Auto Mall, Inc.*, No. 07-CV-0591, 2009 WL 1325440, at *7 (D.N.M. Apr. 6, 2009).  This email, and anything like it, should be excluded under Rule 403.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' Motions *in Limine* Nos. 11–12 and preclude the government from mischaracterizing permissible practices as unlawful conduct.

Dated:  December 5, 2018

/s/ Joseph Sedwick Sollers, III
Joseph Sedwick Sollers, III
(admitted *pro hac vice*)
wsollers@kslaw.com
Mark Jensen (admitted *pro hac vice*)
mjensen@kslaw.com
King & Spalding LLP
1700 Pennsylvania Avenue NW
Washington, D.C. 20006
Telephone: (202) 737-0500

William H. Kettlewell (BBO# 270320)
wkettlewell@collorallp.com
Hogan Lovells
Boston, MA 02110
Telephone: (617) 371-1005

*Attorneys for Michael Babich*

Steven A. Tyrrell (admitted *pro hac vice*)
steven.tyrrell@weil.com
Patrick J. O'Toole, Jr. (BBO# 559267)
Patrick.otoole@weil.com
Weil, Gotshal & Manges LLP
2001 M Street, NW
Washington, D.C. 20036
Telephone: (202) 682-7213

*Attorneys for Richard Simon*

/s/ Michael Kendall
Michael Kendall (BBO# 544866)
michael.kendall@whitecase.com
Alexandra Gliga (BBO# 694959)
alexandra.gliga@whitecase.com
White & Case, LLP
75 State Street
Boston, MA 02109
Telephone: (617) 939-9310

*Attorneys for Joseph Rowan*

Respectfully submitted,

/s/ Beth A. Wilkinson
Beth A. Wilkinson (admitted *pro hac vice*)
bwilkinson@wilkinsonwalsh.com
Alexandra M. Walsh (admitted *pro hac vice*)
awalsh@wilkinsonwalsh.com
Kosta Stojilkovic
kstojilkovic@wilkinsonwalsh.com
Wilkinson Walsh + Eskovitz LLP
2001 M Street NW
Washington, D.C. 20036
Telephone: (202) 847-4000

Brien T. O'Connor (BBO# 546767)
brien.o'connor@ropesgray.com
Aaron M. Katz (BBO# 662457)
aaron.katz@ropesgray.com
Ropes & Gray LLP
Prudential Tower 800 Boylston Street
Boston, MA 02199
Telephone: (617) 951-7000

*Attorneys for Dr. John Kapoor*

/s/ Tracy A. Miner
Tracy A. Miner (BBO# 547137)
tminer@demeollp.com
Megan Siddall (BBO# 568979)
msiddall@demeollp.com
Demeo LLP
200 State Street
Boston, MA 02109
Telephone: (617) 263-2600

*Attorneys for Michael Gurry*

/s/ Peter Horstmann
Peter C. Horstmann (BBO# 556377)
pete@horstmannlaw.com
Law Offices Peter Charles Horstmann
450 Lexington Street, Suite 101
Newton, MA 02466
Telephone: (617) 723-1980

*Attorney for Sunrise Lee*

## LOCAL RULE 7.1 CERTIFICATION

Pursuant to Local Rule 7.1(a)(2), I hereby certify that counsel for Dr. Kapoor have in good faith conferred with counsel for the government to resolve or narrow the issues presented by this motion, and that the disputed issues remain unresolved.

/s/ Beth A. Wilkinson
Beth A. Wilkinson
Counsel for Dr. John Kapoor

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document will be served on all counsel of record through the ECF system.

/s/ Beth A. Wilkinson
Beth A. Wilkinson
Counsel for Dr. John Kapoor