**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| UNITED STATES<br><br>v.<br><br>MICHAEL L. BABICH et al.,<br><br>Defendants. | Criminal No. 16-CR-10343-ADB<br><br>**REDACTED VERSION**<br><br>**LEAVE TO FILE GRANTED ON JANUARY 10, 2019 (DKT. NO. 667)** |

**DEFENDANTS' CONSOLIDATED REPLY**
**IN SUPPORT OF MOTIONS *IN LIMINE* NOS. 1–13**

## INTRODUCTION

The government's consolidated response makes clear that it intends to prove anything and everything at trial but the charged RICO conspiracy.  In particular, it intends to obtain convictions based on improper and inflammatory testimony about patient harm, uncharged crimes, and the purported foreseeability of the acts of third parties (regardless of whether Defendants were aware of or intended those acts).  The government should be precluded from inviting the jury to infer the existence of a conspiracy from the downstream acts of others.  And the government should be prevented from irreparably tainting the jury with evidence that has no bearing on the sole count of conspiracy for which Defendants will stand trial.

Defendants' stand by their Motions *in Limine* Nos. 1–13 in full.  This reply focuses on answering particular arguments and contentions in the government's opposition, and will not burden the Court with repetitive argument as to each MIL.

## I.      MOTION *IN LIMINE* NO. 1 TO EXCLUDE EVIDENCE OF PATIENT HARM

The government's response makes clear that it intends to use stories of patient harm to establish that Insys had financial relationships with "bad doctors" who did not look out for their patients' best interests.  The government apparently intends to maximize the impact of these patient harm stories by having the patients themselves testify, in the hope that this dramatic evidence, provided by sympathetic witnesses, will inflame the jury to such a degree that it will be primed and willing to convict Defendants regardless of whether the government can prove that each agreed to join the RICO conspiracy.  As explained in Defendants' opening brief and in their separate Motion *in Limine* to Exclude Patient Testimony (Dkt. No. 645), the government should not be permitted to do so, for a host of reasons.

The government's brief lays bare its intent to turn this trial into a series of mini-trials about alleged wrongful or excessive prescribing by doctors that purportedly resulted in harm to a handful of patients.  That has *nothing* to do with whether Defendants here *intended or agreed* that Subsys should be wrongfully prescribed.  Cherry-picked examples of purported harm to patients is not proof of Defendants' intent or agreement to run Insys as a racketeering enterprise by bribing practitioners to prescribe Subsys to patients who did not need it.  In any case against pharmaceutical executives, the government can find a handful of patients who suffered harm due to known side-effects or a few bad prescribers.  If that is what it took to prove RICO conspiracy, every pharmaceutical company in America could be so charged.  That is not the law, and the government offers no persuasive reason why the Court should admit such evidence here.

The government argues that evidence of the downstream acts of others is relevant under the *Pinkerton* doctrine.  *See* Gov't Consolidated Resp. at 2, 5 (citing *Pinkerton v. United States*, 328 U.S. 640, 647–48 (1946)).  But *Pinkerton* is not a blank check to introduce any bad act of an alleged co-conspirator, nor any negative patient outcome associated with Subsys.  Rather, *Pinkerton* holds only that a conspirator can be held responsible for the reasonably foreseeable substantive crimes of a co-conspirator that are committed "in furtherance of the conspiracy."  328 U.S. at 647–48; *see also United States v. Vazquez-Botet*, 532 F.3d 37, 62 (1st Cir. 2008) ("Under the *Pinkerton* doctrine, a defendant can be found liable for the substantive crime of a coconspirator provided the crime was reasonably foreseeable and committed in furtherance of the conspiracy."); *United States v. Morel*, 885 F.3d 17, 24 (1st Cir. 2018) (same).  Here, Defendants are not charged with *any* substantive offenses—much less with "foreseeable" substantive offenses committed solely by their alleged co-conspirators.  The jury, therefore, will *not* be asked to decide whether

Defendants should be held responsible under *Pinkerton* for purported crimes allegedly committed by co-conspirator practitioners in the course of their medical practice.  *Pinkerton* is inapposite.

Moreover, even if *Pinkerton* could justify admitting downstream substantive offenses of unindicted co-conspirators in a case where the indictment charges only a conspiracy, it would still not support admitting patient harm evidence here.  The government does not seek, through this evidence, to demonstrate that, after receiving speaker payments, co-conspirator practitioners prescribed Subsys more often or at higher doses.  Rather, the government wants to introduce evidence of the *consequences* of cherry-picked prescriptions by alleged co-conspirator practitioners, even though there is no evidence that those practitioners discussed particular patients or their conditions with Defendants.

