**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

UNITED STATES OF AMERICA

v.

MICHAEL L. BABICH et al.,

Defendants.

Criminal No.:  16-CR-10343-ADB

**DEFENDANTS' OPPOSITION TO MOTION**
**TO ADMIT TESTIMONY OF DANIELLE DAVIS AND LESLIE ZACKS**

## INTRODUCTION

Eight weeks into trial and near the end of its case-in-chief, the government has doubled down on its effort to call lawyers who worked for Insys to discuss communications and legal advice allegedly provided to Insys's Board of Directors, including Defendant Dr. John Kapoor, and any ensuing actions taken or not taken by those lawyers. The government bases its request on three contentions: (1) that Defendants opened the door to such testimony by discussing compliance during trial; (2) that the testimony is not privileged or otherwise subject to the crime-fraud exception; and (3) that Dr. Kapoor would not be prejudiced by its admission because he is allegedly already in possession of privileged information. None of these contentions is well-taken.

*First*, it is the government that has repeatedly raised the issue of compliance at trial, on direct examinations of former Insys employees. It solicited testimony from non-lawyer witnesses—including Insys's former CEO Mike Babich, VP of Sales Alec Burlakoff, and VP of Marketing Matt Napoletano—that compliance was essentially non-existent prior to 2014 and a sham thereafter. Defendants have cross examined witnesses with documents and information rebutting the government's characterizations. That is as far as things have gone—non-lawyer witnesses being asked by both sides about how they interacted with compliance and what they thought about it.

The government, however, has always wanted to go further, to admit advice of Insys's counsel working in conjunction with and under the privilege of an outside law firm that reported to and advised the Board of Directors. That advice falls clearly within Insys's attorney-client privilege: It was provided by lawyers hired by the Company, was related to legal issues, and was marked as "Confidential and Subject to Attorney Work Product and Attorney-Client Privilege[]." Dkt. No. 779-1 ("Exhibit 116") at 1. Insys's counsel has advised the government that it does not

intend to waive the privilege.  Hence, when the government indicated before trial that it intended to call Danielle Davis and Leslie Zacks to elicit such testimony, Dkt. No. 678-2, Defendants moved to preclude, Dkt. No. 678.  The government responded by stating that it would not elicit at trial information protected by Insys's attorney-client privilege, and Defendants agreed to reciprocate. The Court entered a corresponding stipulation.  Dkt. No. 715.

Pursuant to this stipulation, Defendants *did not elicit* testimony about the legal advice provided to the Board, even when Michael Babich, Matt Napoletano, and Alec Burlakoff—all of whom attended Board meetings and corresponded with Board members—testified.  Defendants likewise stopped short of eliciting testimony about any investigation undertaken by Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") related to this advice.  The Court has recognized that Defendants have not opened the door to material implicated by Insys's attorney-client privilege. *See* 2/15 Tr. 141:17-21 ("I am sensitive to the privilege issue . . .  I don't think they've opened the door at this point, and I don't think this email opens the door."); *accord* 3/12 Tr. 92:10-12 (Ms. Wilkinson:  "Have we opened the door yet?"; The Court:  "No.").

The government's motion seeks to move these goalposts and place Defendants in a Catch-22:  either Defendants could have stood mute as the government elicited one-sided testimony that compliance was a sham or Defendants could, by responding to the government's sponsored testimony, have opened the door to an incomplete and likely misleading presentation of legal advice provided to Insys's Board.  That is not how "opening the door" works.  The Court has kept the door to legal advice closed throughout trial, and the government cannot open its own door by soliciting negative testimony about Insys's compliance programs.

*Second*, the information at issue was and remains under privilege.  Insys cannot selectively waive privilege, even though their late-breaking about-face on Ms. Davis and Mr. Zacks suggests

it may be doing just that.  The government cannot rely upon Insys's contorted and changing position on privilege to weaponize select portions of legal advice provided to the Board.  And the government's reliance upon the crime-fraud exception is without merit.  After years of investigation, neither Ms. Davis, nor Mr. Zacks, nor then-Insys General Counsel Franc Del Fosse, nor anyone at Skadden, nor, for that matter, any Board member beyond Dr. Kapoor, has been identified by the government as a participant in the conspiracy.

*Third*, the prejudice to all Defendants of allowing the government to call Ms. Davis or Mr. Zacks would be extreme.  None of the Defendants possesses admissible evidence of the legal advice provided by Ms. Davis or Mr. Zacks, or the potentially competing legal advice provided by Skadden, Mr. Del Fosse, and others.  Dr. Kapoor (and none of the other Defendants) possesses a subset of materials from Skadden.  As is typically the case, though, most legal advice conveyed to the Board was likely presented orally.  It is absurd to expect Dr. Kapoor to recall it all, and unconstitutional to force him to testify and rebut testimony provided by Ms. Davis or Mr. Zacks. Finally, there is no way, at this late date, to unwind Insys's privilege.  Defendants have forsaken crossing critical witnesses on these points, and there is no time for Defendants to conduct comprehensive discovery during trial.

