# EXHIBIT E

UNITED STATES DEPARTMENT OF JUSTICE

OFFICE OF THE UNITED STATES ATTORNEY

DISTRICT OF MASSACHUSETTS

```
_____|
                                 |
UNITED STATES OF AMERICA,        |
                                 |
                                 |
      VS.                        |    Case No.
                                 |
                                 |
JOHN DOE.                        |
_____|
```

United States Attorney's Office
U.S. Courthouse
1 Courthouse Way
Boston, Massachusetts


Thursday
December 1, 2016


** SWORN STATEMENT **




APPEARANCE:  NATHANIEL YEAGER and SUSAN POSWISTILO
             Assistant U.S. Attorney

WITNESS:     DANIELLE DAVIS

USAO-MA-0029685

A P P E A R A N C E

REPRESENTING WITNESS

    STACEY F. GOTTLIEB, ESQ.
    Cohen Dowd Quigley
    The Camelback Esplanade One
    2425 East Camelback Road, Suite 1100
    Phoenix, AZ  85016
    (602) 252-8087

REPRESENTING INSYS THERAPEUTICS

    GEOFFREY E. HOBART
    Covington & Burling, LLP
    One City Center
    8 Tenth Street, NW
    Washington, DC 20001-4956
    (202) 662-5281

USAO-MA-0029686

3

I N D E X

| WITNESS | | PAGE |
|---|---|---|
| Danielle Davis | | 4 |

| EXHIBITS: | DESCRIPTION | PAGE |
|---|---|---|
| 1 | E-mail Napoletano to Babich and Del Fosse, May 2014 | 76 |
| 2 | INS 5352190 - 2192 | 78 |
| 3 | INS-BOS-03181840 - 1841 | 93 |
| 4 | PLAN-00096972 - 6974 | 101 |
| 5 | E-mail, Scherm to Davis, 6-2-15 | 112 |
| 6 | EJF-000242523 | 114 |
| 7 | EJF-000071205 - 1206 | 128 |
| 8 | INS 1551594 - 1595 | 128 |
| 9 | INS-BOS-00290514 - 0515 with Excel spreadsheet | 146 |
| 10 | Approved FAQ's | 157 |
| 11 | INS-BOS-03169808 - 9811 | 163 |
| 12 | Opt-In form, one page | 169 |
| 13 | Opt-In form, two pages | 169 |

4

1              P R O C E E D I N G S

2                                      (9:45 a.m.)

3      D A N I E L L E   L.   D A V I S , of 4146 E. Glenrosa

4      Avenue, Phoenix, Arizona  85018-4224, having been sworn

5      by a Notary Public to tell the truth, the whole truth

6      and nothing but the truth, testified upon her oath as

7      follows:

8                         EXAMINATION

9          BY MS. POSWISTILO:

10     Q    State your full name again for the fifth time

11  since --

12     A    Danielle Louise Davis.

13     Q    And Ms. Davis, in what town do you reside

14  currently?

15     A    Phoenix, Arizona.

16     Q    And your date of birth is what?

17     A    May 1, 1981.

18     Q    Just before we actually get started with the

19  reason you're here, I want to advise you of some of your

20  rights that you have during this proceeding today.  First,

21  so, you know, the Grand Jury is conducting an investigation

22  of possible violations of criminal law.  And you're under an

23  obligation to answer truthfully in response to questions put

24  to you by me.  Do you understand that?

25     A    Yes.

1      Q     If a truthful answer to a question would tend to

2   incriminate you, you may refuse to answer that question.  Do

3   you understand that?

4      A     Yes.

5      Q     Anything you say here today may be used against

6   you by a Grand Jury or in any other subsequent legal

7   proceeding.  Do you understand that?

8      A     Yes.

9      Q     So, if you lie or you knowingly make some kind of

10   false statement while you're testifying, you could be

11   prosecuted for perjury or for making a false statement.  Do

12   you understand that?

13      A     Yes.

14      Q     Now, you have counsel in the room here with you

15   today; don't you?

16      A     Yes.

17      Q     And that counsel is Stacey Gottlieb?

18      A     Correct.

19      Q     And also present in the room is Geoffrey Hobart;

20   is that right?

21      A     Correct.

22      Q     And Mr. Hobart is representing Insys Therapeutics,

23   Inc; correct?

24      A     Correct.  Yes.

25      Q     Now, just so you know, if you do have questions or

1    concerns about answering a question, you have a right to

2    step out with your counsel to talk if necessary.

3         A    Okay.

4         Q    And we'll suspend the proceedings for a bit and

5    you can do that.  Okay?

6         A    All right.  Thank you.  Yes.

7         Q    Now, the other things are a couple of things, just

8    ground rules.  The court reporter is taking down every word

9    you are saying, every word I am saying and anyone else who

10   may participate.  And so, it's really important that you

11   respond verbally as opposed to shrugging your shoulders or

12   shaking your head; okay?

13        A    Understood.

14        Q    All right.  And then, also, I will try not to

15   interrupt you when you're answering a question.  Although,

16   sometimes, I mess up on that.  But, I will also ask you to

17   try not to answer until I'm actually finished a question.

18   Okay?

19        A    Okay.

20        Q    And between the two of us, hopefully, we'll be

21   able to get a clean transcript when this is all said and

22   done.  Okay?

23        A    Yes.

24        Q    If you forget any of these kind of ground rules,

25   either I will remind you or the court reporter surely will

USAO-MA-0029690

1   remind you.

2        A    Okay.  Yes.

3        Q    Now, I'm just trying to get some background from

4   you.  And could you describe what your educational

5   experience is?

6        A    Can you be more specific?  Do you want the highest

7   level of education or --

8        Q    Well, beginning with high school.  Well, first of

9   all, where were you educated?

10       A    Well, I went to high in Sydney, Australia which is

11   where I'm from.

12       Q    What year did you graduate?

13       A    19 -- well, my senior of high school was completed

14   in America in Seattle, Washington in 1999.

15       Q    And after high school, where did you go?

16       A    I went to the University of Washington to do my

17   undergraduate degree in political science.

18       Q    And what year did you graduate from the University

19   of Washington?

20       A    2003.

21       Q    And did you get further education after your

22   undergraduate degree?

23       A    Yes.

24       Q    What was that?

25       A    I got a law degree from the University of Sydney

1   in Sydney, Australia.

2        Q    What year?

3        A    I graduated in 2007.

4        Q    And other than your law degree, have you had other

5   education?  Formal education?

6        A    I started a Master's in international business and

7   law prior to my actually doing the law degree.  But, I only

8   completed half of that.

9        Q    Where was that?

10       A    The University of Sydney.

11       Q    What years did you attend there?

12       A    That was the latter half of 2003, I believe.

13       Q    And when you say you completed half of that, what

14  does that mean?

15       A    So, I believe, the course was two years in length.

16  But, halfway through, I decided I wanted to get a full law

17  degree.  And so, when I was accepted to that program, I

18  essentially stopped and enrolled.

19       Q    Now, I'm not familiar with the study of law in

20  Sydney.  So, could you describe what that entails?  How long

21  a program is it and whether there's any focus of your

22  education there?

23       A    Sure.  So, it's three years in length.  And I

24  think, it's fairly similar to what you would expect here in

25  the states.  The only difference is, we have a bifurcated

1   system, meaning we have solicitors and barristers.  So,

2   there's not a focus on particular things that you would find

3   in law school here, classes like evidence, perhaps.

4           So, all the basic courses.  And then, the final

5   year, you could take electives, have focus areas.

6       Q    So, when you're studying law and it's bifurcated

7   between solicitors and barristers, do you choose what you

8   want to be?

9       A    Not at that time.  Everybody goes through that

10  first.  If you elect to become a barrister, there's

11  additional training and education.

12      Q    And describe what a solicitor is and a barrister.

13      A    So, a solicitor would be working in a law firm

14  preparing the case.  And the barrister is the only one

15  that's permitted to go before a Judge in the courtroom.

16      Q    And what did you choose or if you chose?

17      A    I've just completed the solicitor course.

18      Q    And you didn't have to specialize in any

19  particular area; right?

20      A    No.

21      Q    Okay.  That was a no; right?

22      A    That was a no.

23      Q    So, you said, I'm sorry, you graduated in 2003?

24      A    From the University of Washington.  My

25  undergraduate degree.

USAO-MA-0029693

1       Q    Yeah.  I'm sorry.  2007 you got your law degree

2   from Sydney?

3       A    Yes.  Correct.

4       Q    After your law degree, what did you do?

5       A    I moved back to America and started working.

6       Q    When did you move?

7       A    I think it was November 2007.  Either late

8   November, early December, thereabouts.

9       Q    Where did you start working?

10      A    I started working for a company in Phoenix locally

11  called Lightstone Solutions.

12      Q    So, when you say the company was in Phoenix, it

13  was headquartered in Phoenix?

14      A    Um-hmm.  Yes.

15      Q    And they had a local office in where did you say?

16  Where were you physically?

17      A    In Phoenix.

18      Q    Oh, you were.  Okay.  I misunderstood you.

19           Does Sydney or Australia have a bar exam in order

20  to be able to practice?

21      A    Yes.

22      Q    Did you take that bar?

23      A    Yes.

24      Q    And how about when you moved to Phoenix, did you

25  take the bar exam in Arizona?

USAO-MA-0029694

1      A    Not in Arizona.

2      Q    Are you currently licensed anywhere?

3      A    Yes.

4      Q    Where?

5      A    In California.

6      Q    And when did you get that license?

7      A    I took the exam in 2008.  But, I think the way it

8   works is, you don't actually find out the results and get

9   admitted until I think it was maybe beginning of 2009.  It

10  could have been the end of 2008.  I'd have to look at the

11  certificate.  Sorry.

12     Q    But, in --

13     A    But, I took the test in 2008 and passed it in

14  2008.

15     Q    And then, you were admitted some time thereafter?

16     A    Yes, I believe so.

17     Q    All right.  So, when --

18     A    Either 2008 or 2009.

19     Q    And did you take the bar exam in any other states?

20     A    No.

21     Q    And are you currently licensed today?

22     A    Yes.

23     Q    And have you ever had any disciplinary actions

24  against you regarding your bar -- regarding your practicing

25  as an attorney?

1      A     No.

2      Q     So, let's talk about Lightstone Solutions.   What

3   exact time period did you work there?

4      A     It was December 2007 until March 2008.

5      Q     And what was your job there?

6      A     I was assisting with due diligence, some cases

7   that they were working on, just part time assistant work.

8      Q     What kind of company is Lightstone Solutions?

9      A     They do all sorts of things, forensics, personal -

10   - private investigations.  They do a lot of background

11   checks.  That sort of thing.

12      Q     How big of a company is it?

13      A     It's very small.

14      Q     What does that mean?

15      A     I don't currently know how many people.  But, I

16   could tell you at the time.

17      Q     Yes.  Tell me at the time.

18      A     Might have been five or six people.

19      Q     And you said you did due diligence.  What does

20   that mean?

21      A     So, I was doing background checks, either for

22   individuals or corporations.

23      Q     Any other duties while you were at Lightstone?

24      A     No.

25      Q     What did you do after you left Lightstone?

USAO-MA-0029696

1      A    I became the executive director for the Snoqualmie

2  Gaming Commission.

3      Q    I'm sorry.  For what?

4      A    The Snoqualmie Gaming Commission.

5      Q    And what is that?

6      A    That is, I guess, you'd call it the regulatory arm

7  for the Snoqualmie tribe.

8           MR. HOBART:  The court reporter might need a

9  spelling on that one.

10           THE WITNESS:  Oh, S-N-O-Q-U-A-L-M-I-E.

11           BY MS. POSWISTILO:

12      Q    How long were you executive director there?

13      A    Five years and change.

14      Q    So, when did you start there?

15      A    April 2008.

16      Q    When did you leave?

17      A    November 2013.

18      Q    What were your duties there?

19      A    So, I was responsible for establishing a

20  compliance department, and as they call it a regulatory body

21  that would regulate the casino enterprise.

22      Q    Did that tribe have a casino going at the time?

23      A    Not when I started.

24      Q    How about when you left?

25      A    Yes.

USAO-MA-0029697

14

```
1        Q    Did you set it up?

2        A    Um-hmm.  Yes.

3        Q    How big of a casino was it?

4        A    In terms of what?

5        Q    How many employees did it have, if you can tell

6   me?

7        A    Approximately 2000.

8        Q    And were you working in more the corporate side?

9   You weren't out on the floors --

10       A    Correct.  Yes.

11       Q    -- dealing cards?

12       A    Right.

13       Q    And where were those offices?

14       A    Underneath the gaming floor.

15       Q    In what town or city?

16       A    Snoqualmie.

17       Q    Is that Arizona?

18       A    No.  That's in Washington state.

19       Q    You can tell I never heard of it.

20       A    Not a lot of people have.

21       Q    And how did you end up going from Arizona to

22   Washington state and getting -- working with the Indian

23   tribe?

24       A    So, my boss that I worked for at Lightstone

25   Solutions sat on a commission board in Snoqualmie for the
```

USAO-MA-0029698

1   tribe.

2        Q    And he told you about the job?

3        A    He did.

4        Q    Was he working at the tribe, also?

5        A    Well, yes.  He was a board member.

6        Q    Does that mean he was there on a daily basis, or

7   does that mean he had monthly meetings, if you know?

8        A    Yeah.  I couldn't say exactly.  But, he had, I'd

9   say, ongoing responsibilities.  Perhaps, he was up there

10  once a month.

11       Q    When you worked there, who did you report to?

12       A    To -- I reported a board of three individuals.

13       Q    Is that the board he was sitting on?

14       A    Yes.  Um-hmm.

15       Q    And were you acting as an attorney in that job?

16       A    Not specifically, no.

17       Q    Now, after November 2013, what did you do?

18       A    I moved back down to Phoenix.  And I guess,

19  started looking for another job.

20       Q    And did you find one?

21       A    I did.

22       Q    Where?

23       A    At Insys Therapeutics.

24       Q    When did you start looking there -- I mean, I'm

25  sorry -- when did you start working there?

USAO-MA-0029699

1    A    March 31, 2014.

2    Q    And you're still currently there; correct?

3    A    Correct.

4    Q    Why did you leave the tribe to move back to

5    Arizona?

6    A    The -- how it works with a tribe is, there is a

7    tribal government that changes every time there's a new

8    election.  And when that happens, sometimes, they invite you

9    to stay, and sometimes, they rotate in different

10   individuals.  And so, after that period of time, they

11   rotated in different individuals on the board in my position

12   and a couple of people directly underneath me.

13   Q    So, you didn't have a job any more?

14   A    Correct.

15   Q    And why did you move to Arizona?

16   A    Because I have a partner that lives there.

17   Q    Okay.  And how did you find out about the job at

18   Insys?

19   A    My -- my sister-in-law's sister worked at the

20   company at the time.

21   Q    And who was that?

22   A    Kristen McCoy.

23   Q    Where did she work?

24   A    At Insys.

25   Q    What was her job at Insys?

1    A    She was in -- it was called business

2   intelligence/sales operations.  I'm not exactly sure of her

3   title though.

4    Q    Okay.  What did she do?

5    A    To the best of my knowledge, I believe, she worked

6   on -- like rep alignment with managers.  So, working on the

7   districts.  Like which reps report to which district

8   manager, sort of carving out territories, I guess.

9    Q    Was she stationed in Phoenix?

10    A    Yes.

11    Q    So, tell me what the procedure was for hiring?

12   Did you have an interview first?

13    A    Yes.  I had several interviews.

14    Q    And who did you interview with?

15    A    First, I interviewed with Franc Del Fosse, who is

16   the general counsel.  And then, I interviewed with both him

17   and Mike Babich.  And I think that was it.

18    Q    And did anyone describe what your job was to be at

19   Insys?

20    A    In the general sense that it was going to be a

21   compliance director position.  Specifics, no.  I don't

22   recall specifics being discussed.

23    Q    Now, what kind of company is Insys?

24    A    Pharmaceutical manufacturer.

25    Q    And what product did it sell?

USAO-MA-0029701

1      A      Subsys.

2      Q      Which is what?

3      A      A sublingual fentanyl spray.

4      Q      And do you know what Subsys was supposed to be

5   used for?

6      A      Yes.

7      Q      What is that?

8      A      It's indicated use is for break through cancer

9   pain in adult opioid tolerant patients.

10      Q      Now, when you had your interviews, it looks like

11   you had two, one with Franc Del Fosse and then, with Babich

12   and Del Fosse.  And they were looking for a compliance

13   director.  Did they explain to you what a compliance

14   director was?

15      A      Not per se, no.

16      Q      What did they tell you?  Generally.  I don't

17   expect you to remember the exact --

18      A      Yeah.  To be honest, I really don't remember.  It

19   was -- we're going back quite a while.  To the best of my

20   recollection, I remember them saying, you know, we need

21   somebody in charge of compliance right now.  It's currently

22   being out sourced and we want to bring the position in house

23   and have you build a team and assist with training for sales

24   representatives.  That was -- that was discussed.

25           I remember, I had another interview, sorry, with

USAO-MA-0029702

1    Jenna Grosshans.  Sorry.  That triggered that memory.

2          Q    That's okay.

3          A    All of a sudden, I remembered sitting across the

4    table from her.

5          Q    That's --

6          A    I can't remember -- yeah.  I can't remember if

7    that -- I don't know if that was on a separate occasion, or

8    that might have been after speaking with either gentleman.

9    I can't remember.  It might have been a separate day, I just

10   -- but, I remember talking with her.

11         Q    Okay.  And she's with human resources; right?

12         A    At the time, she was.

13         Q    So, you had your first interview with Del Fosse?

14         A    Yes.

15         Q    And was the second interview with Babich and Del

16   Fosse on the same day?

17         A    It -- it might have been.

18         Q    You're not 100 percent sure?

19         A    I'm not 100 percent sure.  I can't -- but, I

20   remember it was two distinct times, because I remember Franc

21   sat here one time, and then, I remember him and Babich

22   another time.  And then, probably one of my longest

23   conversations was with Jenna.

24         Q    Okay.  So, they said they were moving compliance

25   in house.  And it doesn't sound as if you had any

1    pharmaceutical experience prior to coming into Insys?

2         A    Correct.

3         Q    Did anyone express a concern about that?

4         A    Not during the interviews that I recall.  No.

5         Q    Were you concerned about that?

6         A    Well, to be honest, I can't remember if I was at

7    the time.  I knew that the job would entail building a

8    compliance program, which is something that I had just done

9    previously and in a very highly regulated environment.  So,

10   I felt confident that, while I might have a steep learning

11   curve, I was aware that there was outside consultants that

12   had agreements.  They were going to stay on for a certain

13   amount of time.  So, I didn't think I would be without help.

14        Q    When you say outside consultants, what does that

15   mean?

16        A    Well, like I said, they had -- the compliance

17   position seemed to be farmed out, if you will, to either one

18   or two consultants at the time.

19        Q    Do you remember to whom it was farmed out?

20        A    I can't remember when -- so, Leslie Zaks, his last

21   name is S-A-K-S (sic).  I can't remember specifically if he

22   stopped before I was hired or -- because my communication

23   with him was through Franc, if at all.  But, Steve

24   Celestini, last name spelling, I'm not 100 percent on.

25   Sorry.  He was there through maybe August or September of

1   2014.  So, he was -- and he was, I think, initially hired

2   either in December or January of 2013, 2014.

3        Q    And Steve Celestini was an outside consultant?

4        A    Yes.

5        Q    Do you know, did he have a company he worked for

6   particularly?

7        A    I think it was his own.

8        Q    I'm sorry?

9        A    I think it was his own company.

10       Q    Do you know the name of it?

11       A    I can't remember.  No.

12       Q    Do you know what his background was?

13       A    I knew he previously worked at a company called

14  CIS that did pharmaceutical consulting.  And through

15  conversation with him, I believe, he had previously had an

16  in house role or several roles as well.

17       Q    With CIS?

18       A    No.  With actual pharmaceutical companies.  I just

19  -- I don't even know if we discussed the names.

20       Q    He was not located in the Insys offices; right?

21       A    Well, when he was on site, he would be.

22       Q    How often was he on site?

23       A    I believe, at first, it was twice a month.  And

24  then, it went down to once a month, I believe.

25       Q    And when he was on site, how long did he stay?  I

1   mean, if it's --

2        A    About a week.

3        Q    So, he'd come once a month for a week?

4        A    Yes.

5        Q    And would he be there full time?

6        A    Yes.

7        Q    And who would he deal with mostly?

8        A    Well, once I started, me.  But, before that, I

9   know that he had met extensively with Desiree Hollandsworth,

10  I believe, Matt Napoletano, and I do remember a few meetings

11  with Mike Gurry.  But, that's all I can remember at least at

12  this moment.

13       Q    And who is Desiree Hollandsworth?

14       A    She was an employee at Insys at the time.

15       Q    What was her job?

16       A    I believe, her title was associate director, MMC,

17  medical marketing communications.  I think that's right.

18       Q    And how about Matt Napoletano?

19       A    He was vice president of marketing.

20       Q    And Mike Gurry?

21       A    At the time, he was vice president of managed

22  markets.

23       Q    Going back to your interviews, you also said you

24  spoke with Jenna Grossman?

25       A    Grosshans.

1     Q    Grosshans.  Yeah.  I have it written down wrong.

2  And you stated that that was your longest interview.  What

3  did you and Jenna talk about?

4     A    She wanted to know -- she was asking me questions

5  about how, if I was to earn the position, how I would tackle

6  certain challenges.

7     Q    Do you remember what challenges she asked you

8  about?

9     A    I do remember one.  She wanted to know how I would

10  handle training the reps, because they were, you know,

11  spread out across the country.  It wasn't a situation where

12  everybody was based in the corporate office.  And she wanted

13  to know how I would -- how I would tackle that.

14     Q    And then, she raised other issues that you just

15  don't remember right now?

16     A    Yeah.  I mean, I'm sure we covered a lot of

17  ground.  That's just the one that stands out the most in my

18  mind.

19     Q    Okay.  So, who made the offer to you?

20     A    Franc did.

21     Q    And was that shortly after the interviews?

22     A    I -- no, I wouldn't say shortly after the

23  interviews.  I think, I interviewed in late January.  Maybe

24  in February.  I can't pinpoint.  Was either one of those

25  two.  I'm trying to think when I got the offer.  I think, it

24

1  was either -- around middle of March.  Might have even been

2  to the -- I started on March 31st.  So, you know, if I'm

3  guessing, it was a week before, something like that.

4       Q    All right.  So, there was --

5       A    It was maybe like four to six weeks that I didn't

6  hear anything.

7       Q    That's fine.  And what was your title when you

8  started?

9       A    Director of compliance.

10      Q    And what is your title now?

11      A    Director of compliance.

12      Q    What generally, if you don't remember

13  specifically, was your salary back when you started?

14      A    I started on a base salary of 120,000.

15      Q    Did you also have bonuses?

16      A    I did.

17      Q    Do you remember -- is that a yes?

18      A    Yeah.  I think, I -- I'm just trying to remember

19  if I -- so, the first year, I think, I did.  And it was

20  about 20 percent, I think.

21      Q    20 percent of your base?

22      A    Yeah.  Yes.

23      Q    And did that 20 percent get changed throughout the

24  years?

25      A    The 20 percent was increased to 30 percent.  It's

USAO-MA-0029708

1   a discretionary potential bonus.

2       Q    What is your potential bonus for 2016?  Or if you

3   know it already, what is it for 2016?

4       A    As far as I know, it shouldn't have changed.  It

5   still should be 30 percent.  But, I -- I don't know

6   specifically.

7       Q    Was the highest bonus you got 30 percent of your

8   base salary?

9       A    I don't believe so.  No.

10      Q    What was the highest?

11      A    Well, we didn't get 100 percent of that potential

12  paid out.  So, I think, it was either 80 or 90 percent of

13  that 30 percent allocation.

14      Q    Okay.  What is your current salary?

15      A    I think, it's 166,000 and change.  I don't know

16  the exact dollar amount.  But, that would be pretty close.

17      Q    And plus a bonus, whatever that is?

18      A    The potential, yeah.

19      Q    And did you also get stock options?

20      A    I did.

21      Q    How many and how are they --

22      A    So, my initial grant was when I started.  I don't

23  know if that was the first vesting day.  I'm not -- I'm not

24  sure.  That was the first grant.  And then, there was a

25  grant in August of 2014.  And then, I think, there was one

USAO-MA-0029709

1   earlier this year, maybe March or early April.

2          Q    Did you ever cash any of these stocks in?

3          A    Yes.

4          Q    And how much did you get?

5          A    I honestly -- I honestly can't remember.  I can

6   remember, because of course, it hasn't been recent, but at

7   some point -- was it last year -- I cashed in around 9000

8   options.

9          Q    And do you remember the dollar value?

10         A    I don't, no.  I'm sorry.

11         Q    How about generally?

12         A    I did it in two portions.  And I think, maybe one

13  was about approximately 40,000.  And the second one, I'm --

14  I'm really guessing -- but, I think is approximately 30,

15  maybe.  Maybe.

16         Q    Certainly, less than 100,000?

17         A    Yes, that I netted.  Yes.  I'm only talking about

18  what I netted.

19         Q    What you netted?

20         A    Yeah.

21         Q    Now, when you started at Insys, who was your

22  direct supervisor?

23         A    Franc Del Fosse.

24         Q    And did that change at all through the years?

25         A    Yes.

1    Q    Tell me the changes.

2    A    So, I started reporting to Sanga Emanuel.  I

3  believe, it was November 16th, on or about, last year, 2015.

4    Q    Is that who you currently report to?

5    A    Yes.

6    Q    When you started, did you manage anybody yourself?

7    A    I did, yes.

8    Q    Who?

9    A    Yoshi Jamison.

10   Q    And who is that?

11   A    She became the compliance manager, was it -- I

12 want to say approximately two to three weeks after I started

13 working there.

14   Q    And compliance manager of any particular area?

15   A    No.

16   Q    And she reported to you?

17   A    Yes.

18   Q    And do you know what her background was?

19   A    Oh, I know she had worked in -- oh, in sales.  I

20 don't know if it's Web MD related --

21   Q    What kind of related?  I'm sorry?

22   A    Web MD, I think.  And I want to say she was at

23 either a pharmaceutical company -- I'm not 100 percent sure.

24 Sorry.  Don't hold me to that.  And you know, I didn't

25 interview her.  I didn't hire her.  So, I don't recall

USAO-MA-0029711

1   looking through her resume that extensively.  Just from

2   conversations.

3        Q     That's fair.  When you started your job, did you

4   know that you were going to be managing Yoshi Jamison?

5        A     No.

6        Q     And do you know how it transpired that you ended

7   up managing her?

