# EXHIBIT F

E-FILED
Anne Arundel Circuit Court
12/15/2017 12:16:07 PM
Jeffrey Buchalter v. William Tham, M.D., et al

Deposition of Danielle Davis

1          IN THE CIRCUIT COURT

2       FOR ANNE ARUNDEL COUNTY

3

JEFFREY BUCHALTER,                    )
4                                     )
         Plaintiff,                   )
5                                     )
vs.                                   )  Case No.:
6                                     )  C-02-CV-16-002718
WILLIAM THAM, M.D., et al.,           )
7                                     )
         Defendants.                  )
8                                     )

9

10

11       VIDEOTAPED DEPOSITION OF DANIELLE DAVIS

12

13                Phoenix, Arizona
                  October 19, 2017
14                   10:03 a.m.

15

16

17

18

19  REPORTED BY:
    Kristy A. Ceton, RPR
20  AZ Certified Court Reporter No. 50200

21

PLAINTIFF'S
EXHIBIT
1

Deposition of Danielle Davis | Jeffrey Buchalter v. William Tham, M.D., et al

**Page 2**

1      VIDEOTAPED DEPOSITION OF DANIELLE DAVIS

2  commenced at 10:03 a.m., on October 19, 2017, at

3  Cohen, Dowd & Quigley, 2425 East Camelback Road,

4  Suite 1100, Phoenix, Arizona, before Kristy A. Ceton,

5  RPR, Arizona Certified Court Reporter No. 50200.

6

7          * * *

8

9  APPEARANCES:

10    For the Plaintiff:

11    BEKMAN, MARDER & ADKINS, LLC
    By: Aaron L. Moore, Esq.

12    300 West Pratt Street
    Suite 450

13    Baltimore, Maryland 21201

14    For the Defendant Insys Therapeutics:

15    CARLTON FIELDS
    By: Adam P. Schwartz, Esq.

16    4221 West Boy Scout Boulevard
    Suite 1000

17    Tampa, Florida 33607

18

19

20

21

**Page 3**

1  APPEARANCES, CONT'D:

2    For the Defendants Tham, Physical Medicine & Pain
    Management Associates, P.C., Sophia

3    Leonard-Burns, PA-C, Michael Weeks, PA-C, Amy
    Fernandez, PA-C, Robert Loya, PA-C and Karen

4    Scott, PA-C:

5    VERNICK & ASSOCIATES
    By: Michael McCubbin, Esq.

6    111 Annapolis Street

7    Annapolis, Maryland 21401

8    For the Witness:

9    COHEN DOWD & QUIGLEY
    By: Stacey F. Gottlieb, Esq.

10    2425 East Camelback Road
    Suite 1100

11    Phoenix, Arizona 85016

12    Also Present:

13    Samantha Elliott, the videographer

14    Robert Schwimmer

15

16

17

18

19

20

21

**Page 4**

1        I N D E X

2

3  EXAMINATION BY             PAGE

4

5  Mr. Moore................................   8

6

7

8  EXHIBITS      DESCRIPTION      PAGE

9  Exhibit 1   Confidentiality Agreement    6
    Concerning Documents Produced

10    by Insys Therapeutics, Inc.

11  Exhibit 2   Complaint       41

12  Exhibit 3   HSGAC Minority Staff Report   140
    Fueling an Epidemic

13

14  Exhibit 4   Leslie Zacks Joins Arbor   153
    Pharmaceuticals as General

15    Counsel and Compliance Officer

16  Exhibit 5   11/9/2012 e-mail from Xun Yu   187
    to Jessica Larichiuta

17  Exhibit 6   1/12/2013 e-mail from Michael   200
    Babich to Sales All

18

19  Exhibit 7   Code of Conduct, 2013    214

20  Exhibit 8   The New York Times article,   220
    November 27, 2014, Using

21    Doctors with Troubled Pasts to
    Market a Painkiller

**Page 5**

1  EXHIBIT      DESCRIPTION      PAGE

2  Exhibit 9   The New York Times article,   220
    May 13, 2014, Doubts Raised

3    About Off-Label Use of Subsys
    Painkiller

4

5  Exhibit 10  12/16/2014 e-mail from Alec   221
    Burlakoff to Sales All

6  Exhibit 11  9/11/2013 e-mail from Alec   227
    Burlakoff to Beth McKey

7

8  Exhibit 12  11/13/2014 e-mail from   231
    Joseph Rowan to Sales East

9  Exhibit 13  Insys Speaker Programs Field   243
    Responsibilities

10

11  Exhibit 14  11/3/2012 e-mail from Sunrise   252
    Lee to Alec Burlakoff

12  Exhibit 15  Strategies to Develop and   255
    Enhance Monitoring Activities

13    for Commercial Teams

14  Exhibit 16  Elevate Monitoring and Auditing   255
    Efforts for Continued

15    Compliance throughout the
    Organization

16

17

18

19

20

21

Deposition of Danielle Davis                    Jeffrey Buchalter v. William Tham, M.D., et al

---

**Page 6**

1                 Phoenix, Arizona
2                 October 19, 2017
                    10:03 a.m.

3    (Exhibit 1 was marked for identification.)

4

5          TRANSCRIPT OF PROCEEDINGS

6      THE VIDEOGRAPHER:  Good morning.  My name

7  is Samantha Elliot, certified legal video specialist

8  with CRC Salomon.  Our court reporter is Kristy Ceton

9  representing CRC Salomon.  Their address is 2201 Old

10  Court Road, Baltimore, Maryland 21208.

11      We are at 2425 East Camelback Road, Suite

12  1100, Phoenix, Arizona, to take the deposition of

13  Danielle Davis on behalf of the plaintiff in the

14  Circuit Court for Anne Arundel County, case of

15  Buchalter versus Tham, et al., Case No.

16  C-02-CV-16002718.  The date is October 19th, 2017,

17  and the time is 10:03 a.m.

18      The attorneys will now introduce

19  themselves and those present.  Plaintiffs first,

20  please.

21      MR. MOORE:  Good morning.  Aaron Moore on

---

**Page 7**

1  behalf of the plaintiff, Jeff Buchalter.

2      MS. GOTTLIEB:  Stacey Gottlieb on behalf

3  of the witness, Danielle Davis.

4      MR. SCHWARTZ:  Adam Schwartz on behalf of

5  Insys Therapeutics.

6      MR. MCCUBBIN:  Michael McCubbin on behalf

7  of William Tham and his practice, PMPMA, and the

8  physician's assistant defendants.

9      MS. GOTTLIEB:  And let the record reflect

10  that Mr. McCubbin is attending by telephone.

11      MR. SCHWIMMER:  Also, Robert Schwimmer.

12  Counsel for -- in-house counsel for Insys.

13      THE VIDEOGRAPHER:  Court reporter, please

14  swear in the witness.

15

16           DANIELLE DAVIS,

17  called as a witness herein, having been first duly

18  sworn, was examined and testified as follows:

19

20

21      (Next page, please.)

---

**Page 8**

1            EXAMINATION

2  BY MR. MOORE:

3    Q.  Would you --

4      MR. SCHWARTZ:  Just as a housekeeping

5  matter, we've premarked a document as D1, which is

6  the confidentiality -- confidentiality agreement

7  governing this case.  We -- Pursuant to paragraph 5,

8  we reserve the right to designate portions of the

9  deposition confidential.  And until that's done,

10  would insist upon the nonsharing provisions in

11  paragraph 3.

12    Q.  BY MR. MOORE:  Would you please state

13  your name for the record?

14    A.  Yes.  Danielle Davis.

15    Q.  Good morning, Ms. Davis.  My name is

16  Aaron Moore.  I represent a United States veteran

17  named Jeff Buchalter in this case.

18    Do you understand that?

19    A.  Yes.

20    Q.  Okay.  Have you reviewed any materials in

21  preparation for your deposition?

---

**Page 9**

1    A.  Not specifically, no.

2    Q.  Have you reviewed anything?

3    A.  Not that I can recall, no.

4    Q.  Okay.  Have you been deposed before?

5    A.  I have not been deposed before.

6    Q.  Okay.  If there's a question that I ask

7  that you don't understand, please tell me and I'll be

8  happy to rephrase the question.

9    A.  Okay.

10    Q.  Okay.

11    A.  Yeah.  Thank you.

12    Q.  You are the director of compliance for

13  Insys Therapeutics?

14    A.  Yes.

15    Q.  And how long have you held that position?

16    A.  Since March 31st of 2014.

17    Q.  As I'm sure you're aware, Insys

18  Therapeutics is involved in various investigations in

19  litigation across the country?

20    MR. SCHWARTZ:  Object to form.

21    MS. GOTTLIEB:  Objection.  Form.

---

Deposition of Danielle Davis                                    Jeffrey Buchalter v. William Tham, M.D., et al

Page 10

1     THE WITNESS: I'm aware, yes.
2     Q. BY MR. MOORE: Okay. In connection with
3  any of that -- any of those investigations, have you
4  given any statements or interviews or testimony?
5     A. Yes.
6     Q. Okay. Who have you given statements to?
7     A. Her first name is Susan, and I don't
8  remember her last name.
9     Q. And who is Susan with?
10    A. With the Boston office of the Department
11 of Justice.
12    Q. I don't remember Susan's last name.
13    A. I don't either. I'm sorry.
14    Q. But she is the Attorney General in
15 Boston, correct?
16    MS. GOTTLIEB: Form.
17    THE WITNESS: I'm not sure if she's the
18 Attorney General. She's one of the people that work
19 in that office that I'm aware of, but I don't know
20 her title.
21    Q. BY MR. MOORE: She's one of the

Page 11

1  attorneys?
2     A. Yes.
3     Q. Okay. She's one of the attorneys that is
4  prosecuting Insys's former executives?
5     A. I believe so, yes.
6     Q. Okay. When did you provide information
7  to Susan?
8     MR. SCHWARTZ: Object to form.
9     MS. GOTTLIEB: Same.
10    THE WITNESS: Approximately December of
11 2016.
12    Q. BY MR. MOORE: Was that part of the grand
13 jury?
14    A. No.
15    Q. Okay. Was it sworn testimony under oath?
16    A. Yes.
17    Q. When you gave that testimony -- Let me
18 back up.
19    Are you aware of what the Fifth Amendment
20 is?
21    A. Yes.

Page 12

1     Q. All right. Did you take the Fifth in any
2  of Ms. -- or in any of Susan's questions to you?
3     A. No.
4     Q. When you spoke with Susan, did you
5  decline to answer any questions on the grounds of
6  attorney/client privilege?
7     A. Yes.
8     Q. Okay. Is it your understanding that the
9  United States government intends to call you as a
10 witness in the trial against Insys's former
11 executives?
12    MR. SCHWARTZ: Object to form.
13    MS. GOTTLIEB: Foundation.
14    Q. BY MR. MOORE: If you know?
15    A. I don't know the answer to that.
16    Q. Okay. Have you given any other sworn
17 testimony to anybody else?
18    A. No.
19    Q. It's my understanding that in the coming
20 days, Insys is going to reach a settlement with the
21 Department of Justice. Do you have any knowledge

Page 13

1  about that?
2     MR. SCHWARTZ: Object to form.
3     MS. GOTTLIEB: Form.
4     THE WITNESS: No.
5     Q. BY MR. MOORE: Do you know if Insys
6  intends to admit liability in that settlement?
7     A. I don't.
8     Q. Do you know if Insys is under
9  investigation by the State of Maryland?
10    MR. SCHWARTZ: Object to form.
11    MS. GOTTLIEB: Join.
12    THE WITNESS: I can't recall that
13 specifically, no.
14    Q. BY MR. MOORE: Do you recall being part
15 of -- involved in producing documents to the State of
16 Maryland?
17    A. I can't recall anything specifically
18 right now, no.
19    Q. Okay. To your knowledge, have you been
20 identified as a coconspirator?
21    A. No.

Deposition of Danielle Davis

Jeffrey Buchalter v. William Tham, M.D., et al

Page 14

1  Q. No, you don't know; or, no, you have not
2  been identified?
3  A. To the best of my knowledge, I am not a
4  coconspirator right now. I have not been listed.
5  Q. Have you been involved at all in turning
6  over documents for Jeff's case?
7  MS. GOTTLIEB: Form. Foundation.
8  Q. BY MR. MOORE: My client?
9  A. Oh, your client. Sorry.
10  Q. Yes.
11  A. We have several Jeffs. Sorry.
12  Q. That's okay.
13  A. I may have been. I can't recall
14  specifically.
15  Q. Okay. What would your role have been?
16  MS. GOTTLIEB: Foundation. Form.
17  THE WITNESS: Well, for this specific
18  case, if I was to have been involved, I would be
19  asked just generally for documents and I would give
20  them to either outside or internal counsel. They
21  don't always specify which case it's for, so ...

Page 15

1  Q. BY MR. MOORE: Okay. Have you had
2  communications with Mr. Schwartz in this case?
3  MR. SCHWARTZ: Object to form.
4  Foundation.
5  MS. GOTTLIEB: Same.
6  THE WITNESS: Yes, I've spoken to him,
7  yes.
8  Q. BY MR. MOORE: What have you two spoken
9  about?
10  MS. GOTTLIEB: Objection.
11  MR. SCHWARTZ: Objection. Privileged.
12  MS. GOTTLIEB: Privileged.
13  Instruct the witness not to answer
14  anything that calls for privileged information.
15  Q. BY MR. MOORE: Your attorney today here
16  is who?
17  A. Stacey Gottlieb.
18  Q. Have you ever been represented by
19  Mr. Schwartz?
20  A. No.
21  MS. GOTTLIEB: Just for the record, there

Page 16

1  is a common interest privilege as well as through the
2  company in-house legal function and its relationship
3  with Mr. Schwartz.
4  MR. SCHWARTZ: The privilege is with
5  Insys.
6  Q. BY MR. MOORE: It's my understanding that
7  -- Switching topics here.
8  It's my understanding that when employees
9  left Insys that they turned over their devices back
10  to Insys, such as their phones and their iPads; is
11  that true?
12  MS. GOTTLIEB: Form. Foundation.
13  MR. SCHWARTZ: Same.
14  THE WITNESS: It's my understanding that
15  that is the practice, yes.
16  Q. BY MR. MOORE: Okay. One of the sales
17  representatives in my case that interacted with the
18  healthcare providers, her name was Jessica
19  Larichiuta. Do you know Jessica?
20  A. I know of her, yes.
21  Q. Okay. You never met her?

Page 17

1  A. I can't recall meeting her specifically.
2  Q. Okay. Would that policy have applied to
3  her?
4  MS. GOTTLIEB: Objection to the form.
5  THE WITNESS: Yeah. In the compliance
6  department, I'm not -- I wouldn't be specifically
7  involved with that. I understand that is the
8  practice, as you've mentioned. But I -- I don't know
9  why it would or would not have applied to her.
10  Q. BY MR. MOORE: Where are these devices
11  kept?
12  MS. GOTTLIEB: Objection. Form.
13  Foundation.
14  THE WITNESS: I don't know.
15  MS. GOTTLIEB: Just wait for me to have
16  an opportunity.
17  Q. BY MR. MOORE: If I wanted to know where
18  the devices are kept, whether or not Jessica turned
19  over her device in this case back to Insys, who would
20  I go to speak to about that?
21  MS. GOTTLIEB: Foundation.

Deposition of Danielle Davis                              Jeffrey Buchalter v. William Tham, M.D., et al

Page 18

1   THE WITNESS: I think it would be a human
2   resources department.
3   Q. BY MR. MOORE: Okay. And is there
4   somebody in that department that heads that
5   department?
6   A. Yes.
7   Q. What's his or her name?
8   A. His name is Daniel Pon, P-o-n.
9   Q. Thank you.
10   Would the same be true in terms of
11   turning devices back over for the executives who have
12   been indicted?
13   MS. GOTTLIEB: Form.
14   THE WITNESS: I guess I don't know.
15   Q. BY MR. MOORE: I would need to go to the
16   human resources department to figure that out?
17   A. Yes.
18   Q. Okay. Do you have a resume?
19   A. I do, yes.
20   Q. Is that something that when we're
21   concluded here today that you could provide to your

Page 19

1   counsel so that she could turn that over to me?
2   A. I think I'll defer to Stacey on that.
3   Q. That's something that you could do,
4   though?
5   A. I could physically do it, yes.
6   Q. Okay.
7   A. But you'll have to ask Stacey.
8   Q. Okay. I would make that request.
9   Tell me a little bit about yourself,
10   starting with, where did you grow up?
11   A. I grew up in Sydney, Australia.
12   Q. Okay. Did you attend high school,
13   college over there?
14   A. I attended high school. I went to Pymble
15   Ladies' College up until I -- we call it year 12
16   there, but it would be called senior year here. And
17   then I also attended law school in Sydney.
18   Q. Okay. Graduated from college? Graduated
19   from law school?
20   A. Yes.
21   Q. When did you come to the United States?

Page 20

1   MS. GOTTLIEB: Form.
2   THE WITNESS: Specifically? There's been
3   several times. Is there a specific instance?
4   Q. BY MR. MOORE: In terms of coming over
5   full-time.
6   A. Full-time, I guess I would say 2007.
7   Q. Okay. What was your college degree
8   earned in?
9   A. I received a bachelor's in political
10   science.
11   Q. Okay. And when was that?
12   A. I graduated in 2003.
13   Q. Did you work after that or did you go
14   straight to law school?
15   A. I went -- Before law school, there was a
16   period of time where I enrolled to get a master's of
17   international business and law and then decided to
18   switch and go to law school full-time.
19   Q. Okay. Were you working at all between
20   the period of time after earning your B.S. degree and
21   then starting law school?

Page 21

1   MS. GOTTLIEB: Form.
2   THE WITNESS: I think I may for a little
3   while after I graduated from -- in 2003, continued
4   being a nanny for a while.
5   Q. BY MR. MOORE: Okay. When did you start
6   law school?
7   A. Sorry. The calendar year is different.
8   I'm having to think different.
9   Q. I'm sorry.
10   A. We start school in January. You guys
11   start school in the fall. January of 2005.
12   Q. Okay.
13   A. Yes, that's right.
14   Q. There's different lengths of law school
15   here in the United States. It's generally three
16   years. But how long is it in Australia?
17   A. It's three years.
18   Q. Okay. So you would have graduated in
19   2008?
20   A. 2007. So four years. So all of '5, all
21   of '6, and graduated in '7.

Deposition of Danielle Davis                                       Jeffrey Buchalter v. William Tham, M.D., et al

Page 22

1    Q.  I see.  Okay.  All right.
2    A.  Yeah.
3    Q.  And what do you do upon graduating from
4    law school?
5    A.  I think I worked for a little while.  So
6    my last year in law school, I was working at a law
7    firm in Sydney, and I continued for a little while
8    and then I moved to the States.
9    Q.  What type of law were you practicing at
10   the law firm?
11   A.  At that time, I was still considered a
12   clerk, so I would rotate, you know, with whoever
13   really needed help at the time.
14   Q.  Is a clerk kind of the equivalent of an
15   intern here?
16   A.  Yeah.  I'm -- I'm forgetting the actual
17   name that it's given.  I remember law clerk, but it's
18   just our in between before you get your official
19   certifications in between that period.
20   Q.  Did you get your official certification
21   in Australia?

Page 23

1    A.  I did, yes.
2    Q.  And when was that?
3    A.  I can't remember specifically, but I
4    believe it was -- I think I was admitted in
5    approximately June or July in 2008.
6    Q.  Okay.  And did -- Once you were
7    admitted, did you practice in Sydney?
8    A.  No.
9    Q.  Did you come to the United States?
10   A.  Yeah.
11   Q.  Okay.  And upon arriving to the United
12   States, tell me what you did.
13   A.  So --
14   MS. GOTTLIEB:  Form.
15   THE WITNESS:  In terms of work?
16   Q.  BY MR. MOORE:  Yes.
17   A.  Okay.  So, specifically, as it relates to
18   work, I found a -- I was offered a position up in
19   Washington State.
20   Q.  Did you -- How do you go about -- did
21   you eventually take the bar here in the United

Page 24

1    States?
2    A.  I did, yes.
3    Q.  How does that work?
4    A.  A lot of studying.  I took the California
5    bar in -- I'm pretty sure it was 2009, that area.
6    It's sort of blurry, but I think it was 2009.
7    Q.  It's been a little while?
8    A.  Sorry.
9    Q.  Did you pass?
10   A.  Yes.
11   Q.  Okay.  2009?
12   A.  I did.
13   Q.  Good.
14   A.  First go.
15   Q.  Do you have to -- when you -- Just
16   because I don't know, when you come over from
17   Australia to the United States, do you have to do any
18   additional schooling or are you just automatically
19   eligible to take the bar exam here?
20   A.  It's my understanding that the
21   qualifications differ by state.  And California was

Page 25

1    one state that did not require additional schooling.
2    Q.  Okay.  Good.
3    So you become barred in California 2009?
4    A.  Uh-huh.
5    Q.  But before that period of time, you start
6    working for a company in Washington State?
7    A.  Correct.
8    Q.  And you started working for that company
9    in 2008?
10   A.  Yes.
11   Q.  Okay.  Was that the -- who was that
12   company?
13   A.  I guess it's not a company.  It's a
14   tribe.
15   Q.  A tribe?
16   A.  Yes.
17   Q.  What was the tribe's name?
18   A.  Snoqualmie.
19   Q.  And for -- as a layperson, were you
20   operating a -- What was your position with the
21   tribe?

Deposition of Danielle Davis                                     Jeffrey Buchalter v. William Tham, M.D., et al

Page 26

1    A.  My title was executive director of the
2  Snoqualmie Gaming Commission.
3    Q.  Is that kind of a fancy term for a tribal
4  casino?
5      MS. GOTTLIEB:  Form.
6      THE WITNESS:  No.  That's not, no.
7    Q.  BY MR. MOORE:  No?
8    A.  No.
9    Q.  Okay.  Was it a casino that you were the
10  executive director over?
11    A.  Not specifically, no.
12    Q.  Tell me about it.
13    A.  So the role I played was specifically to
14  do with compliance as it related to the tribe's
15  casino.
16    Q.  Okay.  And I take it when we're talking
17  about compliance for a casino, there's a number of
18  laws, regulations --
19    A.  Oh, yeah.
20    Q.  -- that apply?
21    A.  Yes.

Page 27

1    Q.  Okay.  How did you -- how did you get
2  that position?
3    A.  So I knew the chairman of the Gaming
4  Commission and upon graduation from law school, I
5  reached out to him and said, You know, I want to try
6  to get a job in the United States.  And he
7  recommended me for the position.
8    Q.  What was the chairman's name?
9    A.  William Papazian.
10    Q.  Just out of curiosity, how did you know
11  Mr. Papazian?
12    A.  Mr. Papazian was -- he knew my mother.  I
13  believe she taught one of his children ballet.
14    Q.  Is he from Australia?
15    A.  No.
16    Q.  As the executive director overseeing
17  compliance for the Snoqualmie Tribe, had you ever
18  held a position like that before?
19    A.  No.
20    Q.  Give me a sense of some of the compliance
21  issues that you were having to deal with as the

Page 28

1  executive director of the -- of the tribe.
2      MR. SCHWARTZ:  Object to form.
3      MS. GOTTLIEB:  Form.
4      THE WITNESS:  Anything, like,
5  specifically?
6    Q.  BY MR. MOORE:  Just an overview.
7    A.  So there was no casino when I got there.
8    Q.  Okay.
9    A.  Similarly, there was no compliance
10  program.  So it was my responsibility to build the
11  compliance program from scratch.  And there are
12  several layers of compliance and adherence to laws
13  that is necessary to even be able to get the casino
14  to open.
15      So it was my responsibility to make sure
16  that the casino was compliant with tribal, state, and
17  federal laws.
18    Q.  For the most part, were you -- did you
19  teach yourself those laws and regulations that needed
20  to be followed and adhered to?
21      MR. SCHWARTZ:  Object to form.

Page 29

1      MS. GOTTLIEB:  Form.
2      THE WITNESS:  I don't recall
3  specifically.  I remember putting a lot of time in --
4    Q.  BY MR. MOORE:  Sure.
5    A.  -- to being brought up to speed.  And I
6  certainly had a team of experts around helping --
7  helping me grow, you know, my knowledge in that area.
8    Q.  Do you have any type of medical training
9  at all?
10    A.  No.
11    Q.  So, in essence, your -- your job as the
12  executive director, your job in a -- kind of simple
13  terms, was to make sure that the Snoqualmie Tribe
14  operated in compliance with all material
15  requirements?
16      MS. GOTTLIEB:  Form.
17      MR. SCHWARTZ:  Object to form.
18      THE WITNESS:  Generally, I think that's
19  -- that's a fair statement.
20    Q.  BY MR. MOORE:  You said you had a -- a
21  team of experts surrounding you there.

Page 30

1    A. Uh-huh.

2    Q. Tell me about that.

3    A. So the -- the operations side of the

4  casino, so -- maybe to be helpful. So there's an

5  operation side.

6    Q. Okay.

7    A. And then there's a -- a compliance side.

8    Q. Okay.

9    A. The -- the operations side was comprised

10 of individuals who each alone would have had over 20

11 years' experience in their positions. These were the

12 individuals that I was working with on a daily basis

13 to get the casino up and running.

14      And then, of course, I had my -- my --

15 the commission that I reported into, which included

16 Mr. Papazian. It's my understanding, he had been

17 doing this for decades as well.

18    Q. And then there's -- So we have the

19 operational side and the compliance side?

20    A. Correct.

21    Q. Okay. On the compliance side, was there

Page 31

1  anyone other than you?

2    A. Yes.

3    Q. Okay. Did you have a team of individuals

4  working underneath of you?

5    A. Yes.

6    Q. Okay. Is -- Are those individuals that

7  you hired and brought on to assist you?

8    A. Yes.

9    Q. Okay. How long did you stay employed

10 with the -- the Snoqualmie Tribe?

11    A. I think it was approximately six years.

12    Q. Take us up roughly 2013, something like

13 that?

14    A. It was like the end of 2012, yeah. So it

15 was pretty close.

16    Q. Okay.

17    A. Actually, I'm sorry. I think it was end

18 of '13.

19    Q. Okay. You eventually started at Insys as

20 the director of compliance. But turning back to when

21 you were the executive director at the Snoqualmie

Page 32

1  Tribe, were there any laws and regulations that you

2  were dealing with with the Snoqualmie Tribe that

3  overlapped with what you eventually had to do at

4  Insys?

5      MS. GOTTLIEB: Form.

6      THE WITNESS: Not specific in terms of

7  gaming policies or gaming laws, but certainly the

8  essence of, like, a code of conduct or general --

9  generally speaking, policies on behavior.

10    Q. BY MR. MOORE: Did you develop those type

11 of policies, code of conduct, policies on behavior

12 while serving as the executive director of the

13 Snoqualmie Tribe?

14      MR. SCHWARTZ: Object to form.

15      MS. GOTTLIEB: Form.

16      THE WITNESS: I recall being part of a

17 team that did, yes.

18    Q. BY MR. MOORE: Okay. Did you have a --

19 did you develop a compliance committee while you were

20 serving as the executive director of the Snoqualmie

21 Tribe?

Page 33

1      MS. GOTTLIEB: Form.

2      THE WITNESS: No.

3    Q. BY MR. MOORE: Okay. As part of your

4  role as the executive director, did you have to

5  investigate instances -- instances of misconduct?

6    A. Yes.

7    Q. Including fraud?

8    A. I don't recall a specific instance of

9  fraud.

10    Q. Have you gained any certifications in

11 compliance?

12    A. Yes.

13    Q. What certifications have you gained?

14    A. I believe the acronym is CCEP. Something

15 along the lines of Compliance and Ethics

16 Professional. It might be Certification for

17 Compliance and Ethics Professional. Something to

18 that effect.

19    Q. Is that through the Compliance

20 Certification Board or CCB?

21    A. Yeah. There's a society of it. So I'm

Deposition of Danielle Davis                                  Jeffrey Buchalter v. William Tham, M.D., et al

Page 34

1  spacing on the actual --
2    Q.  That's okay.
3    A.  -- terminology.  But something to that
4  effect, yes.
5    Q.  All right.  When did you get that
6  certification?
7    A.  It was either in 2012 or '13.
8    Q.  Was it after you started at Insys?
9    A.  No.  Before.
10   Q.  Was it while you were still the executive
11 director of the Snoqualmie Tribe?
12   A.  Yes.
13   Q.  It was?
14   A.  Yes.
15   Q.  Building a compliance program from the
16 ground up, sounds like you did for the Snoqualmie
17 Tribe, what did you learn to the -- to the importance
18 of having a -- a corporate compliance program in
19 place?
20       MS. GOTTLIEB:  Form.
21       MR. SCHWARTZ:  Object to form.

Page 35

1        THE WITNESS:  Can you ask a bit more
2  specific question?
3    Q.  BY MR. MOORE:  Well, what's the purpose
4  of having a corporate compliance program?
5        MS. GOTTLIEB:  Form.
6        THE WITNESS:  My understanding of having
7  a corporate compliance program is so that people
8  know -- people, specifically employees of the
9  organization know the framework and rules in which
10 they're operating.
11   Q.  BY MR. MOORE:  Does having a -- an
12 appropriate corporate compliance program in place
13 help prevent misconduct?
14       MR. SCHWARTZ:  Object to form.
15       MS. GOTTLIEB:  Form.
16       THE WITNESS:  Having a corporate
17 compliance program -- I'm sorry.  Could you repeat
18 the question?
19   Q.  BY MR. MOORE:  Sure.  Absolutely.
20       Just any time you need me to, tell me.
21   A.  Sorry.

Page 36

1    Q.  I'm over here shuffling around papers and
2  I'm probably distracting you.
3    A.  Sorry.
4    Q.  Is one of the reasons why you want to
5  have an appropriate compliance program in place to
6  prevent misconduct?
7        MS. GOTTLIEB:  Form.
8        THE WITNESS:  I would say having a
9  corporate compliance program in place is necessary to
10 help prevent poor conduct, yes.
11   Q.  BY MR. MOORE:  Is it important to have
12 such a program in place as well to help detect
13 misconduct?
14   A.  Yes.
15   Q.  And importance of detecting misconduct
16 when it occurs is so that it can be stopped
17 immediately?
18       MS. GOTTLIEB:  Form.
19       THE WITNESS:  If it is detected, yes.
20   Q.  BY MR. MOORE:  And when you switched --
21 and when you switch over and we start talking about

Page 37

1  compliance programs with pharmaceutical companies
2  that you -- in this case, Insys, that you were the
3  director of, one of the reasons why you want to have
4  appropriate corporate compliance -- an appropriate
5  corporate compliance program in place is to make sure
6  that the company and its employees are interacting
7  appropriately with healthcare professionals?
8        MR. SCHWARTZ:  Object to form.
9        MS. GOTTLIEB:  Objection.  Form.
10       THE WITNESS:  Well, yes, I --
11       Would it be possible to just ask one
12 specific question?
13   Q.  BY MR. MOORE:  Oh, sure.
14       You had a question for me?
15   A.  No.  Could you just ask --
16   Q.  Sure.
17   A.  I felt like there was more than one
18 question there, so I got a little bit lost.
19   Q.  One of the purposes of having an
20 appropriate corporate compliance program in place is
21 to make sure that there are appropriate interactions

Deposition of Danielle Davis                                    Jeffrey Buchalter v. William Tham, M.D., et al

Page 38

1  with healthcare providers?
2      MR. SCHWARTZ: Object to form.
3      MS. GOTTLIEB: Form.
4      THE WITNESS: I would say that is one
5  element of what a compliance program strives to
6  achieve, yes.
7      Q. BY MR. MOORE: And why is that important?
8      MR. SCHWARTZ: Form.
9      MS. GOTTLIEB: Form.
10      THE WITNESS: Well, you want to make sure
11  that the representatives for the company are engaging
12  appropriately and within policy, within the law.
13      Q. BY MR. MOORE: Back up and talk about
14  your time, again, as the executive director for the
15  Snoqualmie Tribe. Okay?
16      A. Yes. Can I just correct you? Sorry. I
17  was the executive director for the Gaming Commission.
18      Q. I'm sorry.
19      A. Not for the Tribe. It's a different
20  position.
21      Q. Thank you. For the Gaming Commission.

