# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

UNITED STATES

v.

MICHAEL J. GURRY et al.,

Defendants.

Criminal No. 16-CR-10343-ADB

ORAL ARGUMENT REQUESTED

LEAVE TO FILE EXCESS PAGES
GRANTED JUNE 6, 2019
(DKT. NO. 858)

## DEFENDANTS' RENEWED JOINT MOTION FOR JUDGMENT OF ACQUITTAL AND JOINT MOTION FOR A NEW TRIAL

## TABLE OF CONTENTS

OVERVIEW ......................................................................................................................... 1

LEGAL STANDARD........................................................................................................... 8

ARGUMENT ...................................................................................................................... 10

I.    The Jury's Verdict On The Controlled Substances Predicate Must Be Reversed In Favor of ACquittal. ................................................................................................ 10

    A.    The Jury's Verdict Is Not Supported By Any Evidence That Defendants Agreed Or Intended To Violate The CSA. ........................................................ 11

    B.    The CSA Predicate Was Multiplicitous With The Honest Services Fraud Predicate, Which RICO Case Law Does Not Permit............................................ 15

    C.    Reversal Of The CSA Predicate Is Also Necessary To Ensure That Defendants Are Not Improperly Sentenced....................................................... 17

II.    The Jury's Verdict On the Remaining RICO Predicates Should, At A Minimum, Be Set Aside For A New Trial. .................................................................................. 19

    A.    A New Trial Is Warranted On The Honest Services Fraud Predicates................ 19

    B.    A New Trial Is Warranted On The Mail Fraud Predicate.................................... 21

    C.    A New Trial Is Warranted On The Wire Fraud Predicate. .................................. 22

    D.    A New Trial Is Also Warranted Because of Prejudicial Spillover. ...................... 23

III.    The Jury's Verdict On Any Surviving Predicate Should Be Set Aside Because Of Improperly Admitted Evidence................................................................................ 26

    A.    The Court Should Have Excluded The Testimony Of Patients About Whom Defendants Knew Nothing................................................................................... 27

    B.    The Court Should Have Barred The Government From Eliciting Testimony About Dr. Chun's Drug Addiction......................................................................... 29

IV.    The Jury's Verdict On Any Surviving Predicates Should Be Set Aside Because Of The Government's Improper Rebuttal. ........................................................................ 31

CONCLUSION................................................................................................................... 36

REQUEST FOR ORAL ARGUMENT ............................................................................. 36

# TABLE OF AUTHORITIES

**Cases**

*Berger v. United States*,
  295 U.S. 78 (1935) ................................................................................................ 31

*Detrick v. Panalpina, Inc.*,
  108 F.3d 529 (4th Cir. 1997) ............................................................................... 23

*Floyd v. Meachum*,
  907 F.2d 347 (2d Cir. 1990) ................................................................................. 35

*Fogie v. THORN Ams., Inc.*,
  190 F.3d 889 (8th Cir. 1999) ............................................................................... 23

*Gonzales v. Oregon*,
  546 U.S. 243 (2006) ................................................................................ 11, 14, 15

*Griffin v. California*,
  380 U.S. 609 (1965) .............................................................................................. 31

*Leggins v. Duncan*,
  2010 WL 4916437 (D. Ariz. Aug. 27, 2010) ...................................................... 18

*Ocasio v. United States*,
  136 S. Ct. 1423 (2016) .......................................................................................... 10

*Polycast Tech. Corp. v. Uniroyal, Inc.*,
  728 F. Supp. 926 (S.D.N.Y. 1989) ...................................................................... 17

*Sanchez v. Triple-S Mgmt., Corp.*,
  492 F.3d 1 (1st Cir. 2007) ............................................................................. 21, 22

*United States ex rel. Hagerty v. Cyberonics, Inc.*,
  95 F. Supp. 3d 240 (D. Mass. 2015) .................................................................... 23

*United States v. Andujar*,
  49 F.3d 16 (1st Cir. 1995) ................................................................................. 8, 9

*United States v. Appolon*,
  715 F.3d 362 (1st Cir. 2013) .................................................................................. 8

*United States v. Azubike*,
  504 F.3d 30 (1st Cir. 2007) ................................................................... 31, 33, 35

*United States v. Cabrera*,
  734 F. Supp. 2d 66 (D.D.C. 2010) ......................................................................... 9

**Cases—continued:**

*United States v. Cameron,*
   814 F.2d 403 (7th Cir. 1987) ............................................................. 30

*United States v. Carpenter,*
   494 F.3d 13 (1st Cir. 2007)................................................. 31, 34, 35, 36

*United States v. Cassese,*
   428 F.3d 92 (2d Cir. 2005) .................................................................. 9

*United States v. Connolly,*
   504 F.3d 206 (1st Cir. 2007)................................................................ 9

*United States v. Cross,*
   308 F.3d 308 (3d Cir. 2002)............................................................... 26

*United States v. Curley,*
   639 F.3d 50 (2d Cir. 2011)............................................................. 9, 10

*United States v. Czubinski,*
   106 F.3d 1069 (1st Cir. 1997) ............................................................ 19

*United States v. DeFries,*
   129 F.3d 1293 (D.C. Cir. 1997) ......................................................... 20

*United States v. Dyer,*
   589 F.3d 520 (1st Cir. 2009).............................................................. 33

*United States v. Feingold,*
   454 F.3d 1001 (9th Cir. 2006) ........................................................... 11

*United States v. Ferguson,*
   246 F.3d 129 (2d Cir. 2001)................................................................ 9

*United States v. Forrester,*
   60 F.3d 52 (2d Cir. 1995) .................................................................. 10

*United States v. Friedman,*
   854 F.2d 535 (2d Cir. 1988)............................................................... 24

*United States v. Genova,*
   187 F. Supp. 2d 1015 (N.D. Ill. 2002) ................................................ 10

*United States v. Johnson,*
   911 F.2d 1394 (10th Cir. 1990) ......................................................... 17

*United States v. Joyner,*
   191 F.3d 47 (1st Cir. 1999)........................................................... 34, 35

**Cases—continued:**

*United States v. Kragness,*
    830 F.2d 842 (8th Cir. 1987) ............................................................ 17

*United States v. MacDonald & Watson Waste Oil Co.,*
    933 F.2d 35 (1st Cir. 1991) .............................................................. 32

*United States v. Manning,*
    23 F.3d 570 (1st Cir. 1994) .............................................................. 31

*United States v. Mardirosian,*
    602 F.3d 1 (1st Cir. 2010) ................................................................. 8

*United States v. Martin,*
    228 F.3d 1 (1st Cir. 2000) ................................................................. 8

*United States v. Morillo,*
    158 F.3d 18 (1st Cir. 1998) ............................................................... 8

*United States v. Ofray-Campos,*
    534 F.3d 1 (1st Cir. 2008) ................................................................. 8

*United States v. Paiz,*
    905 F.2d 1014 (7th Cir. 1990) ......................................................... 14

*United States v. Peake,*
    804 F.3d 81 (1st Cir. 2015) ............................................................. 31

*United States v. Polasek,*
    162 F.3d 878 (5th Cir. 1998) ........................................................... 30

*United States v. Posada-Rios,*
    158 F.3d 832 (5th Cir. 1998) ..................................................... 17, 18

*United States v. Ramirez-Rivera,*
    800 F.3d 1 (1st Cir. 2015) ............................................................... 10

*United States v. Rich,*
    326 F. Supp. 2d 670 (E.D. Pa. 2004) ............................................... 35

*United States v. Rodriguez,*
    738 F.2d 13 (1st Cir. 1984) ............................................................... 9

*United States v. Rodríguez,*
    675 F.3d 48 (1st Cir. 2012) ............................................................. 31

*United States v. Rooney,*
    37 F.3d 847 (2d Cir. 1994) ......................................................... 23, 24

**Cases—continued:**

*United States v. Sanchez,*
    969 F.2d 1409 (2d Cir. 1992) ................................................................. 9

*United States v. Sanjar,*
    876 F.3d 725 (5th Cir. 2017) ............................................................... 14

*United States v. Sarault,*
    975 F.2d 17 (1st Cir. 1992) ............................................................ 17, 19

*United States v. Sawyer,*
    85 F.3d 713 (1st Cir. 1996) ................................................................. 20

*United States v. Sepulveda,*
    15 F.3d 1161 (1st Cir. 1993) ............................................................... 10

*United States v. Spinney,*
    65 F.3d 231 (1st Cir. 1995) ................................................................... 8

*United States v. St. Michael's Credit Union,*
    880 F.2d 579 (1st Cir. 1989) ............................................................... 30

*United States v. Urciuoli,*
    613 F.3d 11 (1st Cir. 2010) ............................................................ 19, 22

*United States v. Urena,*
    73 F. Supp. 3d 291 (S.D.N.Y. 2014) ................................................... 10

*United States v. Varoudakis,*
    233 F.3d 113 (1st Cir. 2000) ............................................................... 29

*United States v. Vicaria,*
    12 F.3d 195 (11th Cir. 1994) ................................................................. 9

*United States v. Walgren,*
    885 F.2d 1417 (9th Cir. 1989) ............................................................. 17

*United States v. Wapnick,*
    60 F.3d 948 (2d Cir. 1995) .................................................................. 24

*United States v. Wheeler,*
    753 F.3d 200 (D.C. Cir. 2014) ............................................................... 9

*United States v. Zolot,*
    968 F. Supp. 2d 411 (D. Mass. 2013) .................................................. 11

*Zaccagnini v. Morris,*
    478 F. Supp. 1199 (D. Mass. 1979) .................................................... 28

**Cases—continued:**

*Ziglar v. Abassi*,
   137 S. Ct. 1843 (2017) ........................................................................................................ 23

**Rules and Guidelines**

Fed. R. Crim. P. 29(a) ................................................................................................ *passim*

Fed. R. of Crim. P. 33(a) ............................................................................................ *passim*

Fed. R. of Evid. 606(b) ....................................................................................................... 5

U.S.S.G. § 2E1.1 ................................................................................................................17

**Other Authorities**

CBC Radio, *As The World Turns* (May 6, 2019) ...........................................................7

Maria Cramer and Jonathan Saltzman, "Insys Jurors
   Horrified at Use of Rap Video To Push Sales," Boston Globe (May 7, 2019) ..........................5

DEA Intelligence Report, National Heroin Threat
   Assessment Summary – Updated (June 2016) ...........................................................2

Eliza Dewey, "U.S. Attorney Andrew Lelling Doubles Down
   On Judge Joseph Indictment," Greater Boston, WGBH News (May 6, 2019).......................2,7

