# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MICHAEL J. GURRY, et al.,<br><br>Defendants. | Criminal No.:  16-CR-10343-ADB<br><br>ORAL ARGUMENT REQUESTED |

**DEFENDANT JOHN KAPOOR'S MOTION FOR A NEW TRIAL**
**BASED ON WEIGHT OF THE EVIDENCE PURSUANT TO RULE 33**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................... 1

LEGAL STANDARD.............................................................................................. 1

ARGUMENT .......................................................................................................... 3

I.    A New Trial Is Warranted Because The Main Witnesses Against Dr. Kapoor Were Incredible and Inconsistent. ................................................................. 3

    A.    The Government Relied on Alec Burlakoff's Uncorroborated Testimony Even Though He Was An Unreliable Witness Who Strayed Well Beyond The Truth. ................................................................................................. 3

    B.    Michael Babich's Biased and Self-Interested Testimony Was Not Corroborated by Other Witnesses or Documents. ................................... 7

    C.    Matt Napoletano's Testimony Did Not Establish That Dr. Kapoor Joined The Alleged RICO Conspiracy. ........................................................... 10

II.   The Remaining Witnesses And Documentary Evidence Failed To Support That Dr. Kapoor Participated In A RICO Conspiracy. .................................................. 12

    A.    The Balance Of The Evidence Did Not Establish Dr. Kapoor's Knowing and Willful Agreement To Join The Conspiracy................................... 13

    B.    Dr. Kapoor Believed In Subsys And Encouraged The "Switch Strategy" Using What He Was Told Were Legitimate Marketing Tools. ........... 14

    C.    The Evidence Connecting Dr. Kapoor To Insurance Fraud Was Insufficient. ...................................................................................... 16

III.  The Government Relied On Evidence That Appealed To The Jury's Emotions Rather Than The Elements Of The Charge........................................................ 17

    A.    The Parody Rap Video Is Not A Basis For Sustaining The Verdict.... 17

    B.    Dr. Kapoor's Relationship with Sue Beisler Was Irrelevant and Unduly Prejudicial. ........................................................................................ 18

    C.    The Government Should Have Corrected Alec Burlakoff's False Allegations That Dr. Kapoor Was Physically Violent To Employees.................. 19

CONCLUSION.................................................................................................... 20

REQUEST FOR ORAL ARGUMENT ................................................................ 20

i

## TABLE OF AUTHORITIES

**Cases**

*Giglio v. United States*,
 405 U.S. 150 (1972)..................................................................................... 7

*Napue v. Illinois*,
 360 U.S. 264 (1959)..................................................................................... 7

*Tibbs v. Florida*,
 457 U.S. 31 (1982)................................................................................... 2, 4

*United States v. Devries*,
 630 F.3d 1130 (8th Cir. 2011) ................................................................... 2

*United States v. Ferguson*,
 49 F. Supp. 2d 321 (S.D.N.Y. 1999)........................................................... 2

*United States v. Gomez-Gallardo*,
 915 F.2d 553 (9th Cir. 1990) ................................................................... 19

*United States v. Hayden*,
 925 F.2d 1471 (9th Cir. 1991) ................................................................... 2

*United States v. Mallory*,
 902 F.3d 584 (6th Cir. 2018) ..................................................................... 2

*United States v. Mangual–Garcia*,
 505 F.3d 1 (1st Cir. 2007).......................................................................... 7

*United States v. Merlino*,
 592 F.3d 22 (1st Cir. 2010)........................................................................ 1

*United States v. Ramirez-Rivera*,
 800 F.3d 1 (1st Cir. 2015).......................................................................... 3

*United States v. Robinson*,
 71 F. Supp. 9 (D.D.C 1947)........................................................................ 2

*United States v. Ruiz*,
 105 F.3d 1492 (1st Cir. 1997)..................................................................... 1

**Statute and Rule**

18 U.S.C. § 1962(c) ............................................................................................. 3

Fed. R. of Crim. Pro. 33 ................................................................................... 1, 2

**Other Authorities**

Maria Cramer & Jonathan Saltzman, "Insys Jurors Horrified at Use of Rap
    Video to Push Sales," Boston Globe (May 7, 2019) ....................................18

Aaron Leibowitz, "Insys Jurors Say They Thought Execs Were Guilty
    Early On," Law360 (May 7, 2019) ..............................................................11

Alanna Durkin Richer, "Employees at Company Accused of Bribing
    Doctors Rapped, Danced Around a Giant Bottle of a Highly Addictive
    Fentanyl Spray," Chicago Tribune (Feb. 16, 2019) ....................................18

Laurel J. Sweet, "Ex-CEO: Insys Execs Used Rap Video Parody to Push Sales of
    Excessive Fentanyl Rx," Boston Herald (Feb. 14, 2019) ............................18

Subsys Rap Video Created by Insys Pharmaceuticals, YouTube (Feb. 18, 2019),
    https://youtu.be/mtwFZwjCSTE....................................................................18

## INTRODUCTION

Dr. John Kapoor joins in full defendants' renewed joint motion for judgment of acquittal and joint motion for a new trial. *See* Dkt No. 860. For all the reasons set forth in the joint filing, this Court should enter a judgment of acquittal on the jury's verdict as to the Controlled Substances Act ("CSA") predicate, and, at a minimum, order new trial on the remaining allegations. Such relief would render this separate motion, which pertains solely to Dr. Kapoor, moot.

In the event, however, that the Court leaves any part of the jury's verdict in place despite the arguments raised in the joint post-trial motion, it should grant this free-standing motion for a new trial as to Dr. Kapoor. It should do so because, under the applicable standards of Federal Rule of Criminal Procedure 33, the jury's verdict against Dr. Kapoor is against the weight of the evidence admitted at trial. *First*, the government's case against Dr. Kapoor rests almost entirely on the testimony of three flawed and interested witnesses—Alec Burlakoff, Michael Babich, and Matt Napoletano—who contradicted each other on virtually every aspect of Dr. Kapoor's supposed involvement in the alleged RICO conspiracy. *Second*, the remainder of the government's evidence sheds little light on Dr. Kapoor's alleged involvement in that conspiracy, and what light it sheds was more exculpatory than inculpatory. *Third*, in lieu of clear evidence of guilt, the government's case against Dr. Kapoor featured evidence of, at best, marginal relevance—including a parody rap video, Dr. Kapoor's relationship with a sales representative, and preposterous accusations by Mr. Burlakoff—that appealed to the jury's emotions but provide no meaningful support for its verdict.

