# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES<br><br>v.<br><br>MICHAEL J. GURRY et al.,<br><br>Defendants. | Criminal No. 16-CR-10343-ADB<br><br>ORAL ARGUMENT REQUESTED<br><br>Leave to File Granted Aug. 2, 2019<br>(Dkt. No. 949) |

**DEFENDANTS' JOINT REPLY IN FURTHER SUPPORT OF RENEWED MOTIONS FOR JUDGMENT OF ACQUITTAL AND JOINT MOTIONS FOR A NEW TRIAL**

# TABLE OF CONTENTS

ARGUMENT .................................................................................................................. 1

I.   THE JURY'S VERDICT ON THE CONTROLLED SUBSTANCES PREDICATE
     MUST BE REVERSED IN FAVOR OF ACQUITTAL. .................................... 1

     A.   The Jury's Verdict Is Not Supported by Any Evidence that Defendants
          Agreed or Specifically Intended to Violate the CSA. ............................ 1

          1.   The Government Cannot Rely on a "Tacit Understanding" Theory ........... 2

          2.   The Record Does Not Support a "Tacit Understanding" for
               Healthcare Practitioners to Prescribe Outside the Course of
               Professional Practice. .......................................................................... 4

     B.   The CSA Predicate Was Multiplicitous with the HSF Predicate. ........................... 7

     C.   Defendants Face Substantial Practical Consequences from the Erroneous
          CSA Predicate. ........................................................................................ 9

II.  THE COURT SHOULD, AT A MINIMUM, ORDER A NEW TRIAL ON THE
     REMAINING PREDICATES. ....................................................................... 9

     A.   The Government Fails to Identify Sufficient Evidence of Deception in
          Support of the HSF Predicate. ................................................................ 9

     B.   The Government Also Fails to Identify Sufficient Evidence of Deception in
          Support of the Mail Fraud Predicate. ................................................... 10

     C.   The Intracorporate Conspiracy Doctrine Bars the Wire Fraud Predicate. ............ 11

III. THE JURY'S VERDICT ON ANY REMAINING PREDICATES SHOULD BE
     SET ASIDE BECAUSE OF IMPROPERLY ADMITTED EVIDENCE AND THE
     GOVERNMENT'S IMPROPER REBUTTAL. .............................................. 12

     A.   Defendants Did Not Waive Their Objections to Improperly Admitted
          Evidence or the Government's Rebuttal. ............................................... 12

     B.   The Errors Were Not Harmless. ............................................................ 16

IV.  THE WEIGHT OF THE EVIDENCE IS INSUFFICIENT AS TO RICH SIMON. ......... 17

V.   THE WEIGHT OF THE EVIDENCE IS INSUFFICIENT AS TO JOE ROWAN. ........ 19

VI.  THE WEIGHT OF THE EVIDENCE IS INSUFFICIENT AS TO JOHN
     KAPOOR. ................................................................................................. 22

CONCLUSION ......................................................................................................... 23

# TABLE OF AUTHORITIES

**Page**

## CASES

*Chiarella v. United States,*
    445 U.S. 222 (1980)........................................................................................ 3

*Giglio v. United States,*
    405 U.S. 150 (1972)...................................................................................... 23

*Gonzales v. Oregon,*
    546 U.S. 243 (2006)........................................................................................ 2

*Keen v. Overseas Tankship Corp.,*
    194 F.2d 515 (2d Cir. 1952)................................................................... 12, 13

*Napue v. Illinois,*
    360 U.S. 264 (1959)...................................................................................... 23

*Roman Rivera v. Puerto Rico Elec. Power Auth.,*
    2012 WL 13170557 (D.P.R. Sept. 25, 2012)............................................... 11

*United States v. Bartlett,*
    567 F.3d 901 (7th Cir. 2009) ........................................................................ 12

*United States v. Berroa,*
    856 F.3d 141 (1st Cir. 2017).......................................................................... 3

*United States v. Burgos,*
    703 F.3d 1 (1st Cir. 2012).............................................................................. 4

*United States v. Carter,*
    236 F.3d 777 (6th Cir. 2001) ........................................................................ 16

*United States v. Ganji,*
    880 F.3d 760 (5th Cir. 2018) .......................................................................... 3

*United States v. Glenn,*
    828 F.2d 855 (1st Cir. 1987)...................................................................... 2, 3

*United States v. Gonzalez,*
    834 F.3d 1206 (11th Cir. 2016) ...................................................................... 9

*United States v. Gullo,*
    502 F.2d 759 (3d Cir. 1974)..................................................................... 16, 17

*United States v. Holmquist,*
    36 F.3d 154 (1st Cir. 1994) ................................................................ 12

*United States v. Kragness,*
    830 F.2d 842 (8th Cir. 1987) ................................................................ 7

*United States v. Madhi,*
    598 F.3d 883 (D.C. Cir. 2010) ............................................................. 8

*United States v. Mangual-Garcia,*
    505 F.3d 1 (1st Cir. 2007) ................................................................... 23

*United States v. Pagan-Ferrer,*
    736 F.3d 573 (1st Cir. 2013) ............................................................... 16

*United States v. Paret-Ruiz,*
    567 F.3d 1 (1st Cir. 2009) ............................................................ 1, 2, 22

*United States v. Peters,*
    732 F.2d 1004 (1st Cir. 1984) ............................................................. 11

*United States v. Spinney,*
    65 F.3d 231 (1st Cir. 1995) ................................................................... 1

*United States v. Watchmaker,*
    761 F.2d 1459 (11th Cir. 1985) ............................................................ 9

*United States v. Zolot,*
    968 F. Supp. 2d 411 (D. Mass. 2013) ............................................... 2, 3

## STATUTUES

18 U.S.C. § 371 .................................................................................... 11

18 U.S.C. § 1962(d) .............................................................................. 11

## RULES

Fed. R. Crim. P. 51(a) ......................................................................... 12

Fed. R. Evid. 103(b) ............................................................................ 12

<u>**ARGUMENT**</u>

**I.    THE JURY'S VERDICT ON THE CONTROLLED SUBSTANCES PREDICATE MUST BE REVERSED IN FAVOR OF ACQUITTAL.**

**A.    The Jury's Verdict Is Not Supported by Any Evidence that Defendants Agreed or Specifically Intended to Violate the CSA.**

The government's opposition has no answer to the charge that it improperly transformed allegations of medical bribery into drug dealing without a sufficient evidentiary basis.  Defendants have argued since before the start of trial that the government was trying to jam a square peg into a round hole.  In service of that effort, the government has mounted a series of shifting and unsuccessful theories:  First, it argued that any prescription written subsequent to a bribe was not a legitimate medical prescription.  Then, it asked the jury to hold Defendants criminally responsible as drug dealers because their alleged conduct supposedly created a reasonably foreseeable risk of some bad prescriptions.  Now, it drops these arguments and offers a new one, urging that the jury could have found Defendants guilty of the CSA predicate on a "tacit understanding" theory.  *See* Gov't Br. 3–5.

