## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA   ) | Criminal No. 16-CR-10343-7-ADB |
| )  | |
| v.    ) | |
| )  | |
| JOHN N. KAPOOR,    ) | **Oral Argument Requested** |
| )  | |
| Defendant.    ) | |

## DR. KAPOOR'S MOTION TO PERMIT LIMITED FINANCIAL TRANSACTIONS PENDING SENTENCING

Recognizing that sentencing in this case could have a substantial financial dimension, Dr. Kapoor and his financial staff have tried to preserve the value of his assets.  Since the verdict, Dr. Kapoor and the government have dealt with pending financial issues informally.  Both parties have acted in good faith, with Dr. Kapoor agreeing to forsake certain types of transactions and informing the government of others, and the government informing Dr. Kapoor of its position on his proposals.  Upon request, Dr. Kapoor has also shared with the government the financial disclosure form that he completed as part of the presentence investigation process, which identifies his assets, liabilities, and net worth with particularity.

The parties have now reached a stage where Court involvement is necessary.  This is due to the confluence of four factors: **(1)** Because of stock-market events over the last several years—including the utter collapse of Insys stock and a substantial drop in value of Akorn, Inc. (another major holding of Dr. Kapoor's)—his net worth is substantially lower now than it was at the time of the alleged conspiracy; **(2)** Although the government has yet to share the underlying details with defendants, it has indicated that it will seek more than $240 million in restitution—a sum that exceeds Dr. Kapoor's current net worth, and may well exceed the combined net worth of all

defendants in this case; (**3**) JP Morgan—where Dr. Kapoor houses many of his investments—has informed him that he must move his holdings out before sentencing; and (**4**) Last week, the government informed Dr. Kapoor that it objects to him continuing to pay attorney fees for civil litigation.

Dr. Kapoor and the government conferred about these issues but were unable to reach agreement.  There are areas where the parties were able to agree—for instance, that Dr. Kapoor should not transfer any assets abroad, that he should not settle any civil cases prior to sentencing, and that he should continue to provide the government with visibility as to his holdings in the event of any asset movements.  But the government now submits that Dr. Kapoor should not be permitted to move assets at all, or engage in almost any type of transaction, unless he agrees to transfer a substantial portion of his assets into escrow with the U.S. Marshals pending sentencing.  *See* Ex. 1 (Email from David Lazarus to Kosta Stojilkovic, Oct. 24, 2019).  Dr. Kapoor submits that such a step is unnecessary at this time, would jeopardize the value of his assets, and would undermine the orderly disposition of this case as well as the more than 200 civil cases he is facing.  As a result, Dr. Kapoor submits this motion to restrict him to a limited set of transactions between now and sentencing, without forcing him to turn over assets to be held in escrow before his sentencing date.

Given the importance of obtaining guidance on these issues, the fact that the parties have already discussed the issues in some depth before this filing, and the pressing need to move assets out of JP Morgan, Dr. Kapoor respectfully requests a slightly expedited schedule for this motion. In particular, Dr. Kapoor requests that the government respond by November 8, 2019—one week from the filing of this motion—and that the Court hear oral argument at its convenience during the week of November 11, 2019.

## I.    Factual background

As set forth in the net-worth statement provided to the probation officer and shared with the government, Dr. Kapoor's assets are held in numerous vehicles.  For example, some assets are held in Dr. Kapoor's own name; others are held by two corporations that he owns completely; others are held in a revocable trust that he created for himself; and still other assets are held in four trusts that his late wife, Editha, created for him and his descendants.  Hereinafter, these entities will be collectively called "the Dr. Kapoor Affiliates."[1]  Dr. Kapoor acknowledges that he has beneficial interests in the Dr. Kapoor Affiliates.

In addition, more than a decade before the alleged conspiracy began, Dr. Kapoor and his late wife Editha established a series of irrevocable trusts for other beneficiaries.  Several other relatives of Dr. Kapoor have also established irrevocable trusts for their respective families.  Hereinafter, these entities will collectively be called "the Irrevocable Trusts."  Dr. Kapoor is not, and has never been, a beneficiary of any of the Irrevocable Trusts.  He is also not a trustee for them.  The beneficiaries of the Irrevocable Trusts are family members of Dr. Kapoor and Editha.[2]

In order to grow and preserve both types of assets—*i.e.*, those held by the Dr. Kapoor Affiliates and those held by the Irrevocable Trusts—these entities made investments through a

---

[1] The trust that Dr. Kapoor created for himself is the John N. Kapoor Trust Dated September 20, 1989.  The two corporations are E.J. Financial Enterprises, Inc., and Pharma Nevada, Inc.  The trust created by Editha is the Editha Kapoor Trust Dated September 20, 1989.  And the four trusts that were in turn created by the Editha Trust are the Appointive Marital Trust, the Exempt Marital Trust, the Nonexempt Marital Trust, and the Exempt Family Trust.  All of these entities are treated as part of the Dr. Kapoor Affiliates for purposes of this motion.

