UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| | * | |
| UNITED STATES OF AMERICA, | * | |
| | * | |
| v. | * | |
| | * | |
| MICHAEL J. GURRY, RICHARD M. | * | Criminal Action No. 16-cr-10343-ADB |
| SIMON, SUNRISE LEE, JOSEPH A. | * | |
| ROWAN, and JOHN KAPOOR, | * | |
| | * | |
| Defendants. | * | |
| | * | |

**MEMORANDUM AND ORDER ON DEFENDANTS' MOTIONS FOR JUDGMENT OF ACQUITTAL AND FOR A NEW TRIAL**

## <u>TABLE OF CONTENTS</u>

I.  **Evidence at Trial** ................................................................................................................... **2**

II. **Rule 29 Motions** ................................................................................................................ **13**

    A.    Legal Standard .................................................................................................... 13

    B.    Controlled Substances Act ................................................................................ 14

    C.    Honest Services Fraud ...................................................................................... 20

    D.    Mail Fraud and Wire Fraud .............................................................................. 24

        1.    Application of Intracorporate Conspiracy Doctrine to Wire Fraud Predicate ................................................................................................. 26

        2.    General Challenge to Mail Fraud Predicate ................................... 28

        3.    Defendant Simon's Challenge to Mail and Wire Fraud Predicates ............. 31

        4.    Defendant Lee's Challenge to Mail and Wire Fraud Predicates ................... 33

        5.    Defendant Rowan's Challenge to Wire Fraud Predicate ............................... 35

III. **Rule 33 Motions** ............................................................................................................... **37**

    A.    Legal Standard .................................................................................................... 37

    B.    Prejudicial Spillover from CSA Predicate ........................................................ 37

    C.    Insufficient Evidence on Honest Services Fraud, Mail Fraud, and Wire Fraud Predicates ......................................................................................................... 39

    D.    Rebuttal Argument .............................................................................................. 39

        1.    Waiver .................................................................................................... 40

        2.    "Loaded Gun" Metaphor ...................................................................... 43

    E.    Evidentiary Issues .............................................................................................. 46

        1.    Patient Testimony (All Defendants) ................................................... 47

        2.    Dr. Chun's Addiction ........................................................................... 50

        3.    "Jess Strategy" Email .......................................................................... 52

        4.    Simon / Andersson Text Messages ...................................................... 54

        5.    Paul Lara's Testimony Concerning Dr. Somerville's Suspension ................. 56

        6.    Ty Rustin's Testimony Concerning Dr. Somerville's Suspension ............... 57

IV. **Individual Motions** ........................................................................................................... **58**

    A.    Lee ...................................................................................................................... 58

    B.    Kapoor ................................................................................................................ 61

    C.    Simon .................................................................................................................. 64

        1.    Error to Deny Motion for Mistrial ...................................................... 64

2.  Ineffective Assistance of Counsel .................................................................. 65

    a.  Whether Claim of Ineffective Assistance of Counsel Is Time-Barred

        .......................................................................................................... 65

    b.  Merits of Ineffective Assistance of Counsel Claim ........................... 68

**V.  Conclusion** ...................................................................................................... **81**

BURROUGHS, D.J.

After a ten-week trial and nearly four weeks of deliberations, on May 2, 2019 a jury convicted Defendants Michael Gurry, Richard Simon, Sunrise Lee, Joseph Rowan, and John Kapoor (collectively, "Defendants") of conspiring to violate the Racketeer Influenced and Corrupt Organizations (RICO) statute, 18 U.S.C. § 1962(d).  The jury found the predicate acts of illegal distribution of a controlled substance, honest services mail fraud, honest services wire fraud, mail fraud, and wire fraud proven against Defendants Simon, Lee, Rowan, and Kapoor and the predicate acts of mail fraud and wire fraud proven against Defendant Gurry.  [ECF No. 841].  The charges and subsequent convictions arose out of Defendants' work as executives and managers at Insys Therapeutics, Inc. ("Insys"), a pharmaceutical company that manufactured, marketed, and sold a sub-lingual fentanyl spray called Subsys.  Currently pending before the Court are Defendants' motions for judgment of acquittal and for a new trial, which were initially made following the close of the Government's evidence and were renewed following trial.  [ECF Nos. 816, 817, 859, 860, 861, 862, 863, 864].  For the following reasons, Defendants' post-trial motions [ECF Nos. 816, 817, 859, 860, 861, 862, 863, 864] are <u>GRANTED</u> in part and <u>DENIED</u> in part.[1]

---

[1] Defendants' briefing incorporates statements made by jurors to news media after the verdict was returned.  <u>See</u> [ECF Nos. 860, 967].  Defendants preemptively recognize that none of the exceptions of Federal Rule of Evidence 606(b) apply, but explain that they included the statements to show that "the arguments and inferences [D]efendants challenged from the outset are precisely the ones that resonated with jurors."  [ECF No. 860 at 13]; <u>see also</u> [ECF No. 967 at 21 n.4].  The Government challenges Defendants' use of these statements.  [ECF No. 936 at 76–77].  Because none of the exceptions listed in Rule 606(b) are applicable, the Court does not consider the juror statements in its inquiry into the validity of the verdict.

## I.        EVIDENCE AT TRIAL

In reaching its verdict, the jury could have found the following facts, based on the

evidence presented at trial.[2]  This summary is intended to provide an overview of events and is

supplemented as needed throughout the memorandum and order with information about specific

Defendants.[3]

In early 2012, the FDA approved Subsys, a sub-lingual fentanyl spray for use in patients

seeking relief from breakthrough cancer pain.[4]  The term "breakthrough cancer pain" refers to

short-lived spikes in pain that occur in patients with cancer who are dealing with constant pain.[5]

The indication for breakthrough cancer pain meant that all other uses of the medication would be

considered "off-label."  Subsys' label instructed that "[t]he initial dose of Subsys to treat

episodes of breakthrough cancer pain is always 100 micrograms,"[6] and warned that the product

contained fentanyl, "a Schedule II controlled substance with abuse liability similar to other

opioid analgesics."[7]  Because of the risk for misuse, abuse, addiction, and overdose, Subsys

could only be prescribed through a program called Risk Evaluation and Mitigation Strategy

("REMS") under the Transmucosal Immediate Release Fentanyl ("TIRF") REMS Access

---

[2] The Court presents the evidence in the light most favorable to the verdict.  See United States v. Meléndez-González, 892 F.3d 9, 17 (1st Cir. 2018).

[3] As most relevant to this summary, the testifying witnesses at trial included Alec Burlakoff, Michael Babich, Matt Napoletano, and Liz Gurrieri, all of whom testified pursuant to cooperation, immunity and plea agreements with the government.

[4] [1/29 Tr. at 44:19–45:4; 3/21 Tr. at 128:25–129:3].

[5] [4/2 Tr. at 125:24–126:5 (Defendants' expert)].

[6] [1/29 Tr. at 50:17–25].

[7] [1/29 Tr. at 48:15–24].

Program.[8]  TIRF REMS was a program put into place by the FDA that required patients,

prescribers, and pharmacists to sign disclosures stating they understood the risks presented by

this class of drugs.[9]

Shortly after obtaining FDA approval, in March 2012 Subsys launched to the market.[10]

Subsys joined several TIRF drugs, or rapid-onset opioids, that were already on the market,

including Fentora, Abstral, Lozanda, and Actiq, which was the generic.[11]  At launch, Shawn

Simon was the Vice-President of Sales, Matthew Napoletano was the Vice-President of

Marketing, Michael Babich was the CEO, and Defendant Kapoor was Chairman.[12]  Sales

representatives, also known as specialty sales professionals, were hired throughout the country

and were given lists of prescribers categorized into deciles based on their history of prescribing

opiates.[13]  The majority of these prescribers were pain management physicians, not oncologists,

despite Subsys' indication for cancer-related pain.[14]  Sales representatives were told to target

only "high-decile" prescribers and were taught to employ a "switch strategy" wherein they asked

prescribers to switch patients off competitor drugs and onto Subsys.[15]

---

[8] [1/29 Tr. at 49:12–50:5].

[9] [1/29 Tr. at 49:21–50:5].

[10] [2/1 Tr. at 79:1–8].

[11] [1/29 Tr. at 49:3–20, 53:22–54:4; 2/11 Tr. at 219:16–220:6].

[12] [1/30 Tr. at 130:2–4; 2/1 Tr. at 72:24–73:5, 75:15–76:16].

[13] [1/29 Tr. at 52:19–53:21].

[14] [1/29 Tr. at 54:10–16].

[15] [1/29 Tr. at 53:16–21, 149:6–24, 168:3–19]

While some Insys employees were positive about the launch, Defendant Kapoor described it to colleagues as the "worst f[***]ing launch in pharmaceutical history [that] he'[d] ever seen."[16]  The company was able to track each prescription of Subsys written because it paid for daily REMS data, which was analyzed regularly for Defendant Kapoor[17] and routinely circulated to sales representatives.[18]  One of the company's major post-launch concerns was that a majority of patients who started on Subsys were not refilling the drug after the initial month.[19]  Patients' failure to continue using Subsys was thought to be due to the fact that patients were not interested in taking an expensive drug that was not covered by insurance.[20]  Further, patients who started on Subsys at a 100mcg or 200mcg dose were more likely to discontinue use of the drug.[21]

By fall 2012, Insys began changing its leadership and its sales and marketing tactics.  In September and October 2012, Insys hosted both a national sales meeting and a national sales call to regroup and train its sales force on new messaging.[22]  Alec Burlakoff, who had started at the company just months earlier as a manager in the southeast region, was promoted to Vice-President of Sales and Shawn Simon was fired.[23]  At the direction of Defendant Kapoor, Mr.

---

[16] [2/12 Tr. at 157:9–11].

[17] [1/31 Tr. at 207:1–15; 2/13 Tr. at 91:5–23; 3/5 Tr. at 122:9–124:5].

[18] [1/30 Tr. at 112:18–114:8].

[19] [2/12 Tr. at 158:9–159:1].

[20] [2/12 Tr. at 159:3–10].

[21] [1/29 Tr. at 150:3–16; 2/12 Tr. at 162:21–163:18].

[22] [1/29 Tr. at 57:22–58:1; 2/4 Tr. at 201:14–21].

[23] [2/1 Tr. at 117:3–16, 118:17–119:9].

Burlakoff rolled out a new marketing program designed to increase sales, including a switch program, a voucher program, and a new effective dose message for sales representatives.[24] The switch program allowed patients who were switching from a competitor drug to receive a voucher for free Subsys for as long as they needed it or until it was covered by insurance.[25] The voucher program, which varied over time, was another program through which Insys provided free product to patients.[26] The effective dose message sought to inform prescribers that 100mcg or 200mcg doses were not effective for patients, despite the labeling that supported these doses. Sales representatives were informed each time a healthcare practitioner wrote a prescription for a 100mcg or 200mcg dose and were required to report back to headquarters within 24 hours as to why the practitioner had prescribed the low dose and how he or she planned to titrate the patient up to an effective dose.[27] Sales representatives were also incentivized to push for higher dose prescriptions by their bonus structure, which calculated bonuses as a percentage of what the company netted from a prescription.[28] The bonus percentages varied, but, as an example, at one time it was 10% for dosages from 100mcg to 800mcg and 12 or 12.5% for dosages from 1200mcg to 1600mcg.[29] Sales representatives recouped a larger bonus on larger doses due to the higher percentage allocation, but also because the higher doses were more expensive.[30]

---

[24] [1/30 Tr. at 129:19–134:8; 1/31 Tr. at 205:6–207:25; 2/4 Tr. at 43:11–50:2].

[25] [2/4 Tr. at 205:3–19].

[26] [2/26 Tr. at 32:7–35:7].

[27] [1/30 Tr. at 131:5–19].

[28] [1/30 Tr. at 158:22–160:9].

[29] [1/30 Tr. at 158:22–159:15].

[30] [1/30 Tr. at 159:19–160:9].

There were several other changes around the fall of 2012.  Defendant Lee, who met Mr. Burlakoff through her work in the entertainment industry, was hired as a regional manager for the Mid-Atlantic region, and Defendant Simon was hired as a regional manager for the Midwest region.[31]  Defendant Rowan, who knew Mr. Burlakoff from working with him at another pharmaceutical company, was promoted into Mr. Burlakoff's former role just months after joining Insys in July 2012.[32]  Becky Gamble, who had been the Vice-President for Managed Markets when Subsys launched to the market, was replaced by Defendant Gurry.[33]

In addition to these leadership changes, the company launched the Insys Speaker Program ("ISP") in August 2012, which was run by Mr. Napoletano.[34]  The program, which began as a pilot program primarily in the southeast region, was intended as a peer-to-peer program to educate physicians who could potentially prescribe Subsys to their patients.[35]  After just a few weeks, in early September 2012, Defendant Kapoor instructed Mr. Babich and Mr. Napoletano to "put on hold all speaker programs effective immediately" in order for them to agree on an objective for the program and its costs moving forward.[36]  The hold on the ISP was lifted shortly thereafter.[37]  Mr. Burlakoff quickly promoted the ISP to sales representatives as

[31] [2/6 Tr. at 132:23–133:10].

[32] [2/4 Tr. at 181:3–20; 3/1 Tr. at 127:20–128:4, 178:5–7].

[33] [2/1 Tr. at 119:10–19; 2/21 Tr. at 89:9–11].

[34] [2/1 Tr. at 109:10–110:24; 2/13 Tr. at 14:24–15:6].

[35] [2/1 Tr. at 114:6–115:9; 2/13 Tr. at 13:1–14:9].

[36] [2/1 Tr. at 111:8–114:5; 2/13 Tr. at 16:8–18:12].

[37] [2/13 Tr. at 23:7–21; 2/6 Tr. at 207:3–14].

their "#1 opportunity to grow [their] business."[38]  In September and October 2012, Defendant

Kapoor, Mr. Babich, Mr. Burlakoff, and Mr. Napoletano had several contentious meetings at

which the ISP and its purpose were discussed.[39]

In December 2012, at Defendant Kapoor's behest, Mr. Napoletano created a document

that tracked return on investment ("ROI") for each ISP speaker between launch and December 6,

2012.[40]  ROI was calculated by dividing the net revenue that was generated by prescriptions

written by a prescriber by what was paid to that prescriber in speaker honoraria.[41]  The ROI

document was used to flag speakers with an ROI of less than 2 to 1 and to identify speakers for a

temporary hold on programming if they were not writing enough prescriptions.[42]  Although the

ISP was supposed to be a peer-to-peer education program to encourage more healthcare

practitioners to utilize Subsys, there were not efforts to include prescriptions written by attendees

as part of this ROI analysis.

Over time, as prescribers who were not writing Subsys were removed from the ISP, sales

representatives increasingly focused on "whales," or prescribers who "basically ha[d] agreed in a

very clear and concise manner that they [we]re up for the deal, which [wa]s they w[ould] be

---

[38] [3/5 Tr. at 144:1–150:8].

[39] [2/1 Tr. at 119:20–122:25, 126:18–128:2 (September meeting), 137:3–140:17 (October meeting), 140:18–142:19 (second October meeting); 2/6 Tr. at 207:15–214:9 (describing timeline of meetings); 2/13 Tr. at 29:11–32:13; 3/5 Tr. at 180:18–181:19].

[40] [2/1 Tr. at 144:22–147:14; Exs. 197, 197A].

[41] [2/1 Tr. at 146:20–147:8].

[42] [2/1 Tr. at 154:17–155:11; Ex. 207].

compensated based on the number of prescriptions of Subsys they wr[o]te."[43]  More specifically, the deal was that "the more they wr[o]te and the more they increase[d] the dose, the more they[] [were] paid to speak."[44]  The following prescribers were considered whales: Dr. Mahmood Ahmad, Advanced Practice Registered Nurse ("APRN") Heather Alfonso, Dr. Gavin Awerbuch, Dr. Steven Chun, Dr. Patrick Couch, Dr. Paul Madison, Dr. Judson Somerville, and Dr. Xiulu Ruan.[45]  These prescribers were frequently discussed on management calls, which occurred daily at 8:30 a.m. and regularly included Defendant Kapoor, Mr. Babich, Mr. Napoletano, Mr. Burlakoff, Defendant Gurry, and Xun Yu, an Insys sales executive who organized the ROI data.[46]

Funds for ISP programming were allocated predominantly for these prescribers and other high-decile prescribers.[47]  There were limits on the amount that a speaker could be paid per event.  A national speaker was paid up to $3,000 per event; a regional speaker was paid between $1,600 and $1,800 per event; and a local speaker was paid between $1,000 and $1,200 per event.[48]  Because of these per event speaker fee limits, a speaker would have to do a large number of events to generate significant payments, which resulted in multiple speaker events featuring the same prescriber.  These ISP events, which were set up for the speaker, were often

---

[43] [3/1 Tr. at 180:2–10].

[44] [Id.].

[45] [3/1 Tr. at 177:14–180:1].

[46] [2/13 Tr. at 34:9–35:20, 110:13–18]; see, e.g., [2/13 Tr. at 110:25–112:2, 125:22–127:10, 149:1–150:15].

[47] [1/30 Tr. at 136:3–14; 2/4 Tr. at 93:23–96:14, 112:13–114:2].

[48] [2/13 Tr. at 36:5–11].

poorly attended, oftentimes only by the prescriber, the sales representative, and a friend or colleague of the prescriber.  In addition, there needed to be documentation for each honorarium paid, which required submitting information about the event including a sign-in sheet and receipts.[49]  This documentation was originally submitted by sales representatives to a third-party compliance provider called SciMedica and was later submitted to Desiree Hollandsworth, who was hired to provide the same functions as SciMedica but in-house.[50]  To generate documentation that made a speaker program look legitimate, sales representatives frequently padded sign-in sheets with people who were not present and then forged their signatures.[51] Honoraria were paid to prescribers via the U.S. mail.[52]

In parallel to the growth of the ISP, Insys worked to create an in-house resource that would eliminate issues the company was facing with insurance approvals.[53]  Subsys required prior authorization from insurers, which meant that insurers would only cover the cost of the drug if the prescription was pre-approved.[54]  When Subsys first launched, Insys utilized a third-party company called Apricot to process prior authorizations.[55]  Apricot managed only a 30–35%

---

[49] [2/7 Tr. at 136:13–17; 3/15 Tr. at 19:12–19].

[50] [2/7 Tr. at 137:25–139:2].

[51] See, e.g., [1/30 Tr. at 155:11–156:12; 2/7 Tr. at 139:20–22, 205:19–209:12; 3/15 Tr. at 21:9–23:24].

[52] [2/12 Tr. at 142:3–7]; see, e.g., [1/31 Tr. at 70:15–71:8, 72:9–10].

[53] [2/14 Tr. at 67:22–68:11, 88:3–15].

[54] [1/29 Tr. at 55:19–56:14].

[55] [2/14 Tr. 74:10–19].

success rate for prior authorization approvals.[56]  After a board member suggested that bringing

the work in-house might result in better outcomes, Defendant Gurry pitched a plan to Defendant

Kapoor to pilot an in-house program that would be known as the Insys Reimbursement Center

("IRC").[57]

To assist with the launch of the IRC pilot program, Defendant Gurry hired Liz Gurrieri

in October 2012.[58]  When the IRC first launched in November 2012, it was located at Insys'

headquarters in Chandler, Arizona.[59]  In its pilot phase, the IRC functioned as an intermediary

between prescribers, sales representatives, and insurers: the prescribers would fax an opt-in form

to the IRC; the IRC would call the insurer; if there was additional information needed, the IRC

would communicate that to the sales representative who would follow up with the prescriber.[60]

The IRC pilot program had early results of a 65 to 70% success rate.[61]  As a result, the IRC

quickly moved out of its pilot phrase, expanded, and moved to another building nearby, where

Ms. Gurrieri maintained an office.[62]  In March 2013, Ms. Gurrieri was promoted to Manager of

Reimbursement Services and was responsible for supervising the prior authorization specialists

and assistants.[63]

---

[56] [Id.].

