**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JOHN N. KAPOOR,<br><br>Defendant. | Criminal No.:  16-CR-10343-7-ADB<br><br>**FILED PARTIALLY UNDER SEAL**<br><br>**LEAVE TO FILE EXCESS PAGES AND PARTIALLY UNDER SEAL GRANTED ON DEC. 16, 2019** |

**SENTENCING MEMORANDUM ON BEHALF OF JOHN N. KAPOOR**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................... IV

TABLE OF EXHIBITS ......................................................................... VI

INTRODUCTION ................................................................................. 1

I.      CASE BACKGROUND ........................................................... 4

II.     PERSONAL BACKGROUND ................................................. 8

        A.      Dr. Kapoor's Life Was the Consummate Immigrant Success Story. ..................... 8

        B.      Dr. Kapoor Achieved Professional Success Through Hard Work and a
                Dedication to Patients. ........................................................ 10

        C.      Dr. Kapoor Is a Devoted Father Whose Care and Support Has Helped His
                Family Through Numerous Tragedies. ................................. 14

                1.      *Throughout His Life, Dr. Kapoor Has Been a Caring and Supportive
                        Husband, Father, and Family Member.* ...................... 14

                2.      *Dr. Kapoor Has Endured Several Family Tragedies, None More
                        Transformative Than His Wife's Suffering and Death from Breast
                        Cancer.* ................................................................... 16

                3.      *Dr. Kapoor's Care and Support Was and Is Critical For His
                        Children.* ................................................................. 17

                4.      *Dr. Kapoor Has Used His Wife's Passing to Effect Positive Change
                        in the Fight Against Cancer.* .................................... 19

        D.      Dr. Kapoor Used His Success to Help and Give Back to Others. ........................ 20

                1.      *Dr. Kapoor Has Contributed More Than $128 Million to Charity
                        with a Particular Focus on Helping Cancer Patients and Their
                        Families.* ................................................................. 20

                2.      *Dr. Kapoor Has Helped Countless Others Through Individual Acts
                        of Generosity and Kindness.* .................................... 24

III.    THE ADVISORY SENTENCING GUIDELINES RANGE ........................................... 26

IV.     THE STATUTORY SENTENCING FACTORS ........................................................ 34

        A.      The Nature and Circumstances of the Offense Justify a Downward Variance
                from His Calculated Guidelines Range. ............................ 35

        B.      Dr. Kapoor's History and Personal Characteristics Justify a Downward
                Variance from His Calculated Guidelines Range. .............. 41

                1.      *Dr. Kapoor's Life-Long Commitment to Charitable Work and
                        Helping Others Justifies a Downward Variance.* ....... 42

                2.      *Dr. Kapoor's Critical Role as Caretaker for His Brother* ▮▮▮
                        ▮▮▮ *Justifies a Downward Variance.* ........................ 45

*3.*      *Dr. Kapoor's Advanced Age Justifies a Downward Variance.* ................ 47

*4.*      *Dr. Kapoor's First-Time Offender Status and Low Risk of Recidivism Justify a Downward Variance.* ................................................. 48

C.      Imposing a Substantial Prison Sentence on Dr. Kapoor Would Lead to Unwarranted Sentencing Disparities ..................................................................... 48

D.      A Sentence That Features a Period of Home Confinement and Community Service Would Serve the Sentencing Goals Set Forth in 18 U.S.C. § 3553(a). ..................................................................................................................... 53

CONCLUSION ..................................................................................................................... 56

# TABLE OF AUTHORITIES

<u>Cases</u>

*Kimbrough v. United States*, 552 U.S. 85 (2007) ........................................................ 53

*Pepper v. United States*, 131 S. Ct. 1229 (2011) ........................................................ 35

*United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) .................................... 52, 54, 56

*United States v. Baron*, 914 F. Supp. 660 (D. Mass. 1995) ............................................ 47

*United States v. Booker*, 125 S. Ct. 738 (2005) .......................................................... 34

*United States v. Bullion*, 466 F.3d 574 (7th Cir. 2006) ................................................. 47

*United States v. Cabrera*, 567 F. Supp. 2d 271 (D. Mass. 2008) ...................................... 48

*United States v. Cooper,* 394 F.3d 172 (3d Cir. 2005) .................................................. 44, 52

*United States v. Darway*, 255 F. App'x. 68 (6th Cir. 2007) ............................................ 48

*United States v. Desmond*, No. 05-cr-719-4, 2008 WL 686779 (N.D. Ill. Mar. 11, 2008) .......... 52

*United States v. Frankhauser*, 80 F.3d 641 (1st Cir. 1996) ............................................ 33

*United States v. Frates*, 896 F.3d 93 (1st Cir. 2018) ................................................... 34

*United States v. Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. 2012) ........................................ 52

*United States v. Hawkins*, 228 F. App'x 107 (2d Cir. 2007) ........................................... 52

*United States v. Hernandez*, No. 03-cr-1257, 2005 WL 1242344 (S.D.N.Y. May 24, 2005) ...... 47

*United States v. Huerta*, 371 F.3d 88 (2d Cir. 2004) ................................................... 33

*United States v. Johansson*, 249 F.3d 848 (9th Cir. 2001) ............................................ 29

*United States v. Lehmann*, 513 F.3d 805 (8th Cir. 2008) .............................................. 46

*United States v. Lucien*, 347 F.3d 45 (2d Cir. 2003) ................................................... 29

*United States v. Maestas*, 642 F.3d 1315 (10th Cir. 2011) ........................................... 29

*United States v. Martin*, 520 F.3d 87 (1st Cir. 2008) .................................................. 34, 35

*United States v. McCord, Inc.*, 143 F.3d 1095 (8th Cir. 1998) ....................................... 29

*United States v. Mehta*, 307 F. Supp. 2d 270 (D. Mass. 2004) ....................................... 44, 51

*United States v. Muñoz-Nava*, 524 F.3d 1137 (10th Cir. 2008) ....................................... 46

*United States v. Nesbeth*, 188 F. Supp. 3d 179 (E.D.N.Y. 2016) ..................................... 48

*United States v. Prosperi*, 686 F.3d 32 (1st Cir. 2012) ................................................ 46, 50, 51

*United States v. Sclamo*, 997 F.2d 970 (1st Cir. 1993) ................................................ 46

*United States v. Smith*, 531 F.3d 109 (1st Cir. 2008) .................................................. 34

*United States v. Thurston*, 544 F.3d 22 (1st Cir. 2008) ............................................... 41

*United States v. Tomko*, 562 F.3d 558 (3d Cir. 2009) ................................................. 44

*United States v. Ubiles-Rosario*, 867 F.3d 277 (1st Cir. 2017) ...................................... 41

*United States v. Vivit*, 214 F.3d 908 (7th Cir. 2000) .................................................. 28

*United States v. Ward*, 814 F. Supp. 23 (E.D. Va. 1993) ............................................. 48

*United States v. Willis*, 322 F. Supp. 2d 76 (D. Mass. 2004) ........................................ 47

<u>Statutes</u>

18 U.S.C. § 3553(a) ............................................................................ passim

<u>Other Authorities</u>

Application Note 14(b)(17)(B)(ii) to U.S.S.G. § 2B1.1 ............................................................... 32

Application Note 2(A) to U.S.S.G. § 2B1.1(a)(1) ...................................................................... 27

Application Note 21(C) to U.S.S.G. § 2B1.1............................................................................. 34

Elizabeth Szockyj, *Imprisoning White Collar Criminals*, 23 S. Ill. U. Law J. 495 (1999) ......... 54

Frank O. Bowman, III, *Sentencing High–Loss Corporate Insider Frauds After* Booker, 20 Fed.
    Sent'g Rep. 167 (2008) .......................................................................................................... 53

U.S. Dep't of Justice, Nat'l Inst. of Corrections, *Correctional Health Care: Addressing the
    Needs of Elderly, Chronically Ill, and Terminally Ill Inmates* (2004 ed.) .............................. 47

U.S. Sentencing Comm'n, *Fifteen Years of Guidelines Sentencing* (2004) ................................ 54

U.S.S.G. § 1B1.1 cmt. n. 1(L)................................................................................................... 29

U.S.S.G. § 2B1.1..................................................................................................................... 27

U.S.S.G. § 2B1.1(a)(1).............................................................................................................. 27

U.S.S.G. § 2B1.1(b)(16)(A)............................................................................................... 28, 29, 31

U.S.S.G. § 2B1.1(b)(17)(B)(ii)(I) ............................................................................................. 33

U.S.S.G. § 2B1.1(b)(2)(A)(i) .................................................................................................... 33

U.S.S.G. § 3B1.1(a) ................................................................................................................. 33

U.S.S.G. § 3B1.1(b) ........................................................................................................... 33, 34

U.S.S.G. § 3D1.2 ..................................................................................................................... 27

# TABLE OF EXHIBITS

**A.**     **Letters from Close Family Members**

1.      Ltr. from Porfirio Balderas, dated Jun. 10, 2019.

2.      Ltr. from Jason DeLeo, dated Jul. 12, 2019.

3.      Ltr. from Mary Gauwitz, dated Aug. 29, 2019.

4.      Ltr. from John Hillock, dated Aug. 8, 2019.

5.      Ltr. from Linda Hillock, dated Sep. 19, 2019.

6.      Ltr. from Randon Hillock, dated Sep. 19, 2019.

7.      Ltr. from Judith Hoskins, dated May 6, 2019.

8.      Ltr. from Christina Kapoor, dated Aug. 15, 2019.

9.      Ltr. from Robert Kapoor.

10.     Ltr. from Vijay Kapoor, dated Aug. 9, 2019.

11.     Ltr. from Anu LoVecchio, dated May 10, 2019.

12.     Ltr. from Frank LoVecchio, dated Sep. 26, 2019.

13.     Ltr. from Arthur and Alex Schildgen.

14.     Ltr. from Catie Schildgen, dated Dec. 12, 2019.

15.     Ltr. from Rob Schildgen, dated Jul. 7, 2019.

**B.**     **Letters from Employees Close to Dr. Kapoor and His Family**

16.     Ltr. from Luz Irene Acuna Lopez, dated Oct. 1, 2019.

17.     Ltr. from Nellie Oquendo, dated Jul. 10, 2019.

**C.**     **Letters from Extended Family Members**

18.     Ltr. from Paras Aneja.

19.     Ltr. from Rajesh Aneja, dated Sep. 19, 2019.

20.     Ltr. from Anuparma Arora.

21.     Ltr. from Arushi Bhatia, dated Jun. 11, 2019.

22.     Ltr. from Beena Bhatia, dated Jun. 12, 2019.

23.     Ltr. from Juhi Bhatia, dated May 14, 2019.

24.     Ltr. from Manav Bhatia, dated Aug. 9, 2019.

25.     Ltr. from Naresh Bhatia, dated Sep. 19, 2019.

26.     Ltr. from Aditi Mehra, dated Jun. 6, 2019.

27.     Ltr. from Gopal Mehra, dated Jun. 27, 2019.

28.     Ltr. from Jessica Mehra, dated Jun. 8, 2019.

29.     Ltr. from Madhu Mehra.

30.     Ltr. from Sanjiv Mehra.

**D.      Letters from Employees and Beneficiaries of Charitable Endeavors**

31.     Ltr. from Sameena Bilgi, dated Sep. 19, 2019.

32.     Ltr. from Sadhna Bokhiria, dated Aug. 8, 2019.

33.     Ltr. from Chris Cohen, dated Aug. 8, 2019.

34.     Ltr. from Noshir Dadrawalla, dated Jun. 1, 2019.

35.     Ltr. from Nirjari Dalal, dated Jul. 3, 2019.

36.     Ltr. from Mark Fortner, dated Sep. 12, 2019.

37.     Ltr. from Hemant Goswami, dated Jul. 11, 2019.

38.     Ltr. from Janet Houghton, dated Jun. 9, 2019.

39.     Ltr. from Roxana Kalyanvala, dated May 31, 2019.

40.     Ltr. from Ganesh Krishnan.

41.     Ltr. from Christina Lopez, dated Jun. 6, 2019.

42.     Ltr. from Nivedita Mishra.

43.     Ltr. from Jackie Mullins, dated Jun. 22, 2019.

44.     Ltr. from Kathleen O'Brien, dated Jun. 16, 2019.

45.     Ltr. from Annie Parker, dated May 23, 2019.

46.     Ltr. from Aparna Raval, dated Jun. 16, 2019.

47.     Ltr. from Chetan Shinde.

48.     Ltr. from Rohit Tandle, dated Aug. 8, 2019.

49.     Ltr. from Joanie Vernasco, dated Aug. 8, 2019.

**E.      Letters from Employees of Dr. Kapoor's Businesses**

50.     Ltr. from Ramesh Acharya, dated Aug. 9, 2019.

51.     Ltr. from Rao Akella, dated Aug. 9, 2019.

52.     Ltr. from Ce Bian, dated May 31, 2019.

53.     Ltr. from John Duffield.

54.     Ltr. from Nobuo Fukuda, dated Aug. 2, 2019.

55.     Ltr. from Venkat Goskonda, dated Jul. 18, 2019.

56.     Ltr. from Mo Habul.

57.     Ltr. from Sunil Kumar, dated Jun. 3, 2019.

58.     Ltr. from Vikram Malhotra, dated Oct. 6, 2019.

59.     Ltr. from Mirnes Mehic.

60.    Ltr. from Roman Petry, dated May 31, 2019.

61.    Ltr. from Vijay Rao.

62.    Ltr. from Abraham Suarez, dated Jun. 14, 2019.

63.    Ltr. from Wesley Turner.

**F.    Letters from Other Friends and Professional Acquaintances**

64.    Ltr . from Dave Alberts, dated Jul. 11, 2019.

65.    Ltr. from Anand Acharya, dated Sep. 5, 2019.

66.    Ltr. from Joe Karczewski, dated Aug. 7, 2019.

67.    Ltr. from Ramesh Pandey, dated Jun. 11, 2019.

68.    Ltr. from Nitin Rai, dated Jun. 12, 2019.

69.    Ltr. from Mahendra Shah.

70.    Ltr. from Alan Jere Solo, dated Jul. 19, 2019.

71.    Ltr. from Tyler Wanke, dated Jul. 29, 2019.

72.    Ltr. from David Wilkinson, dated Sep. 23, 2019.

**G.    Miscellaneous Exhibits**

73.    Steven Morris, *Exec Finds Life After Lyphomed*, Chicago Tribune, Oct. 12, 1990.

74.    Steven Morris, *Unimed Wins FDA Approval On AIDS Drug*, Chicago Tribune, Dec. 23, 1992.

75.    Arsenio Oloroso, Jr., *In Health Care, He's Everywhere*, Crain's Chicago Business, Feb. 18, 1995.

76.    Profile of Alec Burlakoff, LinkedIn.com (Dec. 16, 2019, 2:17 PM), https://www.linkedin.com/in/alec-burlakoff-8405b8191.

