UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
UNITED STATES OF AMERICA     )
                                        )        Court No.:  16-cr-10343-07-ADB
        v.                              )
                                        )
JOHN N. KAPOOR,                 )
                                        )
                Defendant.         )
_____)


### UNITED STATES' SENTENCING MEMORANDUM IN AID OF SENTENCING FOR JOHN N. KAPOOR

        The United States of America hereby submits this memorandum in aid of sentencing for

defendant John N. Kapoor.

I.  Introduction

        Each of the defendants convicted on May 2, 2019 played a leadership role in a

widespread criminal scheme to profit from bribes and fraud.  John Kapoor, however, was the

fulcrum of that criminal agreement; the only defendant that could not have been replaced by

another conspirator.  Kapoor was the company's founder and sole investor, who did not hesitate

to use the authority of his financial position to dictate the criminal strategies employed by Insys.

He was the principal leader, who personally approved, and thereafter enforced, the corrupt

strategies employed throughout the conspiracy.  This crime would not have happened, could not

have happened, without John Kapoor.  It was, in almost every way, Kapoor's crime.

Accordingly, the United States recommends that the Court sentence John N. Kapoor to a period

of incarceration of 15 years (180 months).

II. Kapoor's Criminal Conduct

    A. Kapoor's $59 million motive.

    Evidence at trial proved that it was John Kapoor's decision to have Insys develop a sublingual fentanyl spray for the treatment of breakthrough cancer pain.  02/12 Tr. 113:2-5. The decision, however, was not a benevolent effort to help cancer patients; rather, it was an educated and informed gamble, made by a veteran of the pharmaceutical industry. 02/12 Tr. 102:21-103:9, 107:22-108:5; 110:24-111:21.

    Through his previous investments, Kapoor had learned that by developing a spray delivery system for a generic drug, then marketing it as a premium product, he could profit, even when the same drug was available as a generic, for pennies on the dollar.  02/12 Tr. 107:22-108:5; 110:24-111:21.  And so, between 2006 and 2007, Insys began researching whether molecules of different medications could be delivered to patients as a liquid formulation sprayed beneath the tongue.  02/12 Tr. 111:8-112:11.  As a result of that research, Kapoor came to believe that that by developing a Fentanyl sublingual spray, he could profit by competing with a generic drug called Actiq.  02/12 Tr. 113:2-5.

    Between 2007 and 2010, as Insys researchers worked to create Subsys, the company suffered a number of financial set-backs, including two failed efforts to become a publicly traded corporation, a process known as an Initial Public Offering or IPO.  02/12 Tr. 119:8-15; 122:8-16. In early 2011, after receiving promising results from clinical testing, Kapoor considered a third IPO for Insys.  02/12 Tr. 127:17-19.  The market for drugs like Subsys, however, had become more competitive while Insys had been conducting clinical trials.  02/12 Tr. 127:19-25.  The

market change made Kapoor realize that he had no choice, but to continue privately funding Insys.  02/12 Tr. 128:2-6.

Kapoor's decision in early 2011 to continue privately funding the company was expensive.  Insys would not begin to sell Subsys until late March, 2012.  Ex. 575 (USAO-MA-0021200).  By the time that it went public in 2013, the company warned prospective investors that, "[o]ur operations have consumed substantial amounts of cash since inception."  Ex. 575 (at USAO-MA-0021233).  In fact, just prior to the company's third IPO, Insys was $70.4 million in debt, approximately $59 million of which was incurred from borrowing money from trusts controlled by, or affiliated with, John Kapoor.  Ex. 575 (at USAO-MA-0021234).

Significantly, the launch of the third IPO did not eliminate Kapoor's financial risk.  When the company finally went public, it did not pay off the debt that it owed Kapoor; rather, it converted all of the debt owed to him into shares of common stock.  Ex. 575 (USAO-MA-0021235); 02/12 Tr. 129:11-130:1.  Following the launch of the third IPO, Kapoor went from being the company's primary investor, to owning 62% of all of its common stock.  Ex. 575 (USAO-MA-0021249).  By converting debt owed by the company into stock, Kapoor was not made whole.  Rather, Kapoor's $59 million dollar bet now rested entirely on Insys' share price.

