**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

UNITED STATES OF AMERICA

     v.

MICHAEL L. BABICH et al.,

    Defendants.

Criminal No.:  16-CR-10343-7-ADB

## <u>DEFENDANTS' RESPONSE TO GOVERNMENT'S MOTION FOR RESTITUTION</u>

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................. 1

LEGAL STANDARD ........................................................................................... 4

EVIDENCE AND ARGUMENT ........................................................................... 5

I.     Individual Claims ..................................................................................... 5

II.    Medicare .................................................................................................. 7

      a.    The Government Cannot Pivot Away from the Allegedly Bribed
            Prescribers .......................................................................................... 7

      b.    Not Every IRC Call Was Fraudulent Simply Because It Came
            from the IRC ..................................................................................... 10

      c.    The IRC Did Not Lie About Every Non-Cancer Diagnosis .................... 12

      d.    The IRC Did Not Always Lie About Other Medical Conditions ............ 15

      e.    The Government Wrongly Applies an 80.9% IRC Use Rate to
            All Claims ......................................................................................... 15

      f.    Medicare Restitution Should Be Limited to Losses That Would
            Not Have Occurred in the Absence of Defendants' Conduct .................. 17

III.    Commercial Insurers .............................................................................. 19

      a.    Commercial Insurers Covered Off-Label Subsys Prescriptions
            and Had Many Different Coverage Policies That Changed
            Over Time .......................................................................................... 20

      b.    Specific Commercial Insurer Submissions ............................................ 21

            i.    *Aetna (Ex. 3)* ............................................................ 22

            ii.    *Anthem Blue Cross Blue Shield (Ex. 4)* ......................... 23

            iii.    *Cigna (Ex. 5)* ........................................................... 24

            iv.    *Caremark (Ex. 6)* ...................................................... 25

            v.    *Silverscript (Ex. 7)* ..................................................... 25

            vi.    *Horizon Blue Cross Blue Shield [NJ] (Ex. 8)* ............... 25

            vii.    *United Health Care Services (Ex. 9)* ............................ 26

i

IV. The Government Has Failed to Prove Restitution To A Preponderance Standard ............................................................................................................. 27

V. The Court Should Enter a Final Restitution Order ............................................... 29

CONCLUSION ........................................................................................................................ 29

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Apprendi v. New Jersey,*
   530 U.S. 466 (2000)..................................................................................................... 4

*United States ex rel. Feldman v. Van Gorp,*
   697 F.3d 78 (2d Cir. 2012) ......................................................................................... 18

*United States ex rel. Landis v. Tailwind Sports Corp.,*
   234 F. Supp. 3d 180 (D.D.C. 2017)............................................................................ 18

*United States ex rel. Wall v. Circle C Construction LLC,*
   813 F.3d 616 (6th Cir. 2016) ...................................................................................... 18

*United States v. Alphas,*
   785 F.3d 775 (1st Cir. 2015)........................................................................... 4, 17, 18

*United States v. Berk,*
   666 F. Supp. 2d 182 (D. Me. 2009) .............................................................................. 7

*United States v. Caputo,*
   517 F.3d 935 (7th Cir. 2008) ........................................................................................ 5

*United States v. Causey,*
   No. 15-40040, 2019 WL 4934837 (D. Mass. Oct. 7, 2019) ...................................... 18

*United States v. Chin,*
   No. CR 14-10363-RGS, 2018 WL 1399297 (D. Mass. Mar. 20, 2018).................... 30

*United States v. Cornier-Ortiz,*
   361 F.3d 29 (1st Cir. 2004)........................................................................................... 4

*United States v. Cutter,*
   313 F.3d 1 (1st Cir. 2002)............................................................................................. 4

*United States v. Flete-Garcia,*
   925 F.3d 17 (1st Cir. 2019)........................................................................................... 4

*United States v. Fogel,*
   494 F. Supp. 2d 136 (D. Conn. 2007)..................................................................... 5, 28

*United States v. Innarelli,*
   524 F.3d 286 (1st Cir. 2008)............................................................................. 4, 5, 28

*United States v. Milkiewicz*,
   470 F.3d 390 (1st Cir. 2006) ................................................................ 4

*United States v. Naphaeng*,
   906 F.3d 173 (1st Cir. 2018) ............................................................. 4, 5

*United States v. Prochner*,
   417 F.3d 54 (1st Cir. 2005) .................................................................. 4

*United States v. Puentes*,
   803 F.3d 597 (11th Cir. 2015) ............................................................ 29

*United States v. Theodore*,
   354 F.3d 1 (1st Cir. 2003) .................................................................. 30

*United States v. Vaknin*,
   112 F.3d 579 (1st Cir. 1997) ................................................................ 4

**Statutes**

18 U.S.C. § 3664 ..................................................................................... 29

42 U.S.C. §§ 1395w-102(e)(1) .............................................................. 13

42 U.S.C. §§ 1395w-102(e)(4)(ii) .......................................................... 13

42 U.S.C. §§ 1396r-8(k)(6) ................................................................... 13

42 U.S.C. §§ 1396r-8(g)(1)(B). ............................................................. 13

**Other Authorities**

Aetna, "Off-Label Use of FDA-Approved Drugs Policy" ........................ 22

*Federal Criminal Restitution* § 7:4 (2019) ............................................ 28

# INTRODUCTION

All seven defendants in the above-captioned case (hereinafter, "Defendants") agree with the government that restitution, if ascertainable and properly proven, is mandatory in this case.[1] And Defendants agree that the patients who have timely submitted claims for restitution should not be "further burden[ed]."  Gov't Mot. at 5.  Thus, Defendants will not contest the modest restitution sought by the government on behalf of these individuals, which totals $10,198.20.

What Defendants cannot agree to is the government's position that insurance companies are entitled to $306 million or more in restitution in this case.  The government has not come close to proving this amount, as it must, by a preponderance of the evidence.  Rather, the government's position, and the underlying insurer submissions, are riddled with improper assumptions, unproven assertions, and internal inconsistencies.  Among them are:

**(1)** a fundamentally inconsistent methodology whereby the government calculated loss for the sentencing guidelines by looking at paid Subsys claims linked to 13 allegedly bribed practitioners only to now pivot—along with some (but not all) insurers—to looking at *all* paid Subsys claims nationwide for purposes of restitution;

**(2)** an incorrect assertion that every call from the IRC was materially fraudulent simply because the call did not affirmatively reveal that it came from a call center;

**(3)** an incorrect assumption that the IRC *always* misrepresented non-cancer diagnoses;

**(4)** an incorrect assumption that the IRC *always* lied to insurers about other material issues;

**(5)** a misrepresentation by the government that Defendants agreed that 80.9% of *all* Subsys claims nationwide were processed by the IRC;

---

[1] In briefing restitution issues, the trial defendants do not waive or concede any appellate issues related to the trial, verdict, or post-trial rulings in this case.

(**6**) an incorrect assumption that off-label Subsys prescriptions were never covered by insurers and that their coverage policies were static over the course of the alleged conspiracy; and

(**7**) facially deficient submissions, such as those without a declaration or sworn statement from a knowledgeable fact witness, those that seek restitution for claims outside the time period of the charged conspiracy, and those that seek restitution based on all paid claims (regardless of IRC involvement) linked to purportedly bribed practitioners *not* among the 13 alleged in this case.

Defendants acknowledge that developing reliable estimates for insurance loss in a case like this is challenging.  For that very reason, the government in this district has typically foregone mandatory restitution in other large healthcare fraud cases, citing "complication and prolongation of the sentencing process that would result from an attempt to fashion a restitution order."  Plea Agreement at 3, *United States v. Stryker Biotech*, Case No. 09-cr-10330-GAO-1 (D. Mass. Jan. 17, 2012), ECF No. 290; *see also* Plea Agreement, *United States v. GlaxosmithKline*, Case No. 12-cr-10206-RWZ-1 (D. Mass. Jul. 2, 2012), ECF No. 2 at 5 ("the parties agree that the complication and prolongation of the sentencing process that would result from an attempt to fashion a restitution order…would be extraordinarily difficult, if not impossible."); Plea Agreement, *United States v. Merck Sharp & Dohme Corp.*, Case No. 11-cr-10384 (D. Mass. Dec. 12, 2011), ECF No. 12 at 3 (same); Plea Agreement, *United States v. Elan Pharmaceuticals*, Case No. 10-cr-10431-MBB-1 (D. Mass. Dec. 8, 2010) at 3 (same); Plea Agreement, *United States v. Forest Pharmaceuticals*, Case No. 10-cr-10294-NG-1 (D. Mass. Sep. 15, 2010), ECF No. 7 at 5 (same); Plea Agreement, *United States v. Ortho-McNeil Pharmaceuticals*, Case No. 10-cr-10147-RBC (D. Mass. Apr. 29, 2010), ECF No. 3 at 2–3 (same).  That the restitution order here will run against individuals—except for the now-bankrupt Insys—is no basis to view the task any

differently than in the above cases, where the government allowed non-bankrupt corporations to avoid restitution entirely.

