**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 16-CR-10343-7-ADB |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN N. KAPOOR, | ) | |
| | ) | |
| Defendant. | ) | |

## JOHN N. KAPOOR'S MOTION TO STAY HIS SENTENCE PENDING APPEAL

## **TABLE OF CONTENTS**

BACKGROUND ........................................................................................................... 1

ARGUMENT ............................................................................................................... 2

I.     Dr. Kapoor is not a flight risk nor does he pose any danger to the community. .. 3

II.    Dr. Kapoor is not appealing his conviction for the purpose of delay..................... 4

III.   Dr. Kapoor's appeal will present issues that satisfy the substantial question
requirement because they very well could be decided in his favor. ...................... 5

       A.    Dr. Kapoor's appeal will raise a substantial question because prejudicial
spillover from evidence presented on the vacated CSA and HSF predicates
substantially impacted his conviction on the mail and wire fraud predicates... 6

       B.    Dr. Kapoor's appeal will raise a substantial question because the mail fraud
predicate is not supported by sufficient proof that mailings were used to
facilitate the insurance fraud scheme. ............................................................... 12

       C.    Dr. Kapoor's appeal will raise a substantial question because the law is
unsettled on whether the interagency conspiracy doctrine bars his conviction
on the wire fraud predicate. ............................................................................... 13

       D.    Dr. Kapoor's appeal will raise a substantial question because the curative
instructions given in response to the government's improper rebuttal argument
were inadequate. ................................................................................................. 14

       E.    Dr. Kapoor's appeal will raise a substantial question because the evidence
against him on the ordinary mail and wire predicates was very thin.............. 17

IV.   If decided in his favor, the substantial questions raised in Dr. Kapoor's appeal
will likely result in an acquittal or a new trial....................................................... 19

CONCLUSION ........................................................................................................... 20

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

*Berger v. United States*, 295 U.S. 78 (1935) .............................................................................. 16

*Detrick v. Panalpina, Inc.*, 108 F.3d 529 (4th Cir. 1997).......................................................... 14

*Fogie v. THORN Americas, Inc.*, 190 F.3d 889 (8th Cir. 1999)................................................. 14

*United States v. Bayko*, 774 F.2d 516 (1st Cir. 1985)........................................................ 2, 5, 19

*United States v. Bullion*, 466 F.3d 574 (7th Cir. 2006) ............................................................... 4

*United States v. Casas*, 425 F.3d 23 (1st Cir. 2005).................................................................. 11

*United States v. Colon-Munoz*, 292 F.3d 18 (1st Cir. 2002).......................................................... 2

*United States v. Friedman*, 854 F.2d 535 (2d Cir. 1988)............................................................... 6

*United States v. Hernandez*, No. 03-cr-1257, 2005 WL 1242344 (S.D.N.Y. May 24, 2005)........ 4

*United States v. Natanel*, 938 F.2d 302 (1st Cir. 1991).............................................................. 11

*United States v. Peters*, 732 F.2d 1004 (1st Cir. 1984) .............................................................. 14

*United States v. Rooney*, 37 F.3d 847 (2d Cir. 1994) ............................................................... 6, 9

*United States v. Schwartz*, 86 F. Supp. 3d 25 (D. Mass. 2015) ..................................................... 2

*United States v. Wapnick*, 60 F.3d 948 (2d Cir. 1995) .................................................................. 6

*Ziglar v. Abassi*, 137 S. Ct. 1843 (2017) ................................................................................... 13

## <u>Statutes</u>

18 U.S.C. § 1343(b) ................................................................................................................. 1, 2

18 U.S.C. § 1962(d) ............................................................................................................... 1, 14

## <u>Rules</u>

Fed. R. App. P. 8(1) ..................................................................................................................... 1

Fed. R. Crim. P. 38 ...................................................................................................................... 1

Defendant John N. Kapoor respectfully moves for an order under Fed. R. Crim. P. 38, Fed. R. App. P. 8(1), and 18 U.S.C. § 3143(b) staying his sentence of incarceration pending the outcome of his forthcoming appeal challenging his conviction.

## BACKGROUND

Following a ten-week jury trial, Dr. Kapoor was convicted of one count of racketeering conspiracy in violation of 18 U.S.C. § 1962(d). The jury found that Dr. Kapoor conspired to commit each of the predicate objects alleged by the government in its Second Superseding Indictment. *See* Dkt. No. 841 at 6. Those predicate objects included illicit distribution in violation of the Controlled Substances Act ("CSA"), honest services mail and wire fraud ("HSF"), and ordinary mail and wire fraud. *See* Dkt. No. 841 at 2.

