**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | No.  16-CR-10343-ADB |
| v. | ) | |
| | ) | |
| JOHN N. KAPOOR, | ) | *Redacted Version of Sealed Filing* |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**GOVERNMENT'S OPPOSITION TO**
**DEFENDANT'S EMERGENCY MOTION TO MODIFY SENTENCE**

Relying on the opinions of two physicians who have never examined him and misrepresenting the nature and extent of the medical care he has received at the Bureau of Prisons (BOP), Defendant John Kapoor asks this Court to release him a mere 23 months into his 66-month sentence based on purported "extraordinary and compelling circumstances."  While the health of Kapoor—and every inmate—is an important concern for the Government, his current condition is far from compelling and extraordinary.

Careful review of Kapoor's complete BOP medical file—a file ***not*** provided to the non-treating cardiologists on whose opinions his motion relies—demonstrates that medical staff at FPC-Duluth is more than capable of providing appropriate care for the common medical conditions Kapoor describes in his motion.  In fact, courts throughout the country have repeatedly held that the conditions Kapoor describes in his request for early release do not establish extraordinary and compelling circumstances necessary to justify early release under Section 3582.  *See, e.g.*, *United States v. Taffe*, 2020 WL 6700445, at *3 (S.D. Fla. 2020) (denying motion for reduced sentence for 75-year-old defendant who had skin cancer, alleged

"three cardiovascular emergencies," and was recommended for a "pacemaker and defibrillator");
*United States v. Frost*, No. 2020 WL 3869294, at *2 (D.S.D. 2020) (denying motion for
compassionate release where defendant had "multiple heart attacks" and suffered from "many
severe medical conditions," including "type 2 diabetes mellitus, hyperlipidemia, sleep apnea,
polyneuropathy, hypertension, cardiomyopathy, acute upper respiratory infection, COPD,
asthma, follicular cyst of the skin and subcutaneous tissue, . . . severe coronary artery disease,
severe systolic heart failure, severe obstructive sleep apnea, and severe COPD with severe
restrictive lung disease").

Kapoor's medical files also show that, where appropriate, BOP has facilitated
consultations with qualified healthcare providers outside the facility (e.g., cardiologists, vascular
surgeons, and audiologist) to ensure that any medical concerns Kapoor raises are addressed.
Within BOP, the records make clear that when Kapoor makes a request for medical care or
medical supplies, he is heard—a fact demonstrated by the CPAP machine Kapoor was provided
four months before he filed his motion. Kapoor attempts to pad his medical concerns by layering
onto them potential complications caused by the COVID-19 pandemic. But those arguments are
blunted by his vaccination status ▮▮▮▮▮▮ and the lack of a single COVID infection at FPC-
Duluth, a BOP facility currently operating at the lowest COVID operational level (Level 1).

Perhaps recognizing that his medical condition and COVID concerns are insufficient to
support an early release, Kapoor also points to the hardship that incarceration has caused him,
claiming his "sufferings are beyond belief."  Motion, Ex. 5 at 4.  He maintains that his
relationship with his children has suffered, and that his ability to provide support to his brother
has been curtailed since he reported to prison in April 2021.  *Id.*  While the Government
appreciates these concerns and Kapoor's apparent desire to provide support to family members

in need, these circumstances do not justify an early release. As this Court has acknowledged, "[i]t is the sad truth that incarceration is often harder on family members than on the defendant [himself]." D.E. 1446. Kapoor's supporting papers also appear to suggest that an early release is justified because he has "suffered greatly emotionally, financially, and physically," is "close to bankruptcy,"[1] and has used the last year to "reflect on what happened." Motion at Ex. 5 at 4 (Kapoor letter to Court). However, the closest Kapoor comes to expressing true remorse for his actions is a passive-voice "apology": "I am sincerely sorry and repentful *for some of the things that resulted*." *Id.* at 5 (emphasis added). This, like the rest of Kapoor's motion, is unpersuasive.

For these reasons, which are described in more detail below, the Court should deny Kapoor's request to serve the remainder of his sentence in home confinement.

## BACKGROUND

### *Kapoor's Criminal Conduct at Insys*

Kapoor was the founder of and sole investor in Insys. He used his position of at the top of the company to create, implement, and encourage the various criminal strategies Insys employed to distribute Subsys—a synthetic opioid 70-100 times more powerful than fentanyl—to doctors willing to prescribe it to anyone. As the owner of over 60% of Insys and someone who had invested tens of millions of dollars in the company, Kapoor had a significant financial incentive to ensure that Subsys was a success.

According to the testimony at trial, Kapoor exercised exacting control over all aspects of decision-making at the company. That tight control and demanding style led Kapoor to fire his

---

[1] Kapoor's assertion that he is "close to bankruptcy" is belied by financial information provided to the U.S. Attorney's Office's Asset Recovery Unit. If the Court requires more information about Kapoor's financial condition, including his recent refusal to work productively with the Office to satisfy his restitution debt, which is not yet ripe for judicial intervention, the government can provide further information in a sealed filing.