The government points to the admission of patient testimony in other healthcare fraud cases.  But in those cases, a *prescriber* was on trial.  Indeed, the government acknowledges in its opposition that the evidence of patient harm it seeks to introduce is probative "of the *doctors'* state of mind"—not Defendants'.  Gov't Consolidated Resp. at 5 (emphasis added).  Defendants are not medical prescribers.  Evidence of patient harm is not probative as to whether Defendants *intended and agreed* that practitioners should harm patients, and is therefore inadmissible under Federal Rule of Evidence 401.  In like cases courts have excluded evidence of patient harm.

For example, in *United States v. Bainbridge Management, L.P.*, certain corporate entities were charged with a racketeering scheme that involved "kickback payments for patient referrals," "unnecessarily hospitaliz[ing] patients," and performing "unwarranted medical procedures" to generate fees and funds from Medicare, Medicaid, and private insurance.  2002 WL 31006135, at *1 (N.D. Ill. Sept. 5, 2002).  Notwithstanding those allegations, the court "bar[red] references

to the deaths of two patients who were allegedly subjected to unnecessary medical procedures."

*Id.* at *2. The court explained:

> The crux of the indictment involves a kickback and bribery scheme. . . . The alleged result of two particular unnecessary [medical] tests—the death of two patients—is not a fact central to the scheme. The patients' deaths are not probative of the necessity of the medical procedures performed. Nor are the deaths probative of the elements of . . . racketeering.

*Id.* Likewise, here, any purported patient harm is not probative of whether Subsys was prescribed inappropriately by practitioners—much less whether Defendants *intended and agreed* that Subsys should be prescribed inappropriately. As with any FDA-approved medication, there are both benefits and risks associated with taking Subsys. It would therefore be entirely unsurprising if a small number of the roughly 130,000 Subsys prescriptions[1] during the relevant period resulted in an adverse reaction or an injury associated with using the medication.

Moreover, it would be a perversion of the *Pinkerton* doctrine to allow the government to admit patient harm evidence. The government wants to introduce patient harm because it fears that neither Defendants' own statements nor their own conduct will be sufficient to prove the conspiracy charged in the SSI. If the government is allowed to plug this critical hole with inflammatory evidence of the consequences of various substantive offenses committed by alleged co-conspirator practitioners, it will create a substantial risk that the jury will improperly "resort to the inverse of *Pinkerton* and infer the existence of a conspiracy from the series of disparate criminal offenses." *United States v. Salameh*, 152 F.3d 88, 149 (2d Cir. 1998); *see also United States v. Sperling*, 506 F.2d 1323, 1341–42 (2d Cir. 1974) (stating that *Pinkerton* should not be invoked "as a matter of course," and warning against its use where "evidence of various substantive

---

[1] *See* Insys Therapeutics 2015 10-K, *available at* https://www.sec.gov/Archives/edgar/data/1516479/000143774916026220/0001437749-16-026220-index.htm (last visited Jan. 8, 2019).

offenses . . . [is] great" but evidence that the defendant was a member of the charged conspiracy is weak).

Nor is evidence of patient harm "admissible as a scene-setting device necessary to complete the story of the crime." *United States v. Cadden*, 2018 WL 2108243, at *3 (D. Mass. May 7, 2018) (internal quotation marks omitted). In *Cadden*, the defendants sought to exclude evidence of patient harm stemming from exposure to certain contaminated medicines. The court agreed it should be excluded, explaining that although "arresting or investigating officers [may] explain … how they came to be involved in the investigation," the government should not "be allowed to relate historical aspects of the case." *Id*. Notably, in reaching this decision, the court examined *United States v. Sabetta*, 373 F.3d 75, 83 (1st Cir. 2004), *United States v. D'Alora*, 585 F.2d 16, 20 (1st Cir. 1978), and *United States v. Charles*, 456 F.3d 249, 256 (1st Cir. 2006)—the exact same cases that the government has cited in its consolidated opposition in this case. Gov't Consolidated Resp. at 8. The *Cadden* court distinguished each of these cases, observing that "in each of these cases the evidence helped to explain particular conduct on the part of a defendant," or "tended to undercut the credibility of a defendant's defense to a crime charged." 2018 WL 2108243, at *3. "[I]n no fashion would evidence of patient harm . . . serve either of these functions." *Id.* It would likewise serve no valid function here.