In short, the Court's direction has ably provided the very sort of level playing field that the government purportedly seeks.  The jury has heard the parties' balanced and competing interests in this dispute.  Both sides have elicited testimony and presented evidence on how non-lawyers interacted with compliance personnel at Insys and what they thought of compliance.  Neither side, on the other hand, has been permitted to call lawyers to the stand, get into the contents of any legal advice given, or confront witnesses with any legal work product.  That is where the line should remain, and the only way to keep it there is to preclude Ms. Davis and Mr. Zacks from testifying.

## ARGUMENT

I. **Defendants Have Not Opened the Door.**

A. **The Government, Not Defendants, Created This Issue.**

The government argues that Defendants "opened the door to the privileged advice provided by Davis and Zacks." Mot. at 4. That assertion mistakenly implies that Defendants brought up compliance on their own accord, without prompting or prelude. Yet, from the outset of trial, the government has consistently and repeatedly elicited testimony <u>on direct examination</u> that Insys's compliance program was either non-existent or a "sham" meant to deceive those outside the Company.[1] Those witnesses include:

### 1. **Holly Brown West**

The very first witness in this case, Ms. Brown West, was questioned by the government on direct examination about whether she received compliance training:

Q. All right. *Did you receive any compliance training?*

A. I don't remember anything major regarding compliance training. I guess the thing that I would say about that is that usually in on-site training, that's the largest part, like, the whole thing is all about compliance and what you can do and say in the field, and I don't remember there being a lot of emphasis on that.

1/29 Tr. 40:14-20.

### 2. **Matt Napoletano**

Similarly, the first time the jury heard a witness discuss Ms. Davis and her role at the Company was during the government's direct examination of Mr. Napoletano:

Q. Mr. Napoletano, with regard to 2014, did—were there any changes—*now you've got compliance. Who is Danielle Davis?*

---

[1] In fact, the government's composite exhibit attributes a compliance-related passage to the cross examination of Maury Rice. Dkt. No. 779-4 at 1 (citing 1/30 Tr. at 106:3-15). That is incorrect. The passage is in fact from the government's *direct examination* of Brett Szymanski.

A.  Danielle Davis was a compliance personnel that was hired after the subpoena in December.

Q.  All right. *So there was Leslie Zacks. We talked about him before, correct?*

A.  Correct.

Q.  *Then Danielle Davis was hired; is that correct?*

A.  Not right away. There was another person in between, another contract person. A full-time dedicated compliance person.

Q.  *Was that Steven Celestini?*

A.  That's correct.

Q.  After Mr. Celestini, that's when Ms. Davis was hired?

A.  That's correct.

Q.  When was she hired?

A.  It was late winter, early spring of 2014.

Q.  *And with regard to the hiring of the different compliance people, first Mr. Zacks, then Mr. Celestini, then Ms. Davis*, did the use of the speaker program to award doctors for writing prescriptions or take away from doctors who didn't write them, did that change?

A.  No.

2/4 Tr. 101:15-102:13.

### 3.  Michael Babich

The government likewise elicited on Mr. Babich's direct examination discussion of Ms. Davis and her role at the Company, as well as discussions amongst Insys's board members following the subpoena:

Q.  *It says, "This phrase has been approved per compliance as an appropriate response to questions." Do you see that?*

A.  Yes.

Q.  *Are you familiar with the approval by compliance?*

A.  What date is this document?

Q.  Good question. If we could go back to the email, Ms. Stein.

A.  So by this point we had Danielle Davis in the office as a director of compliance. I don't recall her giving a stamp of approval, so, whether I missed that meeting or not, but I don't recall that being—

Q.  Did you—

A.  —approved a particular time, but I recall it being discussed numerous times.

2/14 Tr. 102:14-103:3.

Q.  *Were there ever any disagreements with regard to the board on any issues related to Insys Therapeutics?*

A.  There was only one in particular that I recall.

Q.  And can you describe that for the jury, please.

A.  In early 2014, which was after we received the subpoena from the Department of Justice, Dr. Stanley was very good friends with Matt Napoletano, and Dr. Stanley took it upon himself to be Matt's mouthpiece and bring up a number of issues that Matt had at a board meeting. Dr. Stanley grabbed me before the meeting and told me, "Get your popcorn ready. I've got some things to say this morning."

\*\*\*

A.  Ted brought up, very indirectly, a lot of the concerns that Matt had, and he was not being very direct at all but he was raising some minor issues of concerns that Matt had. And you know, John, you know, raised his voice to Ted and said, "Ted, what are you trying to say?" *And Ted just said, "Well, I think we're just turning a blind eye to a lot of these things."*

And their argument went back and forth and eventually, you know, John told Ted that he doesn't know what he's talking about and to shut the F up.

2/14 Tr. 33:13–34:24.