8        A     Yes.

9        Q     How did that happen?

10       A     So, it's my understanding Yoshi was hired to be a

11  QA/QC type function for the reimbursement hub.

12       Q     And that's quality assurance/quality control?

13       A     Correct.

14       Q     All right.

15       A     Sorry.

16       Q     That's okay.

17       A     And I guess, Franc and I had a conversation about

18  that.  And that it would be better served to report in to

19  compliance.  And so, I recall Franc had a discussion with

20  Mike Babich and said can we have Yoshi report to compliance.

21  Mike said yes.

22       Q     Were you part of that discussion?

23       A     I did not witness it, no.

24       Q     You heard about it?

25       A     Yes.  Franc recalled it to me.  Yes.

USAO-MA-0029712

1           MR. HOBART:  If I could just interrupt one second.

2    So, those are conversations with Franc and Danielle, I don't

3    believe, about a legal topic.  That's why I think it's okay.

4           MS. POSWISTILO:  Okay.

5           MR. HOBART:  We just need to be careful when she's

6    talking about conversations with Franc.

7           MS. POSWISTILO:  That's kind of my train of

8    thought as well.

9           MR. HOBART:  Yeah.  This is about a staffing

10   decision.  I don't regard that as advice to the company.

11   So, but we need to be --

12          MS. POSWISTILO:  Understood.

13          BY MS. POSWISTILO:

14   Q    Just so you know, Ms. Davis, Mr. Hobart is here as

15   representing the company to make sure that anything you say

16   -- that you don't delve in and I don't ask about

17   conversations you and Mr. Del Fosse may have had that

18   involve the attorney/client privilege.  And so, I will try

19   to be really careful of that, because I do not want to know

20   any discussions, internal discussions you and Franc had or

21   anything that's privileged.

22   A    Okay.

23   Q    And Mr. Hobart certainly will be on the look for

24   that as well.  Okay.  But, because we are talking about a

25   staffing decision, we can talk about that.  And so, what I

USAO-MA-0029713

1   want to ask you about is what conversations did you and Mr.

2   Del Fosse have as to why it would be better for Ms. Jamison

3   to be -- her job to be shifted under compliance.

4       A    Sure.  And I -- I have a feeling that that might

5   be privileged, privileged discussion.  I do.  I mean, I'm

6   happy to step outside and discuss it.  But, I think, my

7   discussion with Franc about the reasoning behind the change

8   would probably be privileged, unless you decide otherwise.

9           MR. HOBART:  We haven't talked about it.  So, I

10  don't know what she would say.

11          MS. POSWISTILO:  Okay.  Why don't you go out there

12  and talk about it.  So, we're off the record for a minute.

13          (Off the record from 10:18 a.m. to 10:20 a.m.)

14          MR. HOBART:  So, there's a potential for an

15  element of legal advice in that answer.  But, I think, if

16  you ask like the first layer of that question, which would

17  be non privileged, I think that's fine.

18          MS. POSWISTILO:  The first layer of that question.

19          MR. HOBART:  Like in terms of like just

20  independence, potential conflict of interest with who she

21  was currently reporting to, I think that's fine.  But, there

22  could be legal advice about the appropriate structure of a

23  compliance department that would be privileged, so --.

24          BY MS. POSWISTILO:

25       Q    Regarding the staffing decision, what staffing

USAO-MA-0029714

1    concerns, if any, were there between -- were discussed with

2    you?  Is that --

3         A    There weren't any really staffing concerns.

4         Q    Okay.  Who did --

5         A    Ask it a different way.  Sorry.

6         Q    Who did Ms. Jamison report to prior to coming over

7    to the compliance --

8         A    So, she reported -- it's my understanding, she

9    reported to Liz Gurrieri.

10        Q    And where was her office back then?

11        A    At the reimbursement hub building.

12        Q    Which was where?

13        A    I don't know the address.  I think it was on Frye

14   Road, F-R-Y-E.

15        Q    It was a different building from your office?

16        A    Yes.  Correct.

17        Q    After she started to report to you, did her office

18   change?

19        A    No.

20        Q    So, how far apart were the two offices?

21        A    Less than a five minute drive.

22        Q    Did she ever move to headquarters?

23        A    Yes.

24        Q    And when I say headquarters, I mean where your

25   office was.

1      A    Yes.

2      Q    And when did she move to headquarters?

3      A    We all moved into the same space.  It was June,

4  July-ish, 2014.

5      Q    Why don't we talk physically about the location of

6  your office when you first started.

7      A    Okay.

8      Q    And where was it?

9      A    My office was on Ray Road.

10      Q    Which is what?  In what town?  What city?

11      A    Oh, sorry.  Chandler, Arizona.

12      Q    And was Ray Road the main headquarter office of

13  Insys?

14      A    No.

15      Q    Where was that located?

16      A    That was also located on Frye Road.

17      Q    Who else was in the physical office where you

18  were?

19      A    There was an HR -- two HR individuals and a

20  finance manager, I believe.

21      Q    Where was Mr. Del Fosse?

22      A    At corporate.

23      Q    And do you know why your office was separated from

24  other people in corporate?

25      A    They ran out of room.

USAO-MA-0029716

1    Q    And then, you said it moved a few months after you

2  started?

3    A    Yes.

4    Q    When you got to the new office, your new office,

5  where was that?  Was that Frye Road?

6    A    No.  Spectrum.

7    Q    Spectrum Road?

8    A    Spectrum Boulevard.

9    Q    So, then, when you moved to the main headquarters

10  -- is that an appropriate term for that office?

11    A    Yes.  Yes.

12    Q    Who else was there -- or where was physically your

13  office based?

14    A    Within the building?

15    Q    Within the building.

16    A    I guess, you would say it was on the north side of

17  the building.

18    Q    Let me ask you this.  I asked it the wrong way.

19  How many floors did the company use?

20    A    Just one.

21    Q    And who else was on that floor of the -- not the

22  support staff group, but VP's, CEO's and that kind of thing?

23    A    So, my boss Franc was in that office.  CFO Darryl

24  Baker, Dr. Kapoor had an office.  Mike Babich was there.

25  And the medical team and the commercial team, including

USAO-MA-0029717

34

1   sales and marketing.  And that included Desiree's group, the

2   medical communications.

3        Q    And you already mentioned Matt Napoletano?

4        A    Yes.

5        Q    Was he there?

6        A    Yes.

7        Q    How about on the sales side?  Who in sales was

8   there?

9        A    To the best of my recollection, it was Alec

10  Burlakoff.

11       Q    And what was his position?

12       A    Vice president of sales.

13       Q    Was Richard Simon there at any time?

14       A    Yes.

15       Q    When was he there?

16       A    Intermittently.  He didn't have an office.  That's

17  what I'm getting at.  I don't know of him having an office.

18       Q    Okay.  When you first were having these interviews

19  with Mr. Del Fosse and Mike Babich, did they discuss with

20  you any particular compliance issues they wanted addressed

21  with the company?

22       A    Not specifics.

23       Q    And generally do you remember?

24       A    I remember at one point, Mike made a comment that

25  Des needed help.  But, that was -- that's all I remember.  I

1    mean, it was an interview so it wasn't specifics.

2         Q    And when you started the job, is that when you

3    first started working with Mr. Celestini?  Is that his name?

4         A    Celestini.

5         Q    Celestini.  I'm sorry.

6         A    A lot of names.  Yes.

7         Q    And did you and he have any discussions regarding

8    particular issues the company may have been having with

9    compliance?

10        A    More subject areas that needed work.

11        Q    And what subject areas?

12        A    So, speaker programs was probably the main one.

13   He was working on putting together an SOP.

14        Q    And what is an SOP?

15        A    Sorry.  A standard operating procedure, a policy

16   document.

17        Q    And?

18        A    That's my clearest memory of working on that.

19             Also, we talked about promotional review.  So,

20   there was putting in place a promotional review committee.

21        Q    And what does that mean, promotional review

22   committee?

23        A    So, any materials that could be used in a

24   promotional type setting would need to be approved by an

25   internal group.

USAO-MA-0029719

1      Q    Did that ever happen where a committee was set up?

2      A    I believe, there was one already in place when I

3  got there.  Yes.

4      Q    I thought you said that he was talking -- what was

5  he talking to you about then when he talked about a

6  promotional review committee?

7      A    We were trying to put together a formal policy

8  that could be followed for consistency and training me in a

9  sense as well.  If I would ever need to look at documents,

10  what to be looking for.

11      Q    Promotional documents?

12      A    Yeah.  Like core visual aid, I mean, any number of

13  things.

14      Q    And speaking of training, did you have any

15  training when you started the job?

16      A    On the job training, yes.

17      Q    And how did you get the on the job training?

18      A    I would say from Steve Celestini.

19      Q    And was that only during the one week periods he

20  was there?

21      A    No.

22      Q    How else would you get it?

23      A    I would be talking to him daily.  You know, as

24  questions came up, he was definitely a resource for me.

25      Q    So, you could contact him at any time?

1    A    Yes.

2    Q    And when did you say he was totally out of the

3    company?

4    A    Approximately, it might have been August or

5    September of 2014.

6    Q    So, maybe five or six months after you started?

7    A    Yeah.  Thereabouts.  We could certainly still call

8    if needed, that sort of thing.  But, I think, the official

9    retainer may have stopped around that time.

10    Q    How about Leslie Zaks?  Did you have contact with

11    him as well?

12    A    I don't recall having direct contact with him.

13    No.

14    Q    Do you know who had the contact with him?

15    A    I believe Franc did.

16    Q    So, your main contact was this Mr. Celestini?

17    A    Yes.

18    Q    When you got the job, what was your understanding

19    of what you were supposed to do?  I mean, you said put

20    together a compliance department or something.  What does

21    that mean specifically?

22    A    Well, my understanding of it was, you know, truly

23    put together a compliance program for the company.

24    Q    And what kind of compliance?

25    A    So, it would be anything from training for

1    everybody, whether that's code of conduct, HIPAA related, or

2    putting together an outline for auditing and monitoring.

3         Q    Of what?

4         A    Really any number of things.  At that time,

5    speaker programs, auditing, monitoring, reimbursement hub,

6    the same thing, interactions with the field, monitoring and

7    auditing some of their submissions as well.

8         Q    What kind of submissions in the field?

9         A    Like expense report submissions and also post

10   program documentation of the speaker programs.

11        Q    And I'll be asking you some specific questions

12   about speaker programs.  And so, we'll get to that in a

13   little bit.

14             How about compensation of sales reps?  Were you

15   involved in any discussions about how they were to be

16   compensated?

17             MS. GOTTLIEB:  Is there a point in time?  I don't

18   know if --

19             BY MS. POSWISTILO:

20        Q    How about initially and then tell me --

21        A    No, not initially.

22        Q    Okay.  And did that change?

23        A    I don't remember being directly involved.  At some

24   point in 2015, I remember sitting in on a meeting.  I can't

25   remember the specifics.  But, I do remember being part of at

USAO-MA-0029722

1  least one or two meetings.

2       Q    And who else was at those meetings?

3       A    Xun Yun.

4       Q    And could you spell those names?

5       A    Oh, Xun is X-U-N.  And his sir name is Y-U-N.

6            I'm trying to think.  Sorry.  I just don't want to

7  get it wrong.

8       Q    That's fine.

9       A    Yeah.  I'm just trying to recall.  I know, because

10 he would always put the outline together.  And then, I

11 believe, at some point, if we're talking this year, it was

12 probably Dr. Kapoor, Sanga.  I'm trying to think who from

13 sales.  From sales this year, it would have Tony recently.

14      Q    Who?

15      A    Tony Pakowski (phonetic).  I couldn't spell his

16 last name.  I'm sorry.  That would be more recent.  If it

17 was something that happened last year, I -- no, I just don't

18 want to speak to -- I'm just not --

19      Q    If you don't remember, that's fine.

20      A    Yeah.  I just don't.

21      Q    Let me ask you this.  Was 2016 the first time you

22 attended these two meetings?

23      A    I want to say I was at least tangentially involved

24 at some point, perhaps last year, towards the second part of

25 the year.  Not the first part, but perhaps, the second part

1 | of the year.

2      Q     And how about for the reimbursement group?

3      A     Yes.  Was involved with that as well.

4      Q     When did you become involved with that?

5      A     Towards the end of 2014.

6      Q     And how were you involved?

7      A     In helping review proposals.

8      Q     What kind of proposals?

9      A     Compensation.

10     Q     Who put them together?

11     A     I believe, Liz Gurrieri and Angel Alarcon.  A-L-A-

12 | C --

13     Q     I think that's A-L-A-R-C-O-N.

14     A     Yeah.  Sorry.

15     Q     Were there issues about the reimbursement or the

16 | compensation of the folks in the reimbursement center?

17     A     What do you mean?

18     Q     Why were they being changed?

19     A     I'm not sure the reasons why they were being

20 | changed.  And to be honest, I'm not sure really that there

21 | were changes that were being made.

22     Q     What were you reviewing?

23     A     The criteria that would potentially result in a --

24 | oh, I remember.  We did incorporate compliance as a factor

25 | that went into whether you received 100 percent of your

USAO-MA-0029724

1   potential bonus.

2       Q    And prior to that, was compliance included in the

3   compensation?

4       A    No.

5       Q    Do you know how the compensation was -- again for

6   the reimbursement group, how it was calculated before you

7   became involved?

8       A    Not specifically.  I don't know the actual

9   criteria.  So, I don't want to -- I don't want to speak out

10  of turn on that.

11      Q    Just generally, if you have a general memory?

12      A    Well, in a general sense, I believe, it had to do

13  with individuals getting approvals, whether for prior

14  authorizations or on appeal.  That's --

15      Q    As far as how any approvals that individual got?

16      A    That was -- yeah.  That was one of the factors.

17  Yeah.

18      Q    And generally, do you remember any of the other

19  factors?

20      A    No.  I think that was -- that's all I remember.

21  Yeah.

22      Q    In addition to dealing with Ms. Gurrieri and Ms.

23  Alarcon, with respect to the compensation of reimbursement

24  employees, do you recall any other discussions with anyone

25  else?

1      A    About that specific --

2      Q    About that issue, yeah.

3      A    I can't remember if I had a discussion with Mike

4  Gurry about it.  I can't remember with him.  Alfreya Holland

5  I did.  Oh, and Jenna Grosshans as HR director.

6      Q    Do you remember what you discussed with Alfreya?

7  Well, actually, first, who is Alfreya Holland?

8      A    She is a director of the reimbursement center.

9      Q    And do you know when she became director of

10 reimbursement?

11     A    I think it was about August of 2014, maybe early

12 August.

13     Q    Prior to that, who was it?

14     A    I think, Liz reported up into a gentleman called

15 Chris Homrich.

16     Q    Do you know whether Mike Gurry was ever involved

17 in the -- ever supervised or managed Liz Gurrieri?

18     A    Yes.

19     Q    In what time period was he doing that?

20     A    I don't know when it started, because it preceded

21 my employment.  I want to say it ended in May of 2014.

22     Q    And at that time, who took over, if you know?

23     A    Chris did.

24     Q    And we've been talking about the reimbursement

25 center.  Does that group have a particular name right now?

1      A     Yes.

2      Q     And what is that?

3      A     I think, it's called the patient service center.

4      Q     Okay.  And prior, when you first started, what was

5   it called?

6      A     Insys reimbursement center.

7      Q     And were you involved at all in the change of the

8   name of the group?

9      A     Not directly.

10     Q     Were you involved indirectly?

11     A     Well, I recall it being discussed.

12     Q     Who was discussing it?

13     A     Well, the conversations that I had, well, I had

14   some with the marketing group, because they were looking at

15   putting together like branding or marketing materials.

16     Q     And when you say marketing group, was there any

17   particular person --

18     A     I'm trying to think.  I think, it was Mark Hein,

19   H-E-I-N, and maybe Rick Kadile, K-A-D-I-L-E, those two

20   people.

21     Q     So, you talked with those two about the change in

22   name?

23     A     Yes.

24     Q     And what do you recall in those conversations?

25     A     Well, they said, "the decision's been made to

44

1  change the name. We're looking at putting together these

2  logos." I guess. I remember looking at some logos.

3      Q    Anyone else that you talked to about that?

4      A    I believe, I spoke with Franc about it.

5      Q    About the change in name?

6      A    I think so, yes.

7      Q    And what were your discussions with Franc on that?

8          MR. HOBART: I don't know what she would answer.

9          MS. POSWISTILO: Well, it doesn't sound privileged

10  to me about changing a company's name.

11          MR. HOBART: It doesn't to me. I just don't know

12  what she would say.

13          MS. POSWISTILO: Well, do you want to find out?

14          MR. HOBART: Yeah. I guess, I should.

15          MS. POSWISTILO: Off the record.

16          (Off the record from 10:41 a.m. to 10:42 a.m.)

17          MR. HOBART: So, as you predicted, the discussion

18  about the change of the names doesn't involve any legal

19  advice. So have at it. We just hadn't had the chance to

20  talk about it. So, I didn't know what she would say.

21          MS. POSWISTILO: Understood.

22          BY MS. POSWISTILO:

23      Q    And what did you and Mr. Del Fosse talk about

24  regarding the change of name?

25      A    That the company wanted to move in the direction

45

1  of being more patient focused.  So, hence, changing the name

2  from the company focused Insys reimbursement center to

3  patient services center.

4      Q    And when he said it wanted to be more -- that's

5  assuming what he said, that he wanted it to be more patient

6  focused.  Do you know what he was talking about?

7      A    No.  That was -- it was a very brief discussion.

8  But that's what, you know, my understanding of it was.

9      Q    Do you know what prompted this discussion with you

10  regarding that?

11     A    I don't.

12     Q    Did he, just out of the blue, come to you and say

13  the IRC, which is what I call the Insys reimbursement

14  center, is going to be name changed because the company

15  wants to be more patients focused?

16     A    No.  The reason I think it was brought up to me

17  was because it was right before or getting close to the

18  national sales meeting.  And they wanted to change the

19  language and presentations, materials and, you know, work

20  with the promotional review committee and marketing.  So,

21  that's why.  I think it was just a heads up.  This is

22  changing.  So, you know, be working with these teams.

23     Q    Okay.  So, going back to the bonuses, we were

24  talking about sales bonuses and reimbursement center

25  bonuses.

USAO-MA-0029729

1        A     Yes.

2        Q     Did you talk to anybody else with respect to

3   bonuses?

4        A     Yes.

5        Q     Who else?

6        A     So, I certainly had discussions with Franc and

7   also with the attorneys from Skadden Arps that we worked

8   with.  Yeah.

9        Q     And we won't get into those discussions.  We'll

10  leave that one --

11       A     I just didn't want to leave them out.  I'm so

12  focused on the company, I'm just not thinking of that.

13       Q     No.  Understood.  Take your time to answer

14  questions and we'll -- because we want them as accurate as

15  they can be.

16       A     Yeah.  Certainly.

17       Q     So, getting back to the reimbursement center

18  bonuses, you said that one thing you do remember with your

19  discussions with Gurrieri and Alarcon was compliance should

20  be included in factoring in the bonus; right?

21       A     Um-hmm.  Yes.

22       Q     And do you know why compliance --

23             MS. POSWISTILO:  What was that?

24             MS. GOTTLIEB:  I'm sorry.  I don't know that she

25  said should.  I'm sorry.

1          BY MS. POSWISTILO:

2      Q    What is it that you said?

3      A    I don't remember exactly what I said.  But, you

4   know, we have a compliance team in place now.  So, we wanted

5   to, as part of the compliance efforts, include some sort of

6   compliance related component into individuals's bonus

7   structure.

8      Q    And did that happen?

9      A    Yes.

10     Q    And whose idea, if you know, suggested that that

11  should happen?

12     A    I think it was mine.

13     Q    And did Ms. Gurrieri or Ms. Alarcon have any

14  reaction to that?

15     A    Not that I recall.

16     Q    Were they receptive to the idea?

17     A    As I recall, yes.

18     Q    How about, did you ever get any feedback from the

19  actual reimbursement center employees about the change in

20  the bonus structure?

21     A    I don't remember and instance where a team member

22  brought up that.  No.

23     Q    Now, let's focus on the speaker program first.

24  All right?

25     A    Okay.

1      Q      And do you know what the speaker program is?

2      A      Yes.

3      Q      What is it?

4      A      So, the speaker programs are when we have, the

5   company had contracted with physicians to speak on our

6   behalf to their peers on our product.

7      Q      And did there come a time when you learned that

8   there were problems with the speaker program?

9      A      Yes.

10     Q      And when was that?

11     A      In the time frame maybe April, May 2014.

12     Q      So, maybe within two weeks after you started?

13     A      Yes.  Yes.  I think that's fair to say.

14     Q      All right.  Well, you started the end of March, so

15   --

16     A      Yeah.

17     Q      So, fairly immediately after you started?

18     A      Yes.

19     Q      And how did you learn about that?

20     A      So, I remember working with Steve Celestini on the

21   SOP.  And we were working on it with members of the

22   commercial team, specifically, working with Matt and

23   Desiree.  And we were, I guess, trying to just create a

24   policy frame work for the company to work within to have

25   that structure.

USAO-MA-0029732

49

1    Q    When you first started, did you have conversations

2    with Matt or Desiree about the speaker program?

3    A    I don't believe I -- I don't believe I met

4    directly with Matt.  It's possible that I was in

5    conversations with Desiree and Steve.  That was definitely

6    during my, you know, early tenure and I was learning.  So, I

7    was observing those conversations.  And that was -- we were

8    really working on the SOP together.  It was quite a long

9    intensive document.

10    Q    So, the SOP started immediately after you got the

11    job?

12    A    I believe so.  It was very, very close around that

13    time, I think.  Yes.

14    Q    And what do you remember in this time period when

15    you first started were concerns regarding the creation of an

16    SOP?

17    A    And again, it's a while ago.  So, this is to the

18    best of my recollection.  We wanted to have a consistent

19    nomination process by which speakers could be nominated into

20    the bureau.

21    Q    And what was the nomination process as you learned

22    it when you first started before or was -- I mean you wanted

23    a consistent nomination process.  What was going on prior to

24    getting a consistent nomination practice?

25    A    I don't entirely recall.  But, to the best of my

USAO-MA-0029733

1    recollection, I believe, a CV was sent in and --

2        Q    To whom?

3        A    I believe to Matt Napoletano, I believe.

4        Q    And when you say a CV was sent in --

5        A    Oh, a curriculum vitae.

6        Q    I know what a CV --

7        A    A resume.

8        Q    Yeah.  I understand that.  Who sent a CV in?

9        A    I don't know.

10        Q    Whose CV?

11        A    Of the potential speaker.

12        Q    Do you know whether sales reps sent those CV's in?

13        A    I don't know where they were coming from.

14        Q    So, what you know is that a CV was sent into Matt

15   Napoletano?

16        A    Yes.

17        Q    Then, what?

18        A    And then, they would review it.

19        Q    They being who?

20        A    I believe, it was either Matt Napoletano.  He

21   probably had assistance by Mark Hein.  But, again, I don't

22   want to speculate.  It was either one of them would review

23   the resume of the potential speaker.

24        Q    For what?  Do you know?

25        A    I don't know initially.

USAO-MA-0029734

1    Q    Did you learn?

2    A    I don't -- I just -- I don't know.  I don't want

3    to say.  I'm just not sure.

4    Q    Well, you said you don't know initially.  What

5    does that mean?

6    A    Well, because the earliest I recall seeing any

7    documentation, they had the chart attached that was on the

8    SOP.  So, I'm not sure if they had that chart ahead of time

9    and were using it separately from when the SOP was

10   implemented.  But, it's a chart that helps you determine the

11   level of experience that the physician would have.

12   Q    So, let me back up.  You said the earliest

13   documentation you saw was a chart attached to the SOP?

14   A    No.  Just to -- to a resume.  I remember seeing

15   like it's a resume behind a -- it's like a three table chart

16   type thing.

17   Q    Do you remember what was on the three table chart?

18   A    Yes.  It's local, regional and national

19   designation.

20   Q    And what does that mean?  Local designation?

21   A    So, that would mean -- that's the lowest tier.

22   So, the tier is used to determine the -- you know, several

23   factors.  Anything from where the physician went to medical

24   school, how many journal articles they might have published,

25   years of experience, prominence in the community, influence

USAO-MA-0029735

52

1    in the community.  And all of those things were factored in

2    to determine what rate they would be permitted to be paid.

3         Q    What do you mean by user experience?

4         A    Oh, clinical experience, perhaps.

5         Q    And what does that mean?

6         A    Experience with the class, TIRF REMS class.

7         Q    Which was what in this case?

8         A    Fentanyl.

9         Q    Okay.

10        A    Years of practice, clinical years of practice.

11        Q    What kind of experience was looked for?

12        A    At the time, I don't know.

13        Q    Did you learn what kind of experience was looked

14   for?

15        A    I think, it's basically what I've just told you.

16   Years in practice --

17        Q    No.  I mean, as far as clinical experience.

18        A    Well, they -- I know they looked to see whether

19   the physician is TIRF REMS enrolled, and if so, for how

20   long.  And that's about the extent of which I can -- I can

21   recall.

22        Q    Well, they certainly looked at whether a doctor

23   was prescribing fentanyl drugs; right?

24        A    Well, they would not be looking at how much Subsys

25   was being prescribed.

1      Q    They looked at fentanyl drugs; correct?

2      A    I'm not sure.  I don't know how marketing would

3   have got that.  So, I'm not sure.

4      Q    You don't know if they looked -- well, you said

5   they look at clinical experience?

6      A    Right.

7      Q    And then, you said that's -- I thought you said

8   that's -- you know, experience in the class of drugs.  And

9   then, I asked you what drugs and you said fentanyl; right?

10     A    Right.

11     Q    And so, when you say they looked at clinical

12  experience --

13     A    Like have they had, I guess, did they publish a

14  journal article 10 years ago on fentanyl use in a patient

15  population.  That would be definitely be -- that would

16  definitely --

17     Q    Well, they said --

18          MS. POSWISTILO:  Okay.  Let's take a break a

19  second.

20          (Off the record from 10:56 a.m to 11:24 a.m.)

21          MS. POSWISTILO:  Back on the record.

22          BY MS. POSWISTILO:

23     Q    Now, my question to you is, what did Steve tell

24  you were the problems with the speaker program or the Insys

25  speaker program when you first started or shortly into your

USAO-MA-0029737

1    tenure there?

2        A    Okay.  Let's see.  I remember we talked about the

3    amounts of programs that were being done.  And just by that

4    sheer volume, that we needed to have more strict guidance in

5    place.  Then, I know that through -- he had expressed that

6    Desiree had mentioned to him that the cost of some of these

7    meals seemed to be what he considered high.  Things like

8    amounts of alcohol, types of alcohol.

9            Another one that got passed along was the location

10   in the sense that sometimes the programs would be in a space

11   that would say would not be conducive to an educational type

12   environment.

13       Q    Let's go through each of those things.  The

14   amounts of --

15       A    I'm trying to think.

16       Q    Oh, there was more?

17       A    Yes.  Had to do with, I believe, the honoraria and

18   cancellation rates.  If things were cancelled at the last

19   minute, what portion of the honoraria would the physician be

20   paid.  So, we needed to have like a -- if you would, like a

21   cancellation policy.

22       Q    So, let's go back to, you said the amounts of

23   programs and the sheer guidance -- I mean, I'm sorry --

24       A    The sheer volume.

25       Q    -- the sheer volume.  What did he say about the

1   sheer volume?