Page 39

1      So it would be accurate to say the
2  Snoqualmie Gaming Commission? Would that be --
3      A. Yes. Yep.
4      Q. Okay. Okay.
5      When you were the executive director of
6  that program, you -- you left roughly end of 2013 at
7  some point?
8      A. Yes.
9      MS. GOTTLIEB: Form.
10      Q. BY MR. MOORE: And you ultimately filed a
11  lawsuit?
12      A. Yes.
13      Q. And that lawsuit that you filed was
14  against individuals who, if I'm correct, were part of
15  the Snoqualmie Gaming Commission?
16      A. No.
17      Q. Part of the Tribe?
18      A. Yes.
19      Q. Okay. And your complaint against those
20  individuals was essentially one for fraud, correct?
21      MS. GOTTLIEB: Form.

Page 40

1      THE WITNESS: I can't recall the
2  specifics of it.
3      Q. BY MR. MOORE: I'm looking at, just so
4  you know, a copy of the complaint that you filed,
5  which was filed on February 6th, 2014. Okay?
6      MS. GOTTLIEB: Do you have a copy to show
7  her?
8      MR. MOORE: I have the one, so it's all I
9  have. But I'm happy to provide it to you to look at.
10  Okay. So you have it. This is my only copy. I'm
11  sorry.
12      Q. BY MR. MOORE: Maybe it will refresh your
13  recollection on this. One of the paragraphs in your
14  complaint states that, "The purpose of the
15  defendant's conspiracy was to operate the casino
16  without any regulatory oversight so they could
17  directly engage in illegal gaming."
18      MS. GOTTLIEB: Objection to the form,
19  unless, I mean, if we're going to mark it as an
20  exhibit.
21      MR. MOORE: Sure. I'll happy to.

Page 41

1      Q. BY MR. MOORE: Let me complete the
2  paragraph for fairness.
3      It goes on to state, "Most immediately,
4  the purpose of the conspiracy was to deceive the
5  Snoqualmie Tribal general counsel, the membership,
6  and to defraud Bank of America into believing the
7  casino was operating in accordance with gaming
8  regulations, when, in fact, the casino was wildly out
9  of compliance on all material requirements."
10      I've highlighted that, which I've read
11  from.
12      MS. GOTTLIEB: Can we please have it
13  marked as an exhibit?
14      MR. MOORE: Sure.
15      MS. GOTTLIEB: Will you please hand that
16  to court reporter so she can mark it as an exhibit
17  before you take a look?
18      MR. MOORE: Why don't we mark the first
19  page there?
20      (Exhibit 2 was marked for identification.)
21      MS. GOTTLIEB: And, for the record, is

Deposition of Danielle Davis                          Jeffrey Buchalter v. William Tham, M.D., et al

Page 42

1  that Exhibit 2?
2         THE COURT REPORTER:  Yes.
3     Q.  BY MR. MOORE:  Did I read that right?
4         MS. GOTTLIEB:  Form.
5         THE WITNESS:  I'm assuming you did.  I
6  didn't have it sitting in front of me when you read
7  it to me.
8     Q.  BY MR. MOORE:  Does that refresh your
9  recollection about why you filed a lawsuit?
10        MR. SCHWARTZ:  Object to form.
11        THE WITNESS:  Vaguely.
12    Q.  BY MR. MOORE:  Okay.  The last page, I'll
13 represent to you, is your signature with the date.
14    A.  Yes.
15        MS. GOTTLIEB:  Form.
16        Let the record reflect that that does not
17 appear to have a signature on it.  I can't see it
18 from that far away.  It just looks like a blank line
19 from here.
20    Q.  BY MR. MOORE:  I'll represent to you,
21 that has your signature on it.  Does it, Ms. Davis?

Page 43

1     A.  It's an electronic signature.
2     Q.  Right.
3         Help me understand a little bit more
4  about what transpired here.  Why did the defendants
5  in your lawsuit have to defraud the Bank of America
6  into believing that the casino was operating in
7  accordance with gaming regulations when, according to
8  the allegations in the complaint, they were wildly
9  out of compliance on all material requirements?
10        MS. GOTTLIEB:  Objection.
11        MR. SCHWARTZ:  Object to form.
12        MS. GOTTLIEB:  Form and foundation.
13        THE WITNESS:  I can't recall specifics of
14 it.  I'm sorry.
15    Q.  BY MR. MOORE:  When you left the -- As
16 the executive director at the end of 2013, was the
17 casino wildly out of compliance on all material
18 requirements?
19        MS. GOTTLIEB:  Form.
20        MR. SCHWARTZ:  Object to form.
21        THE WITNESS:  I can't recall

Page 44

1  specifically.
2     Q.  BY MR. MOORE:  What ultimately happened
3  with this complaint?
4         MS. GOTTLIEB:  Form.
5     Q.  BY MR. MOORE:  The lawsuit?
6         MS. GOTTLIEB:  Same.
7         THE WITNESS:  I -- I don't remember
8  specifically.  I think it was settled.  I don't know
9  the official term of what happened.
10    Q.  BY MR. MOORE:  As the executive director
11 running the compliance for the Snoqualmie Gaming
12 Commission, did you feel as if you had independent
13 oversight over that process?
14        MR. SCHWARTZ:  Object to form.
15        MS. GOTTLIEB:  Form.
16        THE WITNESS:  Do you mean me
17 individually?
18    Q.  BY MR. MOORE:  Yes.  As the executive
19 director.
20        MR. SCHWARTZ:  Same.
21        MS. GOTTLIEB:  Same.

Page 45

1         THE WITNESS:  Yeah, I can't recall
2  specifically because I'm always working in
3  conjunction with the counsel above me.
4     Q.  BY MR. MOORE:  I'm going to read
5  something and hand it back to you just so you can
6  verify that I'm reading this accurately.
7         Do you recall how you learned about the
8  fraud the defendants were committing?
9         MR. SCHWARTZ:  Object to form.
10        MS. GOTTLIEB:  Same.
11        THE WITNESS:  I don't think I can recall
12 the specific instance where I learned, no.
13    Q.  BY MR. MOORE:  What was that?
14    A.  I don't remember.
15    Q.  Oh, I'm sorry.
16    A.  Sorry.  I said I don't remember.
17    Q.  No, I didn't hear you.
18        On page 16, section 4.1, see if I can
19 refresh your recollection.  It states, quote, "In
20 September 2013, Director Danielle Davis learned
21 information that caused her to believe casino

**Page 46**

1  security manager James Contreras was under
2  investigation for money laundering.
3      "The first indication was an article in
4  the Seattle Times describing inappropriate conduct by
5  him relating to confidential informants and a misuse
6  of funds. Later, Defendant Jenkins advised Davis
7  that the Tribe was served with a grand jury subpoena
8  seeking what amounted to Contreras's player records
9  from before his employment at the casino."
10      Does it appear I read that correctly?
11      A.  Yes.
12      Q.  Does that refresh your recollection that
13  you first became aware of the security manager's
14  misconduct through an article in the Seattle Times?
15      A.  Vaguely, yes. I remember somebody gave
16  me the article. Yes.
17      Q.  Okay. And upon receipt of that article,
18  you became concerned?
19      MR. SCHWARTZ: Object to form.
20      MS. GOTTLIEB: Same.
21      THE WITNESS: Yes.

**Page 47**

1      Q.  BY MR. MOORE: And did you launch an
2  investigation?
3      A.  I can't recall specifically, but it
4  sounds familiar.
5      Q.  It sounds like something familiar that
6  you would have done?
7      A.  Correct.
8      Q.  And as part of that investigation that
9  you did, you uncovered what was going on?
10      MR. SCHWARTZ: Object to form.
11      MS. GOTTLIEB: Form.
12      THE WITNESS: I don't specifically recall
13  what happened. I'm sorry. It was a while ago. I
14  just don't remember.
15      Q.  BY MR. MOORE: But, obviously, at some
16  point, it came to light to you as the executive
17  director in terms of what had occurred?
18      MR. SCHWARTZ: Object to form.
19      MS. GOTTLIEB: Form. Foundation.
20      THE WITNESS: What came to light was we
21  had a current employee at the casino who had those

**Page 48**

1  allegations levied against him, yes.
2      Q.  BY MR. MOORE: Including by you in a
3  lawsuit?
4      A.  Yes.
5      Q.  I can't put that away. It's an exhibit.
6      Now, at the same time that you were the
7  executive director for the Snoqualmie Gaming
8  Commission, you were also working as a real estate
9  agent?
10      A.  No, I was not working as a real estate
11  agent.
12      Q.  Was there a period of time when you were
13  working as a real estate agent for Cascade?
14      A.  I recall getting my real estate license
15  just as another, I guess, tool to have in the
16  toolbox, so to speak. I don't recall ever using it.
17      Q.  Is there a period of time, though, that
18  you were working for Cascade?
19      A.  As an employee, I can't say I was working
20  for them, no. I -- I believe you have to when you
21  have your license hang it with -- with a brokerage,

**Page 49**

1  and I think that's likely what I did. But in a sense
2  of working for them, I don't recall that, no.
3      Q.  And when did you get your real estate
4  license?
5      A.  I can't remember.
6      Q.  After you came to the United States?
7      A.  Yes.
8      Q.  So it would have been -- The way that I
9  kind of understand the process in terms of you coming
10  over here and starting with the Snoqualmie Gaming
11  Commission, it would have -- you would have had to
12  have obtained that real estate license after you
13  started working for them?
14      MS. GOTTLIEB: Form.
15      Q.  BY MR. MOORE: Would that be true?
16      MS. GOTTLIEB: Form.
17      THE WITNESS: I did get the license after
18  I had started working for the Commission, yes.
19      Q.  BY MR. MOORE: Okay.
20      A.  I just can't recall the year that I did
21  it. Maybe -- I don't want to guess.

Deposition of Danielle Davis                    Jeffrey Buchalter v. William Tham, M.D., et al

Page 50

1   Q.  No, that's okay.
2   A.  I don't remember.
3   Q.  That's all right.
4       I mean, were there instances where you
5   were out working as a real estate agent trying to
6   sell homes?
7   A.  No.
8   Q.  Okay.  You just had the license?
9   A.  Yes.
10  Q.  Okay.  What's Red Dust Properties?
11  A.  That's a personal LLC.
12  Q.  Of your own?
13  A.  Yes.  My brother might be on it too.  I
14  can't -- it's been a while since I formed it.  I
15  don't remember.  I'm sorry.  But it is a personal
16  LLC.  Yes.
17  Q.  Okay.  Is that still in existence?
18  A.  It is, yes.
19  Q.  Tell me about that.  What is -- what is
20  that?
21      MS. GOTTLIEB:  Form.

Page 51

1   Q.  BY MR. MOORE:  What is Red Dust
2   Properties?
3   A.  I formed it initially to -- so that my
4   plan was to buy rental properties at some point.  And
5   so the intention was once I bought those properties,
6   I would put them into the LLC.
7   Q.  Okay.  Have you started doing that?
8   A.  No.
9   Q.  It's still in existence --
10  A.  But it's there.
11  Q.  -- if you want to.  All right.
12      Where is it incorporated?
13  A.  I think it's in Arizona.
14  Q.  Okay.  Before we turn to Insys, again,
15  sticking with your time with the Snoqualmie Gaming
16  Commission, you were the executive director for
17  roughly six years, you get your certification
18  license.  Did you come to understand that there can
19  be misconduct within an organization that extends up
20  the corporate ladder?
21      MR. SCHWARTZ:  Object to form.

Page 52

1       MS. GOTTLIEB:  Form.
2       THE WITNESS:  Sorry.  Can you repeat the
3   question?
4   Q.  BY MR. MOORE:  Sure.
5       Did you come to learn through your
6   training at the -- through your work at the
7   Snoqualmie Gaming Commission, obtaining the -- the
8   compliance certificate that you did, that misconduct
9   could run all the way up the chain of command within
10  an organization?
11      MR. SCHWARTZ:  Object to form.
12      MS. GOTTLIEB:  Form.
13      THE WITNESS:  Yes.
14  Q.  BY MR. MOORE:  Fraud can run all the way
15  up the corporate ladder to top corporate executives?
16      MR. SCHWARTZ:  Object to form.
17      MS. GOTTLIEB:  Form.  Foundation.
18  Q.  BY MR. MOORE:  Is that a true statement?
19      MS. GOTTLIEB:  Form.
20      THE WITNESS:  In a vacuum, yes.
21  Q.  BY MR. MOORE:  As part of being a --

Page 53

1   overseeing compliance, knowing that misconduct can
2   run all the way up the corporate ladder, is that
3   something that you've got to be on the lookout for,
4   and if something pops up that alerts you to potential
5   misconduct, that you have to investigate?
6       MR. SCHWARTZ:  Object to form.
7       MS. GOTTLIEB:  Objection.  Form.
8   Foundation.
9       THE WITNESS:  I'm sorry.  That was long.
10  Can you do just one question?  Sorry.
11  Q.  BY MR. MOORE:  If you learn of
12  misconduct, potential misconduct, even, that runs up
13  that corporate ladder, what's your responsibility as
14  the compliance director?
15      MS. GOTTLIEB:  Form.
16      THE WITNESS:  Are we talking specifically
17  to Insys?
18  Q.  BY MR. MOORE:  Right now, just generally.
19      MR. SCHWARTZ:  Object to form.
20      THE WITNESS:  Current day working at

Deposition of Danielle Davis                                    Jeffrey Buchalter v. William Tham, M.D., et al

Page 54

1  Insys?

2    Q.  BY MR. MOORE:  No.  Just generally

3  speaking, what would -- what would -- what does the

4  compliance director do?

5    MR. SCHWARTZ:  Same objection.

6    MS. GOTTLIEB:  Form.  Foundation.

7    THE WITNESS:  So if information was

8  brought to the compliance director position about

9  potential misconduct, you know, that would get

10  reported up to the chain, yeah.

11    Q.  BY MR. MOORE:  To you?

12    A.  I would report it up to the chief

13  compliance officer.

14    Q.  Is it particularly difficult to detect

15  evidence of misconduct when it's the top corporate

16  executives who are involved?

17    MR. SCHWARTZ:  Object to form.

18    MS. GOTTLIEB:  Form.

19    THE WITNESS:  I would say it would be

20  difficult, yes.

21    Q.  BY MR. MOORE:  Why?

Page 55

1    MS. GOTTLIEB:  Form.  Foundation.

2    THE WITNESS:  Sorry.  Can you ask the

3  question again?  I'm sorry.

4    Q.  BY MR. MOORE:  I asked why.

5    MS. GOTTLIEB:  Same objection.

6    THE WITNESS:  Sorry.  Why what?

7    Q.  BY MR. MOORE:  Why does it make it

8  particularly challenging to detect?

9    MR. SCHWARTZ:  Object to form.

10    MS. GOTTLIEB:  Form.

11    THE WITNESS:  Well, my experience, the

12  policies and procedures that day to day we're looking

13  at, monitoring, detecting, are looking at lower-level

14  employees.

15    MR. MOORE:  Can we take, like, a

16  five-minute break?  Would that be all right with you?

17  Everybody?

18    MR. SCHWARTZ:  Sure.  That's fine.

19    THE VIDEOGRAPHER:  Off the record at 11

20  o'clock.

21    (A break was taken at 11 a.m.)

Page 56

1    THE VIDEOGRAPHER:  Back on the record at

2  11:11.

3    Q.  BY MR. MOORE:  Ms. Davis, we're back on

4  the record.  There's something I've been told you

5  wanted to clarify.

6    A.  Yes.

7    MS. GOTTLIEB:  Yes.  The -- With respect

8  to the question about whether you reviewed any

9  documents before the deposition.  I think you can --

10  why don't you revisit that question?

11    THE WITNESS:  Okay.  I must have

12  misunderstood the question.  I apologize.

13    Q.  BY MR. MOORE:  It's okay.

14    A.  We did review documents for the purpose

15  of this deposition today.

16    MS. GOTTLIEB:  And the second thing

17  that -- just to clarify, because the question and

18  answer on whether or not the Red Dust Properties,

19  LLC, was used versus whether you started buying

20  properties to put into it is a little bit unclear.

21  Can you explain whether or not you use that specific

Page 57

1  LLC to purchase properties?

2    THE WITNESS:  Yes.  I did not use that

3  specific LLC to purchase rental properties.

4    MS. GOTTLIEB:  Thank you.

5    Q.  BY MR. MOORE:  Did you use another LLC?

6    A.  No.

7    Q.  Have you ever been involved in buying and

8  selling, renting properties?

9    A.  Yes.

10    Q.  When did that start?

11    A.  2008, I believe.

12    Q.  Is that when you got your real estate

13  license?

14    A.  No.

15    Q.  Tell me about what you were doing in

16  2008.

17    A.  I was --

18    MS. GOTTLIEB:  Form.

19    THE WITNESS:  I was working for the

20  Gaming Commission in Washington.

21    Q.  BY MR. MOORE:  But in terms of the

Deposition of Danielle Davis                                      Jeffrey Buchalter v. William Tham, M.D., et al

Page 58

1  properties -- and maybe we're just having a
2  disconnect here that I'm not understanding --
3      A. Yeah.
4      Q. -- what were you doing in terms of rental
5  properties back then?
6      A. I purchased a rental property in 2008.
7      Q. Just the one?
8      A. In 2008, yes.
9      Q. Is that the only time you've ever done
10 that?
11     A. No.
12     Q. Do you continue to do that?
13     MS. GOTTLIEB: Form.
14     THE WITNESS: I am currently in the
15 process of selling a property. Two, actually.
16 Sorry.
17     Q. BY MR. MOORE: Are these properties that
18 you own?
19     A. I fully own one and co-own another.
20     Q. In terms of these properties, do you
21 purchase them and then rent them out?

Page 59

1      A. Yes.
2      Q. Do you purchase and flip them and then
3  resell them?
4      MS. GOTTLIEB: Form.
5      THE WITNESS: I have not flipped in the
6  sense of purchasing, gutting, flipping, selling. No,
7  haven't done that before.
8      Q. BY MR. MOORE: So you currently own one
9  and co-own another?
10     A. I currently fully own two properties and
11 co-own three. I said I was currently selling two,
12 and one that I fully own and one that I co-own.
13 That's what I said.
14     Q. Where are those properties located?
15     A. One is in Gilbert.
16     Q. Is that in Arizona?
17     A. Yes. They're all in Arizona.
18     Q. Okay. And how long have you owned these
19 properties?
20     A. Well, the one I purchased in 2008.
21     Q. Okay.

Page 60

1      A. I purchased one in either 2009 or '10.
2  It might have been '10. I purchased two in -- I am
3  guessing. It -- it might have been 2011.
4      MS. GOTTLIEB: You don't need to guess.
5      Q. BY MR. MOORE: Approximately 2011?
6      A. Approximately.
7      And then I purchased one in 2014.
8      Q. What kind of properties are these?
9      A. Single-family homes.
10     Q. The property that you purchased in 2008
11 here in Arizona?
12     A. Yes.
13     Q. You weren't living in Arizona at the
14 time?
15     A. I wasn't.
16     Q. What prompted you to make a purchase
17 here?
18     A. So I had family living down here at the
19 time. And wasn't sure, you know, how long I would be
20 in Washington --
21     Q. Okay.

Page 61

1      A. -- or move back, so ...
2      Q. Have you ever rented out any of your
3  properties to anybody from Insys?
4      A. No.
5      Q. When did you move to Arizona?
6      A. I think it was March of 2014.
7      Q. When you started with Insys?
8      A. Before --
9      MS. GOTTLIEB: Form.
10     THE WITNESS: Sorry. Before I started
11 with Insys.
12     Q. BY MR. MOORE: Sure.
13     How did you come to learn that there was
14 a -- an opening at Insys?
15     A. Through my sister-in-law's sister who was
16 an employee of Insys.
17     Q. Who is that?
18     A. Her name's Kristen McCoy.
19     Q. Is Ms. McCoy still at Insys?
20     A. She is not, no.
21     Q. At the time that you started at Insys,

Deposition of Danielle Davis                                       Jeffrey Buchalter v. William Tham, M.D., et al

Page 62

1  what was Ms. McCoy's job at Insys?

2  A. I don't recall her exact title.

3  Q. Did she work in the corporate office?

4  MS. GOTTLIEB: Form.

5  THE WITNESS: She did, yes.

6  Q. BY MR. MOORE: Did she hold any type of

7  managerial positions or anything like that?

8  MS. GOTTLIEB: Foundation. Form.

9  THE WITNESS: Not when I joined Insys,

10 that I can recall, no. I don't think she did.

11 Q. BY MR. MOORE: How about after?

12 A. I believe at some point, she became a

13 manager. I just don't know when that was.

14 Q. A manager for what?

15 A. Like I said, I don't remember her exact

16 title. But she was in the -- they call it business

17 intelligence group.

18 Q. And what is the business intelligence

19 group?

20 A. So my understanding of that unit is that

21 they -- they have several different functions. My

Page 63

1  understanding of what Kristen did was, she helped

2  align territories and reps to managers, like from a

3  geographic perspective.

4  Q. Okay. Do you know when she left the

5  company?

6  A. 2016.

7  Q. You know why she left?

8  A. I believe it was -- they did some layoffs

9  at the time, and I believe she was part of that

10 reduction in force.

11 Q. Okay. So Ms. McCoy, I guess, reached out

12 to you and said, There's an opening here at Insys?

13 MR. SCHWARTZ: Object to form.

14 MS. GOTTLIEB: Form.

15 Q. BY MR. MOORE: Is that kind of how it

16 worked or no?

17 MS. GOTTLIEB: Form.

18 THE WITNESS: I can't -- I can't recall

19 if that's how it happened, no.

20 Q. BY MR. MOORE: Do you recall how it

21 happened?

Page 64

1  A. I don't -- I don't remember the first

2  time that we communicated about it. I honestly -- I

3  don't remember that conversation.

4  Q. At some point, did you submit a job

5  application?

6  A. Yes. Actually, I'm not sure. I don't

7  remember filling out -- well, actually, I did fill

8  out an application. I just don't remember what -- at

9  what point of the process that was.

10 Q. Did you fill it out after they hired you?

11 A. I don't recall specifically. Because I

12 know -- I remember you fill it out and they do some

13 sort of background check, but I just don't remember

14 if it was after that hire or it was before that hire

15 conversation.

16 Q. Okay. I'm going to ask that that

17 document be produced. If you could turn that over to

18 Ms. Gottlieb, we'll make a determination about that

19 later. Her and I can talk.

20 A. I don't have it.

21 MR. SCHWARTZ: Hang on a second. That's

Page 65

1  a company -- a company document. If you want that --

2  you can make a written request.

3  MR. MOORE: Okay.

4  Q. BY MR. MOORE: Did you interview with

5  anybody?

6  A. Yes.

7  Q. Okay. Besides that application, is there

8  any other paperwork that you filled out that you can

9  recall?

10 MR. SCHWARTZ: Object to form.

11 MS. GOTTLIEB: Same.

12 THE WITNESS: At what time of the -- the

13 hire process?

14 Q. BY MR. MOORE: Because I don't know how

15 it works specifically, I'm going to be a little bit

16 broad and just say, the entire -- that entire process

17 of you starting out?

18 A. I do remember filling out something -- so

19 there was the employment application, and then there

20 was a couple things else that I know I signed after

21 that. But I don't remember -- I think I did. I'm

Deposition of Danielle Davis                                      Jeffrey Buchalter v. William Tham, M.D., et al

Page 66

1  just not 100 percent.
2      Q.  That's okay.
3      A.  Sorry.
4      Q.  Okay.  Who did you interview with?
5      A.  Frank Delfosse was the general counsel.
6  Mike Babich, who was the CEO.  Jenna Grosshans, who
7  held the position of director of human resources.
8      Q.  How do you spell her last name?  Do you
9  remember?
10     A.  G-r-o-s-s-h-a-n-s.
11     Q.  Okay.  Mr. Delfosse?
12     A.  Yes.
13     Q.  Mr. Babich?
14     A.  Yes.
15     Q.  Ms. --
16     A.  Grosshans.
17     Q.  Grosshans.  Thank you.
18         Anyone else?
19     A.  I don't think so.  I think I had -- I had
20  two interviews with Frank, maybe.  But I don't think
21  it was anybody else.

Page 67

1      Q.  So Mr. --  At that point in time,
2  Mr. Delfosse was at Insys and working in his capacity
3  as general counsel?
4      A.  Correct.  Yes.
5      Q.  Okay.  And it sounds from what you're
6  telling me, you went through two interviews?
7      A.  I think it might have even been three.
8      Q.  Okay.  So on one occasion, you've
9  explained to me who was there.  The three
10  individuals.
11     A.  I never met with three individuals at one
12  time.
13     Q.  Oh, I'm sorry.  Thank you.
14         Tell me about each interview.  Who you
15  met with.
16         MS. GOTTLIEB:  Form.
17         THE WITNESS:  So the first interview was
18  with Frank.
19     Q.  BY MR. MOORE:  Okay.
20     A.  The second interview was with Frank and
21  Mike.

Page 68

1      And the third one was with Jenna.
2      Q.  Jenna only?
3      A.  Yes.
4      Q.  Over what period of time are we talking
5  about did these three interviews take place?
6      A.  A couple weeks to a month.
7      Q.  Okay.  So it would have started -- did it
8  start in February 2014?
9      A.  I think it started late -- late February.
10     Q.  And were you hired -- how long after your
11  meeting with Jenna were you hired?
12     A.  I mean, I can't recall specifically.
13     Q.  Was it that day?
14     A.  No.
15     Q.  Okay.  Besides Ms. McCoy, did you know
16  anyone else at Insys?
17     A.  Yes.  I knew an individual in the
18  marketing department.
19     Q.  Who was that?
20     A.  Lindsay, and her last name is Couturier.
21  I don't know how to spell it.  Sorry.

Page 69

1      Q.  That's all right.
2      A.  That's another one.
3      Q.  Let's just call her Lindsay.  I hope
4  that's okay with Lindsay.
5      A.  Okay.
6      Q.  How did you know her?
7      A.  She was a friend of my sister-in-law.
8      Q.  Okay.  Anybody else?
9      A.  No.
10     Q.  When you ultimately moved here, did you
11  move in with anybody from Insys?
12     A.  No.
13     Q.  Okay.  Have you ever lived with anybody
14  from Insys?
15     A.  No.
16     Q.  Did you know anyone else outside of Insys
17  in the pharmaceutical industry?
18         MR. SCHWARTZ:  Object to form.
19         MS. GOTTLIEB:  Form.
20         THE WITNESS:  Not that's coming to mind
21  right now, no.

Deposition of Danielle Davis                                    Jeffrey Buchalter v. William Tham, M.D., et al

Page 70

1    Q.  BY MR. MOORE:  All right.  Did you know
2  an individual named Leslie Zacks?
3    A.  No.
4    Q.  As you're going through the interview
5  process, what did you learn in terms of why it is
6  that Insys needed to hire somebody?
7      MR. SCHWARTZ:  Object to form.
8      MS. GOTTLIEB:  Same.
9      THE WITNESS:  I remember Mike saying that
10  the company was growing and they needed a -- a
11  compliance department, something to that effect.
12    Q.  BY MR. MOORE:  Did they have a compliance
13  department?
14    A.  At that particular time, I don't believe
15  so, like a department, per se.
16    Q.  Did they have a person overseeing
17  compliance?  Did they have a director of compliance?
18      MR. SCHWARTZ:  Object to form.
19      MS. GOTTLIEB:  Same.
20      THE WITNESS:  I don't recall them having
21  that position at the time, no.

Page 71

1    Q.  BY MR. MOORE:  Who, if anyone, was
2  overseeing compliance, to your knowledge?
3      MR. SCHWARTZ:  Same objection.
4      MS. GOTTLIEB:  Same.
5      THE WITNESS:  So I want to be clear.  At
6  that time during the interview process, I didn't
7  know.  They didn't -- they didn't mention anybody's
8  name.
9    Q.  BY MR. MOORE:  Jumping ahead a little
10  bit, and I'm going to come back to the interview
11  process.  But jumping ahead a little bit to, you
12  start with the company?
13    A.  Yes.
14    Q.  Did you learn at that point in time
15  whether or not there was a compliance department in
16  place?
17    A.  Not a department in place, no.
18    Q.  Okay.  Were you having to come in and
19  build that department kind of like you had with the
20  Snoqualmie Gaming Commission?
21      MR. SCHWARTZ:  Object to form.

Page 72

1      MS. GOTTLIEB:  Form.
2      THE WITNESS:  So, as I understood it, my
3  role, in part, was going to be building out the
4  corporate compliance program.
5    Q.  BY MR. MOORE:  So once you started --
6  focusing on that original time period, March 2014 --
7  who, if anyone, was handling compliance-related
8  issues at that particular time at Insys?
9    A.  So it's my understanding, March of
10  2014 -- do you mean right before I was hired?  I was
11  literally hired on the last day of the month.  March
12  31st.  So you're talking about March or around that
13  time frame, just so I'm clear?
14    Q.  That's a good point.
15      So let's back it up even farther.  And
16  you come on March 2014.  I'm assuming that at that
17  point in time you learned that Insys began marketing
18  Subsys in 2012?
19      MR. SCHWARTZ:  Object to form.
20      MS. GOTTLIEB:  Form.
21    Q.  BY MR. MOORE:  Is that true?

Page 73

1      MS. GOTTLIEB:  Form.
2      MR. SCHWARTZ:  Same objection.
3      THE WITNESS:  It's my understanding that
4  Insys launched Subsys at some point 2012.
5    Q.  BY MR. MOORE:  So between -- between the
6  point of launch and the time that you started with
7  the company, who, if anyone, was overseeing
8  compliance-related issues?
9      MR. SCHWARTZ:  Object to form.
10      MS. GOTTLIEB:  Form.
11      THE WITNESS:  So, as I understand it
12  today, with the knowledge I have today, prior to my
13  being hired at Insys, there was an individual named
14  Leslie Zacks who -- I believe he functioned in a
15  chief compliance officer-type role.  I'm not sure up
16  until what point.
17      I know the company engaged a -- you know,
18  a team of experts in the field with counsel, Skadden
19  Arps, and also at Skadden Arps' recommendation, hired
20  an individual named Steve Celestini to function in
21  that compliance-type role as well, like leadership of

Deposition of Danielle Davis                                    Jeffrey Buchalter v. William Tham, M.D., et al

Page 74

1  compliance-type position.
2      I don't know specifically when he was
3  hired and I don't know specifically when Leslie Zacks
4  was hired.
5      Q.  BY MR. MOORE:  How did you gain that
6  knowledge about Leslie Zacks?  And I'm not going to
7  try to pronounce Steve's last name.  I'll call him
8  Steve.
9      A.  Okay.
10     MS. GOTTLIEB:  Form.
11     THE WITNESS:  Yeah.  I can't recall
12 specifically how I came to know of their involvement.
13 I don't want to guess and give you the wrong answer.
14 I don't know.
15     Q.  BY MR. MOORE:  Something you learned
16 fairly recently?
17     MR. SCHWARTZ:  Object to form.
18     MS. GOTTLIEB:  Form.
19     THE WITNESS:  What specifically?
20     Q.  BY MR. MOORE:  The information about
21 Leslie Zacks and Steve.

Page 75

1      MS. GOTTLIEB:  Form.
2      THE WITNESS:  No.  I learned of that
3  fairly soon after my hire.
4      Q.  BY MR. MOORE:  Oh, okay.
5      Who told you that, if you remember?
6      A.  Sorry.  I thought that's -- I thought
7  that was the previous question.  I don't remember
8  who.
9      Q.  That's okay.  I'm sorry if I asked you
10 that.
11     A.  That's all right.  I just don't remember
12 who it was.
13     Q.  Okay.  I'm going to come back to that in
14 a few minutes.
15     A.  Okay.
16     Q.  But back to your -- back to your
17 interview application and whatnot with Insys.  How
18 old were you at the time that you started with Insys?
19     A.  I think I was 33.
20     Q.  Okay.
21     A.  Or was I 32?  I might have been 32.