Allan Ellis, "Securing a Favorable Federal Prison Placement,"
   NACDL, The Champion Magazine (July 2015).........................................................18

Insys Therapeutics 2014 Definitive Proxy Statement...................................................32

Aaron Leibowitz, "Insys Jurors Say They Thought Execs Were
   Guilty Early On," Law360 (May7, 2019).......................................................5, 25, 35

Andrew E. Lelling, *Corporate Accountability for the
   Opioid Epidemic*, 66 DOJ J. Fed. L. & Prac., no. 5 (2018) ..............................................2

Barry Meier, "Origins of an Epidemic," N.Y. Times (May 29, 2018) ...........................................2

U.S. Dep't of Justice, Office of Public Affairs,
   Press Release (Oct. 26, 2017) ...............................................................................1, 2

U.S. Dep't of Justice, Federal Bureau of Prisons,
   Program Statement P5100.08 (Sept. 12, 2006) ...........................................................18

U.S. Attorney for the District of Massachusetts, Press Release (May 2, 2019) ...........................6

**Other Authorities—continued:**

Charles Alan Wright et al., *Federal Practice & Procedure* (4th ed. Westlaw 2019)................... 35

**OVERVIEW**

On October 24, 2017, this case escalated from a prosecution of alleged medical bribery and insurance fraud to a declaration of war on the opioid epidemic.  On that date, the government superseded its original indictment, which had alleged fraud-based conspiracies and a conspiracy to violate the medical Anti-Kickback Statute ("AKS"), with one that added a lead predicate of illicit drug dealing in violation of the Controlled Substances Act ("CSA").  Whereas the original indictment charged particular defendants with participation in different conspiracies based on their roles in Insys's sales or insurance departments, the first superseding indictment charged *every* defendant with joining *every* part of the alleged scheme.  To top things off, the government added Insys's founder and chairman, Dr. John Kapoor, as a new defendant on all counts.

If the message of the first superseding indictment was not clear enough, the government's accompanying press release was: "We must hold the industry and its leadership accountable—just as we would the cartels or a street-level drug dealer" (statement of Acting U.S. Attorney); "The allegations of selling a highly addictive opioid cancer pain drug to patients who did not have cancer,[1] make them no better than street-level drug dealers" (statement of FBI); "These Insys executives allegedly fueled the opioid epidemic by paying doctors to needlessly prescribe an extremely dangerous and addictive form of fentanyl" (statement of Health and Human Services Officer of Inspector General).[2]

---

[1] The FBI statement was made under the mistaken impression that Subsys could only be properly prescribed to cancer patients—a critical misunderstanding that the government finally acknowledged at trial when confronted with the permissibility and frequency of off-label prescriptions.  *See, e.g.*, 4/4 Trial Tr. 56:12-15 (instruction that "[h]ealthcare practitioners are legally permitted to prescribe an approved drug for any legitimate medical purpose, including off label purposes").

[2] Press Release, U.S. Dep't of Justice, Office of Public Affairs (Oct. 26, 2017), *available at* https://tinyurl.com/FSIRelease ("FSI Press Release").

The reasons for the government's escalation are not hard to discern. The opioid epidemic was (and is) ravaging America, including suburban and rural communities unaccustomed to large-scale drug abuse. Millions of Americans were touched by it, and politicians and law enforcement officials needed to act. Pharmaceutical prescriptions were part of opioid epidemic—though far from its only cause,[3] and Subsys accounted for less than 0.02 percent of all opioid prescriptions nationwide.[4] But the executives of Purdue Pharma, makers of the infinitely more prevalent opioid Oxycontin, had been allowed to plead guilty to misdemeanors in 2007—a decision many now criticized.[5] A new attorney general promised to be tough on drugs—including by pursuing "corporate executives … who illegally contribute[d] to this nationwide epidemic."[6] A new U.S. Attorney in Massachusetts had just been nominated, and this case would be among a "string of blockbusters" through which he sought to make his mark.[7]

---

[3] *See* DEA Intelligence Report, National Heroin Threat Assessment Summary – Updated (June 2016) at 5, *available at* https://tinyurl.com/DEA2016Report ("While pharmaceutical fentanyl (from transdermal patches or lozenges) is diverted for abuse in the United States at small levels, this latest rash of overdose deaths is largely due to clandestinely-produced fentanyl, not diverted pharmaceutical fentanyl."). As the trial showed, Insys's drug, Subsys, is not a transdermal patch or lozenge, nor is it clandestinely produced or sold.

[4] Letter from Saeed Motaharti, President & CEO, Insys Therapeutics, Inc., to The Hon. Claire McCaskill, United States Senate (Sep. 1, 2017) at 2, *available at:* https://tinyurl.com/MotahartiLetter.

[5] *See, e.g.*, Barry Meier, "Origins of an Epidemic," N.Y. Times (May 29, 2018), *available at* https://tinyurl.com/NYTPurdue ("The government's decision not to seek felony indictments against Purdue Pharma was viewed by some as a missed opportunity to stem the opioid epidemic.").

[6] FSI Press Release, *supra* note 2.

[7] Eliza Dewey, "U.S. Attorney Andrew Lelling Doubles Down On Judge Joseph Indictment," Greater Boston, WGBH News (May 6, 2019), *available at* https://tinyurl.com/WGBHLelling (remarks by interviewer in accompanying TV interview discussing this case as well as other prosecutions). Prior to the start of trial, Mr. Lelling also published an article that discussed the charges in this case and their purported relationship to the opioid epidemic. *See* Andrew E. Lelling, *Corporate Accountability for the Opioid Epidemic*, 66 DOJ J. Fed. L. & Prac., no. 5, 159–176 (2018), *available at* https://tinyurl.com/LellingOpioids.

The government's aggression fit the public mood better than it fit the U.S. Code. Whereas in 2007 the government had deemed a felony *too much* for the Purdue executives, now the federal felony proscribing medical bribery—the AKS—was *not enough*. Prosecutors in this case wanted nothing to do with it. Their colleagues had lost too many AKS trials,[8] and they wanted to avoid "the vagaries of the AKS statute in this district." First MTD Hearing Tr. 29:25–30:1 (July 17, 2018) (argument of AUSA Yeager). Thus, in response to defendants' first motion to dismiss and concerns express by this Court, the government obtained a second superseding indictment ("SSI") that doubled down on the CSA predicate and dropped all AKS charges.

In so doing, the government embraced a burden it could not meet with actual evidence. Unlike street-level drug dealing, which occurs without a prescription and is *per se* illicit, prescriptions written by licensed practitioners can only be the basis of a CSA predicate if defendants agree and specifically intend that practitioners write medically illegitimate prescriptions. Yet the government made clear it would not offer such evidence with respect to any particular patient or prescription, but rather, maintained that every prescription written subsequent to an alleged bribe, "as a matter of law, federal law, it's not actually a prescription." 1/30 Trial Tr. 14:1-2 (argument of AUSA Yeager); *see also* 2/4 Trial Tr. 17:25-18:1 (Court's characterization of the government's position as "the theory that every prescription that follows a kickback is bogus"). In other words, the government argued that AKS violations were, *ipso facto*, violations of the CSA.

The Court rejected the government's legal theory, but nonetheless permitted it to put on a CSA predicate case at trial, including calling nine cherry-picked former Subsys patients out of thousands nationwide. Each patient had been prescribed multiple opioids, none was competent to

---

[8] *See United States v. MacKenzie*, No. 1:01-cr-10350 (D. Mass. 2004), Dkt. Nos. 712–18, 720; *United States. v. Bruens, et al.*, No. 1:05-cr-10102 (D. Mass. 2007), Dkt. Nos. 195–98; *United States v. Reichel*, No. 1:15-cr-10324 (D. Mass. 2016), Dkt. No. 247.

testify to the medical legitimacy of their own Subsys prescriptions, and none was known to any of the defendants.   No cooperating witness acknowledged a conspiracy to cause medically-illegitimate prescriptions.   Most merely described an effort to persuade doctors to switch from equivalent TIRF opioid products to Subsys.   Two practitioners bribed by cooperating witnesses testified, in hindsight, that some of their prescriptions were not medically necessary—but not that any of the defendants knew about, agreed, or intended for that to happen.   Two cooperators testified that, over time, they began to perceive a risk that overly aggressive marketing practices could lead to some bad prescriptions.   If that is all it took to make out a CSA predicate, it would be implicated in every case alleging repeated instances of medical bribery.

In response to defendants' motion for acquittal, this Court observed that "the proof on the Controlled Substances Act violation is pretty darn thin," but that it preferred to "leave it to the jury and see where we are after the jury verdict."   4/3 Rule 29 Hr'g Tr. 35:5-9.   Before deferring ruling, the Court was assured by the government's appellate counsel that the case on the CSA predicate "isn't a reasonable foreseeability argument, nor is the government arguing for a *Pinkerton* type theory here."   *Id.* at 22:1-2.   Yet, when closings came, AUSA Fred Wyshak argued just that—in highly prejudicial terms:

> People intend a reasonably foreseeable consequences of their actions.   ***It is though, if I took a gun and fired it into the audience***, which I'm not going to do, I don't intend to shoot any particular individual, but I know somebody's going to get hit.   ***And when the defendants arm these doctors with all these bribes and all these incentives, they were creating a loaded gun.***

4/5 Trial Tr. 169:23-170:4 (emphasis added).

Throughout trial, the Court tried to constrain the government's aggression.   It forced the government to gather and produce medical records before calling patients to the stand, and it sought to keep an even playing field on contested issues through evidentiary rulings and curative instructions that gave each side some, but not all, of what they wanted.   But the Court was

4

unwilling to take the drug-dealing question away from the jury and restrict deliberations to allegations that could lawfully be sustained under the remaining predicates.

At the height of the opioid epidemic, the Court's approach affected the outcome of trial. The jury deliberated over the course of four weeks, but it is now clear that they were working to overcome any reasonable doubts, rather than return an acquittal based upon them.  One juror told the press: "We hit the wall on all of it and it was emotional."[9]  Another made clear that they did not distinguish between bribery and the alleged RICO predicates: "They were buying the doctors.… It was so clear they were buying the doctors."[10]  Jurors were also moved by the plight of testifying patients and what they perceived as a lack of concern from Insys: "It was heart-wrenching to see these patients," Juror 5 said.[11]  Juror 6 felt that Insys "didn't care about the patients.  It was all about the money."[12]  Not a single juror told the press that they thought any defendants agreed or intended to cause medically-illegitimate prescriptions—a financial motive to increase sales was enough.