## LEGAL STANDARD

Under Rule 33, "a district court has greater latitude in considering a motion for a new trial than it does in considering a motion for acquittal." *United States v. Merlino*, 592 F.3d 22, 33 (1st Cir. 2010) (citing *United States v. Ruiz*, 105 F.3d 1492, 1501 (1st Cir. 1997)). A trial court's discretion to grant a new trial "is so broad in that it may weigh the evidence, disbelieve witnesses,

and grant a new trial even where there is substantial evidence to sustain the verdict." *United States v. Devries*, 630 F.3d 1130, 1133 (8th Cir. 2011) (internal quotation marks omitted). "The district court need not view the evidence in the light most favorable to the verdict," *Tibbs v. Florida*, 457 U.S. 31, 38 n.11 (internal quotation marks omitted), as it must under Rule 29. *See United States v. Mallory*, 902 F.3d 584, 596 (6th Cir. 2018). "If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury." *Tibbs*, 457 U.S. at 38 n.11 (internal quotation marks omitted).

There is "no incongruity or inconsistency" in a district court determining that there is evidence sufficient to put the case to a jury and later setting a verdict aside as contrary to the weight of the evidence. *See United States v. Robinson*, 71 F. Supp. 9, 11 (D.D.C 1947). "In directing a judgment of acquittal, the Court makes a final disposition of the case. On the other hand, in setting the verdict aside the Court merely grants a new trial and submits the issues for determination by another jury. It is appropriate that in the latter instance, the Court should have wide discretion in the interest of justice." *Id.*; *see, e.g.*, *United States v. Hayden*, 925 F.2d 1471 (9th Cir. 1991) (affirming district court order denying Rule 29 motion but ordering new trial "predicated in significant part on an evaluation of the credibility of witnesses and on an assessment of the weight of particular evidence"); *United States v. Ferguson*, 49 F. Supp. 2d 321, 323 (S.D.N.Y. 1999) (denying Rule 29 motion but granting Rule 33 motion in RICO case because "the evidence [was] too slender a reed to support a guilty verdict"), *aff'd*, 246 F.3d 129 (2d Cir. 2001).

In order to convict a defendant of racketeering conspiracy, the government must prove that the defendant knowingly agreed and specifically intended that one or more conspirators would

commit a violation of 18 U.S.C. § 1962(c).  *See United States v. Ramirez-Rivera*, 800 F.3d 1, 18 (1st Cir. 2015).  As the Court instructed the jury, a finding of guilt requires proof beyond on a reasonable doubt on six different elements.  *See* 4/4 Trial Tr. 32:10-33:9.  For purposes of this motion, Dr. Kapoor's challenge to the weight of the evidence is focused on the fifth and sixth elements.  The fifth element requires proof that, among other things, the defendant "*knowingly and willfully agreed* to be a member of the criminal conspiracy alleged in the indictment …." *Id.* at 32:24-33:1.  If membership in the conspiracy is established, the sixth element further requires proof that the defendant "*agreed and specifically intended* that he, she or other members of the conspiracy would commit conduct that constitutes at least two racketeering acts of the type or types alleged in the indictment." *Id.* at 33:6-9.  To determine whether the government has met its burden on the sixth element, the trier of fact must look to the elements underlying each of the alleged predicate racketeering acts.  *See id*. at 42:10-16.[1]

## ARGUMENT

**I.    A NEW TRIAL IS WARRANTED BECAUSE THE MAIN WITNESSES AGAINST DR. KAPOOR WERE INCREDIBLE AND INCONSISTENT.**

### A.    The Government Relied on Alec Burlakoff's Uncorroborated Testimony Even Though He Was An Unreliable Witness Who Strayed Well Beyond The Truth.

The government's lead witness against Dr. Kapoor was Insys's former VP of Sales, Alec Burlakoff, who pled guilty to the alleged conspiracy after agreeing to testify at trial as a cooperating witness.  The government told the jury in its closing argument that the "agreement to bribe people began when Alec Burlakoff was promoted to VP of sales," 4/4 Trial Tr. 78:10-11,

---

[1] The government's failure to satisfy the fifth and sixth elements is also briefed in defendants' renewed joint motion for judgment of acquittal and joint motion for a new trial, which Dr. Kapoor joins in full.  *See* Dkt. No. 860.  This motion will not repeat those arguments but focuses on additional arguments specific to Dr. Kapoor.

that Mr. Burlakoff was put "in charge of the whole company" following his promotion, *id.* at 113:6-9, and that an August 2012 business plan authored by Mr. Burlakoff was the "plan of attack" for the alleged RICO scheme, *id.* at 76:11-17.  Mr. Burlakoff's testimony was also repeatedly cited in the government's closing as supplying the necessary proof on key elements of the CSA, honest services fraud, and traditional mail fraud predicates.  *See id.* at 108:5-11 (citing his testimony as proof that Insys used its speaker programs to bribe co-conspirator practitioners); *id.* at 100:3-7; 4/5 Trial Tr. 178:12-23 (citing his testimony as proof that defendants knew about bribes); *id.* at 170:19-24 (citing his testimony as proof that it was foreseeable to defendants that bribes would lead co-conspirator practitioners to overprescribe Subsys).  So crucial was Mr. Burlakoff's testimony to the government's case that AUSA K. Nathaniel Yeager told the jury during the government's closing, "If I could take exhibit stickers and put them on people, ***I would stick one right on Alec Burlakoff, and I would say he's Exhibit No. 1.***"  4/4 Trial Tr. 77:9-11.