The government's latest effort to justify its decision to prosecute pharmaceutical executives as drug dealers at the height of the opioid epidemic fares no better than the prior ones—because it faces the same gaps in evidence.  As this Court observed—and as the government steadfastly ignores in its response— "the proof on the Controlled Substances Act violation is pretty darn thin." 4/3 Rule 29 Hr'g Tr. 35:5–6.  To be sure, the Court must review that evidence in the light most favorable to the jury's verdict.  But deference does not mean abdication.  This Court must "take a hard look at the record" and "reject those evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative."  *United States v. Spinney*, 65 F.3d 231, 234 (1st Cir. 1995).  Where the evidence "gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged, [the Court] must reverse the conviction."

*United States v. Paret-Ruiz*, 567 F.3d 1, 8 (1st Cir. 2009) (internal quotation marks and citation omitted). That is the result required here.

### 1. The Government Cannot Rely on a "Tacit Understanding" Theory.

The government concedes (Br. 16) that there is no direct evidence of an agreement for healthcare practitioners to prescribe outside the course of professional practice, and instead seeks to uphold the verdict because of a purported "tacit understanding between Defendants and the practitioners" that Subsys would be prescribed to patients who did not need it. *See* Br. 15. The government's reliance on a "tacit understanding" theory is inapposite for at least three reasons.

*First*, a "tacit understanding" in the street-level drug dealing context cannot be analogized to the prescribing of FDA-approved drugs by licensed medical practitioners. It is one thing to infer that a "marijuana and hashish" dealer has a "tacit understanding" regarding the distribution of these illegal substances with other dealers downstream from him based on the "known interdependence of [such] linked activities." *United States v. Glenn*, 828 F.2d 855, 857–58 (1st Cir. 1987). In other words, where a drug is not prescribed by an authorized practitioner and the drug itself is illegal, it is not a bridge too far for a jury to infer that an upstream distributor shares a tacit understanding that the drug will be illegally distributed, even if he does not interact directly with the street-level dealers. This case is completely different. The CSA only regulates healthcare practitioners "insofar as it bars [them] from using their prescription-writing powers as a means to engage in illicit drug dealing and trafficking as conventionally understood." *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006). As a result, a tacit understanding that a healthcare practitioner will *distribute* an FDA-approved medicine is not illegal under the CSA. Rather, an additional agreement—that the practitioner will distribute the drug *outside the course of professional practice*—is required, because it is only where the doctor acts as a "pusher" of prescription medicines that CSA liability attaches. *See United States v. Zolot*, 968 F. Supp. 2d 411, 429 (D.

Mass. 2013).  The government cannot assume away this critical agreement by pointing only to an "implicit working relationship and interdependence between [Insys] and the practitioners."  Br. 5.

*Second*, the government's reliance on certain "tacit understanding" cases is misplaced because those cases address an issue different than the one raised in Defendants' motion.  Those cases presumed the existence of a conspiracy and the defendant's intent to violate the CSA, with the "tacit understanding" relevant only to the *scope* of the charged conspiracy.  *See United States v. Berroa*, 856 F.3d 141, 155 (1st Cir. 2017) (whether certain conduct constituted "an act within the scope and timeframe of the conspiracy"); *Glenn*, 828 F.2d at 857 (whether "the evidence introduced at trial showed that, as to [defendants], the charged conspiracy was in fact two separate conspiracies").  Here, by contrast, the government is relying on the "tacit understanding" theory not to establish the scope of Defendants' purported agreement to violate the CSA, but to prove the very existence of that agreement to begin with.  That inference is too speculative to survive scrutiny under Rule 29.  *See, e.g.*, *United States v. Ganji*, 880 F.3d 760, 767 (5th Cir. 2018) ("[P]roof of an agreement to enter a conspiracy is not to be lightly inferred." (citation omitted)).

*Third*, although the government now invokes a tacit understanding theory, it argued the exact opposite in its closing to the jury.  Far from asserting a silent understanding between Defendants and healthcare practitioners about medically illegitimate prescriptions, the government instead argued "*[t]his was not a covert, clandestine agreement*."  4/4 Trial Tr. 88:7.  Yet the only evidence of an overt agreement introduced at trial related to alleged medical  bribery—*i.e.*, violations of the Anti-Kickback Statute—and not drug dealing.  The government should not be permitted now to invent post-hoc rationalizations in defense of the verdict.  *Cf. Chiarella v. United States*, 445 U.S. 222, 236 (1980) (acknowledging that courts "cannot affirm a criminal conviction on the basis of a theory not presented to the jury").

Ultimately, the government's reliance on a "tacit understanding" is just another iteration in a series of shifting theories seeking to justify its attempt to constructively amend federal drug law. What each of the government's formulations lacks is proof of a leap from an agreement to commit alleged medical bribery to an agreement to cause illegal drug distribution. As Defendants have argued from the outset of this case, if the government can obtain a CSA predicate conviction on these facts, it will be able to transform AKS violations into CSA violations with the stroke of a pen. That is not the law, and the time has come for this Court to say as much.

### 2. The Record Does Not Support a "Tacit Understanding" for Healthcare Practitioners to Prescribe Outside the Course of Professional Practice.

Even if the verdict could be defended in terms of a "tacit understanding" that healthcare practitioners would prescribe outside the course of professional practice, the government has not established such an understanding on this record. The government concedes (Br. 16) that *not a single witness* testified that the goal of the alleged conspiracy was to cause illegitimate prescriptions. That concession is striking, especially considering how many witnesses the government called, and how many of them eagerly threw mud at Defendants. Worse yet, the government's argument ignores direct evidence from one of its lead witnesses that affirmatively shows it was *not* his goal to cause medically illegitimate prescriptions. *See* 2/14 Trial Tr. 141:6–8 (Babich testifying "[i]t was not my goal" when asked whether he "intend[ed]" or had a "goal to get doctors to give this medication to patients who didn't need it").