[2] There are 37 of these Irrevocable Trusts, governed by 16 separate trust agreements.  They are described in greater detail in Sealed Ex. 2.  While the documents governing the Irrevocable Trusts are too voluminous to attach to this filing, Kapoor is willing to make them available for inspection.

group of five investment vehicles (hereinafter the "Investment Vehicles").[3]   The Investment Vehicles are currently held at JP Morgan and contain investments from both the Dr. Kapoor Affiliates and the Irrevocable Trusts.

Earlier this month, JP Morgan notified Dr. Kapoor that he had to move his assets out of that institution before sentencing.[4]   Although JP Morgan appears open to continuing to hold investments for the Irrevocable Trusts, it is no longer willing to hold investments for the Dr. Kapoor Affiliates.   As a result, Dr. Kapoor needs to move all assets held by the Dr. Kapoor Affiliates (for which he is a beneficiary) from JP Morgan, while leaving in place the Irrevocable Trusts (for which he is not a beneficiary).   This process is complex, because both types of entities have their assets invested in the same Investment Vehicles, and because any sale or restructuring could create tax consequences for Dr. Kapoor and the beneficiaries of the Irrevocable Trusts.

The trustee for the Irrevocable Trusts—Mr. Rao Akella—has devised a proposal to separate these assets from each other.   His proposal is to separate the Dr. Kapoor Affiliates from the Irrevocable Trusts by redeeming all the Dr. Kapoor Affiliate assets held in the Investment Vehicles.   Based on the Fair Market Value as of September 30, 2019, the Dr. Kapoor Affiliate assets are expected to be worth approximately $85.5 million, against which Dr. Kapoor has previously borrowed approximately $74 million, as reflected in financial information shared with the government.[5]   Once the proposed redemptions are completed, the Irrevocable Trust assets

---

[3] The five Investment Vehicles are EJ Funds LP; EJ Funds-K LP; EJ Funds-H LP; Kapoor Family Partnership, L.P.; and EJ Financial/Akorn Management, L.P.

[4] JP Morgan initially demanded that Dr. Kapoor move his assets out by November 7, 2019, but may have some flexibility on that deadline given the continuance of Dr. Kapoor's sentencing.

[5] *See* Sealed Ex. 3 (Letter from Kosta Stojilkovic to David Lazarus, Oct. 22, 2019).

would remain with JP Morgan, and the redeemed value of the Dr. Kapoor Affiliates would be transferred to another financial institution in the United States.

Entirely separate from the issues involving JP Morgan, there are several categories of routine expenses that Dr. Kapoor should be permitted to pay: (1) basic living and household expenses for himself and his partner Mary Gauwitz; (2) other non-discretionary expenses (*e.g.*, medical expenses, travel to court, required tax payments); (3) reasonable legal fees and related professional expenses (*e.g.*, financial and accounting services, representation in this case and related civil matters); (4) transactions necessary to maintain Dr. Kapoor's assets (*e.g.*, financial transactions to preserve the market value of his investments, maintaining insurance for his assets); and (5) expenses for the execution of the above transactions, including retaining personnel at E.J. Financial to execute such transactions.

With respect to civil litigation, Dr. Kapoor is a defendant in over 200 pending civil cases that relate to his time as an Insys board member and executive.  Many of the cases seek to blame Dr. Kapoor for broad-based consequences of the opioid crisis, despite Insys's late entry into and miniscule share of the overall prescription opioid market.  The total damages sought across these cases exceed $1 billion.  The cases are in a variety of procedural postures, and to date Dr. Kapoor has kept his legal fees for them at moderate levels.  But given the volume and complexity of these cases, it is impossible for Dr. Kapoor to defend himself *pro se*, or to avoid defaulting on deadlines without the assistance of counsel.