[57] [2/14 Tr. at 67:19–70:18 (discussing Ex. 415 ("Prior Authorization Action Plan"))].

[58] [2/14 Tr. at 70:12–18, 72:25–73:2].

[59] [2/22 Tr. at 145:5–6; 152:13–24].

[60] [2/14 Tr. at 73:13–74:3].

[61] [2/14 Tr. at 78:7–22].

[62] [1/30 Tr. at 55:16–56:24, 58:8–19; 2/22 Tr. at 176:19–177:19].

[63] [2/22 Tr. at 195:3–18].

Sales representatives were critical to the success of the IRC because they interacted with prescribers' office staff and were in a position to ensure that the process ran smoothly.[64]  In several physician offices, because of the volume of prescriptions being written, sales representatives understood that they needed to spend at least one day per week in the office assisting with prior authorization requests, which included reviewing patient files and filling out the required documentation for the IRC, which included an opt-in form.[65]  Insys' preference was for prescribers to allow the IRC to handle prior authorizations because the IRC had a high rate of success and, if the prior authorization was approved, "[t]he sales rep would get paid, Insys would get paid, and the script would get paid."[66]

The IRC, which was regularly discussed by Defendants Kapoor and Gurry on the daily 8:30 a.m. call,[67] was under constant pressure from Defendant Kapoor to achieve rates of approval that were upwards of 90%.[68]  At Defendant Kapoor's request, the IRC also compiled and reported on what information each insurer required before it would approve a prior authorization.[69]  Over time, the IRC developed several strategies to deceive insurers into

---

[64] See, e.g., [1/29 Tr. at 94:22–95:16].

[65] [1/29 Tr. at 94:22–95:16, 97:3–15; 1/31 Tr. at 80:10–83:22].  An opt-in form was an internal Insys document used for prior authorizations that was sent from healthcare practitioner's offices to the IRC, contained information that insurers might request during the prior authorization process, such as whether a patient had tried and failed certain similar medications, and required the prescriber's signature.  See, e.g., [2/26 Tr. at 136:8–137:17].  Insys updated the prompts on the opt-in form over time to reflect successful strategies for gaining an insurer's approval.  [1/30 Tr. at 163:11–171:8; 2/14 Tr. at 89:4–19; 2/22 Tr. at 146:1–147:11; 2/25 Tr. at 34:25–35:6].

[66] [2/22 Tr. at 207:16–208:5].

[67] [2/14 Tr. at 78:4–6, 85:25–86:14, 87:16–88:2, 91:14–92:14; 3/5 Tr. at 230:5–232:6].

[68] [2/14 Tr. at 88:16–22; 2/25 Tr. at 22:6–25:10].

[69] [2/14 Tr. at 80:2–81:15].

approving prior authorizations for Subsys, several of which were discussed on the daily 8:30 a.m. management call.[70]  Strategies included saying that the prior authorization specialist was calling from the prescriber's office rather than from Insys;[71] representing that the patient had a history of cancer;[72] giving the ICD-9 diagnosis code as "338," to obscure the fact that the diagnosis was chronic pain, which uses codes 338.29 or 338.4, and not cancer pain or neoplasm-related pain, which uses code 338.3;[73] listing tried-and-failed medications that the patient had not actually used;[74] stating falsely that the patient had difficulty swallowing, a condition known as dysphagia;[75] and employing "the spiel," which was language meant to obfuscate the purpose of the prescription.[76]  The spiel went through several iterations, but one version was the statement: "Yes.  The physician is aware that the medication is intended for the management of breakthrough pain in cancer patients, and the physician is treating the breakthrough pain."[77]

These strategies were important to prior authorization specialists who were financially incentivized to obtain prior authorizations, just as sales representatives were financially incentivized to push for higher doses.  Goals known as "gates" were set weekly; gates were

---

[70] See, e.g., [2/14 Tr. at 85:25–86:14 (dysphagia), 91:14–92:14 (spiel)].

[71] [2/8 Tr. at 95:2–96:19].

[72] [1/30 Tr. at 178:15–25 (opt-in form); 2/8 Tr. at 9:6–10:1 (opt-in form), 128:2–21 (call with insurer)].

[73] [2/22 Tr. at 243:24–246:9].

[74] [2/25 Tr. at 9:6–11:24, 13:15–14:13].

[75] [Id. at 6:16–9:5].

[76] [2/22 Tr. at 232:7–12].

[77] [Id. at 232:7–12].

originally set for the group of prior authorization specialists, and later were set for prior authorization specialists individually.[78]  If the weekly gate was met, the prior authorization specialists, who were otherwise paid low hourly wages, received bonuses.[79]

## II.        RULE 29 MOTIONS

### A.        Legal Standard

To prevail on a motion for judgment of acquittal under Federal Rule of Criminal Procedure 29, a defendant must "show that the evidence presented at trial, even when viewed in the light most favorable to the government, did not suffice to prove the elements of the offenses beyond a reasonable doubt."  United States v. Acevedo, 882 F.3d 251, 257 (1st Cir. 2018).  On a Rule 29 motion, the Court does not "weigh the evidence or make any credibility judgments, as those are left to the jury."  United States v. Merlino, 592 F.3d 22, 29 (1st Cir. 2010) (citing United States v. Ayala-Garcia, 574 F.3d 5, 11 (1st Cir. 2009)).  Instead, the Court "resolve[s] all credibility disputes in the verdict's favor," id. (quoting United States v. Olbres, 61 F.3d 967, 970 (1st Cir. 1995)), and "examine[s] the evidence—direct and circumstantial—as well as all plausible inferences drawn therefrom, in the light most favorable to the verdict," United States v. Meléndez-González, 892 F.3d 9, 17 (1st Cir. 2018) (internal quotations omitted).  The verdict will be upheld if it is "supported by a plausible rendition of the record."  Merlino, 592 F.3d at 29 (quoting United States v. Bristol-Martir, 570 F.3d 29, 38 (1st Cir. 2009)).  "If the evidence viewed in the light most favorable to the verdict gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged," however, the Court must reverse the conviction because "where an equal or nearly equal theory of guilt and a theory

---

[78] [2/8 Tr. at 110:24–113:21, 119:20–25].

[79] [Id. at 111:15–113:8].

of innocence is supported by the evidence viewed in the light most favorable to the prosecution,

a reasonable jury *must necessarily entertain* a reasonable doubt." United States v. Burgos, 703

F.3d 1, 10 (1st Cir. 2012) (quoting United States v. Flores-Rivera, 56 F.3d 319, 323 (1st Cir.

1995)).

### B.    Controlled Substances Act

Section 841 of the Controlled Substances Act ("CSA") makes it unlawful for "any person

knowingly or intentionally . . . to distribute, or dispense . . . a controlled substance" except as

authorized by the statute.  21 U.S.C. § 841(a)(1).  A healthcare practitioner licensed to prescribe

Schedule II drugs, like the fentanyl used in Subsys, violates the CSA "only if he intentionally

prescribes a controlled substance[] for other than a legitimate medical purpose in the usual

course of professional practice." United States v. Zolot, 968 F. Supp. 2d 411, 428 (D. Mass.

2013) (internal quotation omitted) (first citing United States v. Moore, 423 U.S. 122, 124 (1975)

and then citing 21 C.F.R. § 1306.04).

"'[T]he standard for criminal liability under § 841(a) requires more than proof of a

doctor's intentional failure to adhere to the standard of care.'  Instead, '[a] practitioner becomes a

criminal not when he is a bad or negligent physician, but when he ceases to be a physician at

all.'" Id. (quoting United States v. Feingold, 454 F.3d 1001, 1011 (9th Cir. 2006)) (citations

omitted); see Moore, 423 U.S. at 138 (characterizing § 841 offense as "acting as a drug

'pusher'"); United States v. Kohli, 847 F.3d 483, 490 (7th Cir. 2017) (stating that a conviction

under § 841 requires evidence showing that "the physician not only intentionally distributed

drugs, but that he intentionally 'act[ed] as a pusher rather than a medical professional'" (quoting

United States v. Chube II, 538 F.3d 693, 698 (7th Cir. 2008))); United States v. MacKay, 715

F.3d 807, 813, 839 (10th Cir. 2013) (summarizing proof on § 841 counts as "[t]he Government

had to prove Defendant stepped outside his role as a doctor and became a criminal drug pusher");

United States v. McIver, 470 F.3d 550, 564–65 (4th Cir. 2006) (concluding that evidence was

sufficient on § 841 convictions because it "support[ed] a finding that [defendant's] actions went

beyond the legitimate practice of medicine and were 'no different than [those of] a large-scale

pusher'" (quoting United States v. Tran Trong Cuong, 18 F.3d 1132, 1138 (4th Cir. 1994))).

All Defendants moved for acquittal on the CSA predicate at the close of the

Government's evidence and now Defendants Simon, Lee, Rowan, and Kapoor renew that

motion.[80]  See [ECF Nos. 816, 860].  They seek reversal of the jury's verdict on the CSA

predicate on the ground that the evidence presented at trial was insufficient to prove one of the

elements of the charged offense, namely, that any Defendant agreed and specifically intended

that a healthcare practitioner would prescribe Subsys outside the usual course of professional

practice and without any legitimate medical purpose in violation of the CSA.[81]  [ECF No. 860 at

---

[80] Defendant Gurry was not convicted on the CSA predicate.  See [ECF No. 841 at 2].

[81] The Court instructed the jury that:

> In order to prove that a Defendant specifically intended and agreed that he, she, or
> some other member or members of the conspiracy would illegally distribute
> Subsys, the Government must establish beyond a reasonable doubt each of the
> following elements of the offense:

> First, that the Defendant agreed that a healthcare practitioner would prescribe
> Subsys.

> Second, that the Defendant knew that Subsys was a controlled substance.

> Third, that the Defendant agreed that a healthcare practitioner would prescribe
> Subsys outside the usual course of medical practice and without any legitimate
> medical purpose.

[4/4 Tr. at 44:6–18].  The Court provided the jury with further clarification on the meaning of
"the usual course of medical practice" and "legitimate medical purpose."  See [id. at 44:23–45:19
("With respect to a 'legitimate medical purpose,' to establish that a practitioner lacked any

18–23].  The Government opposes acquittal and contends that the evidence supported an

inference that Defendants had a "tacit understanding" to violate the CSA that was "implicit in

[their] working relationship" with co-conspirator prescribers.  [ECF No. 936 at 17–21].

        In support of its argument, the Government marshals the following evidence presented at

trial, viewed in the light most favorable to the verdict.  Under Mr. Burlakoff's leadership as

Vice-President of Sales, Insys developed and used the ISP to bribe healthcare practitioners to

write more Subsys prescriptions.  [Id. at 9–10].  Mr. Burlakoff frequently directed his sales

representatives to use the ISP as one of their best tools to grow their business.  [Id. at 9–11].

Insys took these payments to healthcare practitioners seriously and spent staff time both

identifying "high-decile" prescribers who might be the most lucrative participants in the ISP and

tracking "return on investment" for the prescribers who received payments for participating in

the ISP.  [Id. at 11–12].  Insys also spent considerable resources tracking the dosage of each

prescription written, required sales representatives to explain why a healthcare practitioner wrote

a prescription for the lowest available doses of 100mcg or 200mcg, and incentivized sales

representatives to encourage prescribers to write higher doses.  [Id.].  Healthcare practitioners

were indispensable "business partners" in the efforts to sell more Subsys.  [Id. at 12–13].  Those

who did not write enough prescriptions were quietly removed or "soft-deleted" from the ISP.

---

legitimate medical purpose in prescribing Subsys or a particular dose of Subsys, the Government
must prove, beyond a reasonable doubt, that a practitioner could not or did not in good faith
prescribe Subsys or a particular dose of Subsys to a given patient.  It is not enough for the
Government to show that someone might disagree with the practitioner's decision to prescribe
Subsys to the patient, or that in hindsight Subsys was not the right drug for the patient, or that the
practitioner was a bad or negligent physician or nurse practitioner.  'Good faith' in this context
means the honest exercise [of] professional judgment about the patient's needs.  With respect to
the 'usual course of professional practice,' . . . the Government must prove, beyond a reasonable
doubt, that the Defendant in question knew that the physician's decision to prescribe Subsys or a
particular dose of Subsys to that patient would be inconsistent with any accepted method of
treating the patient.")].

[Id.].  Other prescribers, including some who were suspected of or arrested for illegal activity, continued to be viewed by Insys as acceptable revenue generators.  [Id. at 14–17].

Cases discussing the CSA suggest that a prescriber ceases acting as a physician within the meaning of the statute when he or she deliberately fails to adhere to the applicable standard of care and forgoes traditional practice elements, such as patient exams and consultations.  See, e.g., United States v. Elliott, 876 F.3d 855, 864 (6th Cir. 2017) (concluding that evidence supported charge of conspiracy to illegally distribute controlled substances where physician "prescribed opioids in doses generally not found outside patients with traumatic injuries or in end-of-life care," spent very little time with patients, and knew that patients traveled far distances to obtain prescriptions at the clinic); MacKay, 715 F.3d at 821–23 (affirming CSA verdict based on prescribing practices, which included a "long-term prescription of increased doses of pain medication with no further evaluation" for a 25-year-old presenting with back pain, prescribing early refills for the patient, failing to take a medical history or perform a physical examination before prescribing pain medication, and knowing that the patient had been arrested for falsifying a prescription); United States v. Merrill, 513 F.3d 1293, 1299–1300, 1301 n.10 (11th Cir. 2008) (affirming CSA conviction of physician where evidence demonstrated that he wrote more than 33,000 prescriptions in three-year period, prescribed the same patient multiple controlled substances in a given visit, reauthorized prescriptions for the same controlled substance within less than a month of each other, and frequently prescribed high doses of controlled substances, such as at the highest strength available or by instructing patients to take multiple doses at once); see also United States v. Rosen, 582 F.2d 1032, 1035–36 (5th Cir. 1978) (identifying the following prescribing practices as probative of illicit distribution by a physician: (1) prescribing an inordinately large quantity of controlled substances, (2) issuing large numbers of

prescriptions, (3) not giving physical examinations, (4) warning patients to fill prescriptions at different drug stores, (5) issuing prescriptions to a patient known to be delivering the drugs to others, (6) prescribing controlled drugs at intervals inconsistent with legitimate medical treatment, (7) using street slang rather than medical terminology for the drugs prescribed, (8) the absence of a logical relationship between the drugs prescribed and treatment of the condition allegedly existing, and (9) writing more than one prescription on a single occasion in order to spread them out).

Here, the evidence presented at trial shows how Insys' fixation on increasing the number and dosage of Subsys prescriptions combined with prescribers' interest in increased speaker payments, ultimately harmed an untold number of patients. An inferential leap, however, is required between this body of evidence and what is necessary to support a CSA predicate. In other words, although the evidence clearly shows that Defendants intended to try to sell as much Subsys as possible and wanted healthcare practitioners to prescribe it and to prescribe it at the higher and more expensive doses, there is not evidence sufficient to prove that Defendants specifically intended, much less intended beyond a reasonable doubt, that healthcare practitioners would prescribe Subsys to patients that did not need it or to otherwise abdicate entirely their role as healthcare providers. Even though the evidence could be readily understood as proving that Defendants did not care whether patients needed the drug, that still is not enough to prove the requisite intent. See Zolot, 968 F. Supp. 2d at 428 (explaining that CSA violation requires more than an "intentional failure to adhere to the standard of care" and that the threshold for criminal liability is when a physician "ceases to be a physician at all"); see also Moore, 423 U.S. at 138 (characterizing § 841 offense as "acting as a drug 'pusher'"). Further, the fact that the healthcare practitioners did in fact prescribe Subsys to patients that did not need it or at a

18

higher than necessary dose is similarly not enough to prove that that is what the Defendants intended.

Lacking evidence that Defendants agreed and intended that healthcare practitioners would illicitly distribute Subsys to patients that did not need it or at an unnecessarily high dose, the Government instead relies on the theory that a "tacit understanding" between Defendants and co-conspirator prescribers existed based on their implicit working relationship.  See [ECF No. 936 at 17–21].  The Government contends that the tacit understanding that co-conspirator prescribers would illegally distribute Subsys was a key feature of the ISP as it developed over time, in other words, that it must have been the case that Defendants intended prescribers to illegally distribute Subsys based on how the ISP was structured and the volume of prescriptions that Defendants sought in exchange for bribes.  [Id. at 19–20].  Applying this theory, it would not have been unreasonable for the jury to infer that the nefarious tacit understanding the Government describes existed, but it would have been equally reasonable for the jury to infer from the same evidence that no such tacit understanding existed and that there was only an understanding that healthcare practitioners would prescribe Subsys in exchange for bribes, but only to patients that needed such a medication and at an appropriate dose.  Where the evidence presented and developed over ten weeks of trial, when viewed in the light most favorable to the verdict, does not support proof of intent or "gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence," "a reasonable jury must [have] necessarily entertain[ed] a reasonable doubt," and therefore the verdict must be reversed.  Burgos, 703 F.3d

at 10 (quoting <u>Flores-Rivera</u>, 56 F.3d at 323).  Accordingly, the Court vacates the jury verdict on

the CSA predicate as to Defendants Simon, Lee, Rowan, and Kapoor.[82]

### C.    Honest Services Fraud

Federal law proscribes using the mail or wires in connection with a "scheme or artifice"

to defraud.  <u>See</u> 18 U.S.C. §§ 1341, 1343.  A "'scheme or artifice to defraud' includes a scheme

or artifice to deprive another of the intangible right of honest services."  <u>Id.</u> § 1346.  The U.S.

Supreme Court has construed this definition to refer only to schemes that involve bribes or

kickbacks.  <u>See</u> <u>Skilling v. United States</u>, 561 U.S. 358, 408–13 (2010).

All Defendants moved for acquittal on the honest services fraud predicates at the close of

the Government's evidence and now Defendants Simon, Lee, Rowan, and Kapoor renew that

motion.[83]  <u>See</u> [ECF Nos. 816, 860].  They seek reversal of the jury's verdict on the honest

services mail and wire fraud predicates based on insufficient evidence on the second, third, and

fourth elements, which address the existence of a bribe, breach of fiduciary duty, and deception,

respectively.[84]  <u>See</u> [ECF No. 816 at 14–18].

---

[82] Defendants also challenged the CSA predicate on the basis that it was multiplicitous.  [ECF No. 816 at 13–14; ECF No. 860 at 24].  The Court's ruling vacating the convictions on the CSA predicate renders this issue moot.

[83] Defendant Gurry was not convicted on the honest services fraud predicate.  <u>See</u> [ECF No. 841 at 2].

[84] The jury was instructed that, in order to convict a defendant of honest services mail or wire fraud, they must find beyond a reasonable doubt that the defendant (1) "knowingly devised or participated in a scheme or artifice to defraud patients of the honest services of their doctors through bribes or kickbacks;" (2) "agreed and specifically intended that healthcare practitioners would prescribe Subsys or a particular dose of Subsys in exchange for bribes and kickbacks;" (3) "agreed and specifically intended that healthcare practitioners would breach their fiduciary duty to their patients by prescribing Subsys or a particular dose of Subsys outside the usual course of professional practice and not for a legitimate medical purpose; (4) "agreed and specifically intended that healthcare practitioners would deceive their patients through a material

The Court begins its analysis with the breach of fiduciary duty element, which is dispositive.  The jury was instructed that in order to convict a defendant of honest services mail or wire fraud, they must find beyond a reasonable doubt that the defendant, *inter alia*, "agreed and specifically intended that healthcare practitioners would breach their fiduciary duty to their patients by prescribing Subsys or a particular dose of Subsys outside the usual course of professional practice and not for a legitimate medical purpose."  [4/4 Tr. at 51:14–18].