77.    Resiliency in Motion, https://www.resiliencyinmotion.com/ (last visited Dec. 16, 2019).

78.    Buy Prepare in Paperback, https://www.resiliencyinmotion.com/buy-prepare (last visited Dec. 16, 2019).

# INTRODUCTION

John Kapoor maintains his innocence of the surviving charges in this case.  But that is a question for another day.  The question now before the Court is what kind of sentence is sufficient, and not greater than necessary, to serve the important goals of a criminal sentencing in his case.

The key to answering that question is seeing Dr. Kapoor as a person and not a caricature. The government's description of Dr. Kapoor is the latter.   To the government, he is the equivalent of a mob boss who pursued money above all else, who intentionally established a criminal enterprise under the guise of a pharmaceutical company, and who set out to get innocent Americans hooked on a powerful opioid.  That caricature is born of confirmation bias and simply ignores the many aspects of this case that do not fit the bill.  Whatever one thinks of the evidence at trial, no one seriously disputed that:

- Dr. Kapoor achieved the American Dream and made his fortune decades before Insys;

- he was sincerely motivated in developing Subsys by his wife's cancer pain and death;

- Alec Burlakoff and Michael Babich sought free reign from Dr. Kapoor's supervision and preferred to operate without him looking over their shoulders; and

- Dr. Kapoor invested $80 million of his own money into Insys—and never realized any profit from his investment—while Babich and Burlakoff cashed out more than $45 million in combined stock sales after the subpoenas and investigations started to swirl.

In addition, after comparing the government's current position on restitution (which now stands at $306 million and counting) and forfeiture (an additional $113 million as to Dr. Kapoor) with Dr. Kapoor's net worth (which now stands at well below $200 million), no one can dispute that his life's earnings and the support he was set to provide for many others, from his broader family to charitable beneficiaries, are hanging by the thinnest of threads.

None of this is to say that Dr. Kapoor is blameless for what happened at Insys.  He hired and promoted Babich and Burlakoff to leadership positions.  Burlakoff unquestionably bribed

doctors, and did so with the relish and gall of a born hustler and confidence man.  Babich, by his own admission, learned of Burlakoff's criminal conduct over time and allowed it to proceed.  There is also no question that Dr. Kapoor was, at times, a hard-driving, demanding, and difficult boss, and that those features brought out the worst in Babich and Burlakoff.  There is no question that the Insys Reimbursement Center ("IRC") under Elizabeth Gurrieri lied to insurers to obtain coverage for Subsys.  And there is no question that all this happened while Dr. Kapoor was the Chairman of the Board and was actively engaged in Insys's activities.  If a captain should go down with his ship, then Dr. Kapoor accepts that he must face consequences for what happened at Insys.

What he cannot accept is the caricature of him as the person who directed and commanded essentially all the alleged criminal conduct, with nothing but personal profit as his aim and nothing but callousness to human beings in his heart.  That portrait is fundamentally flawed.  It rests almost entirely on the efforts of Babich and Burlakoff to shift blame onto Dr. Kapoor and minimize their own, independent actions and greed.  Burlakoff's testimony, in particular, evidenced a propensity for absurd exaggeration, an inability to tell the truth with any consistency, and a pulp fiction view of life.  Yet these are the men—the ones who personally profited the most from Insys; the ones who are in their middle ages, able to endure a prison sentence, and resume their lives—for whom the government will seek substantially less prison time than Dr. Kapoor.  With the government's apparent blessing, Burlakoff has even moved onto his next endeavor, now peddling himself as an expert in compliance and lessons learned from healthcare fraud.  Dr. Kapoor acknowledges the government's ability to reward cooperators, but at some point the government's desire to obtain convictions can compromise its ability to assess its cooperators and fairly apportion blame.

Lastly, but most important, the government's caricature of Dr. Kapoor does not square with his actual life.  Because that broader life was not the issue at trial, Dr. Kapoor devotes much of

this sentencing memorandum to it.  The many letters of support appended here as exhibits describe

his life and demonstrate with particularity and credibility how:

- Dr. Kapoor raised himself up from the chaos and poverty of post-partition India to a preternaturally early education and assumption of responsibility for his family;

- he succeeded against odds of literally one in millions in rising from that starting point to immense, self-created wealth in America;

- his success did not insulate him from personal loss and challenge, not just his wife's passing and other difficult deaths in his immediate famil ████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████ and

- from the moment he first made his fortune, Dr. Kapoor has given back to charity— more than $128 million in giving and countless hours of personal time and involvement—in pursuit of causes that mirror his own life's path.

For all these reasons, Dr. Kapoor asks the Court to reject the government's caricature, and

sentence him as it normally would a first-time, non-violent offender, aged 76, who did not profit

personally from the conduct at issue, and who already faces losing everything else beyond the time

left in his life.  Outside the opioid context, such a sentence would almost surely involve no prison

time.  Even in the opioid context, the only sentence this Court should consider is one that Dr.

Kapoor can reasonably expect to outlive, and that will allow him to rejoin and support his family

and community.  While it is difficult to make a particular recommendation without knowing how

the Court will sentence others in the case, if the Court feels compelled to impose a prison sentence

on Dr. Kapoor, we recommend that it be a year and a day, followed by a substantial period of

supervised release with conditions of home confinement and community service.[1]

---

[1] Dr. Kapoor will address the government's position on restitution—as reflected in its filing of December 13, 2019, and which is supported by a large production of documents the government did not provide to defendants until December 6, 2019—in a separate filing.  Because the restitution sought is joint and several, Dr. Kapoor's filing on it may be joint with other defendants.  In

3

## I.     CASE BACKGROUND

On December 6, 2016, the government obtained the original indictment in this case charging six former Insys employees with an alleged RICO conspiracy to commit predicate acts of mail and wire fraud, honest services mail fraud, Travel Act violations, and violations of state commercial bribery laws.  *See* Dkt. No. 1 ¶ 196.  Nearly a year later, the government added Dr. Kapoor as a defendant when it superseded its original indictment with one that expanded the list of predicate acts under RICO to include honest services wire fraud and violations of the Controlled Substances Act ("CSA").  *See* Dkt. No. 183-2 ¶¶ 246, 248-253.  After defendants moved to dismiss the First Superseding Indictment, the government superseded a second time with an indictment that named the same seven defendants but narrowed the charges to a single RICO conspiracy count alleging predicate objects of CSA violations, honest services mail and wire fraud, and money and property mail and wire fraud.  *See* Dkt. No. 419 ¶ 24.

All the alleged predicates related to Insys's marketing and sale of Subsys—an FDA-approved transmucosal immediate-release fentanyl ("TIRF") that accounted for less than 0.02% of the prescription opioid market.[2]  As alleged in the Second Superseding Indictment ("SSI"), each predicate went towards one of two components of the charged conspiracy: (1) an alleged scheme to bribe prescribers who wrote large amounts of TIRF prescriptions to write illegitimate prescriptions for Subsys in violation of the CSA and honest services fraud statute; and (2) an alleged scheme to deceive insurers into approving prior authorizations for Subsys prescriptions in violation of the money and property mail and wire fraud statutes.  *See* Dkt. No. 419 ¶¶ 27-70.

---

addition, because the government waited until the day before Dr. Kapoor's sentencing position was due to reveal its position on forfeiture, Dr. Kapoor will address it in a separate filing.

[2] Letter from Saeed Motaharti, President & CEO, Insys Therapeutics, Inc., to The Hon. Claire McCaskill, United States Senate, dated Sep. 1, 2017, at 2, *available at* https://tinyurl.com/insysletter.

While the SSI charged each of the six former Insys employees named in the prior indictments, only four of them joined Dr. Kapoor in contesting those charges at trial.  Less than two months before trial, Insys's former VP of Sales, Alec Burlakoff, pled guilty to the SSI—including the portions the Court ultimately threw out as to the trial defendants—after entering into a cooperation agreement with the government.  *See* 11/28/18 Hr'g Tr. 24:21-25:13, 27:21-28:5. One month later, the company's former CEO and the lead defendant in the original indictment, Michael Babich, entered into a cooperation agreement that allowed him to plead guilty to the lesser charges of mail and wire fraud conspiracy and aiding and abetting mail fraud.  *See* Dkt. No.  652. As part of their cooperation with the government, both men agreed to testify against Dr. Kapoor and the remaining trial defendants.

With little to offer in the way of documents or emails directly incriminating Dr. Kapoor, Babich and Burlakoff's testimony—and, to an extent, the testimony given by Insys's former VP of Marketing, Matt Napoletano—became the government's primary means of connecting Dr. Kapoor to the alleged conspiracy at trial.  Because all three men were involved in marketing and sales during their time at Insys, the evidence offered against Dr. Kapoor at trial naturally skewed towards the bribery aspects of the alleged scheme.  For example, Napoletano—who was never charged in the case but agreed to testify after being immunized by the government—described Dr. Kapoor's role in requesting an ROI analysis that was allegedly used to track the effectiveness of Insys's payments to practitioners.  *See, e.g.*, 2/1/19 Trial Tr. 141:7-143:24.  Although Babich's and Burlakoff's efforts to implicate Dr. Kapoor were far broader than Napoletano's, they too focused largely on the bribery scheme.  *See, e.g.*, 2/14/19 Trial Tr. 54:20-57:19 (Babich claiming without documentary support that the details of the alleged bribery scheme were discussed with Dr. Kapoor on daily conference calls); 3/7/19 Trial Tr. 165:24-166:10 (Burlakoff claiming without

documentary support that he bribed doctors consistent with a conversation he had with Dr. Kapoor and Babich during his initial interview at Insys).

By comparison, there was far less evidence at trial implicating Dr. Kapoor in insurance fraud. The government called three former IRC employees to testify at trial, but none of them suggested that Dr. Kapoor was directly involved in that part of the alleged conspiracy. *See, e.g.*, 2/8/19 Trial Tr. 132:3-4 (testimony from Kim Fordham, a former IRC employee, that she never had any interactions with Dr. Kapoor); 2/28/19 Trial Tr. 103:6-24 (testimony from Elizabeth Gurrieri, the IRC's former manager, that she had very few interactions with Dr. Kapoor). Likewise, the documents presented by the government at trial did not show that Dr. Kapoor authorized or approved any of the fraudulent conduct within the IRC. Rather, the documents and testimony from IRC witnesses showed that Dr. Kapoor was generally briefed on the IRC's performance and was demanding in the goals he set for its employees. *See* 2/25/19 Trial Tr. 22:6-19 (Gurrieri testifying that Dr. Kapoor wanted close to a 100 percent approval rate for prior authorizations); 2/28/19 Trial Tr. 111:1-18 (Gurrieri testifying about reports on IRC approval rates that she said Dr. Kapoor started receiving in September 2014).

In the absence of documents or testimony from IRC witnesses, the primary evidence implicating Dr. Kapoor in insurance fraud was Babich's claim that Gurrieri openly discussed the IRC's fraudulent strategies on weekly management calls. *See, e.g.*, 2/14/19 Trial Tr. 86:2-14, 92:1-14. Not only was this claim completely unsupported by documentation, but Gurrieri undermined Babich's assertion by testifying that the information she provided on the calls was far more rote and "ranged from the numbers of approvals in the IRC to reports from the IRC that were requested or needed." 2/25/19 Trial Tr. 24:1-9. And the government produced no other witness

to the morning calls—despite the availability of many—who echoed Babich's claim that the IRC fraud was openly discussed.

There was also undisputed testimony—from the government's own witnesses—that Dr. Kapoor was trying to improve compliance at the IRC.  Even Babich was forced to admit that, when Dr. Kapoor got directly involved with the IRC, it was to improve its practices.  *See* 2/15/19 Trial Tr. 75:12-16 (describing how Dr. Kapoor got involved with the IRC in 2014 to "make the [opt-in] form a better form").   Multiple witnesses also attested to changes that Insys's compliance department made to the IRC's practices, including repeated revisions to IRC talking points, explicit instructions to IRC staff not to lie and mislead, and disciplining staff who refused to follow those instructions.  *See* 2/8/19 Trial Tr. 118:24-119:10 (Fordham testifying that compliance changed the talking points); 2/22/19 Trial Tr. 232:7-17 (Gurrieri testifying that compliance-approved talking points were technically accurate); 2/26/19 Trial Tr. 99:8-18, 232:3-9 (Gurrieri testifying that compliance instructed staff not to mislead insurers and set up disciplinary actions for non-compliance); 3/26/19 Trial Tr. 21:19-22:9, 23:8-24:6, 29:17-25 (testimony from Lindsey Meyer, a former IRC employee, that disciplinary procedures were set up for non-compliance, she received a warning letter, and compliance instructed her not to mislead insurers); 3/27/19 Trial Tr. 70:18-23, 81:5-82:15 (testimony from Danielle Davis, Insys's former director of compliance, that IRC talking points changed during her tenure and that non-compliant IRC employees were disciplined). Finally, the undisputed evidence showed that Dr. Kapoor supported efforts to improve compliance at the company, particularly after the well-publicized arrest of nurse practitioner Heather Alfonso. *See, e.g.*, 3/27/19 Trial Tr. 77:21-25 (testimony from Davis that her sense was Dr. Kapoor "wanted compliance to get it right" following the arrest of Alfonso); Trial Ex. 5351 ("The request by Dr. Kapoor was to run everything through compliance.").

Following the jury's verdict, the trial defendants renewed their joint motions seeking an acquittal under Rule 29 and also sought a new trial under Rule 33.  Dkt. No. 860.  In their Rule 29 motion, the trial defendants focused primarily on arguing their convictions on the CSA and honest services fraud predicate objects should be overturned due to a lack of proof of specific intent.  *See id.* at 10-15; Dkt. No. 967 at 1-7.  This Court agreed and vacated the jury's verdict on those objects based on the government's failure to "prove the requisite intent on the part of Defendants, that is, an intent that healthcare practitioners prescribe the drug to people that did not need it or in unnecessarily high doses."  Mem. & Order, Dkt. No. 1028 at 81-82.  The Court opined that the government "could have easily proved bribery, but it elected not to charge bribes or kickbacks and now must live with that decision."  *Id*. at 82.  The Court declined to "disturb the remainder the remainder of the verdict, which convicted all Defendants of ordinary mail and wire fraud," and denied defendants' motions seeking a new trial under Rule 33.  *Id.* at 82.

## II.     PERSONAL BACKGROUND

Along with the personal history and characteristics section of Dr. Kapoor's draft Pre-Sentencing Report ("PSR"), the best source of information about his life and character are the dozens of letters of support appended to this sentencing memorandum.  The summary here cannot substitute for the letters themselves, and the first-hand impressions they convey are better than any lawyer's summary could be.  We offer this summary to facilitate the Court's review of the letters and to point out the most critical information in them.

### A.     Dr. Kapoor's Life Was the Consummate Immigrant Success Story.

Born on the Indian subcontinent in August of 1943, Dr. Kapoor was the second of three children born to Jagan Nath and Gunvati Kapoor.  He was just four years old when the subcontinent was partitioned along religious lines into the separate states of India and Pakistan, leading to civil unrest, rioting, and mass migrations that turned his young life (and millions of other lives) upside

down.  The riots destroyed Dr. Kapoor's childhood home and his parents' business in the new

Pakistani state, forcing the family to move to the safety of his grandparents' home in a neighboring

town in India.[3]   After his parents had difficulty finding steady employment, they moved to

Bombay—a bigger city with better job prospects—but an uncertain financial future forced them

to leave Dr. Kapoor and his sister behind.