B.  Choosing the Members of the Conspiracy.

Whether acting as the primary investor when the company was privately held, or acting as the majority shareholder after Insys went public, Kapoor demanded and exercised tight control over all aspects of corporate decision making.  02/21 Tr. 215:19-216:5.  Kapoor's involvement with hiring, promotion, and termination of company employees was an important aspect of his

control at Insys.  Evidence at trial proved that the conspiracy in this case was begun, and

sustained, through employment decisions made by Kapoor.

At the top of the corporate structure, Kapoor, by his design, was not challenged.  He did

not face the scrutiny of an independent boardroom; rather, whatever Kapoor proposed, the Insys

Board of Directors approved.  02/14 Tr. 33: 7-8.  The Board functioned simply as a "rubber

stamp" for his decisions.  02/14 Tr. 33: 5-7.  Likewise, Kapoor did not face the scrutiny of a

veteran Chief Executive Officer.  Instead, Kapoor hired Mike Babich as his CEO, a 35-year-old

investment analyst, with no senior management experience in any other corporation.  02/14 Tr.

31: 12-22; 65: 5-9.

It was in this context that, in June 2012, Kapoor began to make leadership changes within

the company.  Ex. 290.  Kapoor had planned to launch the third IPO with the ability to tell

investors that Insys was profitable.  02/12 Tr. 139: 12-14.  But by June 2012, three months after

Insys began selling Subsys, Kapoor had grown unhappy with the success of the drug.  02/12 Tr.

157: 9-11.  He considered the launch of Subsys, "the worst fucking launch in pharmaceutical

history." 02/12 Tr. 157: 9-11.

With pressure mounting to make Insys profitable, Kapoor fired both the company's V.P.

of Sales and V.P. of Managed Markets.  02/01 Tr.119:8-18.  Then in June 2012, Kapoor hired

Alec Burlakoff as District Manager for the company's southeast sales district. 02/13 Tr.11:12-

12:16; 03/01 Tr. 132:13-15; 149: 10-17.

Soon after Burlakoff started at the company, Kapoor authorized him to hire Joe Rowan.

02/13 Tr. 46:1-47:2.  Kapoor promoted Burlakoff to V.P. of Sales three months later.  01/30 Tr.

45:20 & Ex. 1488.  Kapoor authorized hiring both Sunrise Lee and Rich Simon as managers.

4

03/01 Tr. at 191:13-25.  He also participated in interviewing Mike Gurry before he was hired, 02/21 Tr. 89:12-13; then appointed him as head of the Insys Reimbursement Center ("IRC"). 02/14 Tr. 70:20-24.

Importantly for this case, as the corrupt strategies conceived at corporate headquarters were carried out nationwide, Kapoor did not use his authority to fire those committing criminal acts.  As described below, the criminal schemes used in this case were approved by Kapoor; and the employees that carried out those strategies, did so at his command.    As the conspiracy grew and profited, Kapoor's co-conspirators were kept in place, and in many cases, promoted.

After Burlakoff was promoted to V.P. of Sales, Joe Rowan replaced him as District Manager for the Southeast.  03/01 Tr. 192:23-25.  Rich Simon was promoted from District Manager to National Sales Director less than a year after joining the company.  02/21 Tr. 168:4-10.  Likewise, Joe Rowan and Sunrise Lee were promoted from District Managers to Regional Directors, each responsible for at least a third of the company's sales force.  Ex. 299.

C. Kapoor's Bribes.

In early 2012, before the company had launched Subsys, the V.P. of Marketing, Matt Napoletano, told Kapoor that the company should use speaker programs to pay doctors to write prescriptions.  02/12 Tr. 149:1-16.  A few months later, after Kapoor deemed the launch of Subsys a failure, he committed to funding a pilot speaker program, focused primarily on Burlakoff's region in the southeastern United States.  02/13 Tr. 14:1-9.  When Kapoor agreed to fund the pilot program, he explicitly warned that he was "not throwing money out, to not fucking get paid in return."   03/01 Tr. 168:10-11.  As early as August 2012, Kapoor insisted that profits

generated by the pilot program should be double the amount of money spent on paying doctors. 03/01 Tr. 168:9-13.