Moreover, the government and the insurers are sophisticated parties with access to the relevant information.  If they wanted to establish restitution by a preponderance of the evidence, they could have—as the government attempted in the leadup to trial—focused on records that allegedly demonstrate material fraud.  *See, e.g.,* 8/21/18 Gov't Ltr. to Defs at 3 (describing Government-prepared summary spreadsheet specifying evidence of ordinary wire and mail fraud and listing "149 calls from three different insurers/pharmacy benefit managers" that the government alleged to be materially fraudulent).  Or the government could have taken a random, statistically significant sample of all claim approvals, attempted to assess the rate of material fraud and loss, and used that analysis in developing restitution amounts.  The government and insurers have not done so here, nor offered anything else that would give the Court confidence that their estimates are remotely accurate.

Instead, the requests for mandatory restitution fail to prove loss amounts by a preponderance of the evidence, and risk a substantial windfall.  In particular, many of the commercial insurers have ongoing civil litigation in which they can attempt to prove their losses to a preponderance standard.[2]  They have not done so here.  Because the commercial insurers have not provided the type of information or analysis to prove the requested amounts, their ability to recover the unproven amounts should be left to those proceedings.

---

[2] *See, e.g., Aetna, Inc. v. Insys Therapeutics, Inc., et al*, Case No. 17-cv-04812-CMR (E.D. Pa. Oct. 25, 2017); *Blue Cross of California, Inc. d/b/a Anthem Blue Cross of California v. Insys Therapeutics, Inc.*, Case No. 2:17-cv-02286-DLR (D. Ariz. Jul. 12, 2017); *United HealthCare Services Inc. v. Insys Therapeutics, Inc.*, Case No. 19-cv-00545 (C.D. Cal. Mar. 20, 2019); *Horizon Blue Cross Blue Shield of New Jersey v. Insys Therapeutics, Inc. et al*, Case No. ESX-L-001442-19 (Essex County Ct. Feb. 22, 2019).

Accordingly, and as set forth in more particularity below, Defendants object to any restitution on behalf of insurers that goes beyond what is supported by the evidence at trial or that is inconsistent with the government's methodology on fraud loss as reflected in the Draft PSR. At the conclusion of this response, Defendants summarize their positions as to the maximum restitution amounts that the Court may award on the record before it.

## LEGAL STANDARD

The purpose of restitution is to compensate victims for "losses actually sustained." *United States v. Flete-Garcia*, 925 F.3d 17, 37 (1st Cir. 2019). To ensure compliance with this purpose, "a court may only order restitution for losses that have an adequate causal link to the defendant's criminal conduct." *United States v. Alphas*, 785 F.3d 775, 786 (1st Cir. 2015) (citing *United States v. Cutter*, 313 F.3d 1, 7 (1st Cir. 2002)). It is the government's burden to prove "a victim's actual loss by preponderant evidence." *United States v. Naphaeng*, 906 F.3d 173, 179 (1st Cir. 2018); *United States v. Prochner*, 417 F.3d 54, 65 (1st Cir. 2005) (same). This requires the government to put forth evidence that allows the Court to make a "reasonable determination of appropriate restitution." *United States v. Innarelli*, 524 F.3d 286, 294 (1st Cir. 2008) (quoting *United States v. Vaknin*, 112 F.3d 579, 587 (1st Cir. 1997)). The Court is the gatekeeper and must ensure that restitution does "not . . . confer a windfall upon a victim." *Naphaeng*, 906 F.3d at 179 (citing *United States v. Cornier-Ortiz*, 361 F.3d 29, 42 (1st Cir. 2004)). Thus, a "rough approximation" is insufficient for purposes of establishing restitution amounts. *Innarelli*, 524 F.3d at 294.[3]

---

[3] In the alternative, Defendants object to restitution amounts not proven beyond a reasonable doubt under the Sixth Amendment. *See Apprendi v. New Jersey*, 530 U.S. 466 (2000). Defendants recognize this argument is likely foreclosed by First Circuit precedent, *see United States v. Milkiewicz*, 470 F.3d 390, 404 (1st Cir. 2006), and raise it only for preservation purposes.

Some circuits require "an exact figure" for restitution losses.  *See, e.g.*, *United States v. Caputo*, 517 F.3d 935, 943 (7th Cir. 2008).  In *Caputo*, the court had to fashion a restitution remedy for buyers of medical devices that were fraudulently sold by defendants.  The Seventh Circuit held that "[t]he district court must determine these figures one customer at a time and not use the list-price shortcut."  *Id.*  Instead, the district court had to be able to calculate restitution based on exact figures for each medical device in order to determine "the amount that defendants owe to each of AbTox's customers."  *Id.* at 944.  By contrast, the First Circuit has allowed some degree of approximation when calculating restitution.  *See, e.g.*, *Naphaeng*, 906 F.3d at 180–82.  But this is not a green light to substitute proof with overstated assumptions of fraudulent activity.  *See, e.g.*, *Innarelli*, 524 F.3d at 294.

Courts have rejected restitution calculations that were based on broad and unfounded assumptions.  For example, the district court in *United States v. Fogel* considered an insurance company's proposal for calculating restitution which "assume[d] a 100% fraud rate" that was "likely inaccurate."  494 F. Supp. 2d 136, 138–39 (D. Conn. 2007).  The district court recognized that such a calculation "would result in a disproportionate restitution award."  *Id.*  While the court acknowledged that "it may be difficult, time consuming, and/or costly to determine with specificity the exact amount of losses actually caused to each insurance company by defendant's offense conduct," doing so was "clearly not impossible."  *Id.*  And the court ultimately ordered restitution under a different, and far more conservative, set of assumptions.

## EVIDENCE AND ARGUMENT

### I.     Individual Claims

Defendants do not contest the restitution sought to date by the government on behalf of individual patients.  Defendants set forth the ensuing analysis only in case the government seeks

to amend its request with additional restitution submissions and incorrectly characterizes Defendants as not contesting *any* restitution amounts for individuals as a general matter.

*First,* Defendants should not be ordered to pay restitution based on a theory that they intentionally caused a patient to be prescribed Subsys without medical necessity.  As the Court concluded, "the Government did not prove the requisite intent on the part of Defendants, that is, an intent that healthcare practitioners prescribe the drug to people that did not need it or in unnecessarily high doses."  Mem. & Order at 81–82, Dkt. No. 1028.

*Second*, Defendants cannot be held responsible for consequences suffered by patients that, rather than being caused by the alleged crimes in this case, were merely the result of the known risks of Subsys regardless of how it was prescribed.  For instance, the patients who testified at trial acknowledged that they had experienced significant pain and were prescribed substantial doses of other opioids before ever starting Subsys.[4]  And Insys witnesses testified that their goal was to get patients who were taking another TIRF to switch to Subsys.[5]  Defendants note that the government has not sought restitution for any of the patients who testified at trial, or, more generally, for all patients who were switched to Subsys from another TIRF.

---

[4] *See, e.g.*, 3/28/19 Trial Tr. 139:24–140:12 (Michelle Kamzyuk) (oxycodone, percocet, dialudid, duragesic fentanyl patch); 3/28/19 Trial Tr. 185:20–25, 186:14–21, 194:1–14 (Alicia Hinesley) (hydrocodone, valium, oxycodone, morphine); 3/27/19 Trial Tr. 252:25–253:5, 265:18–23, 267:18 –268:6 (Kendra Skalnican) (MS Contin, norco, morphine); 3/26/19 Trial Tr. 71:17–22, 81:4–10 (Scott Byrd) (valium, oxycodone, oxycontin); 3/22/19 Trial Tr. 52:9–16 (Woodrow Chestang) (percocet, oxycontin, morphine, oxymorphone); 3/21/19 Trial Tr. 82:6–83:9 (Sara Dawes) (duragesic fentanyl patch, hydromorphone, oxycodone, Actiq); 3/21/19 Trial Tr. 185:15–186:2 (Betty Carrera) (norco, xanax, oxycontin, oxycodone, fentanyl patch); 3/20/19 Trial Tr. 129:3-20, 144:24–145:1 (Cathy Avers) (high doses of oxycodone); 3/20/19 Trial Tr. 183:21–184:1, 184:15– 185:4, 185:25–187:11 (Paul Lara) (Actiq, fentanyl patch, morphine sulphate); 4/2/19 Trial Tr. 30:25–34:1 (Jennifer Adams) (hydrocodone, oxycontin, and Actiq); 4/1/19 Trial Tr. 124:16– 127:12 (Gregory Kundla) (Duragesic fentanyl patch, Actiq, Fentora, oxycodone, oxycontin).