In the weeks following the jury's verdict, Dr. Kapoor and the other trial defendants renewed their joint motions seeking an acquittal under Rule 29 and a new trial under Rule 33. *See* Dkt. No. 860. In addition, Dr. Kapoor separately filed a motion under Rule 33 seeking a new trial based on the weight of the evidence. *See* Dkt. No. 862. One argument advanced in defendants' joint Rule 29 motion sought to overturn their convictions on the CSA and HSF predicates because the government failed to prove specific intent. *See id.* at 10-15; Dkt. No. 967 at 1-7. This Court agreed and vacated the jury's verdict on those predicate objects. *See* Mem. Op. & Order, Dkt. No. 1028 at 81-82 ("Overturning the verdicts on the CSA and honest services fraud predicates . . . is simply a reflection of the fact that the Government did not prove the requisite intent on the part of Defendants . . . ."). The Court declined, however, to "disturb the remainder of the verdict, which convicted all defendants of ordinary mail and wire fraud." *Id.* at 82. The Court also denied defendants' joint motion seeking a new trial under Rule 33, as well as Dr. Kapoor's separate motion seeking the same relief based on the weight of the evidence. *Id.* at 82.

1

In the coming weeks, Dr. Kapoor will appeal his conviction to the Court of Appeals for the First Circuit, including the Court's rulings denying in part defendants' joint motion for an acquittal under Rule 29, denying defendants' joint motion for a new trial under Rule 33, and denying his motion for a new trial based on the weight of the evidence.  For the reasons described below, both Dr. Kapoor's circumstances and the arguments he will make in his appeal satisfy the requirements to stay his sentence of incarceration pending the outcome of his appeal.

## ARGUMENT

Under 18 U.S.C. § 1343(b), a defendant seeking a stay of his or her sentence pending appeal generally must satisfy two requirements.  First, the defendant must show by clear and convincing evidence that he is not likely to flee or pose a danger to the community.  *Id.* § 1341(b)(1).  Second, the defendant must show that his appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in reversal or an order for a new trial.  *Id.* § 1341(b)(2).

The second requirement of the above test has been interpreted as consisting of two prongs. The first prong focuses on whether "the appeal raise[s] a substantial question of law or fact." *United States v. Bayko*, 774 F.2d 516, 522 (1st Cir. 1985).  A "substantial question" is "a 'close' question or one that very well could be decided the other way," and determining whether a defendant's appeal presents such a question is to be done on a case-by-case basis.  *Id.* at 523.   If a defendant's appeal presents a substantial question, the second prong then looks at whether resolving that question in favor of the defendant is "likely to result in reversal or an order for a new trial on all counts on which imprisonment has been imposed."  *Id.* at 522.  This standard is to be applied "flexibly," *United States v. Colon-Munoz*, 292 F.3d 18, 20 (1st Cir. 2002), and requires only that "the claimed error not be harmless or unprejudicial."  *Bayko*, 774 F.2d at 523. Importantly, neither prong is "contingent upon a finding by the district court that it is likely to be reversed."  *Id.  See United States v. Schwartz*, 86 F. Supp. 3d 25, 29–30 (D. Mass. 2015) (holding

that the substantial question prong "does not require a showing that the defendant would 'probably' win").

I.  **Dr. Kapoor is not a flight risk nor does he pose any danger to the community.**

The question of whether Dr. Kapoor poses a flight risk can be easily dispensed with because this Court has already determined twice since he was convicted that he does not. Addressing requests from the government following the jury's verdict that Dr. Kapoor be placed on house arrest or, alternatively, that he report daily to his probation officer, the Court determined there was no basis for believing such measures were necessary:

> [Dr. Kapoor's] been wholly compliant.  He's been respectful and attentive and prompt and complied with every deadline and condition that's been imposed on him until this point, and I don't have any reason to think that he's going to behave any differently now [that] there's been a verdict rendered.  He's also represented by extremely competent counsel who I'm sure is going to fully explain to him the consequences of not being compliant at this stage of the game.

5/2/19 Trial Tr. 11:18–12:2.

More recently, the Court denied the government's request that Dr. Kapoor be detained at his sentencing on the same basis.  1/23/20 Hr'g Tr. 62:21–63:1 ("[Dr. Kapoor] has shown up at every single thing he is supposed to show up for and I'm going to give him the benefit of the doubt and assume that he will continue to do that.").  There is no reason for the Court to deviate from these prior rulings in assessing Dr. Kapoor's risk of flight under § 1343(b).[1]

Dr. Kapoor likewise poses no risk to the safety of other persons or the community.  He has no prior criminal history and, at 76 years old, is highly unlikely to be a recidivist.  *United States v.*

---

[1] In raising the issue of detention at his sentencing, the government claimed that Dr. Kapoor has "substantial resources, . . . much of which is overseas."  *See* 1/23/20 Hr'g Tr. 21:16–20.  Dr. Kapoor challenges the government to show a good faith basis for this incorrect and unsupported allegation.  Dr. Kapoor is originally from India, but that does not mean that he has money there. Rather, as disclosed to both the probation office and to the government, Dr. Kapoor's assets are in the United States.  Those disclosures also identified Dr. Kapoor assets with specificity, down to each account number and description of real property he owns.