3

Vice President of Sales in mid-2012 after releasing Subsys in what Kapoor described as "the worst fucking launch in pharmaceutical history." 02/12 Tr. 157: 9-11. Unsatisfied with the success of Subsys, Kapoor hired co-defendant Alec Burlacoff and ultimately promoted him to Vice President of Sales in September 2012. Thereafter, Kapoor approved the hiring of many of his co-defendants: Michael Babich, Chief Executive Officer; Rich Simon, National Sales Director; Joe Rowan, District Manager; and Sunrise Lee, Regional Manager.

Kapoor approved the funding of the Insys Speaker Program which was designed to pay doctors to write more (and higher-dose) prescriptions of Subsys. Around the time he approved the program, Kapoor warned his team that if he was funding such an initiative, he was "not throwing money out to *not* get paid in return." He later insisted that the profits generated by the illegal speaker program should be double the amount of money spent paying the doctors. 03/01/ Tr. 168:9-13. To that end, Kapoor directed those underneath him to calculate and present the return on investment for each speaker-doctor to see if they had a "positive ROI." 02/01 Tr. at 141:22-23. Witnesses at trial confirmed that Kapoor went through every single line of those calculations. 2/13 Tr. 35:13-20; 03/05 Tr. 185:7-17. This demanding managerial control Kapoor exercised at Insys could be seen in many of the ways he handled his work at the company, including a requirement that senior employees (and members of the conspiracy) attend and his daily morning meeting where he often displayed anger, yelled at attendees, and pressured those under him to get better results. 02/13 Tr. 106:19-23; 03/05 Tr. 120:17-19, 122:9-17. Through those daily meetings, Kapoor knew which doctors were writing scripts for Subsys, and which were writing for competitor drugs.  03/05 Tr. 122:22-24.

The strategies Kapoor approved and enforced created a risk of substantial injury for patients. Kapoor was well aware of the dangers associated with Subsys, yet he approved extra

financial incentives for sales reps in order to ensure that doctors wrote the highest dosages of the drug.  02/22 Tr. 47:17-48:1 & Ex. 1501; Ex. 455 and Ex. 2070.  He also approved bribing doctors that he knew abusively prescribed opioids, including Dr. Paul Madison, who ran a pill mill, 02/22 Tr. 49:3-13, Ex. 003, and Dr. Mahmood Ahmad who was not able to dispense schedule II narcotics from his pharmacy and was suspected of being under investigation by the DEA, 02/22 Tr. 56:9-19 & Ex. 004.

### *Kapoor's Conviction, Sentencing and Report Date*

Following a thirteen-week trial in 2019, Kapoor and his co-conspirators were convicted of one count of Racketeering Conspiracy.  Kapoor was sentenced on January 23, 2020.  Prior to sentencing, Probation calculated Kapoor's total offense level to be 32 and his guideline imprisonment range to be 121 to 151 months.  In his sentencing memo, Kapoor asked the Court to issue a downward variance due to his "advanced age" and, in doing so, discussed some of the same concerns he has raised in his now-pending motion for a reduced sentence.  D.E. 1070 at 47.  The Court sentenced Kapoor to 66 months in prison—representing a 45% departure from low end of the applicable guidelines range as calculated by Probation.   Kapoor later filed or joined multiple motions to continue his surrender date in light of the COVID-19 pandemic.  In April 2021, fifteen months after sentencing, he reported to the Federal Prison Camp in Duluth, Minnesota.

## **LEGAL STANDARD**

Section 3582(c) begins with the principle that "a court may not modify a term of imprisonment once it has been imposed."  18 U.S.C. § 3582(c); *see Dillon v. United States*, 560 U.S. 817, 819, 824–25 (2010).  "[T]here is no 'inherent authority' for a district court to modify a sentence as it pleases; indeed a district court's discretion to modify a sentence is an exception to

[§ 3582's] general rule" barring modification.  *United States v. Cunningham*, 554 F.3d 703, 708 (7th Cir. 2009); *cf. United States v. Goodwyn*, 596 F.3d 233, 235 (4th Cir. 2010) (noting that 18 U.S.C. § 3582(b) "states that a district court 'may not modify a term of imprisonment once it has been imposed' unless the Bureau of Prisons moves for a reduction, the Sentencing Commission amends the applicable Guidelines range, or another statute or Rule 35 *expressly* permits the court to do so").

Section 3582(c)(1)(A) represents an exception to this general rule.  The statute originally permitted judicial relief only upon a motion by the BOP Director.  The provision was amended by the First Step Act, effective December 21, 2018.  Under the statute as amended, a court may now consider a defendant's motion for compassionate release following the exhaustion of his administrative remedies with the BOP or 30 days after submitting a request to the appropriate warden, whichever is sooner.  18 U.S.C. § 3582(c)(1)(A).  The First Step Act did not amend the eligibility requirements for compassionate release, which are set forth in 18 U.S.C. § 3582(c)(1)(A) and Section 1B1.13 of the United States Sentencing Guidelines.