The recent federal criminal trial of practitioner Christopher Clough—a physician's assistant charged with prescribing Subsys to patients in exchange for kickbacks, rather than based on the patient's medical needs—does not support admitting evidence of patient harm. In *Clough*, the court allowed the prosecution to call a handful of patients to testify that they became addicted to Subsys, holding that such evidence was "relevant to demonstrating whether Clough in fact overprescribed Subsys and whether something other than medical need motivated his prescriptions

of Subsys." *United States v. Clough*, 2018 WL 6519068, at \*2 (D.N.H. Dec. 11, 2018).  But

Clough was the prescriber, and the government presented evidence of what he allegedly knew

about particular patients in the course of his treatment decisions, including how patients were

tolerating Subsys.  There is no evidence that Clough, or any other alleged co-conspirator, provided

(or was even asked to provide) such patient information to Defendants here.  The district court's

order in *Clough* does not suggest that patient harm—of which Defendants were not even aware—

is relevant to this case.

Finally, even if evidence of patient harm were somehow marginally relevant—and it is

not—the Court should still exclude it under Federal Rule of Evidence 403 because of its prejudicial

impact.  As the court explained in *Bainbridge*:

> Evidence about the death of two patients is inflammatory and likely to prejudice
> the jury against the corporate defendants who are not charged with causing the
> patient's deaths.  Moreover, the challenged evidence would also raise collateral
> causation issues concerning patients' deaths.

2002 WL 31006135, at \*2.  Cherry-picked evidence of patient harm would likewise inflame the

jury against Defendants in this case, potentially necessitating a series of mini-trials concerning co-

conspirators' treatment of individual patients.  *See* Dkt. No. 645 (Defendants' Motion in *Limine* to

Exclude Patient Testimony).  The government could thus turn this trial into a series of irrelevant

and highly prejudicial detours into the personal stories of a handful of patients who had a negative

experience with Subsys and/or their prescribing practitioner.  Such evidence would improperly

invite the jury to decide this case on an emotional basis, and find Defendants guilty-by-association

instead of assessing whether the government has met its burden to prove the crime charged.

Moreover, as Defendants have explained, such evidence would be especially prejudicial here

because the government has not produced the medical records necessary for Defendants to mount

an adequate defense to the government's allegations of patient harm.  Dkt. No. 645 (Defendants'

Motion in *Limine* to Exclude Patient Testimony) at 4–5.

## II.     MOTION *IN LIMINE* NO. 2 TO EXCLUDE ANY EVIDENCE OR ARGUMENT REGARDING PLEAS, CONVICTIONS, SETTLEMENTS, OR MEDICAL BOARD ACTIONS OF NON-TESTIFYING WITNESSES

In response to Defendants' Motion *in Limine* No. 2, the government concedes that it will

not introduce evidence or argument regarding pleas, convictions, settlements, or medical board

actions of non-testifying witnesses—except to the extent that Defendants "'open the door' by

arguing that non-testifying HCPs were engaged in legitimate practices and/or respected in the

medical community." Gov't Consolidated Resp. at 10–11.  Defendants will not open the door.  In

particular, Defendants will not argue or elicit testimony that non-testifying practitioners have *not*

been convicted of crimes, pled guilty, or suffered adverse medical board actions.   However,

Defendants do intend to point out what the government has not proved, and may well point out

that the government has failed to call certain witnesses available to the government.  Doing so

does not "open the door" to anything.  It merely notes the government's failure to offer certain

kinds of proof to the jury.

## III.    MOTION *IN LIMINE* NO. 3 TO EXCLUDE ANY EVIDENCE OR ARGUMENT THAT ANY PRACTITIONER OTHER THAN THE THIRTEEN ALLEGED CO-CONSPIRATORS WAS BRIBED

The government's response to Defendants' Motion *in Limine* No. 3 attacks a straw man.

Defendants are not seeking to exclude evidence of unsuccessful *attempts* to bribe practitioners.