### 4.   Alec Burlakoff

The government invited Mr. Burlakoff, on multiple occasions, to not only discuss compliance, but to opine on its effectiveness before *and* after the subpoena:

Q.  All right. So were there SOPs for the speaker program?

A.  Yes.

Q. *And "SOP" means what?*

A.  Standard operating procedures.

Q. *And was it Desiree's job to try to enforce those?*

A.  I believe so.

6

Q. Were they for real?

A. No.

*Q. Why were they created?*

A. For optics to make it look as if on paper we as a company were following compliance guidelines and direction.

3/5 Tr. 203:17–204:2.

Q. I'm going to read this. "Please see the below answers to the proposed questions. I am 100 percent sure the answers I have conveyed both verbally and below make the most business sense. *I have no interest in being involved in a compliance meeting."* Why not?

A. Because it's all smoke and mirrors. It's for show. And it's a waste of my time, and it's going to get in the way of me doing my job. If it was for real, I'd be all about it.

3/5 Tr. 215:13-21.

### 5.    Liz Gurrieri

With respect to Ms. Gurrieri, the government repeatedly questioned her about who worked

in compliance, when they started at the Company, and what they did:

Q. If you know, were Danielle Davis and Yoshi Jamison working at Insys at this point?

A. Yes.

Q. So this e-mail says that there is a zero tolerance policy for noncompliance? This is May of 2014, right?

A. Correct.

Q. And did you continue working at Insys at the IRC for some time after this?

A. Yes.

Q. *So is that statement accurate that there was a zero tolerance policy for noncompliance?*

A. It is not.

7

Q. *Why do you say it's not accurate?*

A. Because compliance was listening to calls, et cetera, and things were being done that were noncompliant. However, people were not getting fired, as well as myself.

Q. Were insurance companies still being lied to and misled?

A. Yes, they were.

Q. Were PBMs still being lied to and misled?

A. Yes, they were.

Q. *And that was while compliance was there?*

A. Correct.

Q. Do you know whether compliance knew that the spiel was still being used?

A. They absolutely did.

2/26 Tr. 74:1-25.

### 6.     Kim Fordham

On direct examination, the government elicited the following testimony from Ms. Fordham

regarding her view of compliance:

Q. So you've said that a couple times. *What do you mean by "compliance came in"? Can you explain, please.*

A. So after we all heard about Dr. Awerbuch's indictment, they brought in compliance, someone to go over and tell us what we could and could not say. And we all had been complaining about the whiteboard, and that was one thing that Yoshi, who was in compliance, took down.

Q. Is that Yoshi Jamison?

A. Yes.

2/8 Tr. 113:25-114:8.

Q. *So before compliance, the spiel was misleading?*

A. Yes.

Q. *After compliance, the spiel was misleading?*

A. Yes.

2/8 Tr. 119:5-8.

### 7.     Richard Horrocks

And even after filing the instant motion, the government continued to elicit witness testimony about Company legal and compliance, including as to Ms. Davis specifically:

Q. Did that change at some point?

A. Yes. At one point, yes.

Q. Who is Danielle Davis?

A. I guess head of compliance.

Q. Was she part-time or full-time?

A. She was full-time.

Q. *Describe how things changed at Insys once Danielle Davis was hired.*

A. Nothing really changed . . .

***

Q. Did Danielle Davis offer compliance with regard to the speaker programs that you managed in both the Detroit and Chicago?

A. Yes. It was coming up. She was starting to implement compliance rules and regulations on conference calls.

Q. *Did anything change with regard to the practices that you followed at Insys?*

A. No.

3/19 Tr. 183:12-20, 184:13-20.

### B.     Defendants Used Their Cross Examination to Respond to the Government.

These citations make clear that the government affirmatively brought up compliance with nearly all Company witnesses, and in fact made first and last mention of Ms. Davis's role and

9

responsibility within the Company.  As reflected with Mr. Horrocks, the government apparently has no intention to stop for the remainder of its case in chief.  There is no authority that requires Defendants to offer a muted response to such a strategy.  That is not how opening the door works or what opening the door means.  Cross examination on issues raised in direct examination is emblematic of what a fair and proper criminal trial is supposed to look like.

That is why the excerpts the government included in its motion, *see* Dkt. No. 779-4, are irrelevant to the issue at hand.  These excerpts fail to demonstrate that Defendants sought testimony regarding Ms. Davis's and Mr. Zacks's advice to the Board—the very testimony the government intends to now elicit by calling them to the stand.  *See* Mot. at 2 (Mr. Zacks will "testify that he recommended the Board cancel the ISP in December 2013," and Ms. Davis will "testify that she reported insurance fraud at the IRC to the Board").  Most excerpts cited by the government have nothing to do with Ms. Davis or Mr. Zacks.  The government cites testimony on SciMedica, *id.* at 9; Ms. Hollandsworth and Mr. Burlakoff, Dkt. No. 779-4 at 11; marketing communications, *id.* at 8–9; and personnel interactions with Ms. Jamison, *id.* at 29.  These topics do not implicate Mr. Zacks, Ms. Davis, or the Board—they relate to issues the government raised on direct examination.