2        A    The company was doing a lot of programs.

3        Q    What did you understand him to mean a lot?

4        A    Well, when he said a lot, I took that to be more

5   than what our industry peers were doing.

6        Q    Which was what?

7        A    I don't know in terms of numbers.  It wasn't like

8   it was a -- it was quantified by numbers.  But, the

9   insinuation was, we're doing more than the average company

10  our size.  So, just by virtue of that, there's -- you know,

11  many things that could go wrong at one program, let alone

12  when you're doing a large volume of programs, you know, more

13  difficult to monitor that many programs.  If you've got, I'm

14  just saying as an example, eight programs on one night, like

15  how are we going to get our arms around this and make sure

16  that they're being executed compliantly.  So that was the --

17  like in a nutshell, that was it.

18       Q    And you listed four things.  These four things

19  were --

20       A    I also want to add to that first point, too.  When

21  -- another insinuation out of the volume would be the amount

22  that a physician could potentially make per year.  So, it

23  kind of tree branches off that.  But, it might be a separate

24  issue.

25       Q    So, when we talk about the, let's call it five

USAO-MA-0029739

1   items that you mentioned, was that your understanding as to

2   why one of your duties was to assist in writing an SOP for

3   the company?

4       A    I -- yes.  And like I said, there was a draft SOP

5   already in place.  It was not that I was -- I was not

6   participating in writing it at that stage.  It was in the

7   final stages.  So, I don't want to say that, you know, I

8   take credit for coming in and writing all of that.  That

9   wasn't -- that was the case.  He was saying, look, this is

10  how we arrived at the SOP.  These are the bundles or

11  categories of issues that we are trying to address.

12      Q    And you said the company doing a lot, and you said

13  that meant more than what the industry -- your industry

14  peers were doing?

15      A    According to Steve.

16      Q    According to Steve.  Because at the time, you

17  didn't know what your industry peers were doing; correct?

18      A    Correct.

19      Q    Did there ever come a time when you learned what

20  industry peers were doing as far as the amounts of programs?

21      A    Not amounts of programs.  No.  Don't know numbers.

22      Q    Did there ever come a time when you learned that

23  Insys was, in fact, doing the same amount of programs as

24  your industry peers?

25      A    I'm sorry.  Could you -- I'm sorry.  I don't think

USAO-MA-0029740

1    I completely understood the question.

2         Q    Did there ever come a time when you learned that

3    Insys was or was not doing the same amount of --

4         A    That's what I thought you said.

5         Q    -- programs of --

6         A    Yes.

7         Q    -- your industry peers?

8         A    Yes.

9         Q    Yes, you did come to find --

10        A    I did.  I did.

11        Q    And what did you learn?

12        A    So, the way we learned about it was, and to be

13   clear, I still to this day, I don't know how many number of

14   programs our peers do.  But, how we sort of backed into that

15   was, when the Sunshine Act data became public, we were able

16   to do an analysis to see what the, I guess, similar

17   companies about revenue level, product life cycle, what they

18   were, I guess, you could say paying physicians.  And you

19   look at the number of times that they perhaps might have

20   been used for programs with other companies.

21             So, we used -- looked at that data and figured out

22   that, just by the sheer overall number of money spent, that

23   we were doing more.

24        Q    And you're using the term we.  Who does that

25   include?

58

1      A    So, I'm trying to think.  So, I was using a

2  company called CIS at the time to do our Sunshine Act

3  reporting data.  And a gentleman by the name of Eric Jenn

4  (phonetic) was responsible for that.  And we actually hired

5  him to bring that function in house, I'm guessing, early Q2,

6  last year, thereabouts.

7      Q    So, let me interrupt you right now, if I can.

8      A    Yeah.

9      Q    You said, at the time, you said we looked at

10  Sunshine data at the time.  What time was that?

11      A    This is -- this is about the time.  It's, I want

12  to say, June of -- May or June of last year, because that

13  span from 2014, I believe, became public, I think, it was in

14  June.  I'm pretty sure.  I mean, we can obviously check.

15  But, I'm pretty sure it was around that time.  Because we

16  had to submit ours, I believe, by March.  And then, there's

17  that dispute period.  And then, it goes public.

18      Q    And when you say ours, you mean your --

19      A    The company.

20      Q    -- data for the Sunshine Act?

21      A    For Insys, yes.

22      Q    So, when you looked, or when Mr. Jenn --

23      A    Jenn.

24      Q    -- looked at the Sunshine Act data from 2015, were

25  --

USAO-MA-0029742

1       A    It was from -- he was looking at all of 2014.

2       Q    Okay.  He looked at 2014?

3       A    Yeah.  But, we're analyzing the 14 data in '15.

4       Q    Okay.  Well, I mean, he looked at the 2014 data.

5    What did you learn about the amount of programs that were

6    being used or being done by Insys vis-a-vis your industry

7    peers?

8       A    Sure.  And I just -- I do want to clarify so I'm

9    not misstating that.  Again, it's not number of programs.

10   It's the volume of money that we're figuring out.  And I'm

11   just using a hypothetical.  If we're using $4,000,000 a

12   year, are our industry peers using 4?  Are they down at 1?

13   Are they up at 8?  So, that's how I'm using it as a gauge.

14            So, at no time, again, did I ever find out how

15   many programs are being done --

16      Q    You made that clear.  I've got that.

17      A    Yes.

18      Q    So, when you looked at the volume of money being

19   paid by Insys vis-a-vis the industry peers, what did you

20   learn?

21      A    It -- I think, we were -- we were quite high up on

22   that list.  I don't remember what number we were.  11 stands

23   out in my mind for some reason in terms of honoraria paid.

24   That was a specific category that we were looking at.

25            And so, if it was vis-a-vis companies of our size,

1   even factoring in the stage of the product life cycle, it

2   did appear that we were on the high side compared to what we

3   would consider industry peers, companies of a similar size.

4        Q    And do you know percentage wise how high you were?

5        A    I don't by numbers.  I mean, it's definitely

6   something we could get.  But, I don't know.

7        Q    Okay.  So, in addition to amounts of programs, the

8   other thing you mentioned is that Steve told you that

9   Desiree Hollandsworth was concerned about the meals, the

10  cost of the meals, and that that was high.  Was this

11  conversation early on in your --

12       A    From what I remember, yeah.

13       Q    What do you recall, other than the cost of meals

14  was high, from that conversation regarding the cost of

15  meals?

16       A    Sure.  So, a lot of it seemed to be alcohol based.

17       Q    Do you recall learning that other times -- let me

18  follow that up.  Alcohol based, what does that mean?

19       A    Well, so, when you look at the receipt, I guess,

20  for the program, there was a high volume of alcohol

21  purchases.

22       Q    Was there also a concern regarding the number of

23  attendees at these meals who had meals?

24       A    Yes.  I do remember -- although, I can't recall if

25  that was actually a conversation with Steve.  It might have

USAO-MA-0029744

 1   been a conversation I had directly with Des.  But, there was

 2   the question of attendees that was discussed.  I just don't

 3   think I had that conversation with Steve.

 4        Q    What was the question that was discussed regarding

 5   the number of attendees?

 6        A    There -- I think there were two issues from what I

 7   recall.  Too few attendees at some programs, lots of last

 8   minute cancellations, not knowing ahead of time really who

 9   was supposed to be coming to the programs.

10        Q    And when you say that, is that what you learned

11   from Des?

12        A    Yes.  This stuff is from Des.

13             Shoot.  I'm sorry.  I just lost my train of

14   thought.  I said there was two things, there was -- oh,

15   repeat attendees.  So, you'd see the same names popping up

16   in the post documentation, sign in sheets.

17        Q    And do you recall ever having a discussion with

18   Des about who the attendees were?

19        A    I don't recall her talking about specific

20   attendees.  More like a class of -- or a category.  So, for

21   example, you'd have MD's, NP's, PA's, but then, you would

22   see office manager or account staff on a sign in sheet.  So

23   that was -- she brought that to my attention.  Again, this

24   is Des.  This is not -- I don't recall ever having this

25   conversation with Steve.

USAO-MA-0029745

62

1    Q    What was your understanding of a concern with

2    having an office manager attend a program such as that?

3         MS. GOTTLIEB:  And again, this is at the time you

4    had discussions with Des or --

5         MS. POSWISTILO:  Yes.  The discussions with Des

6    and all the then follow up with when these discussions were.

7    A    Okay.  So, I don't want to put words in her mouth.

8    And to be clear, I don't think she said this is why this is

9    a problem.  She would just throw it in front of me and say,

10   look, there's an office manager here or something like that.

11        To me, doing my research, it's clear to me that

12   those programs are intended to be educational peer to peer

13   programs.  And so, I'm speculating, but I'm guessing her

14   insinuation was, is it really appropriate to have an office

15   manager at a speaker program.

16   Q    And when did you do your research?

17   A    It was around the time I started having those

18   conversations with her which would have been I'd say -- I'm

19   pretty sure we were in the new building.  So, I want to say

20   around maybe June, July.  They were not with Steve.  By

21   then, I'd developed a rapport with Des where, you know, I

22   could go and have a chat with her about these sort of

23   things.

24        So, I was starting to learn things on my own

25   outside of Steve.

1    Q    But, was Steve still used by the company?

2    A    He was on retainer.  So, if there was an issue

3    that came up that I needed some help with, you know, we

4    would definitely have him weigh in on things.  But, by July,

5    August, like I said, we weren't really using him any more.

6    I was primarily using Skadden as a resource.

7    Q    You stated that, when Steve talked to you, there

8    was sometimes a problem with the location.  What were those

9    problems?

10    A    So, it seemed that we were having the -- when I

11    say we, I mean, the company was having these programs at

12    restaurants.  And it did not appear that they were in a

13    private room.  They were in the main dining room.  And so,

14    the concern was, you know, if it's loud, is the doctor

15    really able to effectively educate the attendees on the

16    product.  Can they even hear him?  Is there live

17    entertainment?  Is this a restaurant where there's a piano

18    player in the lobby?  That sort of thing.

19          So, the focus was, need to make sure that it's in

20    a space that's conducive to learning.

21    Q    And did Steve indicate to you that that is a

22    problem with the company?

23    A    He -- he definitely said, look, this is something

24    that you are going to have to watch.  It's something I am

25    aware of.  Des has made me aware of this.  So, it's going to

USAO-MA-0029747

64

1   have to be -- it's going to be a focus for the monitoring

2   efforts.

3        Q    And let's talk about honoraria and the

4   cancellation rates.

5        A    Okay.

6        Q    What else did he tell you about that?

7        A    So, honoraria, it wasn't so much per person.

8   Because what they had done just before I got there was, they

9   had -- again, using CIS, they had developed an SOP that was

10  for fair market value.  And so, we had out sourced to CIS

11  the process by which they -- they collect data and they

12  figure out who should be paid what depending on what your

13  specialty is or what the designation is, you know, how many

14  hours you're going to be contracted for.  So that, in and of

15  itself, was not a concern, how much they were being paid per

16  program.  It was the fact that how many programs are they

17  doing and how much in total for the year are we paying these

18  physicians to do speaker programs.  Does that make sense?

19       Q    I understand your answer.  But, what does that

20  have to do with cancellation rate?

21       A    So, if a program was cancelled, depending on when

22  it was cancelled, the speaker could be paid 100 percent of

23  that honoraria.

24       Q    Okay.  Was that the practice?

25       A    I don't know what was the practice before I got

1   there.  But, the SOP that was in place when I arrived was,

2   it was sort of pro-rated, if you will.  If it was   -- if

3   the program was cancelled, I think, 73 hours out, there was

4   no honoraria paid.  Then, 48 hours out, I think, it was 50

5   percent was paid.  And if it was cancelled within 24 hours,

6   the physician was paid the full amount, even though they

7   didn't do anything.

8       Q    And why was there a concern about how much that

9   physician made, either through cancellation rates or through

10  the number of programs?

11      A    I'm trying to be helpful here.  I think, there's

12  two issues here.

13      Q    Okay.  So, --

14      A    Yeah.  So, one is how much we're paying a

15  physician overall, the company's paying per year.  And then,

16  if they're cancelled and continuously cancelled at the last

17  minute and they're being paid.

18      Q    Why don't we focus on the first issue, how much a

19  doctor or a physician or a practitioner is being paid

20  through the course of a year?

21      A    Okay.  So, again, you know, I was definitely new

22  to the industry at the time.  So, I'm getting advice from

23  Steve and Skadden on, you know, what would be appropriate.

24  And so, we had to make sure that there were caps put in

25  place to make sure that -- you know, we weren't paying

USAO-MA-0029749

66

1    physicians hundreds of thousands of dollars a year, because

2    of, you know, the optics of that and the appearance of

3    impropriety.  And so, we wanted to make sure that there was

4    an appropriate cap in place that would prevent physicians

5    from doing too many programs.

6         Q    And did Steve tell you what kind of impropriety

7    that would appear if a physician is making way more than

8    another throughout the course of the year?

9         A    Sure.  I mean, the insinuation is that you're --

10   that the company is paying the speaker to do all these

11   programs, you know, in return for script writing.  That

12   could be -- you know, the appearance.

13        Q    And did he indicate to you that, prior to --

14   strike that.

15             And going back to conversations with Steve about

16   the cost of the meals being high, or what Steve told you

17   Desiree told him, did he mention to you that there was a per

18   person dollar amount budget for attendees at these meals?

19        A    Yes.  They -- I'm not -- I'm a bit fuzzy on

20   whether it -- because as long as I can remember, for dinner

21   programs, it's been 125 per person at dinner.  I can't

22   remember if -- when exactly that was put into place.  And I

23   don't remember if it was a little bit higher before I got

24   there.  I'm just not -- I'm not sure.

25             As far as I can remember, it was 125.  But, we

1   needed to make it clear that that was a cap, not a target.

2   Because one of the concerns that Des had brought forward was

3   that -- well, not a -- I guess, it was a concern.  But, in

4   theory, a meal in Nebraska is not going to cost the same as

5   it would in New York City.  So, while restaurants are, you

6   know, more expensive in New York, 125 per person may end up

7   being well within reason.  But, in Nebraska, just as an

8   example, because she used that state, that might seem

9   opulent or exorbitant in that area.

10        So, it had to be like a modest meal as by local

11   standards I think is the terminology used in the SOP.

12   Q    Did Des ever tell you that she was getting the

13   sign in sheets from a speaker program that did not have

14   enough names on it to indicate that the cost per attendee

15   was 125 or lower?

16   A    You know, I'm -- I'm not sure about that.

17   Because, if I'm right, the way you've just described it,

18   like that would happen more if it was preset.  Like you had

19   committed to having 10 people there at $125 a head.  But,

20   then, only eight showed up and so it went over.

21        But, if -- it was once we started looking at

22   things and actively monitoring, it was not common that we

23   were going over that limit.  And if it did happen, it was --

24   I don't remember it occurring for a long period of time.  It

25   was like, you know, getting the word out there these are the

1    limits, now, you know, start abiding by them.

2         Q    And do you recall ever learning that that had

3    happened in the past before you got there?

4         A    Well, like I said, I'm just not sure when that

5    limit came in place.  So, when she told me like meals were -

6    - they did seem, you know, opulent or exorbitant, I don't

7    know if she was going off that 125 or it was just a general

8    comment, whether it just seemed like too much for what we

9    would consider a modest meal.  But, I can't remember a

10   specific time before like May, June, where that was brought

11   to my attention.

12        Q    Did you ever learn that there were district

13   managers or regional managers in the field who would pay for

14   part of the restaurant bill so that the official bill

15   appeared to be within the cap?

16        A    I remember hearing rumors of that.  And I remember

17   one or two specific instances, although I can't remember now

18   who the rep or the -- or the manager would be.  A lot of the

19   times, I don't think the angers were even at the programs.

20             But, I remember, she brought -- I'm trying to

21   think of when it was.  It might have been towards the fall

22   of 2014.  Yes.  I think it -- okay.  I think I remember.

23   And it looked like, on the receipt that was submitted, that

24   a portion had been carved out and charged somewhere else.  I

25   think it said, on like the main itemized receipt, like AMEX

USAO-MA-0029752

69

1    this amount, and then, like a Visa or something, for

2    example, another amount.  That's a specific instance that I

3    can -- that I can recall.

4         Q    What rumors did you hear?

5         A    That -- so, as we got stricter with the policy

6    over time and cracked down on how much alcohol was permitted

7    at programs, I instituted that it was no more than two

8    drinks maximum per person and beer and wine only.  And I had

9    heard rumors that Alec was saying, you know, if the doctor

10   shows up and he wants a whatever drink that's not beer or

11   wine, you know, take care of it, or something to that

12   effect.  And I learned of that, I believe, by talking to

13   Des.  But, I can't tell you who -- I don't know who she had

14   heard it from.  If it was rumor or whatever.

15        Q    And did you ever talk to Alec about that?  And

16   we're talking about Alec Burlakoff?

17        A    Yes.  Yes.  Yeah.  Yeah.

18        Q    What did you talk about?

19        A    I said, "I don't ever want to hear that you are

20   instructing the field to do this.  This is the policy.  This

21   is what the rules are.  That's it."

22        Q    And what was his reaction?

23        A    Well, I mean, he -- huff and puff about it and be

24   like, oh, all right.  Like obviously not happy about it.

25   And it wasn't probably a pleasant conversation.  But, I

1    remember that he, at least to my face, acknowledged that

2    this was going to be the policy.

3         Q    So, he heard the words that you were saying?

4         A    Yes.

5         Q    Who else was there during that conversation?

6         A    That was just me.

7         Q    All right.  So, let's go back to the SOP's.  You

8    said that there was a draft when you first started; correct?

9         A    Yeah.  I can't -- I can't remember if it was a

10   draft or it was -- the SOP has evolved over time.  And I'm

11   trying to remember -- I can see who signed it.  I can see it

12   was Alec.  It was Matt, Des, Steve Celestini.  I can see

13   that front page.  I really want to say it was signed in

14   February of '14.  So, it just -- I'm sure it had just come

15   into play.

16        Q    So, what was your role with respect to the SOP?

17        A    So, I then took that and went out and found -- I

18   put out for bid and interviewed companies that could assist

19   with monitoring the speaker programs for compliance with the

20   policy at that time.

21        Q    Why did you do that?

22        A    Because I needed help.  I couldn't be in all those

23   places at once.  And I wanted a company that had experience

24   and knew what to look for.  And you know, would help provide

25   me with feedback so I could be training the field to -- on

USAO-MA-0029754

 1   how we could get better.

 2        Q    Who made the decision that speaker programs should

 3   be monitored?

 4        A    I don't know if there was ever a -- like an

 5   absolute decision.  I know, I talked about it with Steve.

 6   And I think, he had suggested I interview a couple of

 7   companies.  I -- it was just always assumed that that was

 8   the direction we were going in.  I don't remember ever

 9   having a meeting where it was like, yes, we decide that this

10   is what we're going to do.  It was just sort of the

11   progression of the compliance program, like that's where we

12   were going.

13        Q    So, when you started there, it was your

14   understanding that programs would be monitored?

15        A    Yes.

16        Q    From the get go?

17        A    Yes.

18        Q    Now, getting back to the nomination practice, and

19   correct me if I'm wrong, but I believe you stated earlier

20   that, in the SOP's, that one of the things that the SOP was

21   concerned with was the nomination practice of the speakers?

22        A    Yes.

23        Q    What did Steve tell you were the concerns with

24   that nomination practice?

25        A    I honestly don't really recall having a

1    conversation with him about his concerns about the

2    nomination process.  It might have been a conversation

3    about, you know, this is how you make sure you avoid certain

4    things.  But, I can't remember -- because I don't even know

5    if he was involved with the nomination.  I -- I just -- I

6    cannot remember having a specific conversation with him

7    about that area.

8         Q    Did you have a conversation with anybody about

9    that area?

10        A    I think -- I think Des and I spoke about it.  I

11   don't -- I can't remember anybody else.  I mean, I can see

12   the policy.  I can see starting to -- you know, how it was

13   starting to work.  But, I don't remember having specific

14   conversations of -- aside from like, in a global sense, like

15   this is what we want to avoid, we don't want to look like

16   we're doing this, those sorts of things.  But, nobody ever

17   came to me and said, you know, this person was put on the

18   bureau for this reason.  This is a problem.

19             It was more about moving forward.  We want to get

20   this right.  This is how we're going to do it.

21        Q    But, did you ever learn, during the course of your

22   employment at Insys what criterion were used to nominate a

23   speaker before your SOP's came into place?

24        A    I think, I remember again, talking to Des about

25   what her concerns were.  But, I didn't -- I don't think I

1  talked with Alec about the process.  I know I didn't talk to

2  Alec about the process.  I can't remember talking to Matt

3  about the process.  I think, it was just mainly Des and her

4  concerns that she didn't want Alec putting like his buddies

5  on the bureau.

6       Q    Did she indicate to you that that's what Alec had

7  done in the past?

8       A    I guess, there was an insinuation there.  Because

9  he had been in the business a while and so had Matt

10 Napoletano.  And I know that we had speakers on the bureau

11 that Matt had worked with for a long time.  And I'm sure

12 there was one or two from Alec as well.

13            I can think of two names.  And that's about that.

14      Q    And what two names?

15      A    So, Matt Napoletano had worked with -- this is

16 going to be difficult.  Sri Nalamachu.  I think, he's S-R-I,

17 and Nalamachu, -A-L-A-M-A-C-H-Y.  I know he was on the

18 bureau and he had Matt had worked together for a long time.

19            And then, I know that Alec had been buddies at

20 some point with Dr. Bart Gatz.  Those are the two that --

21 that really come to mind.

22      Q    Did Des ever -- well, let me back up.  Did anyone

23 ever express a concern to you about that the nomination, the

24 practice, also -- or included a return on investment?

25      A    The nomination process itself, no.

USAO-MA-0029757

1        Q    Did you ever learn about a concern regarding

2    return on investment with the speaker programs?

3        A    I mean, I guess, in a general sense, it goes back

4    to the conversation with Steve in the beginning.  Look, if

5    you're having doctors do a high level of -- a high number of

6    programs, it can definitely appear that you're doing that as

7    an inducement for script writing.  And I know I had that

8    similar conversation with Des, too.  Early on like, you

9    know, this is what we need to be mindful of and careful of.

10       Q    Did you ever learn that, in fact, Des or others in

11   the company were tracking return on investment for speakers?

12       A    I came to learn at one point, I don't think it was

13   through Des.  I think it was Matt Napoletano.  I can't

14   remember though if he -- I want to say that I was with Franc

15   when he was talking to us about that.

16            THE WITNESS:  So, I'm not sure like at what point,

17   there's a line, if any, that needs to be drawn there.

18            MR. HOBART:  Well, I think there's -- you're

19   right.  But, I think, it's fair to give these guys like the

20   date like when this happened, who else was present.

21            THE WITNESS:  Okay.  Sure.

22       A    So, I remember, I learned of this pretty early on

23   because we were not in the new corporate office yet.  So, it

24   would have been before June of 2014.  I remember I was

25   sitting in Franc's office.  And I'm sure Matt Napoletano

1    came in.  And we were just talking about a lot of things.

2           And somehow that came up that, I think, it was in

3    2012 or '13, was not when either Franc or myself were there,

4    there had been some sort of analysis that had been

5    performed, like an ROI analysis, on speakers and their

6    script writing.

7           BY MS. POSWISTILO:

8      Q    Outside of Franc's presence, did you have any

9    conversations with -- let me ask you this.

10          After that conversation in Franc's office, did you

11   and Matt talk?

12     A    No.

13     Q    After that conversation in Franc's office, did you

14   -- strike that.

15          MS. GOTTLIEB:  So, you said after the conversation

16   in Franc's office did you and Matt talk like about that

17   issue, you mean?

18          MS. POSWISTILO:  Well, yes.

19          MS. GOTTLIEB:  That's what I thought.  Just to be

20   clear.  Sorry.

21          MS. POSWISTILO: Yes.  Yeah.  Okay.

22          BY MS. POSWISTILO:

23     Q    Did you observe any reactions from Matt Napoletano

24   during that discussion?

25     A    He seemed upset.

USAO-MA-0029759

1        Q    And what was he doing?

2        A    He seemed upset that they had been asked to

3   perform that analysis.  I don't -- I don't think Matt would

4   have done the -- well, he -- I don't know that he had

5   personally had access to it.  But, he had somehow

6   participated.  I believe, Xun was the one that had all the -

7   - he has -- he's the one that's got access to the script

8   writing data.  So, he probably would have matched that up.

9   I'm definitely speculating.  It was before my time.  But,

10  just in terms of who would usually do those types of things,

11  I think, it would have been him.

12       Q    Do you know, with the analysis that was done on

13  the speakers, to whom that was disseminated?

14       A    I don't know.

15       Q    Did you yourself ever see it?

16       A    I believe, I did.  But, it was only in the context

17  of, I think, getting documentation for preparation for

18  submissions to this office.  Because I think I might have

19  seen it in an e-mail.

20       Q    I just want to go through a bunch of documents now

21  that are somewhat focused on the speaker program.

22                          (Exhibit Number 1 marked for

23                           identification.)

24            (Witness scans document.)

25            MS. GOTTLIEB:  Is there supposed to be an

1    attachment?

2            MS. POSWISTILO:  There is none attached.  It

3    indicates that there's supposed to be.  I don't have it

4    attached.

5            BY MS. POSWISTILO:

6        Q    So, do you recognize this document as it's printed

7    out?

8        A    Honestly, I don't have a recollection of reading

9    it.  But, --

10       Q    But, it appears to be a document, an e-mail from

11   Matt Napoletano to Babich and Franc Del Fosse.  And you're

12   cc:'d on that; is that right?

13       A    Correct.

14       Q    And it talks about -- it's addressed to Mike and

15   Franc.  "As a follow up to our discussion on ISP's and in

16   preparation for tomorrow, attached please find the recently

17   updated speaker bureau SOP."  Okay?  Do you see that?

18       A    Yeah.

19       Q    My question to you is, this is dated May of 2014.

20   And after you started -- I thought you had -- It's just kind

21   of to refresh your memory as to the dates of the SOP's and

22   when you started.  And so, was there a final one that was

23   implemented after May of 2014?

24       A    So, like I said, there has been different

25   versions.  We had -- that's why I'm almost positive the

USAO-MA-0029761

1   initial one was done right before I got there.  And then,

2   maybe this was -- there was a -- because I do remember these

3   people.  We met in the board room around this time.  And I

4   think, additional modifications were made to the one that

5   was either already executed or in a final version around

6   this time.

7       Q   Okay.  And you would have had a role in doing the

8   final or the --

9       A   So, this one would have been Steve Celestini

10  primarily working on.  However, the meeting that I believe

11  that they are referring to, I was present.  If it's the

12  meeting that I'm picturing we were all at.

13          MS. POSWISTILO:  Okay.  So, I'm going to get a

14  second document marked.  And you can just put that one aside

15  for now.