Page 76

1      Q.  One of the two?
2      A.  32 or 33.
3      Q.  Were you employed at all between the
4  period of time that you left the Snoqualmie Gaming
5  Commission and before you started with Insys?
6      A.  No.
7      Q.  Okay.  At the time that you interviewed,
8  had you ever heard of the FDA?
9      A.  Yes.
10     Q.  Were you conversant with the FDA
11 regulations?
12     MR. SCHWARTZ:  Object to form.
13     MS. GOTTLIEB:  Same.
14     THE WITNESS:  Do you have specific
15 regulations in mind?
16     Q.  BY MR. MOORE:  The entire FDCA.
17     MR. SCHWARTZ:  Form.
18     MS. GOTTLIEB:  Object to form.
19     THE WITNESS:  I was aware of its
20 existence.
21     Q.  BY MR. MOORE:  How?

Page 77

1      A.  I believe through my compliance
2  certification classes that I had been taking.
3      Q.  That's a certificate that we talked about
4  earlier?
5      A.  Yes.
6      Q.  Was it just a basic understanding that
7  there were laws and regulations in place with the
8  FDA?
9      MS. GOTTLIEB:  Form.
10     MR. SCHWARTZ:  Object to form.
11     THE WITNESS:  I can't recall specifically
12 what I knew at that time.
13     Q.  BY MR. MOORE:  Had you heard about the
14 Controlled Substance Act?
15     MS. GOTTLIEB:  Form.
16     THE WITNESS:  I don't recall if I did
17 know that.
18     Q.  BY MR. MOORE:  Insys was the first and
19 only pharmaceutical company that you've worked for;
20 is that true?
21     A.  Yes.

Page 78

1    Q.  Fair to say that before Insys you never

2  really had to get into any of those laws and

3  regulations?

4         MR. SCHWARTZ:  Object to form.

5         MS. GOTTLIEB:  Form.

6         THE WITNESS:  Well, like I said, I took

7  my compliance courses.

8    Q.  BY MR. MOORE:  Sure.

9    A.  And they have ongoing requirements to

10  keep -- keep your certification, and so there was

11  pharmaceutical-based classes as part of that.  That

12  was compliance.

13    Q.  When did you start taking --

14       How often do you have to recertify?

15    A.  I believe it's every other year.

16    Q.  Okay.  When did you start taking -- and

17  when you -- and when you recertify, can you take

18  specific courses on specific topics?

19    A.  Yeah.  The certification is quite broad

20  in the sense that what -- it's sort of like the legal

21  CLEs, you have to get, I think they're called CEUs.

Page 79

1    Q.  Okay.

2    A.  And you can choose from a variety of

3  courses, conferences that have specific classes.  And

4  there is -- there's a portion that has to be live and

5  there's a portion that can be done web-based.  And so

6  it's a total, I believe, of 40 CEUs every two years.

7    Q.  Got it.

8       And so if you wanted to, you could focus

9  your CEUs on FDA laws, regulations?

10    A.  Yeah.  Yes.

11    Q.  Okay.  And is that something that you

12  started to do?

13    A.  When I joined Insys, I believe I started

14  -- whichever next compliance courses I took, it was

15  pharmaceutical-based, yes.

16    Q.  Okay.  Had you ever heard of a C2 drug

17  before when you joined Insys?

18    A.  I don't know if I did.

19    Q.  Had you ever heard of fentanyl when you

20  first started?

21    A.  I can't recall specifically.

Page 80

1    Q.  How about Subsys?

2    A.  Yes.

3    Q.  Is that something that you educated

4  yourself on for the interview?

5    A.  Yes.

6    Q.  Had you ever heard of the term

7  "misbranding" at the time that you started with

8  Insys?

9    A.  I don't think so.

10    Q.  How about off-label?

11    A.  Yes.

12    Q.  Is that something that you, in preparing

13  for your interview, learned about as well?

14    A.  I would say so, yes.  But in a -- just a

15  general knowledge of off-label versus on-label, I

16  guess.

17    Q.  How about HIPAA?

18    A.  Yes.

19    Q.  Did you have to get into HIPAA-related

20  issues at the Snoqualmie Gaming Commission?

21       MS. GOTTLIEB:  Form.

Page 81

1       THE WITNESS:  I don't remember

2  specifically if I did, but I was -- I was generally

3  aware of HIPAA, yes.

4    Q.  BY MR. MOORE:  How about REMS?

5       MS. GOTTLIEB:  Form.

6       THE WITNESS:  I don't believe so, no.

7    Q.  BY MR. MOORE:  Do you have an

8  understanding of anything to deal with prior

9  authorizations?

10       MS. GOTTLIEB:  Form.

11       THE WITNESS:  Not at the time of

12  interviewing, no.

13    Q.  BY MR. MOORE:  Okay.  I think the

14  language that you used earlier when I talked -- in

15  terms of what you said when you started, you said

16  something along the lines, I was hired, in part, to

17  establish the compliance department?

18       MR. SCHWARTZ:  Object to form.

19       MS. GOTTLIEB:  Form.

20    Q.  BY MR. MOORE:  Do you remember that?

21       MS. GOTTLIEB:  Form.

Deposition of Danielle Davis                    Jeffrey Buchalter v. William Tham, M.D., et al

Page 82

1    THE WITNESS: Yeah. What I think I said
2   was part of my responsibility was to build out the
3   corporate compliance program.
4       **Q.  BY MR. MOORE:  Right.**
5       **Was there something else you were hired**
6   **to do as well?**
7       A.  Yes.  I was involved with -- I was hired
8   into the legal department and I assisted with all the
9   litigation requests that were taking place at the
10  time.
11      **Q.  And what did you do in terms of what was**
12  **your responsibility in terms of the litigation**
13  **requests?**
14      MR. SCHWARTZ: Object to form.
15      MS. GOTTLIEB: Form.
16      THE WITNESS: Well, let me know if I get
17  close to any sort of privilege line.
18      But there was an ongoing legal review
19  that was being conducted by Skadden, and I
20  participated with them in those efforts.
21      **Q.  BY MR. MOORE:  What do you mean you**

Page 83

1   **"participated"?**
2       MS. GOTTLIEB: And I'll just say, you can
3   talk generally about what you did, as long as it does
4   not talk about the communications or invade the
5   privilege from a work product perspective.
6       THE WITNESS: Okay. I helped facilitate
7   Skadden reviewing certain processes or protocols,
8   meeting with people.  If they needed to speak with an
9   employee, I would usually set that up and then
10  participate in the phone call.  Those are some
11  examples that come to mind immediately.
12      **Q.  BY MR. MOORE:  Were you acting in a**
13  **capacity as general counsel?**
14      A.  No.
15      **Q.  What specific litigation were you helping**
16  **address?**
17      MS. GOTTLIEB: Form.
18      THE WITNESS: So the first one when I
19  initially started was with the Office of Inspector
20  General subpoena that had been sent.
21      **Q.  BY MR. MOORE:  When did you receive --**

Page 84

1   when did Insys receive that subpoena?
2       MS. GOTTLIEB: Foundation.
3       THE WITNESS: To the best of my
4   knowledge, I believe it was received in December of
5   2013.
6       **Q.  BY MR. MOORE:  What else?**
7       MS. GOTTLIEB: Form.
8       THE WITNESS: I can't remember specifics,
9   but as cases or subpoenas came in, it was my practice
10  to assist Skadden and the company's general counsel
11  in responding to whatever needed to be responded to.
12      **Q.  BY MR. MOORE:  And the company's general**
13  **counsel, that was Mr. Delfosse?**
14      A.  Yes.
15      **Q.  Okay.  And I take it if I ask you**
16  **questions about your communications with Skadden's**
17  **attorney, I'm going to hear objection?**
18      MS. GOTTLIEB: Skadden's attorney?
19      MR. MOORE: Yes.
20      MR. GOTTLIEB: You mean, Skadden as
21  counsel for Insys?  Yes.

Page 85

1       MR. SCHWARTZ: Yes.
2       **Q.  BY MR. MOORE:  I take it if I ask you**
3   **questions about participating on phone calls between**
4   **the Skadden attorneys and Insys employees, I'm going**
5   **to hear the same objection?**
6       MR. SCHWARTZ: Same objection.
7       MS. GOTTLIEB: Yes.
8       **Q.  BY MR. MOORE:  Did some of those**
9   **communications that you sat in on include individuals**
10  **who were not part of the executive team?**
11      MR. SCHWARTZ: Object to form.
12      MS. GOTTLIEB: Same.
13      THE WITNESS: When you mean -- say
14  "executive team," are you referring to --
15      **Q.  BY MR. MOORE:  Me, I'm thinking of maybe**
16  **general counsel, CEO, vice president, members of the**
17  **executive team.**
18      MR. SCHWARTZ: Just so I'm clear, are you
19  talking about calls with Skadden and an employee of
20  Insys?  Is that what you're talking about?
21      MR. MOORE: Yes.

Deposition of Danielle Davis                    Jeffrey Buchalter v. William Tham, M.D., et al

Page 86

1      MR. SCHWARTZ: Okay.
2      THE WITNESS: Okay. Yes.
3      Q. BY MR. MOORE: And if I were to ask you
4  questions about what was discussed during those
5  calls?
6      MR. SCHWARTZ: Same objection.
7      MS. GOTTLIEB: Same.
8      Q. BY MR. MOORE: Were you helping assist
9  with investigations by various states?
10     A. Yes.
11     Q. Do you recall how many states had sent
12 subpoenas to Insys?
13     MR. SCHWARTZ: Object to form.
14     MS. GOTTLIEB: Same.
15     THE WITNESS: In what particular time
16 frame?
17     Q. BY MR. MOORE: When you were first hired?
18     A. I can't recall specifically. There might
19 have been one out of -- sorry, excuse me -- out of
20 California.
21     Q. Was there one out of Oregon?

Page 87

1      A. Not at the time that I was hired.
2      Q. Okay. That came later?
3      A. Yes.
4      Q. Roughly, if you can recall, or
5  specifically, if you can recall, how many
6  investigations are we talking about at the time that
7  you were hired?
8      MS. GOTTLIEB: Form.
9      THE WITNESS: I remember those two. I'm
10 just not sure when that California one out of the
11 Los Angeles office came in, if that was before I was
12 hired or after.
13     Q. BY MR. MOORE: Okay.
14     A. It might have just been those two. I
15 remember another document, but I don't know if it was
16 in conjunction with the OIG subpoena.
17     Q. Have the investigations since grown --
18     MR. SCHWARTZ: Object to form.
19     Q. BY MR. MOORE: -- since you've been part
20 of the company?
21     MR. SCHWARTZ: Same objection.

Page 88

1      MS. GOTTLIEB: Same.
2      THE WITNESS: Grown in what sense?
3      Q. BY MR. MOORE: More and more states?
4      MS. GOTTLIEB: Form.
5      THE WITNESS: Yes, I'm aware of
6  investigations with more states.
7      Q. BY MR. MOORE: Are there investigations,
8  to your knowledge, with every state?
9      A. No.
10     Q. Do you know how many states, sitting here
11 today?
12     MS. GOTTLIEB: Form.
13     THE COURT REPORTER: I'm sorry. What did
14 you say?
15     THE WITNESS: I said "No."
16     MS. GOTTLIEB: I said "Form."
17     Q. BY MR. MOORE: We need to go off track a
18 little bit while it's still on my mind and backtrack.
19     You mentioned when we came back from the
20 break that you did review documents to prepare for
21 your deposition?

Page 89

1      A. Yes.
2      Q. What documents did you review?
3      MS. GOTTLIEB: Objection. That calls for
4  privileged information and the mental impressions of
5  counsel and work product.
6      So I'll instruct you not to answer that.
7      MR. SCHWARTZ: Same.
8      Q. BY MR. MOORE: Why did you believe that
9  you were qualified to come in to take on this
10 position at Insys?
11     MR. SCHWARTZ: Form.
12     MS. GOTTLIEB: Form.
13     THE WITNESS: Well, I had just spent the
14 last six years building a compliance program, and it
15 was my understanding that this is part of what the
16 job requirement was going to be, and I thought I
17 could do it.
18     Q. BY MR. MOORE: You're still employed at
19 Insys, correct?
20     A. Yes.
21     Q. Is your job title still director of

Deposition of Danielle Davis                        Jeffrey Buchalter v. William Tham, M.D., et al

Page 90

1  compliance?

2      A.  Yes.

3      Q.  Has your job description, functioning is

4  what I'm getting at, as director of compliance

5  changed over the years from when you first started

6  until today?

7      MR. SCHWARTZ:  Object to form.

8      MS. GOTTLIEB:  Form.

9      THE WITNESS:  Well, I would say I have a

10  -- a different boss now, and I guess he runs the

11  department.  And now I sort of do as I'm instructed.

12      Q.  BY MR. MOORE:  Who is your boss now?

13      A.  Sanga Emmanuel.

14      THE COURT REPORTER:  What was the name?

15  I'm sorry.

16      THE WITNESS:  Sanga, S-a-n-g-a.  His

17  surname is Emmanuel, E-m-m-a-n-u-e-l.

18      Q.  BY MR. MOORE:  What is Mr. Emmanuel's

19  title?

20      A.  Chief compliance -- sorry.  VP, chief

21  compliance officer.

Page 91

1      Q.  When did he start?

2      A.  November 2015.

3      Q.  Lack of a better term, he's kind of the

4  -- he oversees the compliance department now?

5      MR. SCHWARTZ:  Object to form.

6      MS. GOTTLIEB:  Form.

7      THE WITNESS:  I think that's a fair

8  statement to make, yes.

9      Q.  BY MR. MOORE:  And before Mr. Emmanuel,

10  you would have been the one overseeing the compliance

11  department?

12      MR. SCHWARTZ:  Object to form.

13      MS. GOTTLIEB:  Objection to form.

14      THE WITNESS:  I reported up and to the

15  general counsel.

16      Q.  BY MR. MOORE:  Who was your boss?

17      A.  The general counsel.

18      Q.  Mr. Delfosse?

19      A.  Yes.

20      Q.  Was it Mr. Delfosse's decision ultimately

21  to hire you or was it part of a committee in terms of

Page 92

1  those three people that we talked about that you

2  interviewed with?

3      MR. SCHWARTZ:  Object to form.

4      MS. GOTTLIEB:  Form.  Foundation.

5      THE WITNESS:  I don't know.

6      Q.  BY MR. MOORE:  Okay.  Do you believe that

7  Insys hired you to be the compliance director for the

8  same reasons that you outlined to me in terms of why

9  you felt qualified for the job?

10      MS. GOTTLIEB:  Form.

11      MR. SCHWARTZ:  Object to form.

12      MS. GOTTLIEB:  Foundation.

13      THE WITNESS:  I don't want to speculate

14  what they were thinking.

15      Q.  BY MR. MOORE:  Have you ever formed an

16  opinion on that?

17      MR. SCHWARTZ:  Same objection.

18      MS. GOTTLIEB:  Form.

19      THE WITNESS:  No.

20      Q.  BY MR. MOORE:  Do you have stock options

21  with the company?

Page 93

1      A.  Yes.

2      Q.  How long have you had stock options?

3      A.  I don't recall the specific grant date,

4  but around the time of hire.

5      Q.  Bonuses?

6      A.  Yes.

7      Q.  Since the time of hire?

8      A.  Not directly at the time.  I didn't get a

9  sign-on bonus.

10      Q.  Sure.

11      Is it an annual bonus?  Quarterly?

12  Something like that?

13      MS. GOTTLIEB:  Form.

14      THE WITNESS:  There's a discretionary

15  bonus available.

16      Q.  BY MR. MOORE:  How often?

17      A.  On an annual basis.

18      Q.  Okay.  That's been true since you

19  started?

20      A.  Yes.

21      Q.  Okay.  And what is it based on?

Deposition of Danielle Davis                                   Jeffrey Buchalter v. William Tham, M.D., et al

Page 94

1      MS. GOTTLIEB: Form. Foundation.

2      THE WITNESS: My understanding of it is

3 -- it's been a while since I looked at the metrics

4 for it. There's a percentage of reaching team goals,

5 me working with individuals on the team, and I -- I

6 believe there's a component how well my direct report

7 thinks I've performed.

8      **Q. BY MR. MOORE: It's based in part on how**

9 **well the company is doing as a whole financially?**

10      MR. SCHWARTZ: Form.

11      MS. GOTTLIEB: Foundation.

12      THE WITNESS: I don't know if that's

13 specifically a requirement of something that he would

14 consider.

15      **Q. BY MR. MOORE: This is Mr. Delfosse that**

16 **considers this?**

17      MS. GOTTLIEB: Form.

18      THE WITNESS: No. Mr. Emmanuel. I

19 currently report to Sanga.

20      **Q. BY MR. MOORE: And how about prior? So**

21 **between your time of hire until Mr. Emmanuel took**

Page 95

1 over?

2      MS. GOTTLIEB: Same.

3      MR. SCHWARTZ: Same.

4      THE WITNESS: I don't know what the

5 metrics were at that point.

6      **Q. BY MR. MOORE: And you don't know if one**

7 **of the metrics over that time period was company**

8 **performance?**

9      MR. SCHWARTZ: Object to form.

10      MS. GOTTLIEB: Same.

11      THE WITNESS: I'm not aware of that, no.

12      **Q. BY MR. MOORE: So you start with Insys as**

13 **the director of compliance and shortly thereafter you**

14 **tell me that you learned that Leslie Zacks and some**

15 **other person, Steve, were some way involved with**

16 **compliance-related issues before you started?**

17      MS. GOTTLIEB: Form.

18      MR. SCHWARTZ: Same.

19      THE WITNESS: That was my understanding

20 at the time.

21      **Q. BY MR. MOORE: Okay. As the director of**

Page 96

1 compliance, did you go back to look for any

2 compliance -- maybe compliance committee meeting

3 minutes?

4      MR. SCHWARTZ: Object to form.

5      MS. GOTTLIEB: Form. Foundation.

6      THE WITNESS: I do remember as part of

7 the legal review looking for them at some point. I

8 can't recall specifically that time frame.

9      **Q. BY MR. MOORE: Did you find any that were**

10 **in existence?**

11      A. Yes.

12      **Q. I would ask that those be produced.**

13      **How many did you find?**

14      A. I don't recall exactly.

15      **Q. Okay. Did you ever go and speak with**

16 **Mr. Zacks or Steve?**

17      MS. GOTTLIEB: Form.

18      MR. SCHWARTZ: Object to form.

19      THE WITNESS: At that time, and since, I

20 have not spoken to Mr. Zacks. Like I said, I don't

21 know when he stopped working at the company or with

Page 97

1 the company. Steve Celestini, yes.

2      **Q. BY MR. MOORE: When did you speak with**

3 **Steve?**

4      A. I think right at the point of hire.

5      **Q. And tell me what you talked about. Tell**

6 **me what you learned.**

7      MS. GOTTLIEB: Form.

8      MR. SCHWARTZ: Same.

9      THE WITNESS: Yeah. I'm not sure. I

10 mean, that was -- you have to be a bit more specific

11 because Steve was working with Skadden before I got

12 there as part of legal review, and then when I first

13 started joining that team. So I'm just not sure. We

14 can certainly discuss, but I don't -- I don't want to

15 waive any company privilege around those

16 conversations.

17      **Q. BY MR. MOORE: Well, your attorneys, I**

18 **promise you, will tell you not to answer if there is.**

19      A. Okay.

20      **Q. So my question, just so everybody knows,**

21 **I want to know about the conversations that you had**

Page 98

1    with Steve.

2        A.   Okay.  Well --

3        MR. SCHWARTZ:  Again, if it involves her

4    work with Skadden and Celestini on the legal team,

5    that would be -- those would be privileged

6    conversations.  So that's why I think she's asking

7    you what areas are you talking about, because it may

8    depend.

9        MR. MOORE:  Ms. Gottlieb, is that right?

10       MS. GOTTLIEB:  Yeah.  I think that's

11   right.  And it's going to be difficult for her to

12   answer, in a really super broad question like that in

13   a vacuum.  She's not going to know.

14       Q.   BY MR. MOORE:  As your role as the

15   director of compliance, did you speak with Steve in

16   that role, in that capacity, to learn about what, if

17   any, problems existed at Insys before you started?

18       MR. SCHWARTZ:  Object to form.

19       MS. GOTTLIEB:  Same.

20       THE WITNESS:  I can't recall specifically

21   what hat I was wearing.

Page 99

1        Q.   BY MR. MOORE:  When you came on as the

2    director of compliance wearing that hat, did you come

3    to learn how, you know, if somebody had a -- a

4    concern at Insys prior to you arriving there, how

5    that process worked in terms of how it was handled?

6        MR. SCHWARTZ:  Object to form.

7        MS. GOTTLIEB:  Form.

8        THE WITNESS:  I can't specifically recall

9    a particular conversation at that time.  I don't want

10   to -- I don't want to speculate specifically at that

11   time.

12       Q.   BY MR. MOORE:  Put away conversations.

13   Did you learn as the director of compliance how it

14   was handled?

15       MR. SCHWARTZ:  Object to form.

16       MS. GOTTLIEB:  Form.

17       THE WITNESS:  It was my understanding at

18   the time I was hired there was a -- a hotline, ethics

19   hotline reporting mechanism that was available 24

20   hours a day, seven days a week, and employees could

21   submit concerns, complaints anonymously or if they

Page 100

1    chose to reveal their identity.

2        Q.   BY MR. MOORE:  They could fill out

3    written complaints?

4        A.   I don't know if it was written because

5    how it -- it's -- they might be able to, but it's my

6    understanding you call in and it gets transcribed.

7    I'm not 100 percent if there's a -- actually writing.

8        Q.   And at the time that you started, was

9    that same process in place?

10       A.   That process, yes.

11       Q.   Okay.  And was the -- was the concern

12   transcribed by that third party?

13       A.   I believe so.

14       MS. GOTTLIEB:  Form.  Foundation.

15       MR. SCHWARTZ:  Hang on.

16       Object to form.

17       THE WITNESS:  That's my understanding.

18       Q.   BY MR. MOORE:  Okay.  And that third

19   party was who?

20       MS. GOTTLIEB:  Form.  Foundation.

21       THE WITNESS:  The name of the company

Page 101

1    that provides that service, I believe is called

2    Navex, N-a-v-e-x.

3        Q.   BY MR. MOORE:  Navex Global?

4        A.   That sounds familiar, yes.

5        MR. MOORE:  I think we're at a point

6    where we need to take a break from the video.  So

7    let's go ahead and take another break.

8        MR. SCHWARTZ:  Okay.

9        THE WITNESS:  Sure.

10       THE VIDEOGRAPHER:  This concludes media

11   No. 1 of the continuing deposition of Danielle Davis.

12   Off the record at 12:06.

13       (A break was taken at 12:06 p.m.)

14       THE VIDEOGRAPHER:  This begins media No.

15   2 in the continuing deposition of Danielle Davis.  On

16   the record at 12:38.

17       Q.   BY MR. MOORE:  All right.  We're back on

18   the record, Ms. Davis.  I hope you had a good lunch.

19       I think we left off talking about the --

20   the third-party administrator -- before lunch -- of

21   the compliance -- who transcribed compliance.  The

Deposition of Danielle Davis                                    Jeffrey Buchalter v. William Tham, M.D., et al

Page 102

1 complaints that were generated and were transcribed,
2 were they sent to Insys?
3        MS. GOTTLIEB: Form.
4        MR. SCHWARTZ: Same.
5        THE WITNESS: No, they were not sent to
6 Insys.
7        Q. BY MR. MOORE: Okay. Was it some third
8 party that was looking into the complaint or was it
9 somebody within Insys that was looking into it?
10       MS. GOTTLIEB: Form.
11       MR. SCHWARTZ: Same.
12       MS. GOTTLIEB: Foundation.
13       THE WITNESS: At what time are you
14 talking about?
15       Q. BY MR. MOORE: Fair enough.
16       Let's start when you first started,
17 because that's what was in place at the time, right?
18       A. Yes. Sorry. So it's my understanding
19 that if somebody submitted any sort of report or
20 called in, Navex sends an e-mail notification.
21       Q. To Insys?

Page 103

1        A. To employees of Insys, yes.
2        Q. All right. What employees?
3        MS. GOTTLIEB: Form.
4        THE WITNESS: At the time I started at
5 the company, I recall learning that I believe Jenna
6 Grosshans and Frank, I believe, were e-mailed
7 notifications.
8        Q. BY MR. MOORE: Okay. Frank started with
9 the company February 2014?
10       MS. GOTTLIEB: Foundation.
11       THE WITNESS: I think that sounds right.
12 Yes.
13       Q. BY MR. MOORE: Okay. And the e-mails
14 that were sent to those two individuals, did it
15 contain the transcribed complaint?
16       MR. SCHWARTZ: Object to form.
17       MS. GOTTLIEB: Form.
18       THE WITNESS: So I really don't want to
19 speak to what happened before I started because I
20 don't know those specifics on the administrative end.
21       Q. BY MR. MOORE: Did you ever go back when

Page 104

1 you first started to learn whether or not there were
2 complaints that were generated?
3        MS. GOTTLIEB: Form.
4        THE WITNESS: I can't quite recall the
5 first time I logged in. Definitely in 2014, but I'm
6 -- I'm stretching. I'm sorry. I just don't remember
7 the first time I did it.
8        Q. BY MR. MOORE: That's okay. It sounds
9 like there's a place where you can go on and log in
10 and look?
11       A. Yes. So the third party has that housed.
12       Q. And that's something you can access from
13 Insys?
14       MS. GOTTLIEB: Form.
15       THE WITNESS: I wouldn't say you can
16 access it from Insys. You would have to be a
17 designated individual.
18       Q. BY MR. MOORE: Okay. You were one of
19 those individuals?
20       A. Not when I started, no.
21       Q. How long after?

Page 105

1        A. That's what I'm trying to remember. I
2 don't remember when I first logged in. I just can't
3 recall. I'm sorry. I can't recall the month.
4        Q. It's okay.
5        Do you think it would have been 2014?
6        A. It was definitely 2014.
7        Q. Sure. Okay.
8        And when you go on and you log on, what
9 is it that you see?
10       MS. GOTTLIEB: Form.
11       THE WITNESS: So the view that I could
12 see is a -- sort of looks like a -- I guess an Excel
13 spreadsheet, if you will. A bit fancier, but lots of
14 columns and rows. You see case -- case numbers. So
15 there's a column with a case number. And I believe
16 there's a column with a date, and there's a column
17 about status, whether reviewed or not reviewed,
18 closed, open, to that effect.
19       Q. BY MR. MOORE: Does it say who the
20 reviewer was at Insys?
21       MS. GOTTLIEB: Form.

Deposition of Danielle Davis                                    Jeffrey Buchalter v. William Tham, M.D., et al

Page 106

1   THE WITNESS:  No.
2   Q.  BY MR. MOORE:  Does it provide -- how --
3   Do you learn about a description of the complaint or
4   concern?
5   MS. GOTTLIEB:  Object to form.
6   MR. SCHWARTZ:  Form.
7   THE WITNESS:  So I indicated there's a --
8   a column for cases --
9   Q.  BY MR. MOORE:  Sure.
10  A.  -- with the numbers.  And so you click on
11  a number to find out the details of the case.
12  Q.  And to your -- and what are those
13  details?  What's contained in those details?
14  MS. GOTTLIEB:  Form.
15  THE WITNESS:  So it says case details at
16  the top, I believe.  And then there's an opportunity
17  for the reporter to state their name or be anonymous.
18  So that option is there.
19  Q.  BY MR. MOORE:  Okay.
20  A.  And then there's a -- like a paragraph, I
21  guess you would say, that -- that has sort of the

Page 107

1   content of the information that the reporter's
2   submitting.
3   And then I -- I believe there's a
4   question that says, May we contact you directly?
5   And I think there's another -- I know
6   there's another question where the reporter can
7   answer yes or no, and I can't recall the exact
8   verbiage, but to the effect of, does your -- is your
9   supervisor aware or have you talked to your --
10  something like that.  Is your supervisor aware?
11  Q.  Is that same system still in place?
12  A.  We still use Navex.  Like I said, I don't
13  -- I don't have knowledge of, you know, if things
14  look different or appear different in substance, yes,
15  they've gone through some software updates.  It looks
16  a little different.
17  Q.  So, as I understand it, in simple terms
18  like I think, Navex is a third-party administrator
19  who allows employees to -- if they have a concern
20  about something, to, you know, voice their concern,
21  can be anonymously, and then that information is

Page 108

1   provided to Insys to review and decide what kind of
2   course of action, if any, to take?
3   MS. GOTTLIEB:  Form.
4   MR. SCHWARTZ:  Object to form.
5   MS. GOTTLIEB:  Foundation.
6   THE WITNESS:  Yeah.  I might be splitting
7   hairs.
8   Q.  BY MR. MOORE:  Okay.
9   A.  But --
10  Q.  That's okay.
11  A.  -- I want to make sure that, you know,
12  I'm answering it correctly.
13  So it's not Navex that allows an
14  individual to voice a concern.  It's the company that
15  allows via this mechanism.
16  Q.  That's fair.
17  A.  So I want to be clear about that.
18  Q.  That's fine.
19  The company has set that third-party
20  process up?
21  A.  Yes.

Page 109

1   Q.  Okay.
2   A.  As a mechanism --
3   Q.  Sure.
4   A.  -- by which to report.
5   Q.  Okay.
6   A.  So, yes.  And they just administrate it.
7   They don't have, as far as I understand, any
8   decisionmaking abilities or anything like that.
9   Q.  Okay.
10  MR. MOORE:  I'm going to ask for all of
11  the reports that have been generated to Navex be
12  produced from 2012 until 2016.
13  MR. SCHWARTZ:  For your client?
14  MR. MOORE:  No.  Everyone.
15  MR. SCHWARTZ:  Okay.  So same thing,
16  right?  Whatever you want coming out of this
17  deposition, Aaron, just, you know, do what you need
18  to do in a formal process.
19  Q.  BY MR. MOORE:  Would it be true that an
20  employee doesn't necessarily have to use the Navex
21  third-party system, they could go directly, I guess,

Deposition of Danielle Davis                                   Jeffrey Buchalter v. William Tham, M.D., et al

Page 110

1  to a supervisor, to you, somebody else, to voice a
2  concern as well?
3      MR. SCHWARTZ:  Object to form.
4      MS. GOTTLIEB:  Form.
5      THE WITNESS:  Navex is not the sole place
6  for an individual to lodge a complaint or a concern
7  or report.
8      Q.  BY MR. MOORE:  Is that true not only
9  before you started, but also after you started?
10     MS. GOTTLIEB:  Form. Foundation.
11     THE WITNESS:  I can't -- I can't speak
12 specifically to what, you know, happened before I was
13 there.
14     Q.  BY MR. MOORE:  But that's something you
15 had in place as the director after you started?
16     MS. GOTTLIEB:  Form.
17     THE WITNESS:  Correct.  Yes.
18     Q.  BY MR. MOORE:  Okay.  So just to be
19 clear, Navex, they didn't do any type of training of
20 employees?
21     MS. GOTTLIEB:  Form.

Page 111

1      MR. SCHWARTZ:  Form.
2      MS. GOTTLIEB:  Foundation.
3      THE WITNESS:  I can't speak to before I
4  was hired, but not since I've been hired.
5      Q.  BY MR. MOORE:  Did you learn that they
6  were doing anything like that before you were hired?
7      A.  That's not come to my attention, no.
8      Q.  They weren't doing any type of audits?
9      MS. GOTTLIEB:  Form. Foundation.
10     MR. SCHWARTZ:  Object to form.
11     THE WITNESS:  Not that I'm aware of.
12     Q.  BY MR. MOORE:  Not establishing any
13 policies?
14     MR. SCHWARTZ:  Same objections.
15     MS. GOTTLIEB:  Form. Foundation.
16     THE WITNESS:  Are you talking before I
17 was hired, or after I was hired?
18     Q.  BY MR. MOORE:  After.
19     A.  Not after.
20     Q.  And did you learn that they were ever
21 doing that before you were hired?