Defendants recognize that, absent special circumstances, Federal Rule of Evidence 606(b) prohibits reliance on public juror statements as a basis for reversing a verdict.  That is not the purpose of raising them here.  Rather, the statements give fair indication that the arguments and inferences defendants challenged from the outset are precisely the ones that resonated with jurors. In other words, the government cannot now claim that inclusion of the CSA predicate, use of

---

[9] Aaron Leibowitz, "Insys Jurors Say They Thought Execs Were Guilty Early On," Law360 (May 7, 2019), *available at* https://tinyurl.com/law360insysjurors.

[10] Maria Cramer and Jonathan Saltzman, "Insys Jurors Horrified at Use of Rap Video To Push Sales," Boston Globe (May 7, 2019), *available at* https://tinyurl.com/globeinsysjurors.

[11] *Id.*

[12] *Id.*

patient testimony to engender antipathy for defendants, and its improper rebuttal closing argument, were harmless and immaterial to the outcome.

In a different case or time, the Court's evidentiary rulings and curative legal instructions may have provided sufficient safeguards for defendants.  But a fair trial is hardest to achieve precisely when public passions are high.  That is when criminal laws are most likely to get twisted in the service of what prosecutors see as the greater good.  Here, no one can say with confidence what this jury would have done were the government constrained to only the theories and allegations it could legally prove.  And four of the defendants—a septuagenarian founder and philanthropist, two pharmaceutical salesmen, and a saleswoman with nearly no relevant experience—now face a CSA predicate finding that, if allowed to stand, could change their sentencing guidelines and cause them to serve time in institutions designated by the Bureau of Prisons for leaders and organizers in the drug-dealing world.

Moreover, unless this Court intervenes, this case will become the blueprint for charging pharmaceutical executives across the country.  Within hours of the verdict, the government issued a press-release that touted the CSA predicate, with the following lead quote:

> "Today's convictions mark the first successful prosecution of top pharmaceutical executives for crimes related to the illicit marketing and prescribing of opioids," said United States Attorney Andrew E. Lelling.  "***Just as we would street-level drug dealers, we will hold pharmaceutical executives responsible for fueling the opioid epidemic by recklessly and illegally distributing these drugs***, especially while conspiring to commit racketeering along the way. …  This is a landmark prosecution that vindicated the public's interest in staunching the flow of opioids into our homes and streets."[13]

---

[13] Press Release, U.S. Attorney for the District of Massachusetts (May 2, 2019), *available at* https://tinyurl.com/DMassConvictionPR (emphasis added).

A few days later, U.S. Attorney Andrew Lelling gave multiple interviews that focused on this case.  In one, he acknowledging that a "racketeering conspiracy charge" was "unusual in this context," but predicted that "you will see more of these cases because we have proven the model works."[14]  Another interview echoed the government's public talking points to a tee, with the interviewer introducing Mr. Lelling like this:  "For the first time in the history of the opioid crisis, the American justice system is treating a pharmaceutical CEO responsible for pushing addictive and deadly drugs on doctors and their patients the same way it would treat a drug kingpin pushing the same stuff on the street."[15]  The interviewer asserted that the RICO charge, "generally reserved for the mafia," was brought here because defendants purportedly bribed doctors "to get them to prescribe more of their fentanyl drug called Subsys, ***including to people who did not need it***."[16]  Mr. Lelling agreed that "other U.S. Attorney's offices are calling [Massachusetts] and getting advice to pursue comparable things across the country" and that "this kind of prosecution can scare other executives," and he hoped that lawyers around the country were telling pharmaceutical CEOs "this could be you next time."[17]

In the end, what the government accomplished in this case—in the face of constant defense objections—is a constructive amendment of the CSA and RICO statutes.  If the opioid epidemic calls for rechristening alleged medical bribery and marketing violations as drug dealing and organized crime, it is up to the elected branches to make those changes, not to prosecutors to revise existing laws.  Defendants urge this Court to hold the government to its legal burden and not allow

---

[14] CBC Radio, *As The World Turns* (May 6, 2019), available at https://tinyurl.com/LellingCBC (interview starts at 26:05).

[15] Dewey, *supra* note 7 (comments in TV interview).

[16] *Id*. (emphasis added).

[17] *Id.*

a CSA predicate finding on "pretty darn thin" evidence to stand and become the blueprint for prosecutorial decisions throughout the country.  And defendants urge the Court, at a minimum, to grant a new trial on the remaining predicates because of the scarcity of evidence on key elements, the prejudicial spillover of allowing the CSA allegation to reach the jury, the improper admission of certain evidence, and improper rebuttal argument by the government.

## LEGAL STANDARD

A district court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).  Where a verdict has been rendered by the jury, "the inquiry focuses on whether 'a rational jury could have found that the government proved each element of the crime beyond a reasonable doubt.'" *United States v. Appolon*, 715 F.3d 362, 367 (1st Cir. 2013) (quoting *United States v. Mardirosian*, 602 F.3d 1, 7 (1st Cir. 2010)).

Although a district court must look at the evidence in the light most favorable to the jury's verdict, "juries do not have *carte blanche*" under the Rule 29 standard.  *United States v. Spinney*, 65 F.3d 231, 234 (1st Cir. 1995); *see also United States v. Martin*, 228 F.3d 1, 10 (1st Cir. 2000) (noting that "the jury verdict is not given a 'free pass'" under Rule 29).  The court is required to "take a hard look at the record and to reject those evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative.'" *Spinney*, 65 F.3d at 234; *United States v. Ofray-Campos*, 534 F.3d 1, 31-32 (1st Cir. 2008).  "If the evidence viewed in the light most favorable to the verdict gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged, th[e] court must reverse the conviction." *United States v. Morillo*, 158 F.3d 18, 22 (1st Cir. 1998) (internal quotation marks and citations omitted).  "This is so because ... where an equal or nearly equal theory of guilt and a theory of innocence is supported by the evidence ... 'a reasonable jury *must necessarily entertain* a reasonable doubt.'" *United States v. Andujar*, 49 F.3d 16, 20 (1st Cir. 1995) (emphasis in original); *accord United*

*States v. Cassese*, 428 F.3d 92, 99 (2d Cir. 2005) ("[A]t the end of the day, if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt").

Federal Rule of Criminal Procedure 33(a) provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." "The rules do not define 'interests of justice,'" *United States v. Wheeler*, 753 F.3d 200, 208 (D.C. Cir. 2014) (internal quotation marks omitted), and whether to grant a motion for a new trial pursuant to Rule 33 "is ordinarily a 'judgment call,'" *United States v. Connolly*, 504 F.3d 206, 211 (1st Cir. 2007) (citation omitted), that "rests within the discretion of the trial judge," *United States v. Rodriguez*, 738 F.2d 13, 17 (1st Cir. 1984). The interests-of-justice standard encompasses more than what would constitute reversible error on appeal, *see United States v. Vicaria*, 12 F.3d 195, 198 (11th Cir. 1994), and courts have granted new trials "in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial," *United States v. Cabrera*, 734 F. Supp. 2d 66, 87-88 (D.D.C. 2010) (internal quotation marks omitted), *aff'd in part sub nom. United States v. Vega*, 826 F.3d 514 (D.C. Cir. 2016) (*per curiam*). "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (citing *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)).

A timely-raised trial error will also warrant a new trial, unless the government shows that the error was harmless. *See United States v. Curley*, 639 F.3d 50, 58 (2d Cir. 2011). Courts typically consider several factors in determining whether the error was harmless: (1) whether the error went to a critical issue in the case; (2) whether the government capitalized on the error in its

arguments to the jury; and (3) the strength of the government's case. *Id.* Of these factors, the strength of the government's case is "[t]he most critical." *Id.* (internal quotation marks omitted); *see also United States v. Forrester*, 60 F.3d 52, 64-65 (2d Cir. 1995) ("Error going 'to the heart' of a critical issue is less likely to be harmless."). Even if a court finds each individual error harmless, it must grant a new trial if their "aggregate" effect was to deny the defendant a fair trial. *United States v. Sepulveda*, 15 F.3d 1161, 1195-96 (1st Cir. 1993).

## ARGUMENT

## I.   THE JURY'S VERDICT ON THE CONTROLLED SUBSTANCES PREDICATE MUST BE REVERSED IN FAVOR OF ACQUITTAL.

To convict defendants of conspiring to violate RICO, the government was required to prove (among other things) that defendants "agree[d] to commit, or in fact commit[ed] two or more predicate offenses." *United States v. Ramirez-Rivera*, 800 F.3d 1, 18 (1st Cir. 2015). The government was also required to prove that defendants "specifically intended that some conspirator commit *each element* of" the predicate offense at issue. *Ocasio v. United States*, 136 S. Ct. 1423, 1432 (2016) (emphasis added). For Rule 29 purposes, each of the three RICO predicates charged in the SSI must be treated as a distinct conspiracy charge, and a conviction may stand only if a reasonable jury could find beyond a reasonable doubt that defendants agreed and intended that they or their co-conspirators should commit that distinct predicate offense. *See, e.g.*, *United States v. Urena*, 73 F. Supp. 3d 291, 312 (S.D.N.Y. 2014) (granting Rule 29 motion and setting aside jury's finding on racketeering act predicate underlying a larger RICO count); *United States v. Genova*, 187 F. Supp. 2d 1015, 1019-22 (N.D. Ill. 2002) (same).

Acquittal on the CSA predicate is warranted here because of a complete lack of proof that defendants agreed and intended that practitioners would prescribe Subsys to patients who had no

legitimate medical need for it—a lack of proof the Court has previously acknowledged but that was not reflected in the jury's verdict.

### A.   The Jury's Verdict Is Not Supported By Any Evidence That Defendants Agreed Or Intended To Violate The CSA.

The Supreme Court has held that the CSA "manifests no intent to regulate the practice of medicine generally," but rather is limited to "bar[ring] doctors from using their prescription-writing powers as a means to engage in illicit drug dealing and trafficking as conventionally understood." *Gonzales v. Oregon*, 546 U.S. 243, 269-70 (2006).  Thus, where a practitioner is writing his or her patient a prescription for an FDA-approved controlled substance, the CSA is violated only where the practitioner has no good faith belief that the patient has a legitimate medical need for the medication.  Or, as Chief Judge Saris has put it, a practitioner violates the CSA only if he or she acts as a " 'pusher' " rather than a healthcare provider.  *United States v. Zolot*, 968 F. Supp. 2d 411, 429 (D. Mass. 2013) (favorably citing and quoting *United States v. Feingold*, 454 F.3d 1001, 1011 (9th Cir. 2006)); *see also Feingold*, 454 F.3d at 1011 ("A practitioner becomes a criminal not when he is a *bad* or *negligent* physician, but when he ceases to be a physician *at all*." (emphasis in original)).