Yet even the government concedes that significant issues existed with respect to Mr. Burlakoff's credibility well before he ever took the witness stand.   As the government acknowledged in closing, not only was Mr. Burlakoff a cooperating witness motivated by a desire reduce his own sentence, but he had already amply demonstrated a willingness to lie when it served his interests.  *See* 4/4 Trial Tr. 83:21-84:13.  When he was first interviewed by government in May 2016, Mr. Burlakoff lied repeatedly about whether he engaged in misconduct at Insys, to the point that Mr. Yeager told Mr. Burlakoff in the interview that he did not believe anything Mr. Burlakoff was telling him.  *See, e.g.*, 3/6 Trial Tr. 177:24-179:17.  Special Agent Paul Baumrind, a seasoned veteran of the FBI, testified that he had never in his career worked with a potential witness who was caught lying on tape to the government and then become a testifying witness for the government at trial. 4/3 Trial Tr. 66:11-19.

In addition to the lies he told the government, Mr. Burlakoff undermined his credibility during the May 2016 interview in other ways.  For one thing, Mr. Burlakoff admitted in the interview that he harbored an extreme hatred towards Dr. Kapoor, infecting his testimony against Dr. Kapoor at trial with a clear risk of potential bias.  *See* 3/6 Trial Tr. 186:13-16 ("**MS. WILKINSON:** Does that refresh your recollection that you did say on a scale of 1 to 10 your hatred for John Kapoor and [Insys general counsel] Franc Del Fosse was a 10?  **MR. BURLAKOFF:** Yes.").  Additionally, Mr. Burlakoff made clear in the interview that he was willing to "do whatever the Government wanted [him] to do" to lessen his own punishment.  3/7 Trial Tr. 36:24-37:3.

Mr. Burlakoff's trial testimony validated the credibility concerns raised by his May 2016 interview with the government.  Most notably, his testimony was repeatedly contradicted by other witnesses, including SA Baumrind, who  contradicted Mr. Burlakoff's claim that he had previously told the government that he discussed bribing doctors during his initial employment interview with Michael Babich and Dr. Kapoor.  *Compare* 3/7 Trial Tr. 53:23-54:3 ("**MS. WILKINSON:** And you discussed with [the agents] what happened at that interview, right? **MR. BURLAKOFF:**  I believe so. **MS. WILKINSON:** And you told them everything that happened at that meeting, or at least the main points you've told us, right? **MR. BURLAKOFF:** I tried.") *with* 4/2 Trial Tr. 247:2-6 ("**MS. WILKINSON:** Mr. Burlakoff did not tell you that during his initial meeting with Dr. Kapoor and Mr. Babich when he interviewed that he agreed to pay doctors in exchange for prescriptions, did he? **SA BAUMRIND:** I have no recollection of that.").  Likewise, SA Baumrind debunked Mr. Burlakoff's claim that he had previously shared with the government a story that Dr. Kapoor told him that his favorite interview question was Mr. Burlakoff's question about how employees valued loyalty versus integrity.  *Compare* 3/7 Trial Tr. 286:5-8 ("**MS. WILKINSON:**

5

Did you or did you not ever tell the agents starting in August of last summer, 2018, that John Kapoor told you that your loyalty/integrity question was his favorite question?  **MR. BURLAKOFF:** Yes, I did tell the agents that.") *with* 4/2 Trial Tr. 249:3-8 ("**MS. WILKINSON:** And neither your notes nor your report from August 3 when you were documenting your interview with Mr. Burlakoff, they do not contain any mention of Mr. Burlakoff telling you that he discussed with Dr. Kapoor or Mr. Babich the interview question of integrity versus loyalty, right?  **SA BAUMRIND:**  That is correct.").

Mr. Burlakoff's testimony also conflicted in significant ways with the testimony of the government's other major cooperator in the case, Insys's former CEO Michael Babich.  For instance, contrary to Mr. Burlakoff's claims, Mr. Babich testified that using the speaker program to pay doctors to prescribe was *not* discussed by the two of them and Dr. Kapoor during Mr. Burlakoff's initial employment interview.  *See* 2/14 Trial Tr. 189:10-12 ("**MS. WILKINSON:** [Mr. Burlakoff] didn't tell you that was his plan before that, right?  **MR BABICH:** *He did not tell us that was the plan in the interview*." (emphasis added)).  In fact, Mr. Babich testified that as late as September 2013, more than a year after the employment interview, he *still* did not know for sure that Mr. Burlakoff was using the speaker program to bribe doctors.  *See* 2/14 Trial Tr. 228:24-229:3 ("**MS. WILKINSON:** So [in September 2013] you said you were becoming aware of what Mr. Burlakoff was actually doing?  **MR. BABICH:** Yes.  **MS. WILKINSON:** But you didn't know the full extent of what he was doing?  **MR. BABICH:** *At the time, no*." (emphasis added)).

In addition to what transpired in the employment interview, Mr. Burlakoff and Mr. Babich also disagreed about:

- what was discussed during an October 2012 meeting with Dr. Kapoor and Matt Napoletano about the speaker program, as well as the significance of that meeting, *compare* 2/13 Trial Tr. 29:21-30:24, 111:13-23 *and* 2/15 Trial Tr. 108:14-22 *with* 3/7 Trial Tr. 95:1-6;

- the details of a meeting discussing the "ROI analysis" of practitioners serving on Insys's speaker program—which the government later described in its closing as the "smoking gun in the case," 4/5 Trial Tr. 177:9-10—including who distributed the analysis and when the meeting occurred, *compare* 2/15 Trial Tr. 129:19-130:1 *with* 3/7 Trial Tr. 118:10-12; and

- whether the ROI analysis described above continued to be performed after 2012, *compare* 2/15 Trial Tr. 131:20-132:16 *with* 3/12 Trial Tr. 165:9-168:5.