The government attempts to minimize its failure of proof by pointing to inferences from circumstantial evidence. But courts on a Rule 29 motion are "loath to stack inference upon inference in order to uphold the jury's verdict" because such reasoning is "too speculative to sustain [a] conviction." *United States v. Burgos*, 703 F.3d 1, 10, 15 (1st Cir. 2012) (internal quotation marks and citation omitted). The "pretty darn thin" evidence that the government

musters in its opposition merely confirms the government's improper conflation of the AKS and the CSA, and it is ultimately insufficient to meet its burden.

**Napoletano ROI analysis.** The government cites (Br. 7) Mr. Napoletano's testimony regarding the "ROI analysis" and warning to certain Defendants that it "was wrong." But Napoletano never testified about anything remotely akin to an intent to cause medically inappropriate prescriptions. Mr. Napoletano said he thought the ROI analysis was wrong *because it suggested the company was violating the AKS*—a statute that requires no showing of intent with respect to medically unnecessary prescriptions. *See* 2/7 Trial Tr. 39:22–25 ("the data that was necessary to, yeah, violate the anti-kickback statute"). Thus, far from supporting the government's "tacit understanding" theory, the government's reliance on Mr. Napoletano's testimony confirms its efforts to equate an alleged AKS conspiracy with illicit drug dealing.

**Burlakoff emails.** The government quotes extensively (Br. 8) from an email written by Mr. Burlakoff that it claims shows efforts to harass sales representatives whose doctors wrote low-dose Subsys prescriptions. But the very same email contains language expressly *disclaiming* any intent to cause medically unnecessary prescriptions. *See* Ex. 445 ("The goal is to generate Subsys patients whom [sic] believe in the safety and efficacy behind this product."). Likewise, the government cites (Br. 7) a Burlakoff email about "solidify[ing] a return on investment" from speaker programs, but it neglects to mention language from the same email emphasizing the importance of finding speakers with "10 times more clinical experience than all of your attendees combined." Ex. 175. As with Mr. Napoletano's testimony, the Burlakoff emails may, in the light most favorable to the government, show an intent to violate the AKS—by bribing doctors in the hopes of switching as many patients as possible from competitors to Subsys—but they do not support an agreement to cause medically illegitimate prescriptions.

**Babich "pill mill" email and testimony.** The government relies (Br. 14–15) on an email to Mr. Babich raising a concern that Dr. Madison was running a "very shady pill mill" as purported evidence of Dr. Kapoor's agreement to violate the CSA. But there was no proof that Dr. Kapoor ever received that email, and Mr. Babich could not recall whether he provided it to him. 2/14 Trial Tr. 165:9–166:1; 2/22 Trial Tr. 89:14–21. The government also cites (Br. 15) purported inculpatory testimony by Mr. Babich regarding Dr. Kapoor's reaction upon learning of the arrest of Dr. Awerbuch, but fails to mention that Mr. Babich testified that Dr. Kapoor's "view at the time" of the arrest was that Dr. Awerbuch was "conducting *Medicare fraud*," 2/22 Trial Tr. 57:5–11, which predated and was unrelated to his Subsys prescriptions as Dr. Awerbuch acknowledged at trial, *see* 1/31 Trial Tr. 102:5–25. Mr. Babich never suggested that Dr. Kapoor's reaction to the Awerbuch arrest indicated an awareness of *medically illegitimate Subsys prescriptions*. Finally, the government relies (Br. 15) on Mr. Babich's testimony to suggest that it was Dr. Kapoor's idea to negotiate a "direct distribution" arrangement with two Alabama practitioners after he learned that a wholesaler had capped their supply of Subsys. But Mr. Babich never remotely suggested that direct distribution was a way to support medically illegitimate prescriptions, and he even vouched for the legitimacy of the direct distribution agreement at issue. *See* 2/15 Trial Tr. 168:20–169:6 (testifying that he believed the direct distribution agreement was "a lawful contract").

**Dr. Awerbuch and APRN Alfonso testimony.** The government's opposition places significant emphasis (Br. 11–13) on the testimony by Dr. Awerbuch and APRN Alfonso that they prescribed Subsys to *some* patients who did not need it in order to continue receiving speaker fees from Insys. But this testimony is not probative of whether Defendants *agreed and specifically intended* for those prescriptions to be written, because the government failed to introduce evidence that they were even aware of Dr. Awerbuch or APRN Alfonso's conduct. To the contrary, Dr.

Awerbuch testified that when asked by Dr. Kapoor about his prescribing habits, he assured Dr. Kapoor that he was prescribing Subsys off-label because it was providing relief to his "patients with chronic pain, and that [he] use[s] Subsys to treat patients with chronic pain." 1/31 Trial Tr. 89:4–8. And APRN Alfonso did not interact with any Defendants, let alone testify about their purported intent to cause medically illegitimate prescriptions.

In sum, after 51 days of trial—and testimony from more than 40 witnesses—the only support the government can muster for Defendants' convictions on the CSA predicate consists of stacked inferences that, at most, establish an alleged conspiracy to violate the AKS in an ill-conceived "switch strategy" of moving patients from competitor products such as Actiq to Subsys. That is not enough to sustain the jury's verdict on the CSA predicate. If the government choses to charge pharmaceutical executives with *agreeing and specifically intending* to cause medically illegitimate prescriptions, it must prove the existence of such an agreement with actual evidence. It has failed to do so here.

### B. The CSA Predicate Was Multiplicitous with the HSF Predicate.

The government puts forth (Br. 17–19) various tests it claims the First Circuit "might adopt in determining whether RICO predicates are multiplicitous." When properly applied, however, these tests demonstrate that the CSA predicate was multiplicitous with the HSF predicate.

*First*, the government's attempt to distinguish the separate acts-based test adopted by the Eighth and Ninth Circuits fails. The government notes (Br. 19) these cases involved only a single act, while the jury here found multiple acts to satisfy each predicate. That is true, but of no assistance to the government on this record. As the Eight Circuit has explained, it is unlawful to "charge two predicate acts where one action violates two statutes." *United States v. Kragness*, 830 F.2d 842, 861 (1987). Here, the jury found multiple acts of CSA and HSF agreement as to Defendants Simon, Lee, Rowan, and Kapoor, but there is no reason to think the jury found any

difference in the acts underlying those findings. The government never argued that certain acts constituted CSA violations but not HSF violations. And the government's opposition shows why: In response to Defendants' arguments on lack of proof of an agreement to cause medically illegitimate prescriptions, the government's response on the HSF predicate simply refers the Court *to the same evidence* invoked in defense of the CSA predicate, then goes on to discuss the evidence on deception. *See* Br. 20–21. Nor does the verdict as to Mr. Gurry assist the government. On the contrary, the fact that the jury found multiple CSA and HSF predicates as to Defendants Simon, Lee, Rowan, and Kapoor, but *no* CSA or HSF predicates as to Mr. Gurry, confirms that the jury viewed the CSA and HSF predicates as based on the same theory of liability—*i.e.*, medical bribery.