As but one example, Dr. Kapoor is a defendant in a class-action case pending in the District of Arizona alleging violations of the federal securities-fraud laws.  *See Di Donato v. Insys Therapeutics, Inc.*, *et al.*, No. 16-cv-302-NVW (D. Ariz.).  Dr. Kapoor tried, but failed, to stay that litigation pending his sentencing.  He is currently engaged in expert discovery, the deadline

for which is November 22, 2019.  Dispositive motions and motions challenging expert testimony must be filed within 28 days of the close of expert discovery.  Dr. Kapoor believes the claims remaining against him are defensible—the court has already dismissed 20 of the 22 misstatements alleged by plaintiffs—and he should be permitted to present a defense to them via counsel. Michael Babich is a co-defendant in *Di Donato* and continues to be represented by counsel in that action.

## II.    Argument

### a.    *The Court Should Allow the Restructuring Transactions*

The Court should allow Dr. Kapoor to engage in the restructuring transactions described above.  Those transactions are necessary to comply with JP Morgan's requirement that he move his holdings out before sentencing.  They are also necessary to extract the Dr. Kapoor Affiliate assets from JP Morgan in a way that will not harm the innocent beneficiaries of the Irrevocable Trusts.  The proposed transactions will not hinder Dr. Kapoor's ability to satisfy a potential forfeiture or restitution order.  To the contrary, they will likely simplify any potential enforcement of a financial obligation in this case, because they will separate the Dr. Kapoor Affiliates from the Irrevocable Trusts and avoid confusion about "who owns what" within the Investment Vehicles.

These transactions are not a pretext to make Dr. Kapoor's assets more difficult to locate. Dr. Kapoor will not move the redeemed assets outside of the United States; he will not transfer them to any other party; and he will promptly disclose to the government the particular financial institution(s) and account(s) into which the assets will be moved.  Thus, there is no reason for the Court to condition approval of these transactions on the government's request that the transferred assets be "sent to the U.S. Marshals to be held in escrow pending sentencing."  Ex. 1 (Email from David Lazarus to Kosta Stojilkovic, Oct. 24, 2019).

Moreover, a restraining order against the restructuring transactions is not justified here as a matter of law.  To be sure, the RICO statute allows restraining orders to preserve property for forfeiture.  But the restrained property must first be "subject to forfeiture under this section."  18 U.S.C. § 1963(d)(1)(A); *see also United States v. Monsanto*, 491 U.S. 600, 615–16 (1989) (recognizing the purpose of RICO's forfeiture provision as "preserv[ing] the availability of property . . . for forfeiture"); *United States v. Siegal*, 974 F. Supp. 55, 57 (D. Mass. 1997) (similar). The purpose of forfeiture is to "separate[e] a criminal from his ill-gotten gains."  *Honeycutt v. United States*, 137 S. Ct. 1626, 1631 (2017).  The RICO statute specifically provides that a defendant must forfeit only those proceeds that he himself "obtained" from the racketeering conspiracy.  *See* 18 U.S.C. § 1963(a)(3).  The government has the burden to establish the amount of funds that should be forfeited.  *See United States v. Bader*, 678 F.3d 858, 893 (10th Cir. 2012); *United States v. King*, 231 F. Supp. 3d 872, 905 (W.D. Okla. 2017).

Despite the passage of six months since the criminal trial, the government still has not revealed the amount of forfeiture it will seek from Dr. Kapoor.  That alone argues against the imposition of a broad-based restraint of Dr. Kapoor's assets.  Moreover, under the facts here, only one class of Dr. Kapoor's assets could plausibly count as forfeitable: his shares of Insys stock. After all, those shares are the only "proceeds" that Dr. Kapoor ever allegedly "obtained" from the racketeering conspiracy.  18 U.S.C. § 1963(a)(3).  Dr. Kapoor himself did not obtain the total revenues or profits of the Insys corporation.  Likewise, Dr. Kapoor did not obtain the value of his stock at the height of its value, because he did not sell his stock at the height of its value.  And Dr. Kapoor did not obtain the proceeds that his co-defendants Michael Babich and Alec Burlakoff obtained by cashing out vast portions of their Insys stock holdings.  Babich and Burlakoff obtained those proceeds, not Dr. Kapoor, and the Supreme Court's *Honeycutt* decision makes clear that Dr.

Kapoor cannot be required to forfeit amounts obtained by his co-conspirators. *See Honeycutt*, 137 S. Ct. at 1635 ("Forfeiture pursuant to [the analogous forfeiture provision in] § 853(a)(1) is limited to property *the defendant himself actually acquired* as the result of the crime.") (emphasis added).