Defendants contend that the Government's proof on this element "failed for the exact same reason it failed as to the CSA," *i.e.* there was insufficient evidence to show that Defendants Simon, Lee, Rowan, and Kapoor specifically agreed and intended that healthcare practitioners would prescribe Subsys outside the usual course of professional practice and not for a legitimate medical purpose.  See [ECF No. 816 at 17]; see also [ECF No. 860 at 27–28 (reiterating argument under Rule 33)].  The Government argues the converse.  See [ECF No. 936 at 25 (stating that the CSA and honest services fraud predicates "both required proof that a Defendant agreed and specifically intended that healthcare practitioners would prescribe Subsys outside the

---

misrepresentation, false statement, false pretense, or a deliberately misleading statement;" and, (5) agreed and specifically intended that the wires or mail would be used to carry out the scheme to defraud.  [4/4 Tr. at 50:25–52:13].

Although Defendants argued that there was insufficient evidence on the bribery element in their original Rule 29 motion, only Defendant Lee presses this argument in her renewed motion.  See [ECF No. 816 at 15–16; ECF No. 817 at 2–4; ECF No. 864 at 1 n.1].  She argues that payments to prescribers who participated in the ISP were mere "gratuities," and therefore could not support an honest services fraud conviction.  [ECF No. 817 at 2–4].  While gratuities may be insufficient to support an honest services fraud conviction as a legal matter, it was for the jury to decide whether the payments were intended as "gratuities" or "bribes."  See Skilling v. United States, 561 U.S. 358, 408–13 (2010) (limiting § 1346 to "bribery or kickback schemes"); United States v. Turner, 684 F.3d 244, 258 (1st Cir. 2012) (concluding that it was reasonable in light of the evidence for the jury to find that defendant paid a bribe even though he used the word "gratitude" when making the payment).  Here, a reasonable jury could have concluded that payments to prescribers for participating in the ISP were intended as bribes in exchange for writing future prescriptions and were not gratuities for prescriptions already written.

usual course of professional practice and not for a legitimate medical purpose" and arguing that "for the same reason that the jury reasonably could conclude that Defendants Kapoor, Simon, Lee, and Rowan agreed and specifically intended that healthcare practitioners would violate the CSA, the jury reasonably could conclude that those same four Defendants agreed and specifically intended that healthcare practitioners would breach their fiduciary duty to their patients")].

The overlap between the CSA and the honest services fraud predicates is evident from the jury instructions, which defined a healthcare practitioner's fiduciary duty when prescribing controlled substances in terms of what is required by the CSA.  See [4/4 Tr. at 50:8–13 (defining "fiduciary duty" owed by a doctor to patients as "a duty to act for the benefit of the patient, including prescribing a controlled substance to a patient only for a legitimate medical purpose and while the doctor is acting in the usual course of his or her professional practice").  In addition, as reflected in the jury instructions, the charge on the third element of the CSA predicate and the charge on the honest services fraud predicates used nearly identical language with both, in effect, requiring an intent that healthcare practitioners prescribe Subsys outside the usual course of professional practice and not for a legitimate medical purpose.  Compare [4/4 Tr. at 44:15–18 (instructing jury that third element of CSA predicate required proof beyond a reasonable doubt "that the Defendant agreed that a healthcare practitioner would prescribe Subsys outside the usual course of medical practice and without any legitimate medical purpose"), with [id. at 51:14–18 (instructing jury that third element of honest services fraud predicate required proof beyond a reasonable doubt that "the Defendant agreed and specifically intended that healthcare practitioners would breach their fiduciary duty to their patients by

prescribing Subsys or a particular dose of Subsys outside the usual course of professional practice and not for a legitimate purpose")].

The Court therefore concludes, as did the parties, that in order to demonstrate a breach of fiduciary duty for the purposes of the honest services fraud predicates charged, the Government needed to prove beyond a reasonable doubt that Defendants agreed and specifically intended that a healthcare practitioner would breach his or her fiduciary duty to patients by prescribing Subsys or a particular dose of Subsys outside the usual course of professional practice and not for a legitimate medical purpose, as those terms were defined with regard to the CSA predicate.  See [ECF No. 816 at 17; ECF No. 860 at 27–28; ECF No. 936 at 25].  While it is conceivable that conduct that breaches a healthcare practitioner's fiduciary duty to a patient is distinct from conduct that violates the CSA, the breach charged here relates specifically to the improper prescribing of a controlled substance.  Evidence supporting the fiduciary duty element of the honest services fraud predicate was therefore coextensive with the evidence presented in support of the third element of the CSA predicate.

The Court has already found that the Government failed to carry its burden on the third element of the CSA predicate and now finds the same as to the honest services mail and wire fraud predicates.  See supra Section II.B.  The Court concludes that the evidence viewed in the light most favorable to the Government did not establish that any Defendant agreed and specifically intended that a healthcare practitioner would prescribe Subsys outside the usual course of medical practice and without any legitimate medical purpose.  See supra Section II.B. Accordingly, the Court vacates the jury verdict on the honest services mail and wire fraud predicates as to Defendants Simon, Lee, Rowan, and Kapoor.

### D.     Mail Fraud and Wire Fraud

As set forth above, federal law proscribes using the wires or mail in connection with a "scheme or artifice" to defraud.  See 18 U.S.C. §§ 1341, 1343.  "The crime of mail fraud includes three elements: '(1) a scheme to defraud based on false pretenses; (2) the defendant's knowing and willing participation in the scheme with the intent to defraud; and (3) the use of interstate mail . . . communications in furtherance of that scheme.'"  United States v. Soto, 799 F.3d 68, 92 (1st Cir. 2015) (quoting United States v. Hebshie, 549 F.3d 30, 35 (1st Cir. 2008)). The elements of the crime of wire fraud are the same, except it requires the use of interstate wires rather than the mail.  See United States v. Arif, 897 F.3d 1, 9 (1st Cir. 2018) (quoting United States v. Appolon, 715 F.3d 362, 367 (1st Cir. 2013)).  Where mail or wire fraud is charged as a RICO conspiracy predicate act, the Government must prove beyond a reasonable doubt that a defendant agreed to the existence of a scheme as alleged in the indictment and that he, she, or a co-conspirator would satisfy the latter two elements of either crime.  See [4/4 Tr. at 46:4–49:8].

Here, the Second Superseding Indictment ("SSI") alleged a scheme wherein the Defendants "bribed and provided kickbacks to . . . targeted practitioners . . . in exchange for the practitioners: (1) increasing the number of new Subsys prescriptions; and (2) increasing the dosage and number of units of Subsys for new and existing prescriptions" and then fraudulently "cause[d] insurers to pay for [these] new prescriptions, as well as for [the] increases in dosages and units of new and existing prescriptions . . . ."  [ECF No. 419 ¶¶ 27, 30].  As detailed in the SSI, "almost all insurers required patients to obtain prior authorization before agreeing to pay for a Subsys prescription."  [ECF No. 419 ¶ 14].  "In general, patients had to receive a particular medical diagnosis before the insurer would authorize payment for Subsys.  In addition, many

24

insurers would not pay for Subsys until the patient had tried and failed certain other preferred medications." [Id.]. Recognizing "that the potential for profits generated by their bribes and kickbacks could not be fully realized unless insurers authorized payments for Subsys prescriptions," the Defendants "instructed Insys employees to make false and misleading representations and omissions to insurers in order to secure payment for Subsys prescriptions." [Id. ¶¶ 34, 63, 64]. The information conveyed to the insurers included "false and misleading representations about patient diagnoses, including the type of pain being treated and the patients' prior course of treatment with other medications," as well as falsely representing that the patient had dysphagia, and failing to disclose to insurers that the callers submitting the prior authorization requests on the phone worked for Insys. See [id. ¶¶ 64, 67–70].

To support the mail and wire fraud allegations, the SSI alleged that Defendants arranged and coordinated the bribes and kickbacks using interstate wire transmissions, including emails, texts, and telephone calls, "caused bribes and kickbacks to be sent and delivered by the United States Postal Service and by private and commercial interstate carriers," and that Insys sales employees transmitted patient information to the IRC using interstate wires. [Id. ¶¶ 33, 34, 66]. Further, the trial record is replete with testimony about IRC employees having conversations with insurers over the telephone and using email to convey the false information to the insurers. See, e.g., [2/8 Tr. at 95:2–96:19; 2/14 Tr. at 73:13–74:3, 76:9—77:22].

Defendants collectively challenge the legal basis of the wire fraud predicate and the sufficiency of the evidence on the mail fraud predicate, and they individually challenge the sufficiency of the evidence on both the mail and wire fraud predicates.

1.    Application of Intracorporate Conspiracy Doctrine to Wire Fraud
      Predicate

Defendants moved for acquittal on the wire fraud predicate at the close of the

Government's evidence and now renew that motion.  See [ECF Nos. 816, 860].  They argue that

the wire fraud predicate should not stand because any agreement by Defendants to commit wire

fraud is not a legally cognizable agreement pursuant to the intracorporate conspiracy doctrine

where "the insurance fraud allegations that underlie the ordinary wire fraud predicate were

presented at trial as an alleged agreement among Insys personnel."  [ECF No. 816 at 20–21; ECF

No. 860 at 30–31].

The intracorporate conspiracy doctrine provides that "an agreement between or among

agents of the same legal entity, when the agents act in their official capacities, is not an unlawful

conspiracy."  Ziglar v. Abassi, 137 S. Ct. 1843, 1867 (2017).  This is because "[w]hen two

agents of the same legal entity make an agreement in the course of their official duties, . . . their

acts are attributed to their principal.  And it then follows that there has not been an agreement

between two or more separate people."  Id.

There is a recognized circuit split on the issue of whether the intracorporate conspiracy

doctrine applies to RICO conspiracies.  See Kirwin v. Price Commc'ns Corp., 391 F.3d 1323,

1326–27 (11th Cir. 2004) (noting that "[t]he four circuits that have addressed the issue [of

whether the intracorporate conspiracy doctrine bars § 1962(d) claims] are split on the answer"

and adopting view that the doctrine does not bar § 1962(d) civil claims because "[c]orporations

and their agents are distinct entities and, thus, agents may be held liable for their own

conspiratorial actions"); Roman Rivera v. P.R. Elec. Power Auth., No. 11-cv-2003, 2012 WL

13170557, at *6 n.7 (D.P.R. Sept. 25, 2012) ("Courts of Appeal are split on whether the

intracorporate conspiracy doctrine applies to RICO conspiracy claims and the First Circuit Court

26

of Appeals has yet to definitively extol on the applicability of the doctrine in the RICO

context.").[85]

Equally unsettled is whether the intracorporate conspiracy doctrine extends to criminal

cases.  Even courts that have applied the intracorporate conspiracy doctrine in civil cases do not

apply it to the criminal context.  See, e.g., United States v. St. John, 625 F. App'x 661, 665 (5th

Cir. 2015) ("While our court has applied the intracorporate conspiracy doctrine in antitrust and

civil rights cases, we have not expanded its application to the criminal context.  We decline to do

so here."); United States v. Hugh Chalmers Chevrolet-Toyota, Inc., 800 F.2d 737, 738 (8th Cir.

1986) ("The dealership also claims that a corporate entity cannot be subject to criminal

prosecution for conspiracy solely among its own agents.  We disagree."); see also

Commonwealth ex rel. Martino-Fleming v. S. Bay Mental Health Ctr., Inc., 334 F. Supp. 3d 394,

403 n.4 (D. Mass. 2018) (recognizing that "[o]utside of the antitrust context, the scope of the

intracorporate conspiracy doctrine is far from settled" and noting that the First Circuit has

"recognized an exception to the doctrine in the context of criminal fraud under 18 U.S.C.

§ 371").  But see United States v. Notarantonio, 758 F.2d 777, 789 (1st Cir. 1985) (noting in

dicta that in a § 371 criminal conspiracy case a corporation and its president "could not by

themselves constitute a conspiracy").

This Court finds the First Circuit's decision in United States v. Peters, 732 F.2d 1004,

1008 (1st Cir. 1984), instructive.  See [ECF No. 936 at 30].  In Peters, the First Circuit rejected

---

[85] The Seventh, Ninth, and Eleventh Circuits do not apply the intracorporate conspiracy doctrine to civil RICO claims.  Kirwin v. Price Commc'ns Corp., 391 F.3d 1323, 1326 (11th Cir. 2004) (first citing Ashland Oil, Inc. v. Arnett, 875 F.2d 1271 (7th Cir. 1989) and then citing Webster v. Omnitrition Int'l, Inc., 79 F.3d 776, 787 (9th Cir. 1996)).  The Fourth and Eighth Circuits do.  Id. (first citing Detrick v. Panalpina, Inc., 108 F.3d 529, 544 (4th Cir. 1997) and then citing Fogie v. THORN Ams., Inc., 190 F.3d 889 (8th Cir. 1999)).

the application of the intracorporate conspiracy doctrine to criminal conspiracies prosecuted under 18 U.S.C. § 371. 732 F.2d at 1008. The court opined that, in the § 371 context, "[t]he actions of two or more agents of a corporation, conspiring together on behalf of the corporation, may lead to conspiracy convictions of the agents (because the corporate veil does not shield them from criminal liability) and of the corporation (because its agents conspired on its behalf)." Id. It also observed that "[t]here is a world of difference between invoking the fiction of corporate personality to subject a corporation to civil liability for acts of its agents and invoking it to shield a corporation or its agents from criminal liability where its agents acted on its behalf." Id. at 1008 n.7.

Even if the First Circuit chooses to follow the minority of circuits and apply the intracorporate conspiracy doctrine to civil RICO conspiracy cases, the fact that it declined to apply the doctrine in the § 371 context in Peters suggests that it is unlikely to apply the doctrine to criminal RICO conspiracy cases. The Court, therefore, declines to rely on the intracorporate conspiracy doctrine here. Accordingly, Defendants' challenge to the wire fraud predicate based on the intracorporate conspiracy doctrine fails.

> 2. General Challenge to Mail Fraud Predicate

All Defendants moved for acquittal on the mail fraud predicate at the close of the Government's evidence and now renew that motion. See [ECF Nos. 816, 860]. They seek reversal of the jury's verdict on the mail fraud predicate on the ground that the Government failed to introduce evidence that insurers asked Insys about its financial relationship with prescribers or that anyone at Insys conspired to make false statements regarding the company's financial relationships with prescribers. [ECF No. 816 at 19–21]. In the alternative, they argue that the Government did not present evidence that the off-label prescriptions for which the IRC

sought reimbursement were medically illegitimate prescriptions.  See [ECF No. 967 at 14–15].
Both of these general challenges to the mail fraud predicate fail.

First, the Government did not need to show that the misrepresentations made to insurers
were about the bribes paid to prescribers; rather, it had the burden of demonstrating some
connection between the mailing of the bribes and the overall "scheme or artifice to defraud."  It
is well-established that the First Circuit does not "require[] a 'but-for' link between a mailing
and the fraudulent scheme," although the completion of the scheme "must have depended in
some way on the mailings."  Hebshie, 549 F.3d at 36 (quoting United States v. Pacheco-
Ortiz, 889 F.2d 301, 305 (1st Cir. 1989)).  In other words, "a mailing can serve as the basis for a
mail fraud conviction even if the fraud would have been successful had the mailing never
occurred," but "that mailing—even if dispensable—must at least have some tendency to
facilitate execution of the fraud."  United States v. Tavares, 844 F.3d 46, 59 (1st Cir. 2016).
Here, the fraudulent scheme alleged in the SSI deceived insurers into paying for prescriptions for
which they otherwise would not have paid.  The mailing of bribes to prescribers facilitated the
execution of the fraudulent scheme by incentivizing prescriptions from high-volume
practitioners.

Second, although the Government did not need to demonstrate that the fraudulent scheme
was successful, the evidence at trial demonstrated that insurers would not cover certain
prescriptions, that the IRC sought coverage from insurers for these prescriptions, and that, to
gain prior authorizations, IRC employees known as prior authorization specialists misled
insurers, including by lying about the medication being prescribed for breakthrough cancer pain,
the patient having a history of cancer, the patient having tried-and-failed similar medications,
and the patient having difficulty swallowing.  See [3/18 Tr. at 135:9–140:6 (prior authorization

report from insurer for Kendra Skalnican); 3/21 Tr. at 83:10–84:10 (IRC call regarding Sarah Dawes); 3/28 Tr. at 57:20–61:25 (IRC call regarding Michelle Kamzyuk)].  The Defendants understood that these misrepresentations made it more likely that the prior authorizations would be obtained and that they were material to the insurer's decision to cover the prescription.  See, e.g., [3/18 Tr. at 126:9–127:2, 135:24–140:6, 193:7–15; 3/21 Tr. at 65:13–66:3].

Further, to prove the mail fraud predicate beyond a reasonable doubt, the Government did not need to prove that the prescriptions for which the IRC sought reimbursement were in fact medically illegitimate, meaning that the scheme involved making false representations to insurers to get them to pay for prescriptions without regard to whether the prescriber properly or improperly prescribed the drug.  Thus, the Defendants' argument fails.  Even if proof of mail fraud did require proof of medically illegitimate prescriptions, the argument would still fail as the evidence at trial demonstrated that prior authorization specialists did mislead insurers concerning off-label prescriptions that were in fact medically illegitimate.  See [1/31 Tr. at 60:6– 62:11 (Dr. Awerbuch testimony on medically illegitimate prescriptions for Kendra Skalnican); 2/11 Tr. at 150:19–25 (APRN Alfonso testimony on medically illegitimate prescriptions for Michelle Kamzyuk), 163:12–17 (APRN Alfonso testimony on medically illegitimate prescriptions for Sarah Dawes); 3/18 Tr. at 135:9–140:6 (prior authorization report from insurer for Kendra Skalnican); 3/21 Tr. at 83:10–84:10 (IRC call regarding Sarah Dawes); 3/28 Tr. at 57:20–61:25 (IRC call regarding Michelle Kamzyuk)].

For clarity, the Court notes the distinction between the unsatisfied element of the CSA and honest services fraud predicates—that Defendants agreed and specifically intended that a healthcare practitioner would prescribe Subsys outside the usual course of professional practice and without any legitimate medical purpose—and the deception element of the mail fraud

predicate, which required evidence of "a scheme, substantially as alleged in the indictment, to defraud insurance companies or Medicare or to obtain money from insurance companies by means of false or fraudulent pretenses."  [4/4 Tr. at 46:25–47:4].  Only the former requires a specific intent on the part of Defendants that medically illegitimate prescriptions be written.  Thus, while proof that the Defendants intended prescribers to write unnecessary or inappropriate prescriptions is an element of both the CSA and the honest services predicates at issue here, it is not required to prove the ordinary mail and wire fraud predicates.

### 3.   Defendant Simon's Challenge to Mail and Wire Fraud Predicates

Defendant Simon challenges the jury's convictions on the mail and wire fraud predicates and argues that the trial evidence did not establish that he "knew about or approved of false or misleading statements made by [IRC] employees to insurance companies."  See [ECF No. 863 at 4, 9].  He further contends that he "never directed or supervised IRC personnel and played no role with regard to interactions with insurance companies."  [Id. at 8].  The Government responds that the evidence presented at trial was sufficient to support these convictions.  [ECF No. 936 at 34].  The Court agrees.