After his parents relocated to Bombay, Dr. Kapoor spent the next decade living in a small

house with his grandparents, sister, and a dozen other extended family members.  His cousin,

Gopal Mehra, described these as financially difficult times for the family that forced Dr. Kapoor

to face the "harsh realities of life" at an early age.[4]  But according to Mehra, these struggles also

taught Dr. Kapoor important life lessons about the true value of family and helping others in need.[5]

Despite the difficult circumstances of his childhood, Dr. Kapoor excelled as a student and

graduated from high school when he was only thirteen.  After graduating, he reunited with his

parents and brother in Bombay, but the family continued to struggle financially.  Nine family

members lived in a two-bedroom apartment where, given the scarcity of space, Dr. Kapoor and his

brother were forced to sleep on the balcony.[6]  Yet Dr. Kapoor continued to transcend his

circumstances by excelling in his academic pursuits.  He graduated from Khalsa College in

Mumbai in April 1960 at the extremely young age of 17, and was one of 18 students from all over

---

[3] Ltr. from Gopal Mehra, dated Jun. 27, 2019, at 1 (Ex. 27).

[4] *Id.* at 1.

[5] *Id.*

[6] Ltr. from Robert Kapoor at 1 (Ex. 9).

India selected for a prestigious graduate program at Bombay University's Department of Chemical Technologies.[7]  He graduated from the program "with the highest rank" in 1963.[8]

Dr. Kapoor then spent one year as an Associate Lecturer at Bombay University before setting his sights on the United States for his Ph.D. studies.[9]  He applied to a program offered by the Department of Medicinal Chemistry at the State University of New York in Buffalo. According to his former professor, his application stood out because "in addition to indicating that he had great ability and a good grasp of the basic pharmaceutical sciences, it was unique in that he also had completed a program in manufacturing pharmacy."[10]  Dr. Kapoor was admitted to the program and offered financial support to cover his tuition, as well as a small stipend for living expenses.  With this opportunity, he left everyone and everything he had ever known to continue his education and pursue the American dream.

### B.    Dr. Kapoor Achieved Professional Success Through Hard Work and a Dedication to Patients.

Upon starting his doctoral studies in the United States, Dr. Kapoor quickly separated himself from other students with his work ethic; he was the rare graduate student who never took a vacation during his entire course of study.[11]  He was also motivated by a desire to help patients in need and aspired to start a company that would help address the acute shortage of modern drugs in India.[12]  In 1972, Dr. Kapoor earned his Ph.D. and thereafter began working for a small generic drug manufacturer in Buffalo.

---

[7] Ltr. from Ramesh Acharya, dated Aug. 9, 2019, at 1 (Ex. 50).

[8] *Id.*

[9] *Id.*

[10] Ltr. from Alan Jere Solo, dated Jul. 19, 2019, at 1 (Ex. 70).

[11] *Id.* at 2.

[12] *Id.*

After six years, Dr. Kapoor yearned to start a company on his own. He approached Lyphomed, a Chicago-based drug manufacturer, and secured a job as a general manager with an option to purchase the company if its parent corporation (better known for manufacturing corrugated cardboard) exited the pharmaceutical industry.[13] Dr. Kapoor quickly climbed the ranks at Lyphomed and became "a pioneer in developing generic injectable products."[14] He was named President in 1980 and secured the funding to buy the company a year later. He was then named CEO after taking the company public in 1983.[15]

Under Dr. Kapoor's leadership, Lyphomed grew from fewer than 20 employees to more than 800.[16] As CEO, Dr. Kapoor focused not just on improving Lyphomed's bottom line, but on how the company could help patients suffering from debilitating diseases. Research and development remained Dr. Kapoor's passion, and he played a "critical role" in developing Pentamidine, which is used to treat a common and deadly pneumonia that afflicts AIDS patients.[17] He also focused on methods of drug delivery, and introduced injectables consisting of micronutrients for cancer patients, while challenging barriers established by larger pharmaceutical companies to give patients greater access to generic medicines.[18]

In 1990, Lyphomed was acquired by a Japanese pharmaceutical firm that paid $150 million for Dr. Kapoor's ownership stake.[19] Dr. Kapoor could have easily used this money to

---

[13] *See* Steven Morris, *Exec Finds Life After Lyphomed*, Chicago Tribune, Oct. 12, 1990, at 1 (Ex. 73); Ltr. from Alan Jere Solo, dated Jul. 19, 2019, at 2 (Ex. 70).

[14] Ltr. from Mahendra Shah at 1 (Ex. 69).

[15] *Id.*

[16] Ltr. from Ramesh Acharya, dated Aug. 9, 2019, at 1 (Ex. 50).

[17] *Id.*

[18] *Id.* at 1–2.

[19] Draft PSR ¶ 202.

retire.  Instead, he decided to use his fortune to develop new companies and give back to others in

need.[20]  To accomplish the first of these goals, he founded EJ Financial Enterprises Inc., a holding

company through which he invested in a variety of pharmaceutical companies, including:

- Option Care, a company that provided patients with in-home intravenous feeding and chemotherapy services, in which Dr. Kapoor acquired a two-thirds stake in 1990.[21]

- Unimed, a company that focused on treatments improving the quality of life for patients with compromised immune systems, in which Dr. Kapoor acquired a 20 percent stake in 1991.[22]

- Sciele Pharma, a company that developed branded cardiovascular, metabolic, and women's health medications, and that included Dr. Kapoor on its board of directors from 1996 to 2006.[23]

- Akorn, Inc., a manufacturer of generic ophthalmology products and injectables for hospitals that Dr. Kapoor invested $25 million in during the 1990s to become its largest shareholder.[24]

From the start, Dr. Kapoor was interested in investing in companies that developed cancer

treatments, leading him to acquire a 21 percent stake in NeoPharm Inc. (formerly Oncomed Inc.),

whose development of a once-promising brain cancer drug stalled out during clinical trials.[25]

NeoPharm was part of a group of cancer-related ventures Dr. Kapoor invested in during the 1990s,

which also included Texas Biomedical Development Partners (which sought to commercialize

---

[20] *See* Ltr. from Rao Akella, dated Aug. 19, 2019, at 2 ("With the money he made, Dr. Kapoor could easily retire.  He doesn't need more money.  He did not retire, because he wanted to help cancer patients.") (Ex. 51).

[21] Steven Morris, *Exec Finds Life After Lyphomed,* Chicago Tribune, Oct. 12, 1990, at 1 (Ex. 73).

[22] Steven Morris, *Unimed Wins FDA Approval On AIDS Drug*, Chicago Tribune, Dec. 23, 1992, at 1 (Ex 74).

[23] Press Release, Dr. John Kapoor Retires from Sciele Pharma Board of Directors (Dec. 8, 2006), *available at* https://tinyurl.com/scielepr.

[24] Draft PSR ¶ 209.

[25] Val Brickates Kennedy, *NeoPharm Plunges on FDA Request*, MarketWatch (Mar. 29, 2007), *available at* https://tinyurl.com/neopharmmw.

promising drugs developed at M.D. Anderson Cancer Center), Introgen Therapeutics, Inc. (which invested in research for a gene therapy to treat lung cancer), and Carbomed Inc. (which focused on the research and development of cancer-fighting agents).[26]

The common thread of Dr. Kapoor's pharmaceutical endeavors has been a focus on patients. His colleagues overwhelmingly describe him as someone "with [a] dedication and passion for helping cancer patients," whose "focus was how to improve the quality of life for patients."[27] In particular, his colleagues emphasize Dr. Kapoor's "patient centric" approach to developing new products, and his dedication to "advanc[ing] research with the goal of improving the quality of patients' lives."[28]

In addition to his pharmaceutical ventures, Dr. Kapoor founded JNK Holdings LLC in 2006 to pursue various restaurant businesses. Even where the restaurants were concerned, his vision emphasized health and cancer prevention. For example, Dr. Kapoor's goal in opening Marigold Maison was to "create a menu that used scientifically supported ingredients as potential sources of cancer prevention."[29] Dr. Kapoor's colleagues recall him caring more that his restaurants delivered quality food than immediate profits.[30]

---

[26] Arsenio Oloroso, Jr., *In Health Care, He's Everywhere*, Crain's Chicago Business, Feb. 18, 1995, at 2, 4-5 (Ex. 75).

[27] Ltr. from Dave Alberts, dated Jul. 11, 2019, at 2 (Ex. 64); Ltr. from Ramesh Acharya, dated Aug. 9, 2019, at 1 (Ex. 50).

[28] Ltr. from Vikram Malhotra, dated Oct. 6, 2019, at 1 (Ex. 58); Ltr. from Venkat Goskonda, dated Jul. 18, 2019, at 1 (Ex. 55). *See also* Ltr. from Mahendra Shah at 1 ("I found John to be very hard working and dedicated to developing new pharmaceutical products and companies to help patients.") (Ex. 69).

[29] Ltr. from Sunil Kumar, dated Jun. 3, 2019, at 1 (Ex. 57).

[30] *Id.* at 2 (describing how Marigold Maison "lost money, over and over, year after year," but Dr. Kapoor still "refused to compromise quality for profit"); Ltr. from Mo Habul at 2 (recounting a conversation with Dr. Kapoor where he told him that "as long as we are trying different things, learn[ing] from them, and fighting each day . . . we will succeed") (Ex. 56).

### C.      Dr. Kapoor Is a Devoted Father Whose Care and Support Has Helped His Family Through Numerous Tragedies.

#### 1.      Throughout His Life, Dr. Kapoor Has Been a Caring and Supportive Husband, Father, and Family Member.

As he pursued his many professional endeavors, Dr. Kapoor did not lose sight of the importance of family.  He met his wife, Editha Hillock, in Buffalo shortly after he earned his Ph.D.[31]  They were married in a legal wedding ceremony in September 1974 in Buffalo, and also had traditional Hindu and Catholic ceremonies in April and October 1974, respectively.  Editha was by Dr. Kapoor's side for all of his early successes.



Dr. Kapoor's children describe a childhood filled with "lots of love and joy."[36]  Christina describes how Dr. Kapoor and Editha were always there for her and her siblings' extracurricular

---

[31] Ltr. from John Hillock, dated Aug. 8, 2019, at 1 (Ex. 4).

[32] Draft PSR ¶ 171.

[33] Ltr. from Roxana Kalyanvala, dated May 31, 2019, at 1 (Ex. 39).

[34] *Id.* at 1.

[35] *Id.*

[36] Ltr. from Christina Kapoor, dated Aug. 15, 2019, at 1 (Ex. 8).

activities, including sports games, girl scouts, dance lessons, piano lessons, and summer camps.[37]

Both parents played a "very active role and were there to cheer and support me on always."[38]

Others close to the family provide similar descriptions. For example, Nellie Oquendo, Dr.

Kapoor's longtime assistant, describes how the children brought "a smile to [Dr. Kapoor's] face"

and ███████████ led to "a home now filled with laughter and the love of family."[39]

Dr. Kapoor also maintained strong ties with his extended family in India, including through

visits that are fondly remembered by a wide range of family members.[40] Dr. Kapoor continued to

serve as the head of this wider family, supporting relatives in matters big and small,[41] until this

case ended his ability to travel to India or send money abroad.

---

[37] *Id.*

[38] *Id.*

[39] Ltr. from Nellie Oquendo, dated Jul. 10, 2019, at 2 ("███████████████████ ██████████. Each little bundle of joy would bring a smile to his face - the times spent with them, - the many vacations, - the school functions, - proms, - graduations, - are all memories he will always cherish. It was the start of a new way of life for them, a home now filled with laughter and the love of family.") (Ex. 21).

[40] *See, e.g.*, Ltr. from Naresh Bhatia, dated Sep. 19, 2019, at 2 (describing how "his whole family in India eagerly used to wait for Dr. Kapoor's visit during the Christmas Holidays," and how those "3-4 days used to be like a Festival for our whole family and was an opportunity to reconnect with cousins who lived far away") (Ex. 25); Ltr. from Beena Bhatia, dated Jun. 12, 2019, at 3 (describing Dr. Kapoor's frequent visits to India as "a beautiful time for our family when everyone from all around gathered at one place to celebrate," and how "[e]veryone, be it elders or children, looked forward to these get togethers in the family") (Ex. 22); Ltr. from Arushi Bhatia, dated Jun. 11, 2019, at 1 (describing Dr. Kapoor's visits to India as "the time we all looked forward to the most" and a way of "living up to our family's legacy of how our elders and great grandparents would want us to be one tight knit family just like the way they were") (Ex. 21).

[41] *See, e.g.*, Ltr. from Manav Bhatia, dated Aug. 9, 2019, at 1 (explaining that Dr. Kapoor was "the pillar of support" his mother relied on in times of need even though she lived in India) (Ex. 24).

2.      *Dr. Kapoor Has Endured Several Family Tragedies, None More Transformative Than His Wife's Suffering and Death from Breast Cancer.*

Although his family has brought him much joy, Dr. Kapoor has also experienced pain, loss, and challenges in his personal life.  Dr. Kapoor's sister passed away in India in the early 1960s from an accidental kitchen fire that left her with severe burns that she was unable to survive.[42]  Dr. Kapoor's mother passed away from an accidental carbon monoxide leak in her home in Illinois in 1999, which also left Dr. Kapoor's younger brother temporarily in a coma and permanently disabled.[43]  Dr. Kapoor was instrumental in his brother's recovery and continues to assist with the care he still needs for his injuries.[44]

None of these tragedies impacted Dr. Kapoor as much as Editha's passing from breast cancer in 2005.  Dr. Kapoor did everything he could to save her—in searching for a cure for her breast cancer and, when that became untenable, in keeping her comfortable amidst her pain.[45]  He

---

[42] Ltr. from Gopal Mehra , dated Jul. 27, 2019, at 2 (describing how she was in "horrific pain from her burns" and passed away after being hospitalized for a few months).  Letters describe Dr. Kapoor's struggle to cope with his sister's untimely death, and how it led him to explore whether Subsys could also help treat patients with severe burns.  *See* Ltr. from Christina Kapoor, dated Aug. 15, 2019, at 3 (explaining that "to this day she is not talked about as its too painful for [Dr. Kapoor] to relive what happened to her"); Ltr. from Mary Gauwitz, dated Aug. 29, 2019, at 3 (explaining that his sister's death was "another reason I know [Dr. Kapoor] developed Subsys," and how Dr. Kapoor "talked to doctors . . . about the possibility of running clinical trials to see if it could help alleviate the pain some burn patients have.").

[43] *See, e.g.*, Ltr. from Robert Kapoor at 2 (describing the accident and its consequences).

[44] *Id.* at 2 ("[W]ithout his help I don't know what I would do without him . . . . I depend on my brother for so much."); Ltr. from Vijay Kapoor, dated Aug. 9, 2019, at 1 ("After the accident, my father has not been the same and constantly needs help.  John has been taking care of him since. If John wouldn't have been there, it would have been very difficult for my father to survive and recover the way he has.").