While Burlakoff was not the first Insys executive to support the idea of using the speaker program to bribe doctors, he executed the strategy with skill. Ex. 1488. No matter what Burlakoff did, however, Kapoor was never satisfied. 03/05 Tr. 121:7-13. Kapoor had approved of the scheme to bribe doctors, but remained determined to know whether each speaker was providing an adequate return on investment, or "ROI." 02/1 Tr. at 141:22-23; 02/13 Tr. at 29:21-31:15. In October of 2012, Kapoor instructed Matt Napoletano, to calculate the return on investment for each speaker and determine if the speaker had a "positive ROI." 02/01 Tr. at 141:22-23. Napoletano initially refused to compile the information, and angrily warned Kapoor that doing so was wrong. 02/01 Tr. 143:3-24; 03/05 Tr. 180:12-17. Napoletano, however, eventually relented to Kapoor. 02/01 Tr. 144:1-145:20.

Kapoor's incessant demand to calculate ROI, over the objection of his V.P. of Marketing demonstrates the degree of his control over the conspiracy. In November 2012, at Kapoor's direction, Napoletano produced a spreadsheet that calculated ROI using a ratio of speaker program honoraria paid to each individual speaker versus the net revenue generated by the speaker. 02/01 Tr. 144:1-145:20 & Ex. 197. Then, Kapoor, Babich, Napoletano, and Burlakoff attended a meeting at which the group went through every single line of Napoletano's ROI calculations. 02/13 Tr. 35:13-20; 03/05 Tr. 185:7-17.

John Kapoor's management of the bribe scheme was not limited to ROI calculations. Evidence at trial established that he controlled and enforced strategy on a daily basis using a morning meeting, referred to as the "8:30 call." The briefing involved many of the senior

members of the conspiracy, including Kapoor, Babich, Gurry, Napoletano, Burlakoff, and
Simon.  02/13 Tr. 106:19-23; 03/05 Tr. 120:17-19, 122:9-17.

The John Kapoor that blithely faced the jury for 15 weeks in this case, was not the John
Kapoor that ran the 8:30 call at Insys.   His demeanor during the daily meeting was not pleasant.
02/25 Tr. 24:15-17.  He often displayed anger.  02/25 Tr. 24:15-17.  He routinely yelled at, and
pressured attendees to obtain better results.  02/25 Tr. 24:15-17.

One of the topics covered during the meeting was the scheme to bribe.  Kapoor routinely
discussed the suitability of additional funds to bribe particular speakers.  02/13 Tr. 50:19-22;
85:15-21. The group also discussed the return on speaker fees paid to doctors.   02/13 Tr. 17:17-
23.  The fact that speakers were generating profits was discussed on a regular basis during the
call.   02/13 Tr. 25:1-6.   Kapoor came to the meeting with full command of the issues that
would be discussed.  03/05 Tr. 122:9-13.   He knew which doctors were writing scripts for
Subsys, and which doctors were writing scripts for competitor drugs.  03/05 Tr. 122:22-24.   It
was in every way, Kapoor's meeting.  03/05 Tr. 121:1-4.

D.  Kapoor and the IRC

Kapoor knew that the commercial success of Insys depended upon the willingness of
insurers to reimburse their patients for the cost of the drug.  02/12 Tr. 131:16-133:3 & Ex. 575.
If bribed doctors wrote prescriptions, but insurance companies did not authorize payment, no one
at the company, including the sales reps, made money.  03/05 Tr. 122:4-8.

In October 2012, Kapoor approved creating a pilot program designed to test the
feasibility of running an internal reimbursement center.  02/14 Tr. 68:11; 69:1-20 & Ex. 415; 71:
13-24.  From a cubicle at corporate headquarters in Arizona, a company employee named

Elizabeth Gurrieri began directly contacting insurers on behalf of select practitioners based in several locations around the country. 02/22 Tr. 141:24-25; 145:9-11. The pilot program was able to obtain a prior approval from insurers on more than 65% of prescriptions handled. 02/14 Tr. 88:12-15. The program was deemed a success, and using information learned from the pilot program, Kapoor approved the launch of the Insys Reimbursement Center (IRC) in January 2013. 02/22 Tr. 175:2-4.

Following its launch, Mike Gurry regularly briefed Kapoor on the success of IRC employees at obtaining authorizations. 02/25 Tr. 21:25-23:25. Kapoor did not simply sit back and wait for results; rather, he demanded that the IRC achieve a 90% approval rate. 02/14 Tr. 88:16-20. Then, after initial success, Kapoor told Gurry that he expected a 100 percent prior authorization rate. 02/25 Tr. 22: 14-19; 24:18-21.