[5] *See, e.g.*, 2/4/19 Trial Tr. 133:18–25 (Napoletano testifying that Insys's strategy was to "get doctors to switch"); 2/14/19 Trial Tr. 141:6–14 (Babich confirming that Insys just wanted doctors to prescribe Subsys over competitor TIRFs).

*Third*, Defendants note that individual victims are limited to restitution for "readily identifiable expenses," and that restitution "should not be extended to include damages which are difficult to calculate, such as pain and suffering." *United States v. Berk*, 666 F. Supp. 2d 182, 192 n.9 (D. Me. 2009). Several patient letters submitted by the government, *see* Gov't. Mot., Ex. 1, reference such other damages, which the government appropriately did not include in its request.

For these reasons, if the government amends its requests or submits additional patient information in support of restitution, Defendants reserve the right to challenge such other claims. Defendants do not contest the individual restitution amounts submitted to date.

## II.   Medicare

The government seeks $136,768,059 to compensate alleged losses to Medicare from the conduct at issue. This is fundamentally inconsistent with the government's approach to fraud loss under the sentencing guidelines. For guidelines purposes, the government calculated Medicare loss by reference to paid Subsys claims for prescriptions written by 13 alleged co-conspirator practitioners. *See, e.g.*, Gov't Statement of Relevant Facts at 21; Draft Kapoor PSR at ¶ 121. It further reduced that amount based on an assumption that 80.9% of the paid claims for the 13 prescribers were processed by the IRC, and then reduced it based on the assumption that 73% of prescriptions were for non-cancer patients. *See id.* at 19. This approach resulted in an estimated actual loss to Medicare of $17,854,641—or approximately ***87% less than*** what of the government is now seeking in restitution for Medicare. The change in the government's approach is neither justified nor proven by a preponderance of the evidence.

### a.   The Government Cannot Pivot Away from the Allegedly Bribed Prescribers

It is the government's theory that Defendants "bribed doctors" to prescribe Subsys and "defrauded and misled insurance companies" to secure payment for these Subsys prescriptions.

Gov't Mot. at 1. Prior to trial, the government identified 13 co-conspirator practitioners that allegedly received bribes from Insys to prescribe Subsys. *See* Defs' Opp'n to Mot. for Clarification, Exs. A & B, Dkt. No. 759. Those 13 practitioners were a small minority of all Subsys prescribers nationwide. At trial, the government repeatedly made clear that Insys's strategy "was never to go after every doctor in the United States and bribe them." 4/4/19 Trial Tr. 94:21–25. As AUSA Yeager argued in closing, "There are eight co-conspirators named in the indictment. Eight. Why? Because the strategy was never to go after every doctor in the United States and bribe them. The strategy was to pick the right doctors." *Id.*

Defendants do not contest, for purposes of these restitution proceedings, that the government adduced evidence linking 10 of the 13 allegedly bribed practitioners to the charged conspiracy under a preponderance standard. Eight of them were named in the SSI and referenced by AUSA Yeager in closing: Drs. Ruan, Couch, Awerbuch, Ahmad, Somerville, Madison, Chun, and N.P. Alfonso. The government also elicited inculpatory testimony regarding two more practitioners—Dr. Rosenberg and P.A. Clough—bringing the total number of allegedly bribed prescribers to 10.

The three remaining practitioners from the government's list of 13, Drs. Frey, Khanna, and Roque, were almost never mentioned at trial and no evidence was ever presented that they received bribes.[6] Nor has the government substantiated its allegations as to them in the relevant conduct materials submitted to the Probation Office. Accordingly, Defendants submit that the government's approach to Medicare restitution should be confined to prescriptions written by 10

---

[6] These three doctors were collectively mentioned just once in front of the jury, and even then it was not in reference to bribes. *See* 3/12/19 Trial Tr. 191:1–3 (reference to Dr. Frey at sidebar as someone that Tracy Krane called on); 3/1/19 Trial Tr. 155:14–20 (Burlakoff testifying only that Dr. Khanna was a high-decile prescriber of opioids); 3/26/19 Trial Tr. 12:1–11 (referencing Dr. Roque only at sidebar prior to Sue Beisler's testimony).

of the 13 prescribers. *See, e.g.*, Kapoor Sentencing Memo. at 28, Dkt. No. 1070 ("Dr. Kapoor questions the decision to include the prescriptions of three of the 13 prescribers in this calculation because the government did not show their involvement in the conspiracy (either at trial or in any subsequent submission of evidence supporting relevant conduct to the Probation Office)").[7]

This issue is dwarfed, however, by the government's pivot away from allegedly bribed practitioners altogether in determining Medicare restitution. Defendants acknowledge that, as a theoretical matter, one can defraud insurers without bribing doctors. But the government claims to have presented the conduct at issue as part of an intertwined whole, not as two free-standing and separate schemes. And the Court agreed, even after dismissing the CSA and HSF predicate objects of the charged conspiracy.

In particular, in rejecting the trial defendants' arguments about spillover prejudice from the CSA and HSF, this Court held that "the conspiracy charged in the indictment was ***a single conspiracy that consisted of bribing healthcare practitioners to prescribe Subsys and then defrauding insurers to pay for <u>those</u> prescriptions</u>*." Mem. & Order at 38, Dkt. No. 1028 (emphasis added). "Those prescriptions" refers to prescriptions written by bribed practitioners, not by every Subsys prescriber nationwide. Moreover, the Court found that, "even if the Court accepted the premise that two conspiracies were charged, evidence of bribery was directly relevant to both." *Id.* And the purported link between bribery and insurance fraud played a substantial role in the Court upholding verdicts against trial defendants Simon, Rowan, and Lee. *See id.* at 31–36.

Having survived Rule 29 and 33 motions on the insurance fraud allegations precisely because of a purported link between the alleged bribery and insurance fraud, the government

---

[7] Notably, the government's affiant in support of the Medicare restitution prepared alternate calculations excluding the prescriptions of Drs. Frey, Khanna, and Roque. *See* Gov't Mot., Ex. 2 at 5, ¶ 11 & n.9.

should not now be permitted to reverse course and argue that the alleged bribery was immaterial to the insurance losses. The government's basic approach to fraud loss for the sentencing guidelines in the Draft PSR—which was premised on Medicare losses linked to allegedly bribed practitioners—should carry over to the restitution determination as well. That approach results in a substantially lower Medicare restitution than what the government is seeking now.

### b.  Not Every IRC Call Was Fraudulent Simply Because It Came from the IRC

The government compounds the above error by assuming that every IRC call was materially fraudulent. This, too, conflicts with the government's approach to Medicare fraud loss for the sentencing guidelines, where the government estimated the percentage of off-label Subsys prescriptions paid by Medicare for the 13 allegedly bribed prescribed. By contrast, the government now insists that Medicare would not have paid any claims that "originated at the IRC (breakthrough cancer pain or otherwise.)" Gov't Mot. at 9.

The government's basis for this expanded claim is that "Medicare would not knowingly authorize payment for any Subsys prescription if that payment authorization (or non-tier formulary request) was originated at the Insys Reimbursement Center." *Id*. at 8–9 (quoting trial testimony of Amy Moyer-Carey and Nicole Shenk). But Moyer-Carey and Shenk are not Medicare officials or government employees authorized to testify authoritatively about Medicare's coverage policies; rather, they are employees of commercial insurance carriers. *See* 3/20/19 Trial Tr. 223:9–13 (Moyer-Carey); 3/21/19 Trial Tr. 115:23–116:3 (Shenk); *see also* Gov't Mot. at Ex. 6 (Declaration of Shenk seeking restitution for CaremarkPCS rather than for Medicare). At best, these witnesses were relying on their own, second-hand understanding and experience with Medicare regulations. And they were not competent to testify as to whether Medicare adheres to the purported policy in all cases.