*Bullion*, 466 F.3d 574, 577 (7th Cir. 2006) (observing that "the tendency to commit crimes, violent and otherwise, diminishes with age."); *United States v. Hernandez*, No. 03-cr-1257, 2005 WL 1242344, at *5 (S.D.N.Y. May 24, 2005) (noting a recent trend by some courts to impose lower sentences on older defendants because they "exhibit markedly lower rates of recidivism in comparison to younger defendants").  There is also no risk that Dr. Kapoor will engage in conduct similar to that alleged in this case; he is no longer involved in managing the companies he owns and resigned from all positions he held at pharmaceutical companies in response to the indictment. Finally, as described in the numerous letters of support that accompanied his sentencing memorandum, Dr. Kapoor's life outside of this case, far from suggesting he poses any sort of safety risk, is notable only for its consistent generosity and commitment to helping others.  *See* Dkt. No. 1070 at 20–24, 42–45 (summarizing those letters of support).

## II.   Dr. Kapoor is not appealing his conviction for the purpose of delay.

The reason Dr. Kapoor plans to appeal his conviction is not to delay his sentence but to avoid an unwarranted period of incarceration.  Given that the median processing time for First Circuit appeals is more than 13 months,[2] it is likely that, if the Court denies this request to stay his sentence, Dr. Kapoor will have served a substantial period of imprisonment by the time his appeal is decided.  This is particularly troubling for Dr. Kapoor, who, at 76 years old, is uncertain as to how many years he has left.  Because Dr. Kapoor's appeal could result in a new trial or an acquittal, releasing him on bail pending the outcome of that appeal is the only way to ensure he is not incarcerated for longer than is warranted.

---

[2] *See* First Circuit 2018 Annual Report at 18, *available at* https://tinyurl.com/20181stCirRpt.

III.   **Dr. Kapoor's appeal will present issues that satisfy the substantial question requirement because they very well could be decided in his favor.**

As described earlier, a substantial question is presented within the meaning § 3143(b)(2) when the issue at hand is "a 'close' question or one that very well could be decided the other way." *Bayko*, 774 F.2d at 523.  Dr. Kapoor's appeal will raise several issues that satisfy this standard. First, his appeal will raise a substantial question because his case presents a compelling argument for spillover prejudice from the vacated CSA and HSF convictions.  This is not a run-of-the-mill spillover prejudice argument involving a stray count that should not have gone to the jury; defendants' argument is instead a reflection of the government's choice to make the CSA and HSF charges the crux of its presentation to the jury at trial.  Relying on patient testimony about Subsys addiction and abuse, which this Court expressly admitted based on its relevance to the now-rejected CSA allegations, a critical component of the government's presentation was labeling Dr. Kapoor—at the height of the national opioid epidemic—as a drug dealer who was pushing opioids on patients who did not need them.  While the Court has described the remaining allegations in the case as "a pretty garden variety insurance fraud," 1/13/20 Hr'g Tr. 41:2–7, the case the jury decided was anything but.  A substantial question exists whether the suriving insurance fraud verdict can stand given the nature and extent of the government's presentation at trial on the now-rejected CSA and HSF allegations.

Dr. Kapoor's appeal will also raise substantial questions in seeking acquittal on the ordinary mail and wire fraud predicates because reasonable minds could differ on the Court's basis for finding the deceit element met on the mail fraud predicate, and because the law is unsettled on whether the intracorporate conspiracy doctrine bars his conviction on the wire fraud predicate.  In addition, Dr. Kapoor will raise a substantial question in appealing improper remarks the government made in the rebuttal portion of its closing argument, including an inappropriate

reference to firing a gun into an audience (which the government concedes should not have been made and the objection to which was preserved by all defendants). Finally, a substantial question is presented by the Court's denial of Dr. Kapoor's weight-of-the-evidence motion because, at the very least, it is debatable whether sufficient evidence was presented against him on the ordinary mail and wire fraud predicates given the far heavier focus at trial on the now-rejected CSA and HSF allegations.

A. Dr. Kapoor's appeal will raise a substantial question because prejudicial spillover from evidence presented on the vacated CSA and HSF predicates substantially impacted his conviction on the mail and wire fraud predicates.

In assessing a claim of spillover prejudice, courts look to three factors to determine "whether the totality of the circumstances requires reversal of some or all of the remaining counts." *United States v. Rooney*, 37 F.3d 847, 855 (2d Cir. 1994). First, Courts assess whether the evidence on the vacated counts (or predicates, as relevant here) was so "inflammatory," *United States v. Friedman*, 854 F.2d 535, 582 (2d Cir. 1988), that it "would have tended to incite or arouse the jury into convicting the defendant on the remaining counts," *Rooney*, 37 F.3d at 855. Second, courts look to the inter-relatedness of the evidence on the various counts (or predicates). A defendant's claim of spillover prejudice will succeed where "evidence is introduced on the invalidated count that would otherwise be inadmissible on the remaining counts, and this evidence is presented in such a manner that tends to indicate that the jury probably utilized this evidence in reaching a verdict on the remaining counts." *Id.* at 856 n.11. Third, courts will make "a general assessment of the strength of the government's case on the remaining counts." *United States v. Wapnick*, 60 F.3d 948, 954 (2d Cir. 1995) (citing *Rooney*, 37 F.3d at 856).