"Before granting a sentence reduction in response to a prisoner-initiated motion for compassionate release alleging extraordinary and compelling reasons, a district court must make three findings."  *United States v. Texeira-Nieves*, 23 F.4th 48, 52 (1st Cir. 2022).  First, the defendant must present an "extraordinary and compelling" reason warranting a sentence reduction under 18 U.S.C. § 3582(c)(1)(A)(i).  *Id.*  Second, the sentence reduction should be "consistent with applicable policy statements issued by the Sentencing Commission, *id.*, though the court is not "constrained" by this policy statement when reviewing prisoner-initiated motions, *United States v. Ruvalcaba*, 26 F.4th 14, 21 (1st Cir. 2022).  And third, the district court "must consider any applicable section 3553(a) factors" to "determine whether, in its discretion,

the reduction . . . is warranted in whole or in part under the particular circumstances of the case."
*Texeira-Nieves*, 23 F.4th at 52.  Finally, while Section 3582(c)(1)(A) provides that a defendant
may request a sentence reduction only "after [he] has fully exhausted all administrative rights,"
the First Circuit recently held that this "administrative exhaustion requirement" is not
"jurisdictional" and does not bar a district court from hearing the motion.  *See id.* at 52–53.

In determining whether the reason offered by the defendant for compassionate release is
"extraordinary and compelling," this Court uses the Sentencing Commission policy statement "as
a guide."  *E.g.*, *United States v. Strickland*, 2022 WL 17630258, at *2 (D. Mass. 2022); *see also*
Motion at 10–11.  These Sentencing Commission Guidelines offer "factors for consideration" for
determining whether defendant presents "extraordinary and compelling reasons to warrant early
release onto home confinement."  *Strickland*, 2022 WL 17630258, at *2.  Two of these factors,
falling under the heading "Medical Condition of the Defendant" in Comment 1(A) under Section
1B1.13, are relevant to Kapoor.  First, the court may ask whether the defendant "is suffering
from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory)."
*Strickland*, 2022 WL 17630258, at *2; U.S.S.G. § 1B1.13, cmt. n.1(A).  Alternatively, the court
may consider whether the defendant is "suffering from a serious physical or medical condition"
or "experiencing deteriorating physical . . . health because of the aging process" that both
"substantially diminishes the ability of the defendant to provide self-care within the environment
of a correctional facility and from which he . . . is not expected to recover."  *Strickland*, 2022
WL 17630258, at *2; U.S.S.G. § 1B1.13, cmt. n.1(A).  Even in cases of elderly inmates, "not
every complex of health concerns is sufficient to warrant compassionate release."  *United States
v. Saccoccia*, 2021 WL 3660814, at *5 (1st Cir. 2021).  This "remains true" during the COVID-
19 pandemic.  *Id.*

## **ARGUMENT**

### A.   *Kapoor's cardiac conditions do not present an "extraordinary and compelling reason" for early release.*

Relying primarily on the opinions of two cardiologists who have never personally examined Kapoor and were not given access to his extensive BOP medical record, Kapoor contends that his cardiac condition justifies his release thirteen months early.  *See* Motion at 11–13.  But a careful review of Kapoor's medical file shows that he has been closely monitored and given appropriate medical care while at FPC-Duluth, including at least three consultations at a reputable area hospital, St. Lukes in Duluth, MN, in 2022.  *See* Ex. 1 at USAO_000175–183; 000194; 000205.[2]  Even assuming that Kapoor had an acute cardiac event in December 2022, Kapoor would still be unable to meet the stringent standard required to justify a reduction in his sentence.

Kapoor's motion lists several health conditions he had when he began his prison sentence in April 2021, including ███████████████████████████ and "cardiac symptoms."  Motion at 4.  Kapoor now reports that he has bradycardia, Peripheral Artery Diseas (PAD), and sleep apnea.  *Id.* at 6–7.  In addition, two non-treating cardiologists, who have never met Kapoor and have reviewed only *one sliver* of Kapoor's medical records, claim that he may have experienced a heart attack.  *See* Motion Exs. 2–3 (letters of Dr. J. Michael Gaziano and Dr. Roderick Woods).

Kapoor's treatable conditions do not justify early release—even if Kapoor did suffer a heart attack while incarcerated.  Kapoor's medical conditions pale in comparison to those courts

---

[2] Kapoor's Motion included his BOP medical records only through February 2022.  The Government has since received more comprehensive records from BOP spanning May 2022 to February 2023, which is attached as Exhibit 1.