*See* Gov't Consolidated Resp. at 11.  Rather, Defendants may point out that the government alleges

that only thirteen practitioners actually joined the alleged conspiracy.  The government offers no

reason why it should be permitted to present evidence that would effectively expand the scope of

the charged conspiracy during trial.  In particular, the government has consistently maintained that

7

there are thirteen co-conspirator practitioners, as alleged in the SSI.  If Defendants point out this number at trial, the government cannot be allowed to ambush Defendants by offering evidence or argument that additional practitioners were successfully bribed, after not having identified them in the co-conspirator disclosures for the SSI.

### IV.   MOTION *IN LIMINE* NO. 4 TO EXCLUDE EVIDENCE OF ANY CRIMES OTHER THAN RICO PREDICATE OFFENSES ALLEGED IN THE SSI

The sole count in the SSI is conspiracy to violate the RICO statute.  The jury should not hear evidence or arguments that Defendants committed uncharged crimes that are not RICO predicates—such as violations of the federal Anti-Kickback Statute ("AKS") or the Health Insurance Portability and Accountability Act ("HIPAA").  If the government is able to present conduct that violates those statutes as if it is evidence of the crime charged, it would be obviously and highly prejudicial to Defendants.  Indeed, this concern is a central focus of Defendants' pending Motion to Dismiss, and the government's response here confirms Defendants' fears.

In the government's view, the fact that AKS and HIPAA "offenses are not chargeable as RICO predicates pursuant to 18 U.S.C. § 1961(1) does not preclude evidence of these crimes if they are relevant *proof* of the RICO conspiracy."  Gov't Consolidated Resp. at 12 (emphasis added).  That statement is absurd on its face, and confirms that the government is improperly recasting non-RICO predicates as RICO violations.  Violations of the AKS or HIPAA are not by definition "relevant proof" of the RICO conspiracy because they are not offenses that qualify as RICO predicates.  *Cf.* 18 U.S.C. § 1961(1) (listing RICO predicate offenses); *Illinois Farmers Ins. Co. v. Mobile Diagnostic Imaging, Inc.*, 2014 WL 4104789, at *9 (D. Minn. Aug. 19, 2014) ("Violations of the anti-kickback statutes are not predicate acts under RICO."); *Wheeler v. Hilo*

*Med. Ctr., Inc.*, 2010 WL 1711993, at *8 n.11 (D. Haw. Apr. 27, 2010) ("Violations of . . .

HIPAA . . . are not predicate acts under RICO.").

It will be confusing enough for the jury to hear that, of the various cooperating government witnesses, only *one* has pled guilty to the offense actually charged in the SSI (Alec Burlakoff), while most others have pled guilty to AKS violations. If the government were also permitted to introduce affirmative evidence and argument that *Defendants* violated the AKS or HIPAA, it would be impossible for Defendants to get a fair trial on RICO conspiracy. The Court should not countenance the government's effort to sow confusion about the crime charged.

## V.   MOTION *IN LIMINE* NO. 5 TO EXCLUDE EVIDENCE OF CRIMINAL CONDUCT AND OTHER BAD ACTS ABSENT A PROFFER OF EVIDENCE THAT ANY DEFENDANT KNEW ABOUT OR AGREED TO THEM

The SSI charges Defendants with conspiring to use Insys to engage in a pattern of honest services fraud, mail and wire fraud, and Controlled Substances Act violations. Defendants' trial should examine only whether they knowingly agreed to participate in such a conspiracy. As the consolidated response makes clear, however, the government wants to turn the trial into an examination of the conduct of others—including conduct of which Defendants indisputably had no knowledge, committed by individuals with whom certain Defendants had never even met. If the government is permitted to do this, Defendants' trial will devolve into a series of mini-trials over third-party misconduct.

As described above, the most concerning example of this is the government's desire to present to the jury a handful of cherry-picked stories of patients allegedly mistreated and injured by certain alleged co-conspirator practitioners who are not on trial in this case. *See supra* at 2–7. But the issue goes beyond that category and even touches upon any evidence of bad conduct that the government cannot link to the knowledge or awareness of any of these Defendants.

Contrary to the government's belief, *Pinkerton* does not support admitting such evidence. Instead, the government wants to point to various "disparate offenses" committed by alleged co-conspirator practitioners so that that the jury will improperly "resort to the inverse of *Pinkerton* and infer [Defendants' agreement to join the charged] conspiracy from [this] series of disparate criminal offenses." *United States v. Salameh*, 152 F.3d 88, 149 (2d Cir. 1998). *Pinkerton* should not be invoked "as a matter of course," especially where "evidence of various substantive offenses . . . [is] great" but evidence that the defendant was a member of the charged conspiracy is weak. *United States v. Sperling*, 506 F.2d 1323, 1341–42 (2d Cir. 1974). The court should require a proffer of evidence showing that one or more of the Defendants knew about or agreed to the criminal conduct or other acts, before the relevant witness takes the stand, and exclude any evidence of criminal conduct of which Defendants were unaware.