Indeed, Defendants have time and again stopped short of opening the door to the advice the Board received throughout trial.  During Mr. Babich's cross examination, for instance, counsel for Dr. Kapoor, after a sidebar, declined to pursue questions about a December 2013 Board meeting.  2/15 Tr. 32:16–36:11.  Later on, counsel for Mr. Simon asked about the circumstances behind Insys sales representative Casey Hanoch's firing.  2/21 Tr. 199:12-22.  Once the government informed counsel that this termination was a result of Ms. Davis's investigation, counsel dropped the issue.  *Id.* at 201:4–202:2.

Likewise, during Ms. Gurrieri's testimony, counsel for Mr. Gurry asked whether Ms. Gurrieri had been "interviewed by lawyers from Skadden Arps." 2/26 Tr. 196:4-5. Once again, the Court cautioned counsel that her questions were "awfully close to the line." *Id* at 197:7-9. And, once again, counsel responded by moving to a different issue.

Critically, with respect to Mr. Burlakoff, defense counsel sought to show that Skadden was hired and interviewed him, largely because Mr. Burlakoff had stated on direct examination that compliance was non-existent at the Company both before and after the subpoena. Counsel for Dr. Kapoor did not intend to elicit testimony on whether Mr. Burlakoff was honest in these interviews and what came as a result. 3/7 Tr. 207:4-15. The Court stated that such questions would put defense counsel "at your peril," *id.* at 214:20, and, as a result, counsel declined to pursue this line of questioning. Similarly, for Jessica Crane Bradley, counsel for Dr. Kapoor began asking about Ms. Bradley's interviews with an outside law firm, before the government requested a sidebar. During sidebar, counsel stated that he sought "to ask her that she did not tell those people the same thing she told the Court." 2/8 Tr. 62:24-25. After the Court stated that counsel could not do that because of the Company's privilege, counsel agreed to skip the topic altogether.

### C.       The Government Addressed Defendants' Points in Redirect Examination.

Furthermore, Defendants' line of limited cross examination did not leave the government holding the bag. The government had ample opportunity to respond, and did so on redirect examination. The passages below are just a handful of examples.

#### 1.       Matt Napoletano

Mr. Napoletano stated that the Company did not follow compliant practices:

Q. Before, you talked about the pharma code. Do you remember that?

A. Yes.

Q. So the pharma code, what is generally the pharma code?

A. It is a best-practices policy and procedures put together by a consortium of pharmaceutical companies.

Q. It's not the law, correct?

A. Not the law.

Q. But it is part of compliance; is that correct?

A. Yes.

Q. Best practices?

A. Best practices.

Q. Did Insys Therapeutics follow the pharma code?

A. No.

2/7 Tr. 146:10-23

### 2.    Michael Babich

On redirect, Mr. Babich stated that Company compliance was fluff:

Q. When you referred before to the compliance documents as "fluff," what did you mean by that?

A. The compliance documents that Matt had created when we started the company were pieces of paper. They were not followed all the time. They were never discussed in meetings. It was always Matt's way of, as he told us all the time, putting these documents and SOPs in place in order to protect ourselves. During my time period at the company, there was no major compliance initiative in the fact that we didn't even have a compliance person until postsubpoena. In fact, we didn't even go out and hire someone of the stature that you should in that situation. We hired some young person at a director level when we had a subpoena. So the compliance department and the overall focus on compliance, while I was there at the company, was not evident.

2/22 Tr. 63:21–64:11

### 3.    Alec Burlakoff

On redirect, Mr. Burlakoff asserted that compliance was a facade.

Q. In this email that you sent to John Kapoor in 2014, that last sentence, "That being said, my below email to the sales force clearly indicates your desire for me to lead the way in making sure Insys moves forward with a priority around compliance." Can you explain what you meant by that?

A. I meant that Dr. Kapoor had asked me to put on a dog and pony show to ensure that anybody looking in from the outside, whether it be government or whoever subpoenaed us—I'm not aware of all the details—would feel that we had a compliance program in place. We didn't always have a compliance program in place, which I don't know—but eventually we built one and tried to create the façade. Now, the compliance manager, Danielle Davis, who was hired by Mike Babich who was met at the golf tournament, she came from the gaming industry.

3/12 Tr. 140:15–141:5

### D.    Defendants Have Followed the Court's Guidance.

As the Court has recognized, "I see a difference between what the company was doing as a compliance program all along and then what they did in terms of an internal investigation once the subpoena came." 3/7 Tr. 208:22-25.  Consonant with the Court's direction, Defendants have distinguished between the Company's run-of-the-mill compliance efforts and the specific legal advice the Board received.  The former is—as Defendants have long acknowledged—"obviously fair game for trial." Dkt. No. 627 at 2.  The government has taken full advantage of this point, by raising compliance on direct examination and re-raising it on redirect examination.