16                          (Exhibit Number 2 marked for

17                          identification.)

18          BY MS. POSWISTILO:

19      Q   Now, take a look at Exhibit 2.  And it's fairly

20  lengthy.  It's an e-mail from Alec Burlakoff addressed to

21  Franc Del Fosse and yourself, and a bunch of folks are cc:'d

22  on it.  Do you see that?

23      A   Yes.

24      Q   Why don't you read it and I'll have a few

25  questions on it?

USAO-MA-0029762

1      A    Okay.

2           MR. HOBART:  This is from the company?

3           MS. POSWISTILO:  Yeah.

4           MR. HOBART:  So, they didn't always use like the

5    INS-BOS?

6           MS. POSWISTILO:  They, at times -- we got some

7    documents differently marked.

8           MR. HOBART:  But, my question is, that's a Skadden

9    redaction?

10          MS. POSWISTILO:  Yes, it is.

11          Let's go off the record for a second.

12          (Off the record from 12:10 p.m. to 12:15 p.m.)

13          BY MS. POSWISTILO:

14     Q    So you had a chance to read, what is that, Exhibit

15   2?

16     A    Yes.

17     Q    And do you recall getting it?

18     A    Yes.

19     Q    And tell me the circumstances as to this e-mail.

20     A    So, the back story, as I recall, was, at this

21   time, June of 2014, we had implemented the new SOP.  And so,

22   things were starting to be more structured.  And what you

23   would consider more compliant.  And I believe, this e-mail

24   is illustrating that Alec definitely got an issue with how

25   and the direction in which things are proceeding.

1    Q    And what was your reaction when you got this e-

2    mail?

3    A    I think, to be honest, I was probably quietly a

4    little bit happy that, you know, we were definitely moving

5    in the right direction.  And it seemed like he was

6    frustrated, but I didn't really care.  He just -- he needed

7    to get on board.

8    Q    And what was the source of his frustration as

9    you're understanding?

10   A    Well, with this particular e-mail, it looks like

11   he's expressing frustration with Desiree and her team.  As I

12   mentioned earlier, that we were doing a very high -- the

13   company was doing a very volume of programs.  And Desiree

14   had a team, albeit a small one.  And so, they would clash

15   often when she would make arrangements.  Because a lot goes

16   in behind the scenes in organizing a speaker program.  It's

17   not as simple as, you know, everybody shows up for dinner.

18   There are contracts that oftentimes get involved with the

19   restaurants.  And coordination, especially if things are

20   going to be in a private room.  And once the decision to

21   choose a restaurant and everything, and the contract's in

22   place and locked down, she didn't want to give any wiggle

23   room on that.

24        And it appears that Alec is venting frustration

25   because she was not flexible in bending if there were

1   changes that the sales force was wanting to make.

2       Q    Now, was this, as your description is, lack of

3   wiggle room by Des on your direction?

4       A    No.  That was -- that was purely administrative.

5   Because once you get a contract with the restaurant, I mean,

6   you can't call up the same morning and try and cancel it and

7   find another private space in San Francisco or New York

8   City.  I mean, she would tell me that the logistics of that

9   was near impossible.

10      Q    Now, let me ask you this.  Turn to the second

11  page, there's a lot in this e-mail, but I'm just going to

12  put out a couple of things.  In the second paragraph, it

13  begins by stating, "I am hearing", this is Alec's words,

14  "that the two main issues at this point with the

15  investigation are the IRC speaker programs and alleged off

16  label promotion."  Which actually appears to be three main

17  issues.  But, that's besides the point.

18           And when he says "with the investigation", do you

19  know to what he's referring?

20      A    I'm guessing he means the DOJ investigation.

21      Q    And then, he continues by saying, "I'm also

22  learning sales people on all levels are being questioned

23  regarding the strict logistics associated with these speaker

24  programs."  Is that what you were just talking about with

25  Des and cancellation and changing the venue and that type of

82

1   thing?

2        A    I don't -- I don't know.

3        Q    When you read it, did you know?

4        A    I'm not sure that that changes whether I know or

5   not.  I mean, it would appear that way when he talks about

6   strict logistics.  And then, I think, further down, he

7   mentions not having wiggle room with moving things.  So, I'm

8   guessing that --

9        Q    Okay.  And then, it says, "these questions make

10  the sales force very uncomfortable.  Suffice it to say they

11  are being backed into a corner to place the blame on other

12  people involved in sales.  This is where I felt it was my

13  moral obligation to those who made this company strive to

14  step in.  The truth is, these reps were never given

15  direction by anyone in sales to do anything that would even

16  come close to being seen as non compliant."

17           And focusing on that last statement, at the time

18  of this e-mail in June of 2014, were you aware of any issues

19  or any thing that would appear to be seen at non compliant?

20       A    With respect to?

21       Q    With respect to the speaker programs.

22       A    So, at the timing of this e-mail, I look at this

23  e-mail, so this was right after the SOP had been

24  implemented.  And this was right before we -- meaning Franc,

25  myself and Yoshi -- went into the field and had compliance

1    meetings live with the sales force.

2         So, where we -- you know, got the message out

3    about, you know, many different topics.  And at this time,

4    early June, I'm -- you know, 60 days in.  I'm still getting

5    my feet wet.  Other than what I've discussed with you about

6    my learning from Des or Steve, and I don't even know if I

7    had had conversations with Des before this e-mail, I can't

8    say that I was -- that I was aware of like specific

9    instances of non compliance.  It was more I was addressing

10   topics.  Like we've been discussing trying to absorb those

11   into an SOP to make sure, going forward, we're going to roll

12   this SOP out to the field.  We're going to go and discuss it

13   with them.  Going forward, this is how we're going to be

14   doing things.

15        So, we may -- I did have several conference calls

16   with the field about compliance, introducing myself, giving

17   them a prelude for what we'd be discussing in the on site

18   meetings in June.  But, at this time, I don't think I was

19   dealing with like specific instances of non compliance with

20   speaker programs.  So, it was pretty early on.

21        Q    Do you know if anyone responded to Mr. Burlakoff -

22   -

23        A    I don't know if anybody responded to this e-mail.

24        Q    Did you?

25        A    Honestly, I can't remember if I did.  Yeah.

84

1   Typically, I don't think I would have.  Privileged and

2   confidential to me means that it's more directed at Franc.

3   So, he's the general counsel.  So, if someone responded,

4   perhaps he did.  But, I just -- I don't know.

5        Q    cc:'d on this e-mail is Mike Babich.  Did you have

6   any conversations with Mr. Babich about this e-mail?

7        A    Not that I can recall.  That doesn't mean I wasn't

8   present if we did have a meeting.  If Franc went in to talk

9   to him or -- or that would have been Franc, because that's

10  not on here.  I can't -- I can't remember if I did or not.

11       Q    Do you remember any meetings about it?

12       A    I don't.  Because this was -- I don't even think

13  we were in the corporate office at this time.  I think, I

14  was still off in the -- in the other building.  And I just

15  didn't have a lot of meetings with Mike early on.  I really

16  didn't.

17       Q    After you moved to the corporate headquarters, did

18  you?

19       A    It was definitely easier for access.  So, if Franc

20  and I were discussing something and we said, oh, let's go

21  talk to Mike, it was easier because he was there.  I can't

22  think of like anything specific, you know, especially

23  relating to this.

24            But, I started to be involved more in meetings

25  throughout the end of, you know, 2014.

1       Q     What kind of meetings were you involved in?

2       A     I'm trying to think of when it started.  But, I

3   was in -- oh, I asked to be involved.  That's how it

4   started.  So, on Fridays, we would have, the commercial team

5   would do a sales management call.

6       Q     Who's the commercial team?

7       A     So, it would have been Alec would have been

8   leading the team.  Des would have been in there.  If Matt

9   was still at the company at the time, he was there.  Mark

10  Hein, Xun, Mike Babich, Mike Gurry.  Rich Simon was usually

11  dialing in.  If he happened to be in the office, he would be

12  in the board room.  And sometimes, Dr. Kapoor, but not --

13  certainly to often.  Sometimes, he would call in.

14      Q     And who would -- I'm sorry.

15      A     That's all I can picture at the table.

16      Q     So, these individuals that you just mentioned had

17  a meeting every Friday?

18      A     Yeah.  It was typically every Friday with

19  management.

20      Q     Including yourself; right?

21      A     Yes.  I inserted myself at some point.

22      Q     Generally, what was discussed during these

23  meetings?

24      A     It was sort of like status updates.

25      Q     Status updates of what?

86

1    A    So, I'm getting to that.  Sorry.

2    Q    Oh, okay.

3    A    Everyone would go around the room and sort of give

4    an update on their department.  If someone affected, you

5    know, sales, for example, you know, might be putting out new

6    marketing materials, so marketing would give an update on

7    that.  Just -- I'm just trying to think.

8         It was typically, like from Alec, when he

9    introduced, it was like a type of a rah, rah call.  It was

10   an opportunity, like if Des had any updated, any general

11   comments about organizing programs or get program

12   submissions in or whatever the conversation might be.  Just

13   like an update type call every Friday.

14   Q    How about compliance?  Did you get an update on

15   compliance?

16   A    Yes, definitely.  So, I'm trying to think of when

17   I started doing that, because it would have been well after

18   this e-mail.  But, I would give -- so, one of -- you know,

19   to be fair, one of my frustrations early on was that we had,

20   as a general rule, that you had to submit your post program

21   documentation within 24 hours of the program being executed.

22   And one of my pet peeves were that people just, you know,

23   were not administratively on the ball.  And I would get

24   really frustrated with that.

25         And so, I would definitely address the managers

1    and sometimes call them out by names if their teams didn't

2    have their submissions in on time.  I would give them notice

3    about any upcoming trainings that we were going to be

4    having.

5            As time went on, as we had updated or changes to

6    policy, I would speak to that and give them notice that, you

7    know, I'm going to be hosting calls with your district.

8    These are the changes that we are implementing, kind of

9    giving them a sense for what was coming.

10           If there were anything that was maybe picked up

11   through the monitoring of speaker programs, if I had seen

12   something happen twice, even sometimes, once, just depending

13   on what it was, I would just give a general reminder like,

14   you know, we've observed this.  This is a tip for how to

15   avoid that for you and your teams.  That sort of thing.

16       Q    So, the individuals you listed were included on --

17   usually were on those calls; right?

18       A    Yeah.

19       Q    And who else?  Was it the whole nation teams?

20       A    No.  I'm sorry.  All the managers.  So, you'd have

21   -- and directors.  So, you'd have the sales directors and

22   then all the managers.

23       Q    And district managers?

24       A    Yes.

25       Q    And regional managers?

USAO-MA-0029771

1        A    They're called regional directors, not managers.

2        Q    Okay.  How many regional directors were there?

3        A    There was two at the time, first, when I started

4    doing that call.

5        Q    And who were they?

6        A    Excuse me.  Joe Rowan and Sunrise Lee.

7        Q    Okay.  And then?

8        A    I can't remember all the managers.  I hope you're

9    not going to ask me to list them all.

10       Q    Okay.  No need to.  Okay.

11       A    All 26.

12       Q    I won't ask you to list all the managers.  And did

13   Mike Gurry give updates on his group?

14       A    On managed markets.  I'm trying to think like what

15   he would have been giving an update on.

16       Q    How about the --

17       A    Oh, exclusion lists.  Like if we got on an

18   exclusion list.  I remember him talking about -- this is at

19   the beginning of 2015, something to do with Express Scripts.

20   I just can't remember specifically what it was.  He's not an

21   overly big talker.

22       Q    Okay.  How about on the reimbursement center?  Did

23   he talk about that on those updates?

24       A    Liz was not on those calls that I remember.  And

25   remember, he was not in charge of the reimbursement hub as

89

1   of like May 2014.  So, and I didn't insert myself in these

2   meetings until going towards the fall of 2014.  So, at that

3   time, he wasn't over the PSC.  So, when he's giving updates,

4   they're strictly about like managed markets.

5        Q    Did anyone give an update on the PSC?

6        A    I think, at some time, Chris Homrich would because

7   there was a lot of fuss from the field at times that it was

8   taking too long to acknowledge that an Opt-In was received.

9   There's been ongoing fax issue.  So, a lot of back and forth

10  about, you know, the sales force screaming that these

11  weren't --

12       Q    Okay.  Other than the Friday meetings, did you

13  attend regular meetings?  Other regular meetings?

14       A    I started at -- again, very end of 2015, probably

15  -- or '14, I'm sorry -- going into '15.  And it really got

16  very consistent, I'd say, April, May of 2015, I was asked to

17  be in what they call like the morning commercial meetings.

18  And they still have them.  It's called like the 9 o'clock

19  meeting.

20       Q    First off, before we talk about them, who asked

21  you to be in it?

22       A    Could have been a combination of Mike Babich

23  asking me to be present and me saying that I should be

24  present and that being supported.

25       Q    Who would you say that to?

USAO-MA-0029773

1      A    I probably would have said it directly to Mike.

2  And I would have asked Franc.  I was reporting to him at the

3  time.

4      Q    Who attended the morning commercial meetings?

5      A    So, you would have Dr. Kapoor, Mike Babich, Mike

6  Gurry, Xun Yun.  At the time, Matt had left, so Mark Hein.

7  Those were the main ones.  Alec, that's right, Alec and

8  Rich.  That's all I can see at that time.  I can more see

9  like who's at the table now.  But, at the time, that was who

10  was there.

11      Q    So, you started going to these at the end of 2014?

12  I mean, that's what you said earlier?

13      A    Yeah.  So, in 2014, they were more conference call

14  based.  But, sometimes, they would say Dr. Kapoor's in the

15  office today.  We'll meet in the office.

16          So, as I say, it really started to get consistent.

17  I'd sporadically jump in in 2014.  But, in 2015, I really

18  started to be more involved.  Like I said, it was April,

19  May.  Then, I could say I was -- I think, I was going every

20  day at that point.  So that's probably the clearest memory.

21      Q    During the time period that they were

22  inconsistent, how often would Dr. Kapoor attend?

23      A    Oh, he was on -- I think, he was on all the calls.

24  And I was primarily jumping in on Fridays, because I know

25  for sure he would jump in on Fridays, I think.

USAO-MA-0029774

1    Q    Why was Friday so important?

2    A    I think, it was just end of the week, let's talk

3    about what happened for the week.  Other than that, didn't

4    really hold any significance to me.

5    Q    And given your list of attendees when you were

6    there, do you know, through some other source, whomever, who

7    attended before you actually physically or verbally went to

8    the meetings?

9    A    Oh, no, no.  I didn't -- it wasn't like -- I don't

10   think it was like a super secret special meeting.  It was

11   just like a logistics type meeting.  And I just thought it

12   would be helpful to have compliance there if there were

13   questions.

14   Q    Okay.  Well, it wasn't super secret, did you know

15   who attended?

16   A    I think it was these people.  I don't think it

17   changed.

18   Q    So, but prior to your going, there were no

19   compliance people there?

20   A    Correct.  The only change would have been that, at

21   some point, Matt Napoletano was going.  And then, when he

22   left, like I said, I think, Mark Hein sat in.  There was a

23   period of time where a gentleman by the name of Steve Harper

24   (phonetic) was there.  I'm a little hazy on when it was.  I

25   think, it might have been end of '14, '15-ish.

USAO-MA-0029775

1      Q      Were these mostly phone calls?  Or were they in

2  person meetings?

3      A      Yeah.  Calls.  Calls.

4      Q      Mostly calls?

5      A      Yeah.

6      Q      But, there were times when they were in person?

7      A      Yes.

8      Q      And they would be calls even though Mike Babich

9  was down the hall from you?

10     A      Yeah.  They would have -- there would always be a

11  dial in circulated.  Like even if you look at the calendars

12  today, there's always like -- that spot is always on the

13  calendar as a dial in.

14     Q      And then, the meetings you attended, were there

15  compliance issues discussed?

16     A      No.  Because it was primarily a commercial

17  meeting.  It was just -- I was just there just in case or to

18  get a flavor of maybe what things might be coming up that

19  are being worked on.  You know, if I'm being very candid

20  with you, I think, if I was not present in those meetings, I

21  think, if Alec got pressure having to ask -- to answer the

22  question like, you know, if sales were down, why are sales

23  down?  Oh, compliance.  It's always compliance's fault.

24          So, that's why.  That's one of the reasons.  I got

25  a whiff that that might have been happening.  So, I inserted

1    myself in those meetings.  Because if I was present, that

2    mysteriously was never a reason.

3        Q    So, who did you get that whiff that that's what

4    was happening?

5        A    I honestly can't remember who -- who said it, who

6    told me.  But, I did hear that compliance was being blamed

7    at some point for a drop in sales.  And so that's why.  I

8    didn't want that to be a thought process, so --.

9        Q    Did anyone ever ask you whether compliance was

10   causing a drop in sales?

11       A    No.

12       Q    Did anyone ever express to you a desire to cut

13   back on compliance?

14       A    No.  I think people took it as, you know, it was

15   Alec saying it.  So, they just, you know, attributed it to

16   him finding something to deflect on.

17            MS. POSWISTILO:  Okay.  Let me show you the next

18   document.

19                          (Exhibit Number 3 marked for

20                          identification.)

21            (Witness scans document.)

22            BY MS. POSWISTILO:

23       Q    Okay.  Do you remember this document?

24       A    I do.  Yeah.

25       Q    And this is marked as Exhibit 3; is that right?

USAO-MA-0029777

1        A    Correct.

2        Q    And the bottom part of the document is an e-mail

3   from Richard Simon to Jonathan Roper, cc:'d Joe Rowan and

4   Desiree Hollandsworth; correct?

5        A    Yes.

6        Q    And that record or that e-mail says "approved upon

7   Joe's approval"; right?

8        A    Yes.  Sorry.

9        Q    And below that, on September 10, 2014, we have an

10  e-mail that indicates Jonathan Roper wrote, and it doesn't

11  say who it went to, but it says, "Hi, Rich.  Now that Dr.

12  Voudoris and NP Defeo have been trained and are able to

13  begin programs, I would like to request three ISP's for each

14  of these HCP's to total six programs, if possible.  Thanks."

15  Okay?

16       A    Yeah.

17       Q    Now, at the top of the e-mail, you wrote a

18  response to that e-mail; is that right?

19       A    Correct.

20       Q    First off, how did that e-mail come to your

21  attention?

22       A    This would have been sent to me, I believe, by

23  Desiree.

24       Q    Now, you're saying this would have been sent to

25  you by Desiree.  Do you remember that or are you guessing

USAO-MA-0029778

1   based on --

2        A    I don't.  I'm guessing based on practice.  Yeah.

3        Q    And why would -- or do you have an understanding

4   as to why Desiree sent this to you?

5        A    Yeah.  Absolutely.  So, the sales force had this

6   way of requesting programs where -- and going -- I don't

7   know whether it was a training issue or how it arose, that

8   they -- the way they would ask for programs was, they'd

9   attribute it to a physician, rather than saying we've

10  identified an educational opportunity, this is the physician

11  that we would like to request for the program.  And even

12  though we told them this 'til we were blue in the face, you

13  would still get these e-mails once in a while where it looks

14  like the managers are saying they want to give programs to

15  physicians.

16            And it's wrong.  That's not -- that's not our

17  thinking.  That's not our ideology.  And so, you know, I

18  would have followed up.  My practice would have been to

19  follow up by a phone call and say this is completely

20  inappropriate.  Don't be referring to giving anybody

21  anything.  And then, I would have followed it up like I've

22  done here, in an e-mail making it clear what our practice

23  was.

24        Q    Who is it that you were telling?  You said I've

25  been telling him that and this.  Is it to Jonathan Roper

USAO-MA-0029779

1   that you're referring to?

2      A    The managers.  Yes.  So, we would address this on

3   management calls.  And if we had -- like if Des held a

4   speaker program call, which wasn't uncommon, just talking

5   about logistics, really anything.  She would have me jump on

6   the call and gave me an opportunity to do like a compliance

7   refresher.  And this would definitely be something that we

8   spoke to on more than one or two occasions.

9      Q    And did it concern you that these issues were

10  happening --

11     A    I didn't like the verbiage at all.  It made me

12  uncomfortable.

13     Q    I understand that.  But, did the continuing nature

14  of these kinds of things disturb you?

15     A    Um-hmm.  Yes.

16     Q    And who did you address those concerns with?

17     A    I would have had a discussion with Franc about

18  this.

19     Q    And who else would you have discussed it with?

20     A    I can't say for certain -- actually, I can say for

21  certain.  I did talk to Alec and I talked to Rich about

22  this.  And actually, I believe, I spoke with Rich on more

23  than one occasion about how this was completely

24  inappropriate and there was going to be some severe

25  repercussions if people were not going to get this right.

1       Q       So, let me talk about that --

2       A       I remember I was talking to Rich about this.

3       Q       And that's Rich who?

4       A       Rich Simon.

5       Q       And what position was he in at the time?

6       A       Director of sales, I think.

7       Q       And what was his reaction to that conversation?

8       A       He'd be irritated, too.  He's like, yeah, yeah, I

9   completely understand.  I can't believe he put that in

10  writing.  It's so stupid.  We don't -- you know, this is not

11  how we practice.  This is not how we speak.  I don't know

12  why he's doing this.  They would say that they're rushing to

13  do e-mails.  That was one I heard a lot.  They're just

14  rushing and moving too quickly and they're not thinking

15  things through and putting things appropriately.  They're

16  being lazy.

17          But, he -- he was not happy about it either.  He -

18  - I mean, I never got push back from him when I called to

19  read him the riot act about it.

20      Q       Do you know whether he did anything to his

21  managers or reps to stop the practice?

22      A       Well, I asked him to follow up in discussions with

23  them independent of my discussions with these managers.

24      Q       Yes.

25      A       And he said that he would.  And --

USAO-MA-0029781

1       Q    Do you know if he did?

2       A    Yeah.  I mean, he would get back to me and say I

3    spoke with them and said that -- you know, set them straight

4    sort of thing.

5       Q    Is that what he would say?

6       A    Yeah.

7       Q    But, even after he had those conversations, it

8    would happen again?

9       A    It -- it definitely got less and less.  By the

10   time I was really having those very stern conversations with

11   him, I don't really think it happened too much after that.

12   And even on the district manager calls that we've just

13   previously talked about, he would chime in and support as

14   well.  He'd say, look, we've just had this happen again.

15   This is unacceptable.

16      Q    When did have the stern conversations with him?

17      A    I'm thinking it was probably around the fall of

18   2014.  I don't remember a lot happening into '15.  I mean, I

19   can't be 100 percent certain on the time line.  But, I don't

20   remember too much that that bled over into my second year

21   there.

22      Q    And when you talk about that, what --

23      A    Sorry.  The specific inappropriate use of language

24   as it related to allocating speaker programs to physicians.

25      Q    So, you don't recall getting e-mails like this

1   that appeared to you to be inappropriate use of language?

2       A    I -- I don't.

3       Q    Okay.  You also had conversations with Alec?

4       A    I -- Yes.  I mean, I honestly don't remember a

5   specific time where I went to talk to him.  But, I do

6   remember having a general discussion with him about how the

7   managers were, again, inappropriately referring to giving

8   physicians programs.

9       Q    And what was his reaction when you would have

10  discussions such as that?

11      A    He'd be more -- a little bit more defensive, like

12  oh, they made a mistake.  Like give them a break type thing.

13  It wasn't like he was going to pick up the phone.  Like when

14  I spoke with Rich, I knew he was ticked that they were doing

15  that.  With Alec, it was more like, he was a little bit more

16  laid back, like, oh, you know,  give them a break.  Like

17  they didn't mean it intentionally.  Like, you know, talk to

18  Rich or whatever, like talk to them, they won't do it again

19  type thing.  He wasn't as stern.

20      Q    Are you saying he didn't get more verbal with you,

21  or he didn't express anger at you?

22      A    No, not about this.  We had -- you know, was had

23  addresses -- like I said, like several times before.  And it

24  would have just been like, all right, all right.  I just

25  don't recall that this was a type of issue that he  really

1    got emotional about.

2        Q    When you're saying this, you're referring to the -

3    -

4        A    The verbiage that was used.

5        Q    -- verbiage used.  All right.

6            MS. POSWISTILO:  Why don't we go to the next

7    document.  You can put that aside.

8            BY MS. POSWISTILO:

9        Q    And while she's marking that document, when you

10   first started at Insys, were the logistics for the speaker

11   programs being handled in house?

12       A    I don't know.  There was a -- I'm not 100 percent

13   sure.  Des might have taken them back.  They had been with -

14   - I think, it was Synchrony or --

15       Q    How about SciMedica?

16       A    Oh, maybe that was it.  SciMedica.  Synchrony,

17   SciMedica.  I think that's where Des is employed now,

18   Synchrony.  So, maybe it was SciMedica.

19           But, I remember, they had out sourced it.  It

20   didn't work.  They were bringing it back in.  And I can't

21   remember when that transition happened.

22       Q    You said it didn't work.  What was not working, if

23   you know?

24       A    So, to the best of what I learned from that

25   experience was that SciMedica just wasn't helpful in getting

USAO-MA-0029784

1    Des what she needed in a timely manner.  There was mistakes

2    with putting programs together, I think.  And just getting

3    records from SciMedica, she wasn't getting what she wanted.

4    So, I think, she pulled it back in house.  That's really all

5    I know about that.  I think it was 2013.  I'm just not sure.

6         Q    And you learned this from who?

7         A    I think, I learned this from Des directly.  It's

8    either Des or maybe even Mark Hein.

9         Q    Do you know whose decision it was to out source it

10   -- I mean, to bring it back in house?

11        A    No, I don't.

12        Q    And did you ever have any other discussions, other

13   than what you just talked about, regarding bringing it back

14   in house?

15        A    No.

16        Q    No?

17        A    No.  I think it was mostly before me.

18        Q    Okay.  Now, take a look at the next document which

19   is marked as Exhibit 4.

20                        (Exhibit Number 4 marked for

21                         identification.)

22             MS. GOTTLIEB:  Just to go back, no discussions

23   about that ever with anyone?  I just want to make sure

24   because of the timing issue.

25             THE WITNESS:  Yeah.  It's not something that ever

USAO-MA-0029785

1    was really talked about.

2              MS. POSWISTILO:  Okay.

3              THE WITNESS:  I don't have anything to give on

4    that.

5              BY MS. POSWISTILO:

6         Q    Take a look at Exhibit 4.

7              (Witness scans document.)

8         A    I remember this well.

9         Q    And what is it?

10        A    So, this is -- I'm trying to think.  Here we go.

11   Yeah.  So, I just wanted to make sure I was clear on how it

12   came to me.  So, this came to me as -- it seems like a

13   program was held and Plan 365, who was trying to close out

14   all the program documentation, was having inconsistencies

15   that they couldn't necessarily get to the bottom of.  And

16   so, the practice at the time was then to turn that over to

17   compliance for investigation.

18        Q    First, what is Plan 365?

19        A    They are an events company.  I'm not entirely

20   sure.  But, as it related to Insys, they helped with the

21   administrative component of -- excuse me -- our speaker

22   programs for a period of time.