Page 112

1      A.  No.
2      MR. SCHWARTZ:  Same objection.
3      MS. GOTTLIEB:  Same.
4      Q.  BY MR. MOORE:  We talked earlier about
5  how you were wearing two hats:  One was the director
6  of compliance, and one was when you started helping
7  assist with the litigation investigations, correct?
8      A.  Yes.
9      Q.  The hat that you were wearing with the
10 assisting of the investigations, has that stopped or
11 does it still continue?
12     A.  No, I would say in some instances it has
13 continued.
14     Q.  When has your work with Skadden stopped?
15     A.  I wouldn't --
16     MR. SCHWARTZ:  Object to form.
17     MS. GOTTLIEB:  Yeah.  Form.  Foundation.
18     THE WITNESS:  -- say -- I wouldn't say
19 it's officially stopped.
20     Q.  BY MR. MOORE:  Okay.  You're coming on as
21 the corporate -- you're coming on as the director of

Page 113

1  compliance, and we've talked about how it is that
2  you're -- my term -- kind of building the compliance
3  processes up at Insys.  Okay.
4      And you're simultaneously, it sounds
5  like, learning information through your work with the
6  investigation process?
7      MS. GOTTLIEB:  Form.
8      Q.  BY MR. MOORE:  Right?
9      MR. SCHWARTZ:  Same.
10     THE WITNESS:  Right.
11     Q.  BY MR. MOORE:  Okay.  Are you taking what
12 you learn from the investigation side of things and
13 incorporating it into what you're doing as the
14 director of compliance?
15     MS. GOTTLIEB:  Form.
16     THE WITNESS:  I would think it is fair to
17 say that I was working with a team of experts to
18 assist, in part, building out the compliance program.
19     Q.  BY MR. MOORE:  Who were these team of
20 experts?
21     A.  So we've got the team at Skadden Arps.

Deposition of Danielle Davis                        Jeffrey Buchalter v. William Tham, M.D., et al

Page 114

1    Q. Oh.
2    A. Sorry if that was ...
3    Q. Okay.
4    A. There was a number of them.
5         And then also Steve Celestini who was the
6  recommended pharmaceutical expert. And CIS. I'm
7  spacing on what it stands for. I'm sorry.
8    Q. We're going to talk about CIS. It's
9  okay. I know what you're talking about.
10   A. So, initially, that's all I can think of
11 at -- in this moment.
12   Q. I'm sorry. I didn't ask you this before.
13 When you first started, were you aware of OIG
14 compliance guidances?
15   A. I was familiar with the term "OIG."
16   Q. Okay.
17   A. And compliance, in general, I believe I
18 learned that in my -- in my compliance -- one of my
19 compliance classes.
20   Q. Okay.
21   A. Had heard the term, yeah.

Page 115

1    Q. You heard the term before?
2    A. Yeah.
3    Q. Had you actually reviewed the compliance
4  guidance that OIG had issued at the time?
5         MS. GOTTLIEB: Form.
6    Q. BY MR. MOORE: Actually, it was in place
7  at the time.
8         MS. GOTTLIEB: Form.
9         THE WITNESS: I'm sorry. Can you repeat
10 that question?
11   Q. BY MR. MOORE: Had you actually looked at
12 the OIG compliance guidance that was in effect at the
13 time that you started?
14        MS. GOTTLIEB: Form.
15        THE WITNESS: In effect to Insys or the
16 guidance that the OIG had issued about compliance?
17   Q. BY MR. MOORE: Let's do both. The policy
18 that OIG had enacted?
19        MS. GOTTLIEB: Form.
20        THE WITNESS: So I'm -- I can't recall
21 whether I looked at the -- the OIG guidance about the

Page 116

1  effective compliance program specifically before I
2  started.
3         And, I'm sorry, I don't think I
4  understand your second -- the second part of your
5  question as it relates to the company.
6    Q. BY MR. MOORE: Was the company following
7  that at the time that you started?
8         MS. GOTTLIEB: Form.
9         MR. SCHWARTZ: Object to form.
10        MS. GOTTLIEB: Foundation.
11        THE WITNESS: I guess initially I don't
12 recall making that sort of, at least, initial
13 assessment when I first started.
14   Q. BY MR. MOORE: How about at any point in
15 time after you started?
16        MS. GOTTLIEB: Form.
17        MR. SCHWARTZ: Same.
18        MS. GOTTLIEB: Foundation.
19        THE WITNESS: Well, like I said, when I
20 started, I was part of that legal review, which was
21 reviewing these sorts of things, so I don't know if

Page 117

1  whether what I've learned and making that conclusion,
2  it seems like I'm getting in a -- an area that the
3  company might object to me talking about.
4         MR. SCHWARTZ: To the extent that you can
5  answer it without revealing privileged information,
6  you can answer.
7         MS. GOTTLIEB: Right. And to the extent
8  the information you have is based on privileged
9  communications, then I would instruct you not to
10 answer, if there is stuff outside of that that you
11 think you can't answer.
12        THE WITNESS: I'm just not sure that I
13 can, and I just don't want to open that door.
14        MS. GOTTLIEB: Do we need to go have --
15 so can we talk about it off the record so that we can
16 clarify that so that if there's an area that she can
17 answer without an objection, she would be able to do
18 that.
19        MR. MOORE: Sure.
20        THE VIDEOGRAPHER: Off the record at
21 12:55.

Deposition of Danielle Davis                    Jeffrey Buchalter v. William Tham, M.D., et al

Page 118

1    (A break was taken at 12:55 p.m.)
2    THE VIDEOGRAPHER: Back on the record at
3 1 o'clock.
4    **Q. BY MR. MOORE: So, Ms. Davis, is there a**
5 **way for you to answer my question without violating**
6 **any privilege?**
7    A. So --
8    MS. GOTTLIEB: To the extent that the
9 question called for privileged information, I'm going
10 to instruct you not to answer. It doesn't seem like
11 there's anything else that you would be able to say
12 in response to that as it's phrased, so ...
13    THE WITNESS: All right.
14    MR. MOORE: So, what?
15    MS. GOTTLIEB: So I'm instructing her not
16 to answer.
17    MR. SCHWARTZ: Response calls for
18 privileged information. Instruct not to answer.
19    **Q. BY MR. MOORE: When in your work as the**
20 **director of compliance to your -- did Insys start**
21 **adhering, if ever, to the OIG compliance?**

Page 119

1    MR. SCHWARTZ: Object to form.
2    MS. GOTTLIEB: Form.
3    And -- and to the extent it calls for
4 privileged information, I would instruct you not to
5 answer.
6    THE WITNESS: Yeah. I don't know that I
7 can. I'm just trying to think through in my mind the
8 meetings that I've had and -- and who has been
9 present and the purpose behind it. So I'm trying to
10 be helpful, but I also don't want to waive, you know,
11 company privilege either.
12    **Q. BY MR. MOORE: Well, I mean, you're a --**
13 **you're the director of compliance up until November**
14 **2015. You still are.**
15    A. Yes.
16    **Q. So, you know, as the director of**
17 **compliance, these are things that from a compliance**
18 **perspective, from that standpoint alone, you would**
19 **know. True?**
20    MS. GOTTLIEB: Form.
21    MR. SCHWARTZ: Form.

Page 120

1    THE WITNESS: Well, again, all of this
2 information I'm learning is in connection with a
3 legal review and being done for the purpose of giving
4 the company legal advice.
5    **Q. BY MR. MOORE: But you're also directing**
6 **the compliance programs at Insys?**
7    MS. GOTTLIEB: Form.
8    MR. SCHWARTZ: Form.
9    THE WITNESS: I'm one person that -- that
10 participates in that system, yes.
11    **Q. BY MR. MOORE: Okay. And there's --**
12 **there's no question that I can ask you in terms of**
13 **when Insys started adhering to the Office of**
14 **Inspector General's compliance program guide for**
15 **pharmaceutical manufacturers that doesn't trigger the**
16 **attorney/client privilege?**
17    MS. GOTTLIEB: Form. Foundation.
18    MR. SCHWARTZ: And to the extent you can
19 answer that without revealing privileged information,
20 that's okay. But if it calls for privileged
21 information, then instruct not to answer.

Page 121

1    THE WITNESS: Yeah. I'm not saying you
2 can't ask a question, just, broadly like that, if
3 you've got --
4    **Q. BY MR. MOORE: What month and year did**
5 **Insys --**
6    MS. GOTTLIEB: I'm sorry. She wasn't --
7    Did you finish your sentence?
8    **Q. BY MR. MOORE: What month and year did**
9 **Insys begin following --**
10    THE COURT REPORTER: I'm sorry. Begin
11 following? You're all talking over each other.
12    MS. GOTTLIEB: Yeah. I'm sorry.
13    First of all, I'll object for the record.
14 Please let Ms. Davis finish her answer when she's in
15 the middle of speaking. Thank you.
16    THE WITNESS: I forgot what I was saying.
17    **Q. BY MR. MOORE: The question was, what**
18 **month and year did Insys begin following the OIG**
19 **compliance program guidance for pharmaceutical**
20 **manufacturers?**
21    MS. GOTTLIEB: Form. Foundation.

Page 122

1   MR. SCHWARTZ: And, again, to the extent
2   that that calls for privileged information --
3   THE WITNESS: Maybe I need to ask you
4   some more specific questions. I just don't want to
5   -- can we have one more minute? Do you mind? Is
6   that all right?
7   THE VIDEOGRAPHER: Off the record at
8   1:03.
9   (A break was taken at 1:03 p.m.)
10  THE VIDEOGRAPHER: Back on the record at
11  1:07.
12  MR. MOORE: And?
13  MS. GOTTLIEB: So, to the extent that you
14  can answer whether you have knowledge about the
15  existence or adoption of the OIG policy or guidance
16  at the time -- you know, at or after the time you got
17  there, is there something you can say about that that
18  doesn't call for privileged information?
19  THE WITNESS: Yes. So it's my
20  understanding that at the time I was hired on at
21  Insys, that the company had already adopted that OIG

Page 123

1   guidance.
2   Q. BY MR. MOORE: When?
3   A. I don't know specifically.
4   Q. Was it adopted in 2013?
5   MS. GOTTLIEB: Foundation.
6   MR. SCHWARTZ: Object to form.
7   THE WITNESS: I don't know specifically.
8   Q. BY MR. MOORE: How about the same
9   questions regarding the PhRMA Code of Interactions
10  with Healthcare Providers?
11  MS. GOTTLIEB: Form. Foundation.
12  THE WITNESS: Yes. Similarly, it's my
13  understanding that prior to my hire, the company was
14  striving to adhere to the PhRMA Code -- the PhRMA
15  Code.
16  Q. BY MR. MOORE: When you started with the
17  company, did you learn that -- in your role as the
18  director of compliance, that the company was not
19  adherent to the OIG compliance guidance?
20  MR. SCHWARTZ: Object to form.
21  MS. GOTTLIEB: Form.

Page 124

1   THE WITNESS: Yeah, I think --
2   MS. GOTTLIEB: And to the -- to the
3   extent it calls for privileged information, I would
4   instruct you not to answer.
5   THE WITNESS: Yeah. I don't think I can
6   answer that as asked. I believe it calls for
7   privileged information.
8   Q. BY MR. MOORE: Same question with regard
9   to the PhRMA Code of Interactions with Healthcare
10  Providers?
11  MS. GOTTLIEB: Form.
12  MR. SCHWARTZ: And same instruction
13  regarding privilege.
14  THE WITNESS: Yeah. I think I have to
15  give you the same answer.
16  Q. BY MR. MOORE: As part of the director of
17  compliance, don't you have to, when you start off in
18  that role -- I mean, I would imagine that you've got
19  to start off and kind of look back to see where the
20  company had been to see what you -- what changes need
21  to be implemented. Would that be fair?

Page 125

1   MS. GOTTLIEB: Form.
2   MR. SCHWARTZ: Object to form.
3   THE WITNESS: That's a correct statement,
4   yes.
5   Q. BY MR. MOORE: Okay. So in that role as
6   the director of compliance, you can't answer for me
7   without violating a privilege whether or not there --
8   the company was not adhering to either one of those
9   guidances?
10  MS. GOTTLIEB: Form. Foundation.
11  MR. SCHWARTZ: Same instruction regarding
12  privilege.
13  THE WITNESS: Right. So as I, you know,
14  said a little while back, when I first started, you
15  know, that was what I did. I worked with outside
16  counsel conducting a review and analysis of what had
17  been and what was. So I don't know how -- that was
18  just too tight. I don't know how I could say
19  anything without -- in that respect, without waiving
20  the company's privilege.
21  Q. BY MR. MOORE: When you came on with the

Deposition of Danielle Davis                                    Jeffrey Buchalter v. William Tham, M.D., et al

Page 126

1  company, did you -- as part of your role as the
2  compliance director, did you learn that the company
3  was being investigated for fraud?
4      MS. GOTTLIEB: Form.
5      THE WITNESS: I can't specifically recall
6  the allegations, as I sit here right now, that were
7  in the OIG subpoena. I can't remember specifically
8  at that time when I first started.
9      Q. BY MR. MOORE: Were there concerns
10  over -- To try to refresh your recollection, were
11  there concerns over the speaker program?
12      MS. GOTTLIEB: Form.
13      MR. SCHWARTZ: Object to form.
14      MS. GOTTLIEB: Foundation.
15      And to the extent it calls for privileged
16  information.
17      THE WITNESS: I mean, again, this goes to
18  that review I did when I first started with outside
19  counsel in learning about what had gone on and what
20  was currently in place.
21      Q. BY MR. MOORE: Okay. Well, any time as

Page 127

1  being the director of compliance?
2      MR. SCHWARTZ: Again, to the extent it
3  calls for privileged information, instruct not to
4  answer.
5      MS. GOTTLIEB: And objection as to form.
6      THE WITNESS: He's instructed me not to
7  answer.
8      MR. MOORE: Is that correct?
9      MR. SCHWARTZ: To the extent it calls for
10  privileged information, instruct not to answer.
11      THE WITNESS: Yes. That's my answer.
12      Q. BY MR. MOORE: It's yours that it calls
13  for privileged information?
14      A. Well, with what I'm thinking through in
15  my mind right now, when I first started with the
16  company and learning about everything, that's -- I
17  can't think of a time when I wasn't with -- learning
18  with Frank or Skadden. So at this point, I would
19  have to -- I'd have to say that it's privileged.
20  Company privilege.
21      Q. And as the director of compliance and

Page 128

1  when you were trying to implement programs at Insys,
2  were you trying to implement programs that were
3  addressing past fraud?
4      MR. SCHWARTZ: Object to form.
5      MS. GOTTLIEB: Form.
6      THE WITNESS: Could you be more specific
7  about what you mean when you say "fraud"?
8      Q. BY MR. MOORE: About insurance fraud.
9      MR. SCHWARTZ: Same objection.
10      MS. GOTTLIEB: Same.
11      THE WITNESS: As it relates to speaker
12  programs?
13      Q. BY MR. MOORE: No.
14      A. Sorry. I was starting to think about the
15  question as it related to speaker programs. Could
16  you --
17      Q. Sure.
18      A. -- repeat it?
19      Q. Give me one moment, please.
20      Well, when did you first become aware of
21  a problem within Insys's insurance reimbursement

Page 129

1  center?
2      MS. GOTTLIEB: Form.
3      MR. SCHWARTZ: Object to form.
4      MS. GOTTLIEB: Foundation.
5      THE WITNESS: Could you -- could you be a
6  little bit more specific, I mean, about a problem?
7      Q. BY MR. MOORE: Would you agree with me
8  that between -- starting in 2012 and continuing
9  onward during the time period that you were the
10  director, that Insys was committing insurance fraud
11  out of its insurance reimbursement center?
12      MS. GOTTLIEB: Form.
13      MR. SCHWARTZ: Form.
14      MS. GOTTLIEB: Foundation.
15      THE WITNESS: I would agree that there
16  have been instances brought to light through various
17  legal documents that would, you know, if proven to be
18  true, certainly allege insurance fraud.
19      Q. BY MR. MOORE: The manager of the
20  insurance reimbursement center was Elizabeth
21  Gurrieri?

Deposition of Danielle Davis                    Jeffrey Buchalter v. William Tham, M.D., et al

Page 130

1   A.  Correct.

2   Q.  She's pleaded guilty to that, correct?

3       MS. GOTTLIEB:  Form.

4       MR. SCHWARTZ:  Form.

5       MS. GOTTLIEB:  Foundation.

6       THE WITNESS:  Correct.

7   Q.  BY MR. MOORE:  Have you seen her guilty

8   plea?

9   A.  I can't recall if I've -- I've seen

10  documents involving her.  I just can't recall

11  specifically if that's one of those documents.

12  Q.  Okay.  And starting in 2012, and through

13  the period of time that you were the director of

14  compliance, Insys was engaged in a fraudulent scheme

15  to bribe medical practitioners to prescribe Subsys?

16      MR. SCHWARTZ:  Form.

17      MS. GOTTLIEB:  Form.  Foundation.

18  Q.  BY MR. MOORE:  True?

19      MS. GOTTLIEB:  Form.  Foundation.

20      THE WITNESS:  Like I just answered, I

21  have read the allegations that are out there in those

Page 131

1   public documents, yes.

2   Q.  BY MR. MOORE:  Well, is it true or not

3   true?

4       MS. GOTTLIEB:  Form.

5       MR. SCHWARTZ:  Object to form.

6       MS. GOTTLIEB:  Foundation.

7       THE WITNESS:  Well, I think that -- that

8   issue is before the Department of Justice and the

9   courts to decide.  I don't think it's appropriate for

10  me.

11  Q.  BY MR. MOORE:  Well, I'm asking you as

12  the director of compliance, whether it was true -- is

13  true or not?

14      MR. SCHWARTZ:  Object to form.

15      MS. GOTTLIEB:  Form.  Foundation.

16      THE WITNESS:  Is there a specific

17  instance that you want to discuss?

18  Q.  BY MR. MOORE:  Why don't you just tell me

19  whether it was occurring or not first?  Is my

20  statement true or not true?

21      MS. GOTTLIEB:  Form.

Page 132

1       MR. SCHWARTZ:  Same objection.

2       MS. GOTTLIEB:  Foundation.

3       THE WITNESS:  Well, like I said before,

4   if those allegations were to be proven true in a

5   court of law, then your statement would be correct.

6   Q.  BY MR. MOORE:  Well, I'm asking you,

7   though, as the director of compliance, is my

8   statement true or not true?

9       MS. GOTTLIEB:  Form.  Foundation.

10      THE WITNESS:  I've given my answer.

11      MR. SCHWARTZ:  Asked and answered.

12      And, again, to the extent that it calls

13  for privileged information, I'll instruct you not to

14  answer.

15      THE WITNESS:  I've given my answer.

16  Q.  BY MR. MOORE:  You can't tell me as the

17  director of compliance whether or not Insys, from

18  2012 to 2016, was bribing medical practitioners to

19  prescribe Subsys?

20      MS. GOTTLIEB:  Form.  Foundation.  And to

21  the extent it calls for privileged information.

Page 133

1       MR. SCHWARTZ:  Asked and answered.

2       MS. GOTTLIEB:  Asked and answered.

3       And I would instruct you not to breach

4   privilege.

5       THE WITNESS:  As I said, I've given you

6   my answer.

7   Q.  BY MR. MOORE:  Have you seen where

8   Natalie Levine has pleaded guilty to bribing medical

9   practitioners to prescribe Subsys?

10      MR. SCHWARTZ:  Object to form.

11      MS. GOTTLIEB:  Form.

12      THE WITNESS:  It's my understanding she

13  has pled guilty to that, yes.

14  Q.  BY MR. MOORE:  Okay.  Have you seen where

15  Karen Hill has pleaded guilty to bribing medical

16  practitioners to prescribe Subsys?

17      MR. SCHWARTZ:  Object to form.

18      MS. GOTTLIEB:  Form.

19      THE WITNESS:  I have -- I have seen that

20  document, yes.

21  Q.  BY MR. MOORE:  Okay.  Natalie Levine is

Page 134

1 Michael Babich's wife; is that true?

2 　　　MS. GOTTLIEB: Foundation.

3 　　　THE WITNESS: That is my understanding,

4 yes.

5 　　　Q. BY MR. MOORE: Michael Babich is the

6 former CEO of the company, true?

7 　　　A. Yes.

8 　　　Q. Okay. As part of your direct -- as part

9 of your duties as the director of compliance, did you

10 investigate how it could be that those two

11 individuals pleaded guilty to bribing practitioners?

12 　　　MS. GOTTLIEB: Objection. Form.

13 Foundation.

14 　　　MR. SCHWARTZ: To the extent it calls for

15 privileged information, instruct not to answer.

16 　　　THE WITNESS: Well, I believe any work I

17 have done in connection with that would have been

18 with outside counsel and the direction of the general

19 counsel and would call for privileged information.

20 　　　Q. BY MR. MOORE: Have you seen where

21 healthcare practitioners have pleaded guilty to

Page 135

1 accepting bribes from Insys?

2 　　　MR. SCHWARTZ: Object to form.

3 　　　MS. GOTTLIEB: Form.

4 　　　THE WITNESS: Yes.

5 　　　Q. BY MR. MOORE: And when did you first

6 become aware of that?

7 　　　MS. GOTTLIEB: Form.

8 　　　MR. SCHWARTZ: And, again, to the extent

9 that that -- to the extent that that calls for

10 privileged information, instruct not to answer.

11 　　　THE WITNESS: Sure.

12 　　　Well, what would not be privileged was

13 that I read a news article in, I believe it was June

14 of 2015 about Heather Alfonso, and I think I read --

15 I read that online first.

16 　　　Q. BY MR. MOORE: Troubling?

17 　　　MR. SCHWARTZ: Form.

18 　　　MS. GOTTLIEB: Form.

19 　　　THE WITNESS: I -- I recall at the time

20 of reading it, I was concerned.

21 　　　Q. BY MR. MOORE: And what steps did you

Page 136

1 take at that point in time to address those concerns?

2 　　　A. Sure.

3 　　　So when that information was brought to

4 light, as it related to speaker programs

5 specifically --

6 　　　I don't think this is privileged, but

7 please, stop me if you think I'm getting close to

8 anything.

9 　　　MR. SCHWARTZ: Okay.

10 　　　THE WITNESS: So at that time when that

11 information came to light, I completely, with the

12 assistance of others, overhauled the speaker bureau

13 policy.

14 　　　Q. BY MR. MOORE: What was wrong with it

15 beforehand?

16 　　　MS. GOTTLIEB: Form. Foundation.

17 　　　MR. SCHWARTZ: And, again, to the extent

18 that that calls for privileged information, instruct

19 not to answer.

20 　　　MS. GOTTLIEB: Same.

21 　　　THE WITNESS: So -- Sorry, just give me

Page 137

1 a minute. I'm just trying to find that line in my

2 mind so I can be responsive.

3 　　　Okay. So, you know, maybe I can help

4 draw a box around.

5 　　　So there was an analysis that was done in

6 response to that news about Heather Alfonso. That

7 was done with outside counsel. The contents of that,

8 I believe, would be privileged.

9 　　　However, there were opportunities

10 identified in the -- the SOP, and so I -- I think I

11 could speak to those.

12 　　　So what I remember was, there was an -- a

13 cap on honoraria for speakers, that they could up to

14 X amount in a particular year. But an opportunity to

15 improve upon that would be to, in addition, put caps

16 around the number of programs that they could

17 conduct.

18 　　　So as an example, that would be -- so one

19 of the things we did was put in a monthly, quarterly,

20 and annual cap on how many programs a speaker could

21 give. And in addition to that, as another example,

Deposition of Danielle Davis                                    Jeffrey Buchalter v. William Tham, M.D., et al

Page 138

1   we put in caps around how many programs sales
2   representatives were permitted to conduct.
3       Q.  BY MR. MOORE:  Why did you do that?
4       MR. SCHWARTZ:  To the extent this calls
5   for privileged information, instruct not to answer.
6       MS. GOTTLIEB:  Join.
7       THE WITNESS:  So, like I said, again,
8   when that news came out about Alfonso, we did a
9   review with outside counsel and in-house counsel, the
10  result and conclusions of which are covered by the
11  company's privilege.  However, the measures I've just
12  gone over were examples of additional items that we
13  added to the -- the policy.
14      Q.  BY MR. MOORE:  But why?
15      MR. SCHWARTZ:  Same -- same instruction
16  to the extent that -- that the "why" calls for
17  privileged information, instruct not to answer.
18      MS. GOTTLIEB:  Join.
19      MR. SCHWARTZ:  That advice came from
20  outside counsel or inside counsel, instruct not to
21  answer.

Page 139

1       Q.  BY MR. MOORE:  I'm sorry.  I don't know
2   if -- is the answer, do you believe, privileged?
3       A.  I do, yes.  Sorry if I wasn't clear on
4   that.
5       Q.  I see.
6       When you started with Insys, did you
7   become familiar with the CIS report that was
8   generated in February 2014?
9       A.  Which specific report are you referring
10  to?
11      Q.  Have you seen the report that was
12  generated by the United States Senate called,
13  "Fueling an Epidemic, Insys Therapeutics and its
14  Systemic Manipulation of Prior Authorization"?
15      A.  Yes, I've seen that document.
16      Q.  Disturbing?
17      MR. SCHWARTZ:  Object to form.
18      MS. GOTTLIEB:  Form.
19      THE WITNESS:  There are some concerning
20  elements, yes.
21      MR. MOORE:  We can mark it as an exhibit.

Page 140

1       (Exhibit 3 was marked for identification.)
2       Q.  BY MR. MOORE:  Which I think is 3.  But
3   at the end of this report -- it's the CIS report that
4   I'm referring to, dated February 18th, 2014.
5       MR. SCHWARTZ:  Do you have another copy
6   of that, Aaron?
7       MR. MOORE:  I don't.  I'm sorry.
8       THE WITNESS:  You want to make sure it's
9   the same.
10      MS. GOTTLIEB:  Is it missing a page?  Is
11  --
12      MR. SCHWARTZ:  I think we're missing the
13  last page.
14      MR. MOORE:  Oh, really?
15      MR. SCHWARTZ:  9 of 10.
16      Q.  BY MR. MOORE:  We're missing one page?
17      MS. GOTTLIEB:  At the very back, it stops
18  at 9 of 10.
19      MR. MOORE:  Oh, okay.
20      MS. GOTTLIEB:  Is that --
21      MR. MOORE:  So page 10 and 11, right?  I

Page 141

1   will add page 10, even though I've highlighted it,
2   just to make sure it's complete.  But let's mark this
3   as Exhibit --
4       What number are we on?
5       THE COURT REPORTER:  3.
6       MR. MOORE:  3.
7       Q.  BY MR. MOORE:  Let's talk about the CIS
8   report, and if I get to page 10, I will give you what
9   I have with my highlights.
10      MS. GOTTLIEB:  Well, I mean, I think for
11  purposes of the -- picture that the exhibit is
12  complete, we should have it, and the record should
13  reflect that 10 or anything after 10 if there's
14  anything is not there.
15      Q.  BY MR. MOORE:  Got it?
16      A.  Yes.
17      Q.  Okay.  This was generated on
18  February 18th, 2014.  True?
19      MS. GOTTLIEB:  Form.  Foundation.
20      MR. SCHWARTZ:  Form.
21      THE WITNESS:  I see here that it is dated

Deposition of Danielle Davis                    Jeffrey Buchalter v. William Tham, M.D., et al

**Page 142**

1  February 18th, 2014.
2      Q.  BY MR. MOORE:  Okay.  And at the time
3  that you started at Insys, did you ever read this
4  report?
5      A.  I don't recall seeing this specific
6  document, no.
7      Q.  Have you ever learned about its existence
8  since being the director of compliance?
9      MR. SCHWARTZ:  Form.
10     And, again, if this calls for privileged
11  information, instruct not to answer.
12     MS. GOTTLIEB:  Same.
13     THE WITNESS:  Yeah, I think this -- I
14  think had I learned about it, it would have been with
15  discussions with outside counsel and in-house
16  counsel.
17     Q.  BY MR. MOORE:  It shows gaps in policies,
18  correct?
19     MS. GOTTLIEB:  Form.
20     MR. SCHWARTZ:  Object to form.
21     MS. GOTTLIEB:  Foundation.

**Page 143**

1      THE WITNESS:  I would have to take time
2  to read it if that's all right.  I don't recall
3  seeing this specific document.  So to the extent you
4  want to ask specific questions, I can -- I can do my
5  best, but I don't want to guess because I -- I'm not
6  familiar with this document.
7      Q.  BY MR. MOORE:  You're not familiar with
8  it outside the context of the attorney/client
9  privilege?
10     MS. GOTTLIEB:  Form.
11     Q.  BY MR. MOORE:  Or you've just never seen
12  it before?
13     MR. SCHWARTZ:  Object to form.
14     Q.  BY MR. MOORE:  I'm confused.  I'm sorry.
15     MS. GOTTLIEB:  Look back at the whole
16  thing.
17     THE WITNESS:  Yeah.  I've -- I've seen
18  this and I have read this report.  And when I read
19  the report, I went over this as well.
20     Q.  BY MR. MOORE:  Okay.
21     A.  I see "draft" on it.  But I don't recall

**Page 144**

1  receiving this or being given a copy when I started
2  at Insys.
3      Q.  Okay.  When did you review it?  Did you
4  -- so you received a copy of it after the report came
5  out from Senator McCaskill?
6      A.  Yes.  When this -- Senator McCaskill's --
7      Q.  Okay.
8      A.  -- report came out, yes.
9      Q.  And, to your knowledge, that's the first
10  you'd ever seen that CIS report?
11     A.  Correct.
12     MR. SCHWARTZ:  Object to form.
13     Q.  BY MR. MOORE:  Did you have conversations
14  with anybody about it, despite not seeing it?
15     MR. SCHWARTZ:  Hang on.  Hang on.
16     MS. GOTTLIEB:  I think it -- To the
17  extent it calls for privileged information, you can't
18  say that.  But I think even if it does, you can
19  answer yes or no.
20     MR. SCHWARTZ:  Right.
21     THE WITNESS:  Okay.  That answered the

**Page 145**

1  question I was going to ask.  But could you --
2  Sorry.  Could you ask your question again?  Sorry.
3      Q.  BY MR. MOORE:  Right.  You didn't see it
4  until after Senator McCaskill produced it?
5      A.  Yes.
6      MR. SCHWARTZ:  Object to form.
7      Q.  BY MR. MOORE:  Did you have discussions
8  with anybody about it during your -- between the time
9  that you started and when Senator McCaskill produced
10  it?
11     MS. GOTTLIEB:  Form.
12     MR. SCHWARTZ:  Right.  So you can -- if
13  you can answer that question, did you have
14  discussions -- you can't reveal any discussions that
15  you've had.
16     THE WITNESS:  Right.
17     MR. SCHWARTZ:  But he asked, did you have
18  discussions?
19     THE WITNESS:  So --
20     MR. SCHWARTZ:  I think that's what you
21  said, right?

Deposition of Danielle Davis                    Jeffrey Buchalter v. William Tham, M.D., et al

Page 146

1    MR. MOORE: Let's do a timeout here. I
2  mean, let's leave it to Ms. Gottlieb to instruct
3  Ms. Davis on how to proceed here. Because it's --
4  Ms. Gottlieb's client.
5    MR. SCHWARTZ: Right. But it's Insys's
6  privilege.
7    MS. GOTTLIEB: Right. It's Insys's
8  privilege. And I think I did say that to the extent
9  that -- I don't think answering yes or no would
10  necessarily implicate the privilege, but beyond that,
11  if anything about those communications, if it's
12  privileged, I would instruct you not to answer that.
13    THE WITNESS: Okay.
14    MS. GOTTLIEB: And if you have something
15  that's unclear to clarify, do we need to have a
16  discussion about that?
17    THE WITNESS: Just quickly, yes. Yeah.
18  Because I want to make sure I'm, you know, answering
19  to the best of my abilities, but I do want to check
20  with you on one thing first if that's --
21    MS. GOTTLIEB: All right.