For the jury to convict on the CSA predicate, the government thus needed to prove that defendants *agreed* and *intended* that healthcare practitioners should act as drug pushers, prescribing Subsys to patients who did not have a legitimate need for a TIRF medication.  It failed to do so.  At most, the government was able to point to evidence that Dr. Awerbuch and APRN Alfonso prescribed Subsys in questionable circumstances or to patients whom they now say could be effectively treated with a less potent pain medication.  *See* 1/31 Trial Tr. 49:11-14 ("**DR. AWERBUCH**: [P]atients who had arthritis may have needed something more like a Motrin or a Tramadol or Codeine.  But I went ahead and prescribed Subsys to some of the patients that really

11

didn't need it just to increase my number of prescriptions."); 2/11 Trial Tr. 156:2-8 ("**MR. LAZARUS**: In your medical opinion, did he need a rapid onset opioid?  **APRN ALFONSO**: No. …. Why did I choose Subsys?  **MR. LAZARUS**: Yeah.  Why did you give him Subsys. **APRN ALFONSO**:  Because Subsys was paying me to write prescriptions.").  While defendants' cross examinations of Dr. Awerbuch and APRN Alfonso demonstrated that their hindsight review of patient files, performed at the request of the government, was unreliable and inconsistent with their prior statements to investigators, defendants acknowledge that a reasonable jury could have concluded that Dr. Awerbuch and APRN Alfonso violated the CSA.  But this was not enough to find against any defendants on the CSA predicate, in the absence of evidence that they agreed or intended for such conduct to occur.

Not a single Insys employee testified to having an intent or goal that healthcare practitioners would prescribe Subsys to patients who had no medical need for it.  In fact, the government's star cooperating witnesses provided testimony to the contrary.  Michael Babich, for example, was specifically asked whether he "intend[ed]" or had a "goal to get doctors to give this medication to patients who didn't need it," and he answered unambiguously, "*It was not my goal.*" 2/14 Trial Tr. 141:6-8 (emphasis added).  Other Insys executives and sales representatives— including sales representatives Holly Brown, Brett Szymanski, and Tracey Krane, as well as Mr. Napoletano—provided essentially identical testimony.[18]  Even Dr. Awerbuch, when specifically

---

[18] *See, e.g.*, 1/29 Trial Tr. 182:12-17 ("**MS. WILKINSON**: And the idea was when physicians and their staff heard about the drug, they would then want to go out and prescribe it to their patients, right?  **HOLLY BROWN**: Yes.  **MS. WILKINSON**: If it were appropriate?  **MS. BROWN**: Yes."), *Id.* at 184:1-3 ("**MS. WILKINSON**: You never encouraged a doctor to prescribe something a patient didn't need?  **MS. BROWN**: Not on purpose, no."); 1/30 Trial Tr. 148:9-13 ("**BRETT SZYMANSKI**: Dr. Awerbuch pushed back and said, the patients are doing great on one and 200 micrograms.  I am not comfortable increasing them for no reason.  **MR. STOJILKOVIC**: What did Alec say?  **MR. SZYMANSKI**: I think he basically agreed to it.");

confronted about whether he ever disclosed to defendants that he was writing prescriptions that he considered medically unnecessary, acknowledged that he had not.  To the contrary, Dr. Awerbuch testified that he assured Dr. Kapoor that he was prescribing Subsys off-label because it was providing relief to his "patients with chronic pain, and that [he] use[s] Subsys to treat patients with chronic pain."  1/31 Trial Tr. 89:4-8.

The Court has already acknowledged the government's failure to present such evidence, describing the government's proof on the CSA predicate as "pretty darn thin."  4/3 Trial Tr. 35:2-6.  Far from addressing the Court's concerns, the government's closing argument effectively confirmed them.  Not once did the government reference any evidence that defendants agreed and intended for practitioners to prescribe Subsys to patients without a legitimate medical need.  Rather, as it has throughout the trial, the government relied on the theory that defendants' conduct supposedly created a foreseeable risk that some practitioners might prescribe Subsys to patients without a legitimate medical reason.  *See* 4/4 Trial Tr. 88:20-24 ("No matter what happened in this case, you'll see that over and over and over they were given warnings. They were told over and over and over that what they were doing was causing people to distribute illegally.  They knew."); 4/5 Trial Tr. 170:15-18 ("And that's because [Michael Babich] knew, when he pled guilty, like every other defendant here knew, that what they were doing was creating this danger to the people

---

2/6 Trial Tr. 111:4-6 ("**MS. WILKINSON**: You wanted the patients who needed the medicine to get the medicine, correct?  **MR. NAPOLETANO**: Yes."), *id.* at 196:16-18 ("**MS. WILKINSON**: So the goal was to get better medication to patients, right?  **MR. NAPOLETANO**: Yes."), *id.* at 197:14-16 ("**MS. WILKINSON**: You would never want a doctor to use it on a patient who did not need it?  **MR. NAPOLETANO**: No."); 3/13 Trial Tr. 138:4-7 ("**MS. MINER**: [You would] try to get [the doctor] to try Subsys with some of their patients that they would feel were appropriate for the medicine, right?  **TRACEY KRANE**: Yes."), 3/13 Trial Tr. 163:7-15 (Ms. Krane testifying that Dr. Steven Chun told her he switched patients to from Fentora and Actiq to Subsys "due to better safety and bioavailability"), 3/13 Trial Tr. 167:2-4 (Ms. Krane testifying that her sales target, Dr. Liebowitz, told her "he had made the decision to prescribe Actiq for patients who had migraines" because "it worked so well for their headaches").

who were ultimately going to get this drug.").  The government even went so far as analogizing defendants' conduct to the reasonably foreseeable consequences of firing a gun at an audience. *See* 4/5 Trial Tr. 169:23-170:4.

As defendants argued repeatedly in prior motions, the government's theory for establishing liability under the CSA is a blatant attempt to equate a conspiratorial agreement with civil standards of causation and reasonable foreseeability.  If that theory held water, any alleged conspiracy to violate the AKS with respect to a FDA-approved controlled substance could be prosecuted as a CSA conspiracy, because the government could always argue that paying a physician a kickback increases the risk of improper prescriptions.  This would eliminate the distinction between those prescriptions that were influenced in some way by a kickback but have a colorable medical basis, and those that are the equivalent of illicit drug dealing.  *See* 2/4 Trial Tr. 17:25-18:1 ("**THE COURT:** I just don't agree with the theory that every prescription that follows a kickback is bogus.").[19]

Significantly, the government failed to introduce a shred of evidence at trial that defendants agreed and intended that co-conspirator practitioners would engage in "drug dealing and

---

[19] The government also cannot sustain the CSA predicate findings through the concept of *Pinkerton* liability.  As discussed in more detail in defendants' prior Rule 29 motion, *Pinkerton* liability "is based on an agency theory," namely that a defendant can be held vicariously liable for certain substantive offenses that a co-conspirator commits in furtherance of the conspiracy.  *United States v. Paiz*, 905 F.2d 1014, 1025 (7th Cir. 1990).  *Pinkerton* does not hold that the agreed-upon objects of a conspiracy are, *a fortiori*, all of the reasonably foreseeable crimes that some co-conspirator may commit in furtherance of the conspiracy.  To the contrary, *Pinkerton* liability is imposed where the substantive offenses that a co-conspirator committed *were not* objects of the conspiracy that the defendant agreed to join.  *See, e.g.*, *United States v. Sanjar*, 876 F.3d 725, 744 (5th Cir. 2017) ("Foreseeability is more often an issue when the substantive offense for which *Pinkerton* liability is being sought is not an object of the conspiracy.").  Here, the SSI does not charge defendants with any substantive offenses, and the question the jury was charged with answering was whether there is sufficient evidence that defendants agreed and specifically intended that co-conspirator practitioners would prescribe Subsys even where the patient had no medical need for a TIRF medication.

14

trafficking as conventionally understood." *Gonzales*, 546 U.S. at 270. When confronted with Michael Babich's seemingly dispositive testimony refuting that illegitimate prescriptions were a goal of the conspiracy, *see* 2/14 Trial Tr. 141:6-8, the only response the government could muster was telling the jury to simply disregard that part of his testimony. *See* 4/4 Trial Tr. 88:17-20 ("You're going to hear—and it's true. Mike Babich sat in that chair and he told you it was not his goal to have illegal distribution. You can accept some, all, or none of what a witness says."). But the government did not point to any former Insys employee who contradicted Babich on this fundamental point, or to any documentary evidence that defendants (or anyone else at Insys) had a goal of causing medically illegitimate prescriptions.

Ultimately, acquittal is warranted because the government's erroneous theory equating a conspiratorial agreement with civil standards of reasonable foreseeability has led the jury to convict defendants based on evidence that, at most, establishes an alleged conspiracy to violate the AKS. A conspiracy to violate the CSA requires the government to establish more than purported bribes or kickbacks; here, it required evidence showing that defendants *agreed* and *intended* that co-conspirator practitioners would prescribe Subsys to patients who did not need it. Because the government failed to present such evidence, no rational jury could have concluded beyond a reasonable doubt that defendants conspired to violate the CSA.

### B.     The CSA Predicate Was Multiplicitous With The Honest Services Fraud Predicate, Which RICO Case Law Does Not Permit.

As explained in defendants' prior Rule 29 motion, the allegations underlying the CSA predicates included that defendants "engaged in conduct to prevent detection of their illegal activities by the DEA and others." SSI ¶ 71. Specifically, the SSI alleged that defendants conspired to engage in an unlawful "direct shipping" scheme to a pharmacy partly owned by Practitioners #1 and #2 in order to evade wholesalers' suspicious order monitoring requirements,

as well as a pharmacy associated with Practitioner #3.  *Id.*  ¶¶ 72-73.  These allegations served, at least somewhat, to distinguish the CSA predicate from the honest services fraud ("HSF") predicates.