That the government continued to rely on Mr. Burlakoff's testimony, despite knowing of his character for untruthfulness and material inconsistencies between his trial testimony his prior statements to the FBI, not only undermines the jury's verdict against Dr. Kapoor, but constitutes a violation of Dr. Kapoor's due process rights under *Napue v. Illinois*, 360 U.S. 264, 269 (1959). *Napue* held that the government "may not knowingly use false evidence, including false testimony, to obtain a tainted conviction *regardless of whether the prosecutor solicits false evidence or ... allows false evidence to go uncorrected when it appears*." *United States v. Mangual–Garcia*, 505 F.3d 1, 10 (1st Cir. 2007) (quoting *Napue*, 360 U.S. at 269) (emphasis added) (internal quotation marks and brackets omitted).  Here, the government may not have intentionally solicited false testimony from Mr. Burlakoff, but it repeatedly allowed his false statements to go uncorrected. The Court should order a new trial on this basis alone because Mr. Burlakoff's testimony, despite the defense's attempts to impeach him, "could in any reasonable likelihood have affected the judgment of the jury." *Mangual–Garcia*, 505 F.3d at 10 (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972)) (internal quotation mark omitted).

### B.     Michael Babich's Biased and Self-Interested Testimony Was Not Corroborated by Other Witnesses or Documents.

The government also relied heavily on the testimony of Michael Babich, Insys's former CEO.  Mr. Babich not only testified as to Dr. Kapoor's alleged involvement in the bribing of healthcare practitioners, but his testimony also represented the only evidence directly implicating Dr. Kapoor in the insurance fraud scheme.  Mr. Babich's testimony, however, was notable for its

lack of corroboration and attempts to minimize—often beyond reason—his own role in the alleged conspiracy. Taken together, these factors raise serious doubts about the credibility of Mr. Babich's testimony, particularly with respect to the accusations he leveled against Dr. Kapoor.

As an initial matter, Mr. Babich was a self-interested witness. And his self-interest went far beyond a run-of-the-mill desire to reduce his own sentence. Mr. Babich's wife, a former Insys sales representative, is also awaiting sentencing for crimes she committed at Insys. *See* 2/14 Trial Tr. 204:25-205:6. Moreover, Mr. Babich had a lot on the line financially when he took the stand to testify. On cross-examination, Mr. Babich conceded that his compensation while at Insys totaled approximately $43.8 million, *see* 2/22 Trial Tr. 109:15-110:11, yet the government had only required him to forfeit $3.5 million up to that point for his role in the alleged conspiracy, *see* 2/14 Trial Tr. 152:14-153:5. With over $40 million hanging in the balance, as well as his and his wife's own freedom, Mr. Babich had every incentive to provide testimony at trial that helped the government implicate Dr. Kapoor in the alleged conspiracy.

Considering his motives, it is no surprise that Mr. Babich repeatedly tried to downplay his own role in any misconduct at Insys, while adapting his testimony to the government's needs. Consider Mr. Babich's testimony regarding his awareness of bribes paid to APRN Heather Alfonso, one of the practitioners that his wife called on when she worked as an Insys sales representative. On cross-examination, Mr. Babich testified that he was completely unaware at the time that APRN Alfonso was being bribed by his now-wife to prescribe more Subsys, 2/14 Trial Tr. 201:12-14, which insulated him and his wife from any wrongdoing, but was completely implausible considering the two were dating at the time. In the face of this absurdity, the government succeeded in getting Mr. Babich to reverse himself on redirect examination: he now testified that he was aware of the bribes that were paid to APRN Alfonso, which, in turn, made it

more plausible that defendants too were aware she was being bribed.  2/22 Trial Tr. 67:24-68:2.

Regardless which answer was true, Mr. Babich's about-face severely undermines his credibility.

Mr. Babich's testimony also lacked corroboration.  Rather than pointing to documents or specific events that could be corroborated by other witnesses or documents, Mr. Babich implicated Dr. Kapoor by repeatedly claiming that details of the RICO conspiracy were discussed on a daily call between himself, Dr. Kapoor, and other senior members of Insys's management team.  *See, e.g.*, 2/14 Trial Tr. 57:3-19, 86:2-14, 92:1-14.  But no document supported Mr. Babich's testimony about these daily calls, and other witnesses failed to corroborate his account of what was discussed on them.  For example, although Mr. Babich suggested that the prescribing habits of individual doctors were frequently reviewed on the daily calls, *see* 2/14 Trial Tr. 55:11-24; 2/22 Trial Tr. 21:5-22:1, Mr. Burlakoff testified that going through the prescribing habits of individual doctors "wasn't the point" of the daily calls, 3/7 Trial Tr. 130:18-131:8.  Likewise, Mr. Babich claimed that Liz Gurrieri openly discussed the IRC's fraudulent strategies with Dr. Kapoor on the daily calls.  *See, e.g.*, 2/14 Trial Tr. 86:2-14, 92:1-14.  But Ms. Gurrieri never once mentioned these discussions during her own testimony.  Without Mr. Babich's unsubstantiated claims about what was discussed on the daily calls, the government would have been left with little else to implicate Dr. Kapoor, particularly with respect to the insurance fraud scheme.[2]

---

[2] The government could have easily corroborated Mr. Babich's testimony about the daily calls—if his testimony had been truthful—by calling Xun Yu to testify at trial.  Mr. Babich and multiple other witnesses confirmed that Mr. Yu was a core attendee of the daily calls, and the government designated him as a "will call" witness on the revised witness list it submitted on January 14, 2019.  The government immunized Mr. Yu ahead of trial to permit him to testify, then elected not to call him.  This fact casts further doubt on the credibility of Mr. Babich's testimony about what was discussed on the daily calls.

### C.     Matt Napoletano's Testimony Did Not Establish That Dr. Kapoor Joined The Alleged RICO Conspiracy.

The third cooperating witness the government called to testify against Dr. Kapoor was Matt Napoletano, a veteran of the pharmaceutical industry who served as Insys's Vice President of Marketing from October 2011 through August 2014.  Notwithstanding his immunity, *see* 2/1 Trial Tr. 63:21-64:3, Mr. Napoletano merely admitted to participating in a scheme that, by his own testimony, did no more than violate the anti-kickback laws, *see* 2/7 Trial Tr. 39:15-25, which the Court specifically instructed the jury was "not alone sufficient to prove a violation of the RICO statute," 4/4 Trial Tr. 58:3-5.  Additionally, Mr. Napoletano testified on cross-examination that there was nothing wrong with many of the practices relied upon by the government as proof of the alleged RICO conspiracy, including encouraging practitioners to challenge insurance denials for Subsys, pursuing a "switch strategy" aimed at practitioners with patients already taking competitor products, educating practitioners on using an effective dose for their patients, wanting every speaker to be a Subsys prescriber, and the practice of "soft deleting" speakers who were not prescribing the drug from Insys's program.  *See* 2/4 Trial Tr. 214:6-16; 2/6 Trial Tr. 101:23-102:3, 198:15-199:11, 210:4-14.  Mr. Napoletano also agreed that Dr. Kapoor wanted to focus on marketing Subsys to oncologists—despite it being more difficult to get them to prescribe medications like Subsys—based on his personal experience having watched his wife battle and ultimately succumb to breast cancer.  *See* 2/7 Trial Tr. 57:7-19.