*Second*, the government fares no better under an elements-based test. The government concedes (Br. 18) the key inquiry is "whether each provision requires proof of a fact which the other does not." Yet in applying this test, the government focuses solely on the fact that the HSF predicate "requires proof of an element that the CSA predicate does not; namely, the fraud." Br. 19. As elaborated below, however, the government did not offer sufficient proof of deception as to the HSF predicate. And, more fundamentally, the elements analysis requires *both* statutes to have unique elements. *See, e.g.*, *United States v. Madhi*, 598 F.3d 883, 890 (D.C. Cir. 2010). According to the government's own response, the CSA predicate here was subsumed within the HSF predicate because, under the government's theory, an HSF finding required an agreement to cause medically unnecessary prescriptions—just like the CSA—*plus* deception. That approach is

multiplicitous because whenever the jury found agreement as to HSF, it would necessarily have found agreement as to CSA.[1]

### C. Defendants Face Substantial Practical Consequences from the Erroneous CSA Predicate.

The government misconstrues (Br. 20) Defendants' argument on the sentencing implications of the CSA predicate. Defendants are not suggesting that the sentencing implications of the CSA predicate have any bearing on whether sufficient evidence exists to support the jury's verdict. Rather, Defendants raised the sentencing implications to emphasize, first, that allowing the CSA predicate to go to the jury was not harmless error and, second, that their arguments on the CSA predicate need to be resolved promptly before sentencing takes place—a point that the government itself acknowledges in its opposition. *See* Gov't Br. 20 (recognizing that the implications of the CSA predicate "might impact questions of timing" with respect to sentencing). If the Defendants are sentenced and forced to serve time based on the CSA predicate, that will materially impact them in ways that the Court of Appeals may not be able to fully undo.

## II. THE COURT SHOULD, AT A MINIMUM, ORDER A NEW TRIAL ON THE REMAINING PREDICATES.

### A. The Government Fails to Identify Sufficient Evidence of Deception in Support of the HSF Predicate.

Neither of the government's arguments with respect to the deception element of HSF is compelling. *First*, the Court has already rejected the government's theory (Br. 21) that "the

---

[1] The final test cited by the government from *United States v. Watchmaker*, 761 F.2d 1459, 1475 (11th Cir. 1985), does not apply in these circumstances because it addresses whether predicate acts proximate in time demonstrated the "continuity" necessary for a RICO conviction. In any event, the Eleventh Circuit has more recently noted that it has "regularly utilized" an elements-based analysis "in deciding whether an indictment is multiplicitous." *United States v. Gonzalez*, 834 F.3d 1206, 1219 (2016).

prescription itself" can serve as the deceptive act because the prescription "purported to represent the practitioner's belief that Subsys was medically necessary." *See* 2/4 Trial Tr. 18:6–8 ("I don't think that every prescription is bogus just because there was a kickback behind it, and I don't think there's any obligation to disclose [the kickback]."). Nor can the government rely on the testimony of Dr. Awerbuch that he lied to his patients in failing to prescribe Subsys for a legitimate medical purpose. *See* Gov't Br. 21–22. As explained earlier (*supra* at 6–7), not only is there a lack of evidence that Defendants were aware Dr. Awerbuch deceived some of his patients, but when asked by Dr. Kapoor about his prescribing habits in 2013, Dr. Awerbuch assured him that he was prescribing Subsys because his patients needed it. *See* 1/31 Trial Tr. 133:6–17.

*Second*, the government's response on the Open Payments website misses the mark. To be sure, the website "did not disclose that practitioners … were prescribing Subsys outside the usual course of professional practice and not for a legitimate medical purpose in return for bribes and kickbacks." Gov't Br. 22. But the government's response concedes that under its theory medically unnecessary prescriptions flow from—that is, are "in return for"—the payments to healthcare practitioners. And there is no dispute that the website *did* disclose those payments. Because the critical ingredient in the doctors' alleged fraud (i.e., the payment) was out in the open for all to see, and there is no evidence that Defendants knew practitioners were prescribing Subsys without a legitimate medical need, the jury had no basis to find that Defendants agreed that any practitioners would deceive their patients in the manner alleged in this case.

**B.      The Government Also Fails to Identify Sufficient Evidence of Deception in Support of the Mail Fraud Predicate.**

The government does not dispute (Br. 23) that it failed to introduce any evidence at trial that "Insys affirmatively lied to insurance companies and PBMs about its financial relationship with certain practitioners," but claims the evidence was sufficient to prove that insurers "would

not authorize payment for prescriptions written outside the course of professional practice, or not for a legitimate medical purpose." Even if that claim were true, the only evidence the government cites in support of it was testimony from insurance company employees that authorizations for Subsys depended largely on the existence of a cancer diagnosis. *See* Gov't Br. 23–24. By itself, however, the existence of a cancer diagnosis would only tell the insurer whether Subsys was being prescribed off-label, not if the prescription was written outside the course of professional practice and not for a legitimate medical purpose. *See* 4/4 Trial Tr. 56:24–57:4 (instructing that the jury could not conclude a prescription was outside the usual course of professional practice and not for a legitimate medical purpose "solely because it was prescribed for an off label use"). In other words, an insurer may not have covered off-label prescriptions under their policies, but that hardly shows that Insys misrepresented the medical legitimacy of those prescriptions. Thus, even accepting the alternative theory of deception proposed in its opposition, the government's failure to identify evidence supporting that theory necessitates setting aside the mail fraud predicate.

**C.** **The Intracorporate Conspiracy Doctrine Bars the Wire Fraud Predicate.**

Citing *United States v. Peters*, 732 F.2d 1004 (1st Cir. 1984), the government claims (Br. 26) that the First Circuit has "stated its express agreement" with decisions that have "rejected application of the intracorporate conspiracy doctrine to criminal conspiracies." But the government acknowledges (Br. 26) that *Peters* involved "conspiracy convictions under 18 U.S.C. § 371," not the RICO conspiracy statute, 18 U.S.C. § 1962(d). The law on the doctrine's application to Section 1962(d) conspiracies is far less settled than the government suggests, because "Courts of Appeals are split" and the First Circuit "has yet to definitively extol on the applicability of the doctrine in the RICO context." *Roman Rivera v. Puerto Rico Elec. Power Auth.*, 2012 WL 13170557, at \*6 n.7 (D.P.R. Sept. 25, 2012). Thus, absent contrary authority from the First Circuit, this Court should rule that the intracorporate conspiracy doctrine bars the wire

fraud predicate, which—unlike the other predicates—rests entirely on an alleged conspiracy within and among Insys personnel.