Dr. Kapoor also never sold Insys stock during the conspiracy period, save for minor sales at a loss for tax purposes. He thus never made any money from his Insys stock. Rather, he maintained his stock holdings despite investing approximately $80 million of his own money in Insys—$80 million that he has never recovered and never will. The government froze Dr. Kapoor's Insys shares when he was arrested, and they remain frozen. Thus, even if Dr. Kapoor is required to forfeit all his Insys stock, there is no risk that "the property described" in the RICO forfeiture statute will not be "availabl[e]" when the time comes. 18 U.S.C. § 1963(d)(1); *see also United States v. Yerardi*, No. CRIM. 93-10278-NMG, 2012 WL 1657528, at *3 (D. Mass. May 8, 2012) (holding that the purpose of the statute is simply to allow a court "to enter a restraining order to protect the interest of the United States in the property ordered forfeited").

The government's anticipated position on restitution does not provide a basis for a broad-based restraining order here, either. Unlike the forfeiture statute, the restitution statute does not give courts specific authority to enter restraining orders to preserve property before sentencing. *See generally* 18 U.S.C. § 3663A (including no provision authorizing a restraining order to prevent the disposition of a defendant's property); Sharon Cohen Levin (Former Chief, Asset Forfeiture Unit, SDNY), *The Interplay Between Forfeiture and Restitution in Complex Multivictim White-Collar Cases*, 26 Fed. Sent. R. 10, 11-12 (2013) (noting that "even after [a  defendant] is convicted," the "restitution statute provides no mechanism to restrain a defendant's assets during the many months or even years it may take before a defendant is finally sentenced and restitution is ordered").

Some courts have used the All Writs Act to restrain assets between conviction and sentencing.  But that extraordinary power is best reserved for clear and uncontroversial cases.  *See United States v. New York Tel. Co.*, 434 U.S. 159, 172 (1977) ("[A] federal court may avail itself of all auxiliary writs as aids in the performance of its duties, when the use of such historic aids is calculated in its sound judgment to achieve the ends of justice entrusted to it.") (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 273 (1942)).   For that reason, when cases have employed the Act for restitution-preservation purposes, the risk of asset dissipation has been far more serious than in this case.  *See, e.g.*, *United States v. Numisgroup Int'l Corp.*, 169 F. Supp. 2d 133, 137 (E.D.N.Y. 2001) (using the All Writs Act to enjoin the disposition of $430,000 in collectible coins where the defendants had virtually no assets—other than the coins themselves); *United States v. Simmons*, No. 07-CR-30, 2008 WL 336824, at *1 (E.D. Wis. Feb. 5, 2008) (enjoining a bank robber from diverting funds from his bank account where restitution would have been $177,000 and where, after being convicted, the defendant had "sent a third party to attempt to withdraw all funds [$24,000] from the account").

Here, by contrast, the government still has not made clear the exact amount of restitution it is seeking, or the basis for seeking it.  To date, the government has identified only one alleged victim (Medicare) and only one set of alleged losses (totaling approximately $17 million) with particularity.  Dr. Kapoor has lodged a partial objection to this figure with the probation officer. More importantly, any additional victims and amounts the government will seek could present a host of issues, from improper loss estimates for private insurers whose coverage policies were different than Medicare's, to personal injury damages claimed by individuals stemming from their *physicians'* choice to prescribe Subsys.   Such theories will require careful examination at sentencing and should not carry a presumption of legal or factual correctness at this stage.  Thus,

the government's anticipated position on restitution does not justify its request that Dr. Kapoor turn over the value of the Dr. Kapoor Affiliates to the U.S. Marshals to be held in escrow.

      b.     *The Court Should Allow the Routine Expenditure Transactions*

With respect to the routine expenditures described above, the Court should enter an order permitting Dr. Kapoor to continue to engage in them.  There are basic living and household expenses, medical expenses, court-travel expenses, and similar obligations that Dr. Kapoor should be permitted to pay on a regular basis.  And given the complexity of his holdings, Dr. Kapoor requires the assistance of EJ Financial personnel to maintain his investments, including executing any steps he may be required to take in order to satisfy his financial obligations in this case. Finally, although Dr. Kapoor's legal fees have decreased considerably since the criminal trial, he cannot avoid legal expenditures entirely, including for advice on financial transactions such as the JP Morgan proposal described above and for representation in the civil cases.[6]  From an asset-preservation perspective, it makes little sense for Dr. Kapoor to cease managing his finances or defending civil lawsuits pending sentencing.