The jury could have found beyond a reasonable doubt that Defendant Simon knew about the bribes and agreed to the mail and wire fraud schemes based on the evidence presented at trial.  See, e.g., [2/13 Tr. at 125:22–127:10].  As National Sales Director, Defendant Simon participated in daily 8:30 a.m. management calls during which the IRC, including strategies for deceiving insurers, was openly discussed.[86]  In addition, he had first-hand knowledge of how the

---

[86] See [2/13 Tr. at 110:13–18 (Babich testimony that Defendant Simon "occasionally" participated in the 8:30 a.m. call); 2/14 Tr. at 85:25–86:14 (Babich testimony that dysphagia was discussed on the 8:30 a.m. calls in early 2013), 91:14–92:14 (Babich testimony that spiel was

IRC worked based on his June 2014 visit to the IRC when he "[sat] and listen[ed] to calls" made by prior authorization specialists.[87]  Other witness testimony about visits to the IRC indicated that the fraud would have been apparent from even a short visit.  See [3/27 Tr. at 30:3–32:17 (Danielle Davis testimony that she visited the IRC in March 2014 and understood that employees were lying to insurance companies)].  Following his visit to the IRC, Defendant Simon worked with Ms. Gurrieri and Ms. Angel Alarcon to develop a "Charts in Progress" or "CIP" report, which allowed Simon to track which patient charts were in the process of receiving prior authorization.  See [2/25 Tr. at 42:21–45:1].  Thus, rather than distancing himself from the IRC, Defendant Simon elected to more closely monitor the prior authorization process to ensure that prescriptions would pass through the IRC more efficiently.

This evidence was sufficient for the jury to conclude that Defendant Simon had knowledge of and approved of the fraud being perpetrated by the IRC, which would have supported both the mail and wire fraud predicate convictions.  Defendant Simon's attempt to challenge this conviction by arguing that he "never directed or supervised IRC personnel" falls short because that level of involvement and direction was unnecessary for the jury to find that he was a knowing and willing co-conspirator.  Accordingly, the Court denies Defendant Simon's motion for acquittal on the mail fraud and wire fraud predicates.

---

discussed on 8:30 a.m. calls); 3/5 Tr. at 120:11–19 (Burlakoff testimony that Defendant Simon participated in the 8:30 a.m. calls via phone when not in the home office)].

[87] See [2/28 Tr. at 158:12–159:22]; see also [2/28 Tr. at 158:15–21 (discussing Exhibit 2073, a June 30, 2014 email from Chris Homrich to Ms. Gurrieri and Angel Alarcon noting that Defendant Simon and Mr. Burlakoff were interested in "stop[ping] by the IRC tomorrow . . . [to] spend some time watching, listening, discussing, learning how the new forms are coming in and the action the IRC has to take or not with respect to processing the new forms")].

4.    Defendant Lee's Challenge to Mail and Wire Fraud Predicates

Defendant Lee seeks acquittal on her convictions on the mail and wire fraud predicates on the ground that she "had very little, if any, contact with the IRC."[88]  See [ECF No. 817 at 2]. The Government stands by its prior representations to the Court that Defendant Lee's conduct was connected with the IRC scheme.  See [ECF No. 936 at 68–69].

Examining the evidence in the light most favorable to the verdict, the jury could have found beyond a reasonable doubt that Defendant Lee knew about the bribes and specifically agreed and intended that her co-conspirators would commit mail and wire fraud.  See, e.g., [3/5 Tr. at 133:14–137:5].  The evidence showed that Defendant Lee interacted with the IRC, and the jury could have inferred that she understood the connection between the scheme to bribe doctors and the IRC scheme.  As part of the IRC pilot program, Defendant Lee worked directly with Ms. Gurrieri on charts from Dr. Awerbuch and other healthcare practitioners.  See [2/22 Tr. at 167:3–12].  In her sales role, Defendant Lee worked with two of the most prolific writers of Subsys in the country, Drs. Madison and Awerbuch.  The prescriptions written by these physicians were only valuable to Insys if it received prior authorizations, a fact that would have been apparent to Defendant Lee.  See, e.g., [2/26 Tr. at 147:25–151:1 (discussing Exhibit 2045, which was an email from Ms. Gurrieri to Defendant Lee forwarding a list of over 100 prior authorization denials from Dr. Awerbuch's office as of April 9, 2013 that the IRC was working through)]; see also [3/5 Tr. at 121:17–122:8 (Burlakoff testimony explaining importance of prior authorizations to the sales force)].  Defendant Lee worked to put systems and people in place in these offices to

---

[88] Defendant Lee also asserts that the evidence supports an inference that her conduct violated the terms of some insurance policies, but that "there is no evidence of any alleged wrongdoing other than the failure to fully comply with insurance policies," and that violation of these policies was not mail fraud.  [ECF No. 817 at 5].  Because the Court concludes that the evidence supports a conviction on the mail fraud predicate, it does not directly address this argument.

maximize the number of prior authorizations, which is consistent with knowledge of and agreement with the IRC scheme.  For example, in Dr. Awerbuch's office, Defendant Lee arranged to hire Kourtney Nagy as an Insys employee, with the responsibility of completing the prior authorizations for Subsys on behalf of Dr. Awerbuch.  See [1/31 Tr. at 84:5–85:25, 191:4–16].  Ms. Nagy's role, according to Dr. Awerbuch, was to "try to get the prescriptions pushed through."[89]  [Id. at 85:1–5].  The jury could have also inferred that Defendant Lee knew about sales representative Brett Szymanski's and Insys employee Brian Trask's efforts to assist Dr. Awerbuch's office with the prior authorizations.  See [1/30 Tr. at 173:24–174:16; 1/31 Tr. at 80:10–83:22].  Mr. Szymanski made it clear that opt-in forms were to be filled out to optimize the IRC's chances of obtaining approval.  See [1/30 Tr. at 178:15–25].  In Dr. Madison's office, Defendant Lee was aware that sales representative Holly Brown would sometimes spend the day in his office helping to process prior authorizations.  See [1/29 Tr. at 93:10–98:16].  Ms. Brown testified that part of her role was to ensure that the prior authorizations were submitted to the IRC and explained that she was aware of certain strategies that increased the  rates of insurance approval, such as stating that the patient had difficulty swallowing even if they did not.  See [id. at 94:22–95:16, 97:3–98:11].

The foregoing evidence and inferences drawn therefrom are sufficient to permit a reasonable jury to find, beyond a reasonable doubt, that Defendant Lee conspired to commit mail and wire fraud in violation of RICO.  United States v. Sawyer, 85 F.3d 713, 734 (1st Cir. 1996); see also United States v. Ortiz, 966 F.2d 707, 711 (1st Cir. 1992) (explaining that "juries are not

---

[89] Defendant Lee contends that no evidence connects her hiring of Kourtney Nagy to any knowledge of wrongdoing at the IRC.  [ECF No. 966 at 1–2].  While no direct testimony or evidence explicitly drew this connection, the jury could have found that the two were linked based on circumstantial evidence.

required to examine the evidence in isolation, for 'individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its constituent parts.'" (citation omitted)). Accordingly, the Court denies Defendant Lee's motion for acquittal on the mail and wire fraud predicates.

5.    Defendant Rowan's Challenge to Wire Fraud Predicate

Defendant Rowan also seeks acquittal on the wire fraud predicate. See [ECF No. 861 at 3]. He contends that the wire fraud charge is premised on the allegation in the SSI that he "instructed Insys employees to make false and misleading representations and omissions to insurers in order to secure payment for Subsys prescriptions." [Id. (citing [ECF No. 419 ¶ 63])]. He asserts that there was no evidence at trial that he was involved with the operation of the IRC or had knowledge of its fraudulent practices. [Id.]. He further asserts that no sales representative who reported to him testified that he told them to lie to insurance companies or admitted to lying to insurance companies. [Id. at 4]. In response, the Government summarizes evidence adduced at trial that supports Defendant Rowan's knowledge of the bribery and participation in the wire fraud scheme. See [3/5 Tr. at 133:14–137:5; ECF No. 936 at 32–33].

A jury could have found beyond a reasonable doubt that Defendant Rowan had knowledge of and agreed to the wire fraud scheme. Defendant Rowan was the Regional Sales Manager for the southeast region. In this role, he managed a team of district managers who managed sales representatives. [3/1 Tr. at 45:5–46:10]. At a National Sales Meeting, Defendant Rowan led his team in a breakout session where they heard a presentation from Ms. Gurrieri about the IRC. See [3/22 Tr. at 9:1–6]. During her presentation, which was surreptitiously recorded, Ms. Gurrieri discussed "the importance of having cancer or finding cancer" in a patient's record and mentioned "a list of tried and failed" medications. [Id. at 9:12–19, 10:4–14,

35

10:19–11:7].  Ms. Gurrieri also stated that "[w]e have our own list [of tried-and-failed] medications to use if there's nothing on there."  [Id. at 11:18–20].  Defendant Rowan told his team during this session, "[t]his is how you get paid."  [Id. at 13:17–25].  From this statement, the jury could have concluded that Defendant Rowan was encouraging his sales representatives to adopt the IRC's fraudulent strategies in order to ensure that their opt-in forms resulted in successful prior authorizations.  This conclusion is supported by the fact that the financial success of Subsys sales and of the sales representatives depended on the success of the IRC, which in turn depended on fraud to achieve the high rates of approval it did.[90]  Furthermore, the jury could have found that the IRC's strategies for fraudulently gaining prior approval were well-known among Insys sales representatives who provided opt-in forms to the IRC.[91]  The totality of the evidence presented about Defendant Rowan would have permitted the jury to find beyond a reasonable doubt that he specifically intended and agreed to the wire fraud predicate.  See Ortiz, 966 F.2d at 711 ("The sum of an evidentiary presentation may well be greater than its constituent parts.").  Accordingly, the Court denies Defendant Rowan's motion for acquittal on the wire fraud predicate.

---

[90] See, e.g., [2/22 Tr. at 207:16–208:5 (Gurrieri testimony that if a prior authorization was approved, "[t]he sales rep would get paid, Insys would get paid, and the script would get paid."); 3/5 Tr. at 121:17–122:8 (Burlakoff testifying, "[T]hat was big, meaning gross to net sales, how many scripts are being written and how many are being paid for, going through the IRC or prior authorization process.  Obviously, if they're being written, but they're not being paid for by insurance companies, we don't get paid.  So that was something that I had to deal with, with my reps, with the entire sales force on a daily basis . . . ."); 3/6 Tr. at 55:19–56:23 (Burlakoff testimony about an e-mail exchange between him, Mr. Napoletano, and Defendant Rowan in which he complains because Dr. Chun "is generating scripts, he's writing Subsys, but we're not, as a company, making any money because the scripts are not getting approved by the insurance company")].

[91] See, e.g., [1/29 Tr. at 94:22–95:16, 97:3–15; 1/30 Tr. at 178:15–25].

III.        **RULE 33 MOTIONS**

     A.        **Legal Standard**

On a motion for a new trial under Federal Rule of Criminal Procedure 33, "the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  "In considering a motion for a new trial, district courts may 'weigh the evidence and evaluate the credibility of witnesses, . . . [but] the remedy of a new trial is sparingly used, and then only where there would be a miscarriage of justice and where the evidence preponderates heavily against the verdict.'"  Merlino, 592 F.3d at 32 (quoting United States v. Wilkerson, 251 F.3d 273, 278 (1st Cir. 2001)).  "[I]t is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment."  Id. at 32–33 (internal quotations omitted).  "A district court 'judge is not a thirteenth juror who may set aside a verdict merely because he would have reached a different result.'"  United States v. Rivera-Rangel, 396 F.3d 476, 486 (1st Cir. 2005) (quoting Rothrock, 806 F.2d at 322).

In addition, on a Rule 33 motion, the Court may "consider whether its evidentiary rulings at trial were correct."  United States v. DiMasi, 810 F. Supp. 2d 347, 362 (D. Mass. 2011) (citing Wilkerson, 251 F.3d at 279–80).  "However, a new trial is justified only if an error concerning the admission of evidence was made and the error was not 'harmless,'" meaning "it is highly probable that the error did not contribute to the verdict."  Id. (quoting Wilkerson, 251 F.3d at 280).

     B.        **Prejudicial Spillover from CSA Predicate**

Defendants contend that a new trial is warranted on the non-CSA predicates because the jury's verdict was "tainted by spillover prejudice from its consideration of the CSA predicate."

37

[ECF No. 860 at 31].  In the First Circuit, a "claim of prejudicial spillover cannot succeed unless 'a defendant . . . prove[s] prejudice so pervasive that a miscarriage of justice looms.'"  United States v. Trainor, 477 F.3d 24, 36 (1st Cir. 2007) (quoting United States v. Levy-Cordero, 67 F.3d 1002, 1008 (1st Cir. 1995)); see United States v. Portela, 167 F.3d 687, 700 (1st Cir. 1999) ("[T]o prevail on a claim of prejudicial spillover, a defendant must prove prejudice so pervasive that a miscarriage of justice looms." (quoting United States v. Wihbey, 75 F.3d 761, 776 (1st Cir. 1996))).

Defendants are unable to make this showing.  First, the patient evidence they object to would likely have been admissible against Defendants even if the trial were only on the ordinary mail and wire fraud predicates because the Government could have used the testimony to show a patient's history of cancer or lack of dysphagia.  The patient evidence, therefore, cannot support a claim of spillover prejudice from the CSA predicate.  Second, the conspiracy charged in the indictment was a single conspiracy that consisted of bribing healthcare practitioners to prescribe Subsys and then defrauding insurers to pay for those prescriptions.  There were not, as Defendants assert, two separate charged conspiracies where evidence of bribery was only relevant to one; and, even if the Court accepted the premise that two conspiracies were charged, evidence of bribery was directly relevant to both.  Cf. Trainor, 477 F.3d at 35–36 (noting that "[t]he only possible ground for prejudice would be a type of evidentiary spillover—i.e., if the guilty verdicts on the fraud counts relating to one transaction were influenced by evidence relating to the other transaction—but the interconnectedness of the two deals compels a conclusion of harmlessness.  Indeed, even if the government had alleged two separate conspiracies, we think there is little chance that a trial court would have agreed to try them separately given their proximate timing and the substantial overlap.").  As explained supra, the

ample evidence connecting Defendants Simon, Lee, and Rowan to ordinary mail and wire fraud precludes a finding of prejudice from any spillover.  See supra Sections II.D.3–5.

Second, the Court took measures to guard against spillover prejudice from one predicate to another and from one Defendant to another by instructing the jury to consider the evidence as to each Defendant and to treat each Defendant individually.  See [4/4 Tr. at 29:21–30:6 ("You must, as a matter of law, consider each Defendant and his or her involvement with the crime separately . . . . Your verdict of guilty or not guilty must be based solely upon the evidence about each Defendant. . . . [Y]our verdict as to any Defendant should not control your decision as to any other Defendant."), 42:10–54:3 (describing elements of each of the five predicate acts)]; United States v. Casas, 425 F.3d 23, 50 (1st Cir. 2005) ("The court took adequate measures to guard against spillover prejudice by instructing the jury to consider each charged offense, and any evidence relating to it, separately as to each defendant."); United States v. Natanel, 938 F.2d 302, 308 (1st Cir. 1991) (similar).

### C.    Insufficient Evidence on Honest Services Fraud, Mail Fraud, and Wire Fraud Predicates

In their renewed motion, Defendants incorporate by reference their prior arguments concerning the lack of proof on the honest services fraud, mail fraud, and wire fraud predicates and explain why they think the lack of proof requires a new trial.  [ECF No. 860 at 27–31].  Because the Court has concluded that the ordinary mail and wire fraud predicates did not suffer from a lack of proof as to any Defendant, the Court denies Defendants' motion for a new trial as to those predicates for substantially the same reasons as discussed in Sections II.D.1–5, supra.

### D.    Rebuttal Argument

Defendants collectively and individually request a new trial based on five alleged improper statements made by the Government in its rebuttal argument.  These include: (1)

commentary on Defendants not testifying, (2) a statement about corporate officer liability, (3) misstating elements of the charged offense, (4) a "loaded gun" metaphor, and (5) misstating the testimony of Mr. Babich and Mr. Napoletano.  See [ECF No. 860 at 39–44].  In response, the Government argues that Defendants waived all but one of their claims that rebuttal was improper "because they requested curative instructions in lieu of a mistrial and, after the Court agreed to give modified versions of their requested instructions, did not move for a mistrial or otherwise argue that the curative instructions given by the Court were insufficient to cure the harm that they alleged."  [ECF No. 936 at 50–56].

1.    Waiver

In support of its waiver argument, the Government chiefly relies on the recent First Circuit case, United States v. Charriez-Rolón, 923 F.3d 45, 53 (1st Cir. 2019).  In Charriez-Rolón, the defendant sought a new trial based on an improper closing argument.  923 F.3d at 53.  On appeal, the prosecution argued that the defendant had waived this argument because he had accepted a curative jury instruction and then did not object before jury deliberations.  Id.  The First Circuit held that the objection was waived because the defendant's counsel "readily agreed that the judge adequately cured any error" through a curative instruction and even "thanked the judge for adopting the prosecutor's suggested tweak" to the instruction, which was beneficial to his client.  Id.

Charriez-Rolón built upon the existing rule reaffirmed in United States v. Corbett, 870 F.3d 21 (1st Cir. 2017), that "when the subject matter [is] unmistakably on the table, and the defense's silence is reasonably understood only as signifying agreement that there was nothing objectionable, the issue is waived on appeal."  870 F.3d at 30–31 (quoting Soto, 799 F.3d at 96).  In Corbett, similar to Charriez-Rolón, when faced with an issue of how to respond to a juror

note, defense counsel "was not merely silent, but affirmatively stated that he had 'no problem' with the court's proposed response." Id. at 31 (collecting cases).

Here, Defendants objected contemporaneously during the Government's rebuttal and immediately thereafter at sidebar; they then filed a motion for a mistrial in which they requested corrective instructions, or else a mistrial.  [ECF No. 819; ECF No. 967 at 18–19].  The Court heard argument on the mistrial motion the next business day and before the jury retired to deliberate.  See generally [4/8 Tr.].  At that time, the Court informed the parties that it was not certain that supplemental instructions were necessary and would only give "some comment" in response to the objections "if [it] was going to instruct at all."  [Id. at 8:20–9:12].  It then circulated draft instructions to the parties, to which Defendants offered edits.  [Id. at 9:8–12, 15:9–18].  After the Court read the supplemental instructions to the jury, it asked the parties, "[s]idebar or no?"  [Id. at 22:1].  No party requested a sidebar or voiced an objection.  See [id. at 22:1–5].

Defendants' acquiescence following the Court's curative instruction waived objections to the supplemental instruction and suggested that Defendants believed the instruction remedied the harms they had identified.  See Fed. R. Crim. P. 30(d); Charriez-Rolón, 923 F.3d at 53; United States v. Santana-Rosa, 132 F.3d 860, 863 n.1 (1st Cir. 1998); United States v. Nason, 9 F.3d 155, 160 (1st Cir. 1993).  Following the Court's reading of the supplemental instruction, "the subject matter [of the improper rebuttal and the Court's attempt to remedy it] [was] unmistakably on the table," and Defendants' silence can be interpreted as approval of the Court's instruction. See Corbett, 870 F.3d at 30–31.  Accordingly, Defendants have waived their arguments that the curative instructions given by the Court were insufficient or ineffective in curing any harm

41

caused by improper rebuttal argument by the Government.  <u>See</u> [ECF No. 859 at 16–17; ECF

No. 860 at 43; ECF No. 863 at 11; ECF No. 967 at 20–21].[92]

---

[92] Had the Court reached the merits on the waived challenges to the rebuttal remarks, it would
have concluded that the Government's alleged commentary on Defendants' failure to testify, its
discussion of the charge, and its description of testimony from Mr. Babich and Mr. Napoletano
were not improper and that its statement about corporate officer liability was improper, but cured
by the Court's instructions.