[45] Ltr. from Nellie Oquendo, dated Jul. 10, 2019, at 2 (describing how Dr. Kapoor "did not stop pursuing all resources presented to him, in an effort to find Mrs. Kapoor some comfort during her painful struggle"); 2/1/19 Trial Tr. 41:10-20 (testimony from Oquendo that Dr. Kapoor "tried everything possible, seeing doctors from all over the states and getting advice.  He was instrumental in just trying to do everything that he could for her.").

was Editha's caretaker until the end.  His sister-in-law writes that "I've never seen a husband fight the way he fought to save her life."[46]  When Editha passed, Dr. Kapoor was broken, "wailing for at least 30 minutes just saying her nickname *bunny* over and over,"[47] and withdrew for months from all his daily and business activities. [48]

### 3.   Dr. Kapoor's Care and Support Was and Is Critical For His Children.

While Dr. Kapoor took Editha's passing extremely hard, it was even more difficult for his children ███████████████████████  Dr. Kapoor had to put aside his own pain to care for theirs: as his daughter Christina writes, "Dad lost the love of his life and he put his emotions and feelings aside to make sure us kids were protected . . . . Dad took on the role of being a Dad and a Mom."[49] ████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████  █████████████████

---

[46] Ltr. from Linda Hillock, dated Sep. 19, 2019, at 1 (Ex. 5).

[47] Ltr. from John DeLeo, dated Jul. 12, 2019, at 2.  *See also* Ltr. from John Hillock, dated Aug. 8, 2019, at 1-2 (describing how Dr. Kapoor was "shattered" and "devastated" by Editha's passing) (Ex. 2).

[48] 2/1/19 Trial Tr. 42:3-9 (Oquendo testifying that after Editha passed Dr. Kapoor "was just not the same person.  He stopped working, was very distraught, didn't want to have anything to do with business, company, family, stayed to himself and that went on for several months.").

[49] Ltr. from Christina Kapoor, dated Aug. 15, 2019, at 4 (Ex. 8).  *See also* Ltr. from Nellie Oquendo, dated Jul. 10, 2019, at 2-3 (describing the children's difficulties in accepting Editha's passing and how Dr. Kapoor has done "all that he could to keep his family together") (Ex. 17); Ltr. from Linda Hillock, dated Sep. 19, 2019, at 1 (explaining that the "whole family was in turmoil" after Editha's passing as the children coped with "los[ing] their mother at an early age") (Ex. 5).







4. *Dr. Kapoor Has Used His Wife's Passing to Effect Positive Change in the Fight Against Cancer.*

Despite the pain it has caused him and his family, Dr. Kapoor has used Editha's passing to effect positive change in the fight against cancer and in helping cancer patients. Those around him describe an "unwavering desire to help cancer patients" in the years since her death.[57] Specifically, they describe how watching Editha's battle with cancer motivated him to develop a fast-acting



[57] *See* Ltr. from Vijay Rao at 2 (Ex. 61). *See also* Ltr. from Dave Alberts, dated Jul. 11, 2019, at 2 ("In all my years knowing John, he has shown nothing but a desire to help cancer patients and their families.") (Ex. 64).

pain-relieving cancer drug, invest in other companies focused on cancer-related treatments, and contribute to charitable causes designed to help patients with cancer.[58]

### D.     Dr. Kapoor Used His Success to Help and Give Back to Others.

#### 1.     *Dr. Kapoor Has Contributed More Than $128 Million to Charity with a Particular Focus on Helping Cancer Patients and Their Families.*

When he made his fortune in 1990, one of the first things Dr. Kapoor did was start a charitable foundation.[59]  Since that time, Dr. Kapoor's tax filings show charitable contributions in excess of $128 million.  This is not a story of charity in the face of criminal accusations, or a late turn in life to benefiting others.  It is a constant pattern of behavior over the past 29 years, from the moment Dr. Kapoor came into sufficient means to engage in large-scale charitable pursuits.

Recognizing its role in his own success, higher education has always been an area of focus for Dr. Kapoor's charitable endeavors.  Through his foundations and direct contributions, he has funded more than 800 scholarships for students to attend Khalsa College and the Institute of Chemical Technology in India, the University of New York at Buffalo, and other universities in the United States.[60]  Students credit Dr. Kapoor's foundation and these scholarships for changing

---

[58] *See* Ltr. from Rao Akella, dated Aug. 9, 2019, at 2 ("After seeing how much his wife suffered with cancer pain, he was more focused on developing fast acting pain-relieving cancer drugs and started Insys Therapeutics. . . . After [her] death, Dr. Kapoor continued [his] Charitable activities more aggressively than before.") (Ex. 51); Ltr. from Vijay Rao at 2 (explaining that Dr. Kapoor has tried to help cancer patients and their families "through his investments in portfolio companies and via his charitable foundations") (Ex. 61).

[59] *See* Ltr. from Rao Akella, dated Aug. 9, 2019, at 2 (explaining that Dr. Kapoor and Editha started a charitable foundation in 1990) (Ex. 51); Ltr. from Alan Jere Solo, dated Jul. 19, 2019, at 3 (explaining that after Lyphomed was sold, Dr. Kapoor and Editha "immediately put a portion of the funds into a charitable foundation to support causes which they believed in") (Ex. 70).

[60] *See* Ltr. from Mary Gauwitz, dated Aug. 29, 2019, Attach. A (reporting a total of 803 students who have received scholarships from Dr. Kapoor's foundations in the United States and India since April 1998) (Ex. 3).

their lives.[61]   The scholarships also reflect the importance that Dr. Kapoor places on social awareness and helping others.   Scholarship recipients are required to intern with Dr. Kapoor's foundation or another NGO to learn about social responsibility.[62]  This component has had a lasting impact on recipients and allowed them to "reach[] a greater understanding about issues like cancer" and the importance of contributing to one's society.[63]

Following Editha's passing, Dr. Kapoor's focus shifted to charitable endeavors devoted to helping cancer patients.   In 2011, he founded Editha House, which provides lodging to cancer patients seeking treatment from out of town.   The idea for Editha House came to Dr. Kapoor after seeing family members of cancer patients sleeping in waiting lounges and vehicles because they could not afford accommodations.[64]   Since opening its doors, Editha House has provided lodging for almost 1,200 patients from 18 different countries and almost every state in the U.S.[65]   Dr. Kapoor funded the organization entirely by himself,[66] and it has never turned patients away due to cost.[67]  Describing the impact on cancer patients and their families, Janet Houghton writes, "I can't

---

[61] *See, e.g.*, Ltr. from Rohit Tandle, dated Aug. 8, 2019, at 1 ("I am not exaggerating when I say Gunvati Jagan Nath Kapoor Foundation (GJNK) and Dr. Kapoor have played a very vital and lifelong memorable contribution in my life.") (Ex. 48).

[62] Ltr. from Ganesh Krishnan at 2 (Ex. 40).

[63] Ltr. Nirjari Dalal, dated Jul. 3, 2019, at 3 (Ex. 35).  *See also* Ltr. from Rohit Tandle, dated Aug. 8, 2019, at 2 (explaining that his work at the foundation's platelet bank had a "phenomenal impact" and "definitely changed the way I see my life") (Ex. 48).

[64] Ltr. from Janet Houghton, dated Jul. 9, 2019, at 1 (Ex. 38).

[65] *Id.* at 2.

[66] *Id.* at 1.

[67] *See* Ltr. from Chris Cohen, dated Aug. 8, 2019, at 1 ("I can't imagine the cost of running such an amazing place, but Dr. Kapoor saw to it that nobody was turned away.") (Ex. 33); Ltr. from Jackie Mullins, dated Jun. 22, 2019, at 1 ("Dr. Kapoor opened his home (Editha House) up to us for free.  All total we stayed for about a year.  Dr. Kapoor not one time ever asked us for money.") (Ex. 43).

begin to tell you the number of people that have come into my office and expressed their gratitude toward Dr. Kapoor because of [Editha House]."[68]

In addition, Dr. Kapoor donated millions to fund research by Dr. Mary-Claire King, the renowned scientist who discovered the BRCA 1 and BRCA 2 breast cancer genes.[69]  He also funded a "Traveling Fellowship" in partnership with the Indo American Cancer Association.[70] The fellowship allowed oncologists from non-profit hospitals in India to travel to the U.S. for four to five week observer-ships with oncologists at top comprehensive cancer centers.[71]  Collectively, that program helped arrange training for approximately 86 oncologists from India by approximately 53 mentors in the U.S.[72]  Dr. Kapoor also helped the American Cancer Society fund one of its first Patient Guidance Programs in Illinois.[73]  That program helps connect cancer patients with resources such as housing, psychosocial support, wigs, and education, and became the model for a similar program adopted by GNK Foundation.[74]

Dr. Kapoor's charitable efforts in India are equally impressive and led the American Cancer Society to recognize him with an International Achievement Award in 2007.[75]  Through the GNK foundation, Dr. Kapoor helped create programs that have provided valuable assistance

---

[68] Ltr. from Janet Houghton, dated Jul. 9, 2019, at 1 (Ex. 38).  *See also* Ltr. from Jackie Mullins, dated Jun. 22, 2019, at 1 ("I really do not know what I would have done had it not been for Dr. John Kapoor's generosity and kindness . . . . He helped save my life and for that I will be forever grateful.") (Ex 43).

[69] Ltr. from Annie Parker, dated May 23, 2019, at 1 (Ex. 45).

[70] Ltr. from Sadhna Bokhiria, dated Aug. 8, 2019, at 10 (Ex. 32).

[71] *Id.*

[72] *Id.*

[73] *Id.* at 12.

[74] *Id.*

[75] Ltr. from Mary Gauwitz, dated Aug. 29, 2019, at 2 (Ex. 3).

to hundreds of thousands of cancer patients in India.  For example, patient guidance programs at Tata Memorial Hospital (the largest government cancer hospital in India) and two hospitals in Amritsar seek to encourage patients to complete treatment in a highly-bureaucratic and inefficient medical system where many patients simply give up and stop seeking care.[76]  The Foundation has helped more than 241,000 cancer patients complete treatment though "guidance, financial planning, advocacy, cancer education, and psycho-social support."[77]  Likewise, the Foundation has provided the necessary financial support and manpower for the "Save a Life" initiative, which seeks to increase platelet donations at Tata Memorial Hospital.[78]  Between 2014 and 2019, the initiative increased the percentage of donated platelets (versus platelets from caregivers of cancer patients) from 42% to over 90%, helping save the lives of thousands of cancer patients in the process.[79]  And the Community Health Empowerment initiative, which seeks to create cancer awareness and risk mitigation amongst poor women in India, has helped close to 9,000 of India's most vulnerable citizens take their health into their own hands.[80]

Outside of the programs he helped create, Dr. Kapoor has improved cancer treatment in India by donating to palliative care organizations, children's hospices, and rural hospitals.[81]  He

---

[76] Ltr. from Ganesh Krishnan at 2 (Ex. 40).

[77] Ltr. from Nirjari Dalal, dated Jul. 3, 2019, at 2 (Ex. 35).  *See* Ltr. from Sameena Bilgi, dated Sep. 19, 2019, at 1 (describing work she does for GNK Foundation that focuses on "providing psycho social support to people suffering from breast and gynaecology [sic] cancer") (Ex. 31).

[78] Ltr. from Nirjari Dalal, dated Jul. 3, 2019, at 2 (Ex. 35).

[79] *See* Ltr. from Mary Gauwitz, dated Aug. 29, 2019, Attach. A (Ex. 3).

[80] Ltr. from Nirjari Dalal, dated Jul. 3, 2019, at 3 (Ex. 35).

[81] *Id.*

23

has also helped cancer patients by paying for their rehab and accommodations,[82] and instructing

GNK Foundation to hire survivors of the disease to help them achieve financial security.[83]

> ### 2. Dr. Kapoor Has Helped Countless Others Through Individual Acts of Generosity and Kindness.

Dr. Kapoor's generosity was never limited to formal charities or foundations. Whether

their needs be small—such as buying sneakers for Editha House guests—or large—such as

purchasing airline tickets for Editha House guests to travel home during breaks in treatment—Dr.

Kapoor has helped others when he saw an opportunity to do so.[84]

This support extends to dozens of family members in the United States and India. Dr.

Kapoor has helped extended family deal with financial struggles and medical issues, including

bringing children from India to the United States for medical treatment and funding that

treatment.[85] Dr. Kapoor has paid tuition for multiple generations of extended family members so

---

[82] *Id.*

[83] Ltr. from Chetan Shinde at 2 (Ex. 47).

[84] *See* Ltr. from Jackie Mullins, dated Jun. 22, 2019, at 1 ("When Dr. Kapoor learned that I didn't have any comfortable sneakers and that I could not afford them, Dr. Kapoor made sure I had not one but two new pair.") (Ex. 43); Ltr. from Kathleen O'Brien, dated Jun. 16, 2019, at 1 (recounting how another Editha House patient had back surgery and could not drive home safely to Colorado, so Dr. Kapoor bought her and an Editha House employee airline tickets to make sure she got home safe) (Ex. 44); Ltr. from Mary Gauwitz, dated Aug. 29, 2019, at 3 ("If there is a patient who needs groceries, money for gas, clothing, shoes, toiletries, John would take care of it.") (Ex. 3).

[85] *See* Ltr. from Arushi Bhatia, dated Jun. 11, 2019, at 1 ("Around the early 2000s, my father's business was going through a rough patch and my uncle, without thinking twice helped my father and family monetarily and guided him to a better path and helped secure our futures.") (Ex. 21); Ltr. from Beena Bhatia, dated Jun. 12, 2019, at 2 (describing how Dr. Kapoor brought her autistic son to the U.S. for more than 2 years for better medical treatment and has provided "continuous support" for him to attend an "institution with special care" in India) (Ex. 22); Ltr. from Naresh Bhatia, dated Sep. 19, 2019, at 2 ("In 2008, under a depressed global business and economic environment, once again I needed to turn to him for help so I could stabilize the business and stand on my feet again. His guidance for changing my business model and his vision helped me in our survival and in sustaining us and our further progress. His support not only helped me and my family but also so many other families directly connected with my business.") (Ex. 25); Ltr. from Aditi Mehra, dated Jun. 6, 2019, at 2 ("If it were not for [Dr. Kapoor's] financial support, there

they could pursue higher education.[86]  And he instilled the value of giving back to others in the next generation by having the younger generations in the family get involved in charity.[87]

Dr. Kapoor's generosity has also extended to those employed by his various businesses. Numerous employees describe how Dr. Kapoor helped them and others by offering interest-free loans to employees affected by Hurricane Harvey,[88] donating proceeds from the businesses and his own personal funds to pay for employees' medical care,[89] and covering medical care for

---

would [have been] no possibility that my parents could have moved to the U.S. and provided me with the resources and life that I live.") (Ex. 26); Ltr. from Sanjiv Mehra at 2 (describing his father's two-month hospitalization due to an accident in Phoenix and how Dr. Kapoor "would call me at least 3-4 times a day to check on [him] and visited him several times a week") (Ex. 30).