In response to Kapoor's pressure, Gurry and Gurrieri began creating and enforcing efforts to mislead insurers in order to obtain payment authorization. Gurry and Gurrieri regularly briefed Kapoor on their efforts to mislead insurers. When IRC employees learned that insurers were unwilling to engage a third party, such as the IRC, in the prior authorization process, Gurry responded by authorizing IRC employees to lead insurers to believe that they were calling from the office of the practitioner, as if they were employees of the practitioner. 03/05 Tr. 231:4-232:7-233:9. Kapoor approved. 03/05 Tr. 232:20-233:5.

When IRC employees learned that insurers and pharmacy benefit managers were less likely to authorize payment for a drug prescribed for a use that was not recognized on the drug's label, Gurry informed Kapoor that he had authorized a misleading script, called the "spiel,"

designed to trick insurers into believing that the drug had been prescribed to treat breakthrough cancer pain.  02/14 Tr. 92:1-14.

When IRC employees learned that insurers looked more favorably on approving payment if the patient had difficulty swallowing, a diagnosis called "dysphagia," Gurry authorized the use of the diagnosis even when patients were not suffering from the disorder. 02/14 Tr. 86: 8-14 & Ex. 421.  Kapoor approved, commenting to Burlakoff, "Shit, everybody has difficulty swallowing, right, Alec?"  02/14 Tr. 86: 2-14; 03/05 Tr. 227:17-24.

Last, when IRC employees learned that a history of cancer—however old-—could be used to mislead insurers, Gurry informed Kapoor that he had encouraged employees to review patient medical records for a history of cancer, even when the prescribing physician had not relied upon the previous diagnosis of cancer.  02/14 Tr. 91:1-92:4; 107:25-108:6; 03/05 Tr. 232:4-6.

By December 2013, the IRC was achieving an approval rate near 90 percent.  02/04 Tr. 71:5-72:25, Ex. 354 and Ex. 412.  The unit's success meant that it would become an integral part of Kapoor's conspiracy, ultimately forming a "symbiotic" relationship with the Insys sales force.

III.  The Impact of Kapoor's Crime

The strategies approved and enforced by Kapoor created a profound risk of substantial injury for patients.  The dangers associated with Subsys were not a mystery.  The drug's primary ingredient was Fentanyl, a synthetic opioid analgesic that is 70 to 100 times more potent than morphine.  03/05 Tr. 63:8-13.  In this context, Kapoor approved extra financial incentives to sales reps to ensure that doctors wrote the highest dosages of the drug.  02/22 Tr. 47:17-48:1 & Ex. 1501; Ex. 455 and Ex. 2070.  He approved bribing doctors that he knew abusively prescribed

opioids.  These included Dr. Paul Madison, who ran a pill mill, 02/22 Tr. 49:3-13, Ex. 003; Dr. Mahmood Ahmad who was not able to dispense schedule II narcotics from his pharmacy and who was suspected of being under investigation by the DEA, 02/22 Tr. 56:9-19 & Ex. 004; Dr. Gavin Awerbuch, who was arrested and charged with the illegal distribution of Subsys, 01/31 Tr. 104:15-17; 02/22 Tr. 56:23-57:2; and Drs. Couch and Ruan, who wrote so many Subsys prescriptions, a wholesaler cut off supplies of fentanyl products to their pharmacy and who were ultimately arrested and charged with illegal distribution of Subsys, 02/22 Tr. 57:24-59:7 & Exs. 39 and 133.

Put simply, Kapoor ran Insys without a moral compass, without any concern that his strategies would harm people.

IV.  Conclusion

For all of these reasons, the United States respectfully requests that the Court sentence defendant John N. Kapoor to a period of incarceration of 15 years (180 months).

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

Dated: December 18, 2019          By:     /s/ K. Nathaniel Yeager
                                          K. NATHANIEL YEAGER (BBO # 630992)
                                          DAVID G. LAZARUS (BBO #624907)
                                          FRED WYSHAK, JR. (BBO #535940)

**Certificate of Service**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

                                          /s/ K. Nathaniel Yeager
Dated: December 18, 2019                  Assistant U.S. Attorney

10