Contrary to the government's theory, every IRC call did not become materially fraudulent simply because the IRC representative failed to state that she was calling from Insys. The evidence at trial showed that different IRC personnel used different formulations, and that the formulations changed over time in response to compliance efforts at Insys. Some of the calls lied about the location of the caller, such as an IRC representative indicating that she was calling "from the doctor's office,"[8] while others merely confirmed that they were calling "on behalf of" the doctor.[9] The latter formulation was ***true***, because the doctors had in fact provided signed authorizations (also known as opt-in forms) permitting the IRC to call on their behalf.[10] And during the time of the charged conspiracy, compliance promulgated rules that the "from a doctor's office" formulation was impermissible, but that representatives could say that they were calling "with, for, or on behalf of" the practitioner.[11] Yet the government makes no attempt, either for the Medicare restitution or for the commercial insurers discussed later in this response, to quantify or estimate the percentage of IRC calls that misrepresented that a call was coming from a doctor's office.

Finally, the government's treatment of every call from the IRC as fraudulent because it came from an undisclosed call center is difficult to square with reality. As the evidence at trial

---

[8] *See, e.g.*, Trial Ex. 1937 at USAO-MA-1447517 ("**Q.** Are you calling from the doctor's office? **A.** Yes.").

[9] *See* Trial Ex. 1977 at USAO-MA-1414806 ("**Q.** And just to protect the privacy of the patient just gonna verify the doc you are calling on behalf of Doctor Jeffrey Goldstein . . . ? . . . **A.** Yes.").

[10] *See, e.g.*, 2/22/19 Trial Tr. 147:7–11 (Liz Gurrieri testifying that the purpose of the opt-in form was to "have the physician give Insys the authorization to work on their behalf"); Trial Ex. 6213-02 (signed opt-in form authorizing Insys to "obtain information on [the physician's] behalf" and "correspond with respect to accessing medication through the [patient's insurer's] Prior Authorization Process").

[11] *See, e.g.*, 2/26/19 Trial Tr. 174:6–10 (Liz Gurrieri acknowledging the "compliance approved" rules required IRC employees to indicate they were calling "[w]ith, for, or on behalf of" the practitioner); Trial Ex. 2081 (notes recorded from April 2014 IRC Team Meeting stating: "Calls must be made 'for,' 'with,' or 'on behalf of' HCP office - NEVER 'from.'").

showed, a call center of this type was not an Insys invention.  Insys initially retained a third party

to operate the call center,[12] and the government did not allege that the third party engaged in fraud.

And the evidence showed that reputable pharmaceutical companies, such as McKesson, operate

similar call centers and are hired by smaller pharmaceutical companies to assist with obtaining

prior authorizations.   On  the  government's  theory,  these  call  centers  are  either  bridges  to

nowhere—incapable  of  lawfully  obtaining  reimbursements  from  Medicare  or  many  of  the

commercial insurers seeking restitution in this case—or factories for insurance fraud.  The fact

that demand exists for these call centers and they have not been shut down as an industry strongly

suggests that neither is true, and that insurers do sometimes cover claims submitted by them.[13]

### c.   The IRC Did Not Lie About Every Non-Cancer Diagnosis

While the government argues that every call from the IRC was fraudulent, the underlying

affidavit in support of the Medicare loss at least attempts to determine which claims involved

cancer patients.  Gov't Mot., Ex. 2 at 3–4.  That is laudable.  But the affidavit does not offer an

assessment of how much money Medicare actually lost due to misrepresentations about off-label

prescriptions of Subsys.  Rather, the affidavit is from an employee of a financial advisory firm

who is not a fact witness from Medicare.  *See id.* at 1.  The affiant simply assesses certain

information fields of Medicare Part D data to see whether cancer was *not* indicated as a "principal

diagnosis code" or a "principal diagnosis code within 365 days" for a particular patient, and totals

---

[12] *See, e.g.*, 2/14/19 Trial Tr. 74:13–19 (Michael Babich testifying that Insys "started" by using an "outside company" to assist with prior authorizations).

[13] Defendants cannot say with certainty why Medicare and other insurers do not strictly adhere to policies that would bar coverage for any claim submitted through a call center.  Perhaps such policies are legally suspect, because they seek to override a doctor's (and, as applicable, a patient's) written delegation of authority to a third party to call on their behalf.  Perhaps they are unlikely to withstand a coverage denial challenge because they impose unreasonable administrative burdens on medical practitioners.  Or perhaps insurers just enforce their own policies selectively.

the numbers of Subsys claims paid by Medicare for such patients during the period of the charged conspiracy. *See id.* at 6. The affiant then repeats his analysis after discounting the totals to account for only the prescriptions written by the 13 alleged co-conspirators and also, as explained above, for the 10 practitioners that the government actually presented evidence about at trial. *See id.* But nowhere does the affiant express a view as to which approach—the one tethered to the 13 (or, 10) allegedly bribed practitioners or the one that tracks all Subsys prescriptions—this Court should employ.

As noted above, Defendants submit that the proper approach is one that limits the Medicare fraud loss to the alleged co-conspirator practitioners. But the government's reliance on the larger numbers for all practitioners is further undermined by two unstated assumptions—(1) that *no* patient without a cancer "principal diagnosis code" was dealing with cancer-related pain at the time of her Subsys prescription, and (2) that every IRC call about an off-label prescription falsely provided a cancer diagnosis. (The latter assumption also underlies many of the commercial insurer submissions addressed later in this response.) The government has not proven the validity of either assumption by a preponderance of the evidence.

*First*, the government's affiant did not purport to determine whether patients did or did not have cancer; he merely assessed their "primary treatment codes" in the Medicare Part D database.[14] He did not review or analyze any other information that would bear on whether the patient was

---

[14] The government assumes that all Medicare reimbursements for prescriptions of Subsys to patients who did not have cancer count as loss. But it is wrong to assume that Medicare does not reimburse off-label prescriptions in all cases. By statute, Medicare reimburses prescriptions for "medically accepted indications." 42 U.S.C. §§ 1395w-102(e)(1) (defining "covered part D drug"), 1395w-102(e)(4)(ii), 1396r-8(k)(6), 1396r-8(g)(1)(B). Defendants understand this standard to be assessed by reference to certain recognized medical compendia. Because the government's approach to restitution does not assess this issue, and wrongly equates an FDA label indication as the only medically accepted indication, it improperly implies that Medicare would never cover a prescription for an off-label use.

actually experiencing cancer-related pain.[15]  *Second*, neither the affiant nor the government appear to have checked the code information in the Medicare database against the codes provided in the course of the Subsys claim approval for the same patients.  The government certainly *could have* done this for many claims, by referencing the types of call records and IRC documents that it offered as evidence at trial.  But it has not done so, leaving unanswered the question of whether a false cancer diagnosis was affirmatively provided for the Subsys prescription.

*Third*, the government is wrong to assume that the IRC materially misrepresented every off-label Subsys prescription as cancer-related.   As the evidence at trial showed, during the time of the charged conspiracy, compliance changed the "spiel" related to cancer pain to prohibit employees from falsely claiming that patients had cancer when there was no record of that.[16]  Insys then began internally monitoring IRC calls, and IRC employees were reprimanded, lost bonuses, and were terminated for not following the new compliance policies.[17]  Even the government's lead witness on IRC fraud, Liz Gurrieri, testified that, by the middle of 2014—a year and a half before the end of the charged conspiracy—compliance had made it clear that IRC employees could not lie about cancer diagnoses.[18]

---

[15] The government's affiant for the Medicare restitution claim determined whether there was a primary cancer diagnosis in the 365 days that preceded the Subsys prescription, but does not explain the basis for such a date cutoff.  *See* Gov't Mot., Ex. 2 at 5.  United HealthCare, on the other hand, looked to the 6 months prior to the prescription—again, with no explanation of the basis for this cutoff.  *See id.*, Ex. 9 at 2.

[16] *See* Trial Ex. 2081 ("When asked if [Subsys] is being prescribed for the management of [breakthrough pain] in a [patient] diagnosed with cancer, DO NOT, under any circumstances say 'YES, the [patient] has breakthrough pain' if [the diagnosis] is non-cancer.") (emphasis in original); Trial Ex. 2103 at 2 (instructing IRC employees that falsely claiming a patient has cancer was an "unacceptable" response to insurer inquiries); Trial Ex. 6058 at 3 (instructing IRC employees that they "**may not be misleading in any way**" and must provide a "**YES or NO answer**" when asked by an insurer whether a patient has cancer) (emphasis in original).

[17] 2/28/19 Trial Tr. at 113:3–12 (Liz Gurrieri).

[18] 2/28/19 Trial Tr. at 128:17–19 (Liz Gurrieri).