Each of these factors supports a finding of spillover prejudice in this case entitling defendants to a new trial on the mail and wire fraud predicates. First, the government enhanced the prejudicial impact of the evidence at issue by deliberately using it to equate Dr. Kapoor to a

street-level drug dealer who was indifferent to patient harm.  Second, while the Court's post-trial order treats the CSA and HSF allegations as inter-related with the insurance fraud scheme, the evidence on the two issues was largely segregated at trial, with the former the subject of testimony from sales executives, representatives, and medical practitioners, and the latter the subject of testimony from witnesses who worked in the IRC and employees from various insurance companies.  Third, the evidence presented against Dr. Kapoor at trial overwhelmingly related to the CSA and HSF predicate objects, and not the insurance fraud allegations.

While the Court ruled declined to vacate the insurance fraud aspects of the jury's verdict in throwing out the CSA and HSF aspects, Dr. Kapoor submits that the correctness of that decision presents a substantial question.  This is particularly so because the Court expressed grave doubts about the CSA and HSF predicates at the *pre-charging-conference* Rule 29 argument, after defendants argued that allowing the government to "equate Defendants with street-level drug dealers" by claiming that they "conspired to push drugs onto people who did not need them" would "poison the jury against Defendants."  Dkt. No. 816 at 11.  Despite those doubts, the Court elected to take defendants' Rule 29 motion under advisement and declined to throw out the CSA and HSF allegations before the jury began to deliberate.  4/4/19 Trial Tr. 63:2–21 (informing parties at sidebar after instructing jury on CSA and HSF predicates but before closing arguments that Court was taking defendants' Rule 29 motion under advisement).  Then, after the verdict, the Court embraced the same challenges to the CSA and HSF predicates that defendants had raised before the charge conference and deliberations.  As a result, neither the parties nor the Court can say with certainty how the jury would have decided the insurance fraud case had the Court adopted defendants' Rule 29 argument on the CSA and HSF predicates when it was first presented.

Moreover, the totality of the circumstances supports a finding of spillover prejudice with respect to Dr. Kapoor's conviction on the mail and wire fraud predicates. This is due, in part, to the government's deliberate efforts to enhance the prejudicial impact of the evidence it introduced in support of the CSA and HSF predicates by framing it in a way that would rouse the jury's passions. For example, the government fought tooth and nail to convince the Court to allow it to introduce testimony from nine separate patients discussing how practitioners allegedly bribed by defendants got them addicted to Subsys and the devastating impact that addiction had on their lives. This testimony was so critical to its case that the government chose to start on the theme of patient harm in its closing argument by emphasizing the potency and danger of Subsys.

> 70 to 100 times more potent than morphine. 20 to 25 times more powerful than heroin. The label in this case, the label for Subsys, repeatedly warns of the dangers of the drug, the risks associated with the drug. It can be an incredibly powerful reliever of pain for people who suffer from drastic pain, from cancer pain. But it can also be dangerous.

4/4/19 Trial Tr. 65:10-16.

The government revisited this theme of patient harm throughout its closing argument, including by telling the jury that "every single one of the patients you saw was exploited" and claiming their addiction to Subsys "happened because they were used, used as a way for [defendants] to get paid." 4/4/19 Trial Tr. 116:6–8, 117:15–17. Against this backdrop, the government urged the jury to convict defendants for placing "[p]rofits over patients," telling them it was "greed in its darkest and most destructive form that drove these defendants to commit this crime, a greed to transfer the profound risk of fentanyl to people who did nothing more than seek medical treatment." 4/4/19 Trial Tr. 66:9, 120:14–17. Evidence that seeks to portray defendants as "tak[ing] advantage of people who were less able to control their own destiny," is precisely the

sort of evidence courts have found sufficient to establish prejudicial spillover. *Rooney*, 37 F.3d at 856.

In addition, both the verdict and the way the government presented its case suggest that the prejudicial evidence described above influenced the jury's consideration of the mail and wire fraud predicates.   On the mail fraud predicate, the verdict itself suggests that the jury conflated the mailing of payments to practitioners (which was premised upon the same medical bribery allegations the government attempted to use as support for the CSA and HSF predicates, *see* SSI ¶¶ 31, 34) with affirmative misrepresentations to insurance companies on telephone calls (which was the basis for the wire fraud predicate, *see id.* ¶ 61).   How else can one explain the jury's decision to hold all five trial defendants accountable for the mail fraud predicate, even though jurors said afterwards that they failed to find that defendant Gurry was involved with medical practitioners and the bribery-based allegations?

The Court provided three reasons for rejecting defendants' argument that their convictions on the mail and wire fraud predicates were tainted by spillover prejudice.   The first was that "the patient evidence [defendants] object to would likely have been admissible against [them] even if the trial were only on the ordinary mail and wire fraud predicates because the [government] could have used the testimony to show a patient's history of cancer or lack of dysphagia."   Mem. Op. & Order, Dkt. No. 1028 at 38.   But this fails to address the crux of defendants' argument.   Dr. Kapoor does not dispute that evidence concerning a patient's history of cancer or lack of dysphagia would still be admissible at a hypothetical trial limited to the mail and wire fraud predicates.   That does not mean, however, that the testimony these patients provided describing how they became addicted to Subsys and treatment they received from co-conspirator practitioners would also be admissible at the hypothetical trial.   Because it is this latter testimony that defendants contend was

unduly prejudicial, its admission at a trial limited to the mail and wire fraud predicates presents a substantial question on appeal.