have held did ***not*** rise to the level of "extraordinary and compelling."  For example, in *United States v. Rodriguez-Orejuela*, 457 F. Supp. 3d 1275 (S.D. Fla. 2020),[3] at the height of the COVID-19 pandemic, the 81-year-old inmate argued that he was an "old, beaten, and very sick man" and that his medical conditions were "extraordinary and compelling reasons" to justify compassionate release.  *Id.* at 1279, 1281–82.  He had suffered two heart attacks and received a pacemaker after the second.  *Id.* at 1282.  And in addition to these two heart attacks, the inmate allegedly suffered from metastatic colon cancer, metastatic prostate cancer, numerous gastrointestinal and esophageal disorders, coronary artery disease, skin cancer, among and other diseases.  *Id.*  Around the time that he filed the motion, the inmate in *Rodriquez-Orejuela* had also been hospitalized and had separately seen a cardiologist for high blood pressure and cardiac arrhythmia.  *Id.*  In support of his motion for release, the inmate submitted letters from his cellmates detailing his frequent visits to the Federal Medical Center (up to four times per month), his use of a "walker," his inability to "bend down to pick stuff up," and his need to "use the bathroom" up to ten times per night.  *Id.*  Like Kapoor, the inmate in *Rodriguez-Orejuela* argued that his medical conditions were "serious" and "substantially diminishe[d] his ability to provide self-care."  *Id.*  The court disagreed, concluding that the inmate was receiving adequate treatment for all of his medical conditions.  *Id.* at 1283.  Because his condition was "stable," "any risk of death [was] not immediate or foreseeable and . . . he [was] still able to provide meaningful self-care in prison," given that he could "still move without assistance from others, albeit with difficulty" and "provide sufficient self-care in his daily activities."  *Id.* at 1283–84.  The court

---

[3] While the nature of defendant's crimes was far more serious than Kapoor's and the court held that his motion for compassionate release failed under the Section 3553(a) factors, *id.* at 1284–86, the court *separately* held that the defendant "fail[ed] to carry his burden for proving he merits compassionate release" based on his extensive medical conditions, *id.* at 1281–84.

concluded that his "medical condition, while far from perfect, [was] also far from extraordinary and compelling." *Id.* at 1283.

Other courts have reached the same conclusion, holding that medical conditions like those described in Kapoor's motion do not rise to the level of "extraordinary and compelling." *See, e.g.*, *United States v. Taffe*, 2020 WL 6700445, at *3 (S.D. Fla. 2020) (holding that seventy-five-year-old inmate's medical conditions did not "rise to the level of severity that would warrant" such compassionate release, where inmate with skin cancer alleged that he had experienced "three cardiovascular emergencies" and that his "cardiologist recommended a pacemaker and defibrillator"); *United States v. Gearhart*, 2022 WL 3273893, at *1–3 (N.D. Ind. 2022) (denying compassionate release and finding that seventy-two-year-old defendant's "protestations about the urgency of his cardiac condition are belied" by the fact that he was "discharged in stable and ambulatory condition" in "two instances when he was taken to an ER for shortness of breath and slow heart rate"); *United States v. Felts*, 2020 WL 7181087, at *2–3 (S.D. Cal. 2020) (denying compassionate release and holding that defendant "has not shown that his ability to provide self-care is substantially diminished or that [BOP] is unable to monitor and adequately treat his medical conditions," where seventy-five-year-old defendant suffered from "heart problems requiring a pacemaker[], colon cancer, chronic hepatitis B, deep vein thrombosis, and cirrhosis of the liver," because he was "receiving the necessary medical care to treat his various ailments"); *United States v. Draper Dewayne Foster*, 2021 WL 2949875, at *2–3 (D.S.C. 2021) (denying compassionate release where defendant "suffered a heart attack shortly after commencing his sentence within BOP" in addition to having "high blood pressure, diabetes, high cholesterol, [and] cardiovascular issues"); *United States v. Nelson*, 2020 WL 3621244, at *1–2 (D. Nev. 2020) (denying compassionate release where defendant had a recent heart attack

and history of seizures); *United States v. Bolze*, 460 F. Supp. 3d 697, 709–710 (denying compassionate release for seventy-one-year-old defendant who had a history of "two heart attacks resulting in congestive heart failure disease and . . . hyperlipidemia, hypertension, [and] cardiomyopathy"); *United States v. Goldstein*, 2023 WL 243229, at *2 (S.D.N.Y. 2023) (holding that defendant's "severe and symptomatic bradycardia" did "not constitute extraordinary and compelling reasons for release"). *See also United States v. Carlton*, 2023 WL 1070219, at *4 (S.D.N.Y. 2023) ("While a heart attack is an extremely frightening experience for any human being, it is a common scenario.").