The relief sought in Defendants' MIL No. 5 will ensure that the jury learns only of conduct that Defendants themselves knew about or agreed to at the time of the charged conspiracy. This relief does not prevent the government from presenting any relevant evidence. If the government can proffer a satisfactory basis for at least one Defendant's knowledge of the evidence that it intends to elicit from a specific witness, then it can present that evidence to the jury (along, if appropriate, with a cautionary instruction from the Court that the evidence should only be considered against particular Defendants). If the government cannot make this showing, it is offering the very type of inverse-*Pinkerton* evidence that courts have rejected.

The Court should also grant MIL No. 5 because of the length and scope of trial. Unless the government is required to proffer the link between particular evidence and these Defendants in advance of presenting it to the jury, trial will devolve into a months-long barrage of bad conduct evidence without clarity as to what each Defendant knew or agreed to at the time. This is improper,

as it will invite the jury to convict Defendants based on their mere association with and participation in Insys.

Simply put, there is no persuasive reason to deny Defendants' MIL No. 5.  Granting it will result in a fairer trial, with a cleaner trial record, than the government's throw-everything-at-the-wall approach.

## VI.     MOTION *IN LIMINE* NO. 6 TO EXCLUDE ANY EVIDENCE OR ARGUMENT OF CRIMINAL CONDUCT OR OTHER BAD ACTS THAT POST-DATE THE ALLEGED CONSPIRACY PERIOD

In opposing Defendants' MIL No. 6, the government acknowledges that post-conspiracy evidence is generally inadmissible, but argues that it can come in under certain exceptions.  Gov't Consolidated Resp. at 15–17.  This is not at odds with Defendants' motion, which requested that the government proffer, in advance, any post-conspiracy evidence that it seeks to admit at trial and explain the basis for its admission.  For instance, if the government thinks that specific pieces of post-conspiracy evidence are relevant to consciousness of guilt or admissible under Rule 801(d)(2)(E), it should identify that evidence in advance so that Defendants and the Court have an opportunity to assess whether it is in fact relevant and admissible under the pertinent rules.  The government should not surprise Defendants at trial by presenting, without warning, evidence of conduct that post-dates the conspiracy end-date of December 2015.

## VII.    MOTION IN LIMINE NO. 7 TO EXCLUDE ANY COMPARISON OF SUBSYS TO HEROIN

Defendants stand by the arguments made in their opening memorandum.  Any comparison of Subsys to heroin should be excluded as irrelevant and unfairly prejudicial under Rules 401 and 403.  If the government wants to illustrate the strength of fentanyl to the jury, it can do so through comparisons to other *legal* opioids, not to a drug banned in the United States for over a century and associated with criminality in the public mind.

11

For instance, as reflected in a recent production of FDA documents by the government to Defendants, the potency of fentanyl is sometimes described in relation to the potency of morphine. *See, e.g.*, Ex. 1, FDA Briefing Materials (USAO-MA-1402606) at 10 (Fentanyl has "enhanced potency and fewer adverse effects than morphine."). Such a comparison would accomplish the same thing as the heroin comparison, without the impermissible suggestion that Subsys is more dangerous than an illegal street drug. There is no reason to mention heroin, or any other illegal street drugs, at this trial.

## VIII.   MOTION IN LIMINE NO. 8 TO EXCLUDE EVIDENCE OR ARGUMENT CONCERNING "CORPORATE CULTURE" AT INSYS

Defendants stand by the arguments made in their opening memorandum, and in Defendants' Opposition to Government's Motion *in Limine* to Admit Evidence (Dkt. No. 635). As with MIL Nos. 1 and 5, this MIL will ensure that the trial is about Defendants' alleged conspiratorial agreement, and not a compendium of anything bad, salacious, or off-color that may have happened at Insys over a period of years. Granting the MIL will not hamper the government from proving its case, *if* it has the evidence to prove Defendants' agreement to the charged conspiracy. And if the government does *not* have the evidence to prove Defendants' agreement to the charged conspiracy, the Court will not allow the government to obtain convictions by putting on a morality play at trial.