As for the latter, Defendants have moved quickly to different and unrelated topics when even the possibility of breach arose.  That decision had real, significant, and constitutional implications.  As noted above, had Defendants been able to cross Mr. Burlakoff and Ms. Bradley on their interviews with Skadden, Defendants would have sought to show that Mr. Burlakoff and Ms. Bradley deliberately lied to Skadden about their own misconduct for fear that the Company would have terminated them had they been honest.  That would have directly impeached their claims that the Company did not take compliance seriously.  Defendants abandoned these genuine

cross examination points—raising the specter of a Sixth Amendment violation if the government now gets to vitiate the Court's earlier guidance.

As it stands, the jury has heard about compliance, what compliance was able to accomplish, and what it purportedly was not able to do.  The jury knows that the Company retained Mr. Zacks and hired Ms. Davis, but does not know what legal advice these individuals gave the Board, what findings undergirded and supported that advice, and whether this advice was followed.  That posture has provided the Court, the parties, and the witnesses with a workable solution to the issue at hand, and continues to serve as the most sensible path forward.

## II.     Allowing Davis and Zacks to Testify Would Infringe the Attorney-Client Privilege.

### A.     Ms. Davis and Mr. Zacks Served as Insys's Legal Counsel.

In order to sidestep issues of attorney-client privilege, the government states that it seeks "testimony from Davis and Zacks only about business advice—not legal advice—that they provided to Insys."  Mot. at 5; *see also id.* at 16.  Even a cursory review of the record and the government's motion, however, reveals that such statements are demonstrably pretextual.

Regarding Mr. Zacks, the government's motion concedes that he provided legal advice to the Company.  Mot. at 4.  That is consistent with the Company's position.  The privilege log Skadden provided the government identifies Mr. Zacks as "outside counsel," and his produced communications—which include emails and minutes of Compliance Committee meetings—were redacted to avoid even the possible disclosure of advice sought or received from Mr. Zacks.[2]

---

[2] Even within this limited set of produced documents, it is clear that both Mr. Zacks and Insys held him out as counsel for the Company.  Mr. Zacks, for instance, signed a July 22, 2013 e-mail update to the Board as "Leslie Zacks, Counsel for Insys Therapeutics, Inc."  Ex. B.  In a December 12, 2013 e-mail between Insys Vice President Vikram Malhotra and Nellie Oquendo, Dr. Kapoor's personal assistant, Mr. Malhotra referred to Mr. Zacks as Insys's "legal counsel."  Ex. C.

It is also indisputable that Mr. Zacks acted in a legal capacity at the December 2013 meeting where he claims to have made recommendations to the Board regarding the ISP program. Mot. at 2.  At his proffer session, Mr. Zacks provided the government notes from a presentation he gave to the Board, which laid out a plan of action to respond to the government's December 2013 subpoena.  These notes are marked "Privileged & Confidential," and the plan, according to the notes, seeks to present a course of action that will be "looked upon most favorably by the government prosecutors."  Ex. A at 1.  This plan—and the measures Mr. Zacks recommended—cannot plausibly be regarded as business advice.

As to Ms. Davis, the government contends that she "was not employed in a legal capacity and [instead] provided compliance and business advice."  Mot. at 4.  That assertion is contradicted by the documentary evidence.  The government's productions contain numerous examples where Ms. Davis marked her communications with others as "Privileged and Confidential."  Ex. D.  Of note, on August 15, 2014—a mere week after Ms. Davis spoke alongside Skadden before the Board—she reminded an outside monitor to "please remember to include privileged and confidential on any work product."  *Id.* at 1.  "This information should be sent *only to me in order to protect the privilege.  I can share with Des as needed*."  *Id.* (emphasis added).

She sent similar emails to individuals within and outside Insys.  The e-mails relate to internal audits, direct distribution, the IRC, and the speaker program.  The documents date from shortly after Ms. Davis started at Insys to beyond the end of the alleged conspiracy.  Ex. D.[3]

---

[3] These documents show that Ms. Davis, a licensed attorney, held herself out as an attorney for the Company and that others viewed her as such.  Ms. Davis's repeated and consistent use of a "Privilege" designation stands in stark contrast to the practice of Ms. Hollandsworth and Ms. Jamison, both non-lawyers.  Ms. Hollandsworth supervised compliance within the ISP, and Ms. Jamison reviewed practices at the IRC.  Neither Ms. Hollandsworth nor Ms. Jamison employed a "Privilege" designation on any of the thousands of documents in the government's exhibit list.