23        Q    So, what they did was, many of the duties and

24   responsibilities that Des had been handling?  They took that

25   and --

1      A      Yes.

2      Q      Yes?

3      A      Yeah.

4      Q      And so, at some point, Des's job was out sourced

5   or part of Des's job was out sourced to Plan 365?

6      A      Correct.

7      Q      And do you know when that occurred?

8      A      I think, it was the fall of 2014.

9      Q      And do you know why that was out sourced?

10     A      She needed help.

11     Q      How do you know that?

12     A      Just in conversations with her.  Like she couldn't

13  manage with her -- like I said, she had a small team,

14  couldn't manage the logistics for all these programs.  And

15  so, having an outside vendor to help was going to make her,

16  I guess, her life a lot easier.

17     Q      And who made the decision to out source it?

18     A      I don't know.

19     Q      You weren't involved in that?

20     A      No.

21     Q      So, they came to you.  Plan 365 came to you, as

22  you said, because they were trying to get to the bottom of

23  something?

24     A      Yeah.

25     Q      And the e-mail, as you can see, talks about

1   surveillance shots or surveillance photos?

2        A    Yeah.

3        Q    What were those about?

4        A    The surveillance photos were from within the

5   restaurant, specifically, the private room where the program

6   was being held.

7        Q    Who took surveillance photos?

8        A    I believe, it was the restaurant's surveillance

9   footage.

10       Q    And what do you mean by that?

11       A    So, some restaurants have, I guess, security

12  cameras.  So, it was their footage.  I don't think that's

13  usual restaurant practice to have surveillance.  But, this

14  one did.

15       Q    Do you know what restaurant it was?

16       A    I don't know.

17       Q    Do you know what town?

18       A    I think, I know -- or actually, do I even know

19  what state.  It was either Texas or Oklahoma.  That was kind

20  of the region.

21       Q    And looking at the back e-mail, it's by a JW

22  Scherm to you and Desiree Hollandsworth is cc:'d?

23       A    Yeah.

24       Q    It says, "our team was working to close out a

25  program for Casey on October 6th."  And Casey is a sales

USAO-MA-0029788

1    rep?

2        A    Correct.

3        Q    "One of the first programs held after time out and

4    has noticed several discrepancies that I'd like to review.

5    I am attaching the information, but would like to discuss

6    what transpired live as it may not be totally obvious from

7    just the documents."  Right?

8        A    Yes.

9        Q    My first question, in the second sentence, he said

10   JW Scherm.  First, who is that?

11       A    He was the -- I guess, like our point of contact

12   on our account.

13       Q    For Plan 365?

14       A    Yeah.

15       Q    He said -- is it a he?

16       A    Yes.

17       Q    He says, "one of the first programs held after

18   time out"?

19       A    I have no idea what that means.

20       Q    You don't know?

21       A    No.

22       Q    Okay.  That was my question.

23       A    I was reading it, too.  I was like what does that

24   mean.

25       Q    And several discrepancies that he wanted to talk

USAO-MA-0029789

1    with you about.  Do you recall having a conversation about

2    the discrepancies?

3          A    I -- I do.

4          Q    What was the conversation?

5          A    I think, to the best of my recollection, on the

6    receipt, there had been several meals ordered.  It was a

7    couple of things.  So, I think, there were several meals

8    ordered.  But, then, when you look -- so, at the top of a

9    lot of receipts it says number of guests.  And so, the

10   number of guests that was listed at the top didn't

11   correspond to the number of actual meals that were ordered.

12   And then, in addition to that, I believe, there was

13   something on it that said to go.  And that had raised a red

14   flag to him.

15         Q    Did it raise a red flag to you?

16         A    Yes.

17         Q    Okay.  And then, we have an e-mail back to you on

18   that same date, October 13th.

19         A    Back to -- back to me?

20         Q    Oh, I'm sorry.  It's you to --

21         A    Oh, from me.

22         Q    -- him.

23         A    Yeah.

24         Q    And it says, "following up on our earlier call,

25   I'm investigating this program and will need the following

USAO-MA-0029790

1   items."  You say first, "more surveillance shots and some

2   from earlier in the night would be helpful just to confirm

3   that it was only the three people that were in attendance."

4           Do you know who first pulled the surveillance

5   shots?

6       A   I don't.

7       Q   Do you recall if you directed them to pull

8   surveillance shots?

9       A    I don't, because like I said, it wouldn't be

10  common for restaurants to have surveillance.  How I think it

11  happened was, JW had called the restaurant, because he

12  initially had a question about the receipt.  And when he was

13  questioning the restaurant, I believe, they said, well,

14  we've got footage.  I think the restaurant volunteered it

15  just as like a tool to help us type thing.

16      Q   Okay.  And then, looking at the front page --

17  well, let me ask you this.  You don't even need to look at

18  it.  Do you know where those surveillance photos are right

19  now?

20      A   Where they are?

21      Q   Yes.

22      A   They might be attached to an e-mail I have.  On

23  our server maybe, I'm not sure.

24      Q   I'm sorry?

25      A   On our company server.

1    Q    You are aware that there was a subpoena issued by

2    the government to Insys?

3    A    Yes.

4    Q    Do you know, were you tasked with finding relevant

5    documents to that subpoena?

6    A    Not directly, no.

7    Q    Did you conduct any searches of your custodial

8    documents?

9    A    No.

10    Q    Do you have hard copies in your file, in your

11    office, of documents relevant?

12    A    No, not really everything's electronic.

13    Q    You have no paper in your office?

14    A    I mean, I do have some paper, but not a lot.  Not

15    surveillance pictures.

16    Q    Well, do you have paper relevant to compliance

17    issues in Insys?

18    A    Yes, I do.

19    Q    And you did not search your -- you were not asked

20    to look for documents?

21    A    I've been asked to produce documents.  I don't

22    know if it's in connection to this investigation or a state

23    investigation.  I'm just -- as I get them from Skadden, I

24    assist where I'm needed.

25    Q    What were you asked to -- or what documents did

USAO-MA-0029792

1    you produce?

2        A    I -- yeah.  There's been several occasions where

3    I've been helping assist.  But, I can't remember

4    specifically what I've been asked to assist with.  I mean,

5    this is all e-mails I'm getting directly from Skadden asking

6    me to assist.  So, --

7        Q    But, did you ever search your office for documents

8    to respond to Skadden?

9        A    I may have.  I can't recall specifically.

10   Certainly not recently.

11       Q    But, it's your belief that any of the surveillance

12   photos would be attached to an e-mail?

13       A    Yes.  Yeah.

14       Q    All right.  Did you have any conversations with

15   the sales rep, Casey Hanoch about this instance?

16       A    Yes.

17       Q    What was your conversation?

18       A    Well, I called him to ask him about the program

19   and why there were -- excuse me -- inconsistencies with the

20   receipt and the number of people that were present, and

21   also, the to go meals.

22       Q    And?

23       A    I honestly can't recall exactly what he said to

24   me.  But, it was not truthful.

25       Q    What do you mean it was not truthful?

1      A      Well, because as a result of my investigation, I

2  had -- I could compare what he said to me and I had a

3  receipt and surveillance footage to look at.  So, it wasn't

4  like it was a he said, she said type thing.  I actually had

5  like time stamped photos of when this program occurred.

6      Q      And so, you talked to him?

7      A      Yes.

8      Q      Before looking at surveillance photos?

9      A      No.  I think I saw the surveillance photos -- oh,

10  I'm trying to think, because there might -- initially, when

11  it came over, there were one or two, but they were screen

12  shots.  And I think actually, I ended up getting a video.

13          And so I had that.  I had the receipt.  And so

14  then, I questioned him about the program in general.  He did

15  not know that I had surveillance footage.  But, you know, I

16  told him I was looking at the receipt and things weren't

17  adding up.

18      Q      And as a result of your belief that he was not

19  truthful, did you do anything?

20      A      I did.

21      Q      What did you do?

22      A      I fired him.

23      Q      And did you ever tell him why he was fired?

24      A      Yes.

25      Q      And what was his response?

1      A     I'm sorry I lied.  You got me.

2      Q     Whose decision was it to fire him?

3      A     Mine.

4      Q     Did you have to clear it with anybody?

5      A     I wouldn't say clear it.  But, I discussed it with

6   my boss.  And I also discussed it with Mike Babich.  And I

7   informed Alec, from professional courtesy, that I was going

8   to be doing it.  But, it wasn't from a standpoint of I'm

9   giving you an opportunity to weigh in.

10      Q     Did you always have the power to fire individuals

11   in the company?

12      A     No.  And I wouldn't want to make it look like I

13   just did things in a vacuum.  I mean, I certainly would take

14   things up to my boss.  I wouldn't just walk in there and

15   say, hey, I'm firing this person today.  You know, we would

16   talk through the issue, like depending on level of severity

17   and talk about what our -- you know, maybe what my

18   recommendation would be.  And then, whether we'd move

19   forward based on that.

20      Q     Okay.  Which is a little different when you first

21   answered.  You said "I fired him."  I mean, the implication

22   was is that you decided to fire him?

23      A     I guess that was my decision.  And I, you know,

24   went to Franc with that recommendation.  I was like "this is

25   my recommendation is to terminate him", and it was

USAO-MA-0029795

1    supported.

2        Q    All right.

3            MS. POSWISTILO:  Geoff, I'm not bringing in the

4    next e-mail.

5            MR. HOBART:  Yeah.  We're going to have to cut a

6    few if they're going to make their flights.

7            MS. POSWISTILO:  I don't think that's going to be

8    made.  So, we'll get one more marked.

9            MR. HOBART:  Which one is this one?

10           MS. POSWISTILO:  June 2, 2015.

11                          (Exhibit Number 5 marked for

12                          identification.)

13           (Witness scans document.)

14           MS. GOTTLIEB:  You know, I noticed that on some of

15   these, that there's like gray on the text.  So, is that how

16   they came to you guys or --

17           MS. POSWISTILO:  No.  They just came gray because

18   they were copied with my highlights.

19           MS. GOTTLIEB:  Okay.

20           MS. POSWISTILO:  You can ignore that.

21           (Witness scans document.)

22           BY MS. POSWISTILO:

23       Q    Have you had a chance to look at Exhibit 5?

24       A    Yes.

25       Q    And this is an e-mail to you, again, from JW

1    Scherm; right?

2         A    Correct.

3         Q    And again, he's complaining or advising you about

4    another two programs, and had a wife, spouse in attendance,

5    and for the second program by Dennis Tan, he says, "full

6    meals were consumed without true participants."  I'm looking

7    at the top e-mail.

8         A    Oh, sorry.  Sorry.  I just don't recall seeing

9    this e-mail.

10             (Witness scans document.)

11        A    I don't know what that means.

12        Q    When you say I don't know what that means, what

13   does that --

14        A    Were consumed without true participants.  I don't

15   know that means.  "Full meals were consumed without true

16   participants."  I don't know what that means.  I don't know

17   if I e-mailed him back for clarification.  I just don't

18   recall seeing this e-mail before.  Sorry.

19        Q    Okay.  Why don't we put it aside then.  Well, let

20   me ask you this.  Is there a problem with having a spouse

21   attend meetings, the dinner programs?

22        A    Depends on the circumstances.

23        Q    And is there a problem -- when would it be okay

24   for a spouse to attend a --

25        A    So, we would generally say that it's acceptable

1    for them to be there if they would independently qualify to

2    be at that program.  For example, they are an oncologist.

3         Q    How about if a speaker's wife who was an office

4    manager attends a meeting?

5         A    That would -- I would classify that was not being

6    appropriate if this is the speaker's wife.

7         Q    And would you classify a dinner with just a

8    speaker, a speaker's wife, a sales rep and a BRM as a

9    legitimate program?

10        A    No.  No.

11             MS. POSWISTILO:  Okay.  Next is the ISP

12   monitoring.  This will be Exhibit 6.

13                           (Exhibit Number 6 marked for

14                            identification.)

15             BY MS. POSWISTILO:

16        Q    Okay.  Take a look at Exhibit 6 and when you're

17   done, I'll ask a few questions about that.

18             (Witness scans document.)

19        Q    Okay?

20        A    Yes.

21        Q    Now, Exhibit 6 appears to be an e-mail from you to

22   John Kapoor; right?

23        A    Correct.

24        Q    It states that, "just an update following today's

25   meeting.  I spoke with our external program monitor tonight

1    and informed him that, effective immediately, we will no

2    longer be providing notice to the field when we monitor a

3    program.  Further, I discussed with Mike, since our internal

4    monitor Lindsay is currently out on maternity leave, I will

5    personally be stepping in to monitor programs in her

6    absence."

7              Do you know what meeting you're referring to when

8    you say following today's meeting?

9         A    I don't know.  I can speak to, at the time, we

10   were having regular meetings about speaker programs and

11   increasing our compliance efforts around those programs.

12        Q    And who was is the we in that?

13        A    Typically, it was Dr. Kapoor, Xun and myself.

14        Q    And when you say regular meetings, how often?

15        A    At one point, they were every day.  Sometimes, a

16   couple of times a week.

17        Q    When did they start?

18        A    I can't remember.  It was either in April or May

19   of 2015, just before this time.  It might have been May.

20        Q    And during what period were they every day

21   meetings?

22        A    I think, during the month of June, maybe beginning

23   of July, we were having daily update meetings.

24        Q    And what would you talk about in these meetings?

25        A    So, the speaker program unit had responsibility,

 1   had moved from Desiree's team to Xun's team.  And as that

 2   was going on, we were rewriting -- not rewriting, but

 3   enhancing the SOP just based on observations that we had

 4   noted in the past six to nine months, maybe, any gaps, just

 5   usual course of trying to get an SOP stronger and better.

 6            And so, it was a combination of updating the SOP

 7   and putting those new procedures into place with training an

 8   entirely new department and team on running these programs.

 9        Q    Where were the meetings held?

10        A    In the board room.

11        Q    And who led them?

12        A    Dr. Kapoor.

13        Q    And was he interested in the -- what was your

14   understanding as to why these meetings were called on a

15   daily -- regular meetings called?  Other than, I mean, we

16   talked about what was talked about.  But what was your

17   understanding as to the necessity of having these meetings?

18        A    Definitely felt like there was an urgency to get

19   it right.

20        Q    And who felt like that?

21        A    It was definitely clear Dr. Kapoor felt like that.

22        Q    How did he exhibit this?

23        A    Well, I think, he had or has -- always had a lot

24   of trust in Xun and Xun's capabilities.  And so, he moved it

25   to that team.  And I had been asking for certain things to

1   get a little bit tighter.  And he was very supportive of

2   those things at the time.  And this no notice was one of

3   them.  We had previously had a five day notice to monitor a

4   program.  And it was always the intent to get it down to no

5   notice.  And he was supportive of that.  And so --

6        Q    I'm sorry.  Just to interrupt, whose intent was it

7   to get it down to no notice?

8        A    Mine.

9        Q    Okay.

10       A    And -- sorry.  I got sidetracked.  And so, another

11  thing that he wanted was to really limit and cut back,

12  because it's about this time in June that we were able to

13  see.  Remember we talked earlier about this time the

14  spending became public.  And we could see what companies

15  were spending on honorarias and sort of figure out where we

16  laid in the industry.

17            And so, we definitely wanted to become more in

18  line with the average.  And so, he was very involved in

19  wanting to, you know, cut back the spending and reduce the

20  number of programs that we were doing.  So, we were figuring

21  out a way that we could -- that we could do that.

22       Q    And during these meetings, do you recall any

23  discussions regarding how cutting back would affect the

24  sales of the company?

25       A    No.  We didn't talk about the sales.

USAO-MA-0029801

1   Q    Xun never said, well, if we cut back, it might get

2   a lesser amount of sales or income to the company?

3   A    No.  No.

4   Q    Dr. Kapoor never indicated any concern about that?

5   A    No.  No.

6   Q    With respect to the notice of the monitoring, you

7   said you had always wanted to have a no notice.  Who made

8   the decision to give a five day notice?

9   A    So, we had -- we had gotten input, or received

10  input, sorry, from the monitors and people that we

11  interviewed, that there was a spectrum that was used across

12  the industry from no notice, to five days notice, to two

13  weeks notice.  And I guess, we thought a good medium to fall

14  on was the five days notice.  They said that's what they had

15  commonly seen.

16       And so, that's what we started at.  I can't

17  remember who specifically signed off on that decision.

18  Q    Let me ask you this.  Who was the we in the

19  decision making process?

20  A    So, once I received that feedback, I discussed

21  that with Franc and I don't even know that we discussed it

22  with Mike.  It probably was just me and Franc.

23  Q    So, you and Franc.  So, was it Franc's decision to

24  make it a five day notice?

25  A    I'm not sure if it was actually -- if he was the

USAO-MA-0029802

 1    final sign off.  I'm not -- I can't remember if he said --

 2    you know, I need to have a chat with Mike or Dr. Kapoor.  I

 3    just -- I don't know.  But, I do remember like it came back

 4    that five days is -- is good.

 5         Q    And Franc is the one that told you that five days

 6    is what it's going to be?

 7         A    Yeah.  Yeah.  It wasn't like that's the way it was

 8    going to be.  That was like our recommendation.  And whether

 9    he took it off the --

10         Q    When you say a recommendation, what does that

11    mean?

12         A    I guess, it's compliance.  Compliance team's

13    recommendation.  If Franc and I are talking about it and we

14    agree that this seems like a good place to start, and you

15    know, it wasn't like -- again, we didn't make that decision

16    in a vacuum.  I'm sure he would have had to have a

17    conversation with at least the CEO.  And we're implementing

18    a new monitoring program.  I just wasn't -- I don't recall

19    being present in that discussion.  So, I don't want to say

20    it did happen or it didn't.  But, I just -- I know that I

21    didn't just magically say, oh, it's five days and this is

22    how it's going to be.

23         Q    I may have misunderstood you, so correct me if I'm

24    wrong.

25         A    Okay.

USAO-MA-0029803

120

1     Q    But, I believe you stated that you were always

2    pushing for no notice.  And then, you -- is that right?

3     A    No.  I don't think I said I was always pushing for

4    it.  I -- I thought that it would be the ultimate goal in

5    the sense that, I don't know.  I felt like, if we were

6    really getting to the strictest standards that we possibly

7    could, that would be the ultimate goal.  That was always --

8     Q    So, when you had these discussions with Franc, did

9    you express that to him?

10     A    I believe, I did.  Yes.

11     Q    And what was his response to you?

12     A    He was supportive of it.

13     Q    So, he was supportive of the ultimate goal.  And

14    that was your ultimate goal.  And then, he goes and talks to

15    somebody that you don't remember or you don't know who.  And

16    after the discussions with that person, you all conclude

17    that we'll start with the five day notice?

18     A    Correct.

19     Q    What is the reason for giving any notice at all

20    that monitor will be present at a program?

21     A    Sure.  So, it was my understanding when we -- when

22    it was first presented to me, it's mainly logistical.  If

23    you've got people flying to a location to attend a program

24    that you want them to monitor, and then, it was canceled and

25    you didn't know about it, because for whatever reason, we

USAO-MA-0029804

1    knew we weren't giving notice, this way we felt that, if you

2    give the five day notice, if there's a cancellation or a

3    change in plans, at least, you know, we're not going to

4    incur exorbitant costs and, you know, we can reschedule,

5    whatever might be the case.

6         Q    And so, it was a financial reason that you would

7    give --

8         A    I don't know if it was financial.  But, it was

9    more logistical.  If you're going to send someone on a plane

10   to a location, and then, find out that the program's

11   cancelled, I remember that that was a big issue, especially

12   when it was presented -- well, it was just when it was

13   presented to me by the monitor themselves.  They said, this

14   is the biggest factor that we find.  And this is why it's

15   helpful to give a couple of day's notice.  You know, if we

16   show up to a program, eventually, no notice, and it's

17   cancelled, I mean, it is what it is.

18        Q    Who would you tell?  Would the reps be notified

19   that a program's going to be monitored?

20        A    Yes.  Yeah.

21        Q    Did you actually attend some programs yourself?

22        A    Yes.

23        Q    And did you provide notice on those programs?

24        A    I believe, at this time, we were not notifying

25   ahead of time when I went to those programs.

USAO-MA-0029805

1          Q     And how many --

2                MS. GOTTLIEB:  Can I clarify for one -- I think --

3    were you the one providing the notice or somebody on your

4    team?  Who was --

5                THE WITNESS:  Oh, so the notice typically was from

6    that -- the independent third party.  They would send an e-

7    mail to the rep.

8                BY MS. POSWISTILO:

9          Q     Saying that somebody's going to be monitoring the

10   program?

11         A     Someone will be at your program, yeah.

12         Q     And then, you took over, at least based on this e-

13   mail, Exhibit 6, you took over at least temporarily;

14   correct?

15         A     A portion of it.  So, we had it -- we have.  And

16   we still have to this day an external monitor.  But, we also

17   had somebody who was doing it in house, too.

18                So, yes, while she was out on maternity leave, I

19   covered some programs for her.

20         Q     Do you remember how many programs you covered?

21         A     I don't.  No.

22         Q     Do you remember whose programs you covered?

23         A     No.  I really don't.

24         Q     Do you remember, on the times you covered

25   programs, whether you noticed any compliance issues?

1       A    Are we talking this specific time or up to like

2    today?  Because I still -- I still monitor programs?

3       Q    I'm talking about any program that you monitored

4    without notice, have you noticed compliance issues?

5       A    Yes.

6       Q    What kinds of compliance issues have you noticed?

7       A    Well, primarily, they are relating to the speaker,

8    as it relates to the rep.  Some things that I noted that I

9    remember was that it was in a place that I still considered

10   to be too loud.  I remember one particular place I went to

11   in Austin was in a private room.  But even then, it seemed

12   too loud.

13      Q    And where was that?

14      A    I don't remember the name of the restaurant.  But,

15   it was in Austin.

16      Q    And you don't remember the rep?

17      A    The rep, I believe, was Seth Thompson.  That I do

18   remember.

19      Q    And you said compliance issues related to the

20   speaker.  What were those?

21      A    So, let's see.  An observation, just as an example

22   that stands out, I remember, in February, I think, of this

23   year.  The speaker might have skipped over a couple of

24   slides.  And the manager had to step in and say, you know,

25   can you please revisit slide, you know, 3, 4 and 5, you

124

1    skipped over them.  That's an example.

2         Q    What other examples do you remember?

3         A    Sometimes, -- I shouldn't say sometimes.  It's

4    rare that this happens now.  But, I remember, I have

5    witnessed is, the speaker will forget to give the full

6    disclaimer.

7         Q    What disclaimer is that?

8         A    That it's a paid for program.  So, usually,

9    they'll get out, this program is paid for by Insys.  I am a

10   paid speaker of Insys.  Then, they forget to do the last

11   part which is there's no CME credits offered for sitting

12   through this presentation.

13        Q    Any other issues that you noticed with the

14   speaker?

15        A    There's one thing, but I can't quite remember

16   exactly what it was.  It's like he started talking about --

17   I can't remember.  It's a medical term.  But, he was

18   basically saying, by using Subsys, I don't have to use this

19   other thing or do this other thing.  And I thought he was

20   sort of pro-offering information that he shouldn't be.

21   Sorry.  I just can't remember the name of the -- if it comes

22   to me, I'll circle back.

23        Q    So, you also had noticed compliance issues with

24   the reps?

25        A    What I would consider within the rep's

1    responsibility.  So, the location would be the biggest one.

2        Q    Okay.  Any other issues that you noticed since you

3    started monitoring in June of 2015?

4            MS. GOTTLIEB:  And are you talking about the ones

5    that she personally went to?

6            MS. POSWISTILO:  Yes.

7        A    Well, there was one.  I just had it and it just

8    escaped me.  Shoot.  The MIRF one.

9            So, if a -- if an attendee asks the speaker a

10   question that we would consider to be off label, the rep is

11   supposed to give the person who is asking that question a

12   medical information report form.  So, we call it a MIRF.

13   And I believe I observed one time that they forgot to follow

14   up by doing that.

15       Q    Do you know a Josh Lewis or a Dr. Jerry Lewis?

16       A    Yes.  That's sounds familiar.  Josh was a rep at

17   some point in time, I believe, in Texas maybe.  Sounds

18   familiar.

19       Q    Jerry Lewis?  Dr. Jerry Lewis?

20       A    I think I know of him.  I might have seen him once

21   at a speaker training, I think.  I don't think I met him

22   personally.  No.

23       Q    Do you know if there's a family relationship

24   between the two?

25       A    Yes.

USAO-MA-0029809

1        Q    What is it?

2        A    I believe that Josh is his son.

3        Q    And do you know that they were holding speaker

4    programs together?

5        A    I did come to learn of that.  Yes.

6        Q    How did you learn of it?

7        A    I don't remember.  It might have -- it could have

8    been Des.  I just don't remember.

9        Q    And do you see a problem with that?

10       A    Yes, of course.

11       Q    And which is what?

12       A    That -- well, first of all, an individual should

13   not be calling on a family member let alone holding a

14   speaker program on their part.

15       Q    And why not?

16       A    Because it could give the appearance of

17   impropriety.

18       Q    How so?

19       A    Well, if you have somebody who's calling on a

20   family member, it could look like it's a conflict of

21   interest and they might be persuaded to write scripts

22   because of that family connection or otherwise.  And same

23   with speaker programs.  It could look like you're giving

24   speaker programs to a family member.

25       Q    Financially benefit a family member, is that a

1   problem?

2        A    I would consider that a problem.

3        Q    During the course of your employment with Insys,

4   did you ever attend any -- I may have asked you this

5   already.  But, did you ever have any formal courses on

6   pharmacy compliance issues in the pharmaceutical industry?

7        A    Not courses per se.  No.

8        Q    What does that mean, not courses per se?

9        A    Well, I have attended compliance conferences to

10  learn through those forums.

11       Q    Okay.  And you don't consider them courses?

12       A    No, not really.

13            MS. GOTTLIEB:  By courses, do you consider that to

14  be something like a semester at school?

15            THE WITNESS:  Yeah.

16            MR. HOBART:  Do you want to take a short break?

17            MS. POSWISTILO:  Yeah.  If you want to take a

18  break, go ahead.

19            THE WITNESS:  Yeah.  Is that all right?  My throat

20  is just really --

21            MS. POSWISTILO:  No, go right ahead.

22            (Off the record from 1:26 p.m. to 1:38 p.m.)

23            BY MS. POSWISTILO:

24       Q    I want to show you a --

25            MS. POSWISTILO:  It's a June 29, 2015 e-mail,

1   Geoff.  It's probably on the very bottom of the stack.

2          MR. HOBART:  I'll find it just keep going.

3          BY MS. POSWISTILO:

4   Q    If you could take a look at the next exhibit,

5   which the court reporter is marking as we speak.

6                    (Exhibit Number 7 marked for

7                     identification.)