Page 147

1    THE VIDEOGRAPHER: Is that okay?
2    Off the record at 1:35.
3    (A break was taken at 1:35 p.m.)
4    THE VIDEOGRAPHER: Back on the record at
5  1:41.
6    Q.  BY MR. MOORE:  So what have we come up
7  with?
8    A.  First of all, would it be possible to
9  read back the question just to be sure?
10    MR. MOORE: Sure.
11    (The record was read back, as requested.)
12    THE WITNESS: Okay. So I was aware that
13  CIS did a report. I can't be sure if my discussions
14  I had with Frank and Skadden were about this
15  particular document at the time because I'm just
16  seeing it recently now.
17    Q.  BY MR. MOORE:  All right.
18    Let's put aside your conversations with
19  Skadden. Okay. You become the compliance director.
20  Did you go and speak with Dr. Kapoor about it?
21    A.  About Senator McCaskill's?

Page 148

1    Q.  About the CIS report.
2    MS. GOTTLIEB: Form. Foundation.
3    MR. SCHWARTZ: Form.
4    Q.  BY MR. MOORE:  And any information you
5  may have learned?
6    MS. GOTTLIEB: Form. Foundation.
7    MR. SCHWARTZ: Yeah. Objection to form.
8    THE WITNESS: This -- this report
9  specifically?
10    Q.  BY MR. MOORE:  No.  The CI- -- yeah.
11  That specific CIS report.
12    A.  Well, as I've just said, I've only just
13  seen this recently, like, when it just came out.
14    Q.  I understand you just saw it.  But you
15  had discussions about it?
16    MR. SCHWARTZ: Object to form.
17    MS. GOTTLIEB: Form.
18    Q.  BY MR. MOORE:  Right?
19    A.  Yes.
20    Q.  Did those discussions take place around
21  the time that you were hired in 2014?

Page 149

1    MR. SCHWARTZ: Same objection.
2    MS. GOTTLIEB: Same.
3    THE WITNESS: To the best of my
4  recollection, I remember discussions around the
5  report. Yes, I believe it was 2014.
6    Q.  BY MR. MOORE:  Okay.  Did you ever go to
7  Dr. Kapoor specifically and say, Dr. Kapoor, or have
8  any discussions with Dr. Kapoor about it?
9    MS. GOTTLIEB: Form.
10    MR. SCHWARTZ: Form.
11    MS. GOTTLIEB: Foundation.
12    THE WITNESS: Not that I recall
13  specifically.
14    Q.  BY MR. MOORE:  How about Michael Babich?
15    MR. SCHWARTZ: Same. Form.
16    MS. GOTTLIEB: Form.
17    And I don't know whether it applies or
18  not, but to the extent it calls for a privileged
19  information, you can indicate that or not answer.
20    THE WITNESS: I really don't recall. I
21  mean, it was done -- the whole exercise took place

Deposition of Danielle Davis                    Jeffrey Buchalter v. William Tham, M.D., et al

Page 150

1  before I even joined the company.
2     Q.   BY MR. MOORE:  I agree.  And I'm just
3  wondering if you had discussions with Dr. -- with
4  Michael Babich about it.
5        MR. SCHWARTZ:  Object to form.
6        MS. GOTTLIEB:  Same.
7        THE WITNESS:  Not that I can specifically
8  recall.  No.
9     Q.   BY MR. MOORE:  How about any of the
10  executives who were facing criminal charges?
11       MR. SCHWARTZ:  Form.
12       MS. GOTTLIEB:  Form.  Foundation.
13       THE WITNESS:  Again, I'm sorry.  I'm just
14  trying to -- I don't know that I recall specifically
15  discussing this report with the executives that you
16  referenced in that document in the indictment.
17    Q.   BY MR. MOORE:  So if we set the stage
18  here a little bit, you're coming on in March 2014,
19  and Insys is under investigation.  True?
20    A.   True.
21    Q.   Okay.  And they're bringing you on

Page 151

1  because they need a compliance director.  True?
2        MS. GOTTLIEB:  Form.
3        MR. SCHWARTZ:  Form.
4        THE WITNESS:  Yes.
5     Q.   BY MR. MOORE:  Okay.  And there's been --
6  there's been reports of wrongdoing?
7        MR. SCHWARTZ:  Object to form.
8        MS. GOTTLIEB:  Form.  Foundation.
9        THE WITNESS:  Reports of wrongdoing.
10  You're referencing the OIG subpoena?
11    Q.   BY MR. MOORE:  Sure.
12    A.   Correct.  Yes.
13    Q.   Actually, more than that, though.
14        Were you familiar with Ray Furchak's
15  complaint?
16    A.   Not at the time, no.
17    Q.   When did you learn about Mr. Furchak's
18  complaint?
19    A.   It was much later on.
20    Q.   What does "much later on" mean?
21    A.   I think it was in 2015 at some point.

Page 152

1     Q.   Okay.  Do you know the relationship
2  between Dr. Kapoor and Leslie Zacks?
3     A.   No.
4     Q.   This report gets generated, in part, I
5  think, because of the concerns that came up, right,
6  and the company decides, let's do an audit?
7        MR. SCHWARTZ:  Object to form.
8        MS. GOTTLIEB:  Form.  Foundation.
9        THE WITNESS:  I wasn't at the company at
10  that time.  I can't -- it says, "In mid-2013, CIS was
11  approached by Insys's legal representative, at the
12  time, Leslie Zacks, on behalf of the board of
13  directors for Insys to request that CIS support and
14  review certain communications with healthcare
15  professionals and Insys's employees and report how
16  they were being documented."
17    Q.   BY MR. MOORE:  Okay.  And Leslie Zacks,
18  at the time, was the general counsel and chief
19  compliance officer at Arbor Pharmaceuticals.  Did you
20  know that?
21        MS. GOTTLIEB:  Foundation.

Page 153

1        THE WITNESS:  I don't -- I don't think
2  so, no.
3        MR. MOORE:  Okay.  Why don't we mark
4  that, whatever number it is.
5        MR. SCHWARTZ:  What is that?
6        THE COURT REPORTER:  Hang on just a
7  second.
8        MR. MOORE:  It's a press release from
9  February 2012 where Arbor Pharmaceuticals is
10  announcing Leslie Zacks as the general counsel and
11  chief compliance officer.
12        (Exhibit 4 was marked for identification.)
13        MR. SCHWARTZ:  Is that the only copy?
14        MR. MOORE:  That's the only one I've got.
15  It's even highlighted.  Go ahead.
16        MS. GOTTLIEB:  Okay.
17        MR. SCHWARTZ:  You just printed this off
18  from the Internet?  Is that it?
19        MR. MOORE:  Yes.
20    Q.   BY MR. MOORE:  Does it least appear to
21  you to be what I've highlighted there, true what I

Deposition of Danielle Davis                            Jeffrey Buchalter v. William Tham, M.D., et al

Page 154

1   say?
2          MR. SCHWARTZ:  Form.
3          MS. GOTTLIEB:  First, take your time to
4   read it.
5          Objection.  Form.  Foundation.
6          THE WITNESS:  I think you made a
7   statement that Leslie had joined Arbor
8   Pharmaceuticals as general counsel and chief
9   compliance officer, and that's what's written on the
10  document.
11         Q.  BY MR. MOORE:  That's all I'm asking.
12         A.  Okay.
13         Q.  Okay.
14         A.  Sorry.  I was trying to remember.
15         Q.  You haven't learned the relationship
16  between Kapoor and Leslie Zacks at any time?
17         A.  No.  I don't know.
18         Q.  And -- Okay.  And this report, the CIS
19  report that got generated in February 2014, it also
20  got turned over to those who were investigating
21  Insys.  True?

Page 155

1          MS. GOTTLIEB:  Form.  Foundation.
2          THE WITNESS:  I don't know.
3          MR. SCHWARTZ:  Form.
4          Q.  BY MR. MOORE:  Well, it certainly at
5   least got turned over to Senator McCaskill.  True?
6   It appears that way?
7          A.  It appears she has a copy, yes.
8          Q.  Okay.  And this report never once
9   discusses fraud; is that true?
10         A.  Like I've said --
11         MS. GOTTLIEB:  Foundation.
12         THE WITNESS:  -- I would have to read
13  through it.  I don't know.
14         Q.  BY MR. MOORE:  I'll represent to you that
15  that report never once references any type of
16  fraudulent conduct, but, rather, it only talks about
17  compliance gaps that existed at the time that report
18  was generated?
19         MR. SCHWARTZ:  Form.
20         MS. GOTTLIEB:  Same.
21         Q.  BY MR. MOORE:  You're aware that it at

Page 156

1   least talks about compliance gaps, correct?
2          MR. SCHWARTZ:  Objection.
3          MS. GOTTLIEB:  Form.  Foundation.  If
4   you're asking her to read it as she sits here, she
5   can do that.
6          THE WITNESS:  I thought I saw something.
7   Okay.  Would you mind repeating your question again?
8          Q.  BY MR. MOORE:  Maybe I missed it.  I
9   don't recall ever seeing any -- any discussions about
10  potential -- of fraud in that document, but maybe I
11  missed it.
12         A.  I didn't just review the document for
13  fraud.  I apologize.  I thought you said something
14  about compliance.
15         Q.  I did.  You're right.
16         A.  Okay.
17         Q.  I think I asked a follow-up about the --
18  that it's reflecting various gaps in compliance
19  policies?
20         MS. GOTTLIEB:  Form.
21         MR. SCHWARTZ:  Same objection.

Page 157

1          MS. GOTTLIEB:  Foundation.
2          THE WITNESS:  Look, I'm just glancing
3   over it.  But it does appear to say that, in part,
4   that there's no formal and approved policy,
5   et cetera.
6          Q.  BY MR. MOORE:  Turn to page 3 of 10 for
7   me.
8          A.  Okay.
9          Q.  The very last paragraph starting with HCP
10  and IRC Scope.
11         Do you see that?
12         A.  Yes.
13         Q.  Okay.  The first sentence states, in
14  part, that at the request of Insys's board of
15  directors, which Dr. Kapoor was part of at the time,
16  correct?
17         MS. GOTTLIEB:  Form.
18         MR. SCHWARTZ:  Form.
19         THE WITNESS:  I believe so, yes.
20         Q.  BY MR. MOORE:  And in conjunction with
21  the CIS team, narrowed the scope of the engagement,

Deposition of Danielle Davis                                    Jeffrey Buchalter v. William Tham, M.D., et al

Page 158

1  correct?
2        MS. GOTTLIEB: Form.
3        MR. SCHWARTZ: Form.
4        MS. GOTTLIEB: Foundation.
5        THE WITNESS: That is what it reads here,
6  correct.
7        Q.  BY MR. MOORE: Okay.  And on the next
8  page, it outlines on page 4 that there were employee
9  interviews at the very bottom.
10       Do you see that?
11  A.  Yep.
12  Q.  Okay.  Leslie Zacks, correct?
13  A.  Yes.
14  Q.  Identified as legal, correct?
15  A.  Yes.
16  Q.  Mike Gurry was interviewed.  Right?
17  A.  Yes.
18  Q.  Mike Gurry is facing criminal charges?
19       MS. GOTTLIEB: Form.
20       THE WITNESS: I believe so, yes.
21  Q.  BY MR. MOORE:  Liz Gurrieri was

Page 159

1  interviewed?
2  A.  Yes, I see that.
3  Q.  Liz Gurrieri has pleaded guilty to
4  engaging in insurance fraud?
5        MR. SCHWARTZ: Object to form.
6        MS. GOTTLIEB: Same.
7        THE WITNESS: That's my understanding,
8  yes.
9        Q.  BY MR. MOORE: Okay.  So part of the
10  people that were interviewed are individuals who have
11  either pleaded guilty or are facing criminal charges?
12       MS. GOTTLIEB: Foundation.
13       THE WITNESS: Two individuals you listed,
14  yes.
15       Q.  BY MR. MOORE: And the document also
16  references that, in terms of the documents that were
17  produced to CIS, that they were documents provided by
18  Insys.  So if you turn to page 5, for example, under
19  "Fieldwork and General Observations" --
20  A.  Okay.
21  Q.  -- first bullet point, for instance, it

Page 160

1  says, "CIS collected and reviewed various documents
2  provided by Insys," correct?
3        MS. GOTTLIEB: Form.
4        MR. SCHWARTZ: Form.
5        THE WITNESS: It does state that.
6        MS. GOTTLIEB: Foundation.
7        THE WITNESS: Yes.
8        Q.  BY MR. MOORE:  Right.
9        Section -- Roman numeral II, for
10  instance.  Insys provided call notes, correct?
11       MS. GOTTLIEB: Form. Foundation.
12       THE WITNESS: It says, "Insys provided
13  CIS with one year worth of call notes."
14  Q.  BY MR. MOORE:  Right.  Right.
15       It also states that Insys also provided
16  CIS with one year worth of corporate e-mail data?
17       MS. GOTTLIEB: Form. Foundation.
18  Q.  BY MR. MOORE:  It goes on, but --
19       MS. GOTTLIEB: Form. Foundation.
20  Q.  BY MR. MOORE:  -- my point is, it's
21  reflecting that Insys is the one producing the

Page 161

1  documents as part of this audit?
2        MS. GOTTLIEB: Form. Foundation.
3  Objection.
4        THE WITNESS: It does state -- I would
5  agree with you -- that Insys made the provisions.
6        Q.  BY MR. MOORE:  Same thing with Roman
7  numeral III?
8        MS. GOTTLIEB: Form and foundation.
9        Q.  BY MR. MOORE:  True?
10  A.  Oh, I'm sorry.
11       MS. GOTTLIEB: Form. Foundation.
12       THE WITNESS: I didn't realize there was
13  a question.
14       Q.  BY MR. MOORE:  I think I said something
15  like Roman numeral IV even says it or III?
16  A.  That Insys provided CIS?
17  Q.  Right.
18  A.  Sorry.  I didn't realize there was a
19  question there.
20  Q.  That's okay.
21       I'll represent to you that it states that

Deposition of Danielle Davis                                    Jeffrey Buchalter v. William Tham, M.D., et al

Page 162

1   throughout this document.
2        MS. GOTTLIEB: Form and foundation.
3        MR. SCHWARTZ: There's no question.
4        MS. GOTTLIEB: There's no question.
5        MR. SCHWARTZ: Let him ask a question.
6        Q.  BY MR. MOORE:  Have you come to learn
7   that this was a — this was a -- this CIS report was
8   an absolute sham?
9        MR. SCHWARTZ: Objection.
10       MS. GOTTLIEB: Form.
11       MR. SCHWARTZ: Form.
12       MS. GOTTLIEB: Foundation.
13       THE WITNESS: I don't recall coming to
14  that conclusion.
15       Q.  BY MR. MOORE:  Would you agree that it
16  would be detrimental for Insys to have had a report
17  generated reflecting in 2014 that it was engaging in
18  fraudulent conduct?
19       MR. SCHWARTZ: Object to form.
20       MS. GOTTLIEB: Form. Foundation.
21       THE WITNESS: I don't want to speculate.

Page 163

1   This was before my time.  I don't know if a report
2   would be detrimental.  It's my understanding that
3   this sort of report was done to see where gaps or
4   holes were so you could get better.
5        Q.  BY MR. MOORE:  What could be helpful for
6   Insys is if this document was turned over to the
7   federal government and part of the federal
8   government's investigation to suggest that we've
9   looked into this and we've concluded no impropriety,
10  but rather we had some gaps in compliance and now
11  we're fixing it.
12       MS. GOTTLIEB: Form. Foundation.
13       MR. SCHWARTZ: There's no question.
14       MS. GOTTLIEB: It's not a question.
15       Q.  BY MR. MOORE:  Would that be helpful to
16  Insys in that sense?
17       MS. GOTTLIEB: Form.
18       MR. SCHWARTZ: Object to form.
19       MS. GOTTLIEB: Foundation.
20       THE WITNESS: I'm sorry.  What was the
21  question?

Page 164

1        Q.  BY MR. MOORE:  Would it be helpful to
2   Insys to have produced a document that would have
3   been produced to the federal government as part of
4   the federal government's investigations reflecting
5   policy gaps versus fraudulent conduct?
6        MR. SCHWARTZ: Object to form.
7        MS. GOTTLIEB: Form and foundation.
8        THE WITNESS: Yeah.  I don't know that
9   I'm in a position to -- to speak to what their
10  opinion was on what would be or what wouldn't be
11  helpful at that point in time.
12       Q.  BY MR. MOORE:  So this document gets
13  generated in February 2014 reflecting policy gaps,
14  and at the same time you were brought in to be the
15  director of compliance?
16       MR. SCHWARTZ: Form.
17       MS. GOTTLIEB: Form.
18       THE WITNESS: Like I said, I see that
19  this was dated February 18th, 2014, and I was hired
20  March 31st of 2014.  All these gaps.
21       MS. GOTTLIEB: It's ...

Page 165

1        Q.  BY MR. MOORE:  Did anyone charge you with
2   correcting those gaps?
3        MR. SCHWARTZ: Object to form.
4        MS. GOTTLIEB: Form. Foundation.
5        THE WITNESS: Like I said, I've -- I did
6   not see this actual report.
7        Q.  BY MR. MOORE:  Sure.  I understand.
8        But did you take any steps as the
9   director of compliance to fill in and correct the
10  gaps that were identified in that report?
11       MS. GOTTLIEB: Form. Foundation.
12       MR. SCHWARTZ: To the extent that calls
13  for privileged information, instruct not to answer.
14       MS. GOTTLIEB: Same.
15       THE WITNESS: So -- And, like I said,
16  when I started I was doing a review with Skadden on
17  different departments.  And while I can't speak to
18  those communications, I will say that in an effort to
19  build out the compliance program, policies,
20  procedures, and guardrails were either enhanced or
21  implemented.

Deposition of Danielle Davis                                    Jeffrey Buchalter v. William Tham, M.D., et al

Page 166

1    Q.   BY MR. MOORE:  The document on page 4
2    under the "Document Interview and Live Monitoring
3    Scope" references an "Insys Salesforce 360 Platform
4    Call Note Repository."
5        A.   Sorry.  Where did you say you see that?
6        Q.   On page 4.
7            Do you see that?
8        A.   At the top?
9        Q.   Yeah.
10       A.   Yes.  Yes, I see that.
11       Q.   Are you familiar with that repository?
12       A.   Yes, I'm aware of Salesforce 360.  Yes.
13       Q.   Okay.  And Salesforce 360, does it
14   contain call notes from sales representatives and the
15   healthcare providers that they're calling on?
16           MS. GOTTLIEB:  Form.
17           THE WITNESS:  That's my understanding,
18   yes.
19       Q.   BY MR. MOORE:  Okay.  And does the --
20   does that platform -- is it electronic?
21       A.   Yes.

Page 167

1        Q.   Okay.  And there's options that are
2    created as part of that electronic platform for sales
3    reps to choose, for lack of a better term, select,
4    right?
5            MS. GOTTLIEB:  Form.  Foundation.
6            THE WITNESS:  Like, what specifically do
7    you mean?
8            MR. SCHWARTZ:  Form.
9        Q.   BY MR. MOORE:  I don't know because I've
10   never seen it.  But my understanding is that if they
11   go and they visit a healthcare provider, they could
12   just click on something in there to reflect something
13   about the visit?
14           MS. GOTTLIEB:  Form.
15           MR. SCHWARTZ:  Form.
16           THE WITNESS:  Click on something?  I
17   mean, is there a specific question there?
18       Q.   BY MR. MOORE:  My understanding is there,
19   like, you know, if you go to a particular topic,
20   there's a drop down -- drop down box or a menu box
21   that can be selected for that sales representative to

Page 168

1    choose and click on?
2            MR. SCHWARTZ:  Form.
3            MS. GOTTLIEB:  Form.
4            THE WITNESS:  I'm generally -- generally
5    familiar with click down options.
6        Q.   BY MR. MOORE:  Yeah.  Me too.
7        A.   Yes.
8        Q.   Is that right?
9        A.   Yes, I have -- I am aware that there's
10   click down options.
11       Q.   Okay.  And does it provide a -- the rep
12   anywhere with the opportunity to actually type out
13   freehand anything about their interactions with the
14   provider?
15           MS. GOTTLIEB:  Form.  Foundation.
16           THE WITNESS:  I don't recall specifically
17   if it does.  I'm not sure.
18       Q.   BY MR. MOORE:  Okay.  If I wanted to know
19   that, how would I figure that out?
20           MS. GOTTLIEB:  Form.
21           THE WITNESS:  I guess you would have to

Page 169

1    ask the right people.
2        Q.   BY MR. MOORE:  Do you know who those
3    right people might be?
4        A.   The sales operations group.
5        Q.   Okay.  Who heads that up?
6        A.   He's new, and I -- I -- I know what
7    people call him, but I don't know how to pronounce
8    his full name.  But people call him Krishna.
9        Q.   Okay.
10       A.   And that is short for a very long name
11   that I'm not going to attempt to butcher.
12       Q.   All right.  Have you seen statements that
13   have been put out by your CEO recently about the
14   conduct of Insys's former employees?
15           MS. GOTTLIEB:  Form.
16           THE WITNESS:  I think I'm generally
17   familiar with the currency of the statement that was
18   released.
19       Q.   BY MR. MOORE:  Are you talking about the
20   one that was released in connection with Senator
21   McCaskill's statement -- or, I'm sorry --

Deposition of Danielle Davis                                    Jeffrey Buchalter v. William Tham, M.D., et al

Page 170

1  investigation?
2      A.  I think so.  I think we're talking about
3  the same thing.
4      Q.  Your current CEO states in a letter that
5  was drafted to Senator McCaskill dated September 1,
6  2017, quote, "Like you and your staff, I was
7  concerned about certain mistakes and unacceptable
8  actions of former Insys employees that have been
9  disclosed and discussed in public forums over the
10  past several years."
11      Do you remember reading that?
12      A.  It sounds familiar, yes.
13      Q.  Okay.  As the director of compliance,
14  what mistakes and unacceptable actions is your CEO
15  referring to?
16      MR. SCHWARTZ:  Object to form.
17      MS. GOTTLIEB:  Form.
18      MR. SCHWARTZ:  To the extent this
19  calls --
20      MS. GOTTLIEB:  Foundation.
21      MR. SCHWARTZ:  -- for privileged

Page 171

1  information, instruct not to answer.
2      MS. GOTTLIEB:  Join.
3      THE WITNESS:  To be fair, I don't know.
4  I've not spoken directly to Saeed about this.  I
5  figured I report up into -- into Sanga, so I don't
6  communicate directly.
7      Q.  BY MR. MOORE:  Well, have you formed your
8  own opinions as the director of compliance that
9  former employees made certain mistakes and
10  unacceptable actions?
11      MR. SCHWARTZ:  Object to form.  To the
12  extent it calls for privileged information or based
13  on privileged information, instruct not to answer.
14      MS. GOTTLIEB:  Join.
15      THE WITNESS:  So not factoring in
16  privileged information that I've learned in my role,
17  what I've read in the documents that have come to
18  light that are available publicly, now I have formed
19  an opinion that, you know, should those allegations
20  be true, then, yes, that would be concerning
21  behavior.

Page 172

1      Q.  BY MR. MOORE:  Well, your CEO doesn't
2  state that should they be proven to be true, does he?
3      MR. SCHWARTZ:  Object to form.
4      Q.  BY MR. MOORE:  He states, point blank,
5  there were mistakes and unacceptable actions; is that
6  fair?
7      A.  I believe that's what you're reading from
8  his statement.
9      Q.  I am.  That's right.
10      A.  Yeah.
11      Q.  And did you come to the same conclusion
12  as the director of compliance?
13      MR. SCHWARTZ:  Object to form.
14      MS. GOTTLIEB:  Form.  Foundation.
15      THE WITNESS:  I am the director of
16  compliance.
17      Q.  BY MR. MOORE:  I know.
18      A.  You said --
19      Q.  Did you form the same conclusion, as the
20  director of compliance for Insys Therapeutics, that
21  there were, quote, "mistakes and unacceptable actions

Page 173

1  of former Insys employees"?
2      MR. SCHWARTZ:  Object to form.  To the
3  extent it calls or is based on privileged
4  information, instruct not to answer.
5      THE WITNESS:  It's my understanding --
6  Saeed's probably in his capacity as CEO has more
7  information available to him to make that statement.
8  I feel like I've given my answer on it.
9      Q.  BY MR. MOORE:  Don't you, as the director
10  of compliance, need to know?  I mean, these
11  individuals are gone now.  Michael Babich has left.
12      A.  Yes.
13      Q.  Alec --
14      THE COURT REPORTER:  Who?  I'm sorry.
15      Q.  BY MR. MOORE:  Alec Burlakoff, right, and
16  on down the line, they've left, correct?
17      A.  They are no longer at the company.
18      Q.  So don't you need -- don't you need as
19  the -- as the director of compliance, to figure out
20  whether or not when they were still there they were
21  engaging in fraudulent conduct so that you could take

Deposition of Danielle Davis                              Jeffrey Buchalter v. William Tham, M.D., et al

Page 174

1  appropriate conduct -- you and others?
2        MS. GOTTLIEB: Form.
3        MR. SCHWARTZ: Object.
4        MS. GOTTLIEB: Foundation.
5        MR. SCHWARTZ: Object to form.
6        THE WITNESS: I mean, like I've said,
7  right now, and when I learned of that indictment, I,
8  you know, technically am midlevel compliance person
9  now. I've got Sanga reporting above me. So I assume
10 normal course of business, he's working through on
11 those high-level issues with counsel. And then, like
12 you said, they're no longer at the company.
13       Q. BY MR. MOORE: Right.
14       Just, factually speaking, factually
15 speaking, did these individuals lead a nationwide
16 scheme to bribe medical practitioners?
17       MR. SCHWARTZ: Form.
18       MS. GOTTLIEB: Foundation.
19       MR. SCHWARTZ: Form.
20       MS. GOTTLIEB: And to the extent that
21 calls for privileged information, I would instruct

Page 175

1  you not to answer that.
2        THE WITNESS: So, again, I'm again trying
3  to go through the process of separating information
4  in my mind. And I think, you know, I've answered
5  this previously by saying, you know, I've read the
6  documents. I'm aware of the information that's come
7  to light. And, you know, on their face, they're
8  troubling, and should they be proven to be true, are
9  concerning.
10       Q. BY MR. MOORE: Well, have you conducted
11 your own analysis of whether or not it is true?
12       MR. SCHWARTZ: Form.
13       MS. GOTTLIEB: Form.
14       MR. SCHWARTZ: Form. To the extent it
15 calls for -- to the extent that it calls for --
16       THE COURT REPORTER: Okay. Wait. Wait.
17 Wait.
18       MR. SCHWARTZ: To the extent that it
19 calls for or is based on privileged information,
20 instruct not to answer.
21       THE WITNESS: Right. Not in a vacuum by

Page 176

1  myself, no.
2        Q. BY MR. MOORE: Are you able to tell me if
3  it's -- if factually it's true, when it started and
4  when it ended?
5        MR. SCHWARTZ: Object to form.
6        THE WITNESS: When what?
7        Q. BY MR. MOORE: The bribe scheme.
8        MS. GOTTLIEB: Hold on. Form.
9  Foundation.
10       And to the extent it calls for privileged
11 information, I would instruct you not to answer.
12       MR. SCHWARTZ: Join. If that's the case.
13       THE WITNESS: Yeah. I don't believe I
14 would be able to answer that. I don't know.
15       Q. BY MR. MOORE: Are you able to tell me
16 when the insurance fraud started and when the
17 insurance fraud ended within the insurance
18 reimbursement center?
19       MS. GOTTLIEB: Same objections.
20       MR. SCHWARTZ: Join.
21       THE WITNESS: I can't say specifically,

Page 177

1  no.
2        Q. BY MR. MOORE: In your role as the
3  compliance director for Insys Therapeutics, can you
4  look in the camera and say, I have been able to rule
5  out definitively that Insys was not engaging in a
6  nationwide bribe -- nationwide scheme to bribe
7  medical practitioners to bribe -- to prescribe
8  Subsys?
9        MS. GOTTLIEB: Form. Foundation.
10       And to the extent it calls for privileged
11 information, I would instruct you not to answer. You
12 can say whether or not it calls for privileged
13 information.
14       THE WITNESS: Yeah. I believe that would
15 call for privileged information.
16       Q. BY MR. MOORE: I want to know what you
17 have determined in your role as the director of
18 compliance. Let me separate that out.
19       MR. SCHWARTZ: Same objections.
20       THE WITNESS: I don't believe I can
21 separate that out because the reviews, as I've said,

Deposition of Danielle Davis                                    Jeffrey Buchalter v. William Tham, M.D., et al

Page 178

1 took place in connection with outside counsel at the
2 direction of in-house counsel, and since November
3 2015, you know, the chief compliance officer.
4     Q.  BY MR. MOORE:  You haven't divorced
5 yourself from that process, have you?
6     MS. GOTTLIEB:  Form.
7     MR. SCHWARTZ:  Same.
8     THE WITNESS:  Divorced myself from -- I'm
9 sorry -- what process?  I don't think I follow.
10 Sorry.
11     Q.  BY MR. MOORE:  In November 2015, when
12 Mr. Emmanuel came on, were any of the executives who
13 have been indicted still employed with the company?
14     MS. GOTTLIEB:  Form.
15     THE WITNESS:  I can't recall when Mike
16 Gurry left Insys.  He may have still been there when
17 Sanga was on-boarded.
18     Q.  BY MR. MOORE:  Okay.  Did Insys classify
19 doctors into deciles?
20     MS. GOTTLIEB:  Form.
21     THE WITNESS:  Deciles?  I recall hearing

Page 179

1 that term, yes.
2     Q.  BY MR. MOORE:  You've actually sent out
3 e-mails stating — Do you remember drafting e-mails
4 and circulating to the sales force about the use of
5 deciles?
6     A.  I don't recall, no.
7     Q.  In terms of your role as the compliance
8 director, was it appropriate for Insys to be
9 classifying doctors into deciles?
10     MR. SCHWARTZ:  Object to form.
11     MS. GOTTLIEB:  Form.
12     THE WITNESS:  I think there would be
13 instances when there would be -- yeah, it would be
14 appropriate.
15     Q.  BY MR. MOORE:  Was Insys using the decile
16 system inappropriately?
17     MR. SCHWARTZ:  Object to form.
18     MS. GOTTLIEB:  Form.  Foundation.
19     And to the extent it calls for privileged
20 information, you can indicate that, and I would
21 instruct you not to answer.

Page 180

1     THE WITNESS:  Yeah.  I believe any
2 learning about that would have been done under
3 privilege.  But I can say that I'm familiar with the
4 decile system, yes.
5     Q.  BY MR. MOORE:  Wasn't the --
6     MS. GOTTLIEB:  And if you could keep your
7 voice up a little.  I'm having a hard time hearing.
8     THE WITNESS:  Sorry.
9     Q.  BY MR. MOORE:  Was Insys using area
10 business liaisons and business relationship
11 managers -- business relations managers as a form of
12 kickbacks for providers?
13     MR. SCHWARTZ:  Object to form.
14     To the extent you can answer without
15 implicating any privileged information or based on
16 any privileged information.
17     MS. GOTTLIEB:  Same.
18     THE WITNESS:  That position was formed
19 before I started at the company.  And after a legal
20 review was performed, I believe -- the role did
21 change after that.