At trial, however, the government abandoned any attempt to establish the SSI's "direct shipping" allegations as CSA violations.  The government failed to even mention the direct shipping issue in its opening statement, and addressed the issue with just one witness, Michael Babich, whose testimony was completely contrary to SSI's allegations.  Mr. Babich made clear that it was "never the intent" to use a direct shipping arrangement to evade DEA oversight of Subsys shipments or prescriptions, that Insys was "not trying to evade DEA rules," and that Insys was "trying to do it the right way."  2/15 Trial Tr. 152:1-154:6, 155:1-21; *see also id.* 151:12-15, 159:23-25, 161:22-23, 167:3-11, 169:4-7.  While direct shipping was briefly mentioned in the government's closing argument, it had nothing to do with any purported evasion of DEA oversight or rules.  Rather, the government's discussion of direct shipping in its closing argument was limited to (1) conceding that direct shipment arrangements are legal, and (2) using direct shipping in an effort to impute knowledge on defendants that certain practitioners were overprescribing Subsys.  *See* 4/4 Trial Tr. 90:4-7 ("The point of direct shipments is that they knew that certain doctors that owned pharmacies had lost their ability, lost the ability to receive Schedule II opioids in their pharmacies because of the quantity of opioids that were being sold.")

By abandoning the theory of direct shipping as a CSA predicate, the government ensured that a conviction on the CSA predicate would be based on exactly the same conduct as the honest services fraud predicate—that, in exchange for bribes, co-conspirator practitioners prescribed Subsys without a legitimate medical purpose.  *Compare* SSI ¶6 (setting forth alleged CSA standard) ("Federal law mandates that to be effective, a prescription for a controlled substance

must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice") *with id*. ¶ 7 (setting forth alleged honest services standard) ("Practitioners owed a fiduciary duty to their patients to prescribe medication in the usual course of professional practice for a legitimate medical purpose.").  Even apart from whether the government has introduced evidence sufficient to prove the CSA predicate beyond a reasonable doubt (which it has not), it is impermissible to convict defendants for two predicate offenses based on the exact same underlying conduct.  "[I]t is not proper under RICO to charge two predicate acts where one action violates two statutes."  *United States v. Kragness*, 830 F.2d 842, 861 (8th Cir. 1987); *see also United States v. Johnson*, 911 F.2d 1394, 1404 (10th Cir. 1990) (same); *United States v. Walgren*, 885 F.2d 1417, 1425 (9th Cir. 1989) (same); *Polycast Tech. Corp. v. Uniroyal, Inc.*, 728 F. Supp. 926, 945 (S.D.N.Y. 1989) ("Defendants' single set of fraudulent statements cannot be split into two separate acts of racketeering activity [merely because they violated two distinct statutes].").  For this reason as well, the Court should reverse defendants' convictions on the CSA predicate in favor of a judgment of acquittal under Rule 29.

**C.    Reversal Of The CSA Predicate Is Also Necessary To Ensure That Defendants Are Not Improperly Sentenced.**

If the CSA predicate is not reversed, it could impact the sentencing guidelines for defendants Kapoor, Simon, Lee, and Rowan.  In determining the sentence for a RICO conviction, the district court begins with "a base offense level of nineteen or, if greater, 'the offense level applicable to the underlying racketeering activity.'"  *United States v. Sarault*, 975 F.2d 17, 18 (1st Cir. 1992) (quoting U.S.S.G. § 2E1.1).  "Where, as here, there is more than one underlying racketeering act, each racketeering act is treated as if it were contained in a separate count of conviction."  *United States v. Posada-Rios*, 158 F.3d 832, 880 (5th Cir. 1998) (citing U.S.S.G. § 2E1.1, comment 1).  "The racketeering act that yields the greatest offense level is used to

determine the guideline range." *Id.* Although defendants' presentence investigation reports are yet to be completed, the CSA predicate would yield a different—and, quite possibly, greater—base offense level. Accordingly, defendants urge the Court to resolve the CSA issue before any presentence investigation report is finalized.

Even more concerning, sustaining the CSA predicate convictions could affect the prison designations of the same four defendants, in ways that the Court may be powerless to alter. "The BOP's policy and procedures for classifying inmates are set forth in the Inmate Security Designation and Custody Classification Manual. The Manual is referenced as Program Statement ('PS') 5100.08." *Leggins v. Duncan*, 2010 WL 4916437, at *4 (D. Ariz. Aug. 27, 2010). The Manual mandates consideration of the severity of the offense in designation decisions. *See* PS 5100.08 (Sept. 12, 2006) at Appendix A, p.1, *available at* https://tinyurl.com/PS5100-08. The "Greatest Severity" is reserved for offenses including drug offenses if the drug offender "was part of an organizational network and he or she organized or maintained ownership interests/profits from large scale drug activity" involving "heroin or opiates" in certain drug amounts. *Id.* "A male inmate whose current term of confinement falls into the 'Greatest Severity' range according to the Offense Severity Scale (Appendix A) of BOP Program Statement 5100.08" cannot be housed in a minimum security facility unless the BOP Designation and Sentence Computation Center choses to waive such a determination. Allan Ellis, "Securing a Favorable Federal Prison Placement," NACDL, The Champion Magazine (July 2015) at 31, *available at:* https://tinyurl.com/EllisPrisonPlacement.

In assessing who qualifies as a "manager or owner of a large-scale drug activities," the Bureau of Prisons considers, among other things, any "role in the offense" enhancements, *see id.* at 31, which the government will almost certainly seek in this case. Accordingly, sustaining the

CSA predicate could well prevent defendants Kapoor, Simon, Lee, and Rowan from serving any prison term in a minimum security facility that would otherwise be appropriate under the Bureau's policy, given their lack of criminal history and the non-violent conduct at issue. This would hardly be a fair outcome for a "pretty darn thin" CSA case, where the government's zeal to take a hard line on opioid executives resulted in a constructive amendment of federal drug laws.

## II. THE JURY'S VERDICT ON THE REMAINING RICO PREDICATES SHOULD, AT A MINIMUM, BE SET ASIDE FOR A NEW TRIAL.

As discussed in defendants' prior Rule 29 motion, the remaining RICO predicates also suffer from a failure of proof. Defendants stand by those arguments and incorporate them by reference herein. Instead of repeating the arguments, defendants will devote the remainder of this section to showing why the same proof issues require, at a minimum, a new trial.

### A. A New Trial Is Warranted On The Honest Services Fraud Predicates.

A RICO conspiracy based on honest services fraud requires that defendants specifically agreed and intended that healthcare practitioners would (1) violate their fiduciary duty to their patients by prescribing Subsys without a legitimate medical purpose (2) while engaging in acts of deception. *United States v. Urciuoli*, 613 F.3d 11, 17-18 (1st Cir. 2010) (recognizing that some "fiduciary" needs to violate his or her duty for an honest services conviction to stand); *United States v. Czubinski*, 106 F.3d 1069, 1077 (1st Cir. 1997) (requiring breach of fiduciary duty to commit honest services fraud). Here, the government failed to present evidence sufficient to satisfy either the fiduciary duty or deception elements.

As to fiduciary duty, the government's proof was insufficient for much the same reason it failed as to the CSA. The evidence may have been sufficient to prove that Insys engaged in aggressive sales and marketing, or even that some Insys employees offered bribes to certain practitioners. But such conduct by the cooperating witnesses violated AKS; it is not enough to

secure any defendants' conviction on an honest services fraud predicate.  Rather, like the CSA predicate, the government needed to prove that medically illegitimate prescriptions, in breach of a practitioner's fiduciary duty, were the *object* of an unlawful agreement that defendants knowingly and willfully joined.  Were it otherwise, every AKS conspiracy could be re-cast at a prosecutor's whim as honest services fraud.

As discussed above, the government failed to present evidence that it was the *object* of the alleged conspiracy for patients to be prescribed Subsys for no legitimate medical reason.  As with the CSA predicate, it is not sufficient for the government to show that medically unnecessary prescriptions were a foreseeable risk of Insys's sales and marketing efforts, nor is it sufficient to show that defendants might have been subject to *Pinkerton* liability for substantive honest services fraud violations committed by healthcare practitioners.

Moreover, to establish honest services fraud, "the alleged scheme must involve deception." *United States v. Sawyer*, 85 F.3d 713, 732 (1st Cir. 1996); *see also United States v. DeFries*, 129 F.3d 1293, 1306 (D.C. Cir. 1997) ("To constitute a deprivation of 'honest services,' the breach of fiduciary duty must have some element of dishonesty.").  Here, Insys's financial relationships with practitioners were publicly disclosed on the "Open Payments" website maintained by the Centers for Medicare & Medicaid Services ("CMS"), and there is no evidence that defendants agreed and intended that those financial relationships should be concealed.  *See, e.g.*, 2/4 Trial Tr. 142:18-20 ("**MR. KENDALL**: [T]hese are all relationships that get publicly disclosed on the internet, don't they? **MR. NAPOLETANO**: Now they do, yes."); 3/8 Trial Tr. 137:4-8 ("**MR. HORSTMANN**: You knew that doctors like Madison and Awerbuch were going to have [published on the Open Payment website] dollar amounts associated with them that they were receiving from Insys and was attributed to speaker programs, right?  **MR. BURLAKOFF**: Yes.  That wasn't a concern.").

20

Indeed, when addressing the Open Payments website in its closing argument, the only response the government could muster was to ask the jury not to "confuse arrogance with openness" or "audacity with transparency."  4/4 Trial Tr. 115:4-5.  The government never explained what deception occurred, or was intended, with respect to the honest services predicate—let alone offered sufficient evidence of an intent to deceive insurers about the financial arrangements with practitioners.  Thus, this element of honest services fraud was also not met

For both these reasons, the Court should, at a minimum, order a new trial on both honest services fraud predicates.

### B.     A New Trial Is Warranted On The Mail Fraud Predicate.

The SSI's traditional mail fraud predicate is based on the allegation that Insys did not disclose to insurers and PBMs that the prescriptions for which the IRC was seeking reimbursement were written by bribed practitioners.  *See* SSI ¶ 34 ("The defendants caused bribes and kickbacks to be sent and delivered by the United States Postal Service and by private and commercial interstate carriers."); *id.* ¶ 31 ("Had the insurers known that the defendants gave bribes and kickbacks to the targeted practitioners, the insurers would not have authorized payment for Subsys because insurers do not authorize payment for prescriptions that are written ... in exchange for a bribe or kickback[.]").  The Court, however, already has recognized that not "every prescription is bogus just because there was a kickback behind it." 2/4 Trial Tr. 18:6-7.  Thus, no reasonable jury could find that the mail fraud predicate proven simply because the IRC sought reimbursement for prescriptions written by practitioners who received Insys speaker program payments via the mail. Nor could the jury find such a conspiracy based on Insys's failure to affirmatively inform insurance companies or PBMs of Insys's financial relationships with certain prescribers.  *See id.* at 18:7-8 ("THE COURT: I don't think there's any obligation to disclose [the alleged kickback to the insurance company]."); *see also Sanchez v. Triple-S Mgmt., Corp.*, 492 F.3d 1, 10 (1st Cir. 2007)

("[F]ailure to disclose information, without more, cannot make out a violation of the mail and wire fraud statutes.").