The government relied on two aspects of Mr. Napoletano's testimony in attempting to prove its case against Dr. Kapoor.  *First*, it relied on Mr. Napoletano's testimony that it was only after repeated demands by Dr. Kapoor that Mr. Napoletano reluctantly performed the speaker ROI analysis in late 2012.  *See* 4/4 Trial Tr. 78:20-79:24 (arguing in closing that Mr. Napoletano told Dr. Kapoor "you can't track ROI, don't do it" but "kept insisting" it be done).  But while the

government told the jury the resulting analysis was the "smoking gun in the case," 4/5 Trial Tr. 177:9-10, Mr. Napoletano's own testimony refutes that claim. In addition to confirming that the analysis was done only once, *see* 2/4 Trial Tr. 91:7-92:3, Mr. Napoletano testified both that the creation of the analysis, standing alone, was not improper, and that the summary version received by Dr. Kapoor did not provide a basis for allocating speaker programs to specific practitioners according to ROI, *see* 2/7 Trial Tr. 25:1-6, 26:20-23, 27:4-9. Furthermore, Mr. Napoletano testified that, to his knowledge, Dr. Kapoor never received Exhibit 197, the spreadsheet prepared in late 2012 that provided ROI for each individual speaker. *See* 2/7 Trial Tr. 23:5-17. His testimony refutes claims by Messrs. Burlakoff and Babich that the spreadsheet was provided to Dr. Kapoor at an in-person meeting attended by Mr. Napoletano.[3]

*Second*, the government relied on Mr. Napoletano's account of an October 2012 meeting between himself, Mr. Burlakoff, Mr. Babich, and Dr. Kapoor. *See* 4/4 Trial Tr. 78:20-79:10 (arguing in closing "there was a blowup" at the meeting about whether to prepare the ROI analysis). Mr. Napoletano testified that the objective of the speaker program was debated at this meeting, and that Dr. Kapoor gave "a nod of the head" showing his agreement with Mr. Burlakoff's view that focused on the speakers themselves, rather than the program attendees as Mr. Napoletano had advocated. *See* 2/1 Trial Tr. 126:24-128:2; 2/7 Trial Tr. 93:9-16. Far from helping prove Dr.

---

[3] Mr. Babich testified that it was *Mr. Napoletano* who passed out the spreadsheet at the meeting where it was provided to Dr. Kapoor. *See* 2/15 Trial Tr. 129:19-130:1. Conversely, Mr. Burlakoff claimed that it was actually *Mr. Babich* who passed out the spreadsheet to Dr. Kapoor and others at this supposed meeting. *See* 3/5 Trial Tr. 185:9-19. In the face of these wildly inconsistent accounts, the truth regarding distribution of the spreadsheet matters. Juror 8 reported that convicting Dr. Kapoor was "relatively straightforward" because of "an internal Insys spreadsheet shared with Kapoor that calculated 'return on investment' for doctors paid through the company's speaker program, which prosecutors said was the vehicle for the bribery scheme." Aaron Leibowitz, "Insys Jurors Say They Thought Execs Were Guilty Early On," Law360 (May 7, 2019), *available at* https://tinyurl.com/law360insysjurors.

Kapoor's involvement in the alleged conspiracy, this testimony only serves to highlight a fundamental flaw in the government's case against him.  Specifically, Messrs. Burlakoff,  Babich, and Napoletano all testified about this October 2012 meeting, and each of them offered a vastly different story of what transpired.  *Compare* 2/1 Trial Tr. 126:24-128:2 (Napoletano testifying it was an in-person meeting addressing the objectives of the speaker program where Kapoor sided with Burlakoff) *with* 2/13 Trial Tr. 29:21-30:24; 2/15 Trial Tr. 108:14-22 (Babich testifying it was a teleconference debating lunch versus dinner programs where no one agreed with Burlakoff) *and* 3/7 Trial Tr. 95:1-6, 98:1-21 (Burlakoff testifying it was an in-person meeting to discuss Linden Care Pharmacy and ultimately was "no big deal").  Considering the competing narratives about the October 2012 meeting, along with the full scope of what he said about the ROI analysis, Mr. Napoletano's testimony does not establish that Dr. Kapoor joined the alleged RICO conspiracy.

## II. THE REMAINING WITNESSES AND DOCUMENTARY EVIDENCE FAILED TO SUPPORT THAT DR. KAPOOR PARTICIPATED IN A RICO CONSPIRACY.

Outside of the unreliable and inconsistent testimony it elicited from its three principal cooperators, the government failed to introduce witness testimony tying Dr. Kapoor to the alleged conspiracy.  Many of the remaining witnesses called by the government failed to even mention Dr. Kapoor, while the testimony of those that did fell far short of establishing his knowing and willful agreement to join the conspiracy or his specific intent to commit any underlying predicate acts.[4] To the contrary, the balance of the evidence weighs in favor of the conclusion that Dr. Kapoor

---

[4] Most lower-level Insys employees that testified had no interactions with Dr. Kapoor, and the very few that did couldn't connect him to any wrong doing.  Tracy Krane testified that she and Mia Guzman had dinner once with Dr. Kapoor, but could only recall that they had a general discussion about what the speaker program could do for their territories. 3/13 Trial Tr. 11:13-12:3. Likewise, Brett Szymanski testified that Alec Burlakoff called Dr. Kapoor after Dr. Gavin Awerbuch was arrested, but could not recall what was discussed on that call.  1/30 Trial Tr. 186:17-25.

never knowingly and willfully agreed to become a member of the conspiracy and that he never agreed to or specifically intended any of the alleged predicate objects.