## III.  THE JURY'S VERDICT ON ANY REMAINING PREDICATES SHOULD BE SET ASIDE BECAUSE OF IMPROPERLY ADMITTED EVIDENCE AND THE GOVERNMENT'S IMPROPER REBUTTAL.

### A.  Defendants Did Not Waive Their Objections to Improperly Admitted Evidence or the Government's Rebuttal.

The government's claim that Defendants waived their objections to the prejudicial evidence and argument identified in their joint motion for a new trial—the patient testimony, evidence of Dr. Steven Chun's alleged drug addiction, and prejudicial statements made in the government's rebuttal—is contrary to the record in this case and to established caselaw.  At bottom, the government's position presumes a non-existent and nonsensical requirement that a criminal defendant must not only object—but continue objecting again and again—in order to preserve errors for review.  Such a rule would "disturb the proper atmosphere of a trial" and is "wholly untenable."  *Keen v. Overseas Tankship Corp.*, 194 F.2d 515, 519 (2d Cir. 1952) (Hand, J.).  Thus, it has long been clear that the Federal Rules of Criminal Procedure "do not require a litigant to complain about a judicial choice after it has been made."  *United States v. Bartlett*, 567 F.3d 901, 910 (7th Cir. 2009); *see also* Fed. R. Crim. P. 51(a) ("Exceptions to rulings or orders of the court are unnecessary.").  So too with the Federal Rules of Evidence, which provide that "[o]nce the court rules definitively on the record—either before or at trial—a party need not renew an objection … to preserve a claim of error for appeal."  Fed. R. Evid. 103(b).  Because Defendants "call[ed] [their] specific objection[s] to the attention of the trial judge, so as to alert the judge to the proper course of action," *United States v. Holmquist,* 36 F.3d 154, 168 (1st Cir. 1994) (citation and brackets omitted), they fully preserved their arguments.

*First*, Defendants moved *in limine* to exclude testimony of the patients cherry-picked by the government out of thousands of Subsys patients as both irrelevant and unduly prejudicial. *See* Defs.' Mot. to Exclude Patient Testimony, Dkt. No. 645; Defs.' Mots. *In Limine* Nos. 1–6 at 2–7, Dkt. No. 572; Defs.' Consol. Reply in Supp. of Mots. *In Limine* Nos. 1–13 at 1–7, Dkt. No. 669. The Court denied these motions and allowed the government to introduce patient testimony, including "evidence that a patient became addicted to Subsys, the medical consequences of that addiction, and whether and how prescribing practices changed thereafter." Order on Mots. *In Limine* at 2, Dkt. No. 676. Although it was not necessary, Defendants restated their objections at trial. When the government provided notice that Kendra Skalnican was going to testify, Defendants made clear that they didn't "see anything that she should be permitted to testify to." 1/25 Trial Tr. 46:2–4; *see also* 3/8 Trial Tr. 154:13–21 (noting Defendants' continued objection to patient testimony); 3/22 Trial Tr. 46:1–8 (same). At no time did Defendants indicate that they had abandoned their objection to the admission of patient testimony.

*Second*, Defendants objected to the testimony concerning Dr. Steven Chun's purported drug addiction. *See* 3/19 Trial Tr. 135:3–7, 135:25–136:3 (contemporaneous objections while the testimony was being elicited); 3/20 Trial Tr. 26:15–28:17 (mistrial motion the following day). *After* the Court denied the motion for a mistrial, Defendants asked "for some other serious remedy" that would clearly tell the jury that the government's questioning was improper. 3/20 Trial Tr. 28:18–29:10. Seeking curative instructions once Defendants' initial objection and motion for a mistrial was denied does not constitute waiver. *See Keen*, 194 F.2d at 519 (defendant's failure to "later to repeat the objection … was not a 'waiver' of the ruling against him; he had taken his position, had lost, and he was free thereafter to win a verdict if he could within the narrower borders of the case that the judge had laid down for him.").

*Third*, Defendants did not waive their objections to the government's improper argument during rebuttal.  As a preliminary matter, and as the government concedes (Br. 48 n.1), the Court made clear that it did not "like objections during closing" and is "very, very, very unlikely to sustain them."  4/5 Trial Tr. 32:4–6.  The Court maintained this position when Defendants nonetheless objected to the government's rebuttal.  *See* 4/5 Trial Tr. 171:10–172:24 (summarily denying Defendants' objection that AUSA Wyshak misstated Mr. Babich's testimony as to his plea agreement).  In fact, late on Friday afternoon, the Court did not rule on or even acknowledge a second objection Defendants made to AUSA Wyshak's rebuttal, sending a clear message that it would not entertain any further objections.  *See id.* at 174:16.

Over the weekend following the government's rebuttal, Defendants filed a motion addressing numerous improper arguments made by AUSA Wyshak during rebuttal[2] and asked for "robust corrective instructions" or, in the alternative, a mistrial.  Dkt. No. 819 at 1.  Crucial to Defendants' request were instructions that the government's rebuttal arguments were inappropriate and should be disregarded.  *Id.* at 13–14 (requesting multiple instructions that stated "[t]he government should have never made this argument to you, and you must disregard it in your deliberations").  In closing, Defendants stated: "If the Court is not willing to give these instructions, the jury should be sent home, and the Court should declare a mistrial with prejudice."  *Id.* at 14. The Court did neither.

On Monday morning, after the jury had an entire weekend to consider the government's improper arguments, the Court held a hearing on Defendants' motion for a mistrial.  The Court

---

[2] The government does not even attempt to defend some of the rebuttal arguments challenged in Defendants' motion.  For example, the government acknowledges that AUSA Wyshak's use of the "loaded gun" metaphor as a reference to reasonable foreseeability was "inapt."  Br. 59.

indicated that "if [the Court] was going to instruct at all," it would only give "some comment" to the objections Defendants raised. 4/8 Trial Tr. 8:20–9:12. After the Court handed out a draft of the instructions it was considering giving, the government "object[ed] to any phrasing that indicates that the purpose of the instruction is in response to the government's rebuttal," to which the Court responded: "That's all out. I took that all out." *Id.* at 9:13–21, 12:25–13:4. The Court then proceeded to give the jury instructions that omitted the key portion that Defendants requested: an acknowledgement that these arguments made in the government's rebuttal were improper and should be disregarded. Under these circumstances, while Defendants appreciate the Court's curative instructions, they did not align with the requests made in Defendants' motion for a mistrial, and therefore Defendants' objections to the government's rebuttal were not waived.