As with the proposed restructuring, a restraining order forbidding these routine expenditures is not necessary here.  These routine expenditures will not substantially impact Dr. Kapoor's net worth between now and sentencing.  As explained above, given the fact that Dr. Kapoor's Insys stock is already restrained, allowing Dr. Kapoor's to make these expenditures should not compromise his ability to satisfy a forfeiture order.  *See supra* at 6.  Further, as explained above, the restitution statute does not authorize pre-sentencing restraining orders, and the Court should not deploy the All Writs Act here given the legal and factual uncertainties of the government's developing position on restitution.  *See supra* at 8.

---

[6] Dr. Kapoor is principally represented in the civil cases by Nixon Peabody LLP.

c.    *Dr. Kapoor Should Not Engage in Other Transactions Without Leave from the Court or the Government*

Dr. Kapoor recognizes that the Court will want assurance that his assets will not be materially diminished pending sentencing. Such assurance can be accomplished with a general order that he refrain from engaging in any transaction other than those described herein—the proposed restructuring and the routine expenditures—without advance permission from the government or the Court. Dr. Kapoor understands that the government is seeking large amounts of restitution, and that it will likely take a different view of forfeiture than he does. It will be up to the Court to decide those issues at sentencing. In the interim, an order instructing Dr. Kapoor to refrain from financial transactions other than those described herein is a reasonable way to preserve the *status quo* pending sentencing. Dr. Kapoor has complied with all the Court's orders to date, and there is no reason to think that he will change course now.

d.    *Itemization of Requested Relief*

In sum, the Court should enter an order instructing that between now and his scheduled sentencing, in the absence of advance permission from the government or the Court, Dr. Kapoor may engage in financial transactions with respect to an account or property in which he has a beneficial interest only if the transactions fall into one of the following categories:

(1) Transactions necessary to separate the Dr. Kapoor Affiliates from JP Morgan;

(2) Transactions to cover basic living and household expenses for himself and Mary Gauwitz;

(3) Transactions to cover other non-discretionary expenses (*e.g.*, medical expenses, travel to court, required tax payments);

(4) Transactions to cover reasonable legal fees and related professional expenses (*e.g.*, financial and accounting services, representation in this case and related civil matters);

(5) Transactions necessary to maintain Dr. Kapoor's assets (*e.g.*, financial transactions to preserve the market value of his investments, maintaining insurance for his assets); and

(6) Expenses necessary for the execution of the permitted transactions, including retaining personnel at EJ Financial to execute such transactions.

## CONCLUSION

For the foregoing reasons, Dr. Kapoor submits that that the Court should grant this Motion and enter an order providing for the terms described above.

Dated: November 1, 2019                                  Respectfully submitted,

                                                         /s/ Kosta Stojilkovic
                                                         Beth A. Wilkinson (*admitted pro hac vice*)
                                                         bwilkinson@wilkinsonwalsh.com
                                                         Kosta S. Stojilkovic (admitted *pro hac vice*)
                                                         kstojilkovic@wilkinsonwalsh.com
                                                         Andrew W. Croner (admitted *pro hac vice*)
                                                         acroner@wilkinsonwalsh.com
                                                         Wilkinson Walsh + Eskovitz LLP
                                                         2001 M Street NW
                                                         Washington, D.C. 20036
                                                         Telephone: (202) 847-4000

                                                         Brien T. O'Connor (BBO# 546767)
                                                         brien.o'connor@ropesgray.com
                                                         Aaron M. Katz (BBO# 662457)
                                                         aaron.katz@ropesgray.com
                                                         Ropes & Gray LLP
                                                         Prudential Tower 800 Boylston Street
                                                         Boston, MA 02199
                                                         Telephone: (617) 951-7000

                                                         *Attorneys for Dr. John Kapoor*

## **LOCAL RULE 7.1 CERTIFICATION**

Pursuant to Local Rule 7.1(a)(2), I hereby certify that counsel for Dr. Kapoor conferred with the government and that counsel for the government has not assented to this motion.

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document will be served on counsel for all parties of record through the ECF system.

/s/ Kosta S. Stojilkovic
Kosta S. Stojilkovic
Counsel for Dr. John Kapoor