As to the statements concerning Defendants' failure to testify, in the view of the Court, neither
the parties nor the Court understood the challenged statements to be a comment on Defendants'
failure to testify at the time they were made.  <u>See</u> [ECF No. 860 at 39–40 (identifying challenged
comments as: (1) Defendants "want to sit here and say to you . . . that these men and women who
ran this company, who were the managers, had no idea what was going on."; (2) "They can't sit
here and tell you, now, that they didn't intend for that to happen"; (3) "For [Dr. Kapoor] to sit
there, for [his counsel] to suggest that he has no clue what was going on, it's preposterous"; (4)
"And yet Mr. Gurry wants to sit there and tell you, 'I had no idea.'"; (5) "[Counsel] was
basically standing up there testifying on behalf of his client.")]; <u>United States v. Sepulveda</u>, 15
F.3d 1161, 1187 (1st Cir. 1993) ("Once the prosecutor's words are placed in context, we inquire
whether 'the language used was manifestly intended or was of such character that the jury would
naturally and necessarily take it to be a comment on the failure of the accused to testify.'"
(citation omitted)).  The absence of contemporaneous objections to the remarks is significant, as
is the lack of a *sua sponte* instruction from the Court.  <u>See</u> [4/5 Tr. at 185:16–188:3]; <u>Sepulveda</u>,
15 F.3d at 1187 ("[I]n the absence of a contemporaneous objection it seems fair to give the
arguer the benefit of every plausible interpretation of [his] words.").  In addition, even after the
objection to these remarks was raised over the weekend, the Court still did not conclude that the
remarks were improper but agreed to give a supplemental instruction out of an abundance of
caution.  <u>See</u> [4/8 Tr. at 8:20–9:4 ("I don't know that any of this requires response [from the
Court].  That being said, . . . . I'm operating under better safe than sorry. . . . [T]he one that
worries me is the arguable commenting on the defendant's failure to testify.  Because I feel like
that's where bad things mostly happen.")].

Even if the remarks identified by Defendants could be interpreted to be an improper comment on
the failure of Defendants to testify, no harm resulted because the Court instructed the jury
multiple times that it could not consider the fact that Defendants did not testify.  <u>See, e.g.</u>, [4/4
Tr. at 18:21–19:1 (providing initial instruction on Defendants' constitutional right not to testify
and that jury may not consider the fact that a particular Defendant did not testify); 4/8 Tr. at
21:18–25 ("Finally, you should not interpret anything that was said in this case as a comment on
the fact that defendants chose not to testify.  As I've already instructed you, defendants have an
absolute constitutional right not to testify.  And you cannot draw any inference from the fact that
they exercised their rights.  You cannot consider or discuss defendants' choices not to testify
during your deliberations.")].

2.      "Loaded Gun" Metaphor

As to Defendants' argument that an additional curative instruction regarding the "loaded

gun" metaphor was necessary, which is the one objection the Government concedes Defendants

did not waive,[93] [ECF No. 936 at 54], while this remark was improper, it does not warrant a new

trial.[94]  During its rebuttal argument, the Government stated,

> People intend a [sic] reasonably foreseeable consequences of their actions. It is [as]
> though, if I took a gun and fired it into the audience, which I'm not going to do, I
> don't intend to shoot any particular individual, but I know somebody's going to get
> hit. And when the defendants arm these doctors with all these bribes and all these
> incentives, they were creating a loaded gun.

[4/5 Tr. at 169:23–170:4].  Immediately after the rebuttal argument, the Court instructed the jury:

"if you're unclear on the law, if you're not sure what the law is, based upon what you heard in

closing arguments and what you heard me say, it's what I say that controls."  [Id. at 185:24–

186:5].

The next day that the Court was in session before the jury began deliberations, the Court

heard argument on Defendants' additional requests for curative instructions based on the rebuttal

---

Defendants argue that these curative instructions were insufficient and ineffective.  See [ECF
No. 860 at 43; ECF No. 967 at 20–21].  The Court disagrees.  The instructions were forceful,
direct, and provided multiple times, and thereby cured any possible misinterpretation or harm.
See United States v. Turner, 892 F.2d 11, 12–13 (1st Cir. 1989) (holding that rebuttal statement
that "defendant, James Turner, who sits so innocently over there," "although improper, did not
constitute misconduct of a magnitude sufficient to warrant a new trial" and that any possible
misinterpretation of the remark was cured by strong instructions to the jury).

[93] While the Government's briefing limited this objection to only Defendant Rowan, the Court
considers the objection to be joined by all Defendants because, at the outset of trial, the parties
established that an objection by any Defendant would be for all Defendants.  See, e.g., [1/25 Tr.
at 23:4–13 (explaining the practice of joining objections at outset of trial in the context of
peremptory challenges)].

[94] Because the "loaded gun" metaphor related primarily to the intent required to prove the CSA
and honest services fraud predicates, this issue is likely mooted by the Court's decision
acquitting Defendants Simon, Lee, Rowan, and Kapoor of those predicates.  The Court includes
its analysis of the "loaded gun" metaphor, however, in the interest of completeness.

argument.  See generally [4/8 Tr.].  The Government acknowledged that Defendants' objection

to the "loaded gun" metaphor "ha[d] some merit," but opined that a supplemental instruction on

intent and reasonable foreseeability would be adequately curative.  [Id. at 5:21–7:2].  The Court

circulated a proposed draft of supplemental instructions to the parties, which was edited with

input from the parties.  See [id. at 9:5–10, 14:18–15:4, 15:9–10, 17:1–4 (requesting addition of

language to the effect of "reasonabl[y] foreseeable consequences not being enough")].  At the

end of this discussion, counsel for Defendant Rowan requested an instruction that the

Government's use of the metaphor was not a correct statement of the law, which the Court

declined to include.  [Id. at 17:7–19].  The Court then gave the following supplemental

instruction on intent:

> As I already told you bribes and kickbacks alone are insufficient to convict in this
> case. For you to find an agreement regarding the racketeering act of illegal
> distribution of a controlled substance, honest services mail fraud or honest services
> wire fraud, you must find that defendants agreed to and specifically intended for
> healthcare practitioners to write Subsys prescriptions outside of the usual course of
> professional practice and without legitimate medical purpose. Under the law,
> knowledge of foreseeable consequences without more is not enough to establish
> that someone specifically intended certain conduct. Rather, the government must
> prove that the defendant acted with a bad purpose or with the object of committing
> a prohibited act, here, for the controlled substance and honest service predicates,
> having healthcare practitioners prescribe Subsys outside of the usual course of
> professional practice and without legitimate medical purpose.

[Id. at 20:19–21:10].

Defendants argue that the Government's use of the "loaded gun" metaphor misstated the

law of specific intent and employed unfairly prejudicial imagery.  [ECF No. 860 at 41–42].

They contend that, in the context of the opioid epidemic, the metaphor "wrongly implied that

Defendants were responsible for the deaths of patients . . . ."  [Id. at 42].  They also take issue

with the Court's curative instruction, which they argue insufficiently remedied the harm caused

by the statement.  See [id. at 43; ECF No. 967 at 20–21]; see also [ECF No. 859 at 16].  The

Government agrees that the use of the metaphor was "inapt" in light of the Court's instructions of specific intent but asserts that any possible prejudice caused by this language was remedied by the Court's repeated instructions that its description of the law controls and its supplemental instruction that "knowledge of foreseeable consequences without more is not enough to establish that someone specifically intended certain conduct." [ECF No. 936 at 64]. The Government also notes that its use of this metaphor was an "isolated" incident during a lengthy rebuttal. [Id. at 64–65].

The parties seem to agree, and the Court does as well, that the Government's use of the "loaded gun" metaphor was inconsistent with the Court's instruction on specific intent and was thus an improper misstatement of the law. See [id. at 64]. The Court next considers whether the use of the metaphor "so poisoned the well that the trial's outcome was likely affected, thus warranting a new trial." United States v. Peake, 804 F.3d 81, 93 (1st Cir. 2015) (quoting United States v. Rodriguez, 675 F.3d 48, 62 (1st Cir. 2012)). "In making this determination, [courts] focus on (1) the severity of the misconduct, including whether it was isolated and/or deliberate; (2) whether curative instructions were given; and (3) the strength of the evidence against the defendant." Id. at 93–94.

Here, all three considerations counsel against a finding that the Government's misstatement "so poisoned the well" as to warrant a new trial. First, the Government used the metaphor once during a rebuttal argument that lasted approximately thirty minutes and did not employ the metaphor at any other time during closing or the trial; the Court thus considers it to be an isolated incident. See, e.g., United States v. Alcantara, 837 F.3d 102, 110 (1st Cir. 2016) (characterizing as not severe challenged rebuttal remarks that were "a mere handful of lines in the trial transcript"); United States v. Capone, 683 F.2d 582, 586 (1st Cir. 1982) (concluding that

improper "appeal to passion" was isolated and was "something less than deliberate" because the remarks "were not part of a prepared discourse" or "a continuing theme upon which the prosecutor played despite repeated warnings by the court").

Second, the Court gave a curative instruction that addressed the legal principles implicated by the remark along with additional instructions reminding the jury that they must follow the law as given to them by the Court.  See, e.g., United States v. Dwyer, 238 Fed. App'x 631, 655–56 (1st Cir. 2007) (concluding that any harm from prosecution's improper characterization of intent and knowledge as interchangeable in rebuttal argument was remedied by court's supplemental instructions to jury on the issue of intent and reminder that the jury should follow the court's instructions on the law).  For example, the Court instructed the jury that "knowledge of foreseeable consequences without more is not enough to establish that someone specifically intended certain conduct."  [4/8 Tr. at 21:2–4].  This instruction directly addresses the Government's remark that "[p]eople intend [the] reasonably foreseeable consequences of their actions," which the loaded gun metaphor appeared to illustrate.  See [4/5 Tr. at 169:23–170:4].

Third, as described supra, the strength of the evidence against the Defendants on the mail fraud and wire fraud charges was strong and a new trial on those claims is not warranted by this single misstatement of the law that related only to those convictions that the Court is vacating. See Sections II.D.1–5, supra.

### E.     Evidentiary Issues

On a Rule 33 motion, although the Court may also "consider whether its evidentiary rulings at trial were correct," "a new trial is justified only if an error concerning the admission of evidence was made and the error was not 'harmless,'" meaning "it is highly probable that the

error did not contribute to the verdict." DiMasi, 810 F. Supp. 2d at 362 (citing Wilkerson, 251

F.3d at 279–80).  Defendants collectively and individually raise nine evidentiary rulings that they

contend were erroneous and contributed to the verdict.  The Court concludes that none of the

alleged errors identified by Defendants justify a new trial.

      1.    Patient Testimony (All Defendants)

Defendants collectively argue that the Court erred in admitting testimony from nine

patients who were prescribed Subsys.  [ECF No. 860 at 35–37].  Specifically, Defendants

contend that this patient testimony was irrelevant to Defendants' state of mind and did not bear

on the central issue at trial of whether Defendants knowingly joined the charged conspiracy.  [Id.

at 35–36].[95]

---

[95] Defendant Gurry also argues that a new trial is warranted because the Government improperly
invoked inflammatory aspects of patient testimony during its closing and rebuttal arguments in
order to "exploit the emotions of the jury."  [ECF No. 859 at 7–8].  Because defense counsel did
not contemporaneously object to the rebuttal argument on this ground, the Court reviews this
claim for plain error.  See United States v. Serrano-Delgado, 375 F. Supp. 3d 157, 166 (D.P.R.
2019).  "Review for plain error requires determining whether an error occurred which was clear
or obvious and which not only affected the defendant's substantial rights but also seriously
impaired the fairness, integrity, or public reputation of judicial proceedings."  United States v.
Wilkerson, 411 F.3d 1, 7 (1st Cir. 2005).

Defendant Gurry points to factual statements concerning the potency and danger of Subsys and
commentary to the effect that Defendants put "[p]rofits over patients" and patients "at the other
end of this scheme" were "exploited."  [ECF No. 859 at 8 & nn.6–7].  While these statements
might have pulled at the jury's emotions, the Court does not conclude that they were improperly
inflammatory or that a new trial is warranted.  See United States v. Nelson-Rodriguez, 319 F.3d
12, 39 (1st Cir. 2003) ("Closing arguments traditionally have included appeals to emotion . . . .
The outer limit on emotional appeals is generally stated as a prohibition against arguments
calculated to inflame the passions or prejudices of the jury." (internal quotations omitted)).
Some of the statements cited are purely factual, and none run afoul of the Court's motion in
limine ruling concerning patient testimony, which limited the scope of what would be admissible
and did not limit how the admissible evidence could be used.  All told, the comments fell within
the bounds of permissible argument and do not amount to plain error.  Compare United States v.
Cartagena-Carrasquillo, 70 F.3d 706, 713 (1st Cir. 1995) (holding that prosecutor's references to
attending the same church as many of the jurors, and to which the defendant did not belong, and
repeated use of the word "we" improperly suggested an alliance between the government and the

Prior to trial, Defendants moved *in limine* to exclude evidence of patient harm and patient testimony.  [ECF Nos. 572, 645].  The Court granted in part and denied in part these motions and permitted the Government to elicit testimony concerning "the medical care that patients received from co-conspirator physicians, or the medical status of patients to show that prescribing was not medically necessary or was in excess of what was medically necessary, or that a patient's medical status was different from what was represented to insurers . . ." and to "present evidence that a patient became addicted to Subsys, the medical consequences of that addiction, and whether and how prescribing practices changed thereafter."  [ECF No. 676 at 2].  The Court prohibited the Government from presenting evidence "concerning the social consequences to the patient of wrongful prescribing or addiction, such as loss of employment, erosion of familial relationships, and the like" because to go beyond the physical consequences of addiction "runs the risk of arousing undue sympathy in violation of Federal Rule of Evidence 403."  [Id.].

At trial, the Government called nine patients who had been treated by Dr. Paul Madison, Dr. Gavin Awerbuch, Dr. Judson Somerville, Dr. Xiulu Ruan, Dr. Mahmood Ahmad, and APRN Kimberly Alfonso.  See [3/20 Tr. at 114:13–118:25, 128:18–152:10 (Cathy Avers); 152:14–221:17 (Paul Lara); 3/21 Tr. at 70:2–114:13 (Sarah Dawes), 182:19–199:24 (Betty Carrera); 3/22 Tr. at 49:4–69:19 (Woodrow Chestang); 3/26 Tr. at 67:6–96:5 (Scott Byrd); 3/27 Tr. at 249:14–277:8 (Kendra Skalnican); 3/28 Tr. at 137:12–181:8 (Michelle Dilisio), 181:12–207:23 (Alicia Hinesley)].  The Government elicited from these witnesses their medical history, including tried-

---

church), and Arrieta-Agressot v. United States, 3 F.3d 525, 527 (1st Cir. 1993) (concluding that statements characterizing defendants in drug case as "soldiers in the army of evil" were inflammatory and improper), with United States v. Johnson, 952 F.2d 565, 574 (1st Cir. 1991) (characterizing opening remarks that referenced a history of terrorist activity and described the case as "an echo of sadness from the graves of dead generations" as within "the bounds of adversarial propriety").

and-failed medications and whether they suffered from cancer or dysphagia; information concerning when and how they first were prescribed Subsys; dosing history for Subsys prescriptions; and information relating to when they stopped taking Subsys. Some patients discussed brief observations concerning their prescriber's office, but inflammatory responses were struck. See, e.g., [3/20 Tr. at 118:10–19, 157:6–10; 3/22 Tr. at 55:14–19; 3/26 Tr. at 70:12–17]. There were a few references to addiction, but the testimony largely did not veer into the social consequences of addiction. See, e.g., [3/20 Tr. at 136:3–7; 3/22 Tr. at 56:7–19; 3/26 Tr. at 70:24–71:7, 75:18–76:19; 3/27 Tr. at 259:4–18; 3/28 Tr. at 147:22–148:8]. Finally, some patients discussed side-effects of taking Subsys at the dosages they were prescribed. See, e.g., [3/20 Tr. at 165:23–166:21; 3/21 Tr. at 78:17–22, 191:25–192:3, 192:22–25; 3/28 at 147:17–21, 192:8–11, 205:22–206:3].

The Court did not err in admitting testimony from the nine patients. The patient testimony at trial conformed to the Court's motion *in limine* ruling in which it allowed only limited use of patient testimony and carved out most inflammatory aspects, such as the social consequences of addiction. As explained in the Court's motion *in limine* ruling, and as the Government's asserts, this testimony was relevant to show the medical care that patients received from co-conspirator prescribers, to demonstrate that certain prescriptions were not medically necessary or were excessive, and to support claims that a patient's medical status was different from what was represented to insurers. See [ECF No. 936 at 38–39]. While Defendants are correct that some of this information could have been presented by a stipulation, [ECF No. 860 at 37 n.22], the Government was not obliged to agree to a stipulation, see Old Chief v. United States, 519 U.S. 172, 189 (1997) (noting the "accepted rule" in trials that "the prosecution is entitled to prove its case free from any defendant's option to stipulate the evidence away"), and

the prejudicial impact of the evidence had already been reduced by the Court's motion *in limine* ruling.

       2.    <u>Dr. Chun's Addiction</u>

Defendants collectively seek a new trial on the basis that "highly prejudicial" "guilt by association evidence" concerning Dr. Steven Chun's alleged opioid addiction was admitted in error through the testimony of Aqsa Nawaz. [ECF No. 860 at 37–38]. Defendants further contend that this evidence was irrelevant because the Government did not present evidence that Defendants were aware of Dr. Chun's addiction. [<u>Id.</u> at 38]. The Government argues that evidence of Dr. Chun's addiction was properly admitted and that any possible harm from this evidence was addressed by the Court's limiting instruction. [ECF No. 936 at 40–43].

Ms. Nawaz was Dr. Chun's girlfriend and was hired by Insys as an "area business liaison" ("ABL") for Dr. Chun's office. [3/19 Tr. 10:6–8, 18:17–24]. On direct examination, Ms. Nawaz testified to her work as an ABL and her relationship with Dr. Chun. <u>See generally</u> [3/18 Tr. at 204:24–209:23; 3/19 Tr. at 9:10–62:12]. On cross-examination, counsel for Defendant Rowan inquired into Dr. Chun's background and credentials. <u>See</u> [3/19 Tr. at 95:23–96:21 (describing Sloan Kettering as "one of the most famous cancer institutes in the world" and the University of Washington as "number 11 in the country")]. Following cross-examination, the Government requested a sidebar during which it advised the Court of its intention to address Dr. Chun's substance abuse on redirect, which the Court permitted. [3/19 Tr. at 113:5–16, 114:5–18, 115:1–3].

On re-direct, over Defendants' objection, the Government asked Ms. Nawaz about Dr. Chun's addiction to fentanyl products. [3/19 Tr. at 135:3–136:8]. On re-cross, Defendants addressed Dr. Chun's addiction and asked Ms. Nawaz whether she ever informed Defendant

Rowan or anyone at Insys about Dr. Chun's addiction, to which she responded that she did not

know.  [3/19 Tr. 137:25–138:12].

The next day, Defendants moved for a mistrial on the basis that this testimony was meant

as a "character assassination" and was not given with any time frame within which it occurred.