[86] *See* Ltr. from Paras Aneja at 2 ("Having Dr. Kapoor's support, by way of sponsoring me throughout my four years in college, I was able to receive my undergraduate degree from the University of Kansas.") (Ex. 18); Ltr. from Rajesh Aneja, dated Sep. 19, 2019, at 1-2 ("John came forward to help my parents by way of providing my sister and I support to obtain an education from grade school all the way through college . . . . I have two children, whom John supported to get their higher education.") (Ex. 19); Ltr. from Manav Bhatia, dated  Aug. 9, 2019, at 2 ("It was through his generosity that I was able to attend boarding school and complete my Engineering degree from Georgia Tech.") (Ex. 24); Ltr. from Aditi Mehra, dated Jun. 6, 2019, at 2 ("Because he holds education in such high regard, [Dr. Kapoor] has covered the extremely high cost of university for every single child in our family so far, including me.") (Ex. 26); Ltr. from Jessica Mehra at 1 ("[Dr. Kapoor] has been generous enough to provide all my cousins and family with the funding to attend the colleges of their choice, that they had gotten accepted into.") (Ex. 28).

[87] *See, e.g.*, Ltr. from Paras Aneja at 3 ("In requiring the children in our family to get involved in charity, giving back is something that is instilled in me forever.  I never had an interest or desire to volunteer but spending time volunteering at Northwestern Memorial Hospital and the Editha Guest House in Chicago really made me value health, life, and what we have by seeing how so many patients struggle daily.") (Ex. 18).

[88] *See* Ltr. from John Duffield at 1 (describing how Dr. Kapoor directed his restaurant group to offer interest-free loans to any employee at Roka Akor in Houston who suffered losses due to Hurricane Harvey) (Ex. 53).

[89] *See* Ltr. from Mirnes Mehic at 1 ("A few years ago, John got wind that one of our servers at Roka Akor was in a terrible car accident and was needing assistance in paying for surgeries.  John insisted we choose a night of the week and donate all the proceeds of that night to her care.  One [sic] top of that he matched whatever was brought in that night.") (Ex. 59).

employees' children.[90]  Sunil Kumar also describes how, after learning an employee at one of his restaurants was homeless, Dr. Kapoor helped him find a place to stay, bought him groceries, and even "went through his closet to donate his clothes" to the young man.[91]

Dr. Kapoor also used his entrepreneurial spirit to help others develop their own companies. In the 1980s, he helped Ramesh Pandey form Xechem, a company that produced a generic antibiotic.[92]  This is but one example in a long series.[93]  As with his other ventures, Dr. Kapoor shared his belief that there is great "value [in giving] back to the community and society at large."[94]

## III.     THE ADVISORY SENTENCING GUIDELINES RANGE

As of this filing, the Probation Office has yet to issue a final PSR for Dr. Kapoor.  Until the final PSR is issued, Dr. Kapoor cannot formally object to the guideline calculation for sentencing.  However, Dr. Kapoor's anticipated position on the sentencing guidelines is as follows:

---

[90] *See* Ltr. from Abraham Suarez, dated Jun. 14, 2019, at 1 (server at Marigold Maison explaining that following his son's 115-day stay in a neonatal unit, Dr. Kapoor personally paid any resulting medical expenses not covered by his insurance) (Ex. 62).

[91] Ltr. from Sunil Kumar, dated Jun. 3, 2019, at 2 (Ex. 57).

[92] Ltr. from Ramesh Pandey, dated Jun. 11, 2019, at 1-2 (Ex. 67).

[93] *See* Ltr. from Anand Acharya, dated Sep. 5, 2019, at 1 (explaining that Dr. Kapoor provided him with $3 million in seed money for his business, regularly provided him guidance, and "exhibited patience" when it came to any return on his investment) (Ex. 65); Ltr. from Porfirio Balderas, dated Jun. 10, 2019, at 1 ("He not only inspired and guided me, he was also willing to fund my project and never expected any extra benefit in return.  Thanks to John, to his trust, and his kindness I have been a business owner for more than 23 years.") (Ex. 1); Ltr. from Nobou Fukuda, dated Aug. 2, 2019, at 1 ("With very little to gain financially, Dr. Kapoor chose to invest in the restaurant because I believe he sees the value in supporting small local businesses and the hardworking people behind them.") (Ex. 54); Ltr. from Nitin Rai, dated Jun. 12, 2019, at 1 ("Dr. Kapoor has been a role model, mentor and guide to me since I launched [my] company in 1994.") (Ex. 68); Ltr. from Tyler Wanke, dated Jul. 29, 2019, at 1 (describing how Dr. Kapoor's "investment helped us through a critical state and the feedback from he and his team was invaluable") (Ex. 71).

[94] Ltr. from Nitin Rai, dated Jun. 12, 2019, at 1 (Ex. 68).

A.      Consistent with the Court's ruling on defendants' post-trial motions, *see* Dkt. No. 1028, the sentencing guidelines should not include any calculation premised upon the CSA or honest services fraud.

B.      The remaining predicate objects of ordinary mail fraud and ordinary wire fraud result in a single grouping, pursuant to U.S.S.G. § 3D1.2, and are subject to the fraud guidelines set forth in U.S.S.G. § 2B1.1.

C.      The base offense level is six (as reflected in the Draft PSR) rather than seven (as incorrectly urged by the government). The alternative base offense level—seven—applies only if two conditions are satisfied. First, the offense of conviction must be "referenced to this guideline." U.S.S.G. § 2B1.1(a)(1). Second, the offense of conviction must have "a statutory maximum term of imprisonment" of at least twenty years. *Id.* The first condition is the one missing here. According to the Guidelines, an offense is "referenced to this guideline" if—and only if—§ 2B1.1 "is the applicable Chapter Two guideline *specifically referenced* in Appendix A (Statutory Index) for the offense of conviction." Application Note 2(A) to U.S.S.G. § 2B1.1(a)(1) (emphasis added). With respect to the relevant offense of conviction—racketeering conspiracy in violation of 18 U.S.C. § 1962(d)—Appendix A does not "specifically reference" U.S.S.G. § 2B1.1. To the contrary, it specifically references an entirely different guideline provision, U.S.S.G. § 2E1.1. The government's interpretation would render superfluous the guidelines provision requiring that the offense of conviction be "referenced to this guideline" before the base offense level rises to seven, and would incorrectly apply a base level of seven to all offenses under 2B1.1 with a statutory maximum of at least twenty years' imprisonment.

D.      Dr. Kapoor does not object to the government's position, adopted in the Draft PSR, that the base level should be enhanced by 20 points for a loss amount that is at least $9,500,000

but not more than $25,000,000.  The government calculated this amount by estimating the number of Subsys prescriptions paid for by Medicare for the 13 practitioners identified in the SSI and the 28-day letter as co-conspirators, adjusted based on (1) an estimate of the percent of those prescriptions where coverage was sought through the IRC and (2) the average percent of non-cancer Subsys prescriptions between 2012 and 2015 (on the premise that Medicare would not have covered such prescriptions pursuant to its policies on off-label TIRF coverage absent misrepresentations from the IRC).  While Dr. Kapoor questions the decision to include the prescriptions of three of the 13 prescribers in this calculation because the government did not show their involvement in the conspiracy (either at trial or in any subsequent submission of evidence supporting relevant conduct to the Probation Office), eliminating those prescriptions from the loss amount would not affect the 20 point enhancement.

E.   The Draft PSR correctly declines to apply a two-level enhancement for an "offense involv[ing] the conscious, or at least reckless, risk of death or serious bodily injury" pursuant to U.S.S.G. § 2B1.1(b)(16)(A).  *See* Draft PSR ¶¶ 134-140 (detailing adjustments to the fraud grouping).  The Court should reject the government's objection to the contrary.  For these purposes, the question is whether the criminal "conduct created a risk that others would suffer serious bodily injury." *United States v. Vivit*, 214 F.3d 908, 921 (7th Cir. 2000).  In ruling on trial defendants' post-trial motion, the Court noted that "there is not evidence sufficient to prove that Defendants specifically intended . . . that healthcare practitioners would prescribe Subsys to patients that did not need it" and that the government "lack[ed] evidence that Defendants agreed and intended that healthcare practitioners would illicitly distribute Subsys to patients that did not need it or at an unnecessarily high dose." *See* Mem. & Order, Dkt. No. 1028, at 22-23.

Although the Court reasoned that the jury could have found that defendants did not care about the downstream consequences to patients, carelessness does not rise to a "conscious or reckless risk of death or serious bodily injury." U.S.S.G. § 2B1.1(b)(16)(A).  For an offense to involve a "conscious" risk of death or serious bodily injury, the defendant must be "subjectively aware that his or her conduct created a risk of serious bodily injury."  *United States v. Maestas*, 642 F.3d 1315, 1321 (10th Cir. 2011).  There is no evidence that Dr. Kapoor was consciously aware that any wrongdoing at Insys was creating a risk of death or "serious bodily injury," which the Guidelines define as "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation."  U.S.S.G. § 1B1.1 cmt. n. 1(L).

For an offense to involve a "reckless" risk of death or serious bodily injury, the defendant must at the very least disregard "the type of risk [of death or serious bodily injury] that is obvious to a reasonable person and for which disregard of said risk represents a gross deviation from what a reasonable person would do."  *United States v. Lucien*, 347 F.3d 45, 56-57 (2d Cir. 2003).[95]  To be sure, if a defendant did intend for doctors to prescribe Subsys to patients who did not need it, that would be disregarding a risk of death or serious bodily injury that any reasonable person would be aware of.  But as the Court has recognized, there is no evidence that Dr. Kapoor intended for "healthcare practitioners [to] prescribe Subsys to patients that did not need it."  Mem. & Order, Dkt. No. 1028, at 21.

---

[95] There is currently a circuit split on the proper interpretation of this provision of the Sentencing Guidelines.  *See United States v. McCord, Inc.*, 143 F.3d 1095, 1098 (8th Cir. 1998); *United States v. Johansson*, 249 F.3d 848, 858 (9th Cir. 2001); *Maestas*, 642 F.3d at 1319.  The Eighth Circuit's interpretation of "reckless" is even narrower than the Second Circuit's interpretation quoted above, requiring that the defendant must have "in fact [been] aware of and consciously or recklessly disregarded that risk."  *McCord, Inc.*, 143 F.3d at 1098.  As far as we can tell, the First Circuit has not yet taken a position on this issue.

Moreover, the government's position ignores the undisputed features of *any* opioid, Subsys or otherwise, which necessarily entails a risk of death or serious bodily injury. That is a feature of the medication and not the criminal conduct. And all patients who testified at trial acknowledged being in substantial pain at the time of their Subsys prescriptions, and that they had been taking substantial doses of other opioids before they began taking Subsys. *See, e.g.*, 3/28/19 Trial Tr. 139:24-140:12 (Michelle Kamzyuk) (oxycodone, percocet, dialudid, duragesic fentanyl patch); 3/28/19 Trial Tr. 185:20-25, 186:14-21, 194:1-14 (Alicia Hinesley) (hydrocodone, valium, oxycodone, morphine); 3/27/19 Trial Tr. 252:25-253:5, 265:18-23, 267:18 – 268:6 (Kendra Skalnican) (MS Contin, norco, morphine); 3/26/19 Trial Tr. 71:17-22, 81:4-10 (Scott Byrd) (valium, oxycodone, oxycontin); 3/22/19 Trial Tr. 52:9-16 (Woodrow Chestang) (percocet, oxycontin, morphine, oxymorphone); 3/21/19 Trial Tr. 82:6-83:9 (Sara Dawes) (duragesic fentanyl patch, hydromorphone, oxycodone, Actiq); 3/21/19 Trial Tr. 185:15-186:2 (Betty Carrera) (norco, xanax, oxycontin, oxycodone, fentanyl patch); 3/20/19 Trial Tr. 129:3-20, 144:24-145:1 (Kathy Avers) (high doses of oxycodone); 3/20/19 Trial Tr. 183:21-184:1, 184:15-185:4, 185:25-187:11 (Paul Lara) (Actiq, fentanyl patch, morphine sulphate); 4/2/19 Trial Tr. 30:25-34:1 (Jennifer Adams) (hydrocodone, oxycontin, and Actiq); 4/1/19 Trial Tr. 124:16-127:12 (Gregory Kundla) (Duragesic fentanyl patch, Actiq, Fentora, oxycodone, oxycontin). Moreover, the government's own witnesses testified that their goal was to get patients who were already taking another TIRF to switch to Subsys instead. *See, e.g.*, 2/4/19 Trial Tr. 133:18-25 (Napoletano testifying that Insys's strategy was to "get doctors to switch"); 2/14/19 Trial Tr. 141:6-14 (Babich confirming that Insys just wanted doctors to prescribe Subsys over competitor TIRFs).

Thus, to the extent that any patients incurred a risk of death or serious bodily injury, it was because those patients took opioids generally rather than because they took Subsys specifically.

As a result, any "risk of death or serious bodily injury" incurred was not the result of the criminal activity in this case.  It was instead a well-known and warned-about risk of even the proper use of any opioid.  For this reason as well, the Court should not apply the enhancement under U.S.S.G. § 2B1.1(b)(16)(A).

F.      Dr. Kapoor objects to the government's late-breaking effort to apply a four-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(17)(B)(ii)(I).  That enhancement applies where "*the offense* . . . substantially endangered the solvency or financial security of . . . a publicly traded company."  U.S.S.G. § 2B1.1(b)(17)(B)(ii)(I) (emphasis added).

The government's pursuit of this enhancement is inconsistent with its position at trial.  At trial, in the government's telling, "the offense" dramatically *increased* the solvency of Insys, the "publicly traded company" at issue.  Indeed, according to the government, the offense was central to the success of Insys's 2013 public offering and to its rising market capitalization thereafter.  The government cannot obtain convictions by arguing that the criminal conduct was responsible for the success of Insys, then seek to enhance defendants after trial based on the opposite theory.

During trial, from opening statements through closing arguments, the government argued that the criminal conduct here was designed to cause, and did cause, Insys's financial *success*.  *See, e.g.*, 1/28/19 Trial Tr. 43:16-19 (arguing in opening that Dr. Kapoor's motive was to "save his company from potential failure and to avoid personal financial loss"); *id.* 50:5-8  (arguing that, "up through March of 2012, Insys was a money pit.  It was sucking money.  It wasn't profitable. And unless Subsys launched, it had no real way of making money going forward"); 4/4/19 Trial Tr. 70:19-23 (arguing in closing that "[Dr. Kapoor] invested tens of millions of dollars in this company, and that money was at risk if Subsys failed.  But it didn't fail. It was a tremendous success.  And John Kapoor benefited from that."); *id.* 71:1-2 (emphasizing in closing that the

31

"market cap for this drug reached more than a billion dollars and John Kapoor owned more than 62 percent of that."). For this reason alone, the government should not be now allowed to reverse course and claim that the "offense" here made Insys less valuable—indeed less valuable to the point of insolvency.