### d.  The IRC Did Not Always Lie About Other Medical Conditions

To the extent relevant to the government's unsupported assumption of a 100% fraud rate at the IRC, Defendants also note that the IRC did not always mislead insurers on other material facts.  Several IRC employees confirmed at trial that they did not always mislead insurers.[19]  And other IRC employees testified in particular that they were prohibited from making up diagnosis codes when they were not provided on the opt-in forms,[20] that they stopped making unsubstantiated claims that patients had dysphagia in response to improved compliance,[21] and that IRC procedures were changed in 2014 to reduce potential misrepresentations about tried and failed medications.[22] While some fraudulent conduct continued even after these initiatives, even Gurrieri conceded that compliance initiatives were not disregarded by *all* IRC employees *all* the time.[23]

### e.  The Government Wrongly Applies an 80.9% IRC Use Rate to All Claims

The one assumption that the government carries over from its approach to the sentencing guidelines is the one that makes the least sense as applied to all prescriptions—that 80.9% of all

---

[19] *See, e.g.*, 2/28/19 Trial Tr. at 132:2–15 ("**Q**. So this call complied with what compliance was telling folks at the time? **A**. Yes.") (Liz Gurrieri); 3/22/19 Trial Tr. at 106:15–17 ("**Q**. And you testified that you on ***certain calls*** lied to and misled insurers, right? **A**. Correct.") (emphasis added) (Lindsay Meyer).

[20] *See* 2/26/19 138:10–16 ("**Q**. Now, what if it came in with no diagnoses and no ICD code? **A**. Mike advised us to contact them, contact either the physician's office at the time or the sales rep, and ask them to provide the diagnosis. **Q**. You weren't supposed to just make it up, right? **A**. Correct.") (Liz Gurrieri).

[21] For example, Kim Fordham testified that, prior to 2014, she would tell insurance companies that a patient suffered from dysphagia "a 'majority' of times," but this practice stopped when compliance came in and employees were explicitly told that they were "not allowed" to mislead insurance companies in this manner.  2/11/19 Trial Tr. at 45:12–20.

[22] *See* 2/28/19 Trial Tr. at 33:13–34:3 (Liz Gurrieri admitting that, as of mid-2014, tried and failed medications had to be obtained in writing from the prescriber's office).

[23] *See* 2/28/19 Trial Tr. at 141:10–13 ("**Q**. So let me break that down. You're not saying that everyone disregarded compliance's written instructions? **A**. All the time. I'm not saying that everyone disregarded them all the time.") (Liz Gurrieri).

15

Subsys claims were processed by the IRC.  *See* Gov't Mot. at 9.  While this percentage is cited in some insurer submissions, those submissions make clear that the insurers were not competent to testify to the number and were simply provided with that figure by the government.  For its part, the government does not attempt to prove the accuracy of this figure.  Rather, the government claims that Defendants agreed to this IRC use rate by not objecting to it in the PSR.  *See id*. at 9 n.6.  The government's claim is both disingenuous and wrong.

To begin with, the government's submission incorporated in the PSR did not claim that 80.9% of all Subsys prescriptions were processed by the IRC.   Rather, the government merely claimed that "as of January 2013, approximately 80.9% of prescribers opted-in to the IRC."  Draft Kapoor PSR at ¶120.  January 2013 was early in the charged conspiracy, when a relatively small number of prescribers were writing Subsys scripts.  The government did not assert in the PSR that this rate remained constant for the duration of the charged conspiracy.  And the rate itself is about the percentage of *prescribers* who opted into the IRC, not the percentage of *prescriptions* processed by the IRC.  The two concepts are obviously different because each prescriber wrote a unique number of scrips and each opted-into the IRC at a different date (if ever).

Worse yet, the government only relied on the 80.9% figure in the PSR for purposes of calculating the Medicare fraud loss *linked to the 13 allegedly bribed prescribers*.  *See id.* at ¶121.  That is all any Defendant agreed to by not objecting to that portion of the PSR.  And in reserving the right to pursue additional restitution elsewhere in the PSR, the government never indicated that it would be relying on the 80.9% rate for claimed losses beyond those linked to the 13 practitioners.

Assuming the IRC processed 80.9% of the prescriptions written by 13 allegedly bribed practitioners is completely different than assuming that the IRC processed 80.9% of *all* Subsys prescriptions nationwide.   After all, the allegedly bribed practitioners were, according to the

government's theory at trial, the "whales" responsible for a larger share of Subsys prescriptions,[24] who were affirmatively targeted by the company,[25] who had a high rate of return on their Insys speaker fees, and who had a strong mutual interest with Insys in having their many Subsys claims handled by a call center rather than their own offices.[26]  Whatever one thinks of the evidence relating to these practitioners, it is reasonable to assume that the vast majority of their Subsys prescriptions were indeed processed by the IRC.

The same cannot be said for the thousands of other practitioners who prescribed Subsys during the charged conspiracy.  Some of these other practitioners only rarely prescribed Subsys. And none of them—according to the government's own submissions in this case—were identified as co-conspirators of the Defendants who now stand before the Court.  While some of those other practitioners surely utilized the IRC, there is no good reason to assume that they did so to the same extent as the 13 practitioners who were allegedly bribed.

### f. Medicare Restitution Should Be Limited to Losses That Would Not Have Occurred in the Absence of Defendants' Conduct

The government also fails to establish a causal link between the amount of the losses it claims for purposes of restitution and Defendants' conduct.  *See Alphas*, 785 F.3d at 786 ("Actual loss is widely (and correctly) thought to be limited to pecuniary harm that would not have occurred but for the defendant's criminal activity.").  Instead, the restitution methodologies employed by the government (and the commercial insurers) ignore the extent to which supposed losses would

---

[24] *See, e.g.*, 3/1/19 Trial Tr. 177:14–180:17 (Alec Burlakoff testifying that the allegedly bribed practitioners were "whales," which he defined as practitioners who had "taken the deal hook, line, and sinker," and could vault a sales rep to "the top 10 of the company").

[25] *See, e.g.*, 4/4/19 Trial Tr. 94:21–25 ("[T]he strategy was never to go after every doctor in the United States and bribe them.  The strategy was to pick the right doctors.").

[26] *See* 1/31/19 Trial Tr. 79:18–23 (Gavin Awerbuch testifying that prior authorizations were a "hassle" and "very time consuming," and that he had to hire people in his office to do them).

have occurred regardless of Defendants' conduct. Determining the extent of such losses requires consideration of amounts that would have been reimbursed even in the absence of Defendants' conduct. Trial evidence demonstrated that numerous patients who were prescribed Subsys needed clinical analgesia treatment. *See supra* p. 6, n.4. If Medicare and commercial insurers had not reimbursed Subsys for beneficiaries who needed it, they would have been required to reimburse an alternative therapy to treat the beneficiaries' pain.

Under those circumstances, "the amount of loss that would not have occurred but for the defendant's criminal activity" is not measured by the full amount reimbursed for Subsys prescriptions. *See Alphas*, 785 F.3d at 786. Rather, calculation of the loss caused by Defendants' conduct must account for amounts that would have been reimbursed for alternative treatments.[27] *Id.* ("[W]e have made it pellucid that 'restitution should not be ordered if the loss would have occurred regardless of the defendants' misconduct.'"); *United States v. Causey*, No. 15-40040, 2019 WL 4934837 (D. Mass. Oct. 7, 2019) (denying motion to impose restitution because the supposed victim would have spent the amount claimed "even if the Defendant had not conducted her fraud"). Neither the government nor the commercial insurers have come forward with evidence that would enable that calculation. As trial evidence showed, Subsys was priced below

---

[27] Accounting for amounts the government would have paid regardless of the Defendants' conduct is a familiar part of assessing damages in the civil False Claims Act context. In those cases, the proper measure of damages is not the full amount reimbursed by government payors. The damages calculation must factor in the value actually provided. *See, e.g.*, *United States ex rel. Landis v. Tailwind Sports Corp.*, 234 F. Supp. 3d 180, 200 n.27 (D.D.C. 2017) (calculating damages as the difference between the "monetary value the government received an used" and "the delivered services"); *see also United States ex rel. Wall v. Circle C Construction LLC*, 813 F.3d 616, 618 (6th Cir. 2016) (characterizing the government's damages calculation that disregarded the value of what was actually provided as "fairlyand"); *United States ex rel. Feldman v. Van Gorp*, 697 F.3d 78, 90 (2d Cir. 2012) (describing the appropriate damages amount as "the amount of money the government paid out by reason of the false claims over and above what it would have paid out if the claims had not been false").

or competitively with alternative branded treatments during key parts of the relevant period, making claims for restitution even more difficult to prove (particularly as to patients who were not suitable for the only generic alternative, which was the generic alternative to Actiq).[28]

<p style="text-align:center">*      *      *      *      *</p>

For all the above reasons, the government's proposed Medicare restitution figure is improper and not proven by a preponderance of the evidence.  Any Medicare restitution ordered by the Court should be limited to the $17,854,641 in Medicare fraud loss set forth in the draft PSR based on prescriptions written by the 13 alleged co-conspirator practitioners,[29] reduced further because the government has failed to sufficiently link three of those practitioners to the charged conspiracy either at trial or in any submission of relevant conduct.