Indeed, Dr. Kapoor notes that, when the Court initially overruled defendants' objection to the admission of patient testimony, it did not rely on the insurance fraud allegations, but rather, viewed that evidence as admissible because of its relevance to the CSA and HSF allegations.  At the final pretrial conference, the Court specifically rejected the idea that it was allowing patients to testify about becoming addicted to Subsys because that testimony was relevant to the insurance fraud allegations.  1/16/19 H'rg Tr. 48:13–49:4 ("It's not just defrauding the insurance company. If the intent of the conspiracy is to overprescribe and increase prescriptions, . . . they're allowed to put that evidence on to show they succeeded in their objective, which is evidence of the fact that it was their objective.").  Rather, the Court allowed the government to "present testimony concerning the medical care that patients received from co-conspirator physicians, or the medical status of patients ***to show that prescribing was not medically necessary or was in excess of what was medically necessary***."  MIL Order, Dkt. No. 676 at 2. (emphasis added).  This rationale no longer holds, given the Court's ruling throwing out the CSA and HSF predicates.  And an appellate court could conclude that evidence admitted on such a basis would indeed result in spillover prejudice once the allegations that supported its admission were rejected following the jury's verdict, and that its admission could not be later justified by pivoting to the insurance fraud allegations that were not the basis for its admission in the first place.

The Court's assertion that it provided jury instructions that adequately guarded against spillover prejudice from one predicate to another also presents a substantial question on appeal.  In particular, the instructions cited by the Court as addressing spillover prejudice from one predicate to another merely described the elements of each predicate, which the First Circuit could conclude

falls short of the instructions needed to guard against the risk of spillover prejudice. *See United States v. Casas*, 425 F.3d 23, 50 (1st Cir. 2005) (finding trial court adequately guarded against spillover prejudice where it instructed the jury to "consider each charged offense, *and any evidence relating to it*, separately as to each defendant" (emphasis added)); *United States v. Natanel*, 938 F.2d 302, 308 (1st Cir. 1991) (finding that trial court "minimized any possible prejudice by repeatedly instructing the jury to treat the defendants as individuals *and to consider each charge separately*" (emphasis added)). The Court's instructions here did not contain such language, nor could such clarifying instructions be easily given, since all the alleged predicate objects were presented by the government as part of a single RICO conspiracy and therefore had to be considered by the jury as part of the same count.

The Court's final reason for rejecting defendants' spillover prejudice argument was "even if the Court accepted the premise that two conspiracies were charged, evidence of bribery was directly relevant to both." Mem. Op. & Order, Dkt. No. 1028 at 38. This rationale is problematic for two reasons. First, it is at odds with the Court's observation later in same the ruling that the government "could have easily proved bribery, but it elected not to charge bribes or kickbacks and now must live with that decision." *Id.* at 82. The government is not truly made to "live with [its] decision" when the Court allows the jury to consider evidence of bribery as proof of insurance fraud. Another problem with this rationale is that not all the evidence supporting defendants' argument can be described as "evidence of bribery." In fact, the best support for defendants' spillover prejudice argument come from evidence and argument implicating the medical necessity allegations, such as the patient testimony described earlier that was admitted expressly because of its purported relevance to the CSA and HSF allegations.

B.  <u>Dr. Kapoor's appeal will raise a substantial question because the mail fraud predicate is not supported by sufficient proof that mailings were used to facilitate the insurance fraud scheme.</u>

Defendants' Rule 29 motion argued for acquittal on the mail fraud predicate on the basis that the government failed to prove that the IRC deceived insurance companies about either Insys's financial relationships with certain practitioners or the medical necessity of the prescriptions it submitted for reimbursement.  The Court rejected defendants' argument based on two principal rationales.  First, the Court held that, contrary to defendants' argument, the mail fraud predicate only required that the mailed bribes to prescribers have "some tendency to facilitate execution of the fraud," which was satisfied by the government's proof that the mailings "incentiviz[ed] prescriptions from high-volume prescribers."  Mem. Op. & Order, Dkt. No. 1028 at 29.  Second, the Court concluded that defendants' argument fails because the government "did not need to prove that the prescriptions for which the IRC sought reimbursement were in fact medically illegitimate."  *Id.* at 30.  Both rationales present a substantial question on appeal.

On the first rationale, Dr. Kapoor maintains that the mail fraud predicate is not satisfied simply because the mailed bribes "incentiviz[ed] prescriptions from high-volume prescribers."  *Id.* at 29.  The jury's verdict appears to be inconsistent with the Court's rationale, since the jury found the mail fraud predicate met even as to defendant Gurry, whom the jury did not implicate in the CSA and HSF predicate objects, and for whom there was an utter lack of evidence at trial of any involvement in the medical bribery scheme.  Simply put, if the medical bribery allegations were the linchpin for the mailing element of the mail fraud predicate, then the jury would have acquitted Mr. Gurry on the mail fraud predicate as it did on the CSA and HSF predicates.  The fact that it did not strongly suggests that the jury improperly equated the ordinary mail fraud allegations with the ordinary wire fraud allegations.