Kapoor's medical conditions are neither "terminal" nor of a type that substantially diminish his ability to provide self-care.[4]  U.S.S.G. § 1B1.13, cmt. n.1(A).  BOP records demonstrate that Kapoor has been in good spirits, "often seen walking the hallways and visiting with others and challenging others to games of chess."  Ex. 1 at USAO_000149.  Kapoor's chronic conditions are manageable and common for someone his age.  About seventy percent of American adults sixty-five and older have high blood pressure.  Linda Searing, *Majority of Older People with Hypertension Don't Check Blood Pressure*, Washington Post (Oct. 9, 2022, 6:02

---

[4] Kapoor is unlike defendants whose medical conditions this Court has found to be "extraordinary and compelling reasons" for compassionate release.  In *United States v. Dimasi*, 220 F. Supp. 3d 173 (D. Mass. 2016), defendant developed throat and prostate cancers while incarcerated, and the treatment "caused a narrowing of his esophagus," which required continuous additional procedures and led to "great difficulty" fulfilling basic daily functions like eating and breathing.  *See id.* at 192–93.  The condition was so bad that the Medical Director of the BOP "found that [defendant's] condition is sufficiently severe that it is 'medically indicated that someone be present to assist [him] with choking prevention while eating or drinking,'" *id.* at 193, prohibiting his ability to provide self-care.  Similarly, in *United States v. Grajeda*, 2022 WL 4237278 (D. Mass. 2022), defendant was suffering from "late-stage cancer that appear[ed] to be spreading throughout her body despite interventions including surgery and immunotherapy." *Id.* at *3.  Because defendant's condition, a "metastatic cancer," was "expressly cited as an example of a 'terminal illness' that would qualify as 'extraordinary and compelling' in the Applications Notes to the relevant section of the Sentencing Guidelines," this Court granted compassionate release.  *Id.*

AM), https://www.washingtonpost.com/wellness/2022/10/09/blood-pressure-monitoring-numbers-adults/.  According to the CDC, over twenty-five percent of men eighty and older have peripheral arterial disease.  *Peripheral Arterial Disease (PAD)*, Centers for Disease Control and Prevention (Dec. 19, 2022), https://www.cdc.gov/heartdisease/PAD.htm.  Kapoor's conditions are closely monitored and managed by his doctors, and he takes numerous prescription medications to address them.  *See, e.g.*, Ex. 1 at USAO_000009, 000078–81, 000140, 000176.

Likewise, his cardiac conditions are stable and manageable.  On May 12, 2022, Kapoor was seen by interventional cardiologist Dr. Takeshi Onizuka at St. Luke's Cardiology Associates.  Ex. 1 at USAO_000194–197.  Kapoor received an ▮▮▮, a "stress" test, and Holter monitoring.[5]  *See id.*  The ▮▮▮ revealed ▮▮▮▮▮ and both the stress test and Holter were "unremarkable," with "no significant arrhythmia issues [d]etected."  *See id.* at 000194–197, 000244.  Dr. Onizuka recommended only to "[c]ontinue current medications."  *Id.* at 000196.

On November 29, 2022, at Kapoor's request, Kapoor saw vascular surgeon Dr. Mark Eginton at St. Luke's Vascular Surgery Associates.  *See id.* at 000066, 000205–208, 000227.  Dr. Eginton observed that Kapoor was "healthy appearing and well nourished."  *Id.* at 000207.  He noted that Kapoor's heart had a ▮▮▮▮▮▮▮  *Id.*  Dr. Eginton conducted a CT angiogram and reviewed Kapoor's prior cardiology records.  *Id.*  He observed that Kapoor's symptoms (leg pain) were "much more consistent with arthritis" than a vascular issue.  *Id.*  He concluded that Kapoor had ▮▮▮▮ and that his ▮▮▮ conditions were being "fairly

---

[5] A Holter monitor is a "small, wearable device that records the heart's rhythm" and detects "irregular heartbeats." It is more precise and sensitive than an EKG.  *Holter Monitor*, Mayo Clinic (Mar. 25, 2022), https://www.mayoclinic.org/tests-procedures/holter-monitor/about/pac-20385039.

optimally managed." *Id.* at 000207, 000052.  He recommended only "periodic" follow-up. *Id.* at 000207.

Omitted from Kapoor's motion and accompanying exhibits was any reference to his November 2022 visit to the vascular surgeon.  Neither of the two non-treating cardiologists who opined on Kapoor's December 2022 hospital visit knew about this earlier, relevant November 2022 visit either—they were apparently only provided with a small excerpt of Kapoor's medical records.  Motion Exs. 2–3 (stating Drs. Gaziano and Woods reviewed ***only*** the documents from the December 27, 2022 hospital visit).  On December 27, 2022, Kapoor visited the emergency department at St. Luke's Hospital, where he received ████████████.  Motion Ex. 1; Ex. 1 at USAO_000175–183.  The discharge notes from that visit indicate that his evaluation was "reassuring, with no evidence of injury to [his] heart or muscles" and that ██████ "[did] not suggest any other serious problems" besides the "slow rhythm."  Ex. 1 at USAO_000182.  Finally, a subsequent ██████ conducted by BOP on February 8, 2023, does not support the conclusion that Kapoor ████████████████.  That ████████████ test did not reveal signs of a previous myocardial infarct (a heart attack).  *See* Ex. 1 at USAO_000248.  (Indeed, Kapoor's own expert (Dr. Woods) agreed that a "recent myocardial infarction [was] unlikely."  Motion Ex. 3 at 1.  Consistent with BOP's practice of closely monitoring him and consistent with the recommendations of Kapoor's experts, he will undergo yet another ██████ ██████ on March 3, 2023, and will visit a cardiology specialist the week after.  *See* Ex. 1 at USAO_000001.   Kapoor's health condition has been, and will continue to be, well-managed.