## IX.   MOTION IN LIMINE NO. 9 TO EXCLUDE CONTENT POSTED ON CAFEPHARMA.COM

Defendants stand by the arguments made in their opening memorandum. Given the effort expended by the government to resist exclusion of this rank hearsay, Defendants respond briefly here.

The government argues that anonymously-posted content on cafepharma.com is relevant to Defendants' state of mind. Gov't Consolidated Resp. at 18. First, the government cannot make that showing based on former defendants Babich and Burlakoff, or any other cooperating witness being "on notice" of cafepharma.com posts, because they are not the Defendants at trial. Second, it is unclear what relevance the cafepharma.com posts could possibly have as notice. For instance, there is no value in establishing simply that the Defendants were on notice that someone was posting ugly, unsubstantiated rumors on the internet. The posts would serve as notice only under the assumption that the underlying content *is true*. And no jury could be expected to understand these posts as anything other than *evidence* of alleged misconduct at Insys—*i.e.*, that the things described in the posts actually happened—which is undoubtedly the reason that the government has spilled so much ink resisting their exclusion.

Moreover, the risk of unfair prejudice far outweighs any conceivable probative value of the posts, which contain anonymous, unsubstantiated, inflammatory statements that would taint the jury even if a limiting instruction were given. Fed. R. Evid. 403. If the Court believes the posts could somehow be relevant to notice—regardless of the truth of the matter asserted—and the government wants to argue at trial that one or more of the Defendants was on notice of the posts, it can attempt to solicit testimony to that effect without introducing the actual posts into evidence or reading them to the jury.

## X.    MOTION *IN LIMINE* NO. 10 TO EXCLUDE IMPROPER OPINIONS ABOUT THE LEGALITY OF WITNESSES' AND DEFENDANTS' CONDUCT

A witness's opinion that, in hindsight, *the witness's* past conduct was unlawful is irrelevant as to whether *Defendants* had the requisite specific intent. And witnesses' opinions (whether in hindsight or not) regarding the illegality of *Defendants'* actions are inadmissible and inappropriate lay opinions under Federal Rule of Evidence 701. To the extent that a witness's testimony is based

13

on hindsight impressions or hunches about purportedly illegal conduct, it is not based on firsthand knowledge and thus is also inadmissible under Rule 701.  And, perhaps most important—at least in the context of this case—precluding hindsight lay opinion testimony would ensure that Defendants are not convicted by testimony elicited by suggestive government questioning.

A disturbing trend has emerged from the government's recent productions to Defendants, which underscores the need for a ruling excluding hindsight opinion testimony.  Several recent interviews of potential witnesses suggest that some combination of forces—likely including fear on the part of uncharged Insys employees, the inherently coercive power of the government, and the suggestive nature of the government's questioning—is producing unreliable, hindsight opinion testimony on the eve of trial.  The examples that follow are not exhaustive, but they illustrate the point.





These examples illustrate the dangers of hindsight testimony generally, and underscore the need for the Court to exclude lay witnesses' hindsight characterizations of the legality of their conduct or Defendants'.   While Defendants can cross-examine one or more witnesses about changing testimony, it is unrealistic to expect Defendants to be able, through cross-examination, to rebut a months-long government case where witness after witness is now delivering via hindsight the exact narrative the government wants to push.   For all the reasons explained in Defendants' Motion *in Limine* No. 10, such testimony is inadmissible and should be excluded.

## XI.   MOTIONS *IN LIMINE* NOS. 11 AND 12 TO PRECLUDE THE GOVERNMENT FROM MISCHARACTERIZING PERMISSIBLE PRACTICES AS CRIMINAL CONDUCT

The government acknowledges that the practices identified by Defendants in their Motions *in Limine* Nos. 11 and 12 are legal.   Still, the government's response shows that the Court must be vigilant in preventing the government from improperly characterizing these practices at trial.