In addition, the government has not—and cannot—rebut that Ms. Davis reported directly to Insys's then-General Counsel Franc Del Fosse, Dkt. No. 779-2 at 2, and acted "as an extension of Insys' outside counsel, Skadden Arps," based on her own testimonial evidence, Mot. at 4. In her sworn statement from December 2016, Ms. Davis described in detail her extensive communications with and work alongside counsel from Skadden. *See, e.g.*, Ex. E ("Davis Sworn Statement") at 138:7-25, 149:18-25, 171:17–173:7, 182:5-14. Geoffrey Hobart, counsel for Insys, was clear at the time that these communications with Skadden and any resulting work product were privileged: "Let me just [note], real quick, [that] the substance of the meetings with Franc [Del Fosse] and Skadden are privileged."[4] *Id.* at 151:12-14. Far from challenging this position, when Ms. Davis first mentioned that she "had discussions with Franc and also with the attorneys from Skadden Arps that we worked with," the government immediately assured her that "we won't get into those discussions." *Id.* at 46:6-9. The government has seemingly abandoned those assurances, by now seeking Ms. Davis's substantive testimony on a Skadden document.

In an apparent effort to save face, the government avers in its motion that, "[a]lthough Davis *herself* took a position on the company privilege in a separate civil action, *Insys, itself* has since sat with Davis and the government and carefully invoked the privilege when applicable." Mot. at 4 (emphasis added). That assertion is both untrue and facetious. When Ms. Davis gave her sworn statement in 2016, she was represented by Mr. Hobart, Insys's outside counsel, who

---

[4] Neither Insys nor Ms. Davis changed their respective positions a year later, when Ms. Davis was deposed on October 19, 2017, in *Buchalter v. Tham* (C-02-CV-16-002718, Anne Arundel Cty. Cir. Ct.), a civil proceeding in Maryland state court. In that case, counsel for Ms. Davis and counsel for Insys both instructed Ms. Davis not to answer on numerous topics on the basis of privilege. Once again, counsel for Insys stated, very clearly, that if a question "involves her work with Skadden and Celestini on the legal team, that would be—those would be privileged conversations." Ex. F ("Davis Dep.") at 98:3-6; *accord id.* at 83:2-5 (counsel for Ms. Davis, as to Skadden: "[Y]ou can talk generally about what you did, as long as it does not talk about the communications or invade the privilege from a work product perspective.").

took the position that the substance of Ms. Davis's work with Skadden was privileged.  Davis Sworn Statement at 151:12-14.  Insys's outside counsel took the same position—that Ms. Davis's work with Skadden was privileged—during Ms. Davis's 2017 civil deposition.  Davis Dep. at 98:3-6.

At no point has Mr. Hobart (or anyone else at Insys, for that matter) explained how or why or when Insys's position changed.  At no point has Mr. Hobart (or, again, anyone else at Insys) explained how what was considered privileged legal advice in 2016 and 2017 magically transmogrified into non-privileged business advice in 2019.  Insys's reversals and contortions on its position on privilege, not surprisingly, are a boon to the prosecutors in this case.  It is public record that Insys's future will be impacted by its ability to finalize its pending deal with the government.  *See* Insys 2018 10-K at 44 ("If we fail to finalize our agreement in principle with the DOJ or comply with the final terms contained in the final written agreements with the DOJ and OIG, our results of operations and financial condition will be materially and adversely affected.").  Whether Insys has changed course on privilege at the express urging of the prosecutors or from an unstated desire to please them is immaterial.  The Court cannot allow a government-aligned Insys to tilt the playing field by selectively claiming that certain legal materials and communications with the Board—previously marked privileged and kept from discovery—are no longer privileged.

**B.    The Government Cannot Elicit Privileged Testimony Based on a Single Document.**

The government's silence on Insys's about-face is telling.  Instead of trying to explain Insys's change of heart, the government points to a set of "documents Davis presented to the Board on August 7, 2014," Mot. at 2, "which disclosure has [now] been approved by Insys as non-privileged," *id.* at 2–3.  By the government's logic, Ms. Davis's testimony about Exhibit 116 cannot be privileged because the document itself is no longer privileged.

This reasoning does not hold water.  Exhibit 116 is titled "Selected Documents:  August 7, 2014 Board of Directors Meeting," is marked "Confidential and Subject to Attorney-Client Work Product and Attorney-Client Privilege[]," and bears Skadden's logo.  Exhibit 116 at 1.  Skadden clearly saw it as privileged.  Before Insys's change of heart, the Company almost certainly shared that view—its counsel, after all, stated in 2017 that, "if it involves [Ms. Davis's] work with Skadden . . ., that would be—those would be privileged."  Davis Dep. at 98:3-5.  There is no conceivable scenario under which Exhibit 116 would fall outside of that definition of privilege.

The contents of Exhibit 116 further reinforce the point.  The document includes the ROI analysis, Speaker Bureau Assessment, and original spiel—a likely compilation of Skadden's investigative findings at a specific point in time.  Those findings were informed by legal analysis and work product which remains protected by privilege.  How, then, could Defendants possibly ask Ms. Davis about what documents Skadden collected, who Skadden talked to, what Skadden was told, and what actions were taken *without* implicating the attorney-client privilege?