8          BY MS. POSWISTILO:

9   Q    And this is Exhibit 7.  And the bottom of the e-

10  mail is from a Franc Del Fosse to a Nellie Oquendo.  cc:'d

11  on that e-mail is Mike Babich, John Kapoor, yourself and

12  John Bentivigolio; right?

13  A    Yes.

14  Q    And it says, "Dr. Kapoor requested a call on Dr.

15  Gatz.  Does 8:00 a.m. Wednesday morning work for such a

16  call.  If that works, I will circulate a dial in.  This call

17  should be less than a half hour."

18          Do you remember a phone call with Dr. Kapoor

19  addressing Dr. Gatz?

20  A    I do not.

21  Q    Do you know if such a call was had?

22  A    I don't.  I don't know if that's one I was just

23  copied on and if I could jump on, I could.  I don't recall.

24  Q    All right.  Next e-mail is April 24, 2013.

25                    (Exhibit Number 8 marked for

USAO-MA-0029812

USAO-MA-0029813

 1                       identification.)

 2           BY MS. POSWISTILO:

 3      Q    And next, I'm showing you Exhibit 8 which is an e-

 4   mail dated April 24, 2013 which is before your time I

 5   understand.  But, it talks -- if you look at the e-mail, it

 6   talks about an Insys Therapeutics ethics line?  Do you see

 7   that in the body of the e-mail?

 8           (Witness scans document.)

 9      A    Yes.

10      Q    Are you familiar with an ethics line run by Insys?

11      A    Yes.

12      Q    And tell me what you know about it.

13      A    It's a 24 hours a day, seven days a week,

14   available -- we call it an ethics hotline that anyone who

15   has a concern, whether HR, compliance related, really

16   anything, they can submit their concern and they can choose

17   for it to be anonymous or they can choose to be known, I

18   guess you would say.

19      Q    And who monitors that line?

20      A    It's a combination currently of Dan Pon who is the

21   administrator.  He's the vice president of human resources.

22      Q    Could you spell his last name?

23      A    P-O-N.  So, he's the administrator.  And then,

24   there are three additional people that get notifications

25   when there are new cases.  And that is myself, Franc and

1   Sanga.

2       Q     When you started -- and that's the current

3   situation with it?

4       A     Correct.

5       Q     How about when you started?  Do you remember who

6   monitored it?

7       A     Jenna was the administrator.  And Franc and I both

8   received alerts if there were new cases.

9       Q     And when you say Jenna as administrator, what does

10  that mean?

11      A     So, you just need one person that's in charge.

12  It's like a sort of point of contact.  Because they will

13  only speak to the person who's considered to be an

14  administrator if you had to contact them for whatever

15  reason.  So, we just say that they're an administrator.

16      Q     Did Jenna, back in 2014, have a discretionary role

17  as to what calls she would forward to you and Franc or --

18      A     No.  So, they -- any time there is a new case, an

19  e-mail goes out to everybody on the list.  It's not just the

20  administrator gets an e-mail and then chooses who it goes

21  to.  Everybody gets it.

22      Q     When you say new case, does that mean a phone

23  call?

24      A     A report, yes.

25      Q     A report?

USAO-MA-0029814

1       A     Well, a new case on the hotline.

2       Q     So, every time somebody calls the hotline --

3       A     And submits a case, yes.  A case is -- a case

4   number is generated and an e-mail is kicked out saying you

5   have a new case.

6       Q     How is that case number generated?  Is that --

7       A     Through the hotline.

8       Q     So, you make a phone call --

9       A     It's a third party.  And they -- so you can either

10  do it online or you can call in.  And then, they create a

11  case number and then alert those individuals when there's a

12  new case.

13      Q     So, who was the third party that did it?

14      A     Navex, I believe, is the name of the company.

15      Q     And was that true back when you started there?

16      A     Yeah.  I think, it's always been the same, Navex.

17      Q     So, just so I understand this.  Hotline is -- you

18  use the term administrator for Jenna.  But, it's run by a

19  third party?

20      A     Correct.

21      Q     And it's either through online or a phone call?

22      A     Yes.

23      Q     The third party then takes whatever information

24  there is and sends an e-mail to --

25      A     Yes.

USAO-MA-0029815

1      Q    -- Jenna; right?

2      A    Well, --

3      Q    And who else?

4      A    And the people that I currently said are on the

5   list.   Dan, myself, Sanga and Frank.

6      Q    Okay.  And back then, it was just you, Franc and

7   Jenna?

8      A    Correct.

9      Q    And how often did you get contacted about issues

10  back when you first started?

11     A    In 2014, I don't remember there being maybe more

12  than one compliance case.  There might have been a couple of

13  HR related cases.  But, not compliance.

14     Q    Okay.  So, this is --

15     A    I think, yeah.  That's right.

16     Q    Okay.  So, if any, I mean, it was a very small

17  amount?

18     A    It was very small, yes.

19     Q    And that was from the time you started until the

20  end of 2014?

21     A    I believe so, yeah.

22     Q    How about in 2015?

23     A    In 2015, we started to see a few more.  I would

24  say -- I'm just trying to think.  Again, I think, it was

25  more towards the latter part of the year.  We started to see

1    a couple come in.  And then, similar this year.  And it's a

2    blend of HR related concerns and compliance issue related

3    concerns.

4        Q    So, beginning of 2015, you didn't -- you don't

5    recall getting --

6        A    I don't really recall any then, no.

7        Q    Do you know where those e-mails are today?

8        A    The -- which e-mails?  The ones --

9        Q    The ones from Navex, I believe you said?

10       A    Navex.  Yes.  So, they -- well, they would, I

11   guess, be in all of our in boxes.  It's just -- I mean, they

12   just get sent to us and I just store mine in my compliance

13   reporting file.

14       Q    Once a case came in, what did you do with the

15   information?

16       A    So, I would first log in to the portal Navex and

17   see -- you know, we'd make a determination, is this HR

18   related, is this compliance related, and then, figure out

19   who it was going to.  And sometimes, they'd cross over.

20   But, we try to make someone in charge of the investigation.

21       Q    Now, could you just spell for the court reporter

22   Navex so we have it correct?

23       A    N-A-V-E-X.

24           MS. GOTTLIEB:  Do you know what date your name was

25   added to the distribution list?

1          THE WITNESS:  April or May of 2014.

2          BY MS. POSWISTILO:

3     Q    I now want to focus on the reimbursement center.

4  And what your role is in the reimbursement center.  And my

5  first question is, when you first took the job, did you

6  become aware of problems with the reimbursement center in

7  the compliance area?

8     A    Yes, I did.

9     Q    How did you become aware of problems and when?

10 And then, we'll go into what you became aware of.

11    A    So, when I first started, my very first week, I

12 went through the new hire training, because I wanted to see

13 what sort of training was offered to the sales

14 representatives coming through.  So, I sat through all of

15 that.

16         And on the Wednesday, I believe, of that program,

17 part of it was you went over to the IRC and you got to meet

18 some of the people there and sort of observe some of the

19 phone calls that were taking place.  So that was where I

20 first learned that there were issues.  And then, --

21    Q    What issues did you learn?

22    A    So, I sat next to a prior authorization specialist

23 by the name of Alyessa Fulton.  And I remember, she was on a

24 call.  And she had her head piece on.  And she was sort of

25 swinging in her chair and not looking at the computer

USAO-MA-0029818

1    screen.  And why that was important was because, all of a

2    sudden, I started hearing her list off medications.  And

3    when she hung up, I asked her how did you know that that

4    patient had tried all those medications.  And she said

5    something to the effect of, they probably would have.

6         Q    Sorry?

7         A    They probably would have.

8         Q    And you saw that as a problem?

9         A    I did.

10        Q    Why is that?

11        A    Well, she was not specifically referring and using

12   a specific patient's chart or notes, Opt-In form, whatever

13   to work on a prior authorization.  I feared that that

14   information was just being created.

15        Q    And you were able to deduce all of that even

16   though you had only been on the job first day --

17        A    Yeah.  Um-hmm.

18        Q    I mean, the first week of your job?

19        A    Third day.  Third day.

20        Q    And with no pharmaceutical experience.  And did

21   you say anything Alyessa Fulton when she said they probably

22   would have?

23        A    What she said these patients are very sick.  And I

24   said okay.  And that was like stored in the memory brain to

25   have a discussion with somebody else.

USAO-MA-0029819

1    Q    Did you do that?

2    A    I did.

3    Q    With whom?

4    A    Initially, with Franc.  I shared the same concerns

5    that I've just expressed.  And then, working with Skadden.

6    Q    What other concerns about the reimbursement center

7    did you learn?

8    A    Sure.  So, I -- just again, in trying to get

9    myself orientated with the workings of that department, I

10   was given what appeared to be a new hire training binder.

11   And it had a lot of general information about the product,

12   dosing levels.  And then, it looked like a couple of

13   questions and answers.

14        And one of the questions, I can't remember

15   specifically what it said, but it struck me like, when I

16   looked at the Q and the A, the answer, it didn't look right

17   to me.

18   Q    What was the topic?

19   A    It would have been like a hypothetical, person

20   from an insurance company stating, does the patient have

21   break through cancer pain.  And I believe, the response at

22   the time said, something to the effect of, yes.  Break

23   through pain.  Something like that.

24   Q    And?

25   A    And I'm trying to --

USAO-MA-0029820

1      Q    You saw this in a new training binder?

2      A    Yeah.

3      Q    And I'm sorry.  Did you say when you saw this?

4      A    It would have been the first couple of weeks on

5  the job.  Maybe first or second week.  I can't remember

6  specifically when.  But, I just remember looking at the

7  binder.

8      Q    Did you see it during the first week when you were

9  attending the new training --

10     A    I don't believe it was during that week.  So

11  that's why I think it might have been a little later on,

12  whether it was the second week or -- but very early when I

13  started.

14     Q    And what did you do about that?

15     A    The same thing.  Again, I shared that with Franc.

16  And I think it was about that time Skadden first came out to

17  visit the office in Phoenix.  And I remember sharing that

18  information with them.

19     Q    When you say shared the information, did you show

20  the binder --

21     A    I had taken that page out of the binder and I

22  presented it to them.

23     Q    Did you talk --

24          MR. HOBART:  Kind of getting close to the line

25  there.

1        MS. POSWISTILO:  I wasn't going to touch it any

2   more.

3        MR. HOBART:  Just wanted to let you know I was

4   paying attention.

5        MS. POSWISTILO:  Good.  Good.

6        BY MS. POSWISTILO:

7    Q    Did you talk to anyone else about seeing that

8   answer?

9    A    I'm not sure at that time.  I think specifically,

10  at that time, it was just Franc and the Skadden team, I

11  believe.

12   Q    And after you talked to them, did you see any

13  changes made to their training binder?

14   A    To the training binder.  Yes.  I -- that concern

15  on that specific concern I had with the training binder,

16  that portion, I believe, was removed.

17   Q    And why do you believe that?

18   A    Because I never saw it again.

19   Q    Did you look?

20   A    Yes.

21   Q    Do you know who removed it?

22   A    I believe, we instructed Liz to.

23   Q    Who instructed Liz to?

24   A    I'm trying to think.  It could have been me.  It

25  could have been Yoshi.  I'm not 100 percent.

USAO-MA-0029822

139

1      Q    And if Yoshi had instructed Liz to, would that

2   have been on your direction?

3      A    Yes.

4      Q    So, you either did it personally or --

5      A    Yeah.

6      Q    -- you told Yoshi to?

7      A    Yeah.

8      Q    And when you were --

9      A    And I think, too, just so that I'm not omitting

10  anything, I think that we did -- Mike Gurry might have been

11  involved as well in those discussions in telling him, you

12  know, it needs to be removed.  So, I didn't want to forget

13  that.

14     Q    And when you saw the -- when you had that first

15  week when you were there and you heard Alyessa Fulton talk

16  about the tried and failed drugs, and you could see that she

17  wasn't looking at any piece of paper, you told Franc and

18  Skadden.  Did you see any changes or what -- not even that.

19  What happened after you told them about that concern you had

20  with respect to the IRC?

21     A    So, I remember seeing they would have, in their

22  cubes above their desk, they would have a list of these

23  drugs and --

24     Q    They being who?

25     A    The prior authorization specialists.  And we  --

USAO-MA-0029823

1   and I believe, again, it either myself or Yoshi instructed

2   them to remove those lists.  And they were instructed that,

3   in the course of obtaining a prior authorization, that they

4   were only permitted to use the information available to them

5   on the Opt-In form.

6       Q    And do you know what happened?  Did you go to the

7   prior auth offices personally to see if the -- well, let me

8   ask it this way.

9            After you told them to remove the lists, did you

10  ever go into the prior auth offices?

11      A    Yes.

12      Q    And did you see the lists there?

13      A    I did not.

14      Q    And do you know who removed the lists?

15      A    I don't know who personally removed them.  No.

16      Q    Did you ever see the list itself?

17      A    Whether it was still --

18      Q    Yeah.  Did you see the list --

19      A    No.

20      Q    Okay.  Tell me about the list.  Do you know who

21  created the list?

22      A    It is my understanding that both Liz Gurrieri and

23  Tamara Kalmykova.  I'm not sure on spelling.  They were the

24  two initial prior authorization employees, if you will.  And

25  it's my understanding that they would make calls to the

1   insurance companies and sort of test, if you will, what

2   would be required in terms of step therapy prior to getting

3   an approval for Subsys.

4        Q    So, do you know how it translated from getting

5   that information to being a list that was passed out to all

6   the specialists?

7        A    I don't know that.  That -- I mean, that does

8   precede me.  I'm not sure how that -- how they came to that

9   specific list.  I can only speculate.  And I only saw it as

10  it related to Humana.  I don't -- I'm not aware of a list

11  for any other companies at the time that was developed.

12       Q    And was it a typewritten list?

13       A    Yes.

14       Q    And going back to that training binder, you said

15  that you think Mike Gurry was also there maybe when you or

16  Yoshi told Liz to remove that page?  I guess, the page?

17       A    I don't know if he was present during that

18  conversation.  But, he was definitely told at some point

19  directly that it was not going to be used any more.

20       Q    Do you know whether he was aware that that list

21  even -- not the list, that the direction even existed?

22       A    I -- I don't.  I guess, I don't remember asking

23  him if he was aware of it.

24       Q    Did he express any surprise when he saw it when

25  you talked to him?

USAO-MA-0029825

1      A     Not that I remember.  In my experience, he is not

2    emotive at all.  So, I don't remember him having any

3    feelings one way or another.

4      Q     Did he ask any questions about that phrase, break

5    through cancer pain, yes, break through pain?

6      A     Not that I can remember.  No.  I don't remember

7    having a specific discussion with him directly on it.  It

8    might have been discussed when Skadden interviewed him.

9    But, I don't -- I don't remember just having a conversation

10   with him about it.

11     Q     When you first saw it, what were your concerns

12   with that phrase?

13     A     I was concerned that they were being -- lying to

14   insurance companies.

15     Q     And getting back to Gurry again with the tried and

16   failed list?

17     A     Yes.

18     Q     Do you know whether he was aware of that?

19     A     I can't say either way.  But, what I can say is,

20   it was up on the walls.  So, I think, it would be safe to

21   say he knew.  But, I did not have a conversation with him

22   about whether he knew or not.

23     Q     Do you -- all right.  Let's -- were you ever

24   advised or did you -- were you ever advised that prior

25   authorization individuals would say that a patient had

1    dysphagia, whether that patient had it or not?

2         A    Dysphasia.  Not specifically with dysphasia, no.

3         Q    Do you know that today?

4         A    I know, in a general sense, that perhaps things

5    were said to help gain prior authorizations.  Specifically

6    to dysphasia, not 100 percent.  I don't know.

7         Q    What other things would be said that you know

8    about?

9         A    Well, the tried and failed.

10        Q    Tried and failed?

11        A    Yeah.

12        Q    Anything else?

13        A    Yes.  I did hear that they would add on -- when

14   they were giving the ICD-9 at the time, and more recently 10

15   codes, there's a chronic pain code.  I remember hearing

16   that.  I remember hearing that.  I don't remember the

17   dysphasia specific one.

18        Q    How did you hear the ICD-9?

19        A    I'm trying to think if it came up from Yoshi

20   monitoring or our other monitor that was listening to calls.

21   I can't remember.  But, again, it prompted the discussion

22   again, circling back, like you're only able to use the

23   information available to you.

24        Q    Who had that discussion?

25        A    So, Yoshi would hold regular compliance related

144

1   meetings.  They would have -- I forget what they were

2   called, if they are stand up meetings.  Basically, like an

3   all hands on deck type meeting, where compliance would

4   attend.  And she would give general reminders as it related

5   to compliance.

6          Q     Did you ever attend those meetings?

7          A     I may have attended one in the beginning.  I do

8   remember, it was a very awkward space in the old building.

9   And I remember being all squished in at some point.  I mean,

10  I can't remember.  It must have been early in 2014.  So, I'm

11  sure I did.  I just don't remember specifically what they

12  were talking about.

13         Q     And how do you know Yoshi actually told the people

14  that?

15         A     Well, I guess, I would have to rely on her word

16  that she did.  And after a while, we did start to make a

17  formal record of things that were discussed at the IRC

18  meetings, and eventually progressed to, any time compliance

19  would give any sort of reminders in a meeting, we would have

20  a piece of paper where, at the top you would have what was

21  discussed.  And then, each individual had to actually sign

22  off.

23         Q     When did you start doing that formal record?

24         A     It was either -- it's definitely been all for this

25  year.  It could have been at some point -- shoot -- maybe in

1   the fall area last year.  It's just, we got progressively

2   better about keeping notes about what we would say so that

3   nobody could come back and say, I didn't know.

4        Q    So, these IRC meetings where the formal record was

5   kept, did you direct Yoshi to make those -- to do the notes?

6        A    So, they weren't kept at the IRC.  This is

7   something that Yoshi would keep either in her notes.  Or we

8   have like a team -- a compliance folder on the company

9   server.  So, we just started a spreadsheet of the meetings.

10       Q    Did you direct Yoshi to start doing that?

11       A    Yes.

12       Q    And then, you indicated that, at some point later,

13  they were -- all the participants of the meeting were

14  indicated --

15       A    Yes.

16       Q    And you don't know when that was?

17       A    Not specifically.  We have been -- I want to say

18  we've been doing it for about a year, a little bit more.

19       Q    Doing it with all the participants?

20       A    Yeah.

21       Q    And Yoshi was taking the notes some time prior to

22  that?

23       A    Yes.  And when I say notes, she would cover like -

24  - in the Excel spreadsheet, she'd say these were the topics

25  that were discussed.

USAO-MA-0029829

1      Q    Okay.  What happened to them other than being

2    placed on the server?

3      A    I don't know.  They're just sort of there as

4    record keeping.

5      Q    Did you ever look at them?

6      A    Yes, I have looked at them.

7      Q    For what purpose?

8      A    At some point, I had to provide a memo to Sanga on

9    trainings that had been done.  Sort of getting him up to

10   speed, if you will, when he started.  And I think I put

11   together a memo or a spreadsheet or a list of things for

12   him.

13              MS. POSWISTILO:  Okay.  Why don't we get this

14   marked.

15                              (Exhibit Number 9 marked for

16                               identification.)

17              (Witness scans document.)

18              MS. GOTTLIEB:  So, there is a Bates number on the

19   e-mail, but not on the -- what I presume is the attachment,

20   the spreadsheet.

21              BY MS. POSWISTILO:

22      Q    So, take a look at what's been marked as Exhibit

23   9.  And the bottom e-mail is from Liz Gurrieri to Chris

24   Homrich; right?

25      A    Yes.

1      Q     June 27, 2014?

2      A     Yeah.  I see that.

3      Q     And then, there's a top e-mail forwarding the e-

4   mail from Homrich to Babich and John Kapoor dated June 27,

5   2014.  Okay.  Now, and that e-mail attaches an Excel

6   spreadsheet.  The top e-mail, it says attachment factual

7   insurance data.  All right.

8          So, I want you to look at the Excel spreadsheet

9   that is in front of you, also.  And it's a chart with two

10  columns, one for commercial and one for Medicare.

11     A     Okay.  I don't think -- I haven't seen this.  I

12  don't think I've seen this before.

13     Q     You don't recognize it?

14     A     No.  I haven't seen this.  If you're going to ask

15  me specifics, can I take a moment to --

16     Q     Well, let me -- the specifics I'm going to ask you

17  are fairly straightforward.  First, on the Medicare side of

18  the document, on the first page.  Second block down has an

19  asterisk.  And it says, "if asked the question above", and

20  the question above is, "is patient being treated for

21  management of break through cancer pain," IRC response, "the

22  physician is aware that the medication is intended for the

23  management of break through pain cancer patients.  The

24  physician is treating the patient for their pain or break

25  through pain, which ever is applicable."

1      A    Okay.

2      Q    And next to it, there's a gray box that says,

3   "this phrase has been approved per compliance as an

4   appropriate response to such question."

5           Now, first, in the phrase that the spreadsheet is

6   talking about, "the physician is aware that the medication

7   is for the management of break through cancer pain", is that

8   what you were referring to earlier in your testimony that

9   you saw in the training binder?

10     A    No.

11     Q    Tell me what -- repeat again for me what you saw

12   in the training binder.

13     A    The question and answer was a lot shorter than

14   that.  It said, to the effect of, the question was is the --

15   is the patient being treated for break through cancer pain.

16   And the response was, yes.  It was very short like, for the

17   break through pain.  Something like that.

18     Q    So, and this one -- let me ask you this.  In the

19   exhibit that you're looking at, is the phrase that is

20   written there one that was approved by compliance?

21     A    That was not a compliance decision for that to be

22   approved.

23     Q    Whose decision was it?

24     A    I don't know.  It was -- that was above me.

25     Q    Were you aware that such a decision was made?

USAO-MA-0029832

1  A  Yes.

2  Q  And when did you become aware of that decision?

3  A  It was some point in 2014, around -- I'm trying to

4 think -- like May, June-ish.  These were -- I mean, internal

5 discussions that we had with Skadden when we -- you took the

6 whole concept and issue to them for them to, you know,

7 provide advice.

8  Q  Who communicated that decision to use this phrase

9 to the IRC?

10  A  If I had to pinpoint it, I think, it would have

11 been Yoshi, because she did all the training with them and

12 would have said, if she had to convey something like this,

13 would have.

14  Q  And the internal discussions that were had, how

15 many were had?

16  A  That I was a part of, probably can't even count.

17 It was quite a few.

18  Q  And were you a part of any discussions about this

19 issue that did not include Skadden?

20  A  Not that I can recall.  During this time, I

21 remember them being on site a lot and always present in

22 these discussions.  And for whatever reason, if they

23 weren't, I remember them being on -- dialing in on calls.

24 It was just a period of time where they were very heavily

25 involved.

USAO-MA-0029833

1    Q    And who else was part of the discussions that you

2    had?

3    A    To the best of my memory, I recall Franc being

4    present and also Dr. Kapoor being in those discussions.

5    Q    And at the conclusion of those discussions, did

6    you then tell Yoshi that this phrase is appropriate or okay?

7    A    So, I don't know if it was identically this

8    specific phrase, because I have seen variations.  But, if

9    this was the exact one that was relayed, it would have been

10   conveyed under the auspice of this can only be used if you

11   are not going to be misleading an insurance provider, if

12   you're going to be using this statement.

13   Q    You say that, but you weren't there when it was

14   communicated; were you?

15   A    No, I wasn't.

16   Q    So, why do you say that it's been communicated

17   only in the auspices of that?

18   A    Because we didn't want this to be used to gain

19   approvals in a way that was misleading.

20   Q    They again being who?

21   A    The prior authorization team.

22   Q    Did the prior authorization team ever discuss with

23   you, we don't want to be misleading to insurance companies?

24   A    No.  I don't recall them saying that to me.

25   Q    Okay.  I thought you said they didn't want the

1   phrase to be misleading to insurance companies?

2        A    Oh, so that would be -- you asked me what came out

3   of discussions.

4        Q    Yes.

5        A    So, it was discussion result --

6             MS. GOTTLIEB:  With whom?  The discussions with

7   whom?  Let's be clear.

8        A    Skadden and Franc.

9             THE WITNESS:  I'm good to relay what that --

10            BY MS. POSWISTILO:

11       Q    Well, let me just ask you this.

12            MR. HOBART:  Let me just, real quick, so the

13   substance of the meetings with Franc and Skadden are

14   privileged.  The direction that's given to the compliance

15   department coming out of those meetings is not privileged.

16            THE WITNESS:  Okay.

17            MR. HOBART:  So, that's how I would break it down.

18       A    Then, I'll redirect what I said is that, the

19   direction was that this can be used as long as it's not

20   being used in a way that is misleading or untruthful.

21            BY MS. POSWISTILO:

22       Q    Did you give that direction?

23       A    Through Yoshi that was the direction, yes.  And I

24   may have had a conversation directly with Liz at -- I can't

25   remember.  But, I'm sure I said it to her in conversations,

USAO-MA-0029835

1    cannot be misleading.  Cannot lie.

2        Q    But that's not what it says on this paper; right?

3        A    Correct.

4        Q    And you were not present when Yoshi was there

5    saying that this -- telling the reimbursement center that

6    this phrase was okay?

7        A    Correct.

8        Q    Did Yoshi ever talk to you after you told her to

9    tell the reimbursement center about this phrase?

10       A    I'm sure she has talked to me --

11       Q    About this issue.

12       A    About the communication, I don't remember like

13   specific feedback from it.  Just, you know, the message was

14   communicated.

15       Q    Okay.  Would that appear on these records, meeting

16   records that you began keeping?

17       A    It might be in some of them, because it was

18   something that was revisited.  So, it's quite possible.

19       Q    As you look at this phrase standing alone, do you

20   have any concerns with it?

21            MS. GOTTLIEB:  And I'm sorry, which phrase?  The

22   one in the box --

23            MS. POSWISTILO:  The one we've been talking about.

24            MS. GOTTLIEB:  Well, I know, but are you talking

25   about --

USAO-MA-0029836

1          MS. POSWISTILO:  "The physician is aware that the

2     medication is intended for the management of break through

3     pain in cancer patients.  The physician is treating the

4     patient for their pain or break through pain which ever is

5     applicable."

6       A    Right.  And so, I actually don't even recall

7     seeing that.  I remember seeing a variation of the physician

8     is treating the patient for.  But, I don't remember seeing

9     for their pain or break through.  I don't recall seeing

10    that.

11          So, I don't know if this is some version that the

12    IRC felt that they were perhaps able to say.  But, I don't

13    remember seeing, and then, in the parentheses, "which ever

14    is applicable".  I don't remember seeing that.  Doesn't mean

15    I haven't.  But, it's not ringing a bell.

16      Q    When you gave the direction to Yoshi, did you

17    write it down or did you verbally tell her what they should

18    say?

19      A    I'm not 100 percent sure.  It could have been a

20    combination of both.  It's fair to say that there may have

21    been an e-mail, and obviously, we're certainly talking about

22    it.

23      Q    When you see this phrase today, do you have any

24    concerns with it?

25      A    If it's used inappropriately, certainly, yes.

USAO-MA-0029837

1    Q    Okay.  Would you agree with me that, when you read

2    this phrase, it's saying two different things?