Page 181

1     Q.  BY MR. MOORE:  Because it was being used
2 as a kickback?
3     MR. SCHWARTZ:  Object to form.
4     MS. GOTTLIEB:  Excuse me.  Form.
5     And to the extent it calls for privileged
6 information, I would instruct you not to answer that.
7 And you can indicate if it calls for it or not.
8     THE WITNESS:  Right.
9     I do believe that part would call from
10 privileged information from what I learned.
11     Q.  BY MR. MOORE:  Okay.  And when did that
12 -- when did the policy change in terms of the AVLs
13 and BRMs?
14     A.  I believe around -- It was definitely
15 2014, approximately June.
16     Q.  If I ask you why it changed, that would
17 trigger an attorney/client privilege?
18     MR. SCHWARTZ:  And instruct not to
19 answer.
20     MS. GOTTLIEB:  Same.
21     THE WITNESS:  I believe it would, yes.

Deposition of Danielle Davis                    Jeffrey Buchalter v. William Tham, M.D., et al

Page 182

1    Q.  BY MR. MOORE:  Okay.  Was Insys promoting
2    Subsys off-label?
3         MS. GOTTLIEB: Form.
4         MR. SCHWARTZ: Object to form.
5         MS. GOTTLIEB: Foundation.
6         And to the extent it calls for privileged
7    information, you can indicate that, but I would
8    instruct you not to answer.
9         THE WITNESS: And I definitely recall
10   having it be contained in part of the review analysis
11   that we initially did.  So my learnings would be --
12   yeah, I believe they would be captured under the
13   attorney/client privilege, I believe.  Yeah.
14        Q.  BY MR. MOORE:  So just so I'm clear, you
15   can't tell me from 2012 to 2016 whether or not Insys
16   was promoting Subsys off-label without violating an
17   attorney/client privilege?
18        MS. GOTTLIEB: Form. Foundation.
19        THE WITNESS: No.  I don't think that was
20   your first question.
21        Q.  BY MR. MOORE:  Okay.  Was Insys, between

Page 183

1    2012 and 2016, promoting Subsys off-label?
2         MS. GOTTLIEB: Form. Foundation.
3         MR. SCHWARTZ: To the extent that calls
4    for privileged information, instruct not to answer.
5         THE WITNESS: So, again, look, I'll try
6    and draw this line.  You know, I'm doing this review
7    at the direction of counsel with outside counsel, and
8    as a result of that, implementing policies and
9    procedures and guardrails.
10        Q.  BY MR. MOORE:  Were you having to
11   implement policies and procedures and guardrails
12   because Insys was promoting off-label?
13        MS. GOTTLIEB: Same objection.
14        MR. SCHWARTZ: Hang on.
15        Same objections.
16        Go ahead.
17        THE WITNESS: Again, I believe that calls
18   for the privileged information.
19        Q.  BY MR. MOORE:  Let me back up and I want
20   to -- Let me stay on this.
21        Was -- Did you come to learn that Insys

Page 184

1    was circulating low-strength reports to its sales
2    staff?
3         MS. GOTTLIEB: Form.
4         MR. SCHWARTZ: Join.
5         THE WITNESS: I did learn that, yes.
6         Q.  BY MR. MOORE:  What did you as the
7    director of compliance think about that?
8         MR. SCHWARTZ: Object to form.
9         MS. GOTTLIEB: Same.
10        THE WITNESS: I believe I recall thinking
11   at the time when I saw it -- and to be clear, when I
12   saw it, that was no longer in effect -- that it --
13   that it was troubling.
14        Q.  BY MR. MOORE:  Why was it troubling?
15        MS. GOTTLIEB: Form.
16        THE WITNESS: I'm trying to think.  Stuff
17   that I learned in connection with it was definitely
18   part of litigation.
19        MR. SCHWARTZ: If it's -- Again, to the
20   extent you can answer it and it's not based on
21   privileged information --

Page 185

1         THE WITNESS: Right.
2         MR. SCHWARTZ: -- that's okay.  But if it
3    is, instruct not to answer.
4         THE WITNESS: I think I -- I recall
5    thinking it was troubling.  I can't recall right now.
6    I'm sorry.  I'm totally blanking.  I'm sorry.
7         Q.  BY MR. MOORE:  That's okay.
8         I mean, you need to take a break?
9         A.  I don't think so.  I'm just -- I'm trying
10   to formulate a thought.  I'm embarrassed.  I'm sorry.
11   I just can't.
12        Q.  That's okay.
13        A.  I'm totally blanking.
14        MR. SCHWARTZ: Why don't we take five
15   minutes?
16        THE WITNESS: Okay.
17        THE VIDEOGRAPHER: This concludes media
18   No. 2 in the continuing deposition.  Off the record
19   at 2:21.
20        (A break was taken at 2:21 p.m.)
21        THE VIDEOGRAPHER: This begins media No.

Deposition of Danielle Davis                                      Jeffrey Buchalter v. William Tham, M.D., et al

Page 186

1  3 in the continuing deposition of Danielle Davis.  On
2  the record at 2:35.
3      Q.  BY MR. MOORE:  We were talking about the
4  low-strength reports before we took a break, and kind
5  of like you now, my mind is a bit everywhere.
6      But if you can, why was it troubling to
7  you that that was happening?
8      A.  Right.
9      MS. GOTTLIEB:  Same -- same objections.
10     To the extent you can answer without
11 privilege, do so.  But if it calls for privileged
12 information, I would instruct you not to.
13     MR. SCHWARTZ:  Join.
14     THE WITNESS:  So I think that the
15 difficulty I was having before we took the break was
16 I'm having trouble pulling that low-strength report
17 out in isolation.  You know, I've seen lots of
18 documents together with this legal review, and I
19 can't ever remember just seeing it just in isolation.
20     So I -- and I've, you know, had
21 discussions in a broader sense with -- with -- with

Page 187

1  in-house and outside counsel about that report, but I
2  just don't know I can -- that I can separate an
3  independent thought I've just come up with on my own
4  as opposed to, you know, the broader discussions with
5  counsel.
6      MR. MOORE:  Let's mark this whatever
7  number we're on.  Is it 6?
8      THE COURT REPORTER:  5.
9      (Exhibit 5 was marked for identification.)
10     Q.  BY MR. MOORE:  Let me hand you Exhibit 5.
11 This is an e-mail from Xun Yu?
12     A.  Okay.
13     Q.  And who is Xun Yu?
14     A.  Xun.  You pronounce it Xun.
15     Q.  My apologies.  Xun.
16     A.  Xun.
17     Q.  I'm still messing it up?
18     A.  Xun is --
19     Q.  Can I say Mr. Yu?
20     A.  Yes.
21     Mr. Yu is the -- I believe he's the vice

Page 188

1  president of business intelligence.
2      Q.  Okay.  Is he still with the company?
3      A.  Yes.
4      Q.  All right.  This is an e-mail from Mr. Yu
5  to Jessica Larichiuta.
6      A.  Okay.
7      Q.  Which was a sales representative, one of
8  the sales representatives who called on the -- my
9  client's prescribers.  Okay?
10     A.  Okay.
11     Q.  Copied on it is Sunrise Lee.  Who is
12 Sunrise Lee?
13     A.  Sunrise Lee is a former employee of
14 Insys.
15     Q.  Ms. Lee is one of the individuals facing
16 criminal charges?
17     A.  Correct.
18     Q.  Okay.  And the subject line is, "Please
19 note you have low-strength, less than or equal to 400
20 micrograms RX dispensed yesterday - daily rep report
21 for low-strength usage."  Okay?

Page 189

1      MR. SCHWARTZ:  Just one copy?
2      MR. MOORE:  I don't.  I'm sorry.  Please
3  look at if before I -- Yeah.
4      MR. SCHWARTZ:  All right.  Thanks.
5      THE WITNESS:  Okay.
6      Q.  BY MR. MOORE:  Those are the types of
7  e-mails we were referencing earlier.  It's an example
8  of one, correct?
9      MR. SCHWARTZ:  Object to form.
10     MS. GOTTLIEB:  Form.
11     THE WITNESS:  Well, to be fair, we
12 weren't talking about e-mails, but talking about the
13 report for low-strength usage.
14     Q.  BY MR. MOORE:  Right.
15     And the low strength e-mail report was
16 being generated and sent to all of sales any time a
17 prescriber prescribed a Subsys dose less than or
18 equal to 400 micrograms?
19     MS. GOTTLIEB:  Form.  Foundation.
20     MR. SCHWARTZ:  Same.
21     THE WITNESS:  I don't know if it was

Deposition of Danielle Davis                          Jeffrey Buchalter v. William Tham, M.D., et al

Page 190

1  being sent to sales. This one is from Xun directly
2  to Jessica.
3      **Q.  BY MR. MOORE:  Sure.**
4      A.  So I don't know if it was sent to all of
5  sales.
6      **Q.  Well, that particular document I don't**
7  **believe was.  But you've learned as the director of**
8  **compliance, that those types of e-mails were being**
9  **circulated to the entire sales staff?**
10     MS. GOTTLIEB:  Form.  Foundation.
11     THE WITNESS:  I might be splitting hairs,
12 but I don't know if I necessarily recall it being
13 sent to all the sales, sales all e-mails.  I just
14 don't -- I don't recall.
15     **Q.  BY MR. MOORE:  Let's not split hairs.**
16 **Maybe it didn't go to sales all.**
17     A.  Okay.
18     **Q.  But they were being circulated to the**
19 **sales staff throughout the country whenever a --**
20 **whenever one of the sales representative's**
21 **prescribers would write a prescription for a less**

Page 191

1  **than or equal to 400 micrograms strength?**
2      MR. SCHWARTZ:  Object to form.
3      MS. GOTTLIEB:  Form and foundation.
4      THE WITNESS:  Yeah.  I -- I don't think I
5  have firsthand knowledge of the e-mails.  I've -- I
6  recall, like, in abstract, seeing the reports.  I
7  don't recall seeing an e-mail like this to a -- to a
8  rep.
9      **Q.  BY MR. MOORE:  Jessica Larichiuta is a**
10 **rep?**
11     A.  Correct.  Yeah.  No, of course.  I'm not
12 saying that this is not what you're saying.  But I
13 just don't recall that.
14     **Q.  Is that concerning to you what you're**
15 **reading?**
16     MS. GOTTLIEB:  Form.
17     MR. SCHWARTZ:  Same.
18     And same instruction.  To the extent you
19 can answer it, doesn't invade the privilege, that's
20 fine.
21     THE WITNESS:  It could be concerning,

Page 192

1  yes.
2      **Q.  BY MR. MOORE:  In fairness, it is**
3  **concerning, isn't it?**
4      MR. SCHWARTZ:  Object to form.
5      MS. GOTTLIEB:  Form.
6      THE WITNESS:  I'm not really sure I -- I
7  entirely understand what -- what Xun's asking.  So
8  ...
9      **Q.  BY MR. MOORE:  You, as the director of**
10 **compliance, haven't learned what was transpiring with**
11 **the low-strength e-mails reports and how they were**
12 **designed to -- what their purpose was?**
13     MR. SCHWARTZ:  Object to the form.
14     MS. GOTTLIEB:  Form.  Foundation.
15     And instruct you not to answer if it
16 calls for privileged information.  You can -- and you
17 can indicate that that's the case, if it does.
18     THE WITNESS:  I mean, I have learned
19 about this in connection with the reviews that we've
20 -- legal reviews that we've talked about.
21     **Q.  BY MR. MOORE:  And you've told me they**

Page 193

1  were troubling to you.  Why?
2      MR. SCHWARTZ:  Object to form.
3      MS. GOTTLIEB:  Form.  Foundation.  Asked
4  and answered.
5      And to the extent it calls for privileged
6  information that I believe you already said.
7      THE WITNESS:  Right.  I did.
8      MR. SCHWARTZ:  Join.
9      THE WITNESS:  So I'll let my answer stand
10 from when we returned from after the break.
11     **Q.  BY MR. MOORE:  Remind me what that was.**
12 **I'm sorry.  I don't mean to rehash things.**
13     MS. GOTTLIEB:  We can have the court
14 reporter read it back.
15     **Q.  BY MR. MOORE:  Well, what's your answer?**
16 **Remind me again.  What is your response to whether or**
17 **not that's concerning to you?**
18     MS. GOTTLIEB:  Asked and answered.
19     MR. SCHWARTZ:  Same objection.
20     THE WITNESS:  Yeah.  I would say I've
21 given you my answer on it.

Page 194

1    Q.  BY MR. MOORE:  Those reports, to provide
2    some context --
3        THE COURT REPORTER:  I'm sorry.  What?
4    Q.  BY MR. MOORE:  To provide context to
5    those reports, you've learned as the director of
6    compliance, that they were being circulated the day
7    after the prescriber wrote a prescription for Subsys
8    for less than or equal to 400 micrograms, right?
9        MS. GOTTLIEB:  Form.
10       THE WITNESS:  I don't know specifically
11   if they were generated the day after.  I'm not sure
12   how that works.
13   Q.  BY MR. MOORE:  I'm sorry.  On that
14   document, do you see -- the one I'm reading from, do
15   you also see it says, "Here is your doctor who wrote
16   low-dose RX yesterday"?
17   A.  Okay.
18       MS. GOTTLIEB:  Form.  Foundation.
19   Q.  BY MR. MOORE:  Does it say that?
20   A.  I see that here, yes.
21   Q.  Okay.  So does it appear to be that there

Page 195

1    were e-mails that were being circulated to the reps
2    indicating that one of their prescribers had wrote a
3    prescription for less than or equal to a 400
4    micrograms strength the day prior?
5        MS. GOTTLIEB:  Form.  Foundation.
6        MR. SCHWARTZ:  Object to form.
7        THE WITNESS:  I mean, this is sent from
8    Xun to Jessica, who is a sales representative.
9    Q.  BY MR. MOORE:  Saying just that?
10   A.  Yes.
11   Q.  Okay.  And Insys was monitoring the
12   prescribing of the prescribers to know whether or not
13   to generate that type of report, correct?
14       MS. GOTTLIEB:  Form.  Foundation.
15       And if it calls for privileged
16   information, you can indicate that, and I would
17   instruct you not to answer.  If it doesn't and you
18   can answer independently, then do so.
19       THE WITNESS:  I mean, I am speculating
20   because I don't know what happened in 2012.  But what
21   you're saying, these e-mails and the dosage that was

Page 196

1    written the day prior, that seems consistent with
2    what you're saying.
3        But, again, I wasn't there in 2012.  So
4    I'm not sure what the practice was at the time.
5    Q.  BY MR. MOORE:  And did you learn that
6    part of the sales representative's pay structure for
7    bonuses was dependent, in part, on whether or not
8    higher strengths were being used?
9        MR. SCHWARTZ:  Object to form.
10       To the extent you can answer.  If it
11   calls for privileged information, instruct not to
12   answer.
13       MS. GOTTLIEB:  Same.
14       THE WITNESS:  I became aware of it, yes.
15   Q.  BY MR. MOORE:  Is that concerning to you
16   as the director of compliance?
17       MR. SCHWARTZ:  Object to form.
18       MS. GOTTLIEB:  Same.
19       THE WITNESS:  Yes.
20   Q.  BY MR. MOORE:  Why?
21       MR. SCHWARTZ:  Object to form.

Page 197

1        To the extent it calls for privileged
2    information, instruct not to answer.
3        MS. GOTTLIEB:  Same.
4        THE WITNESS:  I think I'm just, again,
5    trying not to muddy the waters.
6    Q.  BY MR. MOORE:  Take your time.
7    A.  I just don't know if I can answer in
8    isolation and not have it be mixed in with, you know,
9    everything I've learned and discussed with counsel.
10   That's the only problem.
11       MR. SCHWARTZ:  If it calls for privileged
12   information, instruct not to answer.
13       THE WITNESS:  Sorry.  Can you say the
14   question again?
15       MR. MOORE:  I don't remember at this
16   point either.
17       Could you repeat it back?
18       (The record was read back, as requested.)
19   Q.  BY MR. MOORE:  I think the context was we
20   were talking about the fact that -- I'm sorry --
21   sales representatives' bonuses were comprised, in

Deposition of Danielle Davis                                      Jeffrey Buchalter v. William Tham, M.D., et al

Page 198

1  part, of whether or not higher doses were used. And
2  I asked you if that was concerning to you. And I
3  think you said yes. And then I said, why? And that
4  was the question.
5       MS. GOTTLIEB: Form.
6       THE WITNESS: Right. And I feel like
7  this is, again, you know, saying the same thing, that
8  I've learned all these things in conjunction with my
9  legal reviews and working with counsel. And so I
10 just don't know if I can -- if that was, like, I just
11 independently came to that conclusion or that was
12 from, you know, everything I learned with counsel.
13      And I have -- I think it probably was. I
14 don't know how else I would have had that
15 information.
16      Q. BY MR. MOORE: Okay.
17      A. I'm sorry.
18      Q. That's okay.
19      How about me and you just sitting here,
20 okay, just talking back and forth. You know, if I
21 were to ask you just as the director of compliance,

Page 199

1  we're talking about a fentanyl spray, right? That's
2  what Subsys is?
3       A. Yes.
4       Q. Okay. And I'm taking it that during the
5  course of your employment at Insys, you've -- you've
6  learned more and more about fentanyl?
7       MR. SCHWARTZ: Object to form.
8       MS. GOTTLIEB: Form.
9       Q. BY MR. MOORE: Just generally, right?
10      MR. SCHWARTZ: Form.
11      MS. GOTTLIEB: Form.
12      THE WITNESS: Yes.
13      Q. BY MR. MOORE: About Subsys?
14      A. Yes.
15      Q. Okay. Is it concerning to you that, you
16 know, that there was apparently this push to use
17 higher strengths from within your company?
18      MR. SCHWARTZ: Object to form.
19      Instruct not to answer if it calls on or
20 is based on privileged information.
21      MS. GOTTLIEB: Same.

Page 200

1       THE WITNESS: I don't see how that's
2  really any different than, you know, your question
3  before.
4       Q. BY MR. MOORE: Okay.
5       A. So my answer would have to be the same.
6       Q. Have you seen the low-strengths reports
7  that were specifically generated from my client, Jeff
8  Buchalter?
9       MS. GOTTLIEB: Form. Foundation.
10      THE WITNESS: I don't think that I have.
11      Q. BY MR. MOORE: Okay.
12      A. Not that I remember, no.
13      MR. MOORE: Let's make this 7.
14      THE COURT REPORTER: 6.
15      MR. MOORE: Oh, 6.
16 (Exhibit 6 was marked for identification.)
17      Q. BY MR. MOORE: This No. 6 is an e-mail
18 from Michael Babich dated 1/12/13, to sales all.
19 Okay.
20      Before I get into this, what does "sales
21 all," who does that encompass?

Page 201

1       MS. GOTTLIEB: Foundation. Form.
2       THE WITNESS: Are you talking that
3  specific period of time because I wasn't at the
4  company.
5       Q. BY MR. MOORE: Well, you've seen e-mails
6  that have been generated to sales all?
7       A. Yes.
8       Q. Okay.
9       A. Yeah.
10      Q. On its face to me, those e-mails are
11 going to everybody in sales. Is that fair?
12      MS. GOTTLIEB: Form. Foundation.
13      THE WITNESS: I -- I think generally
14 speaking, that's a fair statement.
15      Q. BY MR. MOORE: That would include the
16 sales reps?
17      A. Yes.
18      Q. Would it include, you know, like, the
19 regional managers, district managers, things like
20 that?
21      A. Yes.

Deposition of Danielle Davis                    Jeffrey Buchalter v. William Tham, M.D., et al

Page 202

1      MS. GOTTLIEB:  Form.

2      Q.  BY MR. MOORE:  Okay.  So this is an

3  e-mail from Mr. Babich, before you got to the

4  company, dated 1/12/13.

5      A.  Okay.

6      Q.  To sales all.  And let me read it,

7  provide it to your counsel, and then ask you a

8  question about it.

9      But it states, "Great strong finish to

10  the week.  Big units, escalating doses, tons of

11  names, a plethora of awesomeness.  It reminds me of

12  one of my favorite scenes from a movie a lot of us

13  hold near and dear to our heart.  Shooter McGavin is

14  our competition and we are waiting for them in the

15  parking lot.  Enjoy the weekend."

16      That was from Mr. Babich.  I'm going to

17  hand this to your counsel.

18      If you saw that as the director of

19  compliance, would it raise a concern with you that

20  the -- that the CEO of the company is shooting off an

21  e-mail to sales all about, essentially, this is great

Page 203

1  news, we've got escalating doses?

2      MR. SCHWARTZ:  Object to form.

3      MS. GOTTLIEB:  Same.

4      THE WITNESS:  Yes.

5      Q.  BY MR. MOORE:  Now, I can go through -- I

6  don't want to belabor the point.  I mean, I can go

7  through a number of different e-mails, and I'm sure

8  that you've seen some e-mails that have been

9  concerning to you, and other documents.  But let me

10  set it up this way.

11      When did Mr. Babich leave the company?

12      A.  I think it was approximately November of

13  2015.

14      Q.  Okay.  November '15.

15      When did Mr. Burlakoff leave?

16      A.  I don't remember specifically when he

17  left, but I think it was approximately the summer of

18  2015.

19      Q.  How about Mr. Simon, if you know?

20      A.  Mr. Simon.  Rich Simon?

21      Q.  Yeah.

Page 204

1      A.  I don't recall exactly when he left.  I

2  think it was around November 2015 as well.

3      Q.  Were they fired?

4      MS. GOTTLIEB:  Form.  Foundation.

5      And if it calls for privileged

6  information, indicate that because I would instruct

7  you not to answer.  If you can answer without

8  privileged information, you can do so.

9      THE WITNESS:  I believe Rich was fired.

10  And I believe Alec was as well.

11      With Mike, I wasn't -- I don't remember

12  being involved in discussions around him.  So I only

13  have available to me what I've -- like, the press

14  release that I've read, and I think that said he

15  resigned.

16      Q.  BY MR. MOORE:  Okay.  I mean, how about

17  the other folks that have been indicted?

18      MS. GOTTLIEB:  Form.

19      MR. SCHWARTZ:  Object to form.

20      You have to tell her which ones.

21      THE WITNESS:  Yeah.  Be specific.

Page 205

1      Q.  BY MR. MOORE:  How about Sunrise Lee?

2      A.  I believe she was fired.  Yes.

3      Q.  Okay.

4      MR. SCHWARTZ:  I'm sorry.  I didn't hear

5  that.

6      THE WITNESS:  I believe she was fired,

7  yes.

8      Q.  BY MR. MOORE:  What about Joseph Rowan?

9      MS. GOTTLIEB:  Form.

10      THE WITNESS:  Yes, I believe he -- I

11  believe he was fired, yes.

12      Q.  BY MR. MOORE:  And were each of -- Why

13  were they fired?

14      MS. GOTTLIEB:  Form.  Foundation.

15      And if it calls for privileged

16  information, tell us that so that we can instruct you

17  not to answer, or if you can answer it without

18  privileged information, you can do that.

19      THE WITNESS:  Can we go down the list?

20      Q.  BY MR. MOORE:  We can.  Sure.

21      I mean, start with Richard Simon.  Why

Deposition of Danielle Davis                                    Jeffrey Buchalter v. William Tham, M.D., et al

Page 206

1  was Mr. Simon fired?
2      A.  I don't know the specifics around why he
3  was fired.  I know new leadership came in on the
4  commercial side around that time, and I believe he
5  was one of the individuals that was fired.
6      Q.  I mean, were they -- was he fired because
7  of the investigation, at least, within Insys revealed
8  that he had engaged in the acts outlined in the
9  indictment?
10     MR. SCHWARTZ:  Object to form.
11     MS. GOTTLIEB:  Form.  Foundation.
12     MR. SCHWARTZ:  Instruct not to answer if
13  it calls for privileged information.
14     MS. GOTTLIEB:  Same.
15     THE WITNESS:  To be honest, I don't think
16  I know.  Sanga was there at the time, and I'm -- I'm
17  aware that he had had discussions with at least the
18  new commercial management.  But I wasn't -- I don't
19  remember being directly involved in -- in that
20  conversation.
21     Q.  BY MR. MOORE:  Would the same be true for

Page 207

1  everyone else:  Burlakoff, Rowan, and Lee?
2      MS. GOTTLIEB:  Form.
3      MR. SCHWARTZ:  Same objections.
4      THE WITNESS:  Same true for Burlakoff.  I
5  wasn't involved with that.  It was --
6      MS. GOTTLIEB:  I mean, just to be clear,
7  Sanga -- I mean, just time frame, think of time
8  framewise, so that you're not -- I don't want you
9  mixing up time frames.
10     THE WITNESS:  Okay.  When he was
11  terminated, I don't --
12     Q.  BY MR. MOORE:  "He," being Mr. Burlakoff?
13     A.  Burlakoff.  Sorry.
14     Q.  Okay.
15     A.  I don't -- At that point in time, when
16  he was terminated that day, that week, I don't
17  remember having involvement with that at that time.
18  I'm trying to think.
19     With Mike Gurry, I don't remember.
20  Again, that was -- that was in 2016.  I don't think
21  -- I don't even know what his position was at the

Page 208

1  time.  I don't remember.  I just don't remember.  And
2  I don't know why he was terminated.  But I -- I
3  remember he was.  I just don't remember what the
4  reasoning was.
5      Q.  Same with Sunrise Lee, you don't know?
6      A.  Sunrise Lee.  I do remember more about
7  Sunrise Lee.
8      Q.  Okay.
9      A.  I remember that there was national sales
10  meeting and she didn't perform her -- her dues.
11  Like, she didn't lead her -- her district breakouts,
12  like, whatever her role was at the meeting.  And
13  subsequently, I remember, you know, she was
14  terminated.
15     So I think it -- I was aware it had
16  something to do with not performing her
17  responsibilities at that event.
18     Q.  Did you attend national sales meetings?
19     A.  Since I've been at the company, yes.
20     Q.  Have you been at national sales meetings
21  where Mr. Burlakoff was there instructing the sales

Page 209

1  force to promote off-label?
2      MR. SCHWARTZ:  Object to form.
3      MS. GOTTLIEB:  Form.
4      THE WITNESS:  Not that I recall, no.
5      Q.  BY MR. MOORE:  Not that you've heard?
6      A.  No.
7      Q.  Okay.  How is it that these individuals
8  kept their jobs until 2015 -- late 2015, and for
9  some, into 2016?
10     MS. GOTTLIEB:  Form.
11     MR. SCHWARTZ:  Object to form.
12     MS. GOTTLIEB:  Foundation.
13     And if it calls for privileged
14  information, I would instruct you not to answer.
15     THE WITNESS:  Yeah.  I don't know.
16     Q.  BY MR. MOORE:  As a director of
17  compliance, if you wanted to, could you have
18  terminated Mr. Simon?
19     MS. GOTTLIEB:  Foundation.
20     MR. SCHWARTZ:  Object to form.
21     THE WITNESS:  I -- I don't see -- I'm not

Deposition of Danielle Davis                                    Jeffrey Buchalter v. William Tham, M.D., et al

Page 210

1  sure. I mean, I don't see why I wouldn't. I would
2  not have been probably making that decision in a
3  vacuum. I don't see why not.
4      Q.  BY MR. MOORE:  Could you have terminated
5  Mr. Burlakoff?
6          MS. GOTTLIEB:  Form.
7          MR. SCHWARTZ:  Form.
8          MS. GOTTLIEB:  Foundation.
9          THE WITNESS:  I'm trying to think of the
10 meetings I've had, I believe. I don't know
11 ultimately.
12     Q.  BY MR. MOORE:  If I asked you the same
13 thing with Mr. Rowan or Mr. Gurry or Ms. Lee?
14         MR. SCHWARTZ:  Form.
15     Q.  BY MR. MOORE:  Could you have fired them?
16         MR. SCHWARTZ:  Form.
17         MS. GOTTLIEB:  Same.
18         THE WITNESS:  Again, I wouldn't have been
19 the one doing the firing, so I don't know.
20     Q.  BY MR. MOORE:  If you wanted to -- if you
21 wanted to terminate them, who would you have gone to?

Page 211

1      A.  Let's see. Depending on the period of
2  time, I would have gone to my direct report.
3      Q.  Is that Mr. -- Mr. Delfosse?
4      A.  That's why I said depending on the time.
5  If I wanted to fire someone, it was not something
6  that was done in a vacuum, like I said, or in
7  isolation or a silo, I should say. A vacuum's not
8  the right word.
9      Q.  It's all right. I get it.
10     A.  A silo.
11         So I would have involved different
12 parties, both in-house, outside counsel. So I just
13 wasn't operating in a silo like that.
14     Q.  Same be true for Mr. Babich?
15         MR. SCHWARTZ:  Object to form.
16         MS. GOTTLIEB:  Same.
17         THE WITNESS:  Same would be true, yes.
18     Q.  BY MR. MOORE:  Okay. I promise you, I
19 know everybody's getting tired. I'm trying to get
20 through this. You hanging in there?
21     A.  Yeah, I just need another bottle of

Page 212

1  water. Maybe if I throw this one at Robby, he'll get
2  me another one.
3      Q.  And I don't mean to backtrack here --
4      A.  That's okay.
5      Q.  -- but when you started with the company
6  in 2014 --
7      A.  Yes.
8      Q.  -- there was not a compliance committee,
9  per se, that had been created at that point in time;
10 is that true?
11         MR. SCHWARTZ:  Object to form.
12         MS. GOTTLIEB:  Same.
13         THE WITNESS:  I think there was.
14     Q.  BY MR. MOORE:  There was a committee?
15     A.  I believe so.
16     Q.  Who was -- who -- who comprised the
17 committee?
18     A.  You're asking me to go back, but I can
19 remember seeing two names. I remember Leslie Zacks
20 and Jenna Grosshans.
21     Q.  Anybody else?

Page 213

1      A.  Those are the two names I can recall. I
2  don't remember anybody else.
3      Q.  When you started, 2014, when's the first
4  time there was a compliance committee meeting?
5      A.  I can't recall specifically. Some time,
6  I think in 2014.
7      Q.  When you -- when you started, was there a
8  -- was there a compliance committee that was
9  comprised of legal counsel, the CEO, and the heads of
10 the company's medical, sales, marketing, finance,
11 quality, regulatory, and human resources departments?
12         MR. SCHWARTZ:  Object to form.
13         MS. GOTTLIEB:  Form.
14         THE WITNESS:  Like I said, I don't know.
15 I just -- the two names that came to mind are the
16 ones that I -- that I specifically remembered.
17     Q.  BY MR. MOORE:  Well, but when you
18 started, was there that type of a broad committee
19 with all of those individuals involved?
20         MR. SCHWARTZ:  Same objection.
21         MS. GOTTLIEB:  Form.

Deposition of Danielle Davis                    Jeffrey Buchalter v. William Tham, M.D., et al

Page 214

1    THE WITNESS: I don't recall that there
2  was.
3    **Q.  BY MR. MOORE:  Okay.**
4    A.  And I don't remember.
5    **Q.  Do you ever remember a committee being**
6  **comprised of all of those individuals?**
7    A.  Yes.
8    **Q.  When did that first start?**
9    MS. GOTTLIEB:  Form.
10    THE WITNESS:  Well, the one that I can
11  say I was part of.
12    **Q.  BY MR. MOORE:  Yes.**
13    A.  Like, I think I said a few minutes ago,
14  was at some point in 2014 with those individuals that
15  you've just listed off previously.  I just can't
16  remember.
17    MR. MOORE:  This is No. 8?
18    THE COURT REPORTER:  7.
19    (Exhibit 7 was marked for identification.)
20    **Q.  BY MR. MOORE:  This is a --**
21    Here, I have copies.