With the "*per se* bogus prescription" and "fraud by omission" theories gone, the government could sustain the traditional mail fraud predicate only by showing that Insys affirmatively lied to insurance companies and PBMs about its financial relationships with certain practitioners.  Despite calling seven IRC-related witnesses—four insurance company employees, IRC Manager Elizabeth Gurrieri, and Prior Authorization Specialists Kim Fordham and Lyndsey Meyer—the government failed to introduce any evidence that an insurance company or PBM ever asked Insys whether a prescription had been written by a practitioner with a financial relationship with Insys.  Nor did the government introduce a single piece of evidence, through *any* witness, that an insurance company would consider a practitioner's financial relationship with Insys in determining whether the prescription satisfied coverage criteria.  In the absence of such evidence, no reasonable jury would have been able to find either (1) that false statements to insurers about Insys's financial relationship with practitioners were made or intended or (2) that such nonexistent statements would have been capable of influencing the outcome of the insurance decision (*i.e.*, would have been material).  The Court should reverse defendants' convictions on mail fraud predicate and, at a minimum, order new trial.

### C.     A New Trial Is Warranted On The Wire Fraud Predicate.

As the Supreme Court recently held, the "intracorporate conspiracy doctrine" provides that "an agreement between or among agents of the same legal entity, when the agents act in their official capacities, is not an unlawful conspiracy." *Ziglar v. Abassi*, 137 S. Ct. 1843, 1867 (2017). "When two agents of the same legal entity make an agreement in the course of their official duties, ... their acts are attributed to their principal.  And it then follows that there has not been an agreement between two or more separate people." *Id.*  The Fourth and Eighth Circuits have held

that the intra-corporate conspiracy doctrine applies to claims under RICO.  *See also Detrick v. Panalpina, Inc.*, 108 F.3d 529, 544 (4th Cir. 1997); *Fogie v. THORN Ams., Inc.*, 190 F.3d 889, 898-99 (8th Cir. 1999).  Courts in this District have applied the doctrine to causes of action under the False Claims Act.  *See, e.g.*, *United States ex rel. Hagerty v. Cyberonics, Inc.*, 95 F. Supp. 3d 240, 269-70 (D. Mass. 2015) (Saylor, J.).

The government's theory is that the alleged conspiracy was essentially Insys's corporate policy—in the words of the government's opening statement, the conspiracy "became Insys.  It was Insys."  1/28 Trial Tr. 78:2-3; *see also* 4/5 Trial Tr. 181:6-11 (arguing in closing that the schemes underlying the alleged conspiracy were "a policy of management").  While the CSA, honest services fraud, and ordinary mail fraud predicates involved some alleged co-conspirators outside of Insys, for the wire fraud predicates the government did not prove any participation or agreement by individuals outside Insys.  In particular, although the government showed that certain Insys Prior Authorization Specialists made false statements regarding certain patient diagnoses, it did not present evidence that any practitioners or other third parties conspired to join the insurance fraud.  As such, the insurance fraud allegations that underlie the ordinary wire fraud predicate were presented at trial as an alleged agreement amongst Insys personnel.  Because the intracorporate conspiracy doctrine holds that such an agreement is not legally cognizable, defendants' convictions on the wire fraud predicate should be reversed and, at a minimum, remanded for a new trial.

### D.   A New Trial Is Also Warranted Because of Prejudicial Spillover.

The Court should also order a new trial on the non-CSA predicates because the jury's verdict is tainted by spillover prejudice from its consideration of the CSA predicate.  In assessing a claim of spillover prejudice, courts look to three factors to determine "whether the totality of the circumstances requires reversal of some or all of the remaining counts." *United States v. Rooney*, 37 F.3d 847, 855 (2d Cir. 1994).  First, Courts assess whether the evidence on the vacated counts

(or predicates, as relevant here) was so "inflammatory," *United States v. Friedman*, 854 F.2d 535, 582 (2d Cir. 1988), that it "would have tended to incite or arouse the jury into convicting the defendant on the remaining counts," *Rooney*, 37 F.3d at 855.   Second, courts look to the inter-relatedness of the evidence of the various counts (or predicates).   A defendant's claim of spillover prejudice will succeed where "evidence is introduced on the invalidated count that would otherwise be inadmissible on the remaining counts, and this evidence is presented in such a manner that tends to indicate that the jury probably utilized this evidence in reaching a verdict on the remaining counts."   *Id.* at 856.   Third, courts will make "a general assessment of the strength of the government's case on the remaining counts."   *United States v. Wapnick*, 60 F.3d 948, 954 (2d Cir. 1995) (citing *Rooney*, 37 F.3d at 856).

Here, no one can say with certainty that the jury would have come out the same way on the remaining predicates without considering the CSA allegations.   *First*, the government chose to frame its evidence in a way that would rouse the jury's passions.   In service of the CSA allegations, the government introduced evidence that appealed to the jury's emotions, including testimony from nine separate patients who all claimed they had become addicted to Subsys.   The government began its closing argument by underscoring the potency of Subsys: "70 to 100 times more potent than morphine.   20 to 25 times more powerful than heroin."   4/4 Trial Tr. 65:10-11.   Against that backdrop, it urged the jury to convict defendants because they placed "[p]rofits over patients," 4/4 Trial Tr. 66:9, and claimed that "every single one of the patients you saw was exploited," 4/4 Trial Tr. 116:6-8.   Evidence that seeks to portray defendants as "tak[ing] advantage of people who were less able to control their own destiny," is precisely the sort of evidence that is sufficient to establish prejudicial spillover.   *Rooney*, 37 F.3d at 856.

*Second*, the jury's consideration of the CSA predicate dovetailed with its consideration of honest services fraud.  With respect to each defendant for whom the jury found more than two CSA predicates, the jury also found more than two of each of the honest services predicates.  With respect to the sole defendant for whom the jury did not find any CSA predicates, the jury also did not find any honest services predicates.[20]  Thus, there is no way to determine whether the jury's verdict on the honest services predicates was based on appropriate considerations, as opposed to multiplicity and prejudice from the CSA predicate.  Accordingly, if the Court grants defendants' Rule 29 motion on the former, it should at a minimum grant new trial on the latter.

*Third*, the spillover from the CSA allegations affected the ordinary mail fraud predicate. Indeed, the jury appears to have conflated the mailing of payments to practitioners (which was premised upon the medical bribery allegations that the government also attempted to cast as CSA and honest services fraud, *see* SSI ¶¶ 31, 34) with affirmative misrepresentations to insurance companies on telephone calls (which was the basis for the wire fraud predicate, *see id.* ¶ 61).  How else explain the jury's decision to hold all five defendants accountable for the mail fraud predicate, even though jurors told the press that they failed to find that defendant Gurry was involved with medical practitioners and the bribery-based allegations?[21]

---

[20] Tellingly, even though the government did not argue that defendant Gurry was involved in the CSA conduct and did not offer any evidence of his involvement in marketing or speakers program, the jury says it spent substantial time trying to figure out whether they could convict him for it. *See* Leibowitz, *supra* note 9 (according to Jurors 7 and 8, "It was clear that Gurry had violated the mail and wire fraud elements," but "nonetheless, the jurors took their time considering whether [defendant Gurry] was also guilty of several other elements and ultimately found he was not because he didn't interact with doctors").  That jurors spent substantial time during deliberations in search of a theory and evidence that the government did not even present at trial as to that defendant underlines just how inflammatory the CSA allegations were to the case as a whole.

[21] *See id.*

*Fourth*, even with respect to the wire fraud predicate, the government did not present that as a separate conspiracy, but rather part of the same conspiracy that encompassed the CSA allegations.   While some witnesses spoke only about the IRC, the government's principal witnesses, including Michael Babich, Alec Burlakoff, and Matthew Napoletano, addressed all aspects of the case.   In such circumstances, it is "readily apparent that spillover evidence likely confused the jury because it was intertwined with the evidence supporting the remaining [predicates]."   *United States v. Cross*, 308 F.3d 308, 318 (3d Cir. 2002).   Moreover, the government's jury addresses urged the jurors to think of the bribery and insurance fraud as intertwined.   *See, e.g.*, 4/5 Trial Tr. at 162:20-25 (arguing the government charged a RICO conspiracy "because this is organiz[ed] criminal activity" that "involve[d] hundreds and hundreds of false insurance claims, that involve[d] over a million dollars in bribes to various doctors").   It is difficult to explain the jury's findings—especially with respect to defendants Simon, Rowan, and Lee, about whom there was essentially *no evidence* of IRC involvement—as the product of anything other than spillover prejudice.

In sum, if the Court is unwilling to grant a new trial on the non-CSA predicates based on the sufficiency of the evidence, it should nonetheless order a new trial on those predicates because of spillover prejudice from the CSA allegations.

## III.   THE JURY'S VERDICT ON ANY SURVIVING PREDICATE SHOULD BE SET ASIDE BECAUSE OF IMPROPERLY ADMITTED EVIDENCE.

Faced with substantial gaps in its ability to meet its burden of proof, the government repeatedly sought to bolster its case with inflammatory and irrelevant evidence that should not have been admitted.   This provides an independent basis for granting new trial on any predicate that survives defendants' Rule 29 motion.

### A.    The Court Should Have Excluded The Testimony Of Patients About Whom Defendants Knew Nothing.

The government elicited testimony from nine former Subsys patients who recounted stories of substantial personal hardship, including crippling addiction to opioids.   These individuals' personal experiences understandably evoke sympathy from anyone who hears of their difficult, even tragic experiences.   But none of it was relevant to the guilt or innocence of these defendants. Instead, the government seized on this testimony to stir the jury's passions and distract them from the issues at hands—to defendants' substantial prejudice.

The nine patients cherry-picked by the government all testified to having become addicted to opioids, and Subsys in particular, often in stark detail.   *See, e.g.*, 3/20 Trial Tr. 136:3-13 (Avers) ("I'd become an addict …. No matter how much I took, eventually it just wasn't enough."); 3/22 Trial Tr. 56:15-17 (Chestang) ("I'd slobber like just run down my mouth.  I just craved it so bad after I got on it that it would make me just crave it."); 3/26 Trial Tr. 75:22-23 (Byrd) ("[Subsys] was life-changing. It put me into an addiction state that I almost couldn't come out of."); 3/27 Trial Tr. 258:20-21 (Skalnican) ("I slept a lot of my life away.  It made me addicted.  [I] wanted more."). Even though all nine patients had been prescribed other opioids in addition to Subsys, and even though all opioids are potentially addictive, the government framed their testimony to blame Subsys, and only Subsys, for the patients' problems and withdrawal symptoms.