> **A.      The Balance Of The Evidence Did Not Establish Dr. Kapoor's Knowing and Willful Agreement To Join The Conspiracy.**

The sole additional witness called by the government who claimed to witness any conspiratorial conduct by Dr. Kapoor was Beth McKey.  Ms. McKey was at Insys a short period of time, yet was surprisingly called by the government toward the end of its case to fill in gaps in the evidence—surprisingly because the testimony she offered to fill those gaps was entirely missing from her pre-trial interviews.  In particular, the credibility of Ms. McKey's testimony that she heard Dr. Kapoor discuss "soft deleting" speakers who were not prescribing Subsys on a daily call was severely undermined by her apparent failure to disclose the substance of this testimony in two prior interviews with the government.  *See, e.g.*, 3/27 Trial Tr. 145:21-146:3, 187:5-20.  However, even if that were not the case, her testimony about Dr. Kapoor still falls far short of establishing his involvement in any crimes.  As Mr. Napoletano admitted, the practice of "soft-deleting" prescribers from the speakers program is not illegal or unusual.  *See* 2/6 Trial Tr. 210:4-14.  And Ms. McKey admitted on cross that she never heard Dr. Kapoor refer to practitioners as "whales," or any other language the government claimed as code associated with the charged conspiracy.  3/27 Trial Tr. 249:3-5.

The government also told the jury that Sue Beisler "was incessant in her communication with Dr. Kapoor" and told him "how speaker money is being used."  4/4 Trial Tr. 98:17-19.  But the government only introduced seven e-mails from Ms. Beisler to Dr. Kapoor from May to December 2013 without any evidence that Dr. Kapoor ever read or responded to these e-mails.  And Nellie Oquendo, Dr. Kapoor's long-time assistant, explained that Dr. Kapoor got over 100 e-mails *a day*.  2/1 Trial Tr. 45:9-11.  Furthermore, Ms. Beisler testified that Dr. Kapoor never talked

13

to her about bribes or instructed her to bribe any doctors, and her e-mails to Dr. Kapoor were only intended to complain about Mr. Burlakoff's favoritism in assigning speaker program funds. 3/26 Trial Tr. 172:13-22. Neither Ms. Beisler's testimony nor her e-mails to Dr. Kapoor are proof that Dr. Kapoor knowingly and willfully agreed to join the alleged conspiracy or that he specifically intended for the underlying bribery of healthcare practitioners to occur.

**B.      Dr. Kapoor Believed In Subsys And Encouraged The "Switch Strategy" Using What He Was Told Were Legitimate Marketing Tools.**

While the government's proof of Dr. Kapoor's criminal intent came up short, the evidence *did* show that Dr. Kapoor was committed to and believed in Subsys because cancer pain was personal to him. Witness after witness, including Mr. Napoletano, described how Dr. Kapoor's wife died from painful metastatic breast cancer. *See* 2/6 Trial Tr. 200:19-201:6. Ms. Oquendo also testified that Dr. Kapoor "was really never back to his original self" following his wife's death. 2/1 Trial Tr. 42:18-23. Ms. Oquendo also testified about Dr. Kapoor's hectic schedule and numerous responsibilities of Insys. *Id.* at 43:25-45:3, 55:17-56:4.

Dr. Kapoor invested over $70 million into Insys, 2/12 Trial Tr. 134:7-14, and never sold his stock or otherwise abandoned the company—even after the government first started investigating Insys. *See* 1/30 Trial Tr. 82:20-83:3 (testimony of Maury Rice). He stuck by Insys and Subsys because he knew it was a superior drug that worked better than other competitors, a fact that Dr. Lisa Stearns confirmed. Dr. Stearns testified that Subsys "worked faster and worked better," "was more effective" and "had fewer side effects" than other competitors. 4/2 Trial Tr. 105:13-19. Even Mr. Burlakoff—hardly one to do Dr. Kapoor any favors—agreed that Dr. Kapoor "thought the drug was the greatest on earth and everybody would want it for the appropriate patient." 3/6 Trial Tr. 191:21-24. And Dr. Kapoor had a lot of reasons to believe this was the case

14

because patients were writing to Insys to say how well Subsys was working for them.  *See*, *e.g.*, 4/2 Trial Tr. 44:10-19 (testimony of Jennifer Adams); Ex. 6152 (letter from Jennifer Adams).

The evidence also showed that Dr. Kapoor believed speaker programs were legitimate. Multiple e-mails entered into evidence showed that Dr. Kapoor wanted speaker programs to have more attendees, which makes sense only if he was trying to conduct legitimate speaker programs. *See* Ex. 5481, 5325, 5563.  And Mr. Napoletano was sharing information with Dr. Kapoor about speaker programs where there were a lot of attendees and information-sharing regarding Subsys. *See* Ex. 5448 ("This is as close to a best practice as we're going to get with an ISP.  I recommend sharing this with JK....").

The government failed to show that Dr. Kapoor agreed and intended to use the Insys speaker program to cause healthcare practitioners to violate the Controlled Substances Act or engage in honest services fraud.  Instead, evidence showed that speaker programs were used to target high decile prescribers who had been prescribing Fentora and Actiq—and no witness testified that it was wrong to target these prescribers.  *See, e.g.*, 2/15 Trial Tr. 174:18-21 (Mr. Babich testifying that this "switching strategy" was shared "with everyone").  Nor did the government prove that Dr. Kapoor had cause to suspect that any Subsys prescribers were writing medically illegitimate prescriptions.  To the contrary, Dr. Gavin Awerbuch testified that Dr. Kapoor "was interested in why [he] could prescribe so much medication" and Dr. Awerbuch told him that he "treat[s] patients with chronic pain" and "explained some of the conditions [he] use[s] it for."  1/31 Trial Tr. 89:2-10.  Indeed, the government presented no evidence that any practitioner informed Dr. Kapoor that they were prescribing Subsys in exchange for speaker payments.