Finally, the government concedes (Br. 51) that Defendants' objection to AUSA Wyshak's use of a "loaded gun" metaphor was properly preserved, but tries to limit it to Mr. Rowan.[3] That limitation fails because it was clearly established at the beginning of trial—with the government's assent—that an objection by any Defendant was to be considered an objection by all. *See* 1/25 Trial Tr. 23:4–13. In any event, the objection to the "loaded gun" metaphor was raised during the Court's hearing on the mistrial motion, along with Defendants' other concerns. *See generally* 4/8 Trial Tr. 17:7–19. Thus, Defendants all jointly presented and preserved their objections to the government's rebuttal.

---

[3] Defendants first objected to the "loaded gun" comment at a side bar during AUSA Wyshak's rebuttal. Immediately after Dr. Kapoor's counsel objected to the government's mischaracterization of Mr. Babich's testimony about his plea agreement, Mr. Rowan's counsel separately objected to the "loaded gun" argument when he said, "I think the argument on the increased risk is confusing your instruction on intent. Those are two different things." 4/5 Trial Tr. 172:21–23. The Court overruled "[b]oth objections." *Id.* at 172:24.

**B.     The Errors Were Not Harmless.**

Neither the improper admission of evidence nor the government's improper rebuttal was harmless.  The government repeatedly states that "the evidence of Defendants' guilt was strong." *See* Br. 55, 57, 59, 61.  But, as demonstrated above and further elaborated below, the evidence was far from strong on critical elements the government had to prove to obtain a conviction.  And the seasoned prosecutors who tried this case knew exactly what they were doing when they insisted on taking up large swaths of trial with patient testimony and refused stipulations that cancer diagnoses were lacking, when they elicited testimony regarding Dr. Chun's alleged addiction, and when they asked the jury to convict Defendants on plainly inappropriate concepts of corporate officer liability and a metaphor of shooting a loaded gun into a crowd.  The Court should ask itself: If the prosecutors had faith in the strength of their evidence outside the portions challenged by Defendants, why did they push so hard for the admission of this evidence and why did they feel the need to make the challenged comments?  A clear-eyed assessment of this case shows that the government felt the evidence and comments were necessary in order to secure convictions.

Due to the quantity and inflammatory nature of the evidence and argument that was admitted at trial, the curative instructions that the Court provided were insufficient to remedy the error.  Where evidence or argument is "seriously prejudicial," a "curative instruction will be an insufficient antidote."  *United States v. Pagan-Ferrer*, 736 F.3d 573, 586 (1st Cir. 2013); *see also United States v. Carter,* 236 F.3d 777, 787 (6th Cir. 2001) (finding that "measures more substantial than a general instruction that objections or arguments made by the lawyers are not evidence in the case were needed to cure the prejudicial effect of the prosecutor's comments during closing arguments" (internal quotation omitted)).  Furthermore, the utility of curative instructions can be "weakened by the lapse of time," such as the weekend gap between the government's rebuttal and the Court's instructions.  *United States v. Gullo*, 502 F.2d 759, 762 (3d Cir. 1974) (finding that

curative instruction was insufficient when given twenty-four hours after the inadmissible evidence was elicited).

Unsurprisingly, the jury latched onto the precise evidence to which Defendants timely objected. For example, the government urged the jury to convict Defendants on the basis of the patient testimony, arguing that Defendants placed "[p]rofits over patients" and that "every single one of those patients you saw was exploited." 4/4 Trial Tr. 66:9, 116:6–8. Jurors found the patient testimony "heart-wrenching" and walked away from this case believing that Insys "didn't care about the patients. It was all about the money."[4] This conclusion does not satisfy any of the charges in this case, and putting profits over patients is precisely the kind of moral attack that invites jurors to convict Defendants because they dislike the conduct and the people involved rather than because the government proved the charged crimes beyond a reasonable doubt.

## IV.     THE WEIGHT OF THE EVIDENCE IS INSUFFICIENT AS TO RICH SIMON.

To support the jury verdict against Mr. Simon on the CSA predicate, the government points to a single email in which Mr. Simon directed sales reps to develop "plan[s]" to market Subsys to their "top customers." Br. 14, 16 (citing Ex. 224). That unremarkable document does not mention the Insys speaker program, much less any scheme to pay kickbacks to doctors. In his email, Mr. Simon merely encouraged routine, lawful sales practices which he had learned long before he started working in the pharmaceutical industry. Invoking Jim Collins's business classic, "Good to

---

[4] Maria Cramer & Jonathan Saltzman, *Insys Jurors Horrified at Use of Rap Video To Push Sales*, Boston Globe (May 7, 2019), *available at* https://tinyurl.com/globeinsysjurors. As stated in Defendants' joint motion (Mot. 5–6), these post-verdict juror statements are not raised in contravention of Rule 606(b) as an independent basis for invalidating the jury's verdict. Rather, Defendants raise them because the government should not be heard to claim that admitting this evidence was harmless error, when jurors' statements confirm that this evidence resonated strongly with them.

Great," which Insys employees received at the national sales meeting, Mr. Simon directed sales personnel to set plans, execute strategies, and ensure accountability from all involved. According to management experts like Collins, thoughtful, data-driven sales plans are a hallmark of a "great company" with a "culture of discipline," not evidence of a racketeering enterprise.

Regarding the HSF predicate, the prosecution relies on similarly insufficient evidence concerning Drs. Ahmad and Somerville. No doubt, the prosecution focuses on Dr. Ahmad, whose pharmacy was investigated, and Dr. Somerville, whose license was suspended, to taint Insys—and by association, Mr. Simon. But Mr. Simon's limited interactions with these medical professionals does not prove his complicity in any racketeering activity. As Casey Hanoch's call notes state, Dr. Ahmad was "[v]ery pleased with Subsys" on its merits as an FDA-approved medication, not based on any illegal bribe. Ex. 4. The notes further report Dr. Ahmad planned to continue prescribing Subsys when he resolved his "pharmacy issue," not if Insys paid him speaker fees. Without more, Mr. Simon's attendance at an October 2, 2012 dinner, very early in his tenure as a regional sales manager, does not permit a reasonable inference that he bribed Dr. Ahmad. As the prosecution concedes, Dr. Ahmad's Subsys prescriptions did not significantly increase until more than one year after his only meeting with Mr. Simon. (At trial, the prosecution elicited false testimony from Mr. Burlakoff that Mr. Simon attended another dinner with Dr. Ahmad in Arkansas about two years later; at the time, Mr. Simon was in Florida caring for his sick father. *Compare* 3/6 Trial Tr. 134:5–24 *with* 3/11 Trial Tr. 125:18–128:24.)