[3/20 Tr. at 26:15–28:17].  The Court denied the motion.  [Id. at 28:21].  Defendants then

requested "some other serious remedy."  [Id. at 28:22–23].  The Court heard argument on a

proposed instruction, [id. at 202:10–17, 203:10–12, 204:6–9, 217:6–23, 277:1–292:17], and gave

the following instruction the next day:

> This is just another place where I want to make sure that you guys are clear on the
> law. A couple of days ago Mr. Kendall elicited testimony from Aqsa Nawaz about
> the medical training and character of Dr. Chun. The government cross-examined
> Ms. Nawaz on less positive aspects of Dr. Chun's character. In particular she was
> asked and answered questions about drug use by Dr. Chun.  I instruct you that Ms.
> Nawaz's testimony about Dr. Chun's alleged drug use goes only to your evaluation
> of Ms. Nawaz's credibility. It's not direct evidence against any of the defendants
> unless and until there's evidence that they had knowledge of Dr. Chun's alleged
> drug use. I don't know what evidence remains in this case, but at the moment there
> is no such evidence in the record. As I told you at the beginning and I'll tell you
> again at the end and I'm going to tell you now, it's your job to decide the facts. You
> can believe some, all or none of any individual witness's testimony. Whether or not
> you believe Ms. Nawaz's testimony on that point, it's not evidence of these
> defendants' state of mind unless there's evidence presented that they knew or had
> reason to know of any drug use on the part of Dr. Chun.

[3/21 Tr. at 68:25–69:21].  Defendants did not object to the instruction as given.  [Id. at 69:22–

25].

There was no error in admitting evidence of Dr. Chun's addiction because the testimony

was relevant to Ms. Nawaz's credibility.  She testified on cross-examination that Dr. Chun was a

highly credentialed physician who had graduated from some of the most prestigious programs in

the country, thus creating the impression that he was a highly competent physician, with

unassailable credentials.  See [3/19 Tr. at 95:23–96:21].  On re-direct, the Government was

entitled to inquire into information, including drug use, to counteract the perception that Dr.

Chun was a paragon of medical skill and virtue.  While not every invocation of an individual's professional credentials will open the door to a similar re-direct, it was clear during cross-examination that defense counsel was attempting to bolster Dr. Chun's reputation using his credentials.  See [3/20 Tr. at 203:21–204:5 ("MS. WILKINSON:  Your Honor, listing [Dr. Chun's] credentials isn't going to his character . . . .  THE COURT: The gist of that testimony was what an upstanding, fantastic, well-trained, reputable physician [Dr. Chun] was.  . . . And I suspect that [Defendant Rowan's counsel] was trying to walk the line, but he got it too close.")].  Furthermore, even if the Court had erred in permitting the Government to elicit this testimony on re-direct, the detailed limiting instruction served to adequately mitigate any possible harm.

      3.     <u>"Jess Strategy" Email</u>

Defendant Gurry argues that an email he sent to himself with the subject line "Training on btcp vs btp …Jess strategy" and no body text ("Exhibit 334") was admitted in error during the direct examination of Ms. Gurrieri because it was not relevant, and even if it was relevant, its probative value was substantially outweighed by a danger of unfair prejudice, confusion of issues, and misleading the jury.  [ECF No. 859 at 8–10].  The Government asserts that the email was properly admitted as relevant to Defendant Gurry's knowledge of "the spiel" and that the Court did not err in its Rule 403 analysis.  [ECF No. 936 at 44–45].

Ms. Gurrieri, who managed the IRC, testified that Jessica Chavez, a prior authorization specialist, invented what became known as "the spiel" and that Defendant Gurry instructed other prior authorization specialists to use "the spiel" on calls with insurers.[96]  [2/22 Tr. at 234:3–8,

---

[96] There were several versions of the spiel, but one typical version included the statement: "Yes. The physician is aware that the medication is intended for the management of breakthrough pain in cancer patients, and the physician is treating the breakthrough pain."  [2/22 Tr. at 232:7–12]. This would typically be used in response to an inquiry from the insurer as to whether the patient was being treated for breakthrough cancer pain.

238:14–239:7]. During Ms. Gurrieri's direct examination, the Government sought to introduce Exhibit 334, and Defendant Gurry objected on relevance grounds. [Id. at 248:9–249:4]. At sidebar, the Government argued that Exhibit 334 was relevant because the subject line of the email referenced "breakthrough pain versus breakthrough cancer pain" and Jessica Chavez. [Id. at 249:14–21]. Defendant Gurry argued that because the email only had a subject line with no body text, "we don't know what the heck he was talking about," and that Ms. Gurrieri would have no idea what Defendant Gurry meant. [Id. at 249:22–250:2]. The Court overruled the objection but stated that it was "close." [Id. at 250:20–21 (observing also that "[t]he bar of relevance is low")].

The Court did not err in admitting Exhibit 334. Exhibit 334 was relevant to the issue of Defendant Gurry's awareness of "the spiel." Because the email only contained a subject line that used abbreviations, it is not clear what Defendant Gurry meant or what he was thinking, but in any case, the document is relevant to the concept of training on breakthrough pain at the IRC, his awareness of "the spiel," and his knowledge of the difference between breakthrough pain and breakthrough cancer pain for purposes of the IRC and its mission.

Furthermore, to the extent that Defendant Gurry may be pressing an objection to this evidence under Rule 403, any danger of undue prejudice, confusing the issues, or misleading the jury did not outweigh Exhibit 334's relevance.[97] While the ultimate meaning of the document was ambiguous, the topics it addressed were clear, and there was no risk of confusing the issues

---

[97] Defendant Gurry only made a relevance objection to Exhibit 334 at trial. See [2/22 Tr. at 249:1–250:22]. The Government argues that he has therefore waived any objection under Rule 403. [ECF No. 936 at 44–45]. The Court does not address the waiver issue because it addresses the Rule 403 objection on the merits.

or misleading the jury.  Furthermore, any danger of unfair prejudice did not outweigh the document's relevance.

Finally, the Court rejects Defendant Gurry's contention that the Government misused this evidence in its rebuttal argument by arguing that it corroborated some of Ms. Gurrieri's testimony that Mr. Gurry knew about "the spiel."  [4/5 Tr. at 181:12–22].  The Government's rebuttal argument was based on a fair inference that could be drawn from Exhibit 334, just as Defendant Gurry's counsel argued the opposite in her closing.  See [4/5 Tr. at 153:3–15 ("Why isn't it just as likely, if not more likely, that when [Mr. Gurry] hears about Jess strategy, he figures Jess and the IRC need to be trained on the difference [between breakthrough cancer pain and breakthrough pain]?")]; cf. United States v. Ponzo, 853 F.3d 558, 583 (1st Cir. 2017) (reiterating longstanding rule that prosecutors may argue facts in evidence and inferences fairly drawn from the evidence).

### 4.    Simon / Andersson Text Messages

Defendant Simon argues that his right to a fair trial was compromised by the erroneous admission of a series of text messages between him and Torgny Andersson, a sales representative, and that the Court's limiting instruction was insufficient.  [ECF No. 863 at 11–12].  He claims that the Court erred by admitting these text messages because the two prescribers discussed in the text messages were never identified by the Government as unindicted co-conspirators.  [Id. at 12].

On March 17, 2019, the Government moved in limine to admit a series of text messages between Defendant Simon and Mr. Andersson, which Defendants opposed the next day.  [ECF Nos. 778, 781].  On March 20, 2019, during a break in the trial, the Court heard argument on the motion in limine, which it then granted in part and denied in part.  [3/20 Tr. at 204:15–209:12].

The Court ruled that one exchange would only be admitted with a stipulation from the Government that the referenced physician was not bribed, that one exchange would not be admitted at all, and that the remaining two exchanges would be admitted.  [ECF No. 792].

On March 29, 2019, during the direct examination of Bridget Horan, an FBI forensic accountant, the parties agreed to a stipulation regarding Exhibits 2362, 2363, and 2344, which contained the text messages at issue.  [3/29 Tr. at 138:17–139:25]; see also [3/28 Tr. at 13:4– 14:1 (noting that counsel for Defendant Simon and the Government have reached an agreement regarding the text messages and that the Government added in all of the context defense counsel requested)].  The parties stipulated, and the Court read into the record, that "references to any prescriber in the text messages are not being offered as evidence that the prescriber was bribed, and [the jury] may not consider it for that purpose."  [3/29 Tr. at 139:13–16].  The text messages were then read into the record.  [Id. at 141:6–142:20, 143:11–144:4, 144:11–146:5, 146:12– 148:7].

There was no error.  The text messages were statements made by Mr. Andersson, an unindicted co-conspirator, to Defendant Simon about a plan to bribe unidentified doctors, and as such were admissible.  See [ECF No. 936 at 49]; Fed. R. Evid. 801(d)(2)(E) (admissibility of co-conspirator statements).  References to specific doctors in the messages were replaced with innocuous phrases such as "Doctor 1" to avoid references to physicians who were not unindicted co-conspirators.  Lastly, Mr. Simon's challenges to the stipulation read by the Court concerning references to prescribers in the text messages, which he characterizes as an insufficiently remedial "curative instruction," are unfounded as they pertain to a stipulation that was agreed to by the parties prior to being presented to the jury.

5.      Paul Lara's Testimony Concerning Dr. Somerville's Suspension

Defendant Simon argues that the Government improperly elicited testimony concerning the fact that Dr. Somerville was suspended from his former patient, Paul Lara.  [ECF No. 863 at 10–11].  The Government asserts that there is no evidence that it deliberately elicited the testimony.  [ECF No. 936 at 45–46].

During Mr. Lara's testimony, the Government asked if he had stopped seeing Dr. Somerville, to which he responded that he "went to go see Dr. Somerville," and learned that Dr. Somerville had been "suspended."  [3/20 Tr. at 171:12–17].  The Court quickly sustained defense counsel's objection and heard counsel at sidebar.  [Id. at 171:18–22].  The Court then struck the question and answer and advised the jury not to consider the testimony that had been struck.  [Id. at 173:3–16].  Though the Court had previously instructed the Government that it did not think that it could elicit evidence that Dr. Somerville had been suspended, absent evidence that people at Insys were contemporaneously aware of the suspension, it did not make a "blanket ruling" on the evidence.  [3/12 Tr. at 23:7–10, 24:12–17].

Mr. Lara's testimony concerning Dr. Somerville's suspension was erroneously elicited at trial through an unexpected response.  The question that prompted the improper testimony was "what did you do then," where "then" referred to the time when Mr. Lara stopped seeing Dr. Somerville.  [3/20 Tr. at 171:12–17].  This question seemed intended to elicit what provider Mr. Lara saw after Dr. Somerville while bypassing the fact of the suspension, but Mr. Lara did not interpret it that way.  The Court cannot conclude from the question posed that the Government deliberately elicited the challenged testimony.

A new trial is not warranted, however, because it is improbable that the error contributed to the verdict in light of the Court's swift remedial actions.  See DiMasi, 810 F. Supp. 2d at 362.

Here, the Court immediately sustained the objection, which cut off Ms. Lara's response mid-sentence, struck the testimony, and instructed the jury to disregard the challenged testimony if they had heard it. Any testimony the jurors may have heard was ambiguous and did not give context to who or what was suspended or the identity of the "they" who had told him about the suspending. See [3/20 Tr. at 171:16–17 ("I went to go see Dr. Somerville, and they said that they had suspended . . . .")].

6.    Ty Rustin's Testimony Concerning Dr. Somerville's Suspension

Defendant Simon argues that the Government improperly elicited testimony concerning Dr. Somerville's suspension from Ty Rustin, an Insys sales representative, along with commentary on physicians who were treating Dr. Somerville's former patients. [ECF No. 863 at 10–11].

During the Government's direct examination of Mr. Rustin, Defendant Simon objected to the use of an email sent by Mr. Rustin in which he reported on how the physicians who had taken Dr. Somerville's former patients were dealing with the Subsys prescriptions. [3/14 Tr. at 211:24–212:19]. At sidebar, the Court advised the Government that it "would be prudent" to proceed with the testimony without the email and stated that the Court would give a hearsay instruction. [Id. at 213:3–12]. The Government then asked Mr. Rustin about his interactions with a Dr. Martinez, who had told him that Dr. Somerville's patients needed to be titrated down to lower doses, and about how Mr. Rustin conveyed this information to Defendant Lee and Anna Bolet, his manager. [Id. at 214:14–216:20; 3/15 Tr. at 16:8–18:20]. Before the Government got into the specifics of what Dr. Martinez told Mr. Rustin, the Court gave the following instruction:

> [Mr. Rustin is] about to testify to information that he got from Dr. Martinez's office. It's the same instruction I've given you before. Dr. Martinez is not here. We're not going to cross-examine him. So the information that he gets is not admitted for the truth of the matter asserted. It's only admitted for the fact that he gets information

57

and then we'll see what he does with it. We have no idea if the information is true or not, but he receives the information and then it comes in for how it affected his state of mind.

[3/14 Tr. at 215:7–16].

Mr. Rustin's testimony was not admitted in error. The challenged testimony was elicited in a fair manner; it was also limited to the specific purpose of notice to Defendant Lee and others about dosing, and therefore did not violate the Confrontation Clause. See Crawford v. Washington, 541 U.S. 36, 59 n.9 (2004) ("The [Confrontation] Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.").

## IV.       INDIVIDUAL MOTIONS

Defendants Gurry, Simon, Lee Rowan, and Kapoor each filed individual motions that supplement the arguments made in Defendants' joint Rule 29 and Rule 33 motion. See [ECF Nos. 859, 861, 862, 863, 864]. Below, the Court discusses arguments specific to individual Defendants that have not already been addressed.

### A.       Lee

Defendant Lee challenges the Court's pretrial ruling that denied her motion to sever on the basis that she had failed to demonstrate that evidence concerning the IRC would not be admissible against her at a separate trial. [ECF No. 864 at 3]; see also [ECF No. 666 at 5–6]. She argues that the Government's representations that the evidence would show "that she dealt extensively with the Insys Reimbursement Center (IRC), and also supervised others who dealt with the IRC. . . " and that she "was enthusiastically engaged in all facets of the conspiracy" were false. [ECF No. 864 at 1–2]. She further contends that, as a result of these purportedly false assertions, "the Government was able to prove its case against [her] through the use of prejudicial IRC evidence and other evidence that never would have been admissible against her

in a separate trial."  [Id. at 2].  The Government denies that its representations were false.  See [ECF No. 936 at 68–69].

The evidence presented at trial supports the Government's position that it could, and did, demonstrate that Defendant Lee worked with the IRC, supervised others who dealt with the IRC, and was engaged in all facets of the conspiracy.  As previously discussed in the context of the mail and wire fraud charges, Defendant Lee worked closely with Ms. Gurrieri at the IRC during its pilot phase.  See supra Section II.D.4.  Defendant Lee also supervised sales representatives and ABLs who dealt with the IRC and handled the large volume of opt-in forms for prescriptions written by Drs. Madison and Awerbuch.  See supra Section II.D.4.  Finally, as the jury found, the evidence supported a conclusion that Defendant Lee was a participant in the conspiracy, which included bribing healthcare practitioners to write prescriptions for Subsys and ensuring that those prescriptions were covered by insurers.  See supra Section II.D.4.  Defendant Lee's contention that, had her trial been severed, it "would not have contained the prejudicial evidence from the IRC" is, therefore, without merit.[98]

Defendant Lee further argues that severance was appropriate under Federal Rule of Criminal Procedure 14(a) because she was prejudiced by joinder.  [ECF No. 864 at 9–12].  As the Court has previously explained, Rule 14(a) permits a Court to sever a defendant's trial from her co-defendants where a consolidated trial "appears to prejudice a defendant or the government."  Fed. R. Crim. P. 14(a).  In cases where defendants have been properly joined, courts should grant severance motions "only if there is a serious risk that a joint trial would

---

[98] Defendant Lee's argument that joinder was improper because no evidence connected her to the IRC fraud, see [ECF No. 864 at 6–9], fails for the same reason.

compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro v. United States, 506 U.S. 534, 539 (1993).

Here, Defendant Lee contends that there was spillover prejudice from the IRC evidence, in particular from calls made by IRC representatives. See [ECF No. 864 at 10–12]. This argument is unavailing, however, because the evidence at trial showed her direct involvement with the IRC and supervision of individuals who worked with the IRC, and evidence concerning the IRC would have therefore been admissible against her even if she were tried separately. Furthermore, to the extent there was any spillover prejudice from one Defendant to another based on evidence regarding the IRC, Defendant Lee does not take issue with the Court's instructions to the jury on this point. See [4/4 Tr. at 42:10–54:3]; Casas, 425 F.3d at 50 ("The court took adequate measures to guard against spillover prejudice by instructing the jury to consider each charged offense, and any evidence relating to it, separately as to each defendant."); Natanel, 938 F.2d at 308 (similar); see also supra Section III.B (addressing argument of spillover prejudice from CSA claim).

Defendant Lee also suggests that a large portion of the other evidence at trial prejudiced her and would not have been admissible in a separate trial. See [ECF No. 864. at 3–5]. This includes (1) evidence of executive meetings involving Mr. Babich, Mr. Burlakoff, and Mr. Napoletano concerning the ISP; (2) testimony from 34 witnesses who allegedly gave no relevant or incriminating testimony about Defendant Lee but testified about management and board meetings, the IRC, and medical doctors other than Drs. Awerbuch or Madison, or APRN Alfonso; and (3) character evidence from Mr. Babich, Ms. Gurrieri, and Jodi Havens. [Id.]. As with the IRC evidence, much of this evidence would have been admissible against Defendant Lee in a separate trial as statements of co-conspirators made in furtherance of the charged

conspiracy.  See Fed. R. Evid. 801(d)(2)(E); United States v. Arias, 848 F.3d 504, 515 (1st Cir.

2017) ("In order to admit a statement under Rule 801(d)(2)(E), a district court must conclude, by

a preponderance of the evidence, that the 'declarant and the defendant were members of the same

conspiracy and that the statement was made in furtherance of the conspiracy.'" (quoting United

States v. Paz-Alvarez, 799 F.3d 12, 29 (1st Cir. 2015)).  Furthermore, Mr. Babich, Ms. Gurrieri,

and Ms. Havens each interacted directly with Defendant Lee, and their observations about her

and her work would have been admissible against Defendant Lee in a separate trial.

Accordingly, Defendant Lee's motion for acquittal or new trial on the ground that the

Court erred in denying her request for severance is denied.[99]

### B.    Kapoor

Defendant Kapoor seeks a new trial based on the weight of the evidence on the fifth and

sixth elements of the RICO conspiracy charge, which required findings that he "knowingly and

willfully agreed to be a member of the criminal conspiracy alleged in the indictment" and

"agreed and specifically intended that he, she or other members of the conspiracy would commit

conduct that constitutes at least two racketeering acts of the type or types alleged in the

indictment."  [ECF No. 862 at 5–7].

As previously stated, "the remedy of a new trial is sparingly used, and then only where

there would be a miscarriage of justice and where the evidence preponderates heavily against the

verdict."  Merlino, 592 F.3d at 32 (quoting Wilkerson, 251 F.3d at 278).  Although a district

court may weigh the evidence and evaluate the credibility of witnesses when deciding a motion

---

[99] Defendant Lee contends that the Court "could have conducted a separate trial for [Defendant] Lee pursuant to its trial management functions" even if it did not order severance.  [ECF No. 864 at 12].  Defendant Lee did not raise this ground for severance during trial and does not assert that the Court erred in not exercising its trial management functions in this way.  See generally [ECF No. 588].  Therefore, this argument does not raise grounds for a new trial.

under Rule 33, the "judge is not a thirteenth juror who may set aside a verdict merely because [s]he would have reached a different result." Rivera-Rangel, 396 F.3d at 486 (quoting Rothrock, 806 F.2d at 322).

Here, the Court denies Defendant Kapoor's motion for a new trial because there was no miscarriage of justice and the evidence strongly supported his agreement to be a member of the conspiracy and also his agreement that a co-conspirator would commit two or more acts of each of the two remaining predicate acts: ordinary mail and wire fraud. The indictment identified the object of the conspiracy as "to increase profits for the enterprise and [Defendants] by conducting the affairs of the enterprise through bribes, fraud, and the illicit distribution of Subsys, a product containing a Schedule II opioid." [ECF No. 419 at 8]. The weight of the evidence supported a conclusion that Defendant Kapoor agreed to conduct Insys' affairs through bribes and fraud.