Moreover, the government's pursuit of this enhancement improperly conflates the effects of the offense with the effects of the government's investigation and prosecution. Insys started to lose value when the government's investigation became public and the media began to report on it extensively. The company entered bankruptcy after it pled guilty in this case. As part of that guilty plea, Insys entered into a Corporate Integrity Agreement with the government that required the company to divest itself of Subsys, its most successful product.[96] Dr. Kapoor is not blaming the government for these predictable consequences of a prominent and public investigation and prosecution, but they go to a different issue. The Guidelines do not authorize a four-level enhancement where *prosecution of the offense including remedial divestiture* endangers the solvency of a publicly-traded company; they authorize the enhancement where the *offense* itself endangers the solvency of a publicly-traded company. *See* Application Note 14(b)(17)(B)(ii) to U.S.S.G. § 2B1.1 (providing that courts should consider "whether, *as a result of the offense*, the solvency or financial security of an organization that was a publicly traded company . . . was substantially endangered") (emphasis added). The offense here did not do that, because it coincided with a massive increase in Insys's capitalization and did not involve any diversion of funds from the company. What happened since was the result of the government doing its job, not

---

[96] *See* Corporate Integrity Agreement Between the Office of Inspector General of the Department of Health and Human Services and Insys Therapeutics, Inc. § D.1(g) (Jun. 5, 2019), *available at* https://tinyurl.com/insyscia (providing that "a failure by Insys to divest Subsys. . .in an arms' length transaction to a bona fide independent third party" constituted a material breach of the agreement by Insys).

of the offense itself.  The Court should not apply the four-level enhancement pursuant to U.S.S.G.
§ 2B1.1(b)(17)(B)(ii)(I).

      G.     Dr. Kapoor does not object to a two-level enhancement for 10 or more victims
pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i).

      H.     Dr. Kapoor objects to the four-level "organizer or leader" enhancement under
U.S.S.G. § 3B1.1(a).  Although Dr. Kapoor unquestionably was the Chairman (and briefly, the
CEO) of Insys, the leadership-role enhancement should "not be automatically imposed on business
owners or executives."  *United States v. Huerta*, 371 F.3d 88, 92 (2d Cir. 2004).  Dr. Kapoor
submits that he was not the leader of the racketeering activity.  *See United States v. Frankhauser*,
80 F.3d 641, 655 (1st Cir. 1996) (holding that, when determining whether to apply the § 3B1.1
enhancement, "[t]he court must focus on what the *defendant did*, in relation to at least one other
participant, in the commission of the offense") (emphasis in original).  Notably, even before this
Court's ruling rejecting the CSA predicate, the Draft PSR did not apply *any* leadership or
management enhancement to Dr. Kapoor for that predicate object.  *See* Draft PSR ¶ 145
("Adjustment for Role in the Offense").  The four-level "organizer or leader" enhancement should
be removed from the § 2B1.1 calculation as well.  If the Court finds that Dr. Kapoor merits a role
enhancement, it should apply the "manager or supervisor" enhancement under U.S.S.G.
§ 3B1.1(b) rather than the "organizer or leader" enhancement under U.S.S.G. § 3B1.1(a).[97]

      Pursuant to the above, Dr. Kapoor submits that the guidelines range in this case starts with
a base level of 6 and is enhanced by 22 points, for an overall offense level of 28.  Given that Dr.
Kapoor has no criminal history, this offense level would result in an advisory sentencing guideline

---

[97] Dr. Kapoor reserves the right to object to any other guidelines enhancements that were not
applied in the Draft PSR but that may be added to the Final PSR.

range of 78 to 97 months. If the Court applies the three-level "manager or supervisor" enhancement pursuant to U.S.S.G. § 3B1.1(b), the overall offense level would rise to 31, with a resulting guidelines range of 108 to 135 months. The government's proposed guideline calculation, by contrast, would place Dr. Kapoor at an overall offense level of 39, with a resulting guidelines range beyond the statutory maximum of 240 months.

Dr. Kapoor submits that "the offense level determined under this guideline substantially overstates the seriousness of the offense." Application Note 21(C) to U.S.S.G. § 2B1.1. For the reasons described in the next section, the sentencing factors under 18 U.S.C. § 3553(a) compel a variant sentence.

## IV.   THE STATUTORY SENTENCING FACTORS

Following *United States v. Booker*, 125 S. Ct. 738 (2005), courts must impose a sentence in accordance with 18 U.S.C. § 3553(a), and "may not presume the reasonableness of a sentence that falls within the [United States Sentencing Guidelines] range." *United States v. Smith*, 531 F.3d 109, 111 (1st Cir. 2008). A sentencing court "should not consider itself constrained by the guidelines to the extent that there are sound, case-specific reasons for deviating from them." *United States v. Martin*, 520 F.3d 87, 91 (1st Cir. 2008). Courts must "exercise their discretion to select a sentence—either inside or outside of the advisory guideline range—that is sufficient but not greater than necessary" to serve the goals of sentencing. *United States v. Frates*, 896 F.3d 93, 101 (1st Cir. 2018) (internal quotation marks omitted). Those goals include the need "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"; "to afford adequate deterrence to criminal conduct"; and "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(A), (B) and (C).

Under § 3553(a), courts must also consider a number of other factors in choosing an appropriate sentence, including "the nature and circumstances of the offense and the history and

34

characteristics of the defendant"; "the kinds of sentences available"; and "the need to avoid unwarranted sentence disparities" among similarly situated defendants. *Id.* at § 3553(a)(1), (3), and (6). Weighing these factors "necessitates a case-by-case approach, the hallmark of which is flexibility," and courts are not to "operate in the belief that substantial variances from the guidelines are always beyond the pale." *Martin*, 520 F.3d at 91. A sentencing court should "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Id.* (quoting *United States v. Gall*, 552 U.S. 38, 52 (2007)); *see also Pepper v. United States*, 131 S. Ct. 1229, 1240 (2011) (observing that when imposing a sentence "the punishment should fit the offender and not merely the crime" (internal quotations omitted)).

> **A.** **The Nature and Circumstances of the Offense Justify a Downward Variance from His Calculated Guidelines Range.**

Under § 3553(a)(1), the Court must consider the "nature and circumstances of the offense" in determining the appropriate sentence for Dr. Kapoor. 18 U.S.C. § 3553(a)(1). This calls for a focus on the evidence of Dr. Kapoor's involvement in the alleged insurance fraud scheme, which was limited because of the government's far greater emphasis on tying him to the now-discredited CSA and honest services fraud predicates. The principal evidence the government offered to tie Dr. Kapoor to the insurance fraud was Babich's claim that the IRC's fraudulent strategies were discussed with Dr. Kapoor on daily conference calls—a claim completely unsupported by documentation, and that is undercut by Elizabeth Gurrieri's failure to corroborate Babich's testimony. *Compare* 2/14/19 Trial Tr. 86:2-14, 92:1-14 (Babich testifying that Gurrieri discussed the use of dysphagia and the "spiel" to deceive insurers), *with* 2/25/19 Trial Tr. 24:1-9 (Gurrieri testifying that the information she provided on the calls ranged from the number of approvals to reports on the IRC that were requested). Coupled with the evidence that Dr. Kapoor wanted to get

things right at the IRC and pushed for increased compliance over time, especially in the aftermath of nurse practitioner Heather Alfonso's well-publicized arrest, proof of Dr. Kapoor's culpability on the alleged insurance fraud scheme was, at best, a passing aspect of the government's case at trial.

With respect to the alleged bribery conduct, divorced from the government's failed allegations under the CSA and honest services fraud, it stands before this Court as nothing more than uncharged relevant conduct.  While the Court is entitled to consider it as such, the Court should also consider Dr. Kapoor's relative culpability, particularly in comparison to Babich and Burlakoff.  Despite their efforts to shift the blame to Dr. Kapoor, the evidence at trial showed Burlakoff to be the instigator of the bribery scheme, and that Babich became his confidant and closest co-conspirator.  There is no reason to interpret the jury's verdict as establishing any relative culpability between these men and Dr. Kapoor, so that decision lies entirely in the Court's assessment of the evidence.

To be sure, Burlakoff repeatedly claimed he was just following Dr. Kapoor's orders whenever he did anything remotely wrong or criminal.  But there are countless reasons to doubt the credibility of that testimony.  First, Burlakoff lied repeatedly in his first interview with the government, to the point where Assistant U.S. Attorney Nat Yeager stated that he did not believe a word Burlakoff had said in the hours-long interview—even though Burlakoff was not attempting to protect Dr. Kapoor in that interview and in fact admitted his bias against Dr. Kapoor.  *See, e.g.*, 3/6/19 Trial Tr. 117:24-179:17.  Nevertheless, the government chose to call Burlakoff as one of its chief witnesses at trial.  As Special Agent Paul Baumrind testified, never before had he worked with a government-sponsored witness who was previously caught lying for hours to the government in a voluntary interview.  4/3/19 Trial Tr. 68:11-19.

36

Burlakoff's lack of credibility was further demonstrated by the evidence presented at trial. Although he claimed to have been following Dr. Kapoor's instructions "to a T," *see* 3/7/19 Trial Tr. 80:11-15, the evidence showed numerous instances where he and Dr. Kapoor disagreed on how to run sales. The two disagreed on the number of attendees at speaker programs—Dr. Kapoor wanted well-attended programs and Burlakoff wanted sparsely attended shams. *See* 2/15/19 Trial Tr. 21:4-19. They also disagreed on how many doctors sales representatives should call upon— Dr. Kapoor wanted them to call on many doctors while Burlakoff wanted them to focus only on a small number of big prescribers—and on whether to expand the Subsys sales force. *See* 2/14/19 Trial Tr. 231:11-232:22; 3/6/19 Trial Tr. 189:5-190:5, 190:22-191:19. And they disagreed on the direction of the company's oncology initiative—with Dr. Kapoor wanting to promote Subsys to oncologists and Burlakoff viewing the initiative as a waste of time. *See* 3/6/19 Trial Tr. 192:14-24, 195:2-14 (Burlakoff).

Burlakoff repeatedly downplayed these disagreements in his testimony, only acknowledging the truth when confronted with evidence on cross-examination. For example: he initially lied at trial that Dr. Kapoor did not want a large number of attendees at speaker programs until confronted with contemporaneous emails demonstrating that he did. *Compare* 3/7/19 Trial Tr. 79:4-8 (testifying that Dr. Kapoor did not want to increase attendance at speaker programs), *with id.* at 80:16-81:15, 83:7-18 (agreeing that Dr. Kapoor wanted to increase attendees after being shown Exhibit 296). Likewise, he initially disputed that Dr. Kapoor was behind the oncology initiative until shown documents that made his lie untenable. *Compare id.* at 146:23-25, 153:13-15 (testifying that Dr. Kapoor never pushed or approached him about calling on oncologists), *with id.* at 155:20-25 (agreeing that he helped roll out an oncology initiative at Dr. Kapoor's request after being shown Exhibit 6397).

Burlakoff also made claims implicating Dr. Kapoor that were at odds with the testimony of virtually every other government witness.  Perhaps the best example was his absurd claim that he discussed bribes during his initial job interview.  Not only did other witnesses directly contradict this claim, but Burlakoff's attempt to double down by claiming he told investigators the same thing was contradicted by SA Baumrind.  *Compare id.* at 53:23-54:3 (Burlakoff testifying that he had previously told investigators that bribes were discussed in his interview) *with* 2/14/19 Trial Tr. 189:6-12 (Babich testifying that Burlakoff "did not tell us [bribing doctors] was the plan in the interview") *and* 4/2/19 Trial Tr. 247:2-6 (SA Baumrind testifying that he had no recollection of Burlakoff telling investigators that bribes were discussed in his interview).  Burlakoff was also the only person to claim that the speaker ROI analysis continued well past 2012.  *Compare* 3/12/19 Trial Tr. 165:9-21 (Burlakoff testifying that speaker ROI continued to be calculated after December 2012), *with* 2/7/19 Trial Tr. 44:12-20 (Napoletano testifying that he was told in February 2013 that he did not need to prepare any more speaker-based ROI reports); 2/15/19 Trial Tr. 131:20-132:5 (Babich testifying that Napoletano never had to calculate speaker-based ROI again after raising concerns with a member of Insys's board of directors).

The most reasonable interpretation of the evidence presented across many weeks of trial is that Burlakoff committed crimes at Insys on his own initiative.  Indeed, Napoletano testified that Babich allowed Burlakoff to "go off of the reservation" in running the sales department.  2/7/19 Trial Tr. 73:14-21.  And Babich testified he did not become aware of Burlakoff's wrongdoing until sometime in 2013, long after Burlakoff had started bribing doctors.  *See* 2/14/19 Trial Tr. 227:19-228:12, 228:24-229:3.  Witnesses also testified that sales strategies changed dramatically once Burlakoff became VP of Sales.  *See* 1/29/19 Trial Tr. 59:17-60:12, 202:25-203:4 (testimony from Holly Brown West that "things changed a lot" when Burlakoff became VP of Sales, including a

new focus on finding "your whale doctor"); 1/30/19 Trial Tr. 127:18-128:3 (testimony from Brett Szymanski that after Burlakoff took over sales reps no longer had the freedom to schedule speaker programs with certain doctors); 3/13/19 Trial Tr. 27:19-29:1 (testimony from Tracy Krane that there was a "huge difference" when Burlakoff was elevated to VP of Sales in terms of the pressure to schedule speaker programs); 3/26/19 Trial Tr. 189:17-25 (testimony from Sue Beisler that "things changed quite a bit" and speaker programs became mandatory once Burlakoff became VP of Sales).

The evidence at trial also showed that Burlakoff often communicated directly with doctors, which was seldom the case for Dr. Kapoor.[98] *See* 2/6/19 Trial Tr. 35:11-20 (Napoletano testifying that Burlakoff went outside the hierarchy of the sales force to communicate with physicians directly); 1/31/19 Trial Tr. 171:7-12 (testimony from Dr. Awerbuch that the only person who bribed him was Burlakoff). This makes sense, because witnesses also testified that pressure to increase sales or schedule speaker programs came directly from Burlakoff, and not from Dr. Kapoor. *See* 3/19/19 Trial Tr. 59:4-19 (testimony from Aqsa Nawaz that she resigned due to pressure she received from Burlakoff to increase sales); 3/15/19 Trial Tr. 96:21-97:12 (testimony from Ty Rustin that it was Burlakoff who pressured him to schedule more speaker programs).

Critically, the evidence also showed that Babich and Burlakoff preferred to operate outside of Dr. Kapoor's oversight. *See, e.g.*, Trial Ex. 5563 (email from Burlakoff to Babich asking for "guidance on how to present to Dr. Kapoor ISP's [i.e., the program that was the vehicle for bribing doctors] in a way - where he won't get involved," and explaining that Burlakoff needed "as much

---

[98] Indeed, the one interaction described at trial between Dr. Kapoor and a Subsys prescriber was exculpatory in nature. Gavin Awerbuch testified about an interaction where he reassured Dr. Kapoor that he was prescribing Subsys to patients to help treat legitimate pain. 1/31/19 Trial Tr. 89:4-8 (testifying he told Dr. Kapoor that he had a population of "patients with chronic pain, and that [he] use[d] Subsys to treat patients with chronic pain").

Free reign as possible here"); Trial Ex. 5362 (email from Babich instructing Burlakoff and others to "not copy [Dr. Kapoor] on anything except for any normal daily emails he already gets").