## III.   Commercial Insurers

Each of the criticisms of the government's approach to Medicare restitution applies with equal force to its approach for commercial insurers.  With respect to the latter, the government did not even include an estimate of loss for sentencing guideline purposes.  Now, the government claims that commercial insurers are entitled to restitution of $169,650,045.02 or more.

Defendants will not reprise at length criticisms of the government's methodology for calculating commercial insurer restitution that overlap with its approach to Medicare restitution.  Instead, Defendants will describe an additional defect with the government's commercial insurance methodology, and then will briefly respond to each commercial insurer submission.

---

[28] *See, e.g.*, 2/22/19 Trial Tr. 46:13–14 ("[Insys] initially priced [Subsys] at a discount, less than Fentora, the other branded product.  Regarding price, then we said if we ever were to see that we were successful, we could also become a price leader. So our strategy was to price at a discounted Fentora and then eventually raise our price to over Fentora, down the road, if we were successful.").

[29] Some Defendants joining this response contend that the Medicare fraud amount should be less than $17,854,641.  They do not intend to waive those arguments by joining this response.

<p style="text-align:center">19</p>

### a. Commercial Insurers Covered Off-Label Subsys Prescriptions and Had Many Different Coverage Policies That Changed Over Time

Several of the commercial insurers claim that they would not have approved Subsys had they known that it was being prescribed off-label.[30]  *See, e.g.*, Gov't Mot., Ex. 3 at 1 (Aetna), Ex. 5 at 3 (Cigna).  These claims are not accompanied by any supporting coverage policies and are substantially undermined by the trial testimony in this case.[31]

Coverage policies—like most corporate policies—are not static.  Trial testimony showed that insurance companies consistently evaluated their policies and changed their approach to coverage.  Caremark, for example, testified that their coverage criteria "requires at least an annual review," and that it changed its coverage policies for Subsys in 2013, 2014, and 2015 to become more restrictive.[32]  Likewise, Silverscript described adopting "stricter" coverage criteria for all TIRFs, including Subsys, "around the 2013-2014 timeframe."[33]  Silverscript also confirmed that,

---

[30] Defendants maintain—as several witnesses at trial confirmed—that there is nothing improper about an off-label prescription.  *See, e.g.*, 2/1/19 Trial Tr. at 69:6–8 ("**Q**. Doctors are permitted to write the drug off–label, correct? **A**. That's correct.") (Matt Napoletano).  Even if the government had met its burden of showing that insurers would not have covered Subsys for an off-label purpose in the absence of IRC fraud, insurers vary widely in terms of what they consider to be an off-label prescription.  And Defendants showed at trial that cancer pain can persist even in the absence of a recent cancer diagnosis.  *See, e.g.*, 4/2/19 Trial Tr. at 86:17–87:9 (Dr. Lisa Stearns explaining that cancer pain "could be related to the tumor itself" or "related to treatment of cancer"); *see also* 3/28/19 Trial Tr. at 135:12–18 (OptumRX employee explaining that whether a patient in remission is suffering from cancer pain is a determination for a medical practitioner to make, not an insurance company).

[31] A more reliable assessment of insurers' coverage policies would require examining whether those policies were fairly applied across the board to all comparable products or selectively in order to steer patients to generic products that were cheaper but not preferred by the practitioner or patient over branded products with improved delivery mechanisms.  Whether commercial insurers' claim history across comparable classes of products would or would not validate material payment decisions based on medically appropriate off-label use, and during what time periods, remains to be seen.

[32] 3/21/19 Trial Tr. at 119:14–122:16; 169:4–170:24.

[33] 3/20/19 Trial Tr. at 246:8–247:24.

on some calls, its operators did not ask the IRC about breakthrough cancer pain before approving coverage.[34]   Other insurers were no different.[35]   Several witnesses at trial specifically discussed how commercial insurers covered TIRFs for off-label uses.[36]   And all commercial insurers who testified confirmed that they offered many different type of policies to their customers that provided a wide range of coverage options.[37]

With all these variables in play, none of the commercial insurers who submitted claims are justified in taking a one-size-fits-all approach to estimating restitution.   Yet that is what virtually all of them have done.   Because neither they, nor the government, have shown that their coverage policies with respect to Subsys were uniform or constant throughout the charged conspiracy, such an approach is neither fair nor sensible.   For this reason, as well the methodological defects that the commercial insurer estimates share with their Medicare counterparts, the restitution sought by the government is unreliable and does not adequately estimate actual losses.

### b.  Specific Commercial Insurer Submissions

Defendants specifically object to the following aspects and defects in the commercial insurer submissions on restitution:

---

[34] *Id.* at 260:18–23; *see also* 2/22/19 Trial Tr. at 162:3–17 (Babich testimony that Silverscript used to be "looser" with their coverage criteria, and "got more stringent" over time).

[35] *See, e.g.*, 3/28/19 Trial Tr. at 99:1–9 (OptumRX employee testifying that coverage criteria changed over time and, for Subsys, it became more restrictive); 3/18/19 Trial Tr. at 158:12–22 (similar changes were happening at Humana); 2/26/19 Trial Tr. at 214:16–216:9 (Gurrieri explaining that insurers used to approve Subsys off-label and raise no concerns with IRC employees calling on behalf of patients but, over time, the requirements became more restrictive).

[36] *See, e.g.*, 2/21/19 Trial Tr. at 25:9–26:1 (Babich testimony that TIRFs, including Actiq, were being approved for off-label use); 3/28/19 Trial Tr. at 90:8–11; 96:21–98:2 (OptumRX testimony confirming that, at various times between 2012 and 2015, it approved Subsys for off-label purposes).

[37] *See* 3/18/19 Trial Tr. 153:16–155:1 (Humana); 3/21/19 Trial Tr. 36:10–37:20, 166:10–167:6 (CVS Caremark); 3/28/19 Trial Tr. 64:21–65:21 (OptumRx).

      *i.  Aetna (Ex. 3)*

Aetna seeks $15,769,912 in restitution.   Its submission lacks an affidavit or sworn declaration, and instead relies on a three-page letter bereft of much factual discussion.   The letter generally asserts that Aetna would not have covered Subsys for off-label uses, but does not provide any supporting documentation for that claim—which appears to be in conflict with publicly-available information suggesting that Aetna *does* cover off-label prescriptions in certain circumstances.[38]

Instead, the Aetna letter incorrectly claims that: "There can simply be no legitimate explanation or justification for prescribing Subsys to non-cancer patients."  *Id.* at 2.  As the Court well knows, this assertion is contrary to the jury instructions given in this case,[39] was abandoned by the government at trial,[40] and is contradicted by uncontested testimony from Dr. Lisa Stearns who—unlike the Aetna affiant—is an actual medical doctor with substantial experience in treating pain and prescribing Subsys.[41]   Because Aetna's $15 million restitution request rests entirely on this deck of cards, it is not justified or proven to any evidentiary standard.  Aetna's letter also fails to provide any supporting documentation for the assumption that *all* of Aetna's coverage policies

---

[38]   *See* Aetna, "Off-Label Use of FDA-Approved Drugs Policy," *available at* https://www.aetnabetterhealth.com/pennsylvania/assets/pdf/pharmacy/Penn%20Off-Label_Use_ Guideline.pdf.  ("Providers may request coverage of off-label usage well in advance to allow time for review, research, &/or decision. Supportive data and clinical documentation substantiating the request must be submitted to the Plan.")

[39] *See* 4/4/19 Trial Tr. 56:24–57:4 ("Thus, you may not conclude that a particular prescription was outside the usual course of professional practice, not for a legitimate medical purpose, or in violation of a healthcare practitioner's fiduciary duty solely because it was prescribed for an off label use.").

[40] *See* 4/4/19 Trial Tr. 93:1–2 (AUSA Yeager acknowledging to the jury in closing that "the Court told you it's not illegal to have off-label").