The Court's second rationale misconstrues defendants' argument on deceit in their reply brief.  Defendants were not, as the Court suggests, arguing that the alleged deception had to involve a medically illegitimate prescription to satisfy the mail fraud predicate.  Rather, those arguments were part of a more basic point made in defendants' post-trial briefing:  that the mail fraud predicate required proof of deception.  The government claimed heading into trial that the deception element would be satisfied by proof that the IRC made affirmative misrepresentations to insurers concerning Insys's financial relationship with certain prescribers.  The government backed off this theory, however, in its opposition to defendants' post-trial motions, arguing instead that it satisfied the deception element by showing insurers would not authorize reimbursement for medically unnecessary prescriptions.  *See* Dkt. No. 936 at 23–24.  Thus, it was the government that decided to tie the deception element to the issue medical necessity and the arguments in defendants' reply brief were simply responding to this new theory.

Perhaps the government could have satisfied the mail fraud predicate based on a theory that had nothing to do with medical necessity.  But that is not the theory that it has chosen here.  And because no affirmative misrepresentations have been identified to support the theory the government did choose—either by the government or the Court—a substantial question exists about whether the deception element was proven at trial on the mail fraud predicate.  For these reasons, Dr. Kapoor's appeal seeking an acquittal on this basis will raise a substantial question under § 3143(b)(2).

C.    <u>Dr. Kapoor's appeal will raise a substantial question because the law is unsettled on whether the interagency conspiracy doctrine bars his conviction on the wire fraud predicate.</u>

Defendants' Rule 29 motion sought acquittal on the wire fraud predicate because it was premised on an alleged conspiracy involving only Insys personnel and therefore was barred by the intracorporate conspiracy doctrine.  *See Ziglar v. Abassi*, 137 S. Ct. 1843, 1867 (2017) (holding

that under the intracorporate conspiracy doctrine "an agreement between or among agents of the same legal entity, when the agents act in their official, is not an unlawful conspiracy").  Although acknowledging that there is a "recognized circuit split" on the issue of whether the intracorporate conspiracy doctrine applies to RICO conspiracies, the Court rejected defendants' argument after finding that the First Circuit was "unlikely to apply the doctrine to criminal RICO conspiracy cases."  Mem. Op. & Order, Dkt. 1028 at 26, 28.

The only First Circuit case cited by the Court on this issue, *United States v. Peters*, 732 F.2d 1004 (1st Cir. 1984), did not involve the RICO conspiracy statute.  *See* Mem. Op. & Order, Dkt. No. 1028 at 28 (acknowledging that *Peters* involved criminal conspiracies "prosecuted under 18 U.S.C. § 371," and not the RICO conspiracy statute, 18 U.S.C. § 1962(d)).  So the possibility remains that the First Circuit could adopt the reasoning of two circuits that have applied the intracorporate conspiracy doctrine in cases that did involve RICO claims.  *See Fogie v. THORN Americas, Inc.*, 190 F.3d 889, 898–99 (8th Cir. 1999); *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 544 (4th Cir. 1997).  Thus, because the First Circuit has "yet to definitively extol on the applicability of the doctrine in the RICO context," a substantial question exists as to whether the intra-corporate conspiracy doctrine bars Dr. Kapoor's conviction on the wire fraud predicate.  *Id.* at 26–27.

D.     Dr. Kapoor's appeal will raise a substantial question because the curative
         instructions given in response to the government's improper rebuttal argument
         were inadequate.

In their joint Rule 33 motion, defendants argued they were prejudiced by several improper remarks the government made during its rebuttal argument and were therefore entitled to a new trial.  Principal among the challenged remarks was an attempt by the government to analogize Insys's use of speaker programs to market Subsys to shooting a loaded gun into a crowd of people. *See* 4/5/19 Trial Tr. 169:23–170:4.  In its post-trial ruling, the Court did not dispute that the remark

14

was improper nor did it conclude—as it did for the other challenged remarks—that defendants waived any objection to the curative instructions given by the Court in response.  Mem. Op. & Order, Dkt. No. 1028 at 43 & n.93, 45.  But the Court rejected defendants' argument that the prejudice that resulted necessitated a new trial, dismissing the remark as an "isolated incident" and finding that any resulting prejudice was adequately addressed by the Court's curative instructions. Both rationales present a substantial question on appeal.

First, although the government only used this specific metaphor once, it was part of a much broader campaign by the government—described earlier in the section addressing spillover prejudice—to equate defendants to street-level drug dealers who were indifferent to patient safety. Dr. Kapoor submits that reserving the "loaded gun" metaphor for the end of this campaign (as opposed to throughout trial) did not make it any less prejudicial; in fact, introducing the metaphor for the first time on rebuttal made it more prejudicial because defendants had no opportunity to respond to it.