The two cases cited by Kapoor to support the conclusion that a heart attack presents an "extraordinary and compelling circumstance justifying the relief requested" are distinguishable.  Motion at 12.  First, *United States v. Calhoun*, 539 F. Supp. 3d 613 (S.D. Miss. 2021), relied on a

policy statement of the U.S. Sentencing Guidelines that does **not** apply to Kapoor, so its holding

has no bearing on whether a heart attack "substantially diminishes the ability of the defendant to

***provide self-care*** within the environment of a correctional facility."[6]  U.S.S.G. § 1B1.13, cmt.

n.1(A) (emphasis added).  By contrast, the cases the Government cites (*see supra*) show that a

heart attack, bradycardia, and other cardiac conditions—along with equally serious and even

graver ailments—are not sufficient to establish that an individual is unable "to provide self-care

within the environment of a correctional facility."  Motion at 11; U.S.S.G. § 1B1.13, cmt. n.1(A).

Second, the defendant in *United States v. Patton*, 2023 WL 144115 (W.D. Pa. 2023), suffered

much more than "a serious heart attack," as described in Kapoor's motion, Motion at 12.  Unlike

Kapoor, the defendant in *Patton* had a "hole in [his] heart, which required complex surgery and

---

[6]        In *Calhoun*, a 65 year-old inmate who "experienced a heart attack while incarcerated"
was granted compassionate release.  *Calhoun*, 539 F. Supp. 3d at 616–17.  But the *Calhoun* court
relied on a policy statement of the U.S. Sentencing Guidelines that does not apply to Kapoor.
*See id.* at 616.  The court referred **not** to the "Medical Condition of the Defendant" found in
Comment 1(A), but to Comment 1(B)'s "Age of the Defendant."  *Id.*  That comment applies
when a "defendant i) is at least 65 years old; ii) is experiencing a serious deterioration in physical
or mental health because of the aging process; and iii) **has served at least 10 years or 75 percent
of his or her term of imprisonment**, whichever is less."  *Id.* (emphasis added); *see also* U.S.S.G.
§ 1B1.13, cmt. n.1(B).
        Kapoor does not meet the third prong of this policy statement, because he has not served
at least 10 years of imprisonment, nor has he served 75% percent of his term.  He has served
only 23 months, or approximately 35% of his original term of imprisonment (based on a
calculation of twenty-three months served since April 2021 and a total original sentence of sixty-
six months).  This distinction is relevant because, unlike Comment 1(A), Comment 1(B) ***does
not*** require that the medical condition "substantially diminish[] the ability of the defendant to
provide self-care within the environment of a correctional facility" and that the deterioration is
something "from which he . . . is not expected to recover."  U.S.S.G. § 1B1.13, cmt. n.1(A).
Thus, while *Calhoun* supports the proposition that a heart attack—in combination with
defendant's various other cardiac conditions and ailments including gout, type 2 diabetes, and
stage 2 hypertensive retinopathy—may be a "serious deterioration in physical . . . health," it does
nothing to address whether such conditions impede a defendant's ability to provide self-care,
which is the relevant inquiry here.

significant follow-up.  *Patton*, 2023 WL 144115, at *2.[7]  By contrast, the doctors at St. Luke's

Hospital, who have personally treated Kapoor, listed his condition as "stable" and prescribed no

specific follow-up measures.  *See* Ex. 1 at USAO_000182.  Kapoor's cardiac condition simply

does not rise to the level of seriousness and exigency presented in *Patton*, which the court

characterized as "unusual."  *Patton*, 2023 WL 144115, at *2.

**B.    BOP has closely monitored Kapoor's conditions throughout his incarceration, has provided consistent and adequate medical care, and can address Kapoor's common health ailments going forward.**

Because of his medical conditions, Kapoor has been regularly evaluated and closely

monitored by BOP medical staff and has undergone routine medical testing.  Kapoor gets regular

blood work.  *See, e.g.*, Ex. 1 at USAO_000157–158.  His requests for additional ▮ are

respected and acted upon.  *See, e.g.*, Ex. 1 at USAO_000024, 000073, 000236.  In fact, Kapoor

has received at least eight ▮ since reporting to FPC-Duluth in May 2021:  at least two in

May 2022, one in August 2022, three on December 27, 2022 (one at BOP and two at St. Luke's),

and one on February 8, 2023. *See* Ex. 1 at USAO_000236, 000248, 000002.  Additionally, in

May 2022, Kapoor underwent a ▮, and in November

2022, Kapoor received a ▮.  Ex. 1 at USAO_000194-196, 205-207.

Kapoor has been treated by sophisticated doctors in high-quality facilities.  As described

earlier, on November 29, 2022, Kapoor was evaluated by Dr. Eginton, a vascular surgeon at St.