The government admits, for example, that off-label prescribing is legal.   Moreover, as Defendants pointed out in their First Motion to Dismiss, off-label marketing was never charged in this case—and for good reason, as doing so would run headlong into First Amendment problems. *See* Defendants' First Motion to Dismiss, Dkt. No. 319, at 26.   But at the same time, the government insists that any evidence of a bribe converts off-label prescribing into evidence of

Defendants' criminal intent.  *See* Gov't Consolidated Resp. at 26–27.  The government cannot have it both ways by saying that practices are legal but are nevertheless evidence of Defendants' illegal aims.[2]  Since off-label prescribing is legal and off-label marketing is not charged in this case, any attempt by the government to suggest that off-label use of Subsys is evidence of Defendants' criminal intent would be grounds for a mistrial.  The prosecutors in this case have neither the jurisdiction nor the expertise to suggest to jurors that off-label use of a drug is somehow suspect or indicative of a lack of legitimate medical purpose.  Even the FDA does not have the power to say as much.  *Cf.* Ex. 10, Ltr. from N. Yeager and D. Lazarus to Counsel for Defendants (Oct. 14, 2018) at 5 (stating that the FDA "does not regulate the practice of medicine").

The government also acknowledges that "direct shipping" agreements are not prohibited, but argues that there is evidence to show that Defendants used "direct shipping to evade the caps placed on shipments of Schedule II drugs (such as Subsys) to wholesalers, in an effort to conceal their bribery scheme from the DEA and to reward high prescribers for their prescribing practices." Gov't Consolidated Resp. at 33.  The government fails to explain how that can be so, given that Insys used Integrated Commercialization Solutions (ICS), a third-party logistics company, to "direct ship" Subsys.  As explained in Defendants' Motion *in Limine* (Dkt. No. 576 at 10–11), ICS assumed the same obligations to monitor and report any suspicious orders as a wholesaler.

---

[2] The government also concedes that there is nothing impermissible about Insys focusing marketing efforts on practitioners who already prescribe TIRFs.  But it argues that "[t]his evidence will help to establish the Defendants' intent in conspiring to target their bribes on these types of prescribers, including prescribers that the Defendants knew to be running 'pill mills' and knew to be under federal indictment for health care fraud and other crimes."  Gov't Consolidated Resp. at 26.  But the government does not cite any evidence that *Defendants* were on notice of any pill mill doctors.  Rather, the government is using notice to its witnesses—Babich and Burlakoff, who did receive and respond to an email about a pill mill doctor—to present documents and allegations that it cannot tie to Defendants.

### XII.   MOTION *IN LIMINE* NO. 13 TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING ANY "FRAUD BY OMISSION" THEORY

After repeated arguments from Defendants that the government failed to allege the deception necessary to support an honest-services fraud charge, *see* Dkt. Nos. 319 (First MTD), the SSI doubled down by presenting a novel argument: "Had the insurers known that the defendants gave bribes and kickbacks to the targeted practitioners, the insurers would not have authorized payment for Subsys because insurers do not authorize payment for prescriptions that are written . . . in exchange for a bribe or kickback[.]"  Dkt. No. 419 (SSI) at 31.  The government thus seeks to repackage alleged AKS conduct as "fraud by omission"—but has never identified an affirmative duty to disclose on which such a theory could be based.  *See* Dkt. No. 514 (Second MTD).  Defendants could not have committed fraud-by-omission by failing to disclose information that they had no duty to disclose.  Defendants therefore moved *in limine* to preclude the government from offering any evidence or argument that Defendants or any alleged co-conspirators committed fraud by failing to disclose to patients or insurance companies that doctors received payments from Insys in exchange for prescribing Subsys.  *See* Dkt. No. 577 (Motion *in Limine* No. 13).

The government offers no persuasive response.  Instead, the government attacks a straw man by repeatedly conflating fraud-by-omission and affirmative fraud.  To be clear, Defendants are not seeking to exclude evidence of statements made by the Insys Reimbursement Center ("IRC") to insurance companies regarding patients, prescriptions, and diagnoses.  *See* Dkt. No. 577 at 4 n.2.  What Defendants seek to exclude is evidence or argument that Defendants or their alleged co-conspirators failed to disclose a financial arrangement to induce doctors to prescribe more Subsys, which relates to the mail fraud predicate of the RICO conspiracy.  The government's

confusion of these two issues illustrates how easily a jury might confuse the two, absent clear boundaries on what the government may point to as evidence of fraud.