Tellingly, although Ms. Davis's sworn statement and civil deposition are rife with references to her communications and work with Skadden, the government did not in this case produce a single e-mail between Skadden and Ms. Davis in the weeks before and after the August 2014 Board meeting.  Defendants cannot meaningfully cross examine Ms. Davis without these communications.  *See Hercules Inc. v. Exxon Corp.*, 434 F. Supp. 136, 156 (D. Del. 1977) ("A party cannot disclose only those facts beneficial to its case and refuse to disclose, on the grounds of privilege, related facts adverse to its position.").

### C.      This Case Does Not Implicate the Crime-Fraud Exception.

In the alternative, the government contends that Mr. Zacks and Ms. Davis may testify pursuant to the crime-fraud exception, regardless of the attorney-client privilege.  "To invoke the crime-fraud exception to the attorney-client privilege, the party challenging the claim of privilege

must make a prima facie showing (1) that the client was engag[ed] in (or was planning) criminal or fraudulent activity when the attorney-client communications took place <u>and</u> (2) that the communications were intended by the client to facilitate or conceal the criminal or fraudulent activity." *In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, 293 F. Supp. 3d 247, 250 (D. Mass. 2018) (citing *In re Grand Jury Proceedings*, 417 F.3d 18, 22–23 (1st Cir. 2005)).  The government has failed to make any such prima facie showing.

The government has investigated this case for years.  A grand jury has returned three indictments, both sides have exchanged numerous letters, more than one thousand interviews have been conduct, and the government has presented its case in chief for nearly eight weeks.  Not once has the government at any point alleged that Skadden, Mr. Zacks, or Ms. Davis were co-conspirators.  Not once has any government witness stated that Mr. Zacks or Ms. Davis facilitated the alleged criminal activity.  *Compare United States v. Albertelli*, 687 F.3d 439, 450 (1st Cir. 2012) (court identified specific conversations between defendant and his lawyer where defendant "revealed his motive for the crime").  Not once has any government witness imputed such activity to either individual.

There is no "reasonable basis to believe that [Mr. Zacks or Ms. Davis's] services were used by [Insys] to foster crime or fraud." *Celexa*, 293 F. Supp. 3d at 250; *see also id.* ("The 'reasonable' basis standard is intended to be 'reasonably demanding,' and the party must present more than mere speculation or a distant likelihood of collusion.'").[5]  If the government actually believed the crime-fraud exception applied to legal communications to the Insys Board, it would have identified

---

[5] The government's failure to establish a prima facie case obviates the need for an *in camera* review of Dr. Kapoor's personal materials.  *In re Grand Jury Proceedings*, 417 F.3d 18, 22–23 (1st Cir. 2005) (no *in camera* review where government fails to show prima facie case).  The crime-fraud exception does not give license for a fishing expedition in the middle of trial.

Ms. Davis, Mr. Zacks, as well as Mr. Del Fosse and each of the Board members who received the legal advice as part of the conspiracy.  It has done no such thing, confirming that its invocation of the crime-fraud exception here is a lark.

### III.    Allowing Ms. Davis and Mr. Zacks to Testify Would Unfairly Prejudice Defendants.

At its heart, the government's motion telegraphs its intent to use a single, recently-produced document as a Trojan horse to elicit privileged testimony about allegedly inculpatory conduct.  As the Court has observed, calling Ms. Davis or Mr. Zacks now would provide the jury an "incomplete picture," because "we only know what their view is."  3/20 Tr. 212:19-20.  Defendants did not solicit an alternative view from other witnesses when they could have, and cannot even properly cross examine Mr. Zacks and Ms. Davis today because of Insys's continued assertion of attorney-client privilege.  That is "manifestly unfair":  put simply, a party may not "make factual assertions" while "deny[ing]" opposing counsel "an opportunity to uncover the foundation for those assertions in order to contradict them."  *Friction Div. Prods., Inc. v. E.I. Du Pont De Nemours & Co., Inc.*, 117 F.R.D. 535, 538 (D. Del. 1987).

Under such circumstances, it is the government—not Defendants—that seeks to use the attorney-client privilege "as both a 'shield' and a 'sword.'"  *Merisant Co. v. McNeil Nutritionals, LLC*, 242 F.R.D. 303, 311 (E.D. Pa. 2007).  The law does not sanction such conduct:  "a party cannot introduce a document as evidence while denying the opponent sufficient discovery with respect to the 'surrounding circumstances and substance' of the document."  *Id.*

Although the attorney-client privilege is typically waived under these conditions, *Livingstone v. N. Belle Vernon Borough*, 91 F.3d 515, 537 (3d Cir. 1996), that is not a workable solution here.  Even if the Court were to find waiver—notwithstanding Insys's assertions to the contrary—doing so would run afoul of Defendants' Fifth Amendment right to a fair trial and Sixth Amendment right to cross examination, as the Court has so recognized, *see* 3/7 Tr. 210:23-25

("The company is not willing to waive privilege.  Even if they were willing to waive privilege, it's too late to ask them to get up to speed.").