3    A    I mean, yes and no.  We're talking specifically

4    about the break through pain in cancer patients.  Physician

5    is treating the pain, the patient for that pain.

6    Q    Okay.  But, don't -- when we look at this box

7    above it where the question being asked, "is patient being

8    treated for the management of break through cancer pain"?

9    A    Correct.

10   Q    And then, the appropriate answer per compliance

11   is, "the physician is aware that the medication is intended

12   for the management of break through pain in cancer patients.

13   The physician is treating the patient for their pain or

14   break through pain, which ever is applicable."  Right?

15        When reading that as a whole, do you have concerns

16   with it?

17   A    I do, yeah.

18   Q    And what are those concerns?

19   A    That it could be used to be misleading.  To me,

20   when you look at that first question, it's a yes or no

21   answer.

22   Q    And it's not a yes or no --

23   A    Correct.

24   Q    It's a yes or no question without a yes or no

25   answer?

USAO-MA-0029838

1      A     Yeah.

2      Q     And when you told that to Yoshi back then, did you

3  have those same concerns?

4      A     I did.

5      Q     Did Yoshi express any concerns?

6      A     I believe she did, too.  Yes.

7      Q     To who?

8      A     To me.

9      Q     What did she say?

10     A     I can't remember exactly.  But, it would have been

11  to the effect of the same way I felt.  It could be used

12  inappropriately.

13     Q     And you don't recall any -- after Yoshi went to

14  talk to the reimbursement center, you don't recall

15  conversations you and she may have had about that?

16     A     Not afterwards.  I don't remember.  It doesn't

17  stand out to me that there was any sort of push back.  Like

18  she didn't come back and say that was a disaster.  I mean,

19  nothing like that stands out.

20     Q     After this phrase was communicated to the

21  reimbursement center, was there ever a variation of this

22  phrase then put into use?

23         MS. GOTTLIEB:  Well, and just -- was this phrase,

24  to your knowledge, communicated to the reimbursement center

25  by itself, or was it supposed to have more explanation with

USAO-MA-0029839

1    it?  I mean, because I don't want -- right now, I mean, it

2    almost sounds like that would be the only thing that they

3    were told and --

4           MS. POSWISTILO:  Well, she doesn't know, because

5    she wasn't there.

6       A    I wasn't.  But, I know that we, meaning Yoshi,

7    compliance team, it was conveyed that you must be truthful.

8    You must not be misleading.  If you want to use this

9    statement, you must not be misleading.

10      Q    How is it not misleading in your view to say, "is

11   patient being treated for the management of break through

12   cancer pain", and then, you give this answer?

13      A    Sure.  So, --

14      Q    How can that not be misleading?

15      A    It is my understanding that, at the time, there

16   were insurance companies that would deny the prior

17   authorization even on label.  And this sort of gave it a bit

18   of, I guess, gave it a bit extra rather than just saying yes

19   or no by adding in the physician part.

20      Q    And what is that supposed to do?

21      A    Well, to help convey that -- I'm guessing, that

22   the product was needed.  The physician wrote it for the

23   patient and they're trying to get the approval for it.

24      Q    Okay.  I hear what you say, but I guess, it

25   doesn't -- I don't understand.  If one were to respond to

USAO-MA-0029840

1    this question with this answer that is on the first page of

2    Exhibit 9, the Excel spreadsheet, how can that ever be given

3    and not be misleading?

4        A    As I understand it, if you're responding to

5    questions about an on label prior authorization, then this

6    would be an accurate statement.

7        Q    So, it would only be accurate if it's an on label

8    statement?

9        A    Correct.

10        Q    And do you know or were you ever made aware that

11    this response was given also to commercial insurance

12    companies?

13        A    I believe so.  Yes.

14        Q    It was used for all insurance; right?

15        A    Yes.

16        Q    Because one of the indications for Subsys is break

17    through cancer pain?  The only --

18        A    It's the only one.  Yeah.

19        Q    The only indication is break through cancer pain.

20        A    Yes.  Yeah.

21        Q    And if that's what an insurance company was

22    looking for, that's what it would be approved; right?

23        A    Correct.

24             MS. POSWISTILO:  Let's get this marked.

25                            (Exhibit Number 10 marked for

1               identification.)

2          BY MS. POSWISTILO:

3          Q     And if you'd take a look at Exhibit 10, just

4     looking at the document without reading the entire thing,

5     are you familiar with this document?

6               (Witness scans document.)

7          A     I am aware that there was a frequently asked

8     questions document.

9          Q     How are you aware that there was a frequently

10    asked questions document?

11         A     Because, when they were being put together, at

12    times, Yoshi was asked to review them.  And if she wasn't

13    100 percent certain on one, she might bring it to me, or we

14    might ask counsel for input.

15         Q     And who put them together?

16         A     I believe, Liz and Angel did.  And it was for the

17    -- I mean, general purposes, so you've got a history to --

18    you might already -- there was no real SOP's that I was

19    aware of when I got to -- when I started looking at the IRC.

20    And so, this was just sort of -- you know, with all the many

21    questions that were flying around, this was just, I guess,

22    the intention was, just to have one document people could

23    refer to in the interim before, you know, the -- until the

24    SOP's got finalized.

25         Q     And looking at question number 1, --

USAO-MA-0029842

1      A     Okay.  Yes.

2      Q     "Can the SSP give the HCP a template for LMN?"  Do

3  you know what those initials stand for?  SSP?

4      A     Specialty sales professional.

5      Q     HCP?

6      A     Health care professional.

7      Q     LMN?

8      A     Letter of medical necessity.

9      Q     And the answer is, "not at this time"?

10     A     Correct.

11     Q     Are you familiar with this question and answer?

12     A     Yes, I am.

13     Q     What do you know about it?

14     A     Oftentimes, with this particular product, if  --

15  an insurance company might request a letter of medical

16  necessity to get the prior authorization approved.  And a

17  lot of times, the physicians would come back and, either

18  through whatever channels and say, we don't know what's

19  supposed to be in a letter of medical necessity, you know,

20  what should we do.  And so, the field was asking if a -- if

21  there was any sort of template available just so that the

22  physician could see like just generally how it should look.

23     Q     And do you know whether a template was available

24  prior to your coming on board at Insys?

25     A     I don't.  I don't believe there was one.  No.

1    Q    Did you ever see one?

2    A    I did.  I know, at one time, the medical

3    department might have worked with regulatory on one.  I

4    don't -- I can't remember if it ever got put in use.  It was

5    certainly not something that was distributed to my

6    knowledge.  But, might have been available on the iPad.  So,

7    you know, the field could show the HCP what it looked like,

8    but couldn't actually give it to them.

9         I think -- I'm pretty sure medical put something

10   together.

11   Q    When you were over at the Insys offices, at least

12   for your one day training, and then, you said you attended

13   at least one -- I'm sorry -- the reimbursement, the IRC

14   offices, did you ever see an LMN floating around?

15        MS. GOTTLIEB:  You mean like a template?

16        MS. POSWISTILO:  Yeah.

17        THE WITNESS:  A template?

18        MS. POSWISTILO:  A template, yeah.

19   A    I don't think I saw a template floating around at

20   the IRC.  No.

21        BY MS. POSWISTILO:

22   Q    All right.  Let's move on to question number 2.

23   Question, "if we have an Opt-In form that does not have

24   contraindications listed on the Opt-In, however, there are

25   contraindications listed on the supporting

USAO-MA-0029844

1  documentation/medical records, can we still work the Opt-In

2  form?"  Answer, "yes.  If it's not on the Opt-In form, then

3  it is our assumption that the HCP is prescribing Subsys for

4  what was indicated on the Opt-In form, not the

5  contraindication in the records."  Okay?

6     A    Yes.

7     Q    Is that a response that you worked on?

8     A    I believe that was with medical.  I probably

9  helped facilitate working between the IRC and medical.  But,

10  that's not -- I mean, that's medical expertise.  That's not

11  something that I could really weigh in on in a vacuum.  I

12  don't have that medical experience.

13     Q    So, if the response was created by medical, would

14  you have gone to medical?  Would Yoshi?  Would Liz?  Or who?

15  Tell me how the process worked.

16     A    To be honest, there really wasn't one.  It just

17  depended on the circumstances.  I don't know that Liz would

18  have gone directly to medical.  There may have been a time.

19  But, I'd say, for the most part, it was either through her

20  boss, or perhaps through myself or Yoshi.  I remember

21  sitting in the medical director's office talking about this.

22     Q    Talking about that particular answer?

23     A    Yeah.

24     Q    And during those discussions you had with the

25  medical director, was there ever a fear expressed by him or

1  her or you that the contraindication may, in fact, still be

2  valid?

3       A    (No response.)

4       Q    You know what, strike that answer (sic).

5            Let me ask you this.  What was the basis for

6  responding that, if it's not on the Opt-In form than the

7  assumption is that it's prescribing Subsys for what was

8  indicated on the Opt-In, not the contraindication in the

9  records?

10      A    To be honest, I'm not entirely sure.  I know that

11 we definitely conveyed -- we asked the field to convey to

12 the physician to put the most current information and what

13 would be applicable to the patient on the Opt-In form.

14      Q    So, is it fair to say that the records essentially

15 --

16      A    Like this could be saying like there was a

17 headache 10 years ago, somebody had a headache and that

18 could have been as an example.

19      Q    So, the records -- it's assumed that the records

20 aren't the current --

21      A    Exactly.  Yes.

22      Q    And that the Opt-In is the most current?

23      A    Yes.  Absolutely.  Yes.

24      Q    So, if a contraindication is on the Opt-In, what

25 would happen?

USAO-MA-0029846

1      A     So, we would not process the contraindication --

2   the Opt-In form.  Sorry.

3      Q     What would happen to the --

4      A     It would be cancelled.

5      Q     What would be cancelled?

6      A     The -- I guess, it's called the case.  When the

7   Opt-In form is received by the prior authorization unit,

8   it's allocated a case number.  Because like I said before,

9   the prior authorization unit or the IRC, they sent an e-mail

10  to the field saying we received this case number.  So, then

11  they would just put in there that the case was cancelled.

12     Q     Would there be a communication to either the HCP

13  or the rep that the --

14     A     That it was cancelled?

15     Q     -- that it was cancelled?

16     A     Yeah.

17     Q     Would that communication include the reason why it

18  was cancelled?

19     A     I believe so.

20           MS. POSWISTILO:  So, let me just get another

21  document marked.  It's an e-mail June 6, 2014.

22                         (Exhibit Number 11 marked for

23                          identification.)

24           MS. POSWISTILO:  Let's go off the record.

25           (Off the record from 2:37 p.m. to 3:02 p.m.)

USAO-MA-0029847

164

1        MS. POSWISTILO:  So, we're back on the record.

2        BY MS. POSWISTILO:

3    Q    And I wanted to get back to that Excel spreadsheet

4    that we had been talking about.  Where did it go?  Okay.

5    It's down there with your counsel.

6        At the end of the discussions you had with Franc

7    and individuals from Skadden about what could or could not

8    be said, the phraseology that is listed on page 1 of the

9    Exhibit 9 spreadsheet -- it is Exhibit 9; right?

10   A    Yes.

11   Q    Was that your understanding of what you were to

12   direct the reimbursement center to say?

13   A    Yes.

14   Q    And were you directed to tell the reimbursement

15   center about the phraseology of, as long as it's not

16   misleading?

17   A    Yes.

18   Q    You got that after the discussions?

19   A    Correct.

20   Q    And did you ever see anything in writing with the

21   complete phraseology?  I'm saying it all when I say that,

22   the not misleading and the physician is aware?

23   A    I believe so, yes.  And I think there was an e-

24   mail from Skadden.

25   Q    And did you send -- did you give Yoshi anything in

1   writing?

2        A    Like I said, I don't specifically recall, but I

3   may have.

4        Q    So, we had been talking about, with the

5   contraindications.  And I wanted to get another exhibit

6   marked.  It's the June 6, 2014 e-mails.  Did I get it out?

7             MR. HOBART:  Yes.

8             MS. POSWISTILO:  Do we have it marked already?

9             MR. HOBART:  Yeah.

10            MS. POSWISTILO:  Oh, okay.

11            THE WITNESS:  11.

12            BY MS. POSWISTILO:

13       Q    Okay.  Exhibit 11 is an e-mail from you to

14   Jonathan Roper.  And who is Jonathan Roper?

15       A    A former Insys employee.

16       Q    In fact, the e-mail indicates that he's a district

17   sales manager?

18       A    Yes.  Correct.

19       Q    And in your e-mail to Jonathan, you say, "hi,

20   Jonathan.  As discussed yesterday, Laurie Cermack's Opt-In

21   was from 9-12-13.  It is incomplete, hence a new one being

22   required.  Number 2, Jackie Phelan's diagnosis is listed as

23   a contraindication and will not be processed as is."  These

24   two, Jackie Phelan and Laurie Cermack, do you know who those

25   individuals are?

1        A     No.

2        Q     And do you know them to be patients of a

3   physician?

4        A     They might be.  I'm guessing, in the context, yes.

5        Q     And you do know them to be individuals who

6   received a prescription at the -- for which the

7   reimbursement center is trying to get approval?

8        A     I don't know that directly.  But, just looking at

9   this e-mail, that definitely seems to be the context.  Yeah.

10        Q     And speaking about contraindications, you

11   indicated Jackie Phelan's diagnosis is listed as

12   contraindication and will not be processed as is.  By using

13   that term as is in there, what did you mean by that?

14        A     As I'm reading this, I don't know.  They're not

15   being processed.  They weren't being processed at the time.

16        Q     What did you intend Jonathan to do?

17        A     Well, my understanding was, if I remember this,

18   the recollection of the context was the field was having a

19   lot of trouble getting any communications out of the IRC as

20   to status.  And he called and said, can you help me get some

21   status.

22             And so, that was the response.  Jackie Phelan's

23   not going to be processed, and the other one is incomplete.

24   That's all I meant by that.

25        Q     And if you look down, there's an e-mail on the

1   first page, bottom part, it says from Tracy Giles to

2   Fernando Serrano, Insys IRC, Jonathan Roper and Joseph

3   Rowan?

4        A    Yeah.

5        Q    Do you know who Tracy Giles is?

6        A    I think, she was an employee at the IRC.

7        Q    And Fernando Serrano?

8        A    He was an SSP.

9        Q    And Joe Rowan?

10       A    Director.

11       Q    And her e-mail says, "I understand your concerns.

12  However, the information listed on the Opt-In for both

13  patients doesn't supply me with what I need to complete the

14  process.  I need this so I can appropriately make the auth

15  request to ensure I protect myself, the physician and the

16  patient."  Do you see that on the next page?  And then, it

17  continues on.

18            (Witness scans document.)

19       A    I don't know what she means by that.

20       Q    Okay.  But, I'm showing you this just to refresh

21  your memory as to the situation, because your response was

22  that he wasn't -- earlier, I thought you said you were

23  sending him this information because you thought he was not

24  being kept apprised of the status of Opt-Ins?

25       A    Right.  And that's my --

USAO-MA-0029851

1      Q    And would you agree that this e-mail right below

2    it, from Tracy to Fernando, is basically giving the status

3    of the Opt-In?

4      A    Yes.

5      Q    So, your response is something more than just

6    giving the status of the Opt-Ins; isn't it?

7      A    I don't think -- I don't think so.  I mean, I

8    don't -- my level of involvement wouldn't have been any more

9    than that.  I can't -- I'm sorry.

10     Q    Okay.  Well, in the second phrase where you're

11   talking about the Jackie Phelan's diagnosis is listed as a

12   contraindication, will not be processed as is, were you

13   intending to imply that, if the contraindication were

14   removed, it could be processed?

15     A    Absolutely not.

16     Q    And what --

17     A    I think, I was just being a bit too flowery with

18   my language.

19     Q    Would you agree that that could be interpreted to

20   read that way?

21     A    Yes.

22          MR. HOBART:  It looks like there's an e-mail

23   missing in this string, because his -- there's an e-mail in

24   the middle that says, "thanks Danielle".  But, there's no e-

25   mail from her that he would be responding to say thanks.

1          MS. POSWISTILO:  Okay.

2          THE WITNESS:  Yeah.  I noticed that, too.

3          MS. POSWISTILO:  I agree, but --

4          MS. GOTTLIEB:  Yeah.  And could it really be

5    interpreted that way in the --

6          MR. HOBART:  It's probably something as simple as

7    I'll look into it.

8          BY MS. POSWISTILO:

9      Q    So, any way, the bottom of Exhibit 10, there's a

10   question, "now that patients are signing the new Opt-In

11   form, can the IRC call the patients if there is additional

12   information needed on the Opt-In form?"  Answer, "yes, the

13   IRC can call the patients, as long as the patient has

14   signature on the new Opt-In."

15     A    Yes.  I see that.

16     Q    Okay.  And were you involved at all in developing

17   Opt-Ins?

18     A    The Opt-In form, yes.  I was, yes.

19     Q    Let me just show you two Opt-In forms that I have.

20         MS. POSWISTILO:  We'll get them marked.

21                          (Exhibit Numbers 12 and 13 marked

22                           for identification.)

23         BY MS. POSWISTILO:

24     Q    Are you familiar with the first exhibit I'm

25   handing you, which is marked as Exhibit 12?

USAO-MA-0029853

1            (Witness scans document.)

2       A    Yes, I am.

3       Q    And what is that?

4       A    This is an Insys reimbursement assistance form.

5       Q    Was that a form in effect when you started at

6  Insys?

7       A    Yes.

8       Q    And was it subsequently changed?

9       A    Yes.

10       Q    And do you recall when it was changed?

11       A    This is one of the things I started working on

12  almost right away.  I'm guessing, but May, June.  I'm

13  totally guessing.  But, it's around that time.

14       Q    Do you know why it was changed?

15       A    Yes.

16       Q    Why?

17       A    Well, when I first read this form, I didn't think

18  that it had the proper consent forms.  I didn't think that

19  this was a meaty enough, what you'd call, business associate

20  agreement.  I didn't think that was enough.  I thought we

21  needed more for the physician to sign.  And I also wanted to

22  have a patient consent as well.

23       Q    And you said you started this almost right away?

24       A    Yeah.

25       Q    How did you know what a business associate

USAO-MA-0029854

1   agreement was when you first started?

2       A    I looked it up.

3       Q    And where did you look?

4       A    I don't remember.  I probably started on the

5   internet.  Just in my reading, I would have come across it.

6   And then, I looked at this and thought, it doesn't look

7   meaty enough.

8       Q    What prompted you to look it up?

9       A    I think, I was trying to understand the whole

10  process of the reimbursement hub and how we could be in a

11  position where we're calling for processing prior

12  authorizations and how we could be doing that.

13      Q    Why did you need to understand how we could be

14  doing that?

15      A    Because I thought it would help me do my job

16  better to understand that.

17      Q    And how did you know where to look it up?

18      A    I mean, I'd like to think I'm someone of

19  reasonable intelligence.  So, I just started looking on the

20  internet and getting some basic reading.  And then, I

21  reached out -- I didn't really work with Steve Celestini on

22  this.  It was all Skadden.

23           And so, I reached out and started talking with

24  them about it.

25      Q    So, you reached out to them first?

1     A     Oh, definitely, yes.

2     Q     When you saw this, were you familiar with HIPAA?

3     A     Yes.

4     Q     How were you familiar with HIPAA?

5     A     Just in a -- I guess, just in a general sense.  I

6  have attended compliance conferences prior to even being at

7  Insys.  So, I was, generally speaking, aware of protecting

8  patient information and HIPAA.

9     Q     What kind of compliance conferences did you

10  attend?

11     A     So, I belong to, it's called the Society of -- I

12  believe, it's like Corporate Compliance.  I have a CCP

13  designation.  So, I had done that at my previous job.  And

14  just by going through that course, we had teachers at one

15  point who were in the health industry.  And I remember it

16  coming up.  So, it was something that stayed with me.

17     Q     And if you'd look at Exhibit 13?  In looking at

18  Exhibit 13, is that a version of your re-drafted or changed

19  Opt-In form?

20     A     I wouldn't say it was mine.  I can't take credit

21  for it.  But, it was definitely something that I  -- I

22  helped facilitate, yes.

23     Q     Who else helped?

24     A     There was input from definitely the -- we had

25  medical.  I want to say regulatory weighed in.  Marketing,

173

1    just in terms of the appearance of the form.  That's, I

2    believe, the start.  I mean, Skadden put together this

3    consent.  I mean, I'm sure Franc has reviewed it as well.

4        Q    What part did you do?

5        A    Oh, I helped get the ball rolling for the consent.

6    That was the part that I was very focused on and worked with

7    Skadden to make sure that that was part of it.

8        Q    And it was you who prompted the consent issue?

9        A    Yes.  Yeah.

10       Q    And was Exhibit 13 put into place immediately

11   after Exhibit 12 or had there been different versions in

12   between?

13       A    I'm not sure exactly.  They -- they all look very

14   similar.  This is definitely closest to what's in effect

15   now.  But, there's been slight variations that have changed

16   over time.  This does look like one that was earlier on.

17   Whether it was directly afterwards, I don't know.  But, it

18   does look -- you know, down here, it says July 2014.  So, if

19   I had to guess, I think this was the next one.

20       Q    All right.  Going back to what's marked as Exhibit

21   10, the FAQ's, right in front of you.

22       A    Okay.

23       Q    And the second page, question 8, the question is,

24   "may a patient fax over their own Opt-In form and script

25   directly to the IRC?"  Answer, "it is preferred that the HCP

USAO-MA-0029857

1   office fax in the Opt-In form and script.  This

2   significantly reduces the risk of patients forging or

3   changing information on the form, or SSP's and BRM's being

4   accused of the same."  Is that an answer you put together?

5        A    It's not.  I actually don't think -- I'm not sure

6   that I've ever actually seen that.  But, it does sound like

7   something that we've talked about, definitely, yeah.

8        Q    Had it been a concern in 2014 that SSP's and BRM's

9   were forging or changing information on the Opt-In form?

10       A    Yes.

11       Q    And tell me about that.

12       A    I'm trying to think how I came to know of it.  So,

13  initially, I think, I came to learn of it as part of the

14  review that Skadden of the PFC.  I think that's -- I'm just

15  trying to recollect how it originally came to my attention.

16  And I think, it was through an investigation or review that

17  they did on or about like late April, early May.

18       Q    And they being Skadden?

19       A    John, yeah, and Maya.

20       Q    And I'm sorry?

21       A    Maya.

22       Q    And you were going to say John.  John who?

23       A    I can't pronounce his last name.  Bentivigolio.

24       Q    Okay.  And based on their review, you learned that

25  there were accusations?

USAO-MA-0029858

1    A    Yes.

2    Q    Did you do anything about that?

3    A    Yes.

4    Q    What did you do?

5    A    So, right away, we set up conference calls,

6    meaning -- who did I do it with?  I think, I did it with

7    Chris Homrich.  Yes.  I remember I was in Chris Homrich's

8    office.  Mike Gurry had been removed from the PSC at that

9    time.  And I sat in his office.  And we did conference calls

10   with every single district manager and their teams going

11   over that was not appropriate.  And then, --

12   Q    What was not appropriate?

13   A    That it was not appropriate for reps or any field

14   personnel to be completing the Opt-In form.  We said that

15   the only part of the form that they could fill out was the

16   name here, first and last name.  They could write their own

17   name.  And then, they could write the word Subsys for

18   product name.

19   Q    And when you're pointing to the -- what part of

20   the Opt-In form is that?  The record's not going to be able

21   to read that.

22   A    Sure.  Sorry.  That was for your benefit.  Under

23   Insys Specialty Sales Representative, it says first and last

24   name.  So, they were permitted to fill that out.  And then,

25   also, under Practitioner Recommended Product Dosage Quantity

1   Notes, under Product Name, they could put the word Subsys.

2             In addition to those phone calls, we followed it

3   up with a live meeting in the field.  We did three live

4   meetings.  And we had put together, you know, a

5   presentation.  And part of that was addressing this and how

6   they're not permitted to complete the Opt-In.

7        Q    During your conference calls and even this other

8   training that you did, did you get push back from these

9   individuals?  The DM's, the SSP's, or whomever you were

10  talking to?

11       A    I didn't get push back per se from individual

12  DSM's or SSP's.  You know, keep in mind, I was pretty new

13  then, so I don't know that people were necessarily

14  comfortable with expressing that.  But, Alec wasn't shy

15  about it.  He certainly pushed back.

16       Q    What did he say?

17       A    He -- I mean, to the effect of, the physician

18  doesn't have time to do this.

19       Q    And what was your response to that?

20       A    Too bad.

21       Q    And question number 17 of Exhibit 10, you're asked

22  -- not you.  The question is, "can the IRC staff call the

23  HCP's office to obtain information that is missing and/or

24  needed for the prior authorization process?"  Answer,

25  "please call the SSP first to inform them of what

USAO-MA-0029860

1  information you are needing.  Ask the SSP if they would like

2  to work with the HCP's office to have the needed information

3  sent to the IRC, or if they would like you to contact the

4  HCP's office to gather the information."  And then, it goes

5  on about updating the IRC.

6          Now, is that an answer you worked on?

7      A   No.  I haven't seen that one before.  But, I know

8  what it's talking about.

9      Q   Now, when you did your research on business

10  associates, was it you -- did part of your research indicate

11  that, because the IRC had this agreement with the doctor or

12  the practitioner, it could be determined to be a business

13  associate of the practitioner?

14     A   I wouldn't say it was in my research alone.  I

15  didn't feel confident enough in making that decision.  But,

16  I definitely sought counsel on that issue as well.  Yeah.

17     Q   And you were aware that SSP's were not part of the

18  reimbursement center; correct?

19     A   Yes.

20     Q   And so, were you aware, even though you may not

21  have seen this answer before, were you aware that the

22  reimbursement center was talking to SSP's about patient

23  information?

24     A   I was.  Yes.

25     Q   And did that cause you concern about HIPAA

1    violations?

2        A    It did.  As soon as -- one of the very first

3    things I did when I came on board was, give everybody HIPAA

4    training.  The field, to my knowledge, had not received any

5    sort of HIPAA training.  So that was one my first

6    initiatives.

7            I did want to get to a place where we were not

8    communicating that information to the reps.  And it was

9    certainly my preference that the IRC group deal directly

10   with the HCP offices if they needed more information.

11       Q    And with the HIPAA training that you gave, when

12   did you start giving that?

13       A    Gosh, I want to say that was -- it might have even

14   been in April of 2014.  It might have bled over to May.

15   But, it was definitely something that I got on right away.

16       Q    So, within maybe the first month of being on

17   board?

18       A    Yes.

19       Q    And did you ever give compliance training,

20   regulatory, what sales reps can and cannot do?

21       A    Well, so that was the start of it.  In like May,

22   June, when we started making these calls, whether it was

23   about speaker programs or about reimbursement related

24   activities, that's when we started.  We did the calls.