Page 215

1    MR. SCHWARTZ:  Hey.
2    MR. MOORE:  Look at that.  I can only
3  bring so many docs.  Oh, man.
4    THE WITNESS:  You didn't check a
5  suitcase?
6    MR. MOORE:  Not for just documents, no.
7  And, no, I did not check a suitcase.
8    **Q.  BY MR. MOORE:  I'll wait for everybody to**
9  **look at it.**
10    A.  What page is it on?  I can't even find
11  it.
12    **Q.  I'll point you to the page.  I promise.**
13  **This is a document, if you turn to the very first**
14  **page.**
15    A.  Oh, okay.
16    **Q.  This was -- the very first.  This was a**
17  **code of conduct policy dated 2013.**
18    MS. GOTTLIEB:  Form.
19    **Q.  BY MR. MOORE:  Correct?**
20    MS. GOTTLIEB:  Form.
21    THE WITNESS:  Yes.  That's what this

Page 216

1  document is.
2    **Q.  BY MR. MOORE:  It's dated that, isn't it?**
3    A.  Yes.
4    **Q.  And if you turn to the second page.  This**
5  **was a document that appears to be authored by**
6  **Dr. John Kapoor?**
7    MR. SCHWARTZ:  Object to form.
8    MS. GOTTLIEB:  Form.  Foundation.
9    THE WITNESS:  His signature is on page 2.
10    **Q.  BY MR. MOORE:  Dr. Kapoor's signature is**
11  **on page 2.  I gave away all my copies now.**
12    Can I take that back and hand it right
13  **back to you?**
14    A.  Okay.
15    **Q.  I need to find the page I'm going to.**
16  I'm going to give it back to you, but I need to find
17  where I am.  Page 4 on that.  You can use that one.
18  It's the same thing.
19    A.  Okay.
20    **Q.  The top section is called "Compliance**
21  **with Laws."**

Page 217

1    A.  Yes.
2    **Q.  And in that section, do you see where the**
3  **last sentence starting with "Insys Compliance**
4  **Committee"?**
5    A.  Yes.
6    **Q.  It states, "Insys's Compliance Committee**
7  **is comprised of its legal counsel, the CEO, and the**
8  **heads of the company's medical, sales, marketing,**
9  **finance, quality, regulatory, and human resource**
10  **departments," correct?**
11    A.  Yes.  That's what it says.
12    **Q.  And you first recall that actually taking**
13  **place in 2014?**
14    MS. GOTTLIEB:  Form.
15    **Q.  BY MR. MOORE:  Correct?**
16    MS. GOTTLIEB:  Foundation.  Misstates
17  testimony.
18    THE WITNESS:  Like I previously said, the
19  first one that I remember being involved with was in
20  2014.
21    **Q.  BY MR. MOORE:  Did you ever recall when**

Page 218

1  you went back and you looked at the old compliance
2  documents that existed before you got there seeing
3  compliance committee meetings with all of those
4  individuals involved?
5       MR. SCHWARTZ:  Object to form.
6       MS. GOTTLIEB:  Same.
7       THE WITNESS:  I could have.  That's why I
8  said I just don't remember.  I just listed the two
9  people I distinctly remember seeing.
10      Q.  BY MR. MOORE:  And if that was not, in
11 fact, in place at that point in time, that would
12 obviously be an incorrect statement, correct?
13      MR. SCHWARTZ:  Object to form.
14      MS. GOTTLIEB:  Form.
15      THE WITNESS:  If that was the case, sure,
16 yes.
17      Q.  BY MR. MOORE:  All right.  The committees
18 that were formed when you were there, the compliance
19 committees, did it include Mr. Babich?
20      MS. GOTTLIEB:  Form.
21      THE WITNESS:  Gosh.  Now I can't recall.

Page 219

1  I want to say I think so.  But now I'm speculating.
2  I just can't recall.
3       Q.  BY MR. MOORE:  That's okay.  If I asked
4  it broader, did it include anybody that has been
5  criminally indicted?
6       MS. GOTTLIEB:  Form.
7       MR. SCHWARTZ:  Form.
8       THE WITNESS:  I don't know.  I don't know
9  if Alec was on the committee.  I can't recall.  I
10 can't recall if he was.
11      Q.  BY MR. MOORE:  And the committees that --
12 when there were committee meetings, were minutes
13 generated?
14      MS. GOTTLIEB:  Form.
15      THE WITNESS:  From what I remember, yes.
16      MR. MOORE:  Okay.  That's another
17 something I would like to have produced, please.
18 Okay?
19      MR. SCHWARTZ:  Yeah.  Same.  My response
20 is the same on whatever you do formally to get that
21 done.

Page 220

1       MR. MOORE:  If we could mark these as
2  Exhibits -- what are we --
3       THE COURT REPORTER:  8 and 9.
4       MR. MOORE:  8 and 9.
5  (Exhibits 8 and 9 were marked for identification.)
6       Q.  BY MR. MOORE:  Exhibit 8 and 9 are two
7  articles that were generated by The New York Times.
8  One is dated May 13, 2014, called "Doubts Raised
9  about Off-Label Use of Subsys, a Strong Painkiller."
10      The second is dated November 27th, 2014,
11 "Using Doctors with Troubled Pasts to Market a
12 Painkiller."
13      Do you recall ever seeing or reading
14 those two documents or those two articles?
15      A.  As I sit here right now, I -- I don't
16 recall.
17      Q.  I don't expect you to read them.
18      A.  Oh, okay.  Sorry.
19      Q.  That's okay.
20      A.  I just don't remember them.
21      Q.  The titles alone ...

Page 221

1       A.  Okay.
2       Q.  Troubling?
3       MR. SCHWARTZ:  Object to form.
4       MS. GOTTLIEB:  Same.
5       THE WITNESS:  Yes.
6       Q.  BY MR. MOORE:  They would give you
7  concern as a compliance director?
8       MS. GOTTLIEB:  Form.
9       THE WITNESS:  Yes.
10 (Exhibit 10 was marked for identification.)
11      Q.  BY MR. MOORE:  Is that 9?
12      THE COURT REPORTER:  10.
13      MR. MOORE:  Geez, I'm terrible.
14      Q.  BY MR. MOORE:  Exhibit 10, this is a --
15 it's the only one I have, so I'm going to have to go
16 back and even refresh my memory a little bit as well.
17 Can I see it again one more time --
18      A.  Okay.
19      Q.  -- just to refresh my memory.  All right.
20      Do you see the e-mail was generated by
21 Alec Burlakoff?

Deposition of Danielle Davis                                    Jeffrey Buchalter v. William Tham, M.D., et al

Page 222

1    A.  Yes.

2    Q.  And what's the date on it?

3       MS. GOTTLIEB: Foundation.

4       THE WITNESS: December 16th, 2014.

5    Q.  BY MR. MOORE: Then -- after both of

6 these New York Times articles were written, correct?

7    A.  Yes.

8    Q.  Okay. And who does it go to? Sales all?

9       MS. GOTTLIEB: Foundation.

10      THE WITNESS: Sales all, and then --

11   Q.  BY MR. MOORE: That's okay. There's a

12 lot of people on there.

13   A.  Some bcc's.

14   Q.  Read it into the record, if you would.

15   A.  Sure. "What New" --

16      MS. GOTTLIEB: Foundation. Go ahead.

17      THE WITNESS: "What New York Times --

18 What New York Times article? You can't stop this

19 company, exclamation mark. You can't be stopped,

20 exclamation mark. Great Monday, exclamation mark."

21   Q.  BY MR. MOORE: I can tell by your

Page 223

1 response that's troubling from Mr. Burlakoff, isn't

2 it?

3       MR. SCHWARTZ: Object to form.

4       MS. GOTTLIEB: Same.

5       THE WITNESS: I can't speak to what he

6 was thinking when he sent that.

7    Q.  BY MR. MOORE: I understand.

8       But just on its face to you, as the

9 compliance director, that's troubling that that's

10 coming from the vice president of sales?

11      MR. SCHWARTZ: Same objection.

12      MS. GOTTLIEB: Form.

13      THE WITNESS: I don't think the tone of

14 it is appropriate.

15   Q.  BY MR. MOORE: Mr. Burlakoff, if -- if,

16 in fact, he's referencing either one of these New

17 York Times articles, he obviously saw them, correct?

18      MR. SCHWARTZ: Object to form.

19      MS. GOTTLIEB: Form. Foundation.

20   Q.  BY MR. MOORE: It appears that way,

21 anyway, right?

Page 224

1       MS. GOTTLIEB: Same objection.

2       MR. SCHWARTZ: Same objection.

3    Q.  BY MR. MOORE: And, basically, troubling

4 aspect of it, he's saying, cast it aside, don't worry

5 about it?

6       MS. GOTTLIEB: Form. Foundation.

7       MR. SCHWARTZ: Same objection.

8    Q.  BY MR. MOORE: Ignore it?

9       MS. GOTTLIEB: Same objection.

10      MR. SCHWARTZ: Same.

11      THE WITNESS: I don't want to speculate

12 about what he was thinking.

13   Q.  BY MR. MOORE: If you knew that he wrote

14 that e-mail at the time, if that came to you as the

15 compliance director, would you have gone to him?

16      MR. SCHWARTZ: Object to form.

17      MS. GOTTLIEB: Form.

18      THE WITNESS: I can't say what I would

19 have done at the time, but I would like to think so,

20 yes.

21   Q.  BY MR. MOORE: We've learned that

Page 225

1 Dr. Awerbuch was involved as one of Insys's speakers

2 as part of the Insys's speakers' program?

3       MR. SCHWARTZ: Form.

4       THE WITNESS: He was for a period of

5 time.

6    Q.  BY MR. MOORE: And you've learned that

7 Dr. Awerbuch pleaded guilty to accepting bribes from

8 Insys?

9       MS. GOTTLIEB: Form.

10      MR. SCHWARTZ: Form.

11      MS. GOTTLIEB: Foundation.

12      THE WITNESS: Actually, I'm not sure that

13 I knew he pleaded guilty. I knew there were charges

14 levied against him. I'm not sure that I knew he had

15 pled guilty.

16   Q.  BY MR. MOORE: There's an e-mail from

17 Mr. Burlakoff and from September 2013, which -- which

18 discusses Dr. Awerbuch and, in part, he writes,

19 quote, "Let's make some money and stop playing B.S.

20 games and trying -- stop" -- I'm sorry. Let me start

21 over.

Page 226

1      Quote, "Let's make some money and stop
2  playing B.S. games trying to manage rookies.  It's
3  the Dr. Awerbucks of the world that keep us in
4  business.  Let's get a few more and the rest of this
5  job is a joke."
6          MS. GOTTLIEB:  Form.  Foundation.
7      Q.  BY MR. MOORE:  Do you remember seeing
8  that document?
9          MR. SCHWARTZ:  Object to form.
10         THE WITNESS:  I don't recall seeing that,
11 no.
12     Q.  BY MR. MOORE:  Troubling?
13         MS. GOTTLIEB:  Form.
14         MR. SCHWARTZ:  Same objection.
15         MS. GOTTLIEB:  Foundation.
16         THE WITNESS:  Yes.
17     Q.  BY MR. MOORE:  You can mark that as
18 whatever number we're on.  I can't keep it straight.
19 I promise you I am --
20     A.  11.
21     Q.  Thank you, Ms. Davis.  I promise you,

Page 227

1  Ms. Davis, I am trying to get through this.  I have
2  just a few more topics.  Okay?
3          MR. MOORE:  Do you need to take a break?
4  Would you like to take one?
5          THE WITNESS:  I wouldn't mind taking a
6  bathroom break.  Is now a good time?
7          MR. MOORE:  Sure.
8          THE VIDEOGRAPHER:  Off the record at
9  3:21.
10         (A break was taken at 3:21 p.m.)
11 (Exhibit 11 was marked for identification.)
12         THE VIDEOGRAPHER:  Back on the record at
13 3:32.
14     Q.  BY MR. MOORE:  When you started as the
15 director of compliance, did you receive any reports
16 personally about concerns related to off-label
17 promotion?
18         MR. SCHWARTZ:  Hang on.
19         Yeah.  Object to form.
20         And, again, you can answer to the extent
21 it doesn't call for privileged information or based

Page 228

1  on privileged information.
2          THE WITNESS:  As I sit here right now, I
3  can't recall specifically.
4      Q.  BY MR. MOORE:  It's okay.
5          Did you receive any reports about
6  concerns about the way that speakers' program was
7  being conducted?
8          MR. SCHWARTZ:  Same objections.
9          MS. GOTTLIEB:  Form.
10         THE WITNESS:  I do remember there was
11 discussion with counsel about speaker programs when I
12 first started.  I'm not sure about being given any
13 sort of report, per se.
14     Q.  BY MR. MOORE:  What I'm getting at is,
15 when you started, you know, there was a way for
16 employees to voice their concerns.  They could have
17 gone through the -- that third-party program, right?
18         MR. SCHWARTZ:  Object to form.
19         MS. GOTTLIEB:  Form.
20         THE WITNESS:  Navex, you mean.
21     Q.  BY MR. MOORE:  Navex?

Page 229

1      A.  Yeah.
2      Q.  And they could have gone to -- they could
3  have gone to you, right?
4      A.  Yes.
5      Q.  And I'm assuming if they made a -- some
6  type of a complaint to one of their supervisors, that
7  could also have been taken up to you?
8          MR. SCHWARTZ:  Object to form.
9      Q.  BY MR. MOORE:  Is that right?
10         MR. SCHWARTZ:  Form.
11         MS. GOTTLIEB:  Form.
12         THE WITNESS:  Hypothetically, yes.
13     Q.  BY MR. MOORE:  All right.  So, in any one
14 of those ways, did anybody -- did you ever receive
15 any concerns about Insys promoting off-label?
16     A.  I don't -- I don't recall receiving
17 reports.  No.
18     Q.  How about any concerns related to the
19 speakers' program?
20         MS. GOTTLIEB:  Form.
21         MR. SCHWARTZ:  Join.

Deposition of Danielle Davis

Jeffrey Buchalter v. William Tham, M.D., et al

Page 230

1    THE WITNESS:  You know, like I said, when
2  we did the -- the legal review, you know, we --
3  Skadden and I, we spoke with employees, and so they
4  had opportunities to -- to speak up, I guess, you
5  could say, discuss concerns.
6    Q.  BY MR. MOORE:  But if I ask you those
7  concerns, that's going to trigger the attorney/client
8  privilege?
9    MR. SCHWARTZ:  An instruction not to
10 answer.
11   Q.  BY MR. MOORE:  An instruction not to
12 answer?
13   A.  Yeah.  I -- As I'm sitting here right
14 now, I can't specifically recall something outside of
15 that formal process.
16   Q.  I see.
17   A.  That's probably because I'm getting a bit
18 -- my memory's not so great right now.  If I recall
19 something, I'll circle back if something gets
20 triggered.
21   Q.  All right.  Same -- same question, your

Page 231

1  answer would be the same for the insurance
2  reimbursement center?
3    A.  Yeah.
4    Q.  Okay.
5    A.  Yeah.
6    MS. GOTTLIEB:  But if you have specific
7  questions about any of those topics, I think you need
8  to ask them.
9    MR. MOORE:  I've been shut down on all of
10 them, so there's no point in asking them.
11   MS. GOTTLIEB:  I mean --
12   MR. MOORE:  That's not true.
13   MS. GOTTLIEB:  Well ...
14   MR. MOORE:  So it's, you know, we're just
15 going to have to -- there's no point in arguing over
16 it today.  We'll just take it up with the Court and
17 we'll file motions over it.
18   (Exhibit 12 was marked for identification.)
19   Q.  BY MR. MOORE:  This is Exhibit 12.
20   A.  Twice.
21   Q.  Exhibit 12 is a prospective here.  It

Page 232

1  starts with an e-mail from you dated November 12th,
2  2014, to Alec Burlakoff?
3    A.  Correct.
4    Q.  And you're talking about the speakers'
5  program, correct?
6    A.  Yes.
7    Q.  Okay.  And it states, starts off, "Hi
8  Alec, Just a follow-up on our conversation earlier
9  today."  I'm going to stop right there.
10   How often were you and Mr. Burlakoff
11 having discussions about the speakers' program?
12   A.  I can't remember specifically.
13   Q.  I mean, how often in your day-to-day
14 routine would you have interactions with
15 Mr. Burlakoff?
16   A.  I would say not that often because he
17 wasn't in the office very much.
18   Q.  Okay.  How about Mr. Babich?
19   MR. SCHWARTZ:  Form.
20   MS. GOTTLIEB:  Same.
21   THE WITNESS:  You know, when I was

Page 233

1  initially hired, we were in different buildings.  I
2  didn't see him very much.  And then when we were all
3  in the same corporate space, I suppose I would -- I
4  would see him pretty regularly.
5    Q.  BY MR. MOORE:  Okay.  So you write to him
6  and you state -- you have three -- what I'm going to
7  call bullet points, right?
8    No. 1 is "inappropriate venue."  And you
9  state in part -- I'm not going to read it all -- that
10 you're still receiving feedback that the venues the
11 reps are choosing are too loud to conduct a speaker
12 program.
13   What do you mean by the feedback that
14 you're getting?
15   A.  So in this specific instance, the
16 feedback that I am referring to is the feedback I
17 received from our program monitors.
18   Q.  Right.  I saw that too.
19   And what are the program monitors?
20   A.  So they are retained for the specific
21 purpose of monitoring field interactions with

Deposition of Danielle Davis                               Jeffrey Buchalter v. William Tham, M.D., et al

Page 234

1  healthcare professionals, whether it be, they can do
2  field rides or monitor speaker program.
3      Q.  Were these monitors people that were
4  employed by Insys?
5      A.  No.
6      Q.  They were not?
7      A.  No.
8      Q.  Who -- Tell me about -- tell me more
9  about these monitors.  Who were they?  Were they
10 third parties?
11     A.  Yes.  So it's a third party that Insys
12 retained in approximately June of 2014.
13     Q.  Okay.
14     A.  The name is ICC.  And, again, I'm having
15 trouble.  I think it's Independent Commercial
16 Compliance.  I think that's correct.
17     Q.  And how was it -- who decided how the
18 monitoring was set up?  Did they do that or did Insys
19 help facilitate that?  How did it work?
20         MR. SCHWARTZ:  Form.
21         MS. GOTTLIEB:  Form.

Page 235

1          THE WITNESS:  Like, what specifically do
2  you mean?  What part?
3      Q.  BY MR. MOORE:  Well, I'm assuming that
4  these monitors weren't going to every single speaker
5  program, or were they?
6      A.  They were not.
7      Q.  Okay.  Tell me about the process.  So how
8  was -- you know, how was it that a monitor would go
9  to a specific program, a specific location in the
10 United States, or -- I mean, just tell me how it
11 worked.
12         MR. SCHWARTZ:  Form.
13         MS. GOTTLIEB:  Form.
14         THE WITNESS:  So, initially, I remember
15 it being just randomly selected.  And we always say,
16 random and could be targeted.  In the sense that if
17 they went and monitored a program --
18     Q.  BY MR. MOORE:  Okay.
19     A.  -- and, you know, perhaps they -- they
20 noted something that they, you know, might want to
21 revisit, we would revisit that program being

Page 236

1  monitored with that specific speaker in X amount of
2  time.
3      Q.  Okay.
4      A.  So it could be random or targeted.
5      Q.  So they were -- they were going out and
6  they would report back to you what they were seeing,
7  observing, finding, that kind of thing?
8      A.  Correct.  Yes.
9      Q.  Okay.  And was that done because why?
10         MR. SCHWARTZ:  Object to form.
11         MS. GOTTLIEB:  Same.
12         THE WITNESS:  Right, so here I'm going to
13 draw that line, you know, with what we did, the
14 privilege review.  And while I can't speak to that
15 and the results of that privilege review, what I did
16 as a result was engage ICC to help monitor the
17 speaker programs.
18     Q.  BY MR. MOORE:  But you can't tell me why
19 because you feel as if it would trigger the
20 attorney/client privilege?
21         MR. SCHWARTZ:  Instruct not to answer.

Page 237

1          MR. MOORE:  I understand.
2          MR. SCHWARTZ:  Yeah, okay.
3          THE WITNESS:  Yeah, I do.
4      Q.  BY MR. MOORE:  Is that right?
5      A.  Yeah.
6          MR. SCHWARTZ:  And I just want to be
7  clear.  Instruct not to answer based on the
8  attorney/client privilege.  Not outside of any --
9          MR. MOORE:  No.  I get it.
10         MR. SCHWARTZ:  Okay.
11         MR. MOORE:  Yeah.
12     Q.  BY MR. MOORE:  And you can't answer that
13 question outside of that context is what you're
14 telling me?
15     A.  I don't know how I could just draw the --
16     Q.  I mean, that's what we've had a problem
17 with all day, right?
18     A.  Yeah.
19     Q.  Yeah?
20     A.  Yeah.
21     Q.  Yeah.

Deposition of Danielle Davis                           Jeffrey Buchalter v. William Tham, M.D., et al

Page 238

1  Were any of these monitors sent to -- to
2  your knowledge, to monitor the programs that were
3  given by any of my client's providers?
4      A.   So to the best of my knowledge, I
5  understand that a monitor was sent to one of Dr. -- I
6  don't know how to pronounce it.
7      Q.   Tham.
8      A.   Tham.
9      -- one of Dr. Tham's programs, yes.
10     Q.   And why was a monitor sent to one of
11 Dr. Tham's programs?
12     A.   I mean, it -- to the best of my
13 recollection, it was just part of the normal random
14 selection.
15     Q.   Okay.  What did you learn from that?
16 Which one was it, first off, and what did you learn?
17     MR. SCHWARTZ:  Object to form.
18     MS. GOTTLIEB:  Form.
19     THE WITNESS:  Gosh, I can't remember
20 specifically.
21     MR. MCCUBBIN:  Object to the form.

Page 239

1      MR. MOORE:  Hey, Mike.
2      THE WITNESS:  I didn't hear what he said.
3      MR. MCCUBBIN:  Hey, everybody.  I'm still
4  here.
5      THE WITNESS:  Okay.  You're very close to
6  me, so it startled me.  Sorry.
7      I don't remember the specific date.  I
8  believe it was in 2015.  Beyond that, I'm guessing.
9  I recall seeing the -- the monitoring form that has
10 his name on it.  And I just -- I'm sorry.  I'm just
11 blanking on when it was.  I believe it was 2015, I
12 think.
13     Q.   BY MR. MOORE:  And do you remember if the
14 monitor provided any feedback of concern?
15     A.   As I recall, there was nothing reported
16 that was concerning.
17     MR. MOORE:  Okay.  I would ask for that
18 to be produced if it wasn't been.
19     MR. SCHWARTZ:  You have it.
20     MR. MOORE:  When did I get it?  Do you
21 know.

Page 240

1      MR. SCHWARTZ:  I don't know.
2      Q.   BY MR. MOORE:  Your attendee bullet point
3  states that, as discussed, states in part, as
4  discussed, this can -- wait a minute.  Let me just
5  back up.
6      "I'm getting feedback from monitors" --
7  I'll read the whole thing -- "that some programs
8  there are attendees who are either direct reports of
9  the speaker or their administrative staff.  As
10 discussed, this can arguably have the appearance of
11 impropriety."  Right?
12     It goes on to state that, "As such, we
13 need to ensure that no support staff or direct
14 reports are attending ISP, office, in services are
15 the appropriate forum to educate office staff in
16 addition to the HCPs, healthcare providers.
17     "However, ISPs are exclusively reserved
18 for HCPs who have prescribing abilities."  Correct?
19     A.   Correct.
20     Q.   So there's a difference when a -- a
21 program is given at the office of a healthcare

Page 241

1  provider versus when a program is being given outside
2  of an office setting?
3      MR. SCHWARTZ:  Object to form.
4      MS. GOTTLIEB:  Join.
5      THE WITNESS:  Okay.  I don't -- I don't
6  want to split hairs, but I want to make sure I'm
7  answering the question that you're -- that you're
8  asking.
9      I understood you to ask the question, is
10 there a difference between ISPs, outside of the
11 office, and ISPs at an office.
12     Q.   BY MR. MOORE:  Let's start with that.  Is
13 there a difference?
14     A.   There is a difference in terms of the
15 minimum requirement for --
16     I'm sorry.  I'm spacing.
17     Q.   It's okay.
18     A.   On HCPs who have prescribing abilities,
19 yes.
20     Q.   Okay.  And if it's a program that's
21 outside of the physician's office, as I read your

Deposition of Danielle Davis

Jeffrey Buchalter v. William Tham, M.D., et al

Page 242

1 e-mail, it states, they are "exclusively for
2 healthcare providers who can prescribe"?
3     A.  Yes.  That's what it says.
4     Q.  Is that true?
5         MR. SCHWARTZ:  Form.
6         MS. GOTTLIEB:  Form.
7         THE WITNESS:  Yes.  As I read this, I
8 don't know that I've worded it as best I possibly
9 could have, but that is the general essence is that
10 it should be for healthcare providers with
11 prescribing abilities, yes.
12     Q.  BY MR. MOORE:  Okay.  And if there are
13 programs that are being given that do not -- where
14 other people are attending that cannot prescribe,
15 would that have been a violation of your company's
16 policy?
17         MS. GOTTLIEB:  Form.
18         THE WITNESS:  I don't believe
19 specifically so, no.
20     Q.  BY MR. MOORE:  Okay.  Who was permitted
21 to attend the ISPs at a setting outside of the

Page 243

1 office?
2         MS. GOTTLIEB:  Form.
3         THE WITNESS:  Healthcare practitioners,
4 though -- which was defined in the SOP as those with
5 prescribing abilities, and the best of my -- to the
6 best of my recollection, those involved with the
7 patient's care, to the effect of that, yeah.
8     (Exhibit 13 was marked for identification.)
9         MR. MOORE:  You can have -- you can have
10 this one.  It says my copy, but go ahead.
11         MR. SCHWARTZ:  Thanks.
12         MR. MOORE:  Yep.
13         MR. MOORE:  What number are we on?
14         THE COURT REPORTER:  13.
15     Q.  BY MR. MOORE:  This is a document that's
16 called, "Insys Speaker Programs Field
17 Responsibilities."
18         Do you know when this was created?
19         MS. GOTTLIEB:  Take your time to review
20 it.
21         THE WITNESS:  I don't know.

Page 244

1     Q.  BY MR. MOORE:  Okay.  There's -- page 2
2 outlines a "preprogrammed preparation requirements."
3         Do you see that?
4     A.  Yes.
5     Q.  Okay.  On the second bullet point, talks
6 that it's expected that the number of -- it's
7 expected to be reported the number of expected
8 attendees and deciles, correct?
9         MS. GOTTLIEB:  Form.
10         THE WITNESS:  I don't see it.  Where are
11 you?
12         MR. SCHWARTZ:  Object to form.
13     Q.  BY MR. MOORE:  Second bullet point.  I'm
14 reading in part.  I'm not reading it all.  I'm trying
15 to help you through this.
16         Do you see that?
17     A.  Number of expected -- Wait.  Okay.  I
18 don't think I understand it, but, yes, I see that
19 it's written there.
20     Q.  Okay.  The one, two, three, fourth bullet
21 point, "Invitee requirement per program are as

Page 245

1 follows.  Two or more key prescribers, plus support
2 staff for GPBs."
3         Do you know what that means?
4     A.  No, I don't know.  But I can see it
5 spelled out in the first one where it says "group
6 practice briefing."  I don't know what that is.
7     Q.  Does that suggest that it's the in-office
8 programs?
9         MR. SCHWARTZ:  Form.
10         MS. GOTTLIEB:  Form.  Foundation.
11         THE WITNESS:  I can't say I've ever heard
12 that term before.  I don't know.
13     Q.  BY MR. MOORE:  Okay.  So this was, in all
14 likelihood, before your time?
15     A.  Oh --
16         MS. GOTTLIEB:  Foundation.
17         THE WITNESS:  -- well -- well before my
18 time.  I can see that CyMedica was on here, and that
19 was 2012.
20     Q.  BY MR. MOORE:  Okay.
21     A.  So I -- I've never even seen this

Page 246

1 document before.

2     Q. Okay. It goes on to state that, "Four or

3 more key prescribers plus one support staff member

4 for dinner meetings," right?

5     MR. SCHWARTZ: What are you referring to?

6     Q. BY MR. MOORE: I'm on page -- the fourth

7 bullet point down.

8     A. I see -- I see that written there, yes.

9     Q. Okay. And then it says, "As a whole, it

10 looks like to me the programs are designed to be

11 clinical in nature and therefore, nonclinical office

12 staff, office managers, receptionists, et cetera,

13 should not be invited"; is that right?

14     A. Oh, shoot. I lost you. I'm sorry.

15 Which --

16     Q. One, two, three, four, fifth bullet point

17 down.

18     A. Okay. Yes.

19     Q. Okay. Is that fifth bullet point still

20 true when you took over as the compliance director

21 that nonclinical office staff, office managers,

Page 247

1 receptionists, et cetera, should not be invited?

2     A. Yes. To the best of my recollection,

3 yes.

4     Q. And is that because it could give the

5 perception of something improper being done?

6     MR. SCHWARTZ: Object to form.

7     MS. GOTTLIEB: Same.

8     THE WITNESS: I think it would be

9 specific to the circumstances, but possibly.

10     Q. BY MR. MOORE: Turning back to the

11 previous exhibit where you sent the e-mail to

12 Mr. Burlakoff. He responded, to others, sales DMs

13 and Sales RDs, in part, "The end of the ISPs would in

14 my mind mean the end of Insys. Insys may continue to

15 exist, but it will never be the Insys we knew,

16 developed, and loved to be a part of."

17     Do you see that?

18     A. Yes.

19     Q. That's it.

20     When you put it in context of what the

21 allegations are in this case and across the nation

Page 248

1 about the way Insys was using the speakers' program,

2 that's a pretty concerning response, isn't it?

3     MR. SCHWARTZ: Object to form.

4     MS. GOTTLIEB: Form. Foundation.

5     THE WITNESS: Yes.

6     Q. BY MR. MOORE: As the -- Would it be

7 concerning to you as the compliance director if you

8 learned that in one office setting, okay, that there

9 were -- the small office setting, that there were

10 four prescribers being paid by Insys?

11     MR. SCHWARTZ: Form.

12     MS. GOTTLIEB: Form. Foundation.

13     THE WITNESS: I would have to look at the

14 circumstances, but on the face of what you've just

15 said, certainly.

16     Q. BY MR. MOORE: Can you think of any

17 circumstance where that would be appropriate?

18     MR. SCHWARTZ: Object to form.

19     MS. GOTTLIEB: Form. Foundation.

20     THE WITNESS: Did you say it was a small

21 office?

Page 249

1     Q. BY MR. MOORE: Yes.

2     A. Yes.

3     Q. Yes, you can think of a -- of --

4     A. Yes.

5     Q. I'm sorry.

6     So I asked you in a small office setting

7 where four people were being paid, can you think of

8 any explanation -- any reason why that would be

9 appropriate?

10     MR. SCHWARTZ: Object to form.

11     MS. GOTTLIEB: Form. Foundation.

12     THE WITNESS: Paid. I guess it would

13 depend on what they're -- what they're being paid for

14 in what capacity.

15     Q. BY MR. MOORE: Okay. Let's say you've

16 got a small office practice and two people are being

17 paid as part of the speakers' program.

18     A. Okay.

19     Q. And we have two people being paid as

20 consultants who have also gone through the speaker

21 program training. On its face, does that raise some

Deposition of Danielle Davis                                        Jeffrey Buchalter v. William Tham, M.D., et al

Page 250

1  red flags to you?
2     MR. SCHWARTZ: Object to form.
3     MS. GOTTLIEB: Same.
4     THE WITNESS: Yeah. I would need more
5  information. Yeah.
6     Q.  BY MR. MOORE:  It's a red flag that you
7  would need to explore?
8     A.  Correct.
9     MR. SCHWARTZ: Object to form.
10    THE WITNESS: Yeah.
11    MR. SCHWARTZ: You can answer that.
12    THE WITNESS: Yes, I would.
13    Q.  BY MR. MOORE:  And you would need to
14 explore it because, on its face, you don't understand
15 why that would be happening?
16    MR. SCHWARTZ: Object to form.
17    MS. GOTTLIEB: Same.
18    THE WITNESS: Yes, I would want more
19 information.
20    Q.  BY MR. MOORE:  Have you seen e-mails
21 where the physicians are being -- the healthcare

Page 251

1  providers are being called targets?
2     MS. GOTTLIEB: Form.
3     THE WITNESS: In general, that sounds
4  familiar. I can't think of a specific e-mail, but
5  the terms sounds familiar, yes.
6     Q.  BY MR. MOORE:  Is it a little concerning
7  that you're calling healthcare providers targets?
8     MS. GOTTLIEB: Form.
9     MR. SCHWARTZ: Object to form.
10    THE WITNESS: Just depending on --
11 (The record was read back, as requested.)
12    MS. GOTTLIEB: Form.
13    MR. SCHWARTZ: Form.
14    THE WITNESS: Individually, I guess, you
15 could -- I mean, it could be. Depends on the
16 circumstances, the context.
17    Q.  BY MR. MOORE:  This is a -- We'll mark
18 this as an exhibit, but this is an e-mail chain
19 between Jessica Larichiuta, Alec Burlakoff, and
20 Sunrise Lee.
21    A.  Okay.