None of this testimony was relevant.   The critical question in this case, as the Court instructed the jury, was whether defendants "agreed and specifically attended that [a member of the conspiracy] would commit conduct that constitutes at least two racketeering acts of the type or types alleged in the indictment."  4/4 Trial Tr. 33:6-9.  That inquiry focused on defendants' state of mind.  *See Zaccagnini v. Morris*, 478 F. Supp. 1199, 1203 (D. Mass. 1979) (stating that, in a conspiracy case, "defendants' states of mind are of central importance").  Evidence of patient

harm, from patients whom defendants did not even know about, has no bearing on defendants' state of mind, and has no bearing on whether defendants specifically intended and agreed that doctors should prescribe Subsys to patients who do not need it.  For that reason, defendants predicted that the government was using patient testimony "to decide this case on an emotional basis, and find defendants guilty-by-association instead of assessing whether the government has met its burden to prove the crime charged."  Defs.' Omnibus Reply in Supp. of Mots. in Lim. Nos. 1–13 at 6, Dkt. No. 669; *see also id*. at 1-7; Defs.' Mot. in Limine Nos. 1–6 at 2-7, Dkt. No. 572.

The Court should look to the government's characterization of the patient testimony for confirmation that defendants' fears came true.  In its closing argument, the government did not attempt to tie the patient testimony to any of elements of any of the charged predicates.  Instead, it made nakedly emotional appeals that—precisely as defendants warned—portrayed defendants as bad people who generically sough to exploit unsuspecting patients.  "***These patients were used****,*" AUSA K. Nathaniel Yeager urged the jury.  "They were used by John Kapoor, and they were used by Sunrise Lee, and they were used by Mike Gurry, and they were used by Joe Rowan, and they were used by Rich Simon.  ***Their pain was exploited****.*"  4/4 Trial Tr. 116:22-25 (emphasis added); *see also id.* 116:6-8 ("***[E]very single one of those patients you saw was exploited****.*") (emphasis added); *id.* 117:8-17 ("[The patients you heard from] were a way for John Kapoor and Mike Gurry and Joe Rowan and Sunrise Lee and Rich Simon to get paid."); 4/5 Trial Tr. 168:9-11 ("Both of [the patients] came in here and told you that they were hallucinating.  ***That's what the defendants did in this case****.*") (emphasis added) (AUSA Wyshak).  Such appeals by the government "invites the jury to render a verdict on an improper emotional basis."  *United States v. Varoudakis*, 233

F.3d 113, 122 (1st Cir. 2000).[22]  And they improperly substituted for gaps in the government's proof on the CSA and HSF predicates by inviting jurors to confuse cherry-picked patient experiences with defendants' alleged intent to cause medically illegitimate prescriptions.

**B.**     **The Court Should Have Barred The Government From Eliciting Testimony About Dr. Chun's Drug Addiction.**

In an effort to paint alleged co-conspirator practitioners with whom defendants associated as "bottom feeders of the medical profession" who were "running pill mill operations," 3/12 Trial Tr. 23:3-6; 3/20 Trial Tr. 289:25, the government elicited testimony from Aqsa Nawaz that Dr. Steven Chun "admitted" to her that he was addicted to Fentora, 3/19 Trial Tr. 135:3-136:8.  The reason the government did so is clear—it hoped, by smearing Dr. Chun as an opioid addict, to stoke the jury's fears regarding opioids and inflame it against defendants.  If there was any doubt of the government's purpose, Mr. Wyshak cleared it up during sidebar: "I'm sorry if you don't like it, but it's circumstantial evidence.  ***They're associating with the man.***  The man's a drug addict. He's abusing fentanyl products."  3/20 Trial Tr. 288:18-21 (emphasis added).

Even if there were evidence that Dr. Chun's alleged addiction compromised the prescriptions he wrote to his patients—and none was offered or admitted at trial—it is a maxim of criminal law that "guilt by association" is an improper basis on which to convict a defendant.  *See United States v. St. Michael's Credit Union*, 880 F.2d 579, 602 (1st Cir. 1989) (collecting cases). Federal courts "repeatedly have characterized guilt by association evidence as 'highly prejudicial' and 'damaging.'"  *United States v. Polasek*, 162 F.3d 878, 887 (5th Cir. 1998) (internal citations

---

[22] The government's closing argument on the patients also confirms, contrary to the government's representations to this Court, that the patients were not called to testify in order to establish any facts underlying alleged misrepresentations to insurance companies.  As defendants noted several times at trial, they were willing to stipulate to the patients' medical conditions, including absence of cancer, so long as the government produced records of the same.  *See, e.g.*, 2/13 Trial Tr. 172:16-20; 2/14 Trial Tr. 114:8-15.

omitted).   Adding to the prejudice, the testimony from Ms. Nawaz was so emotionally charged that she began to cry, so much so that the court reporter gave her a box of tissues and AUSA David Lazarus paused his re-direct examination.   *See* 3/19 Trial Tr. 136:23-25 ("**Q:**  Do you need a minute Ms. Nawaz?  Is this a difficult topic for you to talk about Ms. Nawaz?  **A:**  Yeah.").

The evidence of Dr. Chun's alleged addiction also fails for a threshold reason: The government never introduced any evidence that any defendant was aware of Dr. Chun's alleged addiction, making Ms. Nawaz's testimony irrelevant.   If defendants did not know of Dr. Chun's alleged addiction, his alleged addiction could not have factored into any decision to do business with him.   *See, e.g.*, *United States v. Cameron*, 814 F.2d 403, 405 (7th Cir. 1987) (warning against allowing evidence of drug use "for the sole purpose of making a general character attack").[23]

---

[23] Nor did defendants open the door to this testimony.  Insys was on notice of Dr. Chun's educational credentials, which is what defendants elicited from Ms. Nawasz on cross.  *See* 3/19 Trial Tr. 96:14-21 ("**MR. KENDALL**: You also know that he did clinical trials at the Sarasota Hospital when he was down there?  **MS. NAWAZ**: I don't know that.  **MR. KENDALL**: You know he went to the University of Washington Medical School?  **MS. NAWAZ**: Sure.  **MR. KENDALL**: You know that's ranked number 11 in the country?  **MS. NAWAZ**: Okay.").  The government did not elicit the testimony about Dr. Chun's alleged addition from Ms. Nawaz in order to impeach her earlier trial testimony regarding Dr. Chun's medical education and training, which are undisputed historical facts, and have been introduced to explain why Insys would have invited Dr. Chun to join its advisory board and speakers bureau.  And the government's position that Mr. Kendall's questioning "turned Ms. Nawaz in part into a character witness" is utterly without legal support.  3/19 Trial Tr. 114:6-7.  "Prestigious credentials" are neither necessary nor sufficient nor even a relevant consideration for good character.  *Id.* at 114:8.

## IV.    THE JURY'S VERDICT ON ANY SURVIVING PREDICATES SHOULD BE SET ASIDE BECAUSE OF THE GOVERNMENT'S IMPROPER REBUTTAL.

The government has the obligation to persuade a jury fairly, by the strength of admissible evidence, and not by misdirection or improper argument. *See Berger v. United States*, 295 U.S. 78, 88 (1935). That is not what occurred in the government's rebuttal in this case. *See* Defs.' Mot. for Corrective Jury Instr., or Else A Mistrial, Based on Inappropriate Rebuttal Arg., Dkt. No. 819.

The First Circuit has recognized that "prejudicial statements made during closing argument 'militate in favor of reversal' because they are 'the last words spoken to the jury by the trial attorneys.'" *United States v. Azubike*, 504 F.3d 30, 39 (1st Cir. 2007) (quoting *United States v. Manning*, 23 F.3d 570, 575 (1st Cir. 1994). In reviewing improper rebuttal remarks, courts determine whether "the misconduct 'so poisoned the well that the trial's outcome was likely affected, thus warranting a new trial.'" *United States v. Peake*, 804 F.3d 81, 93 (1st Cir. 2015) (quoting *United States v. Rodríguez*, 675 F.3d 48, 62 (1st Cir. 2012)). "In making this determination, [courts] focus on (1) the severity of the misconduct, including whether it was isolated and/or deliberate; (2) whether curative instructions were given; and (3) the strength of the evidence against the defendant." *Id.* at 93-94. "However, these factors are not exhaustive; they are meant merely to guide the court's inquiry into whether the prosecutor's improper comments have undermined the fairness of the trial." *United States v. Carpenter*, 494 F.3d 13, 23 (1st Cir. 2007).

Here, the government's improper remarks were prejudicial, repeated, and deliberate:

**Defendants Not Testifying.** Although the Fifth Amendment "forbids either comment by the prosecution on the accused's silence," *Griffin v. California*, 380 U.S. 609, 615 (1965), the government's rebuttal made repeated references to defendants' having not testified. Soon after beginning his remarks, Mr. Wyshak told the jury that defendants "***want to sit here*** [pointing to

seated defendants] and say to you … that these men and women who ran this company, who were the managers, had no idea what was going on." 4/5 Trial Tr. 1617:14-16 (emphasis added). He would go on to repeat this veiled comment on defendants' election not to testify four more times. *See id.* at 168:23-25 ("***they can't sit here*** and tell you, now, that they didn't intend for that to happen") (emphasis added); *id.* at 173:7-9 ("***For [Dr. Kapoor] to sit there,*** for Ms. Wilkinson to suggest that he has no clue what was going on, it's preposterous.") (emphasis added); *id.* at 174:20-21 ("***And yet Mr. Gurry wants to sit there*** and tell you, 'I had no idea.'") (emphasis added). And Mr. Wyshak made specific reference to Defendant Simon's election not to testify by asserting that "Mr. Tyrrell was basically ***standing up there testifying on behalf of his client.***" *Id.* at 185:4-5 (emphasis added).

**Corporate Officer Liability.** The government invited the jury to find Defendants guilty based not on their conduct, but civil law concepts of vicarious liability. "And regarding Mr. Gurry, who was running the IRC, who is responsible for the IRC, that's his job. ***As a corporate officer, he bears the responsibility.***" 4/5 Trial Tr. 174:12-14 (emphasis added). Since Mr. Wyshak had previously described all five Defendants as "managers," "who ran this company," *id.* at 161:19-22, his explicit argument as to Mr. Gurry applied by implication to the other Defendants as well. Mr. Wyshak's argument was wrong as a matter of law as to all Defendants, *see, e.g.*, *United States v. MacDonald & Watson Waste Oil Co.*, 933 F.2d 35, 52 (1st Cir. 1991), and wrong as a matter of fact as to Defendants Gurry, Simon, Lee, and Rowan, none of whom were corporate officers of Insys.[24]

---

[24] *See, e.g.*, Insys Therapeutics 2014 Definitive Proxy Statement at 6, *available at*: http://tinyurl.com/Insys2014Proxy.