Likewise, the evidence showed that the dosing strategy that Dr. Kapoor supported was not intended to cause inappropriately-dosed prescriptions, but instead was based on clinical studies

showing that lower doses were not effective for most patients who participated in those studies. *See* Ex. 6390 (showing that almost 80 percent of patients in the Subsys clinical trial needed a 600 mcg or higher dose for effective pain relief).

### C.   The Evidence Connecting Dr. Kapoor To Insurance Fraud Was Insufficient.

Evidence connecting Dr. Kapoor to insurance fraud was nearly nonexistent.  In its closing argument, the government stated that Liz Gurrieri, the manager of the IRC, shared information about the IRC's fraudulent practices with Dr. Kapoor on the daily calls.  4/4 Trial Tr. 100:25-101:6.  But that's not what Ms. Gurrieri said in her testimony.  While Ms. Gurrieri confirmed that she provided reports to Dr. Kapoor on the IRC's approval rates, *see* 2/28 Trial Tr. 111:1-18, she also testified that she never sent Dr. Kapoor the original "spiel" that instructed IRC employees to mislead insurers.  *Id.* at 125:24-126:9.  More importantly, Ms. Gurrieri testified that she had very few interactions with Dr. Kapoor, *id.* at 103:6-24, and never once mentioned him having any direct involvement in the alleged insurance fraud scheme.  And the time when Dr. Kapoor was involved in the IRC, it was to improve its practices.  *See* 2/15 Trial Tr. 75:12-16 (Mr. Babich describing that Dr. Kapoor got involved with the IRC in 2014 to "make the [opt]in form a better form").

Indeed, the evidence showed that Dr. Kapoor was trying to get it right.  Compliance caused repeated changes in IRC talking points, instructed IRC staff not to lie and mislead, and disciplined staff who refused to follow those instructions.  *See* 2/8 Trial Tr. 118:24-119:10 (Fordham testifying that compliance changed the talking points); 2/22 Trial Tr. 232:7-17 (Gurrieri testifying that compliance-approved talking points were technically accurate); 2/26 Trial Tr. 99:8-18, 232:3-9 (Gurrieri testifying that compliance instructed staff not to mislead insurers and set up disciplinary actions for non-compliance); 3/26 Trial Tr. 21:19-22:9, 23:8-24:6, 29:17-25 (Meyer testifying that IRC set up disciplinary procedures for non-compliance, she received a warning letter, and compliance instructed her not to mislead insurers); 3/27 Trial Tr. 70:18-23, 81:5-82:15 (Davis

16

testifying that IRC talking points changed during her tenure and that non-compliant IRC employees were disciplined).  Danielle Davis, the company's compliance director, acknowledged that Dr. Kapoor supported compliance, particularly after APRN Alfonso's publicized arrest.  *See* 3/27 Trial Tr. 46:4-14, 74:10-25, 77:21-25.  Moreover, while Ms. Davis testified that Dr. Kapoor was upset about a particular employee, Cheri Henshaw, being placed on administrative leave, *see id.* at 47:7-48:18, she also testified that Dr. Kapoor supported other compliance-related terminations and the compliance function generally.  *See id.* at 77:21-25, 83:15-84:4; *see also* Ex. 5351 ("The request by JK was to run everything by compliance.").

## III.   THE GOVERNMENT RELIED ON EVIDENCE THAT APPEALED TO THE JURY'S EMOTIONS RATHER THAN THE ELEMENTS OF THE CHARGE.

Recognizing that it could not sufficiently connect him to the alleged conspiracy through documents, and that the witnesses testifying against him all had significant credibility issues, the government resorted to bolstering its case against Dr. Kapoor by introducing evidence that appealed to the jury's emotions instead of the elements of the charge.  In addition to the improperly admitted evidence discussed in defendants' joint motion for a new trial, the government's introduction of the following categories of evidence distracted the jury from the elements and the burden of proof: (1) a parody rap video titled "Great by Choice"; (2) evidence suggesting Dr. Kapoor had a physical relationship with Sue Beisler; and (3) Alec Burlakoff's preposterous allegations that Dr. Kapoor had a history of physical violence with respect to employees.

### A.   The Parody Rap Video Is Not A Basis For Sustaining The Verdict.

Though he had no role in its creation, as part of its direct examination of Michael Babich, the government introduced a highly inflammatory internal sales video titled "Great by Choice." *See* 2/13 Trial Tr. 158:12-15 (admitting Ex. 471).  The video was one of dozens created by Insys employees—but not by defendants—for the purpose of adding color to an internal sales meeting.

The government did not introduce any evidence that Dr. Kapoor knew about or signed off on this video before it was played, or that it contained an accurate depiction of Insys's sales strategy.  In fact, the video was an obvious parody, as the 1600 mcg Subsys spray dose depicted in it does not even exist (1600 mcg of Subsys is delivered by taking two 800 mcg doses).  *See* 2/15 Trial Tr. 215:18-25.

Despite its marginal relevance, the video made quite a splash.  Immediately, multiple news outlets—national and local—ran stories about it, making it the most highly covered piece of evidence in the entire trial.[5]  One version of the video uploaded to YouTube has more than 106,000 views.[6]  Like the public at-large, the jurors could not resist being influenced by the salacious nature of the video.  The jury watched the video at least twice during its deliberations.[7]  "The rap video just makes me sick to my stomach," Juror 5 said in an interview with the Boston Globe.[8]  Yet the video proves nothing about Dr. Kapoor's alleged involvement in the conspiracy, especially since there was no evidence that Dr. Kapoor signed off on it or approved of it in any way.

### B.     Dr. Kapoor's Relationship with Sue Beisler Was Irrelevant and Unduly Prejudicial.

Compounding the prejudice caused by Alec Burlakoff's unprompted testimony that "everyone [at Insys] was banging everybody," 3/8 Trial Tr. 26:17, the government elicited

---

[5] *See, e.g.*, Alanna Durkin Richer, "Employees at Company Accused of Bribing Doctors Rapped, Danced Around a Giant Bottle of a Highly Addictive Fentanyl Spray," Chicago Tribune (Feb. 16, 2019), *available at* https://tinyurl.com/TribuneInsysRap; Laurel J. Sweet, "Ex-CEO: Insys Execs Used Rap Video Parody to Push Sales of Excessive Fentanyl Rx," Boston Herald (Feb. 14, 2019), *available at* https://tinyurl.com/HeraldInsysRap.