Moreover, the prosecution relies on misleading snippets of sales conversations. Read as a complete document, Mr. Hanoch's call notes demonstrate that, as far as Mr. Simon knew, Insys marketed Subsys, and doctors prescribed the effective pain drug, based on its "clinical advantages … over other TIRFs"; doctors who prescribed Subsys reported patients with chronic pain were

"unexpectedly not in pain any longer"; lunches with sales reps and speakers were opportunities to address medical concerns about "divergence and abuse potential"; and reps did not pressure doctors to write prescriptions or use speaking opportunities as prizes. Ex. 4. Ignoring this exculpatory evidence, the prosecution contends than an isolated comment ("more scripts than we can handle") constitutes proof beyond a reasonable doubt of criminal activity. The prosecution reads Mr. Simon's internal email to Ty Rustin about Dr. Somerville in the same cynical way: without any evidence, it assumes Dr. Somerville "agreed" to write medically unnecessary, high-dose prescriptions in exchange for bribes. Ex. 1514. But the email does not say that, and the trial evidence did not prove it. Mr. Simon's comment to Mr. Rustin referred only to "units" in prescription refills ("180-240 etc."), not dosages (100 mcg, 200 mcg, etc.). *Id.* His point was to ensure an adequate 30-day supply to treat daily episodes of breakthrough pain.

Finally, regarding the IRC-related charges, the prosecution fails to identify any probative evidence about Mr. Simon. Noting that Mr. Simon, who worked at his home in California not at Insys's headquarters in Arizona, regularly participated in morning calls, the prosecution asserts (Br. 30) he "was required to deal with the prior authorization process on a daily basis." The government does not explain that claim, and the evidence does not support it. More importantly, "deal[ing] with the prior authorization process," including reviewing "CIP reports" from Liz Guerrieri, was a routine, lawful insurance practice that occurs at almost every pharmaceutical company. *Id.* The prosecution identifies no evidence, however, that Mr. Simon participated in discussions or reviewed documents about any improper IRC strategy at Insys or any false statements by IRC personnel to insurers.

## V.      THE WEIGHT OF THE EVIDENCE IS INSUFFICIENT AS TO JOE ROWAN.

The government's evidence of Mr. Rowan's intent and knowledge was exceptionally thin. The government's opposition further highlights the degree to which, in place of relevant evidence

concerning Mr. Rowan himself, the government relied on evidence of something else (at most kickbacks), evidence about other individuals, and innuendos. In a broad and inflammatory rebuttal argument that the government now downplays, the prosecution tried to fill the holes in its proof against Mr. Rowan by conflating individual with corporate responsibility and recklessness with intent—culminating in the memorable and highly prejudicial "loaded gun" metaphor.

The government's evidentiary shortcomings are none more obvious than in its insurance fraud argument. The government points to one of the April 2013 National Sales Meeting whistleblower tapes, in which, as part of the IRC's company-wide launch, Liz Gurrieri made a 30-minute presentation about insurance reimbursement and properly filling opt-in forms to Mr. Rowan and his sales team without ever discussing IRC fraud or lying to insurers. The government extracts two ambiguous comments made by Ms. Gurrieri on the tape, ascribes them a nefarious interpretation implicitly based on IRC evidence utterly unrelated to Mr. Rowan and presented at other points during the trial, and then infers that Mr. Rowan must have understood the comments' nefarious meaning—though the evidence points to the contrary.

Ms. Gurrieri's first comment occurs during a lengthy speech in which she exhorts sales representatives to include (not to falsify) tried and failed medication in patient opt ins. Ex. 2280.02, Tr. 2:24–3:6. Ms. Gurrieri states to Mr. Rowan's sales team: "We have our own list [of tried and failed medication] we go off if there's nothing on there." *Id.* at 3:3–4. Ms. Gurrieri does not explain what she meant by "our own list" or how IRC employees used this list and the conversation moves on. There is no indication Mr. Rowan heard this statement, understood it to have negative implications, or discussed it in any way. Yet the government parades Ms. Gurrieri's remark as evidence that Mr. Rowan knew that IRC employees lied to insurance companies about tried and failed medication. However, the government fails to note how this inference failed at

trial. The government chose to introduce the tape with Lillian Logatti,[5] a former sales representative present at the recorded meeting. After playing the tape, the prosecution asked Ms. Logatti to explain Ms. Gurrieri's unclear remark to the jury. The strategy fell flat because Ms. Logatti had no understanding of what Ms. Gurrieri's "list" meant, despite hours preparing her testimony with the prosecution, 3/22 Trial Tr. 21; *see id.* at 13:18–21 ("**MR. YEAGER**: Did you have an understanding of what Ms. Gurrieri meant when she said, 'We have our own list to use if there's nothing on there'? **MS. LOGATTI**: Not really, but—I don't."). Nor could a jury reasonably infer that, even though the well-prepared Ms. Logatti could not understand the remark, Mr. Rowan fully understood that IRC falsely told insurers Subsys patients had tried other medication.

Ms. Gurrieri's second taped comment, "we find cancer a lot of the time… It's in those records you sent us but no one told us, so," Ex. 2280.02, Tr. 4:13–16, also fails to support the government's insurance fraud argument. The government mischaracterizes the remark as a comment by Ms. Gurrieri "on the IRC scheme to mislead insurers regarding a history of cancer." Br. 33. Yet Ms. Gurrieri's remark says nothing about lying to insurance companies. She provides no explanation and there is no evidence that Mr. Rowan had any independent understanding of how IRC intended to use a patient's *accurate* "history of cancer" in the insurance approval process. *Other evidence* at trial, completely unrelated to Mr. Rowan, may have shown that some IRC employees who called insurers used a patient's "history of cancer" to make it easier for them to mislead insurers that the patient currently suffered from cancer. However, the government has

---

[5] The government scrupulously avoided eliciting any testimony from Ms. Gurrieri about Mr. Rowan or this tape, a concession that Ms. Gurrieri could not implicate him in any way—leaving the government with offering ambiguity and arguing unreasonable inferences.

never claimed that Mr. Rowan ever visited the IRC or had any conversations about misrepresentations in its claims process.  Without evidence that Mr. Rowan was actually *aware* of the IRC conduct, a conclusion that he understood that "history of cancer" was code for insurance fraud, and not just another important piece of information IRC asked salespeople to collect, requires a nonobvious inferential leap akin to speculation.  In this context, the taped evidence gave at the very least "equal or nearly equal circumstantial support to a theory" of innocence, warranting a judgment of acquittal, *Paret-Ruiz*, 567 F.3d at 8, or, in the alternative, a new trial.