The evidence showed that Defendant Kapoor was heavily invested in the success of the IRC: he approved strategies and funds for the IRC, demanded upwards of a 90% success rate for prior authorizations, and insisted on being kept apprised of what was working.[100] The success of the IRC was a critical component of Insys' business model, and Defendant Kapoor was briefed on and approved of the misleading strategies that allowed prior authorization specialists to reach the quotas set for them, including relying on dysphagia, the history of cancer, and the spiel.[101]

---

[100] See [2/14 Tr. at 75:17–76:3, 80:14–81:8 (Babich testimony that "Factual Insurance Data" spreadsheet was "what [he] was referring to earlier where [Kapoor], numerous times, throughout the time I was there, would request the IRC to put together what was the facts of approval, what worked for some plans and what didn't work for some plans."), 88:16–22]; see also [2/25 Tr. at 22:6–19 (Gurrieri testimony that she would meet or speak with Gurry almost daily after getting instructions from Defendant Kapoor and that Defendant Kapoor wanted close to a 100 percent prior approval rate)].

[101] See [2/14 Tr. at 66:17–67:18]; see also [2/14 Tr. at 74:7–9 (Babich testifying that, "Every time you got approval for a commercially-paid script, that was money in our pockets."), 78:4–6, 85:25–86:14 (Babich testimony that dysphagia was discussed on the 8:30 a.m. calls in early

The evidence connecting Defendant Kapoor to the IRC adequately supports the conclusion that he agreed to and intended the predicate acts of wire and mail fraud.

Defendant Kapoor's request to essentially excise the testimony of Mr. Babich, Mr. Burlakoff, and Mr. Napoletano for lack of credibility is extreme and unwarranted.[102]  [ECF No. 862 at 7–17].  Each of these men underwent lengthy cross-examinations and both their credibility and the discrepancies in their testimony were emphasized in closing to Defendant Kapoor's advantage.  See, e.g., [4/4 Tr. at 127:25–128:9, 133:12–15, 138:6–12, 143:5–144:16, 144:24–146:11].  The jury rejected defense counsels' theory and seemingly accepted at least portions of the testimony of the cooperating witnesses.  The Court will not second guess these jury decisions or the conclusions drawn by the jury about witness credibility.

Defendant Kapoor also challenges several pieces of evidence on the ground that they "appealed to the jury's emotions instead of the elements of the charge."  [ECF No. 862 at 21–24].  Specifically, he challenges the parody rap video, the testimony from sales representative Sue Beisler concerning her physical relationship with Defendant Kapoor, and the testimony from Mr. Burlakoff that he was "threatened" by Defendant Kapoor who he described as "ha[ving] a

---

2013), 87:16–88:2, 91:14–92:14 (Babich testimony that the spiel was discussed on 8:30 a.m. calls); 2/22 Tr. at 207:16–208:5 (Gurrieri testimony that it was a lost opportunity if a physician's office or pharmacy handled the prior authorization instead of the IRC because the IRC was more successful in getting prior authorizations approved by misleading insurers, and if the prior authorization was approved, "[t]he sales rep would get paid, Insys would get paid, and the script would get paid."); 3/5 Tr. at 229:5–230:4 (Burlakoff testimony that when he learned how successful the IRC was with dysphagia "Dr. Kapoor was really excited and commended them on their research and feedback and basically said, sh[*]t, everybody has difficulty swallowing, right, Alec? And I was, like, yeah, right, Dr. Kapoor."), 230:5–232:5 (Burlakoff testimony that Dr. Kapoor was present at meetings where "history of cancer" was discussed)].

[102] Defendant Kapoor alleges that the Government violated his due process rights under Napue v. Illinois, 360 U.S. 264, 269 (1959), which held that prosecutors may not knowingly use false evidence to obtain a conviction.  [ECF No. 862 at 11].  There is no evidence that the Government knowingly used false evidence during trial.

history of very much violence." [Id.].  Defendant Kapoor does not contest the admissibility of this evidence, but instead contends that its inclusion in the trial "distracted the jury" from the elements of the charge and the burden of proof, which rendered the trial unjust and requires a new trial.  [Id. at 21].

These claims lack merit and are not grounds for a new trial.  As an initial matter, the testimony from Mr. Burlakoff now challenged by Defendant Kapoor was elicited by Defendant Kapoor's counsel on cross-examination.  See [3/7 Tr. at 30:15–17, 171:10].  Testimony elicited by defense counsel on cross-examination that is unfavorable to her client is not a basis for a new trial, particularly where the testimony came into the record without any contemporaneous objection or motion to strike.  Cf. United States v. Reda, 787 F.3d 625, 630 (1st Cir. 2015) ("In this circuit, '[o]rdinarily, a party who elicits evidence would waive any claim that its admission was error.'" (quoting United States v. Harris, 660 F.3d 47, 52 (1st Cir. 2011)).  In addition, neither the parody video nor the testimony from Ms. Beisler was improperly admitted.  [ECF No. 936 at 74].  The video was admitted without any objection from Defendants and the testimony elicited from Ms. Beisler was fair impeachment testimony relevant to demonstrate her bias towards Defendant Kapoor.  The appropriate admission of this evidence does not warrant the drastic remedy of a new trial in "the interests of justice."  See DiMasi, 810 F. Supp. 2d at 362; see also Fed. R. Crim. P. 33.

### C.      Simon

#### 1.      Error to Deny Motion for Mistrial

Defendant Simon "renews his argument that the Court erred in denying his motion for a new trial and/or an evidentiary hearing based on the events surrounding Mr. Rustin's changed testimony." [ECF No. 863 at 7 n.3].  Defendant Simon sought a mistrial during trial based on a

concern that Mr. Rustin had been "browbeaten . . . pressured . . . coached" by the Government

when, during Mr. Rustin's second day of testimony, Mr. Rustin attempted to clarify responses he

had given on direct examination the day before. [ECF No. 827 at 1–4]. The Court concludes

that its decision to deny the motion for a mistrial was not error for the reasons stated in its order,

namely that no improper testimony came before the jury, Defendant Simon was afforded a full

opportunity to cross-examine Mr. Rustin on his meetings with the Government and on the

alleged changes in his testimony, and Defendant Simon did not make a showing that an

evidentiary hearing was necessary. [Id. at 6–8].

### 2.      Ineffective Assistance of Counsel

Defendant Simon seeks a new trial pursuant to Rule 33 on the ground that his trial

counsel's alleged conflict of interest violated his Sixth Amendment right to counsel. [ECF No.

974 at 21–22]. The Court first addresses whether the motion is timely, and concluding that it is,

reviews the claim on the merits.

### a.      Whether Claim of Ineffective Assistance of Counsel Is Time-Barred

The Government urges the Court to deny this motion as untimely pursuant to Federal

Rules of Criminal Procedure 33 and 45. [ECF No. 977 at 2–5]. Rule 33 requires that post-trial

motions not based on newly discovered evidence be filed within 14 days of a verdict. Fed. R.

Crim. P. 33. Here, the verdict was taken on May 2, 2019, and the 14-day period would have

expired on May 16, 2019. See [ECF No. 841]. Consistent with Fed. R. Crim. P. 45 which

permits a court to extend the time required to file certain papers, the Court permitted Defendants

to file post-trial motions by June 6, 2019. [ECF No. 852]. While Rule 45(b) formerly stated that

a court could not extend the time for taking action under Rule 33 except as provided in those

rules, the Rule was amended to allow extensions where the delay was caused by excusable

neglect.  See Fed. R. Crim. P. 45, advisory committee's note, 2005 amendments ("[I]f for some

reason the defendant fails to file the underlying motion [under Rule 33] within the specified time,

the court may nonetheless consider that untimely motion if the court determines that the failure

to file it on time was the result of excusable neglect.").

     "In evaluating whether a party has cleared the 'excusable neglect' hurdle, courts have

used the four-factor test set forth by the Supreme Court in Pioneer Investment Services Co. v.

Brunswick Associates LP, 507 U.S. 380 (1993).  The four Pioneer factors are: (1) 'the danger of

prejudice to the [non-moving party]'; (2) 'the length of the delay and its potential impact on

judicial proceedings'; (3) 'the reason for the delay, including whether it was within the

reasonable control of the movant'; and (4) 'whether the movant acted in good faith.'"  United

States v. French, No. 12-cr-00160, 2015 WL 7012732, at *4 (D. Me. Nov. 12, 2015).  Of the four

factors, the reason for delay is given the most weight.  See Dimmitt v. Ockenfels, 407 F.3d 21,

24 (1st Cir. 2005).

     Here, application of the Pioneer factors leads to the conclusion that there was excusable

neglect.  First, the reason for the delay stems from when Defendant Simon recognized the

conflict of interest issue, which he avers was on or around July 15, 2019, and the fact that he then

undertook to hire new counsel to represent him.  See [ECF No. 983 at 9–10].  This is not a

situation where the delay stemmed from "inadvertence, ignorance of the rules, or mistakes

construing the rules."  See Pioneer, 507 U.S. at 392.  Instead, it is a situation where the claim

could not have been brought earlier because trial counsel could not have been expected to raise

the conflict of interest issue as against himself, particularly where trial counsel disputes the

existence of any actual conflict of interest.  See [ECF No. 983 at 9]; see, e.g., Massaro v. United

States, 538 U.S. 500, 502–03 (2003) (noting that it is axiomatic that "an attorney . . . is unlikely

to raise an ineffective-assistance claim against himself"); United States v. Munoz, 605 F.3d 359, 369 (6th Cir. 2010) (stating in the habeas context that "courts have long made special allowances for defendants who fail to timely raise ineffective-assistance-of-counsel claims against lawyers who continue to represent them at the time those claims would properly have been raised").

Second, the length of the delay was not extreme and the relatively limited delay did not impact post-trial proceedings as the briefing and hearing schedule on this motion was integrated into the schedule for the earlier filed motions.[103]  Third, the danger of prejudice to the Government as the non-moving party is minimal.  The length of delay was limited, other post-trial motions were still pending, and there is no suggestion that any evidence was lost or altered during the delay.  While the Government would be prejudiced by having to re-litigate this case as to Defendant Simon, it would be preferable to do it close in time to the prior proceeding, rather than following a lengthy appeal.  Cf. French, 2015 WL 7012732, at *4 (finding that delay of 618 days increased prejudice to Government because witnesses would become unavailable and memories would fade).  Finally, the Court does not find any bad faith by Defendant Simon in the timing of this motion.

Accordingly, applying the Pioneer factors, the Court concludes that Defendant Simon's late Rule 33 memorandum was the result of excusable neglect and therefore considers the issues raised by the filing on the merits.[104]

---

[103] The delay was at least 60 days, counting from June 6, the Court-set deadline for Rule 33 motions, to August 5, the day Defendant Simon filed his motion for leave to supplement.  It was at most 116 days, counting from May 16, the day Rule 33 motions would have been due under the rule, to September 9, the day Defendant Simon's brief was filed.

[104] Although defendants typically raise claims for ineffective assistance of counsel through collateral challenges pursuant to 28 U.S.C. § 2255, a district court may adjudicate an ineffective assistance of counsel claim on a Rule 33 motion and an appellate court may entertain the issue

b.      Merits of Ineffective Assistance of Counsel Claim

Under the Sixth Amendment, "a defendant has a right to conflict-free representation."

United States v. Cardona-Vicenty, 842 F.3d 766, 771 (1st Cir. 2016) (quoting United

States v. Hernandez-Lebron, 23 F.3d 600, 603 (1st Cir. 1994)).  To prevail on a claim of

ineffective assistance of counsel, a defendant who "raised no objection at trial must demonstrate

that an actual conflict of interest adversely affected his lawyer's performance."  Cuyler v.

Sullivan, 446 U.S. 335, 348 (1980).  "[T]o show an actual conflict of interest, a defendant must

demonstrate 'that (1) the lawyer could have pursued a plausible alternative defense strategy or

tactic and (2) the alternative strategy or tactic was inherently in conflict with or not undertaken

due to the attorney's other interests or loyalties.'"  Ponzo, 853 F.3d at 575 (quoting United States

v. Colón-Torres, 382 F.3d 76, 88 (1st Cir. 2004)); see also United States v. Ramirez-Benitez, 292

F.3d 22, 30 (1st Cir. 2002).

Where a Foster hearing is not held,[105] "the government has the burden of persuasion of

demonstrating that prejudice to the defendant was improbable."  Cardona-Vicenty, 842 F.3d at

772 (quoting United States v. Mazzaferro, 865 F.2d 450, 454 (1st Cir. 1989)).  Here, the Court

was not notified of the potential conflict until after the trial and therefore no Foster hearing was

---

on direct review.  See, e.g., United States v. Mala, 7 F.3d 1058, 1063 (1st Cir. 1993); United
States v. Correia, No. 00-cv-10246, 2002 WL 31052766, at *5 (D. Mass. Sept. 13, 2002).

[105] A Foster hearing requires a trial court

> to comment on some of the risks confronted where defendants are jointly
> represented to insure that defendants are aware of such risks, and to inquire
> diligently whether they have discussed the risks with their attorney, and whether
> they understand that they may retain separate counsel, or if qualified, may have
> such counsel appointed by the court and paid for by the government.

United States v. Foster, 469 F.2d 1, 5 (1st Cir. 1972).

held.  Even assuming that a <u>Foster</u> hearing was necessary, the Court rejects Defendant Simon's

claim of ineffective assistance of counsel because the Government has demonstrated that any

prejudice to Defendant Simon was improbable since there was no actual conflict of interest under

<u>Cuyler</u>, 446 U.S. at 348.  <u>See id.</u>; <u>see also</u> <u>Ponzo</u>, 853 F.3d at 576 ("Consistent with Supreme

Court precedent holding that an actual conflict entails a conflict 'that adversely affects counsel's

performance,' . . . our caselaw says that forgoing an implausible strategy or a strategy that could

inculpate the defendant does not constitute an actual conflict." (quoting <u>Mickens v. Taylor</u>, 535

U.S. 162, 172 n.5 (2002))).

Defendant Simon claims that his trial attorney, Steven A. Tyrrell ("Attorney Tyrrell"),

had a conflict of interest while representing him at trial because Attorney Tyrrell's law firm,

Weil Gotshal & Manges LLP ("Weil"), was representing Insys in a bankruptcy restructuring

matter at the same time.  <u>See</u> [ECF No. 974 at 24–26].  The parties disagree over whether the

potential conflict created by Weil's representation of Insys was waivable.[106]  <u>See</u> [ECF No. 974

at 29–33; ECF No. 977 at 13–14 (citing [ECF No. 975 (Tyrrell Aff.) ¶¶ 7, 10, 13)]].  Even if a

concurrent conflict of interest existed and had been waived, however, "a waiver doesn't

foreclose the possibility that an actual conflict could adversely have affected the adequacy of

representation and violated [Defendant Simon's] [S]ixth [A]mendment right to counsel."  <u>See</u>

<u>United States v. Fahey</u>, 769 F.2d 829, 835 (1st Cir. 1985).  Therefore, because any waiver would

not alter the ultimate analysis, the Court does not opine on whether there was a valid waiver and

examines instead whether Attorney Tyrrell could have pursued a plausible alternative defense

---

[106] The Court assumes that Weil's dual representation of Insys in the restructuring matter and
Defendant Simon in this criminal matter posed a potential conflict of interest because of the
possibility that the parties would become adverse in collateral litigation, such as a discovery
dispute, or if a current Insys employee had testified at trial.  <u>See</u> Mass. R. Prof. Conduct 1.7.

strategy, and if so, whether such a tactic was inherently in conflict with or not undertaken due to

his loyalties, as a partner at Weil, to Weil's client Insys.

Showing an actual conflict of interest requires a demonstration of a "plausible alternative

defense strategy or tactic" that defense counsel might have pursued.  Cardona-Vicenty, 842 F.3d

at 773.  A defendant "need not show that the defense would necessarily have been successful if it

had been used, but merely that it possessed sufficient substance to be a viable alternative."  Id.

(quoting Brien v. United States, 695 F.2d 10, 15 (1st Cir. 1982)).  In other words, the alternative

strategy cannot be hypothetical or speculative.  The First Circuit has made clear that "where the

conflict relies on 'some attenuated hypothesis having little consequence to the adequacy of

representation,' . . . [it] will not grant an 'undeserved windfall to defendants by automatically

vacating convictions.'"  Id. at 774 (first quoting Brien, 695 F.2d at 15 and then quoting United

States v. Nelson-Rodriguez, 319 F.3d 12, 42 (1st Cir. 2003) (alterations omitted)).  "That is so

because the Sixth Amendment right to effective assistance of counsel has been accorded 'not for

its own sake, but because of the effect it has on the ability of the accused to receive a fair trial.'"

Id. (quoting Mickens, 535 U.S. at 166).

Brien v. United States, 695 F.2d 10 (1st Cir. 1982), provides an example of how the

viability of a proposed alternative defense is assessed.  In Brien, the First Circuit considered a

claim of ineffective assistance of counsel based on multiple representations.  695 F.2d at 11.  The

defendant, James A. Brien ("Brien"), was represented by an attorney who belonged to the same

law firm as a co-defendant's attorney.  Id.  The trial of the co-defendant was severed from

Brien's trial after the lawyers brought the conflict issue to the attention of the court.  Id. at 11–

12.  Brien argued that the potential conflict stemming from his attorney's law firm's

representation of both him and the co-defendant prevented his attorney from calling witnesses at

trial and from turning over exculpatory evidence.  Id. at 15.  The First Circuit concluded that the alternative strategies presented by Brien were "merely hypothetical choices that in reality could not have benefited [the defendant] and were often not in any conflict with [his attorney's] other loyalties."  Id.  For example, when Brien argued that his counsel was ineffective because he refused to call the co-defendant who was represented by his law firm as a witness, the First Circuit rejected this argument as Brien had "introduced no evidence establishing what [the co-defendant] might have said and how his testimony might have helped Brien."  Id. At 16.  The court also observed that the fact that the co-defendant's "testimony would not have contributed to a defense . . . can be seen from the fact that none of Brien's other co-defendants, even though they had independent counsel, called [the co-defendant] to testify."  Id.  In addition, the court doubted whether the co-defendant would have agreed to testify while awaiting his own trial, stating that "[t]here is no convincing evidence that he would, or that if he had done so he would have said anything helpful to Brien."  Id.  The court also rejected the argument that the conflict caused Brien's attorney not to call him as a witness because there was "no evidence as to what he could have said to exculpate himself had he testified."  Id.

Similarly, in United States v. Fahey, 769 F.2d 829 (1st Cir. 1985), the First Circuit declined to conclude that there was an actual conflict that adversely affected representation where the proposed alternative strategy was "merely a hypothetical one that would not have likely benefited" the defendant.  769 F.2d at 836.  In Fahey, the defendant, Joseph P. Fahey, was convicted of fourteen counts of mail and wire fraud in connection with sales efforts by the Fahey Company.  769 F.2d at 831.  On appeal, Fahey claimed that his lawyer was ineffective for failing to call Fahey's business lawyer, Gerald Pearlstein, as a witness.  Id. at 831, 834.  Fahey asserted that a conflict of interest prevented his trial counsel from calling Pearlstein because the two were

former law partners.  Id.  The First Circuit rejected this claim of actual conflict because the proposed alternative strategy "appear[ed] to be merely a hypothetical one that in reality would not have likely benefited Fahey and was, in fact, contrary to his best interests."  Id. at 836. Specifically, the court noted that Fahey's trial lawyer presented evidence that his client and the Fahey Company had consulted with legal counsel in connection with the sales materials that were the basis of the fraudulent scheme and that the jury was given an instruction on an advice of counsel defense.  Id.  It also concluded that calling Pearlstein as a witness would likely have weakened Fahey's good faith defense.  Id.  Finally, the court noted that "two of Fahey's codefendants who were also present at the meetings in which Fahey alleges he consulted with Pearlstein and relied on legal advice did not choose to call Pearlstein."  Id.