It is also telling that Dr. Kapoor never profited from the alleged conspiracy, while Babich and Burlakoff cashed out at the first opportunity they could, and—in Babich's case at least—continued to cash out even after they were indicted. *See, e.g.*, 2/22/19 Trial Tr. 109:15-110:11 (Babich confirming that he made more than $28 million by selling Insys stock while he was CEO and more than $11 million by selling more stock after he left the company, including sales that occurred after his indictment); 3/1/19 Trial Tr. 149:25-150:6 (Burlakoff testifying that he made a total of approximately $5.2 million from his sales of Insys stock). By contrast, Dr. Kapoor invested approximately $80 million of his own money into Insys and stood by that investment when the company went public, when it received an investigative subpoena, when the other defendants were indicted, and at all times since. He has, in a very real sense, gone down with the ship.

By contrast, Burlakoff persists to this day in trying to spin his conduct at Insys into a positive. Now promoting himself as a consultant on "training and compliance systems for sales professionals," Burlakoff's current LinkedIn profile claims the "[p]rofound attention" he received from "federal authorities and the judicial system" not only made him "wiser" but a "proven asset" to any organization.[99] He is also using his prosecution by the government to peddle himself as an expert on the criminal justice system. Partnering with a company called Resiliency in Motion, Burlakoff has co-authored a book titled *Prepare: What Defendants Need To Know* that can be downloaded or purchased in paperback on the company's website.[100] Anyone who witnessed

---

[99] Profile of Alec Burlakoff, LinkedIn.com (Dec. 16, 2019, 2:17 PM), https://www.linkedin.com/in/alec-burlakoff-8405b8191 (Ex. 76).

[100] Resiliency in Motion, https://www.resiliencyinmotion.com/ (last visited Dec. 16, 2019) (Ex. 77); Buy Prepare in Paperback, https://www.resiliencyinmotion.com/buy-prepare (last visited Dec. 16, 2019) (Ex. 78).

Burlakoff's trial testimony should be offended that the government is permitting him to hold himself out as an example to others facing criminal investigation.

In sum, the nature and circumstances of Dr. Kapoor's alleged involvement in the criminal conspiracy do not justify the sentence suggested by the government and the advisory guidelines. Even viewed in the light most favorable to the jury's verdict, the evidence at trial showed Dr. Kapoor to be a removed and secondary participant in the IRC conduct.  And even viewed in the light most favorable to the jury's verdict, the leader of the uncharged bribery scheme was Alec Burlakoff.   The government's embrace of Burlakoff goes beyond a fair reward for honest cooperation and undermines its credibility in seeking an effective life sentence for Dr. Kapoor.

### B.      Dr. Kapoor's History and Personal Characteristics Justify a Downward Variance from His Calculated Guidelines Range.

Another factor that § 3553(a)(1) directs the Court to consider when imposing a sentence is the "history and characteristics of the defendant."   18 U.S.C. § 3553(a)(1).   In evaluating this factor, courts have specifically considered a defendant's age, education and employment history, family history, and prior criminal history.  *See United States v. Ubiles-Rosario*, 867 F.3d 277, 292 (1st Cir. 2017) (affirming district court's consideration of these factors under § 3553(a)(1) in sentencing defendant).[101]   Courts have also found it appropriate when evaluating this factor to consider a defendant's "charitable work, community service, generosity with time, and spiritual support and assistance to others."  *United States v. Thurston*, 544 F.3d 22, 26 (1st Cir. 2008).   Here, there are several aspects of Dr. Kapoor's history and characteristics that justify a downward

---

[101] *See also* Statement of Reasons at 3, *United States v. Saltzburg*, No. 18-cr-10486 (D. Mass. Jun. 25, 2019), ECF. No. 22 (Burroughs, J.) (concluding below-Guidelines sentence was appropriate for 69-year-old defendant who pled guilty to charges of mail fraud and filing a false tax return); Statement of Reasons at 3, *United States v. Breton*, No. 17-cr-10017 (D. Mass. Jul. 18, 2017), ECF No. 24 (Burroughs, J.) (citing "Community Ties" and "Family Ties and Responsibilities" as factors supporting a below-Guidelines sentence for a defendant who pled guilty for securities fraud).

variance in his sentence, including his extensive charitable endeavors, the care and emotional support he provides to family members, his advanced age, and his lack of criminal history and low risk of recidivism.

       1.     *Dr. Kapoor's Life-Long Commitment to Charitable Work and Helping Others Justifies a Downward Variance.*

As described earlier, Dr. Kapoor has lived a life marked by consistent generosity and commitment to helping others.  One of the first things he did after making his fortune was to establish a foundation with his late wife, Editha, dedicated to giving back to the charitable causes they were passionate about.  Dr. Kapoor has since contributed more than $128 million to a variety of charitable causes, including donations to more than 300 non-profit organizations through his foundation and to another 200 such organizations on his own.[102]  He has positively impacted thousands of lives in the United States and India through these endeavors, which include:

- funding more than 800 scholarships for students in India and the United States to attend college;

- providing close to 125,000 nights of lodging to cancer patients and their families in India and the United States;

- providing financial assistance and/or accommodation aid to more than 3,700 cancer patients in India and close to 1,200 cancer patients in the United States;

- creating a guidance program that has helped more than 241,000 cancer patients in India complete their treatment;

- creating a program that has provided seminars and/or screening tests to more than 9,000 women in India to help increase their awareness about the risks of cancer; and

- creating a program that has educated more than 2,000 pregnant women from poor, rural backgrounds about ways to stay healthy during pregnancy and improve their chances of a safe delivery.[103]

---

[102] Ltr. from Sadhna Bokhiria, dated Jul. 22, 2019, at 1 (Ex. 32).

[103] Ltr. from Mary Gauwitz, dated Aug. 29, 2019, at 8 & Attach. A (Ex. 3); Ltr. from Janet Houghton, dated Jul. 9, 2019, at 2 (Ex. 38).

As impressive as they are in their scope, it is the depth of Dr. Kapoor's involvement in these charitable efforts that says the most about his character.  As Mary Gauwitz writes, Dr. Kapoor's involvement was "more than just about writing a check and being done with it.  He wanted to know about our projects, who and how we were helping those in need, he wanted to see our budget and see how he could help more people."[104]   The bulk of Dr. Kapoor's charitable contributions have been to organizations he helped create, and employees of those organizations make clear in their letters that his involvement extends beyond giving money.  For instance, Janet Houghton describes how Dr. Kapoor was the driving force behind Editha House after recognizing that lodging was an unmet need for cancer patients and their families.[105]   Sadhna Bokhiria, the administrator of the charitable foundations, attests to Dr. Kapoor's regular participation in meetings at the organizations he has helped created in the United States and India.[106]

In addition to the charitable work done through his foundations, Dr. Kapoor's character is evidenced by the individual acts of kindness recounted in the letters of support.  For instance, letters from former employees and extended family members alike recount how Dr. Kapoor has frequently helped pay the medical bills and expenses of others when they could not afford them.[107]   Similarly, letters describe how he has helped pay the tuition of members of his extended family in

---

[104] Ltr. from Mary Gauwitz, dated Aug. 29, 2019, at 2 (Ex. 3).

[105] Ltr. from Janet Houghton, dated Jul. 9, 2019, at 1 (Ex. 38).

[106] Ltr. from Sadhna Bokhiria, dated Jul. 22, 2019, at 3, 11-13 (Ex. 32).

[107] *See, e.g.*, Ltr. from Sunil Kumar, dated Jun. 3, 2019, at 3 ("We have had staff members hospitalized due to car accidents, illnesses, and/or emergencies.  Dr. Kapoor not only called to check on them, but he would go the extra mile and cover their unmet medical expenses, while still paying them their full salary or hourly wage.  He didn't make them take medical leave or allow them to fall behind on their bills because they could not work.") (Ex. 57); Ltr. from Arushi Bhatia, dated Jun. 11, 2019, at 1 ("Around the early 2000s, my father's business was going through a rough patch and my uncle, without thinking twice helped my father and family monetarily and guided him to a better path and helped secure our futures.") (Ex. 21).

India so they could attend the college of their choice.[108]  All that he asked in return for these tuition payments is that the recipients volunteer their own time to charitable work, instilling a similar commitment to helping others in the next generation.[109]

Both in their scope and in the hands-on approach, Dr. Kapoor's charitable efforts go beyond the "impersonal writing of checks" and are precisely the type of prior good works that warrant a downward variance in sentence.  *United States v. Mehta*, 307 F. Supp. 2d 270, 277 (D. Mass. 2004) (holding that a court's "focus should be on the defendant's activities, understood in the light of his career and resources, particularly those that go beyond the kind of 'impersonal writing of checks' that characterized many wealthy individuals"); *see also United States v. Tomko*, 562 F.3d 558, 572 (3d Cir. 2009) (affirming sentencing court's downward variance for prior good works where letters established that defendant's charitable acts involved "not only money, but his personal time," that he engaged in individual acts of kindness, and that he "went out of his to accommodate his employees"); *United States v. Cooper,* 394 F.3d 172, 177 (3d Cir. 2005) (finding downward departure was warranted because charitable acts were "not the detached acts of charity one might ordinarily expect from a wealthy business executive," but were instead "hands-on personal sacrifices" that "had a dramatic and positive impact on the lives of others").

---

[108] *See, e.g.*, Ltr. from Jessica Mehra, dated Jun. 8, 2019 at 1 ("[Dr. Kapoor] has been generous enough to provide all my cousins and family with the funding to attend the colleges of their choice, that they had gotten accepted into.") (Ex. 21).

[109] *See, e.g.*, Ltr. from Paras Aneja at 3 ("In requiring the children in our family to get involved in charity, giving back is something that is instilled in me forever. I never had an interest or desire to volunteer but spending time volunteering at Northwestern Memorial Hospital and the Editha Guest House in Chicago really made me value health, life, and what we have by seeing how so many patients struggle daily.") (Ex. 18).

2. *Dr. Kapoor's Critical Role as Caretaker for His Brother* ████████████
*Justifies a Downward Variance.*

A downward variance in Dr. Kapoor's sentence is also warranted by his unique family circumstances, namely the care and support that he provides for his brother, Rober ████████████ ████████████████████████████████████████████ Admittedly, most criminal defendants have family members who experience difficulties when the defendants are incarcerated.  But the impact Dr. Kapoor's incarceration would have on his family goes far beyond the typical difficulties experienced by family members.

As discussed earlier, his brother Robert was left permanently disabled by an accidental carbon monoxide leak in 1999 and has since relied on Dr. Kapoor for care and support.[110] ██

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████ █████████████████████████████████
████████████████████████████████████████████████████████████

---

[110] *See, e.g.*, Ltr. from Robert Kapoor at 2 ("[W]ithout his help I don't know what I would do . . . . I depend on my brother for so much.") (Ex. 9); Ltr. from Vijay Kapoor, dated Aug. 9, 2019, at 1 ("After the accident, my father has not been the same and constantly needs help.  John has been taking care of him since.  If John wouldn't have been there, it would have been very difficult for my father to survive and recover the way he has.") (Ex. 10).

██ ████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████     █████████████████████████████████

██████████████████████████████████████████████████████████

████████

The critical role Dr. Kapoor continues to serve ███████████████████████████████

████████, is the type of unique circumstance courts have found justifies a downward variance.

*United States v. Prosperi*, 686 F.3d 32, 48 (1st Cir. 2012) (holding in case where defendant served

as caretaker for his terminally ill wife that "the circumstances of [defendant's] family are atypical

and powerful, both in justifying a variance and in the home confinement actually chosen"); *United*

*States v. Sclamo*, 997 F.2d 970, 972-74 (1st Cir. 1993) (finding defendant's circumstances justified

downward departure because the twelve-year old boy he cared for had a clinical disorder and

evidence existed that his condition would deteriorate in defendant's absence); *see also United*

*States v. Muñoz-Nava*, 524 F.3d 1137 (10th Cir. 2008) (affirming the sentencing court's finding

that the defendant's family circumstances were extraordinary where he cared for his son as a single

parent and had elderly parents with serious medical problems); *United States v. Lehmann*, 513

F.3d 805 (8th Cir. 2008) (affirming downward variance to probation where the district court found

that a prison sentence would negatively affect defendant's disabled son). ████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████

───────────────────────

█ ████████████████████████████████████████████

█ ████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████

### 3.     *Dr. Kapoor's Advanced Age Justifies a Downward Variance.*

At 76 years old, Dr. Kapoor's advanced age is another reason for a downward variance in his sentence.  For one thing, courts have found downward departures or variances justified for older defendants like Dr. Kapoor because their risk of recidivism is markedly lower.  *See United States v. Willis*, 322 F. Supp. 2d 76, 85 (D. Mass. 2004) (finding downward departure warranted because defendant's health and advanced age indicated that he was "not likely to be a recidivist"); *United States v. Baron*, 914 F. Supp. 660, 662 (D. Mass. 1995) (granting downward departure for 76 year-old defendant and noting that "[f]ew cases involve defendants in this age range, and those that do have found it significant."); *see also United States v. Bullion*, 466 F.3d 574, 577 (7th Cir. 2006) (observing that "the tendency to commit crimes, violent and otherwise, diminishes with age."); *United States v. Hernandez*, No. 03-cr-1257, 2005 WL 1242344, at \*5 (S.D.N.Y. May 24, 2005) (citing recent cases where courts declined to impose Guidelines sentences on defendants who were "over the age of forty on the grounds that such defendants exhibit markedly lower rates of recidivism in comparison to younger defendants").

More importantly, Dr. Kapoor's advanced age will unquestionably make it harder for him to adjust to prison life than younger inmates, which could lead to negative consequences for his health.  The Department of Justice has acknowledged that prison ages people faster than they would otherwise age.  *See* U.S. Dep't of Justice, Nat'l Inst. of Corrections, *Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates* 8 (2004 ed.), *available at* https://tinyurl.com/dojnic2004 ("[S]everal important factors seem to speed the aging process for those in prison. These factors include the amount of stress experienced by new inmates trying to survive the prison experience unharmed; efforts to avoid confrontations with correctional staff and fellow inmates; financial stress related to inmates' legal, family, and personal circumstances . . . .").  Such accelerated aging poses a particular threat to a 76-year-old defendant

47

like Dr. Kapoor.  A substantial prison term would likely serve as an effective life sentence for him, which is an unnecessarily harsh and punitive for someone who has lived an accomplished, productive, and charitable life.  It is also a circumstance Dr. Kapoor alone faces among the defendants in this case, the rest of whom are several decades younger than he is.

> 4.   *Dr. Kapoor's First-Time Offender Status and Low Risk of Recidivism Justify a Downward Variance.*

Dr. Kapoor has no prior criminal history.  In addition to his advanced age, his first-time offender status makes him less likely to recidivate and provides another basis for a downward variance in his sentence.  *See United States v. Cabrera*, 567 F. Supp. 2d 271, 279 (D. Mass. 2008) (granting variance because defendants "with zero criminal history points are less likely to recidivate than all other offenders"); *see also United States v. Darway*, 255 F. App'x. 68, 73 (6th Cir. 2007) (upholding downward variance on basis of defendant's first-offender status); *United States v. Nesbeth*, 188 F. Supp. 3d 179, 193 (E.D.N.Y. 2016) (holding downward variance was appropriate where defendant's crimes "were certainly a marked deviation from an exemplary law-abiding life"); *United States v. Ward*, 814 F. Supp. 23, 24 (E.D. Va. 1993) (granting departure based on defendant's age and first-time offender status because the guidelines do not "account for the length of time a particular defendant refrains from criminal conduct" before committing his first offense).