[41] *See* 4/2/19 Trial Tr. 130:19–131:5, 161:10–12 (testifying that she prescribes Subsys and other TIRFs to some patients with "non-cancer breakthrough pain" because it can help them avoid hospitalization during an episode).

were uniform in this regard during the *entire* charged conspiracy.  Nor does the letter provide a

date range for the claims supporting its the restitution request or otherwise indicate whether those

claims were confined to the charged conspiracy period.

Aetna appears to offer an alternative approach based on Subsys claims related to certain

practitioners.  That is more colorable.  But most of the prescribers Aetna suggests were bribed

were never identified by the government as co-conspirators in this case.  *See* Gov't Mot., Ex. 3 at

3.  Focusing on the 13 practitioners the government has alleged were bribed, Aetna only lists the

following: $653,707 for Dr. Chun, $237,381 for Dr. Ahmad, $156,473 for Dr. Madison, $74,998

for Dr. Awerbuch, $40,870 for N.P. Alfonso, $22,671 for Dr. Ruan, and $7,379 for Dr. Frey.  Even

assuming the other defects in the submission could be solved, the outer maximum of the restitution

payable to Aetna is a sum of these figures—minus the amount for Dr. Frey because the government

has not sufficiently linked him to the charged conspiracy—and with the remainder further reduced

by the 80.9% that the government applied to IRC usage rates for the co-conspirator practitioners.

### ii.  *Anthem Blue Cross Blue Shield (Ex. 4)*

Anthem seeks $19,310,973.28 in restitution.  It submitted a two-page sworn declaration

and a short accompanying spreadsheet.  Like Aetna, Anthem's submission is defective because it

simply asserts that off-label prescriptions for Subsys would never have been covered, without

citing any policies or other evidence to prove that such a blanket restriction was in place for any

or all Anthem plans, or that it remained in place throughout the charged conspiracy.  Further, the

Anthem submission also claims, without proof or explanation, that the amounts in question were

paid "where representatives of Insys Therapeutics misrepresented who they were when they called

in for pre-certification."  Gov't Mot., Ex. 4 at 2.   The submission also does not explain why the

fact that a call may have come from Insys was material to every representation, or what the callers

did to misrepresent where they were calling from.  As described earlier, such blanket accusations about the materiality of the call originating from the IRC, without any attention paid to whether the caller lied about calling from a doctor's office or truthfully stated that she was calling on behalf of the doctor, fall well short of proving actual losses caused by fraud.  Finally, Anthem does not appear to apply the government's 80.9% IRC use rate—which, as noted above, is inappropriate as applied to all Subsys claims—and instead appears to assumes that *all* Subsys claims nationwide were submitted through the IRC.  On this record, Anthem is not entitled to any restitution.

       *iii.   Cigna (Ex. 5)*

Cigna seeks $13,467,942.56 in restitution.  It submitted a four-page sworn affidavit.  The affidavit wrongly seeks restitution for *all* Subsys claims paid by the insurer, subject only to a discounting for the government's claimed 80.9% IRC usage rate, which as discussed is not appropriate as applied to all claims nationwide.  Like the Anthem submission, the Cigna submission claims, without any supporting documentation, that every Subsys claim processed by the IRC was fraudulent simply because the call came from the IRC.  And like the Aetna and Anthem submissions, the Cigna submission claims, without any supporting documentation, that Cigna would have never covered any Subsys prescription for off-label use and that any such coverage was obtained as a result of affirmative misstatements by the IRC.  Cigna does not even attempt to determine which claims were paid for patients who took Subsys on-label.

In the alternative, Cigna provides total Subsys claims paid for seven of the allegedly bribed practitioners.  *Id.* at 3 (listing amounts for Drs. Ruan, Awerbuch, Ahmad, Alfonso, Chun, Clough, and Khanna).  The total amount paid for those claims is $1,838,768.07.[42]  This amount, reduced

---

[42] This amount appears to cover all time periods and not just the time of the charged conspiracy, and thus may be an over-estimate.

for the portion attributable to Dr. Khanna, and with the remainder reduced by a factor of 80.9%, is the maximum for the restitution payable to Cigna.

### iv.   Caremark (Ex. 6)

Caremark seeks $76,024,612.98 in restitution.  It submitted a two-page sworn declaration and supporting spreadsheets.  Caremark's entire estimate is based on the government's 80.9% IRC usage rate that cannot be properly applied to all Subsys prescriptions.  It then assumes, without evidence or justification, that every single Subsys prescription submitted by the IRC—whether the prescription was on- or off-label—was materially fraudulent.  No explanation is provided for this assumption, nor does Caremark describe the nature of the underlying misrepresentations.  Simply put, Caremark baselessly assumed that the IRC had a 100% material fraud rate.  On this record, Caremark is not entitled to any restitution.

### v.   Silverscript (Ex. 7)

Silverscript is apparently seeking $7,983,771.48 in restitution.  It submitted a lengthy spreadsheet with no explanation or affidavit.  Accordingly, Defendants are unable to directly assess the basis for the restitution.  However, the government's memorandum suggests that Silverscript's losses are calculated in the same manner as Caremark's.  *See* Gov't Mot. at 10.  Accordingly, for the same reasons set forth above for Caremark, Silverscript is likewise not entitled to any restitution on this record.

### vi.   Horizon Blue Cross Blue Shield [NJ] (Ex. 8)

Horizon is seeking $2,088,066 in restitution. Horizon submitted a four-page letter from outside counsel, a spreadsheet, and certain civil filings.  No coverage policies are enclosed, nor are they described in the submission in any detail.  Instead, in terms nearly identical to the Aetna formulation, Horizon incorrectly claims that: "There can simply be no legitimate explanation or

25

justification for referring the highly-potent and addictive Subsys spray to non-cancer patients." *Id.* at 4, n.8. Horizon then goes on to recount the civil damages it is seeking against some—but notably not all—of the Defendants in this case.

Despite lacking a clear methodology, Horizon's estimate appears to track prescriptions written by allegedly bribed practitioners. That is a step in the right direction. However, only two of the practitioners described in Horizon's letter and supporting spreadsheets—N.P. Alfonso and Dr. Chun—are among the 13 alleged co-conspirators identified by the government. Accordingly, the sum attributable to claims paid as to N.P. Alfonso and Dr. Chun's scripts—$104,693.34[43]— once reduced by the 80.9% IRC usage rate, is the maximum restitution amount payable to Horizon.

> ### vii.   United HealthCare Services (Ex. 9)

United is seeking $35,004,767 in restitution. It submitted a four-page letter accompanied by a short spreadsheet. The United analysis is premised on seeking restitution for Subsys prescriptions where it estimates that no cancer diagnosis was present. The submission does not include any assessment of whether the IRC had any involvement in getting those prescriptions approved, or what it considered as an affirmative misrepresentation of a cancer diagnosis. It also does not account for any variability within the multitude of policies offered by United or any changes to those coverage policies during the course of the charged conspiracy. Finally, United's submission is facially unreasonable because it includes claims for the entirety of the 2016 calendar year, even though the government alleges that the charged conspiracy ended at the close of 2015.[44] On this record, United is not entitled to any restitution.

---

[43] This amount appears to cover all time periods and not just the time of the charged conspiracy, and thus may be an overestimate.

[44] *Compare* Gov't Mot., Ex. 9, at pp. 6–9 (spreadsheet showing United included in its restitution calculation payments it made for Subsys for the entire 2016 calendar year), *with* SSI ¶ 23, Dkt. No. 419 (alleging the conspiracy occurred from "in or about May 2012, and continuing until in or

**IV.     The Government Has Failed to Prove Restitution To A Preponderance Standard**

The government appreciated the substantial difficulty of proving the general elements of fraud at trial.  That burden does not disappear simply because the issue here is restitution and the standard of proof is preponderance of the evidence.  The Court need only look to the government's own representations in the lead-up to trial to appreciate the detailed level of evidence necessary for the government to identify actual losses connected to the IRC, bribery of co-conspirator practitioners, and allegedly related misstatements to insurers.

At the July 17, 2018 motion to dismiss hearing, the Court asked the government about its charging theories in the FSI, including about the ordinary mail and wire fraud counts involving the IRC and practitioner bribes.  Part of the government's attempt to protect those claims against dismissal included commitments "to provide additional information in a bill of particulars with regard to the mail fraud and wire fraud allegations" in the FSI.  *See* 8/21/18 Gov't Ltr. to Defs, at 1.  Those same mail and wire fraud allegations survived in the SSI as predicate offenses of a single RICO conspiracy count.