Second, the Court's curative instructions present a substantial question because they only address one aspect of the prejudice that resulted from the remark.  In its ruling, the Court points to instructions it claims sufficiently addressed any confusion the remarks caused on the standard for specific intent for the CSA and HSF predicates.  Mem. Op. & Order, Dkt. No. 1280 at 46.  For one thing, that issue is now moot given that the same ruling vacated defendants' convictions on those two predicates.  More importantly, those instructions did nothing to address what the Court acknowledged was another aspect of defendants' challenge to the remark: that it "employed unfairly prejudicial imagery." *Id.* at 44.  The Court could have addressed this by—as defendants proposed—instructing the jury that the government's remark was inappropriate and should be

disregarded; because it failed to do so, a substantial question exists about whether the government's use of the loaded gun metaphor entitles defendants to a new trial.

Dr. Kapoor also submits that the Court's conclusion that he waived other objections to the government's rebuttal argument presents a substantial question on appeal.  Defendants plainly objected to the remarks at issue, both during and after the rebuttal, both orally and in writing. Although it is true that defendants, through counsel, proposed curative instructions, the Court failed to incorporate a critical aspect of the "robust corrective instructions" that were proposed:  an admonishment that the government's rebuttal arguments were inappropriate and should be disregarded.  *See* Dkt. No. 819 at 13–14 (requesting multiple instructions that stated "[t]he government should have never made this argument to you, and you must disregard it in your deliberations").  As defendants stressed in requesting the instructions, it was imperative that the Court not let the jury begin deliberations "as if the government's rebuttal argument was a normal or permissible event." *Id.* at 12.  *See, e.g., Berger v. United States*, 295 U.S. 78, 85 (1935) (holding that trial court's use of "mild judicial action" in response to prosecutor's misconduct made it "impossible to say that the evil influence upon the jury of these acts of misconduct was removed").

In addition, the Court's waiver analysis was problematic because it hinged on defendant's failure to respond when, after reading its curative instructions to the jury, the Court asked, "Sidebar or no?"  *See* Mem. Op. & Order, Dkt. 1028 at 41.  In the Court's view, once the curative instructions were read to the jury, "the subject matter of the improper rebuttal and the Court's attempt to remedy it was unmistakably on the table, and Defendants' silence can be interpreted as approval of the Court's instruction."  *Id.* (internal quotation marks and brackets omitted).  But the Court had already settled on the content of the instructions it read beforehand, which included striking the language admonishing the government for its improper rebuttal.  *See* 4/8/19 Trial Tr.

16

9:13–21, 12:25–13:4 (responding to the government's objection to "any phrasing that indicates that the purpose of the instruction is in response to [its] rebuttal" by saying, "That's all out.  I took that all out.").  Although defendants could have restated their position yet again, requiring them to do so under threat of waiver prioritizes form over substance.  The fact remains that the Court declined to include defendants' requested language in the instructions, not because it was unaware that defendants wanted it included, but because the Court disagreed with defendants on whether that language was necessary.  The Court's ruling on waiver therefore presents a substantial issue on appeal as to how many steps defendants needed to take, beyond filing a misconduct motion against the government, to preserve their objections to the government's improper rebuttal argument.

> E.  Dr. Kapoor's appeal will raise a substantial question because the evidence against him on the ordinary mail and wire predicates was very thin.

The Court denied Dr. Kapoor's motion for a new trial based on the weight of the evidence after finding that the "evidence connecting [Dr. Kapoor] to the IRC adequately supports the conclusion that he agreed to and intended the predicate acts of wire and mail fraud."  Mem. Op. & Order, Dkt. No. 1028 at 63.  But the evidence presented against Dr. Kapoor at trial overwhelmingly related to his involvement in the alleged bribery scheme underlying the CSA and HSF predicates.  This is not surprising considering that, with little to offer in the way of documents or emails directly incriminating Dr. Kapoor, the government was left to prove its case against him through the testimony of Michael Babich, Alec Burlakoff, and (to a lesser extent) Matt Napoletano—three former employees who were involved in marketing and sales during their time at Insys.  For example, Napoletano's testimony focused on Dr. Kapoor's role in requesting the ROI analysis that was allegedly used to track the effectiveness of Insys's payments to practitioners.  *See, e.g.*, 2/1/19 Trial Tr. 141:7–143:24.  Likewise, Babich's and Burlakoff's efforts to implicate Dr. Kapoor

focused mainly on his involvement in the bribery scheme.  *See, e.g.*, 2/14/19 Trial Tr. 54:20–57:19

(Babich claiming without documentary support that the details of the alleged bribery scheme were

discussed with Dr. Kapoor on daily conference calls); 3/7/19 Trial Tr. 165:24–166:10 (Burlakoff

claiming without documentary support that he bribed doctors consistent with a conversation he

had with Dr. Kapoor and Babich during his initial interview at Insys).