Luke's.[8]  When he complained of arm pain on December 27, 2022, BOP took him to St. Luke's

---

[7] Such a hole can "cause a host of complications, including heart failure, stroke, early death, and high blood pressure in the lung arteries."  *Id.*  While incarcerated, Patton underwent "surgery to close this hole" and required significant follow-up attention during his ongoing recovery, whose success was precarious.  *See id.*

[8] For background on the qualifications of vascular surgeon Dr. Eginton, see *Mark Eginton, MD, FACS*, St. Luke's, https://www.slhduluth.com/physician-directory/mark-eginton-md-facs/.

Hospital without delay.  Ex. 1 at USAO_000175–183.  While there, he was provided with care at a state-of-the-art Emergency Department, which opened in August 2020.  *St. Luke's New Emergency Department & Cardiac Cath Labs Now Open*, St. Luke's (Aug. 25, 2020), https://www.slhduluth.com/news/2020/august/st-luke-s-new-emergency-department-cardiac-cath-/.  The Emergency Department at St. Luke's boasts "the region's most technologically advanced Cardiac Cath Labs." *Id.*  One of St. Luke's "featured services" is cardiology, where doctors provide the "latest technology treatments" including electrophysiology, which deals with the heart's rhythm.  *Cardiology*, St. Luke's, https://www.slhduluth.com/services/cardiology/.  At St. Luke's, Kapoor received additional ▇▇▇ which were reviewed by an interventional cardiologist, Dr. Takeshi Onizuka.[9]  Dr. Onizuka is the same cardiologist who evaluated Kapoor in May 2022.  As this visit shows, BOP has demonstrated both a willingness and an ability to transport Kapoor to receive specialized care when the need arises.[10]

The opinions of the two cardiologists Kapoor retained to write letters on his behalf do not suggest anything to the contrary.  They had no visibility into the care St. Luke's and FPC-Duluth had provided Kapoor throughout 2022 and thus no basis to evaluate that level of care.  Both doctors recommended that Kapoor receive a "cardiac stress test," undergo further evaluation by a cardiologist, and potentially receive a pacemaker.  *See* Motion Exs. 2–3.  Consistent with these recommendations, BOP has ***already*** scheduled a stress test for Kapoor to be administered on March 3, 2023, and has scheduled an additional appointment with a cardiologist a week thereafter.  Ex. 1 at USAO_000001.  And if a pacemaker is found to be necessary, St. Luke's

---

[9] For background on the qualifications of interventional cardiologist Dr. Onizuka, see *Takeshi Onizuka, MD*, St. Luke's, https://www.slhduluth.com/physician-directory/takeshi-onizuka-md/.

[10] Kapoor was also taken to St. Luke's in April 2022 for a hearing evaluation.  Ex. 1 at USAO_000200.

Hospital, where Kapoor has been seen multiple times, clearly has the facilities and the capacity to perform this common, 60-minute procedure. *Electrophysiology*, St. Luke's, https://www.slhduluth.com/services/electrophysiology/ (advertising electrophysiology services including the "implantation of pacemakers").

As the upcoming stress test and cardiology appointments make clear, Kapoor's argument that the BOP has failed to provide and is incapable of providing him with appropriate care is inaccurate. *United States v. Patton*, one of the cases on which Kapoor's motion relies, demonstrates the high bar necessary to show a failure to provide care—a bar Kapoor's situation does not meet. There, doctors had ordered specific post-surgery follow-ups that the defendant never received. *See Patton*, 2023 WL 144115, at *2. After his complex surgery, cardiologists recommended that the defendant have "routine visits" to receive specialized "therapy." *Id.* But the record showed that the defendant never "had those visits." *Id.* In fact, he "ha[d] not been seen by a physician" for at least seven months. *Id.* It was not surprising, therefore, that the court had "serious concerns that [the defendant] ha[d] not received appropriate post-op treatment." *Id.* By contrast, nothing in the record here suggests that BOP has failed to provide Kapoor with any follow-up care that was recommended by any doctor.

Instead, Kapoor is like the defendant in *United States v. Gearhart*, who argued that release was justified because "the prison [was] providing him inadequate medical care for serious medical conditions." *Gearhart*, 2022 WL 3273893, at *1. Like Kapoor, the defendant in *Gearhart* was elderly (seventy-two years old), had "poor cardiac health," and "maintain[ed] that he likely needs a pacemaker in view of recent episodes of bradycardia." *Id.* The defendant had likewise visited "internal medical facilities" at his prison and had twice been taken to a "local emergency room." *Id.* at *2.