The government cites three cases in support of a physician's general duty to disclose information that would be "material" to a patient's decision. *See* Gov't Consolidated Resp. at 40. But *none* of these cases discuss or impose a duty on physicians to disclose a financial arrangement with a pharmaceutical company. *See Harrison v. United States*, 284 F.3d 293 (1st Cir. 2002) (discussing doctor's failure to disclose risks of a C-section for purposes of obtaining informed consent); *Bourassa v. LaFortune*, 711 F. Supp. 43 (D. Mass. 1989) (concerning physician's failure to disclose cause of patient's death in a wrongful death action); *Canterbury v. Spence*, 464 F. 2d 772, 794 (D.C. Cir. 1972) (evaluating whether surgeon's failure to disclose risks of a procedure "bring[s] the disclosure duty into play"). And the government cites *no* case that identifies a duty on the part of pharmaceutical companies to disclose such financial arrangements to insurance companies.

The Babich information underscores Defendants' point. That information is effectively an AKS plea repackaged as mail fraud. Babich is not alleged to have agreed to prescriptions that lack a legitimate medical purpose or to have agreed to any alleged fraud involving the IRC—rather, his plea is based solely on an agreement to bribes and kickbacks and failure to disclose those bribes and kickbacks. That is purported mail fraud-by-omission, but it does not rest on any identified duty to disclose. Rather, the information is completely silent on why Insys would have had a duty to inform insurance companies about financial arrangements with practitioners. That the government cannot identify a duty even after two motions to dismiss, and is repackaging AKS conduct as mail fraud in the Babich plea, confirms what Defendants have been saying for months: This is an incorrectly-charged case.

Any evidence or argument that Defendants or their alleged co-conspirators failed to disclose financial arrangements to patients or insurance companies is irrelevant, and would confuse and mislead jurors by suggesting that such failures are evidence of fraud.  The Court should preclude all such evidence and argument, and should preclude the government from eliciting testimony from any patient or insurer witness about whether he or she would have wanted to know about such financial arrangements.[3]

## **CONCLUSION**

For the foregoing reasons, the Court should grant Defendants' Motions *in Limine* Nos. 1–13.

---

[3] The government's opposition as well as its recent interviews of Subsys patients demonstrate that Defendants' concerns are well founded.  *See, e.g.,* ███████████████████████████████

Dated: January 10, 2019

Respectfully submitted,

/s/ Tracy A. Miner
Tracy A. Miner (BBO# 547137)
tminer@demeollp.com
Megan Siddall (BBO# 568979)
msiddall@demeollp.com
Demeo LLP
200 State Street
Boston, MA 02109
Telephone: (617) 263-2600

*Attorneys for Michael Gurry*

/s/ Michael Kendall
Michael Kendall (BBO# 544866)
michael.kendall@whitecase.com
Alexandra Gliga (BBO# 694959)
alexandra.gliga@whitecase.com
White & Case LLP
75 State Street
Boston, MA 02109
Telephone: (617) 939-9310

*Attorneys for Joseph Rowan*

/s/ Peter C. Horstmann
Peter C. Horstmann (BBO# 556377)
pete@horstmannlaw.com
Law Offices of Peter Charles Horstmann
450 Lexington Street, Suite 101
Newton, MA 02466
Telephone: (617) 723-1980

*Attorney for Sunrise Lee*

/s/ Steven A. Tyrrell
Steven A. Tyrrell (admitted *pro hac vice*)
steven.tyrrell@weil.com
Patrick J. O'Toole, Jr. (BBO# 559267)
patrick.otoole@weil.com
Weil, Gotshal & Manges LLP
2001 M Street NW
Washington, D.C. 20036
Telephone: (202) 682-7213

*Attorneys for Richard Simon*

/s/ Kosta S. Stojilkovic
Beth A. Wilkinson (*admitted pro hac vice*)
bwilkinson@wilkinsonwalsh.com
Alexandra M. Walsh (*admitted pro hac vice*)
awalsh@wilkinsonwalsh.com
Kosta S. Stojilkovic (admitted *pro hac vice*)
kstojilkovic@wilkinsonwalsh.com
Wilkinson Walsh + Eskovitz LLP
2001 M Street NW
Washington, D.C. 20036
Telephone: (202) 847-4000

Brien T. O'Connor (BBO# 546767)
brien.o'connor@ropesgray.com
Aaron M. Katz (BBO# 662457)
aaron.katz@ropesgray.com
Ropes & Gray LLP
Prudential Tower 800 Boylston Street
Boston, MA 02199
Telephone: (617) 951-7000

*Attorneys for Dr. John Kapoor*

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document will be served on counsel for the government through the ECF system.

/s/ Kosta S. Stojilkovic
Kosta S. Stojilkovic
Counsel for Dr. John Kapoor