The government's repeated insistence that Defendants have an apparent cache of materials to rebut Mr. Zacks and Ms. Davis's testimony is inapposite.  *First*, Dr. Kapoor has only a limited subset of documents pertaining to Skadden's investigation.  Dr. Kapoor has never had a complete collection of Skadden's work product, nor a comprehensive overview of Skadden's resulting legal advice (much of which was likely conveyed orally).  The Company did not produce *any* e-mails between Skadden and Ms. Davis in the weeks before and after the August 2014 Board presentation, and no Defendant—not Dr. Kapoor or anyone else—has these e-mails.

*Second*, the other Defendants do not have a copy of these materials.  The government's ham-handed reference to the existence of Defendants' joint defense agreement—an agreement, of course, that the government has not read and is not a party to—does not provide it an escape route out of this thicket.  Put simply, Dr. Kapoor's materials have not been shared with the other Defendants, further elevating the risk of irremediable prejudice if Ms. Davis or Mr. Zacks were called to testify.  Additionally, any knowledge by Dr. Kapoor of these materials or any resulting legal advice cannot be imputed to the other Defendants, each of whom has their own independent interests in this case.

*Third*, following the Court's guidance, counsel for Dr. Kapoor has not and does not intend to use these materials at trial.   Over the past two months, the government has called to the stand Insys's former CEO, Vice President of Sales, and Vice President of Marketing—witnesses that form the crux of the government's case.  Defendants did not cross examine these witnesses (or any others) about Mr. Zacks or Ms. Davis's advice to or interactions with the Board.  That was a deliberate decision, informed by the Court's guidance, Insys's representations and assertion of

21

privilege, the documents Insys produced and withheld, and the parties' mutual understanding and practice.  Defendants no longer have an opportunity to cross examine these witnesses, all of whom communicated with Board members and attended Board meetings from time to time.  Defendants' decision to follow the rules is not an invitation for the government to break them.

The proper way forward is for the Court to continue with the approach that it has already set and which it has already implemented.  Defendants' rights are safeguarded when witnesses are prevented from presenting testimony or evidence regarding legal advice that the Board received. The parties and the Court have respected this line throughout trial, and there is no reason to depart from it now, at the end of the government's case in chief after many of the case's most significant witnesses have taken the stand.

## CONCLUSION

For the foregoing reasons, the Court should deny the government's motion to admit certain testimony of Danielle Davis and Leslie Zacks.

Dated: March 22, 2019

Respectfully submitted,

/s/ Tracy A. Miner
Tracy A. Miner (BBO# 547137)
tminer@mosllp.com
Megan Siddall (BBO# 568979)
msiddall@mosllp.com
Miner Orkand Siddall LLP
470 Atlantic Ave, 4th Floor
Boston, MA 02210
Telephone: (617) 273-8421

*Attorneys for Michael Gurry*

/s/ Michael Kendall
Michael Kendall (BBO# 544866)
michael.kendall@whitecase.com
Alexandra Gliga (BBO# 694959)
alexandra.gliga@whitecase.com
White & Case LLP
75 State Street
Boston, MA 02109
Telephone: (617) 939-9310

*Attorneys for Joseph Rowan*

/s/ Peter C. Horstmann
Peter C. Horstmann (BBO# 556377)
pete@horstmannlaw.com
Law Offices of Peter Charles Horstmann
450 Lexington Street, Suite 101
Newton, MA 02466
Telephone: (617) 723-1980

*Attorney for Sunrise Lee*

/s/ Steven A. Tyrrell
Steven A. Tyrrell (admitted *pro hac vice*)
steven.tyrrell@weil.com
Patrick J. O'Toole, Jr. (BBO# 559267)
patrick.otoole@weil.com
Weil, Gotshal & Manges LLP
2001 M Street NW
Washington, D.C. 20036
Telephone: (202) 682-7213

*Attorneys for Richard Simon*

/s/ Beth A. Wilkinson
Beth A. Wilkinson (*admitted pro hac vice*)
bwilkinson@wilkinsonwalsh.com
Alexandra M. Walsh (*admitted pro hac vice*)
awalsh@wilkinsonwalsh.com
Kosta S. Stojilkovic (admitted *pro hac vice*)
kstojilkovic@wilkinsonwalsh.com
Andrew W. Croner (admitted *pro hac vice*)
acroner@wilkinsonwalsh.com
Wilkinson Walsh + Eskovitz LLP
2001 M Street NW
Washington, D.C. 20036
Telephone: (202) 847-4000

Brien T. O'Connor (BBO# 546767)
brien.o'connor@ropesgray.com
Aaron M. Katz (BBO# 662457)
aaron.katz@ropesgray.com
Ropes & Gray LLP
Prudential Tower 800 Boylston Street
Boston, MA 02199
Telephone: (617) 951-7000

*Attorneys for Dr. John Kapoor*

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document will be served on all counsel of record through the ECF system.

/s/ Beth A. Wilkinson
Beth A. Wilkinson
Counsel for Dr. John Kapoor