25            But, the whole idea of doing these field meetings

1  was to introduce the in house compliance department to the

2  field.  And that's when Franc and Yoshi and I went out and

3  we did specific compliance training.  And other departments

4  did trainings.  They took it as an opportunity to do

5  refreshers as well.  Like Des went, Matt Napoletano, Mark

6  Hein, they were all there.

7       Q    Did the training that you or Yoshi gave include

8  training on off label promotion?

9       A    Yes.  That was specifically addressed by the

10  marketing team in their promotional materials presentation,

11  the importance of staying on label.

12       Q    Who gave the presentation?

13       A    I'm trying to remember.  It might have been Mark

14  Hein.  But, I thought Matt Napoletano came with us.  So, --

15  but for whatever reason, I just remember Mark standing up

16  there.  So, it might have been that they both were --

17       Q    It could have been Matt or Mark.  You don't

18  remember?

19       A    It could have been, yeah.  But, --

20       Q    Was there compliance training on the Anti Kickback

21  Statute?

22       A    Not per se.  But, in relation to -- I'm trying to

23  think.  Maybe I'm getting confused here.  We talked about

24  not filling out the Opt-In form because we didn't want that

25  to look like any sort of inducement, making it easier for

USAO-MA-0029863

180

1    the physician to prescribe the product, you know, as sort of

2    a value add service.

3         Q    When did you talk about that?

4         A    That was in the meetings in the field.  Sorry.  I

5    believe, they were the first two weeks of June.  And we had

6    three.  So, we did talk about that.

7         Q    Okay.  But, as far as speaker programs being

8    misinterpreted --

9         A    We may not have specifically addressed that at

10   that time.

11        Q    Okay.  But, you did address --

12        A    We were really focused on Opt-In forms and not

13   filling them out.

14        Q    Speaking of Opt-In forms and not filling them out

15   as it could be viewed as an inducement, were you aware that

16   Insys had, on its staff, individuals that were ABL's,

17   assistant -- area -- I forget.  What are they called?  Area

18   business --

19        A    Yeah.  It's changed a couple of times.

20        Q    And BRM's?

21        A    Yeah.  So, now, it's -- actually, I think, it's

22   changed again.  They're called national account managers.

23        Q    Okay.

24        A    We need to keep up, right.

25        Q    Okay.  What --

1      A      It was BRM's, and ABL's, when I started that was

2   the name.

3      Q      Okay.  ABL's, BRM --

4      A      BRM, and then now, national account managers.

5      Q      Okay.  All right.  And when you first started,

6   what did you know as -- what was your understanding of what

7   an ABL was?

8      A      Gosh, I -- it was so early on.  My understanding

9   was that they were there to assist with providing

10  information on the -- the reimbursement, these Opt-In forms.

11  It would have been this one at the time, I think, primarily.

12  But, I did become aware that, at least on one instance, that

13  they were perhaps doing more than they should have, not

14  dissimilar to what we learned about SSP's.

15     Q      Okay.  And more than they should have in --

16     A      In terms of actually, you know, filling out the

17  forms, rather than just providing their name and the drug

18  name.

19     Q      Okay.  And were you aware that the top prescribers

20  for Insys each -- not each, many of the top prescribers had

21  ABL's working with them?

22     A      Not at the time.  I was aware of one instance.

23  But, I wasn't overly familiar with the spreading out of how

24  the ABL's were allocated.  I was quite new at the time.  So,

25  I don't really recall knowing who the highest prescribing

USAO-MA-0029865

1    doctors were and if they had ABL's.  But, one stands out.

2        Q    Who is that?

3        A    That was Dr. Awerbuch, A-W-E-R-B-A-C-H (sic),

4    Gavin, I believe, is his first name.

5        Q    When you became aware that there were ABL's out

6    there, whether they were with Dr. Awerbuch or elsewhere, did

7    that appear to you or were you concerned that that could be

8    viewed as an inducement to the doctor to help fill out the

9    Opt-In forms?

10       A    Yeah.  That was definitely a concern.

11       Q    Did you talk to anyone about that?

12       A    Yes.  We -- when I say we, you know, Franc and I

13   were having discussions with Skadden about that position and

14   like any sort of limitations associated therewith.

15       Q    What do you mean any sort of limitations?

16       A    Well, in terms of like what they could and

17   couldn't do.

18       Q    Did anything ever change after those discussions?

19       A    Well, yes.

20       Q    Which is what?

21       A    We made it very clear that they were not to be

22   completing these forms.

23       Q    What were they supposed to be doing if not

24   completing the forms?

25       A    So, it's my understanding that they were there to

1    -- they would stop by different offices.  And it should not

2    be focused on one office.  And ask the office staff, like

3    I'm here if you've got questions.  You know, let me know if

4    -- if I can help you.  That sort of thing.

5         Q    Did that appear to you to be an inducement to the

6    physicians?

7         A    If they were not filling out the form and not

8    doing any of the work for them, that was the guidance, that

9    that could be okay.

10        Q    What kind of questions did you expect them to

11   answer?

12        A    Well, I've heard -- I have not physically been

13   present when a BRM is in an office getting questioned.  But,

14   I have heard that they get asked like, does this form look

15   complete.  That's the main one that stands out to me.  I'm

16   not sure of specific questions.

17        Q    So, wait a minute, when the change happened after

18   you had discussions with Skadden about your concerns that

19   the ABL's could be looked as an inducement, is that when the

20   BRM's came into -- the name was changed for the BRM's?

21        A    It was around that time.  Because I think, they

22   tried to restructure it.  So, it wasn't as if one person was

23   assigned to an office.  It was more one person is assigned

24   to an entire team, I think.

25        Q    When you say an entire team, is that --

1        A      A district.

2        Q      So that one person could float around from one

3    sales rep to another?

4        A      Correct.  Yeah.

5        Q      And do you have any understanding whether, in

6    fact, that happened?

7        A      It's my understanding that they would tend to have

8    like favorite reps that they liked to work with.

9        Q      What do you mean by that?

10       A      Just maybe if they like somebody more than others,

11   they spent more time working with them.  That sort of --

12       Q      Okay.  So, do you know one way or the other that

13   the BRM's did not stick or did stick with one particular

14   sales rep?

15       A      I don't know with certainty.  But, if I had to

16   guess, I would say that that probably did happen.

17       Q      It probably did or did not?

18       A      Did.

19       Q      And getting back to the IRC, when you started

20   there, did you hear about the IRC specialists saying to

21   insurance that a patient had cancer if, in the medical

22   records, that patient had a history of cancer?

23       A      I did not personally listen to a call where that

24   happened.  But, I do have like peripheral knowledge that

25   that may have been happening, yes.

1      Q    And how do you have that peripheral knowledge?

2      A    I think, Yoshi might have brought it to me after

3  her conversation with Liz.  And I believe, there was a

4  conversation going, it might have involved medical as well.

5  Because again, like that's a medical question as to whether,

6  you know, somebody is considered in remission or active.

7  That's not something that compliance is going to give a

8  black and white answer in a vacuum on.

9           So, I do remember it being brought to my attention

10  at some point.  And I can't remember, I think, I did speak

11  to the medical director about it at some point.

12      Q    And do you know if the practice at the IRC ever

13  changed with respect to the history of cancer?

14      A    I believe, the direction was, you can only use

15  what is on the Opt-In form.  Therefore, if there's not a

16  current cancer diagnosis on the Opt-In form, that cannot be

17  used.  However, if there is a question asked, does the

18  patient have a history of cancer, and that's available to

19  them, it's my understanding that they would answer that

20  accurately based on whatever information they had in the

21  medical charts.

22      Q    Did you ever hear the term, the spiel used by the

23  IRC?

24      A    Yeah.

25      Q    And what's your understanding of what the spiel

USAO-MA-0029869

1   was?

2       A    That was the phrase that we were talking about

3   earlier on the spreadsheet.

4       Q    You mean, the physician is aware that Subsys is

5   for the treatment of break through cancer pain.  The

6   physician is treating for break through pain.  Are you aware

7   of any other versions of the spiel?  Other than the one we

8   just talked about where you -- well, I mean, here, I guess,

9   you qualified it with, if it's not misleading?

10      A    Right.  But, in terms of variations, I mean, I

11  think it even was referred to as the spiel when first

12  identified it in that.  So, it was very short at that time.

13  But, I think, it might have kept the same name.

14      Q    When you first identified the spiel, and I think

15  you said it was yes, the patient --

16      A    Yes.

17      Q    Yeah.  The doctor is aware.  Did you talk to

18  attorneys before that version was changed?

19      A    Yes.  Oh, yeah.

20      Q    And again, who did you talk to?

21      A    I spoke to our Skadden team.

22      Q    And would that have been John and Maya?

23      A    John and Maya.  Yeah.  I don't think Jennifer

24  would -- I don't know that she was involved.  I can't

25  remember speaking to her directly.

1    Q    And who communicated to the IRC that they were to

2    drop the word yes and move on to something else?

3    A    That would have been Yoshi.

4    Q    And do you remember what you told Yoshi?

5    A    To the effect of, like this must stop immediately.

6    That you cannot lie on the phone at all.  And this yes. is,

7    you know, if you're processing a claim that is not

8    indicated, then that's -- that's an outright lie.

9    Q    Did you see that spiel written down on paper?

10   A    Yes.  That's the one I said I saw initially.

11   Q    Oh, okay.

12   A    Yeah.

13   Q    I'm sorry.  I'm thinking of too many spiels.

14   A    There seems to be versions, yeah.

15   Q    Yeah.  So, we had that one and you said it has to

16   be stopped immediately.  And do you know if, in fact, it was

17   stopped immediately?

18   A    I -- to the best of my knowledge, I believe that

19   was.  Yeah.

20   Q    And what was it changed to?

21   A    Well, the yes part was dropped.  That was

22   immediate.  And the whole concept of, you must not lie, you

23   must not be misleading in any way followed that very

24   immediate discussion.  I can't remember when that -- the

25   phrase that we were talking about earlier, when that

1  actually got conveyed.  It would have been after discussions

2  with counsel.  So, it would not have been as immediate as

3  that.

4        Q    Okay.  And do you remember if, between the time

5  the yes was dropped and the one phrase you were talking

6  about in Exhibit 9 was directed, were there any spiels

7  between that time?

8        A    I'm not 100 percent sure.  Just looking at these

9  documents, it looks like there's nuances and variations.

10       Q    And do you remember having any discussions about

11 different variations of spiels?

12       A    No.

13       Q    In the Opt-In's -- can I just take a look at

14 Exhibit 13?

15       A    Yeah.

16       Q    Okay.  In the Opt-In in Exhibit 13 under the

17 medical information, it identifies exact ICD-9's for many of

18 the conditions, cancer, it says provide the ICD-9.  But,

19 degenerative cervical intervertebral disc, etcetera, is

20 given an ICD-9 of 772.  And neoplasm related pain 33.8 --

21 338.3.  Other chronic 338.9, etcetera.

22            Do you --

23            MS. GOTTLIEB:  338.29.  Sorry.

24            MS. POSWISTILO:  Oh, okay.  I'm sorry.  I misread

25 that.

USAO-MA-0029872

1    BY MS. POSWISTILO:

2    Q    Do you know when the ICD-9's were added?

3    A    It would have been in the developmental stages of

4    this form.

5    Q    And before this form took effect in July  2014, -

6    -

7    A    And I'm pretty sure, now I'm thinking of it, this

8    came out before July.  Even though this is -- it's  -- you

9    know, in this -- before it came out, we were training to it

10   in June.  I've got to think it was out before that.

11   Q    So, Exhibit 13, it's your belief that there was

12   another Opt-In form between --

13   A    Yeah.  It must --

14   Q    -- 12 and 13?

15   A    There must have been.  Unless this is like a date

16   stamp when it was -- yeah.  I'm just not sure.

17   Q    And when do you recall the ICD-9's were added to

18   the form?

19   A    When the form changed from this form, which is

20   Exhibit 12, to this variation, that's when these were added.

21   Q    So, it was some time between the day you started

22   and when he did that training?

23   A    Yeah.  Yeah.

24   Q    Do you recall sitting through any discussions with

25   counsel not being present, but with Dr. Kapoor or Mike

1  Babich or Alec Burlakoff, Mike Gurry, regarding the IRC and

2  the manner by which they were operating?

3      A    No.

4      Q    Any of the issues that we've been talking about

5  were always in the presence of counsel?

6      A    Yeah.  I -- I didn't meet with the commercial team

7  about that.

8      Q    After that fact, do you recall ever having

9  discussions with any of those individuals about the IRC?

10     A    Not Mike Gurry, because he was removed.  So, I

11 didn't talk to him about it.  I don't remember having -- who

12 else did you say?  You said Alec and -- oh, Mike and Dr.

13 Kapoor.

14     Q    Alec, Babich, Dr. Kapoor.

15     A    I remember, I mean, there was a lot of discussion

16 about how it was slow.  And I remember being present in

17 those meetings when that would -- I don't even know if they

18 were meetings.  I mean, it even came up when we were doing

19 our compliance introductions.  The field would say, you

20 know, it's really slow getting turn around time.  We don't

21 get communication.  Nobody answers the phone.

22     Q    How about IRC -- prior authorizations getting

23 approved?

24     A    I think, I definitely remember -- I'm not clear on

25 the time frame when there was talk about approval rights

1   dropping.  But, I can't think of -- I mean, I know that

2   topic came up.  I'm just not -- it was so long ago and I'm

3   just not remembering like the context of the meeting,

4   whether I was just sitting in and somehow, you know, it came

5   up related to something else.  I can't remember.

6        Q    Do you remember, during any of those meetings,

7   whether at the same time the sales of the drug were dropping

8   because prior auths weren't being approved as quickly or as

9   much?

10       A    I'm actually not sure.  At the time, I don't

11  remember the numbers actually dropping until January of this

12  year.  So, I -- yeah.  I don't know.

13       Q    We talked earlier somewhat about a subpoena.  But,

14  there's a lot of things I need to clear up on that.  The day

15  you started, were you aware that there had been a subpoena

16  issued to the company?

17       A    Yes.

18       Q    How did you become aware of that?

19       A    I think I read about it in the news.

20       Q    Did you discuss it during your interviews?

21       A    It might have -- it might have come up.  You know,

22  we received the subpoena.  We need to build a compliance

23  program.  We need to get it right.  In that context, yeah.

24       Q    And so, you read about it in the papers.  It may

25  have come up during the interviews.  And Day One of your

USAO-MA-0029875

1  job, was there ever discussions in which you were present

2  without counsel where discussion of the subpoena was -- and

3  right now, I'm talking about whatever -- were there any

4  discussions of subpoenas outside of the presence of counsel?

5    A  I mean, people were -- there was definitely -- you

6  could hear like fear in the office like, you know, there's a

7  subpoena, like that sort of talk.  But, nothing of

8  substance, just like it was raised.

9    Q  And who did you hear talking that sort of talk?

10    A  I can't -- I honestly can't even remember specific

11  people.  I mean, Jenna might have mentioned it.

12    Q  All right.  If you don't remember, just say that.

13  Don't guess.  All right?

14    A  Okay.

15    Q  And what role did you play in producing documents

16  for a subpoena or subpoenas?

17      MS. GOTTLIEB:  Which one?  I don't know.  I'm

18  asking her.

19    A  So, at any time, if counsel needed to establish

20  where things might be located and they thought I might have

21  a clue, they would definitely ask me.  And then, I'd sort of

22  be their point person to go and figure out where things

23  would be housed.  How we could -- if they're in people's e-

24  mails, servers related, that -- so that sort of thing.

25  Yeah.

USAO-MA-0029876

1    BY MS. POSWISTILO:

2    Q    When did that kind of thing first start?

3    A    I'd say within a month.

4    Q    And were you ever asked -- and I think we went

5    over this.  I apologize if we did, but I didn't write it

6    down while you said it.  Were you ever asked yourself to

7    look through your office for documents related that

8    indicated you to be responsive to the subpoena?

9    A    Yes.

10    Q    When were you asked to do that?

11    A    Oh, I can't remember specifically.

12    Q    Was it recently or a while ago?  Or ongoing --

13    A    It would have been a while ago.  It doesn't -- I

14    don't really feel like it's been -- I mean, I was asked if I

15    had something recently, but I didn't.  So, maybe last year.

16    Q    So, and then, when you're asked, did you search

17    your office for papers?

18    A    Yeah, of course.  Yeah.  And some things, you

19    know, obviously, I had, so I passed along.

20    Q    And other times, you would contact people who you

21    assumed had --

22    A    Yeah.  I would try to --

23    Q    -- other information.  All right.

24         Now, did you become aware, when you were -- well,

25    you mentioned Dr. Awerbuch; right?

1      A    Yeah.

2      Q    Were you aware that he had legal problems?

3      A    I became aware.

4      Q    When did you become aware?

5      A    I believe, it was May 2014.

6      Q    Did you --

7      A    Or even end of April.

8      Q    End of April.  Okay.  So, --

9      A    Whenever he got arrested, that's when we found

10  out.

11     Q    So, you were there when he got arrested?

12     A    Yes.  I was.

13     Q    And what did you do with respect to any of Dr.

14  Awerbuch's files after he was arrested?

15     A    So, I was asked to help Skadden to collect them

16  all.

17     Q    Who asked you to help?  To collect?

18     A    Skadden probably asked me directly.

19     Q    Do you remember?

20     A    Not exactly, no.  Sorry.

21     Q    And so, what did you do?

22     A    So, I remember going over to the office with, I

23  believe, it was John and Maya and --

24     Q    What office?

25     A    The IRC.

1    Q    Okay.

2    A    -- and asking Liz, because they were sort of at a

3    stage where they were going from paper to a paperless

4    system.  And so, we had to meet with Liz to figure out where

5    all the potential files could be.  And then, lock down what

6    would be available on the portal server.

7    Q    And did you actually look for all the potential

8    files?

9    A    Not personally.  But, we had -- I remember, we had

10   individuals pulling out files.  I might have actually been

11   there while they were pulling out files.  Or I was told like

12   look for a red folder.  They were red or some color that was

13   associated with the physician so you could eyeball it, that

14   sort of thing.  And then, I would help with put in the pile.

15   Q    Okay.  And when you said and lock down files, was

16   that the computer or the electronic --

17   A    Yeah.  Lock down in the sense of like determine

18   what was going to be where, from what time.

19   Q    Oh, okay.

20   A    Sorry.  Yeah.

21   Q    That's okay.  And so, what happened, do you know,

22   with the hard copy files that people were gathering?

23   A    I believe, Skadden has them.  I believe we gave

24   them to Skadden.

25   Q    You believe you did.  But, do you remember going

196

1  to the IRC and getting the files?

2       A    Yeah.  I think I do.  I'm pretty sure I do.  Yeah.

3       Q    And do you remember how many there were?

4       A    No.  It was maybe boxes.  But, I don't recall for

5  sure.

6       Q    What did you do with the boxes when you got them?

7       A    I believe, I brought them back to the corporate

8  office and gave them to Skadden.

9       Q    Directly you gave them to Skadden?

10      A    Yeah, I believe I did.  I wonder if they were

11 there.  It's kind of hazy.  I'm not sure.  But, I remember

12 bringing them back for them when they were done getting

13 everything they could.

14      Q    Was there anyone in headquarters involved with

15 getting the documents to Skadden?

16      A    Well, Franc would have been.  I don't know if

17 Franc was the one that actually shipped them or, I can't

18 remember if we had an assistant put them in the mail.

19      Q    But, it's your belief right now those documents

20 were shipped to Skadden?

21      A    Now, I'm thinking about it, I'm not certain.  I

22 don't know if they were all scanned in.  I don't want to say

23 either way.  But, somehow we got them, either originals or

24 copies to Skadden.  Yeah.

25      Q    And do you know where the documents are right now?

USAO-MA-0029880

1        A    I don't know.

2        Q    Do you see them around your office?

3        A    No.  Absolutely not.

4        Q    Well, anywhere at headquarters?

5        A    No.  Absolutely not.  No.

6        Q    After you started there, did you attend interviews

7    with various Insys employees with Mr. Del Fosse?

8        A    Yes.

9        Q    And that was regarding an investigation?

10        A    Yes.

11        Q    And after those interviews, I don't want to get

12    into what was -- what happened during those interviews,

13    after the -- well, let me ask you this.  Do you remember who

14    you interviewed?

15        A    I remember, initially, we interviewed Liz Gurrieri

16    and Mike Gurry.  Not what time frame are you --

17        Q    Well, since you started until today.

18        A    Oh, since I started.  Oh, I'm not going to be able

19    to tell you.  I remember Alyessa Fulton.  I met with her

20    with him present.  And then, I also sat in on other

21    interviews with Skadden.  But, I can't -- interviews per se.

22    I -- I can't remember.

23        Q    Do you remember like sitting through one with

24    Babich?

25        A    Not an interview.  I don't think so.  No.

1    Q    After the interviews you had with attorneys

2  present, did you take any action or follow any directions of

3  the attorney to follow up on the interviews?

4    A    Yes.

5    Q    What did you do?

6    A    I mean, aside from the stuff that we've talked

7  about, in a specific instance, they came out and did a

8  review.  And I followed up on some information that was

9  brought to light as part of that review.  And that was --

10    Q    Again, when you say they did it?  Who are --

11    A    I'm sorry.  It was Skadden.

12    Q    And what was your follow up?

13    A    I had to provide -- I issued a letter of warning

14  to a prior authorization specialist and instructed Yoshi to

15  follow up with educational training.

16    Q    Okay.  Who was the PA specialist?

17    A    I believe, it was Chantel Castro.

18    Q    And do you remember why the warning was issued?

19    A    Yes.  It was for improper self identification

20  during the prior authorization process.

21    Q    Okay.  And what do you mean by that?

22    A    So, she didn't identify herself in a matter that

23  we would consider appropriate.  It's my recollection that

24  she insinuated that she was inside the -- or working inside

25  the doctor's office.

USAO-MA-0029882

1    Q    What would an appropriate manner be?

2    A    What would an -- okay.  I thought you said an

3    appropriate or versus inappropriate.

4    Q    No.  An appropriate way.

5    A    An appropriate way would be to introduce saying

6    you're calling on behalf of the physician.  I don't remember

7    the specific language that she used, but it wasn't that.

8    Q    Were you aware that others were doing that before

9    compliance came in?

10   A    Yeah.

11   Q    Were you also aware that the company itself

12   changed or used a different phone and identified the phone

13   system, if one were to call it, as 000?

14   A    Yes.  I did hear that.  And when they call your

15   phone, it shows up the same way.  So, yes.

16   Q    What do you mean it shows up the same way?

17   A    So, if they called the --

18   Q    They being the reimbursement center?

19   A    Yeah.  If that center called the office, I think

20   it either said 00 or unknown, something like that.

21   Q    Okay.  And that's so that Insys itself wouldn't be

22   identified as the caller?

23   A    Yes.

24   Q    And do you see that as a problem?

25   A    Yes.

USAO-MA-0029883

1      Q    Why is that?

2      A    It's misleading.

3      Q    When did you discover or find out that that's the

4   way that the reimbursement center was set up?

5      A    Late spring, early summer 2014.

6      Q    When you learned that that's how it was set up,

7   did you talk to anybody?

8      A    Yes.  I remember speaking with Franc about it.

9      Q    And why did you speak to Franc about it?

10     A    I wanted to -- any time I wanted to raise an

11  issue, it was going to go directly to my superior.

12     Q    Was anything changed after that?

13     A    Not initially.  I know that there is a number that

14  shows up now.  And it might have been when they moved out of

15  that building.  I know they got a whole new phone system.

16     Q    And how does it look like now when someone from

17  the reimbursement -- when someone calls --

18     A    It shows the number.

19     Q    I'm sorry?

20     A    It shows their number.  So, it -- like 480,

21  whatever the number is, it shows up.

22     Q    So, if someone from the reimbursement center calls

23  a company, an insurance company, and says, I'm calling on

24  behalf of Dr. X, will it show up to that insurance company

25  that it's a 4 whatever the number is?

1     A    Yes.  That's my understanding of how it works.  It

2  might even say -- you might want to -- I can check, but I

3  think, it says PSC.  Because I think, you're able to -- I

4  think that's what it shows when it calls to -- you know,

5  when it says your name on the top line.

6     Q    And can the reimbursement center say, I am calling

7  from the Insys PSC?

8     A    Absolutely.  Absolutely.

9     Q    So, they identify themselves now as Insys

10  employees?

11     A    Yes.  If they say, you know, where are you calling

12  from, they'll say the Insys patient services center.

13     Q    And why initially were -- when you got there, do

14  you have an understanding as to why they were not saying I'm

15  calling from Insys?

16     A    Because they wanted to give the appearance that

17  they were calling from within the doctor's office.

18     Q    And why would that be important?

19     A    Because a lot of the times, with insurance

20  companies, you get what's called third partied.  And they

21  won't work with you if you're not in the -- actually calling

22  from the doctor's office.

23     Q    In fact, that is especially true if a third party

24  is a pharmaceutical company selling a drug and getting

25  authorization for?

USAO-MA-0029885

1      A    I think so, yeah.  I just know the term third

2  partied.

3           MS. POSWISTILO:  Okay.  Give me one second.  I

4  think, we can have you out of here.

5           THE WITNESS:  Oh, okay.

6           (Off the record from 3:58 p.m. to 3:59 p.m.)

7           BY MS. POSWISTILO:

8      Q    Do you remember the list you were talking about,

9  the tried and failed drugs?

10     A    Yes.  Yeah.

11     Q    Do you know what happened to that physical list?

12     A    I don't.  I assume they got thrown out.  I mean,

13  we told them to take them down.  I don't know what happened

14  after that.

15     Q    You never saw it again?

16     A    No, no.

17     Q    What about the training binder?

18     A    That got completely revamped.

19     Q    What happened to the one that you saw?

20     A    It goes tossed.

21     Q    Any versions left of it?

22     A    Not that I'm aware of.

23     Q    And that was, what did you say?  A couple of weeks

24  after you started, 2013?

25     A    No.  It took a while for them to develop.  I

1   think, -- I don't even know if they have like a training

2   binder per se now.  They have like -- it's a huge manual.  I

3   think it's like 90 pages.

4        Q    Okay.  I guess, my point is, the training binder

5   that you lost -- that you didn't lose -- that you saw is no

6   longer in existence?

7        A    Correct.

8        Q    And it got tossed?

9        A    Correct.

10       Q    And do you know who tossed it?

11       A    Well, we instructed them not to use it.

12       Q    We?

13       A    Me and Yoshi.

14       Q    You instructed them not to use it?

15       A    Yes.

16       Q    How about the physical copy of it?

17       A    Oh, I didn't speak to the physical copy of it.  I

18  don't know where that went.

19       Q    You never saw it again?  You never saw the

20  physical copy?

21       A    No.  Like we're under obviously a litigation rule.

22  So, we can't just say toss it away.

23       Q    What did you mean when you said it got tossed

24  though?

25       A    Well, tossed aside, like not going to be used

1   again.   Taken out of circulation.

2            MS. POSWISTILO:  We'll finish with that.  We're

3   done.

4            (Whereupon, at 4:00 p.m., the proceedings were

5   concluded.)

USAO-MA-0029888