Page 252

1     Q.  It's pertaining to the codefendants in
2  this case.
3     MR. SCHWARTZ: Is this one?
4     MR. MOORE: It's the only one I've got,
5  but you can look at it, of course.
6     THE WITNESS: Is it both pages? Okay.
7  (Exhibit 14 was marked for identification.)
8     Q.  BY MR. MOORE:  The -- It talks about a
9  speakers' program that's coming up on, what is it,
10 the 14th, I think, of November?
11    A.  2012. Yes.
12    Q.  2012. Right. Before your time.
13    And it outlines individuals who are going
14 to be in attendance.
15    Do you see that?
16    A.  Yes.
17    Q.  If all of those individuals were for the
18 same practice location, would that be problematic?
19    MS. GOTTLIEB: Form. Foundation.
20    MR. SCHWARTZ: Form.
21    MR. MCCUBBIN: Object to the form and

Page 253

1  foundation.
2     THE WITNESS: Can I clarify? Is the
3  speaker, Joseph Ferraro, is he part of the practice?
4     Q.  BY MR. MOORE:  Yes.
5     MR. MCCUBBIN: Same objection.
6     MS. GOTTLIEB: Same.
7     THE WITNESS: So there's -- If that
8  would be the case, there would be certain things that
9  we would have to look at in order to see if that
10 would be appropriate.
11    Q.  BY MR. MOORE:  What would you need to
12 look at?
13    A.  Well, what we don't want to see happen is
14 this one speaker who is in charge of a practice
15 speaking to his employees that he, I suppose, pays,
16 compensates them.
17    Q.  Would it be concerning if people that
18 were in attendance were also part of the speakers'
19 program and being paid as consultants?
20    MS. GOTTLIEB: Form. Foundation.
21    MR. SCHWARTZ: Object to form.

Deposition of Danielle Davis

Jeffrey Buchalter v. William Tham, M.D., et al

Page 254

1   MR. MCCUBBIN:  Object to form and
2   foundation.
3      THE WITNESS:  It could be, yes.
4      **Q.  BY MR. MOORE:  Sunrise Lee, then, writes**
5   **back about how she's going to come down and close**
6   **them.**
7      **Do you see that?**
8      MR. MCCUBBIN:  Objection to the form.
9      MS. GOTTLIEB:  Join.
10      THE WITNESS:  She doesn't use that
11  specific language, but she says, "Many of the key
12  targets will be at this dinner and between the two of
13  us, I'm sure we'll get them all.  Huge potential."
14      **Q.  BY MR. MOORE:  I can tell by your**
15  **reaction, you find that to be concerning?**
16      MR. SCHWARTZ:  Object to form.
17      **Q.  BY MR. MOORE:  Is that true?**
18      MS. GOTTLIEB:  Same form.
19      MR. SCHWARTZ:  Form.
20      MR. MCCUBBIN:  Objection to the form and
21  foundation.

Page 255

1      THE WITNESS:  It's the language, yeah.
2   It's troubling.
3      **Q.  BY MR. MOORE:  You -- When you became**
4   **the director, you went out and you gave some**
5   **presentations about compliance strategies?**
6      A.  Compliance strategies?
7      **Q.  Well, compliance topics maybe would be a**
8   **better term; is that fair?**
9      A.  Yes.
10      MR. MOORE:  Okay.  I have found two.  We
11  can mark these.
12      MS. GOTTLIEB:  And before we get into
13  that, do you mind if we take a quick bathroom break?
14      MR. MOORE:  Can I ask one more question?
15      MS. GOTTLIEB:  Sure.
16      MR. MOORE:  Okay.
17  (Exhibits 15 and 16 were marked for identification.)
18      MR. MOORE:  We'll take a quick break.  Go
19  ahead and take a look at those.  Why don't you just
20  take a quick look, and then I have a very general
21  question about them.  That's it.

Page 256

1      THE WITNESS:  Do you need to see these?
2      MS. GOTTLIEB:  Yeah.
3      **Q.  BY MR. MOORE:  Did you -- did you get any**
4   **additional programs beyond these two when you were**
5   **the compliance director?**
6      A.  Hold on.
7      MS. GOTTLIEB:  I mean, she has to let us
8   take a look.  She'll take a look.
9      MR. SCHWARTZ:  Where did you get these
10  from?
11      THE WITNESS:  Online.
12      MR. SCHWARTZ:  Because they're not
13  Bates'd.  Online?
14      MR. MOORE:  Uh-huh.
15      MS. GOTTLIEB:  Is that part of that?
16      THE WITNESS:  I think so.  It looks
17  familiar.  I didn't create these.  These were created
18  by Adam Toronto.
19      MR. SCHWARTZ:  Can I see that one?
20      THE WITNESS:  Yeah.
21      MR. SCHWARTZ:  What's the date on that

Page 257

1   one?
2      THE WITNESS:  November 10, 2016.
3      They look familiar, yes.
4      **Q.  BY MR. MOORE:  Okay.  Did you give any**
5   **additional --**
6      MR. SCHWARTZ:  Hang on.  Hang on.  Hang
7   on.
8      MR. MOORE:  I'm sorry.
9      **Q.  BY MR. MOORE:  The question doesn't**
10  **pertain to these two.**
11      **Did you give any additional programs that**
12  **you can recall beyond these two?**
13      MS. GOTTLIEB:  Form.
14      MR. SCHWARTZ:  Form.
15      THE WITNESS:  So these weren't given to
16  Insys staff.
17      **Q.  BY MR. MOORE:  No.  I know.**
18      A.  Okay.
19      **Q.  You went outside and you went to national**
20  **meetings and you gave two presentations?**
21      MS. GOTTLIEB:  Form.

Deposition of Danielle Davis                          Jeffrey Buchalter v. William Tham, M.D., et al

Page 258

1    THE WITNESS: So they're not national.
2  This is the West Coast compliance conference. I'm
3  actually supposed to be at it today or yesterday.
4    Q.  BY MR. MOORE:  Oh, heavens.  I'm sorry.
5    A.  Yes.  And, yes, I have co-presented, I
6  guess, two years in a row now.  Missed this year.
7    Q.  Are those the only two times you've
8  presented?
9    A.  Yes.
10    MR. MOORE:  Okay.  Let's take a break.
11  Thank you for giving me a little extra time.
12    THE VIDEOGRAPHER: This concludes media
13  No. 2 -- excuse me -- media No. 3 in the continuing
14  deposition.  Off the record at 4:09.
15    (A break was taken at 4:09 p.m.)
16    THE VIDEOGRAPHER: This begins media No.
17  4 in the continuing deposition of Danielle Davis.  On
18  the record at 4:19.
19    Q.  BY MR. MOORE:  Ms. Davis, before we went
20  off the record, we were talking about the
21  presentations that you had given.  And there were

Page 259

1  two.  In 2015 and also in 2016, right?
2    MS. GOTTLIEB:  Form.
3    THE WITNESS: As it related to the West
4  Coast compliance conference, yes.
5    Q.  BY MR. MOORE:  Okay.  Did somebody ask
6  you to give those presentations?
7    A.  Yes.
8    Q.  Did Dr. Kapoor ask you to give those
9  presentations?
10    A.  No.
11    Q.  Who asked you to give them?
12    A.  On both occasions, the people I was
13  presenting with asked me to join them.
14    Q.  Okay.  Did anybody ask you questions at
15  these presentations that you gave about any of the
16  issues that were ongoing with Insys?
17    MR. SCHWARTZ: Form.
18    MS. GOTTLIEB:  Same.
19    THE WITNESS: Not that I can recall
20  specifically, no.
21    Q.  BY MR. MOORE:  Do you see my term here,

Page 260

1  and I don't mean any disrespect to you, but do you
2  see how it could be viewed as a little bit, my term,
3  a little odd that with all that was swirling around
4  Insys at the time, all the reports that were being
5  generated about problems inside of Insys, for
6  instance, Dr. Awerbuch had pleaded guilty.
7    Nurse Alfonso had pleaded guilty for
8  accepting kickbacks.  All of the various
9  investigations going on, that you were giving
10  compliance talks on how to give a -- set up an
11  effective compliance program?
12    MS. GOTTLIEB:  Form.
13    MR. SCHWARTZ: Object to form.
14    MS. GOTTLIEB:  Foundation.
15    THE WITNESS: I guess I don't recall
16  thinking about that at the time, no.
17    Q.  BY MR. MOORE:  When did -- Has Insys
18  stopped using the speakers' program?
19    A.  No.
20    Q.  It's still ongoing?
21    A.  Yes.

Page 261

1    MS. GOTTLIEB:  I'm sorry.  Can you keep
2  your voice up, please?
3    THE WITNESS: Yes.
4    MS. GOTTLIEB:  Okay.  Thanks.
5    Q.  BY MR. MOORE:  Are you aware that
6  Dr. Kapoor has been identified as a coconspirator?
7    MR. SCHWARTZ: Object to form.
8    MS. GOTTLIEB:  Same.  Foundation.
9    THE WITNESS: Yes.
10    Q.  BY MR. MOORE:  Is that concerning to you
11  as the compliance director that the person that
12  founded this company and who is on the board of
13  directors and who has served as the past president
14  and CEO of the company is still on the board of
15  directors --
16    MS. GOTTLIEB:  Form.
17    MR. SCHWARTZ: Object to form.
18    Q.  BY MR. MOORE:  -- and has been identified
19  as a coconspirator?
20    MS. GOTTLIEB:  Form.
21    MR. SCHWARTZ: Same objection.

Deposition of Danielle Davis

Jeffrey Buchalter v. William Tham, M.D., et al

Page 262

1    THE WITNESS: I'm not really sure all the

2    issues that would -- all the -- I guess, the facets

3    of what gets taken into consideration for someone to

4    be a coconspirator list. I'm not familiar with how

5    that list is formed --

6    **Q. BY MR. MOORE:** Sure.

7    A. -- in and of itself. I mean, I have to,

8    you know, defer to the people above me to discuss,

9    you know, his being on the board.

10    **Q. Have you learned in your role as the**

11    **compliance director whether or not anyone on the**

12    **executive team -- I'm going to include Dr. Kapoor,**

13    **along with all of the individuals who have been**

14    **indicted, okay, to set my question up. Those are the**

15    **individuals I'm talking about. Okay?**

16    **Have you been made aware, as the director**

17    **of compliance, whether or not any of those**

18    **individuals have had romantic relationships with**

19    **sales representatives?**

20    MS. GOTTLIEB: Form.

21    MR. SCHWARTZ: Object to form.

Page 263

1    MS. GOTTLIEB: Foundation.

2    THE WITNESS: Yes.

3    **Q. BY MR. MOORE: What have you learned?**

4    MS. GOTTLIEB: Form.

5    MR. SCHWARTZ: Object to form.

6    And, again, if you can answer this in a

7    nonprivileged context, that's okay. But if you

8    learned this from a privileged source or contain

9    privileged information, instruct not to answer.

10    THE WITNESS: Okay.

11    MR. SCHWARTZ: Did you catch any of that?

12    THE WITNESS: Yeah.

13    MR. SCHWARTZ: All right. Thanks.

14    THE WITNESS: I believe the majority of

15    it would probably fall under the privilege, but I do

16    recall recently reading a document, I think it was

17    from New Jersey.

18    **Q. BY MR. MOORE: You've seen the New Jersey**

19    **complaint?**

20    A. Yes. And I believe I read something to

21    the effect in that complaint about some e-mails with

Page 264

1    a former sales rep and Dr. Kapoor. I think -- that's

2    all that can come to mind right now that would be

3    outside of what I have learned in a privileged

4    capacity.

5    **Q. I see.**

6    **How about romantic relationships with**

7    **representatives and physicians, sales representatives**

8    **and physicians or healthcare providers?**

9    MR. SCHWARTZ: Same objections.

10    THE WITNESS: What specifically?

11    **Q. BY MR. MOORE: Have you learned that**

12    **there was instances where Insys sales representatives**

13    **became romantically involved with the healthcare**

14    **providers they were calling on?**

15    MR. SCHWARTZ: Same objections.

16    MS. GOTTLIEB: Same.

17    THE WITNESS: Yes.

18    **Q. BY MR. MOORE: Tell me about that.**

19    MS. GOTTLIEB: Same.

20    THE WITNESS: So right off just the top

21    of my head right now, I can recall two instances that

Page 265

1    came to my attention.

2    **Q. BY MR. MOORE: Okay.**

3    A. You know, we can specifically talk, you

4    know, about the one that I'm aware of that might --

5    that reflects individuals associated with this case.

6    **Q. Sure.**

7    A. So it's my understanding, it came to my

8    attention at some point, I -- I believe it was

9    through the district manager, I think, that Jessica

10    Larichiuta --

11    **Q. Yes.**

12    A. -- was romantically involved with a

13    physician that she was calling on. She might have

14    become engaged to him.

15    **Q. Okay. Are you aware of instances where**

16    **physicians made requests for Insys to hire people?**

17    A. I can't recall.

18    MS. GOTTLIEB: Form.

19    THE WITNESS: Not sitting here right now,

20    I can't recall a physician requesting somebody be

21    hired.

Deposition of Danielle Davis                                          Jeffrey Buchalter v. William Tham, M.D., et al

Page 266

1    Q. BY MR. MOORE: Okay. Could that be
2  potentially problematic if a physician made a request
3  for Insys to hire somebody? Could it be received as
4  a -- or perceived in any way as a kickback?
5        MR. SCHWARTZ: Object to form.
6        MS. GOTTLIEB: Form.
7        THE WITNESS: Potentially.
8    Q. BY MR. MOORE: Okay. Are you aware of
9  any requests that Dr. Tham made to have individuals
10 hired and whether or not Insys hired them?
11       MS. GOTTLIEB: Form.
12       MR. SCHWARTZ: Form.
13       MR. MCCUBBIN: Objection. Form.
14 Foundation.
15       THE WITNESS: I'm not, no.
16   Q. BY MR. MOORE: The -- In terms of the
17 speaker programs, Insys created the materials for
18 those programs, correct?
19       MS. GOTTLIEB: Form.
20       MR. SCHWARTZ: Form.
21       THE WITNESS: Yes.

Page 267

1    Q. BY MR. MOORE: Okay. And --
2        Go ahead.
3    A. Can I just make a qualification?
4    Q. Please.
5    A. So I think initially it could have been
6  an outside company that did the initial one, perhaps.
7  I remember hearing CyMedica, I think they did that.
8  But from my tenure at the company, it is my
9  understanding that it's developed in-house.
10   Q. Okay. And then they're all developed
11 in-house or through CyMedica and then given to the
12 speaker to go speak on?
13       MS. GOTTLIEB: Form. Foundation.
14       MR. SCHWARTZ: Form.
15       THE WITNESS: Essentially, yes.
16   Q. BY MR. MOORE: Right? Yeah.
17   A. Great simplification. Yeah.
18   Q. I try.
19       If you learned that a speaker was --
20       Well, was it permitted for people that
21 were on the speakers' program, could they

Page 268

1  specifically request, hey, I want to do a program,
2  let's go do a program here, let's go do a program
3  there?
4        MS. GOTTLIEB: Form.
5        THE WITNESS: Yeah. I just -- Again, I
6  know I'm splitting hairs, but just I think for the
7  purposes of answering accurately.
8    Q. BY MR. MOORE: Sure.
9    A. Were you referring to people who were on
10 the speaker bureau?
11   Q. Yeah. I'm using speaker program and
12 bureau the same.
13   A. Okay.
14   Q. So if a person was on the speaker
15 bureau --
16   A. Uh-huh.
17   Q. -- could they -- did they have a right to
18 set up their own programs?
19       MS. GOTTLIEB: Form.
20       MR. MCCUBBIN: Object to form.
21       THE WITNESS: Not that I can think of,

Page 269

1  no.
2    Q. BY MR. MOORE: Okay. So if a speaker
3  said to a rep, I want to do a program at this office
4  and I want to do a program at this office?
5    A. No. I mean, that's not just how --
6        MR. SCHWARTZ: Hang on. There's no
7  question. There's no question.
8    Q. BY MR. MOORE: Is that the way it was
9  supposed to work?
10       MR. SCHWARTZ: Object to form.
11       MS. GOTTLIEB: Form. Foundation.
12       THE WITNESS: No.
13   Q. BY MR. MOORE: Was it appropriate for
14 healthcare providers on the speakers' program to do
15 ride-alongs with reps?
16       MR. SCHWARTZ: Object to form.
17       MS. GOTTLIEB: Join.
18       MR. MCCUBBIN: Object to the form.
19       THE WITNESS: No.
20   Q. BY MR. MOORE: Why?
21   A. I -- I can't even think of an instance

Deposition of Danielle Davis                    Jeffrey Buchalter v. William Tham, M.D., et al

Page 270

1  where or why that would happen, what the purpose
2  would be. I can't think.
3      Q. Okay. It would be a red flag where you
4  would want to investigate, right?
5      MS. GOTTLIEB: Form?
6      MR. SCHWARTZ: Form.
7      MR. MCCUBBIN: Object to the form and
8  foundation.
9      THE WITNESS: Sorry. Can you reask the
10 question?
11     Q. BY MR. MOORE: That would be a red flag
12 to you as a compliance director if you heard that?
13     MS. GOTTLIEB: Form.
14     MR. SCHWARTZ: Same objection.
15     THE WITNESS: If I had heard? Sorry.
16     MR. MCCUBBIN: Same objection.
17     Q. BY MR. MOORE: That a person on the
18 speakers' program was doing ride-alongs with the
19 reps?
20     MS. GOTTLIEB: Form.
21     MR. SCHWARTZ: Form.

Page 271

1      MR. MCCUBBIN: Same objection.
2      THE WITNESS: That would be a red flag.
3      Q. BY MR. MOORE: It would be a red flag if
4  you learned that a particular speaker was asking to
5  do speaker programs and to set them up as well?
6      MS. GOTTLIEB: Form. Foundation.
7      MR. SCHWARTZ: Object to form.
8      MR. MCCUBBIN: Form and foundation.
9      THE WITNESS: Yes.
10     Q. BY MR. MOORE: Did you come to learn that
11 Insys was creating letters of medical necessity for
12 physicians to sign off on?
13     A. Yes.
14     Wait. I need to qualify that.
15     Q. Sure.
16     A. Sorry.
17     I'm aware of a letter of medical
18 necessity template that was offered to physicians to
19 use however they needed to with respect to that, yes.
20     Q. Did you determine whether that was
21 appropriate or not during your -- during your tenure

Page 272

1  as the compliance director?
2      MS. GOTTLIEB: Form.
3      MR. SCHWARTZ: Object to form.
4      And, again, object to the extent that you
5  can answer this with nonprivileged information,
6  that's okay. This calls for privileged information,
7  I would instruct not to answer.
8      MS. GOTTLIEB: Same.
9      THE WITNESS: Yeah. I remember that
10 being part of the discussion with counsel, yeah.
11     Q. BY MR. MOORE: Was that shut down at some
12 point in time?
13     MR. SCHWARTZ: Object to form.
14     MS. GOTTLIEB: Form.
15     MR. SCHWARTZ: Calls for privilege.
16 Instruct not to answer.
17     THE WITNESS: Honestly, as I sit here, I
18 can't recall specifically.
19     Q. BY MR. MOORE: Okay. Did you come to
20 learn that Mr. Burlakoff at one point told someone,
21 quote, "If you keep patients on Subsys for four

Page 273

1  months, they're hooked. Then they'll be on it for a
2  year, maybe longer."
3      MS. GOTTLIEB: Form.
4      THE WITNESS: I don't recall ever hearing
5  that, no.
6      Q. BY MR. MOORE: Pretty shocking if he said
7  that, isn't it?
8      MR. SCHWARTZ: Object to form.
9      MS. GOTTLIEB: Form.
10     MR. MCCUBBIN: Object to the form.
11     THE WITNESS: Yes.
12     Q. BY MR. MOORE: I keep saying it, but I
13 promise to you, I am almost done. Okay.
14     A. Okay.
15     Q. Bear with me.
16     A. Okay.
17     Q. Are you okay?
18     A. Yep.
19     Q. Okay. Mr. Burlakoff was the vice
20 president of sales; is that true?
21     A. At what specific point in time?

Deposition of Danielle Davis

Jeffrey Buchalter v. William Tham, M.D., et al

Page 274

1      Q.   That's fair.
2           At some point he got promoted to the vice
3  president of sales.  I don't remember the exact date.
4      A.   Yes.
5      Q.   He was already in that position when you
6  came on board?
7      A.   Yes.
8      Q.   Okay.  As vice president of sales, did he
9  supervise Insys's sales force throughout the entire
10 United States?
11     A.   That was my understanding, yes.
12     Q.   Okay.  Mr. Simon became the national
13 director of sales, I think, at some point in time in
14 2013, if my memory serves.  I could be wrong on the
15 date.  Is that your recollection?
16     A.   I don't remember either.  I don't even
17 recall if that was his title.  The national part.  I
18 can't remember.
19     Q.   Okay.  Do you recall what his role was?
20 Did he have a responsibility for Insys's sales force
21 throughout the entire United States?

Page 275

1          MS. GOTTLIEB:  Form.
2          MR. SCHWARTZ:  Object to form.
3          THE WITNESS:  That is my understanding,
4  yes.
5      Q.   BY MR. MOORE:  Okay.  And then regional
6  directors, there was also regional directors,
7  correct?
8      A.   Correct.
9      Q.   And as kind of the name implies, they
10 oversaw specific region?
11     A.   Yes.
12     Q.   And they had responsibility for the sales
13 managers, sales representatives for that region?
14         MS. GOTTLIEB:  Form.
15     Q.   BY MR. MOORE:  True?
16     A.   For their particular areas, yes.
17     Q.   Okay.  Were sales representatives
18 required to recruit speakers for the speakers'
19 program?
20         MS. GOTTLIEB:  Form.  Foundation.
21         THE WITNESS:  I wouldn't use the word

Page 276

1  "recruit," no.
2      Q.   BY MR. MOORE:  What would you use?
3      A.   Identify.
4      Q.   Okay.  Did you come to learn that Insys
5  -- as the director of compliance, that Insys was
6  aligning the number of speaking events with the
7  amount that the speaker was prescribing?
8          MR. SCHWARTZ:  Object to form.
9          And, again, object -- if you can answer
10 this with nonprivileged information, that's fine.  If
11 this calls for privileged information based on that,
12 I would instruct you not to answer.
13         MS. GOTTLIEB:  Join.
14         THE WITNESS:  I think that's based on
15 privileged information.
16     Q.   BY MR. MOORE:  Okay.  Now, if you would
17 give me just a few minutes to stop and think about if
18 I have any other questions.  Okay?
19     A.   Certainly.
20         MR. MOORE:  Okay.
21         THE VIDEOGRAPHER:  Off the record at

Page 277

1  4:38.
2          (A break was taken at 4:38 p.m.)
3          THE VIDEOGRAPHER:  Back on the record at
4  4:44.
5      Q.   BY MR. MOORE:  We talked about the CIS
6  report dated February 2014.  Remember that?
7      A.   Yes.
8      Q.   Have there been other CIS reports that
9  have been generated?
10         MS. GOTTLIEB:  Form.  Foundation.
11         THE WITNESS:  I think so, yes.
12     Q.   BY MR. MOORE:  Have there been CIS
13 reports generated regarding the speakers' program?
14     A.   Yes.
15     Q.   When were those generated?
16         MS. GOTTLIEB:  Form.
17         THE WITNESS:  I can't recall
18 specifically.
19     Q.   BY MR. MOORE:  After you came on?
20     A.   I think before.
21     Q.   Before?

Page 278

1      A.   Yeah.

2      MR. MOORE:   I would ask that that be

3 produced.

4      MR. SCHWARTZ:   Same thing.   Whatever you

5 need, just whatever you need to do to get it

6 formally.

7      Q.   BY MR. MOORE:   Have there been other

8 reports generated about the speakers' program?

9      MS. GOTTLIEB:   Form.

10      MR. SCHWARTZ:   Form.

11      MS. GOTTLIEB:   Foundation.

12      THE WITNESS:   Not that I can -- not that

13 I can think of, no.

14      Q.   BY MR. MOORE:   As the compliance

15 director, did you ever go out and do any ride-alongs

16 with any reps?

17      A.   Ride-alongs with reps, yes.

18      Q.   When did you start doing that?

19      A.   I can't recall when I specifically --

20 when I personally did.   I -- At some point in 2015.

21      Q.   Okay.   Did you ever do any in Maryland?

Page 279

1      A.   No.

2      Q.   Did you ever attend any speaker program

3 events in Maryland?

4      A.   No.

5      Q.   If you were doing -- As the compliance

6 director, if you were looking through --

7      A.   Sorry.   Can I -- I think I might have

8 misanswered that.

9      Q.   It's okay.

10      A.   I think, so I -- I specifically remember

11 going into the field monitoring speaker programs in

12 2015.   I don't recall actually doing a field ride, I

13 don't think, until 2016.   I can't remember doing one

14 before then.

15      Q.   That's okay.

16      A.   Sorry.   I just wanted to be clear on

17 that.

18      Q.   All right.   Got it.

19      As the compliance director, if you were

20 looking at documents that were created by sales reps,

21 okay, regarding their interactions with healthcare

Page 280

1 providers, okay?

2      A.   Okay.

3      Q.   And the sales representative documented

4 that the physician is leery to prescribe off-label --

5      A.   Okay.

6      Q.   -- would that be concerning to you that

7 the rep is promoting off-label to the doctor?

8      MS. GOTTLIEB:   Form.

9      MR. SCHWARTZ:   Object to form.

10      MS. GOTTLIEB:   Foundation.

11      THE WITNESS:   I mean, I would certainly

12 have concerns.   I'm not -- I'm not aware of anything

13 like that specifically.

14      Q.   BY MR. MOORE:   But if there was something

15 like that in existence, that would give you a -- that

16 would be a concern for you?

17      MR. SCHWARTZ:   Object to form.

18      MS. GOTTLIEB:   Same.

19      THE WITNESS:   To be clear, it's if a rep

20 created a document that said ...

21      Q.   BY MR. MOORE:   The prescriber continues

Page 281

1 to be leery of off-label use?

2      A.   Okay.   I understand now.

3      Yes, that would be concerning.

4      Q.   Why?

5      MR. SCHWARTZ:   Same objection.

6      And, again, to the extent that it calls

7 for information that's coming out of the privileged

8 matter, I'm instructing you not to answer.   But if

9 you can answer it, nonprivileged, that's fine.

10      MS. GOTTLIEB:   Join.

11      THE WITNESS:   If I -- if I saw something

12 that you've described, that would certainly raise a

13 red flag as to that specific sales representative's

14 -- sales representative's sales practices.   Sorry.

15 I'm getting ...

16      Q.   BY MR. MOORE:   Promoting off-label is

17 illegal?

18      A.   Correct.

19      MR. SCHWARTZ:   I'm going to object to the

20 form on that last question.

21      Q.   BY MR. MOORE:   If I asked you this

Deposition of Danielle Davis                                   Jeffrey Buchalter v. William Tham, M.D., et al

Page 282

1  before, I'm sorry, but I'm going to one more time
2  because I don't remember at this point.
3        You come on in 2014, March, and at that
4  point, you're learning a ton about the company
5  through -- on the investigation side of things.  And
6  you're also in the process of, you know, developing
7  the compliance program at Insys on the other side,
8  right?
9        MS. GOTTLIEB:  Form.
10       Q.  BY MR. MOORE:  You know, if you were
11  asked a question that you had to have learned a lot
12  about what was going on, you had to have learned a
13  lot about what the executives at the time were doing,
14  why is -- did -- what steps did you take to shut it
15  down, what would your response be?
16       MR. SCHWARTZ:  Object to form.
17       MS. GOTTLIEB:  Form.
18       MR. SCHWARTZ:  Again, if you can answer
19  that in not -- without using privileged information,
20  that's fine.  Otherwise, instruct not to answer, if
21  it's privileged.

Page 283

1        THE WITNESS:  Sure.  I'll do my best.
2        Q.  BY MR. MOORE:  Sure.
3        A.  So, again, like we've discussed, I
4  learned a lot of information in a privileged context.
5  And as a result, were to build out the compliance
6  program with policies and procedures, training,
7  guardrails.
8        Q.  But if individuals at the top of the
9  company are engaged in fraud, okay, there's more to
10  it than building out policies and procedures and
11  guardrails.  You know, I would push back on you and
12  say:  Why didn't you take steps or what steps did you
13  take to get these individuals terminated?
14       MR. SCHWARTZ:  Object to form.
15       MS. GOTTLIEB:  Same.  And foundation.
16       Go ahead.
17       THE WITNESS:  When I learned of specific
18  violations, you know, we would discuss, there were --
19  there's been many employees that have been terminated
20  as a result of violating policies.  You know, I would
21  always, you know, escalate matters and discuss with

Page 284

1  -- with both in-house and external counsel.
2        Q.  BY MR. MOORE:  The question's slightly
3  different.
4        A.  Okay.
5        Q.  So it's one thing to violate a policy,
6  per se, right?  It's another thing to be -- to have
7  the top level executives of a company pushing
8  off-label, setting up a bribe scheme, and setting up
9  a scheme to defraud insurance companies.  That's
10  termination conduct, right?
11       MR. SCHWARTZ:  Object to form.
12  Argumentative.
13       MS. GOTTLIEB:  Form.
14       THE WITNESS:  If that specific conduct
15  you're referencing was uncovered, yes, steps would be
16  taken to likely terminate the employment.
17       Q.  BY MR. MOORE:  Did you uncover that?
18       MS. GOTTLIEB:  Form.
19       MR. SCHWARTZ:  Object to form.
20       THE WITNESS:  That calls for privileged
21  information.

Page 285

1        MR. SCHWARTZ:  Instruct not to answer.
2        MR. MOORE:  Okay.  All right.
3        Ms. Davis, thank you for giving me some
4  of your time today.  I appreciate it.  I don't think
5  I have any other questions, but your attorneys might.
6        THE WITNESS:  Okay.
7        MR. SCHWARTZ:  I have no further
8  questions.
9        MS. GOTTLIEB:  Mike, on the phone?
10       MR. MCCUBBIN:  I have no questions.
11  Let's go home.
12       MR. MOORE:  That's it.
13       THE VIDEOGRAPHER:  This concludes media
14  No. 4 in today's deposition.  Off the record at 4:52.
15       (The proceedings concluded at 4:52 p.m.)
16
17       _____
18       DANIELLE DAVIS
19
20
21

Deposition of Danielle Davis                                  Jeffrey Buchalter v. William Tham, M.D., et al

Page 286

1           CERTIFICATE

2        I, Kristy A. Ceton, Certified Court

3   Reporter:

4        That the foregoing deposition was taken by

5   me; that I am authorized to administer an oath; that

6   the witness before testifying was duly sworn by me to

7   testify to the whole truth; that the questions

8   propounded by counsel and the answers of the witness

9   were taken down by me in shorthand and thereafter

10  transcribed by me; that deposition review and

11  signature was requested; that the foregoing pages are

12  a fully, true, and accurate transcript of all

13  proceedings and testimony had upon the taking of said

14  deposition, all done to the best of my skill and

15  ability.  I further certify that I am in no way

16  related to any of the parties hereto, nor am I in any

17  way interested in the outcome hereof.

18        DATED at Phoenix, Arizona, this _____ day of

19  _____, 20__.

20

21                Kristy A. Ceton

         Certified Court Reporter #50200