**Misstating Elements of the Charge.**   The government's rebuttal also crossed the line of permissible argument when Mr. Wyshak improperly argued that the jury could infer Defendants specifically intended and agreed that healthcare practitioners would prescribe Subsys to patients without any legitimate medical purpose from nothing more than Defendants' alleged agreement to bribe healthcare practitioners.   *See* 4/5 Trial Tr. 166:22-167:19 ("How could they trust that kind of an individual, that kind of a corrupt doctor, to really make medically necessary decisions?"). As in *Azubike*, "this was a close case and the prosecutor's misstatements went to the heart of [the] defense," 504 F.3d at 40, *i.e.*, that, as a matter of law, evidence or knowledge of bribes alone is insufficient to convict.   *See* 4/4 Trial Tr. 58:3-5 (jury instruction).   Lacking any evidence of such intent, the government improperly resorted to substituting it with arguments based in recklessness and foreseeability. [25]

**The Loaded Gun Metaphor.**   On the heels of the improper remarks regarding medical necessity, the government analogized Insys's marketing of Subsys via speaker programs to shooting a loaded gun into a crowd of people:

> People intend a reasonably foreseeable consequences of their actions.  ***It is though, if I took a gun and fired it into the audience, which I'm not going to do, I don't intend to shoot any particular individual, but I know somebody's going to get hit.***  And when the defendants arm these doctors with all these bribes and all these incentives, ***they were creating a loaded gun.***

4/5 Trial Tr. at 169:23-170:4 (emphasis added).   This remark was improper for two reasons.   *First*, it misstated the law of specific intent.   *See United States v. Dyer*, 589 F.3d 520, 528-29 (1st Cir. 2009) (explaining distinction between general intent and specific intent); *see also* 4/4 Trial Tr. 33:6-8 (instruction that defendant must have "agreed and specifically intended that he, she or other

---

[25] Even if the CSA and HSF predicates survive Rule 29 scrutiny, *Azubike* makes clear that "the fact that there was sufficient evidence to convict does not mean that the jury would have convicted absent the prosecutor's improper remarks."   504 F.3d at 41.

members of the conspiracy would commit conduct that constitutes at least two racketeering acts"). *Second*, the imagery was unfairly prejudicial. The language was obviously "morally freighted" and "an appeal to instincts of moral disapprobation." *Carpenter*, 494 F.3d at 23, 24 (affirming new trial order based on repeated comparisons of defendants to "river boat gambler"). And the prejudicial nature of such language was heightened against the backdrop of a national opioid epidemic—where jurors are likely aware individuals are dying from opioid-related overdoses[26]— because it wrongly implied that Defendants were responsible for the deaths of patients, even though there was no evidence of any Subsys-related deaths at trial.

**Misrepresenting Witness Testimony.** As set forth in substantial detail in Defendants' earlier motion, *see* Dkt. No. 819 at 5-11, the government's rebuttal also misrepresented the testimony of key witnesses. Specifically, ASUSA Wyshak conflated the issues by recasting Mr. Babich's testimony about his agreed-upon statement of facts (an agreement between Babich and the government) as testimony about the conspiratorial agreement (a purported agreement between Babich and defendants). More critically, Mr. Wyshak misrepresented the testimony of Matt Napoletano on the speaker ROI spreadsheet, Exhibit 197, the purported "smoking gun" evidence in the case. *See* 4/5 Trial Tr. 177:8-10. Instead of acknowledging an obvious conflict between the testimony of Babich and Napoletano with respect to whether Dr. Kapoor ever received Exhibit 197, Mr. Wyshak falsely asserted that Mr. Napoletano testified that Dr. Kapoor received Exhibit 197 when Mr. Napoletano actually testified to the contrary.[27] This misstatement of the trial

---

[26] *See* National Institute on Drug Abuse, "Overdose Death Rates" (January 2019), https://tinyurl.com/NIHOverdoseData (reporting more than 70,000 opioid deaths in 2017).

[27] During his direct examination, Mr. Napoletano testified that Exhibit 197 was sent to Mike Babich, *not Dr. Kapoor*. *See* 2/4 Trial Tr. 84:23-85:2 ("**MR. YEAGER**: With regard to 197A, to whom did you give this particular document to? **MR. NAPOLETANO**: 197A, who did this go to? **MR. YEAGER**: Yes. **MR. NAPOLETANO**: That was Mike Babich."). Then, on cross, Mr.

testimony was improper.  *See United States v. Joyner*, 191 F.3d 47, 54 (1st Cir. 1999); *see also*

Charles Alan Wright et al., 3 *Federal Practice & Procedure Criminal* § 588 (4th ed. Westlaw

2019) ("It is misconduct for a prosecutor to make an assertion to the jury of a fact, either by way

of argument or by an assumption in a question, unless there is evidence of that fact.").  And the

prejudice is clear given the centrality of Exhibit 197 to the case, and given that Dr. Kapoor's

counsel had no ability to address the mischaracterization with the jury.[28]

While defendants appreciate that the Court provided a curative instruction in response to

their motion, "at some point, a curative instruction cannot undo the damage of improper

argument."  *United States v. Rich*, 326 F. Supp. 2d 670, 682 (E.D. Pa. 2004); *see also Azubike*, 504

F.3d at 41 ("[W]here the evidence was close, and the misstatement goes to a central issue in the

case, an instruction to consider the evidence may well be insufficient."); *Floyd v. Meachum*, 907

F.2d 347, 356 (2d Cir. 1990) (comment on defendant's failure to testify and improper vouching

for prosecution witness were "too clearly prejudicial for … a curative instruction to mitigate their

effect").  This was such a case, particularly when the Court declined defendants' request to inform

the jury—as part of the curative instruction—that Mr. Wyshak's comments were inappropriate and

must be disregarded.  When weighed together with the background of the opioid epidemic,

spillover prejudice from the flawed CSA allegations, the inflammatory testimony introduced by

the government, and the overall weakness of the government's proof, "it cannot be said with

---

Napoletano affirmatively testified that he himself did not send Exhibit 197 to Dr. Kapoor, 2/7 Trial
Tr. 23:5-10, and ***that he was not aware of any evidence that suggested Dr. Kapoor ever saw this
document***, *id.* 23:11-17.

[28] Juror 8 reported that convicting Dr. Kapoor was "relatively straightforward" because of "an
internal Insys spreadsheet shared with Kapoor that calculated 'return on investment' for doctors
paid through the company's speaker program, which prosecutors said was the vehicle for the
bribery scheme."  Leibowitz, *supra* note 9.

confidence that the government's improper closing arguments did not taint the verdict." *Carpenter*, 494 F.3d at 24 (internal quotation marks and citation omitted).

## CONCLUSION

For the reasons stated herein and in defendants' prior Rule 29 motion, this Court should reverse the jury's CSA predicate findings in favor of an acquittal on those allegations.  In addition, for the reasons stated herein and in defendants' prior Rule 29 motion, the Court should reverse the remainder of the jury's verdict in favor of an acquittal or, in the alternative, order a new trial.

## REQUEST FOR ORAL ARGUMENT

Defendants respectfully suggest that the Court's resolution of their motions would benefit from oral argument.

Dated: June 6, 2019

/s/ Tracy A. Miner
Tracy A. Miner (BBO# 547137)
tminer@mosllp.com
Megan Siddall (BBO# 568979)
msiddall@mosllp.com
Miner Orkand Siddall LLP
470 Atlantic Ave, 4th Floor
Boston, MA 02210
Telephone: (617) 273-8421

*Attorneys for Michael Gurry*

/s/ Michael Kendall
Michael Kendall (BBO# 544866)
michael.kendall@whitecase.com
Alexandra Gliga (BBO# 694959)
alexandra.gliga@whitecase.com
White & Case LLP
75 State Street
Boston, MA 02109
Telephone: (617) 939-9310

*Attorneys for Joseph Rowan*

/s/ Peter C. Horstmann
Peter C. Horstmann (BBO# 556377)
pete@horstmannlaw.com
Law Offices of Peter Charles Horstmann
450 Lexington Street, Suite 101
Newton, MA 02466
Telephone: (617) 723-1980

*Attorney for Sunrise Lee*

Respectfully submitted,

/s/ Steven A. Tyrrell
Steven A. Tyrrell (admitted *pro hac vice*)
steven.tyrrell@weil.com
Patrick J. O'Toole, Jr. (BBO# 559267)
patrick.otoole@weil.com
Weil, Gotshal & Manges LLP
2001 M Street NW
Washington, D.C. 20036
Telephone: (202) 682-7213

*Attorneys for Richard Simon*

/s/ Beth A. Wilkinson
Beth A. Wilkinson (*admitted pro hac vice*)
bwilkinson@wilkinsonwalsh.com
Alexandra M. Walsh (*admitted pro hac vice*)
awalsh@wilkinsonwalsh.com
Kosta S. Stojilkovic (admitted *pro hac vice*)
kstojilkovic@wilkinsonwalsh.com
Andrew W. Croner (admitted *pro hac vice*)
acroner@wilkinsonwalsh.com
Wilkinson Walsh + Eskovitz LLP
2001 M Street NW
Washington, D.C. 20036
Telephone: (202) 847-4000

Brien T. O'Connor (BBO# 546767)
brien.o'connor@ropesgray.com
Aaron M. Katz (BBO# 662457)
aaron.katz@ropesgray.com
Ropes & Gray LLP
Prudential Tower 800 Boylston Street
Boston, MA 02199
Telephone: (617) 951-7000

*Attorneys for Dr. John Kapoor*

## LOCAL RULE 7.1 CERTIFICATION

Pursuant to Local Rule 7.1(a)(2), I hereby certify that counsel for Dr. Kapoor have in good faith conferred with counsel for the government to resolve or narrow the issues presented by this motion, and that the disputed issues remain unresolved.

/s/ Beth A. Wilkinson
Beth A. Wilkinson
Counsel for Dr. John Kapoor

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document will be served on all counsel of record through the ECF system.

/s/ Beth A. Wilkinson
Beth A. Wilkinson
Counsel for Dr. John Kapoor