[6] *See* "Subsys Rap Video Created by Insys Pharmaceuticals," *available at* https://youtu.be/mtwFZwjCSTE.

[7] Maria Cramer & Jonathan Saltzman, "Insys Jurors Horrified at Use of Rap Video to Push Sales," Boston Globe (May 7, 2019), *available at* http://bos.gl/ElVVm1d.

[8] *Id.*

testimony from Sue Beisler that she was engaged in a physical relationship with Dr. Kapoor.  *See* 3/26 Trial Tr. 249:9-22.  Indeed, since Ms. Beisler's emails to Dr. Kapoor had already been admitted and read into the record by AUSA Fred Wyshak during Nellie Oquendo's testimony in the first week of trial, *see* 1/31 Trial Tr. 216:10-16, 218:18-219:11, 223:1-8 (admitting Exhibits 230, 248 and 249); 2/1 Trial Tr. 7:22-8:17, 18:5-21 (admitting Exhibits 251 and 252), it is fair to wonder whether the government called Ms. Beisler for any purpose other than to elicit evidence of that personal relationship.

The nature of this testimony and the fact that it was elicited on redirect shows that its only purpose was to impugn the character of Dr. Kapoor and impeach the credibility of Ms. Beisler's previous testimony that Dr. Kapoor never responded to her e-mails.  *See id.* 250:11-14 (**MR. LAZARUS:** "So this is around the time, all of those things, the emailing, the texting, the personal cell, that's all around the time that you're sending him these emails, right? … **MS. BEISLER:** Yeah.").  It is impermissible, however, for the government to elicit testimony from a witness for the purpose of later impeaching the witness with testimony that is otherwise inadmissible.  *See United States v. Gomez-Gallardo*, 915 F.2d 553, 555 (9th Cir. 1990) ("The government must not knowingly elicit testimony from a witness in order to impeach him with otherwise inadmissible testimony.").  Here, the government should not have been permitted to elicit testimony from Ms. Beisler that she had a physical relationship Dr. Kapoor under the guise of impeachment, and any effect it had on the jury's consideration of Dr. Kapoor's case was improper.

C.   **The Government Should Have Corrected Alec Burlakoff's False Allegations That Dr. Kapoor Was Physically Violent To Employees.**

Mr. Burlakoff twice went out of his way to allege Dr. Kapoor had threatened him and suggest that Dr. Kapoor caused him to fear for his safety.  In response to a question about a previous statement Mr. Burlakoff had made to the government about hiring family members to bribe

doctors, Mr. Burlakoff testified that he "was being threatened by Dr. Kapoor," and claimed that Dr. Kapoor "has a history of very much violence." 3/7 Trial Tr. 30:15-17.  Later the same day, in response to a question about Dr. Kapoor's focus on oncology, Mr. Burlakoff again emphasized that he was "basically threatened physically by Dr. Kapoor." *Id.* at 171:10.  These completely non-responsive answers were a clear attempt by Mr. Burlakoff to attack Dr. Kapoor's character at all costs. *See id.* at 30:20-21 ("**MS. WILKINSON:**  Is there a story you want to get out?  Is that the idea? **MR. BURLAKOFF:**  That's what I'm here for and I'm doing it.").  Despite the obvious prejudice of these statements to Dr. Kapoor, neither in the balance of his testimony nor at any other point during trial was evidence introduced that corroborated Mr. Burlakoff's baseless accusations. And the government knows full well that no such corroboration exists, even though government agents interviewed hundreds of Insys employees and others with knowledge of Dr. Kapoor as part of their investigation.  Yet, as with the remainder of Mr. Burlakoff's testimony, the government let him throw mud at Dr. Kapoor without regard to whether their star witness was telling the truth. Because these allegations were baseless and of marginal relevance to the charge, they provide no support for the jury's verdict and additional cause to reverse it in favor of a new trial.

## CONCLUSION

For the foregoing reasons, if the Court does not grant defendants' renewed joint motion for a judgment of acquittal and joint motion for a new trial, the Court should vacate the Dr. Kapoor's conviction and grant him a new trial.

## REQUEST FOR ORAL ARGUMENT

Dr. Kapoor respectfully suggests that the Court's resolution of his motions would benefit from oral argument.

Dated: June 6, 2019                     Respectfully submitted,

/s/ Beth A. Wilkinson
Beth A. Wilkinson (*admitted pro hac vice*)
bwilkinson@wilkinsonwalsh.com
Alexandra M. Walsh (*admitted pro hac vice*)
awalsh@wilkinsonwalsh.com
Kosta S. Stojilkovic (admitted *pro hac vice*)
kstojilkovic@wilkinsonwalsh.com
Andrew W. Croner (admitted *pro hac vice*)
acroner@wilkinsonwalsh.com
Wilkinson Walsh + Eskovitz LLP
2001 M Street NW
Washington, D.C. 20036
Telephone: (202) 847-4000

Brien T. O'Connor (BBO# 546767)
brien.o'connor@ropesgray.com
Aaron M. Katz (BBO# 662457)
aaron.katz@ropesgray.com
Ropes & Gray LLP
Prudential Tower 800 Boylston Street
Boston, MA 02199
Telephone: (617) 951-7000

*Attorneys for Dr. John Kapoor*

## LOCAL RULE 7.1 CERTIFICATION

Pursuant to Local Rule 7.1(a)(2), I hereby certify that counsel for Dr. Kapoor have conferred with counsel for the government and that the disputed issues remain unresolved.

/s/ Beth A. Wilkinson
Beth A. Wilkinson
Counsel for Dr. John Kapoor

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document will be served on all counsel of record through the ECF system.

/s/ Beth A. Wilkinson
Beth A. Wilkinson
Counsel for Dr. John Kapoor