## VI. THE WEIGHT OF THE EVIDENCE IS INSUFFICIENT AS TO JOHN KAPOOR.

The evidence introduced at trial must be examined cumulatively and in context.  Following a 51-day trial, the majority of the government's case against Dr. Kapoor rested on the testimony of government cooperators that conflicted with each other on critical facts, irrelevant and inflammatory patient testimony, evidence that tried to dirty Subsys prescribers, and evidence concerning Insys as a whole that was meant to encourage the jury to find guilt by association.

Lacking evidence showing that Dr. Kapoor specifically intended and agreed to enter into a RICO conspiracy, the government instead introduced evidence of marginal relevance, such as the Insys "Great by Choice" video.  The government argues (Br. 70) that the video was "relevant to show the emphasis that Insys officials were placing on sales representatives to increase titration levels for Subsys."  Whatever the relevance of the video, it plainly cannot bear substantial weight in justifying Dr. Kapoor's conviction.  And the government admits (Br. 71) that the video was not "sufficient to convict Kapoor or sustain the jury's verdict."  Yet the jury watched it at least twice during deliberations, and used it to find that Defendants "were promoting higher doses" and "didn't care about the patients"—findings that were insufficient to convict of the crime charged, but which

succeeded in glossing over the holes in proof in the government's case.[6]  When viewed in context with the rest of the evidence, the video is emblematic of the government's strategy at trial: overwhelm the jury with inflammatory evidence to compensate for gaps in actual evidence of guilt.

The same is true of Mr. Burlakoff's false testimony that Dr. Kapoor threatened him and was physically violent to employees.  *See* Gov't Br. 71.  It is the government's responsibility to ensure that it does not "obtain a tainted conviction regardless of whether the prosecutor solicits false evidence or … *allows false evidence to go uncorrected when it appears*."  *United States v. Mangual-Garcia*, 505 F.3d 1, 10 (1st Cir. 2007) (emphasis added and internal quotation marks omitted) (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)).  The fact that the jury "nonetheless found Kapoor guilty of RICO conspiracy," despite Defendants' efforts to impeach Mr. Burlakoff's testimony, Gov't Br. 69, is not a basis for sustaining the jury's verdict.  It is the government's duty to guard against false statements, and where these statements "could in any reasonable likelihood have affected the judgment of the jury," it is this Court's duty to afford Dr. Kapoor a new trial.  *See Mangual-Garcia*, 505 F.3d at 10 (*quoting Giglio v. United States*, 405 U.S. 150, 154 (1972)).

## CONCLUSION

For these reasons and the reasons set forth in Defendants' motions, the Court should enter an acquittal for all Defendants or, in the alternative, order a new trial.[7]

---

[6] *See* Cramer & Saltzman, *supra* note 4.  The fact that Dr. Kapoor did not object to the admission of this evidence is of no moment.  Dr. Kapoor is not arguing that he is entitled to a new trial because this evidence was improperly admitted but rather that, in the absence of other evidence showing Dr. Kapoor's guilt, the video and other evidence painting Insys and drug sales generally in a distasteful light cannot sustain his conviction.

[7] In addition to joining this joint reply brief, Ms. Lee has filed a separate two-page reply brief.  *See* Dkt. No. 966.  Together, Defendants' briefs fall within the 25-page limit.  *See* Dkt. No. 949.

Dated: August 16, 2019

Respectfully submitted,

/s/ Tracy A. Miner
Tracy A. Miner (BBO# 547137)
tminer@mosllp.com
Megan Siddall (BBO# 568979)
msiddall@mosllp.com
Miner Orkand Siddall LLP
470 Atlantic Ave, 4th Floor
Boston, MA 02210
Telephone: (617) 273-8421

*Attorneys for Michael Gurry*

/s/ Michael Kendall
Michael Kendall (BBO# 544866)
michael.kendall@whitecase.com
Alexandra Gliga (BBO# 694959)
alexandra.gliga@whitecase.com
White & Case LLP
75 State Street
Boston, MA 02109
Telephone: (617) 939-9310

*Attorneys for Joseph Rowan*

/s/ Peter C. Horstmann
Peter C. Horstmann (BBO# 556377)
pete@horstmannlaw.com
Law Offices of Peter Charles Horstmann
450 Lexington Street, Suite 101
Newton, MA 02466
Telephone: (617) 723-1980

*Attorney for Sunrise Lee*

/s/ William W. Fick
William W. Fick, Esq. (BBO # 650562)
wfick@fickmarx.com
Daniel N. Marx, Esq. (BBO # 674523)
dmarx@fickmarx.com
Fick and Marx LLP
24 Federal Street, 4th Floor
Boston, MA 02110
Telephone: (857) 321-8360

*Attorneys for Richard Simon*

/s/ Beth A. Wilkinson
Beth A. Wilkinson (*admitted pro hac vice*)
bwilkinson@wilkinsonwalsh.com
Alexandra M. Walsh (*admitted pro hac vice*)
awalsh@wilkinsonwalsh.com
Kosta S. Stojilkovic (admitted *pro hac vice*)
kstojilkovic@wilkinsonwalsh.com
Andrew W. Croner (admitted *pro hac vice*)
acroner@wilkinsonwalsh.com
Wilkinson Walsh + Eskovitz LLP
2001 M Street NW
Washington, D.C. 20036
Telephone: (202) 847-4000

Brien T. O'Connor (BBO# 546767)
brien.o'connor@ropesgray.com
Aaron M. Katz (BBO# 662457)
aaron.katz@ropesgray.com
Ropes & Gray LLP
Prudential Tower 800 Boylston Street
Boston, MA 02199
Telephone: (617) 951-7000

*Attorneys for Dr. John Kapoor*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document will be served on all counsel of record through the ECF system.

/s/ Beth A. Wilkinson
Beth A. Wilkinson
Counsel for Dr. John Kapoor