Likewise, in Cody v. United States, 249 F.3d 47 (1st Cir. 2001), the First Circuit required that the defendant present some proof supporting the viability of his proposed alternative argument.  In Cody, the defendant, Michael Cody, pled guilty to conspiring to import and distribute over 1,000 pounds of marijuana and to being a felon in possession of a firearm.  249 F.3d at 49.  At his plea hearing, Cody represented to the court that he was on the drug lithium but that it was not affecting his ability to think clearly.  Id.  Cody later asked to withdraw his plea, saying that the lithium had in fact influenced his judgment at the time of the plea and that his attorney had pressured him to plead guilty.  Id.  After sentencing, Cody tried to vacate the plea through a § 2255 petition arguing ineffective assistance of counsel.  Id. at 50.  The First Circuit rejected Cody's petition because he "failed to show the plausibility of his claim that his lithium medication rendered him incompetent to plead."  Id. at 54.  The court explained:

> Cody's counsel did, after all, articulate Cody's argument that his plea be withdrawn
> subsequent to clinical scrutiny of his allegations that lithium affected his
> competence to plead; the court rejected the argument. Cody suggests that more
> competent counsel would have previously investigated those allegations and

forcefully presented them to the court. But he offers no proof that such investigation
would have yielded the fruit of a plausible argument. Specifically, he offers neither
proof that a prescribed dose of lithium has the potential to render one incompetent
to plead nor proof that he was suffering such effect at the time of his plea hearing.

Id.

Here, Defendant Simon asserts that Attorney Tyrrell could have pursued a defense of

good faith based on evidence from an internal investigation conducted at Insys, but did not due

to a conflict of interest.  [ECF No. 974 at 34–41].  After Insys was served with a subpoena from

the Department of Justice in 2013, it hired Skadden, Arps, Slate, Meagher & Flom LLP

("Skadden") to conduct an internal investigation.  [ECF No. 974-2 ¶ 4].  Defendant Simon was

interviewed as part of this investigation, as were many other Insys employees.  [Id. ¶¶ 5–6].

Defendant Simon avers that he "provided truthful, accurate, and complete information during

[]his interview" with Skadden.  [Id. ¶ 6].  The results of Skadden's investigation remain

unknown to Defendant Simon, [id. ¶ 8], and were not presented at trial because the documents

produced by Skadden in the investigation were protected by Insys' attorney-client privilege.

Defendant Simon argues that Attorney Tyrrell could have sought these privileged documents

from Insys to bolster his good faith defense.  This would have required challenging the

company's assertion of attorney-client privilege and likely resulted in the ensuing discovery

dispute being litigated.[107]  See [ECF No. 974 at 37–41].

Defendant Simon contends that this alternative defense strategy was "plainly a *potentially*

viable strategy . . . ."  [ECF No. 983 at 17].  He argues that

---

[107] Defendant Simon characterizes this potential discovery dispute with Insys as "just one
concrete way in which the conflict affected the representation and prevented Weil from pursuing
a viable alternative strategy in this case," but he does not articulate in what other ways the
alleged conflict prevented Attorney Tyrrell from pursuing the defense of good faith, which he
presented at trial and argued in closing.  See [ECF No. 974 at 41].

privileged documents from Insys's internal investigation likely would have provided strong support for Mr. Simon's good faith defense whatever their content. It makes no difference whether Skadden found no criminal wrongdoing or reported problematic conduct to the Board that the company failed to remediate, because the very fact of the investigation and Mr. Simon's reasonable reliance on an expectation of appropriate legal guidance from the highest levels of the company would have defeated the prosecution's allegation of *his* criminal intent.

[ECF No. 983 at 18].  The Government, however, characterizes this proposed strategy as speculative and states that "[t]here is no evidence that piercing the privilege would have helped [Defendant] Simon."  [ECF No. 977 at 12].  The Government observes that Attorney Tyrrell represented Defendant Simon for nineteen months before the conflict of interest arose without raising the issue of attacking Insys' privilege.  [Id.].  It also represents that information it provided to the Court during trial contradicts any assertion that Skadden determined that the IRC or ISP were not part of a racketeering enterprise or otherwise approved of the conduct.  [Id. (citing 3/25 Tr. at 17–25 and Exhibit 116)].

In this Court's view, having presided over the ten-week trial, Defendant Simon's proposed strategy is not a viable one for several reasons.[108]  First, Defendant Simon overlooks the serious risks attendant to piercing Insys' privilege, including a redrawing of the careful boundaries set by the Court during trial.  The consequences of Insys waiving its privilege could have included the introduction of testimony and documents from Insys compliance officer Danielle Davis, Insys outside counsel Leslie Zacks, Insys general counsel Franc Del Fosse, members of the Insys Board of Directors, and the Skadden attorneys who conducted the investigation.  The Court is not privy to what the testimony of many of these individuals would have been, but did receive information concerning the expected testimony of Ms. Davis and Mr.

---

[108] The Court assumes for the purposes of its analysis that the legal argument supporting piercing Insys' privilege was plausible.  See [ECF No. 974 at 37–38 (describing "[e]ncouraging precedent" in the District of Massachusetts)].

Zacks.  See [ECF Nos. 678, 678-5, 678-6].  Based on the information it has received, the Court

understands that Ms. Davis' testimony would have predominantly focused on the IRC, her belief

that there was ongoing insurance fraud occurring, and her efforts at effecting compliance at the

company.  Although the Court does not have the benefit of all relevant documents, it seems

apparent that, even with an effective cross-examination, Ms. Davis' testimony on privileged

matters would have been damaging.  See [3/25 Tr. at 9:9–15, 21:10–22:1, 28:20–21, 28:25–

29:1].  Given her familiarity with the IRC, her testimony likely also would have strengthened the

Government's evidence of wire and mail fraud against all Defendants.  Mr. Zacks' testimony

similarly would have probably addressed the ISP, advice he gave to Insys regarding the ISP, and

other efforts at compliance, and may also have been damaging.  [ECF No. 678-6].

The introduction of testimony from Ms. Davis, Mr. Zacks, and attorneys or Board

members involved with Skadden's investigation would have upset the balance struck by the

Court during trial concerning the subpoena and Insys' reaction to it, likely to the detriment of

Defendant Simon.  Although the situation was not ideal, see [id. at 36:5–10, 40:6–11], the line

drawn by the Court permitted the Defendants "to say there was some compliance" and the

Government "to say that compliance was a sham," without allowing either side to explicate

much further, see [id. at 39:12–17].  The ambiguity left by the evidence and testimony presented

also permitted Attorney Tyrrell to make a good faith argument in closing.[109]  Had the line been

---

[109] See [4/5 Tr. at 62:14–19 ("Now, when Rich started, the actions that he took were in line with
the strategies that were mapped out by the company's leaders and communicated to the entire
sales force, and there's no evidence that Rich knew or understood that any aspect of those
strategies was illegal. In other words, Rich acted completely in good faith."), 88:17–89:3 (noting
that while the Government "will say that these emails and actions around compliance are a sham
and a smoke screen," "if someone does this sort of thing [i.e. propose penalizing individuals for
not following company policy] once or maybe twice, that argument may hold water.  But ask
yourself, when someone does it repeatedly over a period of months, over a period of years, are

moved to allow more information about the work Insys compliance personnel did or was doing with Skadden, the evidence available to the Court at this time suggests that it would have been to Defendant Simon's detriment.  Cf. Fahey, 769 F.2d at 836 (concluding alternative defense was implausible in part because "had defense counsel called [defendant's lawyer as a witness] it likely would have weakened rather than strengthened [the defendant's] good faith reliance defense").[110]  In addition, it is important to note that Attorney Tyrrell's representation of Defendant Simon long predated Weil's decision to represent Insys in its bankruptcy.  See [ECF No. 975 ¶¶ 8–11, 15 (noting that Attorney Tyrrell's representation of Defendant Simon began in January 2017 and that Insys engaged Weil in the bankruptcy matter in August 2018)].  If trying to compel Insys to waive its attorney-client privilege was a viable defense tactic, there is no doubt that Attorney Tyrrell would have raised it earlier.

Second, bolstering the Court's conclusion that the proposed strategy was not viable is the fact that Defendants Gurry, Lee, Rowan, and Kapoor, who were each represented by independent and capable counsel, did not choose to attack Insys' privilege.  See, e.g., Fahey, 769 F.2d at 834, 836 (noting that "two of Fahey's codefendants who were also present at the meetings in which Fahey alleges he consulted with [his lawyer] and relied on legal advice did not choose to call [the lawyer as a witness]," which was Fahey's proposed defense strategy); Brien, 695 F.2d at 16 (observing that the fact that a witness' "testimony would not have contributed to a defense . . . can be seen from the fact that none of [the defendant's] other co-defendants, even though they

---

those the actions of someone who's acting with specific intent to commit a crime or with bad purpose either to disobey or disregard the law, or is that someone who is acting in good faith")].

[110] Defendant Simon selectively cites the Court's statements concerning how Insys' assertion of privilege may have impacted the evidence at trial.  See [ECF No. 974 at 39–40].  These statements express frustration with the situation and describe a hypothetical response to Danielle Davis' testimony, but do not lend merit to Defendant Simon's proposed defense.

76

had independent counsel, called [the witness] to testify").  While Defendant Simon may argue that the other Defendants did not pursue the strategy of attacking Insys' privilege because the documents were not exculpatory to them, any such argument is speculative as to all but Defendant Kapoor and cannot support a showing of plausibility.  See [10/17 Tr. at 27:24–28:3 ("We can guess why maybe Dr. Kapoor's lawyers didn't want to go into this information.  The other defendants, did they not think of it? Did they have some other specific reason to be afraid of it? I don't know . . . ."); United States v. Garcia-Rosa, 876 F.2d 209, 231 (1st Cir. 1989) (rejecting ineffective assistance of counsel claim in part because defendant did not "explain why the other defendants, who had independent counsel" did not adopt similar strategy and stating that "perhaps the other defendants did not call [the cooperating witness'] brother as a witness because his testimony would have absolved only [defendant], but we are unwilling to engage in such speculation on the basis of [the defendant's] conclusory allegations"), vacated on other grounds by Rivera-Feliciano v. United States, 498 U.S. 954 (1990) (mem.).  Attorney Tyrrell was a part of a cohesive trial team that clearly had adopted a unified strategy that recognized that the best interest of each individual Defendant was consistent with the best interests of the group as a whole.  If it had been in Defendants' best interest to litigate the privilege issue with Insys, it would have been litigated by the defense team without regard to any perceived conflict on the part of Attorney Tyrrell.  The fact that this strategy was not pursued speaks volumes about the conclusions that a very skilled group of lawyers came to regarding the benefits and risks of the company waiving its privilege to allow the details of its compliance efforts and the Skadden investigation to become available to the jury.

Third, the Court rejects Defendant Simon's contention that the documents would have supported his good faith defense "whatever their content" "because the very fact of the

investigation and [his] reasonable reliance on an expectation of appropriate legal guidance from
the highest levels of the company would have defeated the prosecution's allegation of *his*
criminal intent."  See [ECF No. 983 at 18].  As an initial matter, "the very fact of the
investigation," would not have defeated the prosecution's allegation of Defendant Simon's
criminal intent.  Were that the state of the law, the remaining Defendants would have sought
acquittal on that basis.  In addition, while Defendant Simon has backed away from the position
taken in his original motion that the documents would have been exculpatory, his current
position, which is noncommittal as to the content of the documents, ignores the evidence
currently available to the Court that suggests that Skadden, working in conjunction with Ms.
Davis and Mr. Zacks, identified evidence of wrongdoing.  Even if there were some suggestion
that the documents from Skadden were exculpatory as to Defendant Simon, he is not aware of
the investigation's findings and he does not represent that he ever relied on legal guidance from
Insys' attorneys or compliance personnel related to the investigation.  See [ECF No. 974-2 ¶ 8].
The evidence at trial indicated that although Insys hired compliance personnel and a general
counsel after receiving the subpoena in December 2013, these individuals were largely viewed as
obstacles to the success of the sales force and the company.  Defendant Simon himself was at
times a countervailing force to compliance, both working against the interest of compliance
officers and bad-mouthing them to his co-conspirators behind the scenes.[111]

---

[111] See, e.g., [2/4 Tr. at 103:10–105:1 (Napoletano testimony regarding meeting with Defendant
Simon in which they and others identified physicians to "cap out" with speaker programs); 2/6
Tr. at 171:5– 172:22 (similar); 3/5 Tr. at 197:17–198:17 (testimony concerning displeasure at
allocation of speaker programs, which were described as initiated by Defendant Simon and
believed by some colleagues to be non-compliant); 3/6 Tr. at 40:24–43:25, 144:15–146:11
(Burlakoff testimony concerning text message received from Defendant Simon: "Please consider
if there needs to be a scapegoat in all of this, it should be me, not you.  We are becoming a
company that is scared to go for the kill, in my opinion, with all of these compliance sissies and
new people pretending they understand what got us here."); 3/11 Tr. at 80:12–20 (Burlakoff

Finally, the Court is vacating the CSA and honest service predicates which relate to the ISP and how that program was implemented by the company and the Defendants.  The surviving predicates focus on the IRC.  Even assuming *arguendo* that "Skadden did not advise Insys to shut down the ISP, to close the IRC, or to fire Mr. Simon" as highlighted by Defendant Simon in his motion, [ECF No. 974 at 28], it is inconceivable that such an internal investigation would have in any way condoned the false statements made from the IRC to insurers in connection with the business of the IRC.  Nor could Mr. Simon hope to have established that he had a good faith basis for believing that it was acceptable to make false statements, misrepresentations, and material omissions to insurers to secure prior approval for Subsys prescriptions.  Leaving aside the vacated CSA and honest service predicates which are no longer at issue, there is no credible theory under which Defendant Simon's mail and wire fraud convictions were infected by a conflict of interest.

Ultimately, the idea that, with unconflicted counsel, Defendant Simon would have tried to pierce Insys' privilege to gain access to information about Skadden's investigation that may not even have been exculpatory and then introduced this evidence at trial or opened the door to the Government introducing this evidence at trial, even if it was damaging to him, in order to argue that he "reli[ed] on an expectation of appropriate legal guidance" is simply not plausible. Cf. Bucuvalas v. United States, 98 F.3d 652, 657 (1st Cir. 1996) (concluding that strategy of calling defendant as a witness was not plausible where it would have meant "offer[ing] himself up to a cross-examinational meat-grinder on virtually every relevant issue").  In sum, it is

---

testimony: "Q: All right. But this is now almost a year since Mr. Simon has been promoted to national sales director, correct? A: Correct. Q: And he hasn't called [the compliance officer] a moron yet? A: Yes.  Oh, my God.  Every day.  Many, many times.  Q: Not in any emails to her. A: No, not in an email.  Q: He doesn't say to her that she doesn't know sh[*]t? A: Much worse.")].

speculative that the sought-after documents were exculpatory, it is speculative that Defendant Simon could have presented a more fulsome good faith defense, and it is speculative that presenting a more fulsome good faith defense would have been advantageous to Defendant Simon, particularly given the rulings the Court has made herein concerning the CSA and honest service predicates.

Also, it bears noting that Defendant Simon is not arguing that Attorney Tyrrell did not present a good faith defense to the jury, but rather that he did not pursue the defense zealously enough, allegedly due to Weil's loyalties to Insys.  [10/17 Tr. at 25:11–15, 26:8–11 ("The problem with this case is Mr. Tyrrell goes into closing arguments and says [Defendant Simon] acted in good faith.  He believed the company had compliance.  But he had nothing to back that up."); see Familio-Consoro v. United States, 160 F.3d 761, 766 (1st Cir. 1998) (rejecting conflict of interest claim because, *inter alia*, the defendant "[did] not contend that his attorney failed to pursue an alternative strategy of placing the blame on [the individual paying the attorney's legal fees] (he did advance it), but that he did not pursue it *aggressively enough* for fear of alienating [him]" and jeopardizing his fee).  Attorney Tyrrell worked with the evidence, presumably in consultation with his client, to present a "good faith" defense in closing that sought to paint Defendant Simon as someone who acted within the strategies set by Insys' leadership and sought to follow the rules.  See [4/5 Tr. at 62:14–19, 88:17–89:3].  If the documents from Skadden's investigation would have supported this good faith defense, they would have only added another layer to the defense already presented, rather than allowed the introduction of a new defense.

For the foregoing reasons, Defendant Simon has failed to establish that his proposed alternative defense strategy was plausible, and the Court therefore denies his motion for a new trial based on ineffective assistance of counsel.  In closing, the Court again observes that

Attorney Tyrrell's representation of Defendant Simon was of the highest caliber and there is no evidence that he pulled any of his punches or forwent any plausible defense strategy; at all times during his representation of Defendant Simon, Attorney Tyrrell was zealous and effective. Cf. Reyes-Vejerano v. United States, 276 F.3d 94, 99 (1st Cir. 2002) ("The defendant must still meet the Cuyler standard of actual conflict and adverse effect: the defendant must show some causal relationship between the lawyer's awareness of the [event creating a potential conflict] and the alleged deficiency in representation. . . . But there is nothing to show counsel pulled any of his punches."). As Attorney Tyrrell argued in closing, "[i]t's not my job to defend Insys. It's my job to defend Rich Simon." [4/5 Tr. at 90:15–16]. That is precisely what he did. Defendant Simon received a fair trial, was vigorously defended by aggressive and conscientious counsel, and was not deprived of his Sixth Amendment right to effective assistance of counsel. See Cardona-Vicenty, 842 F.3d at 774 ("[T]he Sixth Amendment right to effective assistance of counsel has been accorded 'not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial.'" (quoting Mickens, 535 U.S. at 166)). Decisions that Weil made about who it was going to represent might have been unwise, but they did not affect the quality of the representation received by Mr. Simon in this case.

## V.    CONCLUSION

The conduct of Insys and the Defendants in this case was reprehensible and designed to financially incentivize healthcare practitioners to prescribe Subsys without regard for the best interests of their patients. Defendants knew the power of Subsys and that addiction was a risk, but nonetheless tried to maximize the number of prescriptions written and the dosage prescribed. Overturning the verdicts on the CSA and honest services fraud predicates is not meant to condone or minimize this behavior, but is simply a reflection of the fact that the Government did not prove the requisite intent on the part of Defendants, that is, an intent that healthcare

practitioners prescribe the drug to people that did not need it or in unnecessarily high doses.  The Government could have easily proved bribery, but it elected not to charge bribes or kickbacks and now must live with that decision.  The jury in this case worked long and hard and returned a thoughtful verdict.  The Court only very reluctantly disturbs a jury verdict, but finds it necessary to do so here.

Accordingly, for the foregoing reasons, Defendants' motions for judgment of acquittal and for a new trial [ECF Nos. 816, 817, 859, 860, 861, 862, 863, 864] are <u>GRANTED</u> in part and <u>DENIED</u> in part.  The Court vacates the verdict on the CSA and honest services fraud predicates as to Defendants Lee, Simon, Rowan, and Kapoor.  The Court does not disturb the remainder of the verdict, which convicted all Defendants of ordinary mail and wire fraud, and does not find that a new trial is warranted for any of the reasons presented by Defendants.

**SO ORDERED.**

November 26, 2019                                                     /s/ Allison D. Burroughs
                                                                      ALLISON D. BURROUGHS
                                                                      U.S. DISTRICT JUDGE