## C.  Imposing a Substantial Prison Sentence on Dr. Kapoor Would Lead to Unwarranted Sentencing Disparities.

18 U.S.C. § 3553(a)(6) instructs the Court to impose a sentence that "avoids unwarranted disparities among defendants with similar records who have been found guilty of similar conduct." Dr. Kapoor's status as the founder and CEO of Insys does not prove that he was the most culpable member of this conspiracy.  Others implicated in the conspiracy have received sentences that were substantially below their advisory guidelines range, including numerous sentences of probation.

As this Court may already know, former Insys sale representatives Natalie Levine Babich and Natalie Perhacs have already been sentenced.[114]   Both were given five years' probation, punishments that were relatively commensurate with the harm they caused.  Heather Alfonso, a nurse practitioner who admitted to improperly prescribing Subsys to hundreds of patients, was recently sentenced to three years' probation.[115]   Of course, Dr. Kapoor was not a sales representative or a low-level nurse practitioner, and he did not plead guilty.  But even considering those obvious differences, singling him out for a substantial prison term would be discordant with the much more lenient punishments received by Alfonso, Levine, and Perhacs.

To date, the only individuals to have received substantial prison terms in related cases are medical doctors who violated the CSA.  Gavin Awerbuch, an alleged coconspirator practitioner, was sentenced to a prison term of 32 months after entering into a plea agreement with the government.[116]   Two other alleged coconspirator practitioners, John Couch and Xiulu Ruan, received prison sentences of 240 and 252 months, respectively, after being convicted at trial.[117] Those cases involved criminal conduct that is entirely distinguishable from what Dr. Kapoor is being sentenced for here.  For one thing, all three men were sentenced for intentionally distributing opioids to patients who did not need those drugs—a crime this Court specifically determined the government failed to prove as to Dr. Kapoor.  *See* Mem. & Order, Dkt. No. 1028 at 81-82.  While pharmaceutical executives should not be shielded from the consequences of their sales tactics, it

---

[114] *See* Judgment, *United States v. Levine*, No. 17-cr-00147 (D. Conn. Jul. 1, 2019), ECF No. 57; Judgment, *United States v. Perhacs*, No. 16-cr-00024 (S.D. Ala. Apr. 24, 2018), ECF No. 28.

[115] *See* Minute Entry for Sentencing Proceedings, *United States v. Alfonso*, No. 15-cr-00111 (D.Conn. Nov. 26, 2009), ECF No. 61.

[116] *See* Judgment, *United States v. Awerbuch*, No. 16-cr-20636 (E.D. Mich. Mar. 7, 2018), ECF No. 35.

[117] *See* Judgment, *United States v. Couch*, No. 15-cr-00088 (S.D. Ala. May 31, 2017), ECF. No. 663; Judgment, *United States v. Ruan*, No. 15-cr-00088 (S.D. Ala. May 31, 2017), ECF No. 665.

is a different thing to pursue profits without sufficient care—as the Court suggested the jury in this case could have found as to the trial defendants—than it is for a doctor to knowingly give his own patients a drug he knows those patients do not need.

In addition, the sentences for Drs. Awerbuch, Couch, and Ruan incorporated punishment for crimes that had nothing to do with Insys or Subsys. Dr. Awerbuch was sentenced not just for violations of the CSA, but also for perpetrating a scheme to defraud Medicare that began more than three years before he started prescribing Subsys.[118] Drs. Couch and Ruan were sentenced for crimes that went far beyond their involvement in the alleged conspiracy, including the illicit distribution of numerous opioids besides Subsys and inducing bribes from companies other than Insys.[119] Thus, the sentences received by Drs. Awerbuch, Couch, and Ruan do not provide a useful basis of comparison in determining the appropriate sentence for Dr. Kapoor.

Nor would a more modest sentence for Dr. Kapoor create unwarranted disparities with respect to comparable cases nation-wide. Many judges have declined to impose a prison term when the nature and circumstances of the offense simply do not warrant one. A few recent decisions from this Circuit make clear that such downward variances are appropriate in extraordinary circumstances such as these. For example, in *Prosperi*, the First Circuit affirmed as substantively reasonable a substantially below-Guidelines sentence for two defendants who were convicted of mail fraud, wire fraud, and conspiracy to defraud the government. 686 F.3d at 34. Although the Guidelines range was 87-108 months, the defendants received a sentence of six

---

[118] *See* Plea Agreement at 2, *United States v. Awerbuch*, No. 16-cr-20636 (E.D. Mich. Nov. 7, 2016), ECF No. 25.

[119] *Compare* Judgment, *United States v. Couch*, No. 15-cr-00088 (S.D. Ala. May 31, 2017), ECF No. 663, *and* Judgment, *United States v. Ruan*, No. 15-cr-00088 (S.D. Ala. May 31, 2017), ECF No. 665, *with* Second Superseding Indictment ¶¶ 77-86, 111-32, *United States v. Couch*, No. 15-cr-00088 (S.D. Ala. Apr. 28, 2016).

months of home monitoring, three years of probation, and 1,000 hours of community service. *Prosperi* bears much resemblance to this case. For one thing, the sentencing court repeatedly rejected the government's attempt to make an example of defendants by inflating their culpability in an attempt to hold them accountable for corporate greed more generally. *Id.* at 45 (noting district court's statement that "[i]t is tempting but ultimately, I think, an abuse of my power as a sentencing judge to hold these defendants responsible for all of the excesses of modern corporate ills"). The First Circuit also agreed with the sentencing court that the circumstances of one defendant's family life were "atypical and powerful, both in justifying a variance and in the home confinement actually chosen." *Id.* at 48.

The court's decision in *Mehta* is also instructive here. The defendant in that case faced a Guidelines range of 18 to 24 months' imprisonment following his conviction for mail fraud and tax evasion. But the court ultimately decided to sentence him to six months home confinement followed by three years of probation. *Mehta*, 307 F. Supp. 2d at 270. The sentencing court justified its decision based on the defendant's otherwise extraordinary life and commitment to serving his community. Similar to Dr. Kapoor, the defendant in *Mehta* was a penniless immigrant from India who built a successful business in the United States and was a fixture in his community. The sentencing court also emphasized that the defendant's good works required "substantial amounts of time and personal attention," and that he had not simply "writ[ten] checks." *Id.* at 271, 277. Placing the defendant's "'hands-on' relationship to his community, the wider Boston area, family and friends, in the context of [his] offense," the court concluded a below-Guidelines sentence was appropriate. *Id.* at 277. A similar conclusion is warranted here given Dr. Kapoor's long and extensive history of charitable works.

Even in more routine circumstances, courts frequently deviate from the Guidelines range after finding it overstates the severity of the offense. *See United States v. Hawkins*, 228 F. App'x 107, 109-10 (2d Cir. 2007) (upholding sentence of probation in healthcare fraud case despite advisory Guidelines suggesting 12-18 months incarceration); *Cooper*, 394 F.3d at 172 (affirming sentence of probation for defendant convicted of both securities fraud and filing a false tax return, even though the Guidelines called for 15-21 months incarceration and the defendant's crimes caused thousands of shareholders [to lose] millions of dollars); *United States v. Desmond*, No. 05-cr-719-4, 2008 WL 686779, at *3 (N.D. Ill. Mar. 11, 2008) (despite Guidelines range of 63-78 months, court sentenced defendant to probation after finding that "the offense level determined under the Guidelines substantially overstates the seriousness of the offense"). Such cases are far more similar to Dr. Kapoor's circumstances and conduct than cases centered on illegal drug dealing.[120]

Finally, sentences that rely too heavily on loss amount have frequently been rejected in white-collar cases because they overstate the defendant's culpability. *See United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) ("By making a Guidelines sentence turn [] on this single factor [loss or gain], the Sentencing Commission ignored [3553(a)] and . . . effectively guaranteed that many such sentences would be irrational on their face."); *United States v. Adelson*, 441 F. Supp. 2d 506, 351 (S.D.N.Y. 2006) (criticizing "the inordinate emphasis that the Sentencing Guidelines place in fraud cases on the amount of actual or intended financial loss" without any explanation of "why it is appropriate to accord such huge weight to such factors."); Frank O.

---

[120] Moreover, despite the government's repeated attempts to analogize this case to one of illicit drug dealing, the government has not sought similarly lengthy sentences in cases that actually involve illicit drug distribution. For example, it recently sought only a 24-month sentence for a man convicted of illicitly dealing fentanyl near a school. *See* Sentencing Mem. of Gov't, *United States v. Miranda*, No. 18-cr-10230 (D. Mass. Jun. 24, 2019), ECF No. 30.

Bowman, III, *Sentencing High–Loss Corporate Insider Frauds After* Booker, 20 Fed. Sent'g Rep. 167, 169 (2008) ("[S]ince *Booker*, virtually every judge faced with a top-level corporate defendant in a very large fraud has concluded that sentences called for by the Guidelines were too high.").

> **D.     A Sentence That Features a Period of Home Confinement and Community Service Would Serve the Sentencing Goals Set Forth in 18 U.S.C. § 3553(a).**

Under § 3553(a)(2), courts are counseled to impose a sentence that best accomplishes the goals of deterrence, providing just punishment, protecting the public from future crime, and providing the defendant with "correctional treatment in the most effective manner." Courts must consider each of the factors in 18 U.S.C. § 3553 and "impose a sentence 'sufficient, but not greater than necessary,' to accomplish the goals of sentencing." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007). Dr. Kapoor respectfully submits that a sentence that includes home confinement and community service would accomplish those goals, for several reasons.

*First*, a lengthy period of incarceration is not necessary to afford just punishment in circumstances such as these. Dr. Kapoor has already suffered tremendous consequences as a result of his indictment, trial and conviction. He has already lost most of what he built up over the course of his life: the businesses he created and ran, his charitable work, and the reputation that five decades of hard work had earned him. While he by no means suggests that this kind of harm can fully replace whatever sentence the Court deems fit to impose, there can be no doubt that the consequences to date have turned his life upside down. The Court should take this into account in fashioning a sentence.

*Second*, the Court should take into consideration the other sentencing consequences that Dr. Kapoor is facing. While this memorandum does not address the government's position on

restitution or forfeiture,[121] the government has finally disclosed that it is seeking at least $306 million in restitution from all defendants and $113 million more from Dr. Kapoor in forfeiture. Whatever the merits of those positions, they stand to take away Dr. Kapoor's life's earnings and savings several times twice over, even though he was independently wealthy before founding Insys, did not cash out his position in Insys, and lost the approximately $80 million that he invested in the company.  How much more is accomplished, on top of such consequences, by consigning a 76-year-old, first-time, non-violent offender to a lengthy prison term?

*Third*, a sentence involving home confinement and community service would accomplish the general deterrence goal envisioned in § 3553(a).  In many white-collar cases, general deterrence can be achieved without a lengthy period of incarceration.  This is so because as the Sentencing Commission has recognized, the certainty of the punishment for white collar offenses is more important than the duration.  *See* U.S. Sentencing Comm'n, *Fifteen Years of Guidelines Sentencing* 56 (2004), *available at* https://tinyurl.com/ussc15 (noting that the Sentencing Guidelines were written, in part, to "ensure a short but definite period of confinement for a larger percentage of 'white collar' cases, both to ensure proportionate punishment and to achieve deterrence").  Courts have recognized the same, noting that "there is a considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders." *Adelson*, 441 F. Supp. 2d at 514.  And probation and home confinement are effective in promoting general deterrence in white collar cases where the public visibility of the conviction causes disastrous reputational harm.  *See* Elizabeth Szockyj, *Imprisoning White Collar Criminals*, 23 S. Ill. U. Law J. 495, 498 (1999) (noting that a "conspicuous electronic monitoring device. . .would serve as a constant reminder to co-workers, business associates, and the public of the offense and penalty").

---

[121] *See* footnote 1, *supra.*

*Fourth*, if Dr. Kapoor is spared a lengthy prison term, he will be able to continue his life's pattern of helping others.  Dr. Kapoor has shown an extraordinary commitment to community service for his entire life.  The letters submitted in support of Dr. Kapoor detail the countless ways in which he makes a tremendous effort to better the lives of others—whether it be through small acts of kindness when someone has come on hard times, or life-changing outreach when an individual or their family member is suffering from a fatal illness.  If the Court is willing to consider community service as part of Dr. Kapoor's sentence, he has already made preliminary arrangements with a community service program that counsel can describe further at sentencing.

*Finally*, a sentence involving home confinement would also allow Dr. Kapoor to continue providing the critical care that his brother ███████████ depend on. ███████████

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
██████  ██████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████  ██████████████████████
███████████████████████████████████████████████
████████████████████████████████████

---

[122] Ltr. from Mary Gauwitz, dated Aug. 29, 2019, at 4 (Ex. 3).

[123] *Id.* at 5.

**CONCLUSION**

Dr. Kapoor's long life—a success story until this conviction and distinguished by his commitment to others—should weigh heavily in the Court's consideration of his sentence.  As Judge Rakoff stated in *Adelson*, a defendant's history and circumstances are of fundamental importance:

> But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance.  This elementary principle of weighing the good with the bad, which is common to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant.'

441 F. Supp. 2d at 513-14.

If this Court feels that it must impose a prison sentence on Dr. Kapoor, we recommend a year and a day, to be followed by a substantial period of supervised release with conditions of home confinement and community service.  Such a sentence would be sufficient, and not greater than what is necessary, to accomplish the sentencing goals of 18 U.S.C. § 3553(a).

Dated: December 18, 2019                    Respectfully submitted,

                                            /s/ Beth A. Wilkinson
                                            Beth A. Wilkinson (*admitted pro hac vice*)
                                            bwilkinson@wilkinsonwalsh.com
                                            Alexandra M. Walsh (*admitted pro hac vice*)
                                            awalsh@wilkinsonwalsh.com
                                            Kosta S. Stojilkovic (admitted *pro hac vice*)
                                            kstojilkovic@wilkinsonwalsh.com
                                            Andrew W. Croner (admitted *pro hac vice*)
                                            acroner@wilkinsonwalsh.com
                                            Wilkinson Walsh + Eskovitz LLP
                                            2001 M Street NW
                                            Washington, D.C. 20036
                                            Telephone: (202) 847-4000

                                            Brien T. O'Connor (BBO# 546767)
                                            brien.o'connor@ropesgray.com
                                            Aaron M. Katz (BBO# 662457)
                                            aaron.katz@ropesgray.com
                                            Ropes & Gray LLP
                                            Prudential Tower 800 Boylston Street
                                            Boston, MA 02199
                                            Telephone: (617) 951-7000

                                            *Attorneys for Dr. John Kapoor*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing document will be served on all counsel of record through the ECF system.

<u>/s/ Beth A. Wilkinson</u>
Beth A. Wilkinson
Counsel for Dr. John Kapoor