The government then supplied Defendants with a spreadsheet listing "149 calls from three different insurers/pharmacy benefit managers and describ[ing], the patient name, insurer, practitioner, and date of call."  *Id.* at 3.  To the extent available, the also provided links to any "recording of the call, patient records, and insurance records."  *Id.*  The spreadsheet (USAO-MA-1278740) contained summary records for the approximately 150 phone calls relating to three insurance plans (OptumRX, SilverScript, and CVS Caremark/BCBS Federal Employee Benefit) for the period July 2012 to March 2016, and involving prescriptions issued by approximately 30

---

about December 2015"), *and* 4/4/19 Trial Tr. 30:21–23 (instructing the jury that the "time period of the conspiracy is alleged to be from in or about May 2012 to in or about December 2015").

unique practitioners (including 8 of the 10 co-conspirator practitioners at issue during trial) for 74 unique patients.  The records provided to Defendants also included insurance disposition reports, call audio, and patient-specific forms and clinical information.

The government could have taken a similar approach to the restitution analysis and looked to "the available information"—specific calls and claims made to insurers by IRC employees—in order to "produce a reasonable result."  Catharine M. Goodwin, *Federal Criminal Restitution* § 7:4 (2019).  The government also could have attempted a statistically significant random sampling from the IRC records to estimate insurer losses.  Instead, the government at trial offered a cherry-picked fraction of all IRC calls and records that it considered to be the most inculpatory calls and the best evidence of fraud.  That is a permissible approach to trial, but it is not a proper basis for estimating total losses based on the thousands of additional IRC calls and records that the government has not reviewed or assessed.

To be sure, the claims process is complicated, and the burden of proof is difficult for the government to satisfy in large healthcare fraud cases like this one.  That is why parties often conclude, and sentencing courts agree, that determining restitution after criminal resolutions in pharmaceutical cases is too prolonged and complicated a process at sentencing and have avoided it altogether.  *See supra* pp. 2–3.  Here, in light of those complications and the government's failure to prove the restitution amounts by a preponderance of the evidence, the best solution is to leave most of the insurers' claims of loss to ongoing civil proceedings where these issues can be litigated and proven.   In any event, it is improper for the government to relax its burden and show nothing more than a "rough approximation," *Innarelli*, 524 F.3d at 294, based on a 100% IRC fraud rate and other sweeping assumptions that are "likely inaccurate," *Fogel*, 494 F. Supp. 2d at 138–39.

## V.      The Court Should Enter a Final Restitution Order

The government acknowledges that it "requested potential victims [to] provide any restitution requests" in "May and June 2019." Gov't Mot. at 6 n.4.  But despite having more than six months to shore up its evidence on restitution, the government has waited until the eve of sentencings to provide the speculative and incomplete information it is currently using to support its $306 million restitution request.  Now, the government seeks to reserve the right "to seek additional restitution for newly discovered or newly ascertained losses." *Id.*

While 18 U.S.C. § 3664 offers a procedure for amending a restitution order if a victim comes forward with "further losses," it does so only under specific circumstances: if there is "a showing of good cause for the failure to include such losses in the initial claim for restitutionary relief." *Id.* § 3664(d)(5).  The "list of ways" that a restitution order can be changed once it is entered is "exclusive." *United States v. Puentes*, 803 F.3d 597, 607 (11th Cir. 2015).  Given the amount of time the government has had to gather supporting evidence, there is no good cause here for failing to include additional claims.  Accordingly, the Court's restitution order should be final and the government should be barred from seeking to include additional requests for restitution.

## CONCLUSION

In light of the foregoing, the restitution order imposed by the Court in this case should be limited, *at most*, to the following:

(1) $10,198.20, for the individual patients who submitted restitution claims;

(2) $15,935,194.30, for Medicare claims (based on the government's submission on fraud loss, incorporated in the Draft PSR, less amounts for Drs. Frey, Khanna, and Roque);

(3) $959,554.90, for claims paid by Aetna (based on amounts identified by Aetna for co-conspirator practitioners, further discounted by the 80.9% IRC use rate);

(4) $1,450,738.13, for claims paid by Cigna (same); and

(5) $84,696.91, for claims paid by Horizon Blue Cross Blue Shield (same).

Defendants pray that the Court upholds the law and rejects the government's justify additional restitution amounts based on incorrect assumptions, methodological flaws, and theories that are inconsistent with the manner in which the government defended the convictions at issue from challenge in post-trial briefing and argument.[45]

---

[45] Defendants note that the government's restitution request far exceeds the combined assets of the Defendants, as well as the now-bankrupt Insys. Though restitution is generally blind to a defendant's ability to pay, some courts have suggested that this should be considered. *See United States v. Chin*, No. CR 14-10363-RGS, 2018 WL 1399297, at *2 (D. Mass. Mar. 20, 2018) (questioning the reasonableness of a restitution award that "would be no more than a symbolic gesture" and noting that "a skeptic might question whether the law, which approaches most issues with a gimlet eye, should be in the business of inflating expectations by holding out an illusory promise of compensation that has no hope of ever materializing"); *United States v. Theodore*, 354 F.3d 1, 9 (1st Cir. 2003) (considering defendant's ability to pay when fashioning restitution order).

Dated: January 6, 2020

Respectfully submitted,

/s/ J. Sedwick Sollers III
J. Sedwick Sollers III (admitted *pro hac vice*)
Mark A. Jensen (admitted *pro hac vice*)
Daniel C. Sale (admitted *pro hac vice*)
Lucas M. Fields (admitted *pro hac vice*)
King & Spalding LLP
1700 Pennsylvania Avenue NW
Suite 200
Washington, DC 20006
Phone: (202) 626-5612
E-mail: WSollers@kslaw.com

William H. Kettlewell (BBO No. 270320)
Hogan Lovells
100 High St., 20th Floor
Boston, MA 02110
Telephone: (617) 371-1005
Email: bill.kettlewell@hoganlovells.com
*Attorneys for Michael L. Babich*

/s/ Peter Gelhaar
George W. Vien (BBO# 547741)
gwv@dcglaw.com
Peter E. Gelhaar (BBO# 188310)
peg@dcglaw.com
Joshua N. Ruby (BBO #679113)
Donnelly, Conroy & Gelhaar, LLP
260 Frankline Street, Suite 1600
Boston, MA 02110
Telephone: (617) 720-2880
*Attorneys for Alec Burlakoff*

/s/ Tracy A. Miner
Tracy A. Miner (BBO# 547137)
tminer@mosllp.com
Megan Siddall (BBO# 568979)
msiddall@mosllp.com
Miner Orkand Siddall LLP
470 Atlantic Ave, 4th Floor
Boston, MA 02210
Telephone: (617) 273-8421
*Attorneys for Michael Gurry*

/s/ Peter C. Horstmann
Peter C. Horstmann (BBO# 556377)
pete@horstmannlaw.com
Law Offices of Peter Charles Horstmann
450 Lexington Street, Suite 101
Newton, MA 02466
Telephone: (617) 723-1980
*Attorney for Sunrise Lee*

/s/ Michael Kendall
Michael Kendall (BBO# 544866)
michael.kendall@whitecase.com
Alexandra Gliga (BBO# 694959)
alexandra.gliga@whitecase.com
White & Case LLP
75 State Street
Boston, MA 02109
Telephone: (617) 939-9310
*Attorneys for Joseph Rowan*

/s/ William Fick
William W. Fick, Esq. (BBO # 650562)
wfick@fickmarx.com
Daniel N. Marx, Esq. (BBO # 674523)
dmars@fickmarx.com
Fick and Marx, LLP
24 Federal Street, 4th Floor
Boston, MA 02110
Telephone: (857) 321-8360
*Attorneys for Richard Simon*

/s/ Kosta S. Stojilkovic
Beth A. Wilkinson (*admitted pro hac vice*)
bwilkinson@wilkinsonwalsh.com
Kosta S. Stojilkovic (admitted *pro hac vice*)
kstojilkovic@wilkinsonwalsh.com
Andrew W. Croner (admitted *pro hac vice*)
acroner@wilkinsonwalsh.com
Wilkinson Walsh + Eskovitz LLP
2001 M Street NW
Washington, D.C. 20036
Telephone: (202) 847-4000

Brien T. O'Connor (BBO# 546767)
brien.o'connor@ropesgray.com
Aaron M. Katz (BBO# 662457)
aaron.katz@ropesgray.com
Ropes & Gray LLP

Prudential Tower 800 Boylston Street
Boston, MA 02199
Telephone: (617) 951-7000
*Attorneys for Dr. John Kapoor*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that the foregoing document will be served on all counsel of record through the ECF system.

<div style="margin-left:50%;">

/s/ Kosta S. Stojilkovic

Kosta S. Stojilkovic

Counsel for Dr. John Kapoor

</div>