By comparison, there was far less evidence at trial implicating Dr. Kapoor in insurance

fraud—a fact the Court seemingly glosses over in its analysis of his motion.  The Court's ruling

fails to acknowledge, for instance, that none of the three former IRC employees called to testify at

trial suggested that Dr. Kapoor was directly involved in that part of the alleged conspiracy.  *See,*

*e.g.*, 2/8/19 Trial Tr. 132:3–4 (testimony from Kim Fordham, a former IRC employee, that she

never had any interactions with Dr. Kapoor); 2/28/19 Trial Tr. 103:6–24 (testimony from Elizabeth

Gurrieri, the IRC's former manager, that she had very few interactions with Dr. Kapoor).  Nor

does the Court mention the absence of documents showing that Dr. Kapoor authorized or approved

any of the fraudulent conduct within the IRC.  In fact, the sole document referenced in the Court's

analysis merely shows that Dr. Kapoor was interested in knowing the approval criteria used by

various insurance companies.  *See* Mem. Op. & Order, Dkt. No. 1028 at 62 n.100 (citing testimony

that attributed a spreadsheet listing the approval criteria for various insurers to a request from Dr.

Kapoor).

The only specifics the Court offers about Dr. Kapoor's involvement in IRC-related

misconduct is its claim that "Defendant Kapoor was briefed on and approved of the misleading

strategies . . . , including relying on dysphagia, the history of cancer, and the spiel."  *Id.* at 62.  The

Court identifies testimony given by Michael Babich and Alec Burlakoff in support of this claim,

but its reliance on that testimony raises a substantial question of fact on appeal.    The cited

testimony from Burlakoff establishes only that Dr. Kapoor was on notice that dysphagia and history of cancer would result in insurance approval, not that he was on notice of IRC employees *lying* to insurance companies about those conditions.  *See* 3/5/19 Trial Tr. 229:5–232:5.  Second, the principal claim made in the cited testimony from Babich—that Liz Gurrieri openly discussed the IRC's fraudulent strategies on daily management calls, *see* 2/14/19 Trial Tr. 86:2–14, 92:1–14—was not supported by any other witness and was later undermined by conflicting testimony from Gurrieri herself.  *See* 2/25/19 Trial Tr. 24:1–9 (Gurrieri testifying that the information she provided on the daily calls "ranged from the numbers of approvals in the IRC to reports from the IRC that were requested or needed").  And although this Court was willing to sidestep these issues for fear of "second guess[ing] . . . the conclusions drawn by the jury about witness credibility," Mem. Op. & Order, Dkt. No. 1028 at 63, another court could decide to take a different approach, particularly considering the overall paucity of evidence against Dr. Kapoor on the insurance fraud allegations.

Given that Dr. Kapoor's conviction now rests on the  small amount of evidence connecting him to the alleged insurance fraud scheme, and given the circuitous path that the government traveled to obtain that conviction, the question of whether he is entitled to a new trial based on the weight of evidence raises a substantial question under § 3143(b)(2).

**IV.**     **If decided in his favor, the substantial questions raised in Dr. Kapoor's appeal will likely result in an acquittal or a new trial.**

As described earlier, the other prong of § 3143(b) looks to whether, if decided in his favor, the substantial questions presented by Dr. Kapoor's appeal are "likely to result in reversal or an order for a new trial on all counts on which imprisonment has been imposed."  *Bayko*, 774 F.2d at 522.  That standard is clearly satisfied here because, if determined in his favor, the substantial questions presented by Dr. Kapoor's appeal would result in either a new trial or an acquittal.

19

Because it is uncertain whether Dr. Kapoor's current sentence of imprisonment will stand if he is successful on appeal, the Court should not require that he begin serving that sentence prior to the outcome of that appeal.

## CONCLUSION

For the foregoing reasons, Dr. Kapoor respectfully requests that the Court enter an order staying his sentence of incarceration pending the outcome of his appeal.

Dated: January 28, 2020

Respectfully submitted,

/s/ Kosta Stojilkovic
Beth A. Wilkinson (admitted *pro hac vice*)
bwilkinson@wilkinsonwalsh.com
Kosta S. Stojilkovic (admitted *pro hac vice*)
kstojilkovic@wilkinsonwalsh.com
Andrew W. Croner (admitted *pro hac vice*)
acroner@wilkinsonwalsh.com
Wilkinson Walsh + Eskovitz LLP
2001 M Street NW
Washington, D.C. 20036
Telephone: (202) 847-4000

Brien T. O'Connor (BBO# 546767)
brien.o'connor@ropesgray.com
Aaron M. Katz (BBO# 662457)
aaron.katz@ropesgray.com
Ropes & Gray LLP
Prudential Tower 800 Boylston Street
Boston, MA 02199
Telephone: (617) 951-7000

*Attorneys for Dr. John Kapoor*

## <u>LOCAL RULE 7.1 CERTIFICATION</u>

Pursuant to Local Rule 7.1(a)(2), I hereby certify that counsel for the moving defendants and the government have conferred and that counsel for the government has not indicated their assent to this motion.

/s/ Kosta S. Stojilkovic
Kosta S. Stojilkovic
Counsel for Dr. John Kapoor

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document will be served on counsel for all parties of record through the ECF system.

/s/ Kosta S. Stojilkovic
Kosta S. Stojilkovic
Counsel for Dr. John Kapoor