Rejecting the motion for early release, the *Gearhart* court observed that "[d]elays in health care are routine" and emphasized that the defendant—like Kapoor—had "been taken to a hospital emergency department, from which he has been discharged each time after doctors insured that his condition was not emergent." *Gearhart*, 2022 WL 3273893, at *2. It held that the "kind of medical attention [Gearhart received] does not readily support a conclusion that his health [was] being neglected." *Id.*; *see also United States v. Green*, 2021 WL 1923281, at *1–2 (S.D. Cal. 2021), *aff'd*, 2021 WL 5818502 (9th Cir.) (denying compassionate release where seventy-three-year-old inmate, who suffered from "congestive heart failure, kidney failure, and a history of traumatic brain injuries," argued that "BOP has failed to provide needed outside consults and care by specialists – especially cardiac care and defibrillator / pacemaker monitoring" because these allegations were "conclusory" and inmate had not "produced evidence that BOP is unable to properly treat him or adequately safeguard his health and safety during the remainder of his sentence"); *United States v. Cooke*, 2022 WL 2104283, at *1–2 (D. Mass. 2022) (denying compassionate release where defendant had a "series of underlying health issues, mostly related to heart disease" and "there [was] nothing in the record to suggest that his medical needs are not, or cannot, be well managed within" his correctional facility).

Kapoor is more like *Gearhart* than *Patton*. Kapoor has failed to show that BOP is unable to care for him or that BOP has neglected his health. If anything, BOP has been attentive and proactive and has provided Kapoor with adequate and specialized care.

## C. Kapoor's sleep apnea does not present an "extraordinary and compelling reason" for early release.

Kapoor's sleep apnea is not an "extraordinary and compelling reason" to grant compassionate release. Kapoor repeatedly complains in his motion that his CPAP machine was recalled, but he neglects to inform the Court that he has had a prison-issued CPAP machine since

October 2022—four months before he filed his motion.  Ex. 1 at USAO_000056, 000117, 000132, 000056 (noting in October 2022 that Kapoor "now has his c-pap machine and been using it accordingly").  Kapoor makes a separate argument concerning the use of his CPAP machine, maintaining that it would be "unsafe" to use it without distilled water.  BOP officials FPC-Duluth have confirmed that distilled water to operate the CPAP machine will be provided.

### D.   Kapoor's risk of contracting COVID-19 does not present an "extraordinary and compelling reason" for early release.

Kapoor's argument that his medical conditions place him at a higher risk of complications from COVID-19 and thus require compassionate release should fail.  First, the epidemiological conditions at FPC Duluth do not appear to be risky.  FPC Duluth is currently classified as "Level 1," *FPC Duluth*, Federal Bureau of Prisons,[11] the lowest of three operational levels under which BOP facilities have been classified during the pandemic.[12]   Furthermore, according to BOP statistics, there are currently zero inmates and zero staff members positive for COVID-19 at Kapoor's facility.  *BOP COVID-19 Statistics*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/covid19_statistics.html (last visited Feb. 17, 2023).

Second, vaccination against COVID-19 "significantly reduce[s]" both "the likelihood of contracting COVID-19 and the associated risks."  *United States v. Lemons*, 15 F.4th 747, 751 (6th Cir. 2021) (holding that, "even recognizing the purported seriousness of [inmate's] [medical] condition" and corresponding heightened risk of COVID-19 complications, his vaccination "substantially undermine[d]" his "extraordinary and compelling" argument).  Kapoor has received ███████████████████████████████████████████████████, the

---

[11] *See* https://www.bop.gov/locations/institutions/dth/ (last visited Feb. 17, 2023),
[12] *See COVID-19 Modified Operations Plan & Matrix*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/covid19_modified_operations_guide.jsp.

most recent one in August 2022.  Ex. 1 at 000240, 00045, 000131.  While the First Circuit has

not spoken directly on this point, several circuits have held that a defendant's vaccination against

COVID-19 militates strongly against finding an "extraordinary and compelling" reason for

compassionate release based on the risks associated with contracting COVID-19.  *See, e.g.*,

*United States v. Broadfield*, 5 F.4th 801, 803 (7th Cir. 2021); *United States v. Granado*, 2022

WL 17974458, at *1 (3d Cir. 2022) (holding that, although 78-year-old defendant suffering from

hypertension, hyperlipidemia, cardiac arrhythmia, and obesity was "at a higher risk of serious

illness from COVID-19," the district court was not wrong to rely on his vaccination against

COVID-19 to conclude that "he did not establish an extraordinary and compelling reason

justifying his release").

## **CONCLUSION**

For the reasons set forth above, the Court should deny Kapoor's Motion to Modify

Sentence.

Respectfully submitted,

Date:   February 17, 2023

RACHAEL S. ROLLINS
UNITED STATES ATTORNEY

By:   /s/ *Patrick M. Callahan*
PATRICK M. CALLAHAN
Assistant U.S. Attorney
One Courthouse Way, Suite 9200
Boston, Massachusetts 02210
(617) 748-3100
Patrick.Callahan@usdoj.gov

**CERTIFICATE OF SERVICE**

I, Patrick M. Callahan, hereby certify that the foregoing was filed through the Electronic Court Filing System and will be sent electronically to registered participants as identified on the Notice of Electronic Filing.

Date:  February 17, 2023                      /s/ *Patrick M. Callahan*
                                              Patrick M. Callahan
                                              Assistant U.S. Attorney